**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**Case No. 3:25-CV-00133**

| | |
|---|---|
| JOE GIBBS RACING, LLC, | |
| Plaintiff, | |
| v. | **COMPLAINT** |
| CHRISTOPHER GABEHART, | |
| Defendant. | |

Plaintiff Joe Gibbs Racing, LLC ("JGR" or the "Company"), by and through counsel, complaining of Defendant Christopher Gabehart ("Defendant"), alleges and states as follows:

## INTRODUCTION

Until November 10, 2025, Defendant served as one of JGR's most senior leaders with respect to all competitive aspects of the business. After his demands for additional authority were rebuffed by JGR's owner, Defendant immediately embarked on a brazen scheme to steal JGR's most sensitive information and use it for the benefit of a direct competitor in NASCAR—Spire Motorsports. In this action, JGR seeks to recover its extensive damages and enjoin Defendant from violating his contractual obligations and wrongfully using JGR's confidential information and trade secrets.

## JURISDICTION, PARTIES, AND VENUE

1.     JGR is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business in Huntersville, North Carolina. JGR is in legal existence and is in good standing with the capacity to sue.

2.     Defendant is a resident of Mooresville, North Carolina.

1

3.     The Court has subject-matter jurisdiction over the federal claim in this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1836(c).

4.     The Court has supplemental jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367(a) because the claims are so related to the federal claim that they constitute part of the same case and controversy.

5.     The Court has personal jurisdiction over Defendant because he is domiciled within the State of North Carolina and within this Judicial District.

6.     Venue is proper in the Western District of North Carolina pursuant to 28 U.S.C. § 1392(b)(1) because Defendant resides within this Judicial District.

## FACTUAL BACKGROUND

### I.     JGR's Confidential Information and Trade Secrets.

7.     JGR is a chartered stock car race team that has multiple drivers and supporting teams that compete in the NASCAR Cup Series and NASCAR O'Reilly Auto Parts Series.

8.     JGR began competing in the NASCAR Cup Series in 1992 and began competing in the NASCAR O'Reilly Auto Parts Series in 1997.  Over its history, JGR has amassed 448 wins, five NASCAR Cup Series Championships, and four NASCAR O'Reilly Auto Parts Series Championships.

9.     NASCAR operates within an exceptionally competitive environment, where on-track results directly impact substantial financial interests, professional reputations, and the livelihoods of teams, drivers, sponsors, and countless industry employees.  NASCAR commands an intensely engaged fan base that closely follows race outcomes and expects those outcomes to be determined by fair competition.

10.     JGR competes directly against other NASCAR teams in both series.

2

11.     JGR's exceptional results are the result of decades of technical and process driven research, refinement, and innovation among other things.   JGR's analyses, processes, and strategies are highly specialized and technically complex.

12.     Like all NASCAR teams, JGR is constantly innovating to improve race performance via technical racecar setup, racecar component specifications, processes to improve driver and supporting team member performance, and processes and strategies to attract and retain the best team members and sponsors to support JGR's product.

13.     Through the efforts and activities described above, JGR has created sensitive, confidential, and proprietary information, including trade secrets and other valuable intellectual property ("Confidential Information and Trade Secrets").   JGR's Confidential Information and Trade Secrets include, without limitation:

a.     Technical information regarding racecar setups, the proprietary technology JGR uses to run simulations to determine the most advantageous racecar setups, and the results of those simulations;

b.     JGR's analytics and the processes and technologies for measuring racecar performance, pit crew performance, and driver performance;

c.     JGR's processes, procedures and analysis for improving racecar performance, pit crew performance, and driver performance;

d.     JGR's processes, procedures, technologies used in analyzing performance of competitors' racecars and drivers;

e.     JGR's processes and procedures for evaluating fuel consumption of JGR's racecars and competitors' racecars used before and during races;

       f.      Base compensation and bonus information for certain JGR employees supporting racecar performance including engineers, crew chiefs, pit crew members, and mechanics; and

       g.      The amount of payment JGR receives from its Company sponsorships.

14.    Each of these categories of JGR's Confidential Information and Trade Secrets is the product of JGR's substantial investment of time, effort, and capital over a period of decades.

15.    A significant portion of the value of JGR's Confidential Information and Trade Secrets is derived from the secrecy and confidentiality of such information. The Confidential Information and Trade Secrets generally are not known outside of the Company and cannot be readily ascertained through independent development.

16.    JGR takes precautions to avoid both the deliberate and inadvertent disclosure or dissemination of its Confidential Information and Trade Secrets. The precautions include, but are not limited to:

       a.      Password protection for all Company devices and systems with access to Confidential Information and Trade Secrets;

       b.      Regular password change requirements;

       c.      Multi-factor authentication;

       d.      Restriction of system access based on job function;

       e.      Restriction of access to JGR's facilities;

       f.      Conditioning employment of key personnel, like Defendant, on execution of agreements including requirements of confidentiality, non-solicitation, and non-competition;

4

g.  Maintaining comprehensive policies and procedures regarding the treatment of Confidential Information and Trade Secrets, which employees are required to acknowledge;

h.  Providing regular training to employees in order to prevent third-party access to JGR systems; and

i.  Endpoint and network security monitoring via a suite of tools to prevent unauthorized intrusion and anomalies in JGR's network.

17.  JGR reasonably relies on its employees' strict adherence to the covenants and terms in the employment agreements and employment policies and procedures to protect its Confidential Information and Trade Secrets from unauthorized disclosure or dissemination to persons outside of the Company.

18.  Disclosure or dissemination of JGR's Confidential Information and Trade Secrets—especially to its direct competitors and their partners—substantially diminishes the value of such information and destroys JGR's competitive advantage.

19.  Competitor acquisition—including acquisition by third parties supporting JGR's competitors—of JGR's Confidential Information and Trade Secrets would allow those competitors and their partners to reap the benefits of JGR's substantial investments without expending comparable time, effort, or capital. Possession of this information would enable competitors to improve their race teams and equipment in ways they could not achieve through independent development, thereby allowing them to unfairly compete with JGR by bypassing or accelerating the research and development process and negating the expertise JGR has built over decades of success.

PPAB 13350173v5

20.     In 2022, NASCAR introduced the NextGen car in order to modernize the cars, reduce costs, improve safety, tighten competition, and make racing more relevant to contemporary automotive technology.   These changes significantly narrowed technical and equipment differences between teams by standardizing racecars and requiring all teams to obtain their car components from the same manufacturers.

21.     Prior to the introduction of the NextGen car, teams obtained a competitive advantage by adjusting their car setup by a matter of inches.  Following the introduction of the NextGen car, variations in car setup as small as two one hundredths of an inch provide a material competitive advantage.

22.     Because all teams now race the same car and obtain car components from the same suppliers, understanding only a small portion of the details of how a competitor sets up its cars would allow other teams to extrapolate on that information and recreate a successful car setup.

23.     As a result, car setup, analytics, and race strategy have become increasingly important as competitive differentiators in NASCAR since the introduction of the NextGen car in 2022. This information is highly guarded.

24.     Consequently, such misuse, disclosure, or dissemination of JGR's Confidential Information and Trade Secrets would result in impaired ability to compete, lost profits and business opportunities, and reputational harm, among other injuries.

25.     JGR treats its Confidential Information and Trade Secrets with such seriousness that it has taken legal action to protect them in the past.  Indeed, because Defendant worked in such a senior position, and was trusted by JGR in such a degree, in 2024, Defendant was involved in JGR's response to an employee misappropriating its Confidential Information and Trade Secrets.  Specifically, Defendant worked with senior leadership at JGR to investigate and address

PPAB 13350173v5

that employee's misconduct of misappropriating JGR's Confidential Information and Trade Secrets after the employee obtained an offer to go work for a direct competitor. He was also involved in JGR's decision to force that employee to comply with the confidentiality obligations in his employment agreement via legal action.

26. Through this process, through the protective measures detailed above, and through participation in the closely guarded secrets of competitive racing to which Defendant directed for JGR, Defendant learned the protection of JGR's Confidential Information and Trade Secrets is of the utmost importance to JGR, that JGR enforces its employment agreements requiring employees to protect and not use or share JGR's Confidential Information and Trade Secrets, and how JGR conducts computer forensic investigations of employees who its suspects of misappropriating its Confidential Information and Trade Secrets.

## II. Defendant Promises to Safeguard JGR's Confidential Information and Trade Secrets.

27. Defendant worked for JGR starting in 2012.

28. Defendant worked his way up from engineer, to crew chief, and eventually to Competition Director.

29. As a condition of his promotion to Competition Director, JGR and Defendant entered into an Employment Agreement on December 1, 2024, and an amendment thereto on June 26, 2025 (as amended, the "Agreement"). The Agreement is attached hereto as **Exhibit 1**.

30. The Agreement is written, valid, and enforceable.

31. As Competition Director, Defendant was ultimately responsible for all competitive aspects of JGR's business. He oversaw preparation and execution of JGR's vehicle and race strategies. He also oversaw the development and improvement of its internal analytics, processes, and procedures, in order to improve race performance.

7

32.    To enable Defendant to perform his job functions, JGR gave him access to some of the Company's Confidential Information and Trade Secrets including, but not limited to:

    a.    Technical information regarding racecar setups, the technology JGR uses to run simulations to determine the most advantageous racecar setups, and the results of those simulations;

    b.    JGR's analytics and the processes and technologies for measuring racecar performance, pit crew performance, and driver performance;

    c.    JGR's processes, procedures and analysis for improving racecar performance, pit crew performance, and driver performance;

    d.    JGR's processes, procedures, technologies used in analyzing performance of competitors' racecars and drivers;

    e.    JGR's processes and procedures for evaluating fuel consumption of JGR's racecars and competitors' racecars used before and during races; and

    f.    Base compensation and bonus information for certain JGR employees supporting racecar performance including engineers, crew chiefs, pit crews members, and mechanics.

33.    Defendant was restricted from access to JGR's Confidential Information and Trade Secrets that did not relate to his job duties, including, but not limited to, information about JGR's drivers, sponsor, business partners, and payroll unrelated to competitive activities.

34.    Defendant acknowledged in the Agreement that JGR's Confidential Information "is a valuable and unique asset of Company's and its affiliates' business, access to and knowledge or which are essential to the performance of [Defendant's] duties hereunder."

35.    The Agreement also provides:

"***Confidential Information***" includes but is not limited to non-public information about Company sponsors and partners, race strategy, engineering information, race car set-ups, pit crew training methods and practices, pit crew analytics, technology and strategy, wind tunnel data and testing of any kind, trade secrets and any Company information that is proprietary or not publicly known.

36. Defendant agreed in Section 5 of the Agreement as follows:

During the Term and for so long as such Confidential Information is not generally known (other than due to Employee's breach), Employee shall not disclose Confidential Information to any third party or use any Confidential Information for any purpose other than as necessary to perform pursuant to this Agreement unless and until such Confidential Information becomes generally known, except as a result of unauthorized disclosure.

37. The Agreement also provides that "Employee acknowledges receipt of the Company's written policies and procedures, which are incorporated herein, and Employee shall comply with such policies and procedures now in force and from time to time adopted by the Company."

38. Defendant's current employment handbook the ("JGR Handbook") provides:

JGR considers certain types of information about its operation as confidential or proprietary. Disclosing this information to other race teams, suppliers, fans or members of the public could significantly harm the company's interests. For this reason, employees are forbidden to disclose any trade secrets or confidential information, data learned or developed by them in the course of, or after their employment at JGR, to individuals not employed by the company, except with the prior written permission by an officer of the company. This restriction applies to active or inactive employees, so before an employee leaves JGR, the employee must return all JGR related information and property that they have in their possession, including, without limitation, documents, files, records, manuals, information stored on a personal computer or on a computer disc, supplies or equipment.

39. JGR supplied Defendant with a Company-owned laptop computer (the "JGR Laptop") to use for his service to JGR. Defendant was expected to use the JGR Laptop for work purposes. The JGR Handbook specifically states that "[s]ince the computer system belongs to

9

JGR and it is for business purposes, you should not expect privacy in anything you create, store, send, or receive on the company's system. Do not store personal/private information to a company computer."

40.     During his tenure with JGR, Defendant used the JGR Laptop to access JGR's information—including Confidential Information and Trade Secrets—to perform his job duties.

41.     During his tenure with JGR, Defendant performed a substantial portion of his job duties while physically present at JGR's facility in Huntersville, North Carolina.

42.     JGR personnel and management also communicated Confidential Information and Trade Secrets to Defendant verbally.

43.     Defendant was physically present at JGR's facility in Huntersville, North Carolina, when he received certain of these verbal communications.

44.     JGR communicated, and permitted Defendant's access to, Confidential Information and Trade Secrets for the express and limited purpose of enabling Defendant to serve the interests of the Company.

45.     JGR trusted Defendant not to use his access to, and knowledge of, the Company's Confidential Information and Trade Secrets for his personal benefit, the benefit of JGR's competitors, or other third parties.

46.     JGR also trusted Defendant to act in the Company's best interests.

47.     JGR would not have provided Defendant access to its Confidential Information and Trade Secrets unless he agreed to the provisions contained in the Agreement.

### III.     Defendant Promises to Protect JGR's Key Relationships.

48.     In addition to promising to protect JGR's Confidential Information and Trade Secrets, Defendant promised to protect certain key relationships.

PPAB 13350173v5

49.     Defendant agreed in Section 6 of the Agreement as follows:

> Except for termination without cause by Company or Term expiration, during the Term and for the longer balance of the Term including all Extensions, or nine (9) months after the date of termination (but not to exceed eighteen (18) months) (the "***Noncompete Period***"), Employee shall not provide services of the general type of services that Employee provided to the Company in the year prior to such termination to any other NASCAR Xfinity Series or NASCAR Cup Series racing team (or their respective successors) or any vehicle manufacturing company or other person or entity that provides goods or services to such a team.

50.     Defendant also agreed in Section 6 of the Agreement as follows:

> During the Term and for a period of eighteen (18) months after the date of termination or expiration of this Agreement, Employee shall not recruit or induce other Company employees to terminate their employment with Company.

51.     Given the level of authority and access provided to Defendant, the Agreement's terms impose reasonable restrictions to protect JGR's legitimate business interests.

## IV.     Defendant Demands More Authority and, When Denied, Decides to Leave JGR.

52.     Over the course of the 2025 season, Defendant became dissatisfied with his position as Competition Director at JGR.  He wanted complete responsibility and control over all departments supporting JGR's competition efforts instead of working with other departments supporting JGR's competition efforts as a peer.

53.     At no point in time did Defendant ever give JGR oral or written notice that the Company gave him job duties or responsibilities that were inconsistent with Defendant's expectations of his job duties or responsibilities as Competition Director.

54.     Eventually, Defendant's dissatisfaction reached a boiling point, and he requested a meeting with JGR owner, Joe Gibbs ("Coach Gibbs"), to voice his demands.  Coach Gibbs agreed to meet Defendant on November 6, 2025.  During that meeting, Defendant requested additional job authority that would give Defendant *carte blanche* authority over all racing decisions.

55. Coach Gibbs declined to provide Defendant with the authority he wanted and asked whether Defendant wished to stay with JGR or leave the Company.

56. Defendant informed Coach Gibbs he preferred to leave JGR.

57. Following that meeting, JGR understood that the parties would pursue an amicable separation. To that end, JGR began preparing a generous separation agreement for Defendant's consideration. Defendant had other plans.

## V. Defendant Rejects a Separation Agreement and Raises JGR's Suspicions.

58. On November 10, 2025, JGR presented Defendant with the terms of a proposed separation agreement. Under those terms, Defendant would have been permitted to work for another NASCAR team, provided that he agreed not to solicit key employees and contractors and that he cooperated in returning JGR equipment and information.

59. JGR was only willing to offer these terms to Defendant because at the time he had represented that he was unsure about his future employment, and JGR had no reason to believe that Defendant intended to harm JGR. That would soon change.

60. During the course of negotiations, Defendant's counsel made repeated edits to the draft agreement, which appeared calculated to allow him to immediately solicit JGR employees to leave JGR.

61. JGR also learned that in the days following his departure from JGR, Defendant had been meeting personally with Jeff Dickerson—the owner of Spire Motorsports ("Spire").

62. As a result, JGR became suspicious of Defendant's intentions.

63. JGR undertook a forensic investigation of Defendant's JGR Laptop. The results were shocking.

PPAB 13350173v5

## V. JGR Uncovers Defendant's Brazen Theft of its Confidential Information and Trade Secrets.

64.     Through its investigation, JGR learned the following, among other things:

      a.      Defendant had synced his personal Google Drive with his JGR Laptop;

      b.      Defendant had repeatedly conducted Google searches and online research about Spire during October and November of 2025;

      c.      The Google Drive contained a folder titled "Spire" and a subfolder titled "Past Setups"; and

      d.      Defendant had possession of more than a dozen photos of the screen of his JGR Laptop taken on November 7, 2025. These photos contained images of JGR files containing Confidential Information and Trade Secrets.

65.     As a result, JGR ceased negotiations with Defendant and, on December 15, 2025, sent him a demand letter demanding that he refrain from using or disclosing JGR's Confidential Information and Trade Secrets and cooperate in a forensic review to identify and return or securely delete such information.

66.     On December 17, 2025, counsel for Defendant responded by agreeing to return any JGR information in Defendant's possession but objecting to a forensic review. Defendant represented that the "Spire" folder on his Google Drive "was used to store his own notes and personal records." This was untrue. Defendant also represented that he "has not retained documents concerning JGR's sensitive financial data." This was also untrue, as the photos taken by Defendant on November 7, 2025, contained a significant amount of sensitive financial information.

13

67.     In that same December 17, 2025 letter, Defendant disclosed for the first time that he "receive[d] an unsolicited offer from Spire on November 13[.]"  Defendant claimed that "the offer was not to provide services similar to those [he] provided to JGR."

68.     Through negotiations, the parties ultimately agreed to a forensic protocol under which a third-party expert would (a) image Defendant's Google Drive and personal cell phone; (b) identify JGR information on those devices; and (c) securely delete confirmed JGR information.

69.     In an effort to secure critical trade secrets as quickly as possible, JGR agreed to the negotiated forensic review protocol that provided for the return of the known JGR materials.  Significant limitations in understanding the scope of Defendant's activity persisted due to Defendant's objection to a comprehensive examination of whether material was transferred, stored, or shared in other locations.  JGR accepted this limitation with the stated expectation that Defendant would not compete in the marketplace pursuant to the terms of his Agreement to reduce the competitive effect of any information that was not immediately returned to JGR.

70.     JGR consistently and uniformly informed Defendant that the Company would be forced to bring legal action against Defendant if he did not agree to the cooling off period, during which he would not provide services supporting another team's competition efforts, in light of the sensitive information he took from JGR for the benefit of Spire.

71.     Upon information and belief, Defendant did not agree to the wholesale forensic review of his electronic devices because he knew such a review would demonstrate he had used and/or disclosed JGR's Confidential Information and Trade Secrets for the benefit of third parties, including Spire.

14

72.     Defendant provided his devices to the examiner on January 12, 2026.  The examiner provided files to Defendant's counsel on January 16, 2026.  Defendant's counsel provided files to JGR's counsel on January 27, 2026.

73.     At this point, and as set out in further detail below, JGR learned for the first time that the "Spire" folder contained, among other JGR information, 20 of JGR's racecar setup files and that Defendant possessed additional laptop photos that he had taken on November 7, 2025.

74.     The examiner completed the deletion of identified JGR files from Defendant's Google Drive and personal cell phone on February 4, 2026.

75.     On February 9, 2026, the Company formally terminated the Agreement for Cause due to his misappropriation of JGR's Confidential Information and Trade Secrets, which violated his contractual obligations, Company policy, and state and federal law, in addition to being an act involving moral turpitude, fraud, willful misconduct, gross negligence, and/or dishonesty.

76.     On February 11, 2026, JGR learned, for the first time, that Defendant plans to take the position of Chief Motorsports Officer at Spire.  In that position, he would be responsible for all of Spire's racing strategy and operations.

77.     This was new information to JGR, as Defendant previously represented to JGR on December 17, 2025, that the job offer he received from Spire was for a role in which he would not provide Spire with services similar to the services he provided JGR.

78.     Upon information and belief, the position of Chief Motorsports Officer at Spire provides services of the general type of services that Defendant provided to JGR as Competition Director.

79.     Upon information and belief, Defendant misrepresented on December 17, 2025, the nature of the job offer he obtained from Spire in order to avoid JGR insisting on a comprehensive

forensic review protocol that would demonstrate Defendant had disclosed JGR's Confidential Information and Trade Secrets to third parties, including Spire.

## VI. The Full Scope of Defendant's Misconduct Comes into Focus.

80. The forensic review of Defendant's computer and phone, albeit limited, provided a timeline of a plan, and Defendant's execution of that plan, to compete unfairly against JGR using the Confidential Information and Trade Secrets that Defendant had promised to keep sacred.

81. First, Defendant met with Coach Gibbs on November 6, 2025. As noted previously, Defendant was dissatisfied with the outcome.

82. At 2:45 p.m. eastern on November 7, 2025, Defendant accessed his JGR Laptop while it was connected to JGR's network. For fifteen consecutive minutes, he accessed JGR's most sensitive Confidential Information and Trade Secrets and, using his personal cell phone, took at least twenty photos of his laptop screen (the "November 7 Photos").

83. Defendant used his personal cell phone to take photos of his laptop screen in order to conceal that he was accessing and taking JGR's Confidential Information and Trade Secrets. Utilizing photos, rather than moving or sending files, would eliminate electronic "paper trails" to show the stealing of Confidential Information and Trade Secrets.

84. The November 7 Photos were saved to Defendant's personal cell phone and personal Google Photos account. These are unsecured systems that JGR did not approve for him to use to store JGR information. Additionally, Defendant's Google Photos account was accessible to third parties, including his spouse.

85. The November 7 Photos included:

a. Comprehensive post-race audit and analyses of team and driver performance for the entire 2025 NASCAR season;

16

b.      Complete team payroll details including job titles, contract length, annual compensation, incentive compensation, and compensation plans for prior years;

c.      An employee compensation calculator used to project and plan pay for key JGR positions;

d.      Driver pay for the 2025 and 2026 NASCAR seasons;

e.      Revenues from sponsors, partners, and other business arrangements for the 2024, 2025, and 2026 NASCAR seasons;

f.      JGR's pit crew analytics for the 2024 NASCAR season; and

g.      Detailed analytics of racecar tires used to assess impact on race results.

86.      Defendant also synced his Google Drive account with his JGR Laptop.

87.      In his Google Drive account, Defendant created a folder named "Spire" and a subfolder named "Past Setups."

88.      The following materials, all of which are JGR's Confidential Information and Trade Secrets, were saved within the Spire Folder:

a.      A 141 page .pdf file titled "Post Race Data Analysis" for a 2025 Las Vegas race containing all of JGR's data analytics including, what data JGR measures at races and how it measures that data;

b.      More than 20 eLap Files, which are reports generated by JGR's proprietary software using inputs hundreds of different JGR employees manually add based off their know-how, historical data, and simulations to determine the best possible racecar setup;

17

c.       A Post Race Debrief Survey that JGR's drivers complete following every race showing the data and driver inputs JGR documents following each race and the manner in which it documents that information;

d.       A document detailing proprietary engine outputs and recommended gear shift points;

e.       Pictures of racecar diffuser skirts detailing the damage to racecars following a 2025 race;

f.       A document detailing the manner in which JGR sorts, picks out, and run tires through a race;

g.       A document detailing JGR's initiative to transport equipment and racecars to and from races for less costs and in a way that increases centralized communication and collaboration between its engineers;

h.       A document detailing how JGR estimates fuel mileage for its drivers and competitors during races and adjustments to strengthen accuracy;

i.       A document showing JGR's process for evaluating crew chief performance during races and that can help competitors improve their crew chiefs' performance;

j.       A photo of a document detailing the manner in which JGR measures and seeks to eliminate subpar pitstops and its bonus structure for its pit crews for successful pit stops;

k.       A spreadsheet listing base compensation and bonus for key members of JGR's teams; and

l.     A document comparing a JGR driver's performance at a specific race to that of a Spire driver, using JGR's proprietary software and processes.

89.    At least some of the foregoing materials regarding JGR's overall payroll, cost of providing benefits, cost of compensating JGR's drivers, and JGR's incurred expenses for hotels and rentals were in a document Defendant created himself. This information was unrelated to his position as Competition Director. Defendant did not have authorized access to this information in his role as Competition Director and did not possess this knowledge until execution of his plan to improperly compete with JGR. Indeed, in piecemeal fashion, Defendant appeared to have obtained this information through verbal and other inquiries under the guise of needing it for projects he was working on to support JGR's competition efforts. In actuality, Defendant was surreptitiously obtaining these pieces of information to use for the benefit of Spire upon departing JGR.

90.    The pictures of JGR's files Defendant took on November 7, 2025, and the materials saved in the Spire Folder are the exact set of Confidential Information and Trade Secrets any of JGR's competitors would want in order to: (a) understand JGR's processes, technological capabilities, and payment structures that has led to JGR's overwhelming success and (b) use them to improve their teams to obtain a competitive advantage over JGR.

91.    Defendant knew or should have known that his actions were unlawful given his prior experience. He worked with JGR's highest levels of leadership in investigating a former JGR employee taking JGR's Confidential Information and Trade Secrets and that JGR treated protecting its Confidential Information and Trade Secrets as a matter of paramount importance. He was also involved in JGR's decision to resort to legal process to enforce the provisions of that employee's employment agreement and restraining him from taking and using them to benefit one of JGR's direct competitors. Given Defendant's involvement in and understanding of how JGR

19

conducts forensic investigations of employees who are suspected of taking its Confidential Information and Trade Secrets, Defendant took intentional steps to avoid JGR detecting his misappropriation of JGR's trade secrets. Upon information and belief, Defendant searched for ways to hide his digital trail by searching things like One Note activity monitoring at the time he was misappropriating JGR's Confidential Information and Trade Secrets.

92.     On November 10, 2025, Defendant returned his JGR Laptop to the Company.

93.     Defendant has not provided any services or performed any work for JGR since November 10, 2025.

94.     Unaware of Defendant's conduct, JGR and Defendant began negotiating the terms of a generous separation agreement.

95.     On November 13, 2025, Defendant received a job offer from Spire.

96.     On December 2, 2025, Defendant personally met with Jeff Dickerson, Owner of Spire.

97.     On December 4, 2025, Defendant spoke to JGR's President and stated he had not spoken to any individuals associated with Spire about employment or any other potential employers about job opportunities.

98.     Defendant accessed and interacted with the Spire Folder on November 12, 13, 15, 23, 25, 26, 27, and December 2 of 2025—the same day he met with Jeff Dickerson.

99.     Upon information and belief, after November 10, 2025, Defendant accessed JGR's Confidential Information and Trade Secrets for the purpose of obtaining a job with Spire, to disclose them to Spire, and/or to use them for Spire's benefit.

100.    Upon information and belief, Defendant's use and disclosure of JGR's Confidential Information and Trade Secrets gives Spire an unfair competitive advantage over JGR.

PPAB 13350173v5

101.    Upon information and belief, Defendant's disclosure to Spire and/or use of Confidential Information and Trade Secrets was a knowing and deliberate act intended to financially benefit Defendant and to provide Spire a competitive advantage over JGR.

102.    Upon information and belief, Defendant's disclosure and/or use of Confidential Information and Trade Secrets was also a knowing and deliberate act intended to maliciously damage JGR.

103.    JGR did not consent to Defendant's retention, disclosure, or use of Confidential Information and Trade Secrets.

104.    Since Defendant ceased providing services to JGR on November 10, 2025, Defendant has informed multiple JGR employees and personnel including one of its drivers that he no longer works for JGR and is going to join Spire.

105.    After Defendant ceased providing services to JGR on November 10, 2025, and after Defendant received a job offer to work at Spire on November 13, 2025, upon information and belief, Defendant began soliciting JGR employees to leave JGR and join Spire.

106.    Since Defendant ceased providing services to JGR on November 10, 2025, and after Defendant received a job offer to work at Spire on November 13, 2025, at least one JGR employee has departed JGR and joined Spire.

107.    Specifically, one of JGR's employees supporting JGR's competition efforts left JGR's employment on January 3, 2026, and began working for Spire in the same or similar role immediately thereafter.  Upon information and belief, Spire agreed to pay that employee a salary significantly exceeding what the employee earned at JGR.

108.    Upon information and belief, Defendant solicited this employee to leave JGR and join Spire.

PPAB 13350173v5

109.     Upon information and belief, Defendant used JGR's Confidential Information and Trade Secrets he stole from JGR concerning the compensation JGR paid its employees in soliciting and recruiting JGR employees to depart the Company's employ and begin working for Spire.

## FIRST CLAIM FOR RELIEF
### (Misappropriation of Trade Secrets - Federal Defend Trade Secrets Act, 18 U.S.C. §§ 1836 *et seq.*)

110.     JGR realleges and reincorporates the foregoing paragraphs as if fully set forth herein.

111.     Section 1836(b)(1) of the Defend Trade Secrets Act, 18 U.S.C. §§ 1836 *et seq.*, creates a private right of action for "[a]n owner of a trade secret that is misappropriated . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."

112.     JGR owns and possesses confidential trade secrets that are used in, and are intended to use in, interstate or foreign commerce.

113.     JGR's trade secrets are confidential, and JGR has taken reasonable measures to safeguard its trade secrets.

114.     JGR's trade secrets derive independent economic value from not being generally known to, or readily ascertainable by, other persons who could obtain economic value from them, which gives JGR a valuable economic and competitive advantage over its competitors.

115.     Independent development by JGR's competitors or the public of materials identical or comparable to JGR's trade secrets would be impossible or extraordinarily difficult and expensive.

116.     Defendant acquired JGR's trade secrets under circumstances giving rise to a duty to maintain their secrecy and limit their use.

PPAB 13350173v5

117. Defendant misappropriated JGR's trade secrets when he wrongfully acquired and retained them without JGR's consent.

118. Defendant also misappropriated JGR's trade secrets when, upon information and belief, he used and relied upon the trade secrets to perform work for or serve the interests of Spire and/or other third parties without JGR's consent.

119. Defendant further misappropriated JGR's trade secrets when, upon information and belief, he used and relied upon the trade secrets to make himself more valuable to Spire or other third parties in attempting to obtain employment from Spire and/or other third parties.

120. Defendant further misappropriated JGR's trade secrets when, upon information and belief, he disclosed them to Spire and/or other third parties without JGR's consent.

121. The trade secrets Defendant misappropriated include, but are not limited to:

    a. Technical information regarding racecar setups, the technology JGR uses to run simulations to determine the most advantageous racecar setups, and the results of those simulations;

    b. JGR's analytics and the processes and technologies for measuring racecar performance, pit crew performance, and driver performance;

    c. JGR's processes, procedures and analysis for improving racecar performance, pit crew performance, and driver performance;

    d. JGR's processes, procedures, technologies used in analyzing performance of competitors' racecars and drivers;

    e. JGR's processes and procedures for evaluating fuel consumption of JGR's racecars and competitors' racecars used before and during races;

    f. Base compensation for JGR's drivers;

PPAB 13350173v5

g.    Base compensation and bonus information for certain JGR employees supporting racecar performance including engineers, crew chiefs, pit crew members, and mechanics; and

h.    The amount of payment JGR receives from team sponsorships.

122.   Defendant's misappropriation of JGR's trade secrets was in bad faith, willful, and malicious.

123.   As a direct and proximate cause of Defendant's misappropriation of JGR's trade secrets, JGR has suffered damages, including the diminution in value of its trade secrets. JGR will continue to suffer irreparable harm unless and until Defendant is restrained from using or disclosing JGR's trade secrets and returns all JGR trade secrets in his possession, custody, or control to JGR.

124.   Pursuant to 18 U.S.C. § 1836(b)(3), JGR is entitled to injunctive relief and judgment against Defendant in an amount to be determined at the trial of this action and presently believed to exceed $8,000,000 for compensatory and other damages, doubled damages, and attorneys' fees.

## SECOND CLAIM FOR RELIEF
### (Misappropriation of Trade Secrets - North Carolina Trade Secrets Protection Act, N.C. Gen. Stat. §§ 66-152, *et seq.*)

125.   JGR reincorporates the foregoing paragraphs as if fully set forth herein.

126.   The data Defendant retained belonging to JGR constitutes JGR's trade secrets and confidential and proprietary information.

127.    JGR's trade secrets are confidential, and JGR has taken reasonable measures to safeguard its trade secrets.

24

128. JGR's trade secrets derive independent economic value from not being generally known to, or readily ascertainable by, other persons who could obtain economic value from them, which gives JGR a valuable economic and competitive advantage over its competitors.

129. Independent development by JGR's competitors or the public of materials identical or comparable to JGR's trade secrets would be impossible or extraordinarily difficult and expensive.

130. Defendant acquired JGR's trade secrets under circumstances giving rise to a duty to maintain their secrecy and limit their use.

131. Defendant misappropriated JGR's trade secrets when he wrongfully retained them without JGR's consent.

132. Defendant also misappropriated JGR's trade secrets when, upon information and belief, he used and relied upon the trade secrets to perform work for or serve the interests of Spire and/or other third parties without JGR's consent.

133. Defendant further misappropriated JGR's trade secrets when, upon information and belief, he used and relied upon the trade secrets to make himself more valuable to Spire or other third parties in attempting to obtain employment from Spire and/or other third parties.

134. Defendant further misappropriated JGR's trade secrets when, upon information and belief, he disclosed them to Spire and/or other third parties without JGR's consent.

135. The trade secrets Defendant misappropriated include, but are not limited to:

  a. Technical information regarding racecar setups, the technology JGR uses to run simulations to determine the most advantageous racecar setups, and the results of those simulations;

PPAB 13350173v5

b.      JGR's analytics and the processes and technologies for measuring racecar performance, pit crew performance, and driver performance;

c.      JGR's processes, procedures and analysis for improving racecar performance, pit crew performance, and driver performance;

d.      JGR's processes, procedures, technologies used in analyzing performance of competitors' racecars and drivers;

e.      JGR's processes and procedures for evaluating fuel consumption of JGR's racecars and competitors' racecars used before and during races;

f.      Base compensation for JGR's drivers;

g.      Base compensation and bonus information for certain JGR employees supporting racecar performance including engineers, crew chiefs, pit crew members, and mechanics; and

h.      The amount of payment JGR receives from team sponsorships.

136.    Defendant's misappropriation of JGR's trade secrets was in bad faith, willful, and malicious.

137.    As a direct and proximate cause of Defendant's misappropriation of JGR's trade secrets, JGR has suffered damages, including the diminution in value of its trade secrets. JGR will continue to suffer irreparable harm unless and until Defendant is restrained from using or disclosing JGR's trade secrets and returns all JGR trade secrets in his possession, custody, or control to JGR.

138.    Pursuant to N.C. Gen. Stat. § 66-154, JGR is entitled to injunctive relief and judgment against Defendant in an amount to be determined at the trial of this action and presently

believed to exceed $8,000,000 for compensatory and other damages, punitive damages, and attorneys' fees.

## THIRD CLAIM FOR RELIEF
### (Unfair Trade Practices - North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §§ 75-1.1, *et seq.*)

139.    JGR reincorporates the foregoing paragraphs as if fully set forth herein.

140.    Defendant's conduct before and following his agreement to leave JGR's employ and stop providing JGR services, including, without limitation, wrongful acquisition and, upon information and belief, use and disclosure of Confidential Information and Trade Secrets to and for the benefit of Spire and/or other third parties, was conduct in or affecting commerce within the meaning of N.C. Gen. Stat. § 75-1.1.

141.    Defendant's conduct as alleged herein, including, without limitation, his surreptitious copying of Confidential Information and Trade Secrets in a manner calculated to avoid detection, was immoral, unethical, and unscrupulous.

142.    Defendant's actions proximately caused damage to JGR.

143.    Pursuant to N.C. Gen. Stat. §§ 75-16 and 75-16.1, JGR is entitled to a judgment against Defendant in an amount to be determined at the trial of this action and presently believed to exceed $8,000,000 for compensatory damages, treble damages, and attorneys' fees.

## FOURTH CLAIM FOR RELIEF
### (Breach of Contract)

144.    JGR reincorporates the foregoing paragraphs as if fully set forth herein.

145.    The Agreement is a written, valid, and enforceable contract between JGR and Defendant.

146.    Defendant breached Section 5 of the Agreement by, upon information and belief, using JGR's Confidential Information and Trade Secrets for a purpose other than providing

27

services to JGR pursuant to the Agreement and disclosing JGR's Confidential Information and Trade Secrets to Spire and/or other third parties.

147. Defendant breached Section 6 of the Agreement by, upon information and belief, providing services to Spire of the general type he provided to JGR pursuant to the Agreement during the term of the Agreement and following his termination for cause from JGR.

148. Defendant also breached Section 6 of the Agreement by, upon information and belief, recruiting and inducing JGR employees to terminate their employment with JGR and join Spire during the term of the Agreement and following his termination for cause from JGR.

149. Each of Defendant's breaches of the Agreement have caused, and will continue to cause, irreparable injury and damages.

## FIFTH CLAIM FOR RELIEF
### (Injunctive Relief)

150. JGR reincorporates the foregoing paragraphs as if fully set forth herein.

151. JGR will continue to suffer irreparable harm unless and until Defendant is restrained from using or disclosing JGR's Confidential Information and Trade Secrets and returns any such information and data still within his possession to JGR.

152. Any harm Defendant may suffer as a result of such injunctive relief is substantially outweighed by the immediate and irreparable harm that JGR will continue to suffer.

153. JGR is entitled to permanent injunctive relief directing to Defendant to:

    a.     Cease and desist from retaining, transferring, or copying any Confidential Information and Trade Secrets;

    b.     Return any Confidential Information and Trade Secrets in his possession to JGR;

c.   Transfer to the custody of JGR's counsel any device used to store the Confidential Information and Trade Secrets and, through an agreed upon or Court ordered process, allow the forensic preservation and review of these devices for identification of Confidential Information and Trade Secrets, the return of any identified Confidential Information and Trade Secrets to JGR, and the removal of any identified Confidential Information and Trade Secrets from the devices; and

d.   Cease and desist from disclosing or using JGR's Confidential Information and Trade Secrets to third parties.

*[Remainder of page intentionally left blank]*

PPAB 13350173v5

## PRAYER FOR RELIEF

WHEREFORE, JGR respectfully prays this Court for relief on all Claims for Relief, including:

1. For trial by jury as to all issues that may be so tried;

2. For permanent injunctive relief;

3. For compensatory damages in an amount to be determined at the trial of this action;

4. For doubled or trebled damages;

5. For pre- and post-judgment interest, as appropriate;

6. For reasonable attorneys' and other legal fees;

7. For taxation of the costs of this action against Defendant; and

8. Such other and further relief as it deems just and appropriate.

This the 19th day of February, 2026.

PARKER POE ADAMS & BERNSTEIN LLP

/s/ Sarah F. Hutchins
Sarah F. Hutchins
N.C. Bar No. 38172
Tory Ian Summey
N.C. Bar No. 46437
Charles G. Middlebrooks
N.C. Bar No. 55171
Bank of America Tower
620 South Tryon St., Suite 800
Charlotte, North Carolina 28202
sarahhutchins@parkerpoe.com
torysummey@parkerpoe.com
charliemiddlebrooks@parkerpoe.com
*Attorneys for Joe Gibbs Racing, LLC*

30