# EXHIBIT A

# DECLARATION OF WALTER BROWN

**Walter Brown** states as follows:

1. I am an adult over the age of 18 years old and competent to testify.

2. I have worked for Joe Gibbs Racing, LLC ("JGR") since December of 2006. Since December 1, 2025 I have served and JGR's Competition Director, and I previously served as JGR's Competition Director from 2016 through 2023.

3. In my roles at JGR, I worked directly with Christopher Gabehart ("Gabehart") from 2012 to 2025.

4. In his role as Competition Director, Gabehart was responsible for many competitive aspects of JGR's business. He oversaw preparation and execution of JGR's vehicle and race strategies. He also contributed significantly to the development and improvement of its internal analytics, processes, and procedures, in order to improve race performance.

5. JGR has created and compiled sensitive, confidential, and proprietary information, including trade secrets and other valuable intellectual property ("Confidential Information and Trade Secrets"). JGR's Confidential Information and Trade Secrets include, without limitation:

    a. Technical information regarding racecar setups, the proprietary technology JGR uses to run simulations to determine the most advantageous racecar setups, and the results of those simulations;

    b. JGR's analytics and the processes and technologies for measuring racecar performance, pit crew performance, and driver performance;

    c. JGR's processes, procedures and analysis for improving racecar performance, pit crew performance, and driver performance;

1

d. JGR's processes, procedures, technologies used in analyzing performance of competitors' racecars, pit crews and drivers;

e. JGR's processes and procedures for evaluating fuel consumption of JGR's racecars and competitors' racecars used before and during races;

f. Base compensation and bonus information for certain JGR employees supporting racecar performance including engineers, crew chiefs, pit crew members, and mechanics; and

g. The amount of payment JGR receives from its sponsors and business partners.

6. Each of these categories of JGR's Confidential Information and Trade Secrets is the product of JGR's substantial investment of time, effort and capital over a period of decades. NASCAR series run on dozens of different tracks. Each track is unique and the cars react differently based on, among other things, the track's configuration, size, surface type, level of grip, banking, radius of turns and pit road configurations. Cars are assembled and tuned to maximize the car's speed and handling on each unique track. JGR keeps detailed records of each set-up along with every change during an event. Enormous amounts of data is collected from tests and race events. This body of data is meticulously analyzed to determine the best combination of inputs which will yield optimized results for every given track. Given the standardization of the Next Gen cars and the fact that parts are sourced from common suppliers, the set up of a car and adjustments made are critical factors in a car's performance on any given day. Improvements and adjustments based on these sorts of factors can improve lap speeds by fractions of a second. In the level of racing in which JGR competes, hundredths of a second can and do make the difference in whether a team wins a given race. For example, during the 2025 Cup Series season, at least a

2

PPAB 13410187v5

Case 3:26-cv-00133-MEO-DCK    Document 9-2    Filed 02/24/26    Page 3 of 17

half dozen races were decided by a difference of less than one second. Details matter. These details are hard earned and of immense value to competitors in NASCAR.

7. A significant portion of the value of JGR's Confidential Information and Trade Secrets is derived from the secrecy and confidentiality of such information. The Confidential Information and Trade Secrets generally are not known outside of the Company and cannot be readily ascertained through independent development.

8. JGR takes precautions to avoid both the deliberate and inadvertent disclosure or dissemination of its Confidential Information and Trade Secrets. The precautions include, but are not limited to:

   a. Password protection for all Company devices and systems with access to Confidential Information and Trade Secrets;

   b. Regular password change requirements;

   c. Multi-factor authentication;

   d. Restriction of system access based on job function;

   e. Restriction of access to JGR's facilities;

   f. Conditioning employment of key personnel, like Gabehart, on execution of agreements including requirements of confidentiality, non-solicitation, and non-competition;

   g. Maintaining comprehensive policies and procedures regarding the treatment of Confidential Information and Trade Secrets which employees are required to acknowledge;

   h. Providing regular training to employees in order to prevent third party access to JGR systems;

3

      i. Endpoint and network security monitoring via a suite of tools to prevent unauthorized intrusion and anomalies in JGR's network; and

9. JGR supplied Gabehart with a Company-owned laptop computer (the "JGR Laptop") to use for his service to JGR. Gabehart was expected to use the JGR Laptop for work purposes. During his tenure with JGR, Gabehart used the JGR Laptop to access JGR's information—including Confidential Information and Trade Secrets—to perform his job duties.

10. JGR reasonably relies on its employees' adherence to the covenants and terms in the employment agreements and employment policies and procedures to protect its Confidential Information and Trade Secrets from unauthorized disclosure or dissemination to persons outside of the Company.

11. A true and accurate copy of relevant portions of JGR's Employee Handbook are attached hereto as Exhibit 1.

12. To enable Gabehart to perform his job functions, JGR entrusted him with access to some of the Company's Confidential Information and Trade Secrets including, but not limited to:

    a. Technical information regarding racecar setups for particular race tracks under particular conditions, the technology JGR uses to run simulations to determine the most advantageous racecar setups, and the results of those simulations;

    b. JGR's analytics and the processes and technologies for measuring racecar performance, pit crew performance, and driver performance;

    c. JGR's processes, procedures and analysis for improving racecar performance, pit crew performance, and driver performance;

    d. JGR's processes, procedures, technologies used in analyzing performance of competitors' racecars and drivers;

4

e. JGR's processes and procedures for evaluating fuel consumption of JGR's racecars and competitors' racecars used before and during races; and

f. Base compensation and bonus information for certain JGR employees supporting racecar performance including race engineers, crew chiefs, car chiefs, pit coaches, pit crew members, and mechanics.

13. In 2022, NASCAR introduced the NextGen car in order to modernize the cars, reduce costs, improve safety, tighten competition, and make racing more relevant to contemporary automotive technology. These changes significantly narrowed technical and equipment differences between teams by standardizing racecars and requiring all teams to obtain their car components from the same manufacturers.

14. Prior to the introduction of the NextGen car, teams obtained a competitive advantage by designing and building their own cars with significant variations among teams. Following the introduction of the NextGen car, variations in car setup as small as two one hundredths of an inch provide a material competitive advantage. NASCAR wins are often achieved by a margin of a fraction of a second.

15. Because all teams now race the same car and obtain car components from the same suppliers, understanding only a small portion of the details of how a competitor sets up its cars would allow other teams to extrapolate on that information and recreate a successful car setup.

16. As a result, car setup, analytics, and race strategy have become increasingly important as competitive differentiators in NASCAR since the introduction of the NextGen car in 2022. This information is highly guarded.

17. Consequently, such misuse, disclosure, or dissemination of JGR's Confidential Information and Trade Secrets would result in impaired ability to compete, lost profits and business opportunities, and reputational harm, among other injuries.

5

18. JGR treats its Confidential Information and Trade Secrets with such seriousness that it has taken legal action to protect them in the past. In 2024, JGR brought suit against a departing employee who wrongfully downloaded a large amount of JGR's Confidential Information and Trade Secrets including vehicle setup and building information, aerodynamic build specifications, wind tunnel test data, analysis and recommendations, and screenshots of proprietary software tools and performance reports, after the employee obtained an offer to go work for a direct competitor.

19. Gabehart worked in such a senior position at JGR, and was trusted in such a degree, that he was involved in JGR's response to the employee's misappropriation of Confidential Information and Trade Secrets in 2024.

20. In connection with the 2024 action, JGR utilized a third party computer forensics provider. Through that process, Gabehart became familiar with the forensic review process, the types of information that it can uncover, and the types of information that can be more easily concealed.

21. Gabehart has not performed any services for JGR since November 10, 2025.

22. Gabehart returned his JGR issued laptop to JGR on November 10, 2025.

23. I have reviewed the JGR files identified by Reliance Forensics as being saved to Gabehart's personal cell phone and Google Drive account.

24. The Google Drive contained the following JGR files:

   a. A 141 page .pdf file titled "Post Race Data Analysis" for a 2025 Las Vegas race containing all of JGR's data analytics including, what data JGR measures at races, how it measures that data, and the specific recommendations derived from the analysis. This document demonstrates JGR's analysis of the

6

performance of all race participants on a variety of different areas. This analysis was generated at great expense by JGR's internal analytics department;

b. More than 20 set-up and simulation files which are reports generated by proprietary software using inputs hundreds of different JGR employees manually add based off their know-how, historical data, and simulations to determine the best possible racecar setup. These documents were developed using a proprietary system developed by JGR over many years and it specifies hundreds of different details regarding the specific equipment and settings used on JGR's racecars;

c. A Post Race Debrief Survey which JGR's drivers complete following every race showing the data and driver inputs JGR documents following each race and the manner in which it documents that information. This document included specific comments from JGR's drivers about issues impacting performance, effectiveness of specific pre-race preparations, and performance of numerous aspects of the vehicle;

d. A document detailing proprietary engine outputs and recommended gear shift points;

e. Pictures of racecar diffuser skirts along with post-race measurements following a 2025 race. This document demonstrates sensitive information about JGR's "ride height" which is a part of car setup that is crucial to performance-- impacting air flow under and around the car and the amount of downforce the car may produce.

7

f.  A document detailing the manner in which JGR sorts and runs tires through a race. The system utilized to sort and select tires throughout a race is an area of competitive advantage for JGR;

g.  A document detailing JGR's initiative to transport equipment and racecars to and from races for less costs and in a way that increases centralized communication and collaboration between its engineers. This document includes detailed information about JGR's current transportation operations and expenses that could be replicated by another team to obtain a business advantage;

h.  A document detailing how JGR estimates fuel mileage for its drivers and competitors during races and adjustments to strengthen accuracy. Being able to accurately measure fuel intake and to estimate a competitor's fuel intake provides JGR with crucial insights that often are the difference between winning and losing races. Determining how much fuel a JGR competitor has and the rate at which it is burning that fuel, as compared to the amount of fuel and burn rate for a JGR car translate to positions on the race track based on judgments made about when a car must pit for fuel, whether the driver can run faster using full throttle as opposed to needing to conserve fuel due to having less fuel on board or because of the efficiency of the car's use of that fuel;

i.  A document showing JGR's process for evaluating performance during races which could immediately help competitors improve race execution and performance;

j.  A photo of a document detailing the manner in which JGR measures and seeks to eliminate subpar pitstops and its bonus structure for its pit crews for

8

successful pit stops. This document shows for JGR incentives pit crew performance and the specific items that JGR measures in order to make its pitstops as effective as possible. Fractions of a second spent in the pit box quickly translate to feet on the racetrack. JGR's confidential information regarding the strategy and techniques used by its pit crews can allow its drivers to spend less time on pit stops, putting the driver back on the track more quickly with better track position;

k. A spreadsheet listing base compensation and bonus for key members of JGR's teams; and

l. A document comparing a JGR driver's performance at a specific race to that of a Spire Motorsports driver. This document specifically demonstrates areas of improvement for the Spire Motorsports driver and areas of advantage for the JGR driver.

25. Gabehart's personal cell phone contained the following JGR files:

a. Comprehensive post-race audit and analyses of team and driver performance for the entire 2025 NASCAR season (20251107_144703.jpg; 20251107_144654.jpg; 20251107_144629; 20251107_144615.jpg; 20251107_144600.jpg; 20251107_144543.jpg; ;

b. Complete team payroll details including job titles, contract length, annual compensation, incentive compensation, and compensation plans for prior years (20251107_144824.jpg; 20251107_144806.jpg; 20251107_144747.jpg; 20251107_145258.jpg);

c. An employee compensation calculator used to project and plan pay for key JGR positions (20251107_145315.jpg);

9

PPAB 13410187v5
Case 3:26-cv-00133-MEO-DCK    Document 9-2    Filed 02/24/26    Page 10 of 17

d. Driver pay for the 2025 and 2026 NASCAR seasons (20251107_145141.jpg);

e. Revenues from sponsors, partners, and other business arrangements for the 2024, 2025, and 2026 NASCAR seasons (20251107_145232.jpg; 20251107_145242.jpg). Notably, this information would not have been directly available to Gabehart in his role as the Director of Competition;

f. JGR's pit crew analytics for the 2024 NASCAR season (20251107_145324.jpg; and

g. Detailed analytics of racecar tires used to assess impact on race results (20251107_150003.jpg).

26. The JGR information contained on Gabehart's personal cell phone and personal Google Drive account is confidential and highly sensitive.

27. JGR did not authorize Gabehart to download JGR information to his personal Google Drive account or to take photos of sensitive JGR files on his laptop screen.

28. Some of the information that Gabehart retained on his personal cell phone and personal Google Drive account exceeded information that he would have been expected to work with in his role as Competition Director. This includes information about driver compensation, sponsor revenues, and JGR's relationship with Toyota Racing Development.

29. The JGR information taken by Gabehart provides a comprehensive roadmap for JGR's competitive and business strategies. It is the exact set of Confidential Information and Trade Secrets any of JGR's competitors would want in order to: (a) understand JGR's processes, technological capabilities, and payment structures that has led to JGR's overwhelming success and (b) use them to improve their teams to obtain a competitive advantage over JGR.

30. On February 20, 2026, Gabehart posted the following statement on his X account:



> Chris Gabehart ✓
> @CG1751
>
> Yesterday afternoon, Joe Gibbs Racing filed a lawsuit claiming – falsely – that I shared JGR confidential information with Spire Motorsports and/or other unnamed third parties. I feel compelled to speak out today and forcefully and emphatically deny these frivolous and retaliatory claims.
>
> I look forward to the opportunity to demonstrate to the Court that I have not shared JGR's confidential information with anyone. In fact, I have already demonstrated that to JGR. A third-party forensic expert retained by JGR recently examined my laptop, cell phone and personal Google Drive and found no evidence to support the baseless allegations in JGR's lawsuit. We even offered JGR the opportunity to do a similar review of Spire's systems. JGR refused that offer and filed this spiteful lawsuit instead.
>
> Stay tuned. We will have much more to say in the legal response we will be filing in the coming days.
>
> 5:08 PM · Feb 20, 2026 · **272.5K** Views

31. On February 21, 2026, FOX Sports reported that Spire Motorsports had confirmed the hiring of Gabehart as its Chief Motorsports Officer as stated in this post on X:



Bob Pockrass ✓
@bobpockrass

Spire Motorsports confirms that Chris Gabehart has been hired as Chief Motorsports Officer. Beyond that, no official comment on the lawsuit other than they are focused on their Hendrick alliance and continuing to improve their performance. @NASCARONFOX

9:27 AM · Feb 21, 2026 · **118.2K** Views

[REMAINDER OF PAGE INTENTIONALLY BLANK]

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

**WALTER BROWN**

*/s/ Walter Brown*

### 5.9 COMPANY COMMUNICATIONS POLICY

**Computer System Acceptable Use**

**JGR** provides computer equipment and Internet access to our employees for business purposes. Many applications and files are on company servers, which are maintained and supported by our Information Technology Department.

**JGR** has specific restrictions that everyone must know and follow. Failure to follow this policy may result in disciplinary actions, including termination, and possible civil and criminal liability. Your use of **JGR's** computer system constitutes consent to all the terms and conditions of this policy.

**Use of Computer Resources**   Since computers are often shared, you should not waste computer resources or spend excessive amounts of time on them. Employees should not:

1. Sending mass, unsolicited emails for non-business reasons (i.e., advertising personal items for sale).

2. Sending or forwarding "chain letters"

3. Playing games.

4. Engaging in online chat groups and social networks.

5. Printing multiple copies of personal documents.

6. Using your company email address to send/receive personal emails.

These activities create unnecessary network traffic and consume file space on the servers. Because audio, video and picture files require significant storage space, these files may not be downloaded unless they are business-related.

**Passwords** The minimum password required is 12 characters long, 1 upper case, 1 lower case, 1 number, 1 special character (~!@#$%^&*_-+=`|\(){}[]:;"'<>,.?/).one upper case, one lower case For example: MyP@ssw0rd or Ex4mpl3! Please don't share or post your password.

**Maintaining your Email Account**   Do not open email attachments, or links in email from unknown senders. Periodically, you will be required to change your password to the computer system. It is also your responsibility to frequently check incoming mail in your inbox. Please report any suspicious emails to the IT Department.

**Privacy**   Since the computer system belongs to **JGR** and it is for business purposes, you should not expect privacy in anything you create, store, send, or receive on the company's system. Do not store personal/private information to a company computer.

**Monitored Use**   The company has the right to monitor any aspect of its computer system. Examples include:

1. Monitoring sites visited by employees on the Internet.

2. Monitoring chat groups, or social networking.

### 5.10 PERSONNEL FILES/ADDRESS OR PERSONAL STATUS CHANGES

The company is required by law to maintain certain personal, pay and job-related information for its employees. **JGR** maintains electronic personnel files on a secure server, accessible by Human Resources. Unless required by law, we will not disclose this information to anyone outside the company without your written consent. We reserve the right, however, to verify basic information such as employment status, job title and employment dates without your prior notification. We will also cooperate with law enforcement, public safety or medical officials who request valid and specific need-to-know information about an employee.

Human Resources personnel are the only employees authorized to release information about our employees. Although North Carolina laws do not require employers to share files with employees, you may see your file by requesting an appointment with Human Resources.

### 5.11 HUMAN RESOURCES INFORMATION SYSTEM (HRIS)

Your payroll and personnel information are also maintained in a secure database which you can access on the internet. You may login to UKG with a unique username and a password that you establish. It is your responsibility to maintain the confidentiality of your password. You also need to logout of the system at the end of each online session.

Through UKG's self-service system, you can do many things:

1. Change your address and phone numbers;

2. Submit requests for Paid Time Off (PTO) pay;

3. View your private information;

4. View and update contact and dependent information;

5. View and update Federal and State tax withholdings;

6. View and print pay statements; and

7. View and print W-2 forms.

Other changes to your records can be made by contacting Human Resources.

### 5.12 CONFIDENTIAL INFORMATION

JGR considers certain types of information about its operation as confidential or proprietary. Disclosing this information to other race teams, suppliers, fans or members of the public could significantly harm the company's interests. For this reason, employees are forbidden to disclose any trade secrets or confidential information, data learned or developed by them in the course of, or after their employment at JGR, to individuals not employed by the company, except with the prior written permission by an officer of the company. This restriction applies to active or inactive employees, so before an employee leaves JGR, the employee must return all JGR related information and property that they have in their possession, including, without limitation, documents, files, records, manuals, information stored on a personal computer or on a computer disc, supplies or equipment.

Trade secrets and other confidential information will be disclosed to employees if their job requires knowledge of sensitive information. Employees are expected to sign confidentiality agreements as a condition of employment and are subject to legal prosecution for violations of these agreements. When handling confidential documents and materials, employees must adhere to all procedures and restrictions designed to safeguard such information.

Employees are restricted from accessing confidential or proprietary information held by other employees. This includes information contained in private offices, the computer system, or other records in the safekeeping of authorized personnel. Employees who violate JGR's confidentiality rules may be subject to legal prosecution in addition to company discipline, up to and including termination. Examples of confidential information include, but are not limited to:

1. Components, parts, systems, assemblies, tools, and/or fixtures

2. Engineering/equipment designs/drawings

3. Research and development projects

4. Technical plans, specifications, technical know-how

5. Race car/truck setup, track and pre/post-race notes

6. Race car/truck test results (i.e., track, aero, 8 post, etc.)

7. Reports (hardcopy and electronic)

8. JGR-provided electronics and computer hardware

9. Any and all JGR domain email

10. All data files and copies of JGR databases

11. Computer software code Trade Secrets & Confidential Information

12. Race car body construction details

13. NASCAR inspection reports

14. Body scans

15. Romer files

16. Engine information (i.e., heads, intakes, cams, springs, etc.)

17. Purchasing/vendor information (sources, materials/chemicals used)

18. Licensing/sponsorship agreements

19. Computer programs, applications and files

20. Organizational/strategic plans

21. Financial information

22. Employee information

23. Payroll information

If you have any questions about what is or is not confidential, proprietary or a trade secret, ask your manager or any officer of **JGR**.

**Inventions & Innovations**

Because you receive compensation as an employee of **JGR**, the company is entitled to receive the benefit of any inventions, discoveries, programs, ideas or innovations that you develop and which pertain to the company's business, functions or operations. You should understand that any of these items conceived during your employment is the sole property of JGR.

If you develop such an invention or new idea, you will be required to sign and deliver to the company any documents that may be necessary for JGR to obtain a patent or copyright protection of any such materials.

**5.13  CONFLICT OF INTEREST**

**JGR** expects employees to conduct business according to the highest ethical standards of conduct. Employees are expected to devote their best efforts to the interests of **JGR**. Business dealings that appear to create a conflict between the interests of JGR and an employee are unacceptable. **JGR** recognizes the right of employees to engage in activities outside of their employment that are of a private nature and unrelated to our business. However, the employee must disclose any possible conflicts so that **JGR** may assess and prevent potential conflicts of interest from arising. A potential or actual conflict of interest occurs whenever an employee is in a position to influence a decision that may result in a personal gain for the employee or an immediate family member (i.e., spouse or significant other, children, parents, siblings) as a result of **JGR's** business dealings.

Although it is not possible to specify every action that might create a conflict of interest, this policy sets forth the ones which most frequently present problems. If you have any question whether an action or proposed course of conduct would create a conflict of interest, you should immediately contact Human Resources to obtain advice on the issue. The purpose of this policy is to protect employees from any conflict of interest that might arise.

Outside Employment   Employees are required to obtain written approval from their manager before participating in outside work activities. Approval will be granted unless the activity conflicts with JGR's interests. In general, outside work activities are not allowed when they:

1. Prevent you from fully performing work for which you are employed at **JGR**, including overtime assignments;

2. Involve organizations that are doing or seek to do business with **JGR**, including actual or potential vendors or customers;