**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**Case No. 3:26-CV-00133-MEO-DCK**

| | |
|---|---|
| JOE GIBBS RACING, LLC,<br><br>                Plaintiff,<br><br>     v.<br><br>CHRISTOPHER GABEHART and SPIRE MOTORSPORTS, LLC,<br><br>               Defendants. | **PLAINTIFF JOE GIBBS RACING, LLC'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

Plaintiff Joe Gibbs Racing, LLC ("JGR" or the "Company"), by and through counsel, pursuant to Rule 65 of the Federal Rules of Civil Procedure, respectfully submits this Memorandum of Law in Support of the Motion for Temporary Restraining Order and Preliminary Injunction ("Motion") to enjoin Christopher Gabehart's ("Gabehart") and Spire Motorsports, LLC's ("Spire") from competing against JGR in violation of Gabehart's contractual obligations and from retaining, using, disclosing, and misappropriating JGR's confidential information and trade secrets.

## INTRODUCTION

During his thirteen years of work for JGR, Gabehart worked his way up from engineer to crew chief and finally to Competition Director. In that role, he was one of JGR's most senior and trusted individuals tasked with helping the legacy team win races in the ultra-competitive NASCAR motorsports organization. But Gabehart had other plans.

Upon information and belief, Gabehart decided to leave JGR and work for a comparatively new team—Spire. At the end of the 2025 NASCAR season on November 6, 2025, and while in active discussions with Spire, Gabehart approached JGR's owner, Joe Gibbs ("Coach Gibbs"),

under the guise of demanding more authority over the JGR team. When Coach Gibbs declined, Gabehart announced his decision to leave JGR.

The next afternoon, Gabehart sat down at his JGR issued computer while it was connected to JGR's network. For fifteen consecutive minutes, he used his personal cell phone to take pictures of, among other things: (a) how much JGR pays its drivers; (b) complete team payroll details; (c) JGR's revenues from sponsors, partners, and other sources of income; and (d) JGR's comprehensive post-race audit and analyses of team and driver performance for the 2025 NASCAR season. He also saved JGR files on his personal Google Drive showing: (a) JGR's car set ups during the 2025 season; (b) proprietary engine outputs and recommended gear shift points; (c) the manner in which JGR sorts, picks out, and runs tires through a race; and (d) how JGR measures its own cars' fuel usage during a race and predicts other teams' fuel usage.

Subsequent investigation has uncovered information about Gabehart's brazen scheme to take JGR's most sensitive and competitive information with him. Despite his noncompetition agreement, his covert misappropriation of JGR's information, and even the filing of this lawsuit on February 19, 2025, Spire announced through media outlets its decision to hire Gabehart as its Chief Motorsports Officer. Consequently, JGR respectfully requests immediate Court intervention to prevent irreparable damage that has and will occur should Gabehart be permitted to accept this role with Spire and further use JGR's confidential information and trade secrets.

## FACTUAL BACKGROUND

### I.    JGR's Business and Protected Information.

JGR is a chartered stock car race team competing in the NASCAR Cup Series since 1992 and the NASCAR O'Reilly Auto Parts Series since 1997. (Am. Compl. ¶¶ 8–9). Coach Gibbs started JGR with no professional racing experience. Since its inception, JGR has tallied 448 wins,

five NASCAR Cup Series Championships, and four NASCAR O'Reilly Auto Parts Series Championships. (*Id.* ¶ 9). Coach Gibbs has routinely stated in public that JGR's success relies on its hundreds of employees who work hard to put the team in the best possible position to succeed.

JGR competes against other race teams in a sport where the slightest of advantages are the difference between winning and losing. (Brown Dec. ¶ 6).[1] JGR's success is due in large part to decades of research, analyses, and innovation. (*Id.*). JGR has expended significant time, expense, labor, and creative thought to create its analytical models, research methods and processes for improving race performance. (*Id.*). Through these efforts, JGR has created and compiled sensitive, confidential, and proprietary information, including trade secrets and other valuable intellectual property ("Confidential Information and Trade Secrets"). (*Id.*). The Confidential Information and Trade Secrets include, without limitation, technical information such as racecar setups, analytics, compensation, and revenues. (*Id.* ¶ 5).

Each of these categories of JGR's Confidential Information and Trade Secrets is the product of JGR's substantial investment of time, effort and capital over a period of decades. (*Id.* ¶ 6). They are not generally known outside of JGR and cannot be replicated at all or not without an extraordinary investment of time, funds, and labor. (*Id.* ¶¶ 7, 17, 29).

This information is closely guarded as NASCAR series run on dozens of different tracks. Each track is unique and the cars react differently based on, among other things, the track's configuration, size, surface type, level of grip, banking, radius of turns and pit road configurations. Cars are assembled and tuned to maximize the car's speed and handling on each unique track. (*Id.* ¶ 6). JGR keeps detailed records of each set-up along with every change made during an event. Enormous amounts of data is collected from tests and race events. (*Id.*) This body of data is

---

[1] The Declaration of Walter Brown is attached to the Motion as Exhibit A.

meticulously analyzed to determine the best combination of inputs which will yield optimized results for every given track. (*Id.*). Improvements and adjustments based on these sorts of factors can improve lap speeds by fractions of a second. (*Id.*). In the level of racing in which JGR competes, hundredths of a second can and do make the difference in whether a team wins a given race. (*Id.*). For example, during the 2025 Cup Series season, at least a half dozen races were decided by a difference of less than one second. (*Id.*). Details matter. (*Id.*). These details are hard earned and of immense value to competitors in NASCAR. (*Id.*).

In 2022, NASCAR introduced the NextGen car in order to modernize the cars, reduce costs, improve safety, tighten competition, and make racing more relevant to contemporary automotive technology. (*Id.* ¶ 13). These changes significantly narrowed technical and equipment differences between teams by standardizing racecars and requiring all teams to obtain their car components from the same manufacturers. (*Id.*). Prior to the introduction of the NextGen car, teams obtained a competitive advantage by designing and building their own cars with significant variations among teams. (*Id.*, ¶ 14). Following the introduction of the NextGen car, variations in car setup as small as two one hundredths of an inch provide a material competitive advantage. (*Id.*). NASCAR wins are often achieved by a margin of a fraction of a second. (*Id.*).

Because all teams now race the same car and obtain car components from the same suppliers, understanding only a small portion of the details of how a competitor sets up its cars would allow other teams to extrapolate on that information and recreate a successful car setup. (*Id.* ¶ 15). As a result, car setup, analytics, and race strategy have become increasingly important as competitive differentiators in NASCAR since the introduction of the NextGen car in 2022. (*Id.* ¶ 16). This information is highly guarded. (*Id.*). Consequently, JGR vigorously protects its

Confidential Information and Trade Secrets. (*Id.* ¶ 8). JGR takes numerous precautions to protect its Confidential Information and Trade Secrets. (*Id.*) (listing specific precautions).

Should any of JGR's competitors or their partners obtain JGR's Confidential Information and Trade Secrets, it would greatly diminish the value of such information, destroy JGR's competitive advantage, and undermine the sanctity of fair competition in the sport. (*See Id.* ¶ 7). Disclosure would allow a competitor to improve their team performance, car performance, and components performance in ways they could not through independent development. (*Id.*). This would allow JGR's competitors to replicate in a matter of months what it took JGR decades to build, thereby destroying JGR's hard-earned competitive advantage and undermining the work of hundreds of JGR employees. (*Id.* ¶ 29).

## II. Gabehart Agrees to Protect JGR's Confidential Information and Trade Secrets, Not to Compete with JGR, and Not to Solicit JGR's Employees.

Gabehart began working for JGR in 2012, was later promoted to crew chief and finally to Competition Director. (*See id.* ¶¶ 3–4). In connection with his promotion to Competition Director, he negotiated and signed an employment agreement effective December 1, 2024 (the "Agreement"). (*See* Am. Compl. Ex. 1). Gabehart's responsibilities included preparation and execution of JGR's car and race strategies, overseeing development and improvement of analytics, processes, and procedures to improve race performance. (Brown Dec. ¶ 4). His primary job was to utilize all of JGR's competitive resources to obtain the strongest competitive advantage. (*Id.*).

In light of his job responsibilities, JGR granted Gabehart access to many of the Company's Confidential Information and Trade Secrets regarding race preparation and competition. (*Id.* ¶ 12). In return, Gabehart agreed to protect those materials and only use them to advance JGR's interests. (Am. Compl., Ex. 1, ¶ 5). The Agreement provides that JGR's Confidential Information and Trade Secrets are "a valuable and unique asset of Company's and its affiliates' business, access

to and knowledge or which are essential to the performance of [Gabehart's] duties hereunder."

(*Id.*).  It also states:

> "***Confidential Information***" includes but is not limited to non-public information about Company sponsors and partners, race strategy, engineering information, race car set-ups, pit crew training methods and practices, pit crew analytics, technology and strategy, wind tunnel data and testing of any kind, trade secrets and any Company information that is proprietary or not publicly known.

(*Id.*).  Gabehart expressly agreed that:

> During the Term and for so long as such Confidential Information is not generally known (other than due to Employee's breach), Employee shall not disclose Confidential Information to any third party or use any Confidential Information for any purpose other than as necessary to perform pursuant to this Agreement unless and until such Confidential Information becomes generally known, except as a result of unauthorized disclosure.

*(Id.)*.

The Agreement further provides "Employee acknowledges receipt of Company's written policies and procedures, which are incorporated herein, and Employee shall comply with such policies and procedures now in force and from time to time adopted by the Company." (*Id.* ¶ 1). The version of JGR's employment handbook adopted in 2023 (the "JGR Handbook") provides:

> JGR considers certain types of information about its operation as confidential or proprietary. Disclosing this information to other race teams, suppliers, fans or members of the public could significantly harm the company's interests. For this reason, employees are forbidden to disclose any trade secrets or confidential information, data learned or developed by them in the course of, or after their employment at JGR, to individuals not employed by the company, except with the prior written permission by an officer of the company. This restriction applies to active or inactive employees, so before an employee leaves JGR, the employee must return all JGR related information and property that they have in their possession, including, without limitation, documents, files, records, manuals, information stored on a personal computer or on a computer disc, supplies or equipment.

(Brown Dec., Ex. 1 § 5.2). Had Gabehart not agreed to these safeguards, JGR would not have provided him with access to its Confidential Information and Trade Secrets. (Brown Dec., ¶¶ 8(d), (f); Am. Compl. ¶ 49).

In addition to agreeing to protect JGR's information, Gabehart also agreed that:

> [e]xcept for termination without cause by Company or Term expiration, during the Term and for the longer balance of the Term including all Extensions, or nine (9) months after the date of termination (but not to exceed eighteen (18) months) (the "***Noncompete Period***"), Employee shall not provide services of the general type of services that Employee provided to the Company in the year prior to such termination to any other NASCAR Xfinity Series or NASCAR Cup Series racing team (or their respective successors) or any vehicle manufacturing company or other person or entity that provides goods or services to such a team.

(Am Compl., Ex. 1 ¶ 6).

Gabehart further promised to refrain from disturbing JGR's relations with its employees. Section 6 of the Agreement provides: "[d]uring the Term and for a period of eighteen (18) months after the date of termination or expiration of this Agreement, Employee shall not recruit or induce other Company employees to terminate their employment with Company." (*Id.*).

These restrictions were appropriate and reasonable in light of JGR's need to protect its legitimate business interests. JGR operates in a small, incredibly competitive industry, and Gabehart served as one of its most senior competitive employees. (*See* Brown Dec. ¶¶ 4, 6, 14– 16).

## III. Gabehart Decides to Leave JGR and Raises Suspicions.

Gabehart became dissatisfied with his position as Competition Director and wanted to wield unilateral control over the competition side of JGR's business. (Am. Compl. ¶ 55). During a November 6, 2025 in-person meeting with Coach Gibbs, Gabehart requested JGR give him total control over all tasks and personnel supporting JGR's competition efforts. (*Id.* ¶ 57). Coach Gibbs

did not agree. (*Id.* ¶ 58). In response, Gabehart informed Coach Gibbs of his decision to leave JGR. (*Id.* ¶ 59). He turned in his JGR computer on November 10, 2025, and has not provided any services to JGR since that time. (*Id.* ¶¶ 102–103).

Also on November 10, 2025, JGR offered Gabehart a generous separation agreement, which would have given Gabehart severance pay and allowed him to work for another NASCAR team on the conditions that he (1) return all JGR equipment and information in his possession, (2) continue to abide by the confidentiality provisions in the Agreement, (3) not solicit JGR's key employees and contractors, and (4) execute a mutual release. (Carmichael Dec. ¶ 9).[2] At the time Gabehart represented that he was uncertain about his future employment pursuits and there was also no reason at the time for JGR to believe Gabehart would use or disclose JGR's Confidential Information and Trade Secrets. (Am. Compl. ¶ 62). JGR further offered this concession in exchange for Gabehart waiving any claim to his considerable remaining salary under the Agreement. (*Id.* Ex. 1).

However, Gabehart's response to the initial separation proposal raised immediate concerns for JGR. Gabehart's revisions to the proposed separation agreement made clear he wanted to quickly solicit JGR's employees to leave the Company. (*Id.* ¶ 63). Around the same time, the Company learned that Gabehart was holding in-person meetings with Spire's owner, Jeff Dickerson. (*Id.* ¶ 64). Given his behavior, JGR became suspicious of his representations and began a forensic review of the laptop computer JGR provided him in conjunction with his employment (the "JGR Computer"). (*Id.* ¶ 67).

---

[2] The Declaration of Tim Carmichael is attached to the Motion as Exhibit B.

## IV.    JGR Discovers Gabehart's Brazen Taking and Use of Its Confidential Information and Trade Secrets.

JGR's forensic review of Gabehart's JGR Computer confirmed its suspicions that Gabehart intended to immediately join Spire. The review also demonstrated Gabehart's plan to join Spire was in motion even before he purportedly decided to depart JGR on November 6, 2025. Even more concerning, JGR discovered that Gabehart planned on using JGR's most sensitive Confidential Information and Trade Secrets to hit the ground running at Spire.

Before leaving JGR, Gabehart connected his personal Google Drive to his JGR Computer and had been conducting routine Google searches and other online research about Spire during October and November of 2025. (Walton Dec. ¶¶ 12–14).[3] Within the Google Drive, **Gabehart had created and saved a folder named "Spire."** (*Id.* ¶ 14). In the Spire folder, Gabehart created a subfolder named "Past Setups." (*Id.* ¶ 14). JGR later learned the Past Setups subfolder contained documents detailing JGR's past car setups and simulations for specific races at specific tracks— some of JGR's most sensitive and coveted Confidential Information and Trade Secrets for competition. (*Id*. ¶ 14); (Brown Dec. ¶ 24).

Gabehart interacted with the Spire folder on his personal Google drive routinely **after** November 10, 2025, the day he handed in the JGR Computer and stopped providing JGR any services. (Walton Dec. ¶ 14). He interacted with that folder on **at least six occasions after leaving JGR**: November 12, 13, 15, 26, 27, and December 2 of 2025.[4] (*Id.*). Because he was no longer providing services to JGR, he had no legitimate reason to possess or access these documents on

---

[3] The Declaration of Clark Walton is attached to the Motion as Exhibit C.

[4] As addressed below, Gabehart received a job offer he said was "unsolicited" from Spire on November 13, 2025**.** We know Gabehart accessed the Spire folder containing JGR's Confidential Information and Trade Secrets on November 12, 2025— two days **after** leaving JGR and one day **before** receiving an "unsolicited" job offer from Spire. We also know he accessed the Spire folder at least five more times after receiving the offer from Spire.

JGR's behalf and could only have been accessing these materials to benefit Spire. (Am. Compl. ¶¶ 102, 110–111).

Lastly, JGR learned that between 2:45 p.m. and 3:00 p.m. on November 7, 2025, Gabehart used his personal cell phone to take at least 20 pictures of JGR's most sensitive Confidential Information and Trade Secrets (the "November 7 Photos"). (Walton Dec. ¶¶ 22, 28). They included:

    a.    Comprehensive post-race audit and analyses of team and driver performance for the entire 2025 NASCAR season;

    b.    Complete team payroll details including job titles, contract length, annual compensation, incentive compensation, and compensation plans for prior years;

    c.    An employee compensation calculator used to project and plan pay for key JGR positions;

    d.    Driver pay for the 2025 and 2026 NASCAR seasons;

    e.    Revenues from sponsors, partners, and other business arrangements for the 2024, 2025, and 2026 NASCAR seasons;

    f.    JGR's pit crew analytics for the 2024 NASCAR season; and

    g.    Detailed analytics of racecar tires used to assess impact on race results.

(Brown Dec. ¶ 25–26).

Certain of the November 7 Photos related to JGR's competition efforts, to which Gabehart had access to perform his duties as Competition Director. (*Id.* ¶ 28). However, other photos included JGR's most sensitive financial information unrelated to Gabehart's duties as Competition Director. (*Id.*). Taken together, these materials are JGR's most secret Confidential Information

and Trade Secrets and, in the hands of a competitor, would allow that competitor to quickly replicate JGR's business and competitive strategies. (*Id.* ¶ 29).

Gabehart knew that his actions were wrong. We know this because he ***used his personal cell phone to take photos of JGR files which would avoid forensic detection***. Ironically, while working for JGR in 2024, Gabehart was a material participant in JGR's decision to take legal action against a former JGR employee who attempted to take JGR's Confidential Information and Trade Secrets after accepting a job with a competitor. (*Id.* ¶ 18–19). Even more, Gabehart learned how JGR investigates electronic devices to track "electronic footprints" in order to learn what was taken and how it was taken. (*Id.* ¶ 20). Gabehart appears to have utilized this experience to attempt to avoid leaving such electronic footprints and conceal his own misappropriation.

## V. Caught Red-Handed, Gabehart Feigns Cooperation But Still Intends to Work for Spire.

After learning about Gabehart's scheme to take JGR's Confidential Information and Trade Secrets, on December 15, 2025, the Company demanded that he allow a full forensic review of all devices he used to store or transmit JGR's Confidential Information and Trade Secrets to ensure he had not retained any other copies or disseminated them. (Am. Compl. ¶ 69). Gabehart responded in writing through counsel on December 17, 2025, and rejected JGR's request for a complete review of his electronic devices and accounts. (Am. Compl. ¶ 70). Instead, Gabehart denied possessing information and objected to anything more than allowing a third party expert to image his Google Drive and cell phone—the two locations JGR's internal investigation had

already revealed Gabehart saved JGR's stolen secrets. (*Id.* ¶ 73).[5] Among other things, ***no*** personal laptop was provided for examination. Given the existential threat posed by Gabehart's acquisition of its Confidential Information and Trade Secrets, JGR agreed to accept this limited review that allowed immediate access but specifically reserved all rights to pursue legal action if necessary. (*Id.* ¶¶ 74–75). Importantly, Gabehart represented that he would not begin working for Spire while the forensic review process was occurring and that although he had received a job offer from Spire, it "was not to provide services similar to those [he] provided to JGR." (*Id.* ¶ 72).

Through the review protocol process, JGR learned Gabehart had taken even more of its Confidential Information and Trade Secrets than it initially feared. Among other things, the following materials, all highly sensitive, were saved in Gabehart's Spire folder: (a) a 141 page .pdf file titled "Post Race Data Analysis" for a 2025 Las Vegas race containing all of JGR's data analytics including, what data JGR measures at races and how it measures that data; (b) more than 20 set up and simulation files which are reports generated by proprietary software using inputs hundreds of different JGR employees manually add based off their know-how, historical data, and simulations to determine the best possible racecar setup; (c) a document detailing proprietary engine outputs and recommended gear shift points; (d) a document detailing the manner in which JGR sorts and run tires through a race; (e) a document detailing how JGR estimates fuel mileage for its drivers and competitors during races and adjustments to strengthen accuracy; (f) a document showing JGR's process for evaluating performance during races which could immediately help competitors improve race execution and performance; (g) a photo of a document detailing the

---

[5] Continued review of the forensic information has revealed possible use of a Microsoft One Drive account that appears associated with Gabehart's Gmail address and with activity at least on October 29, 2025 and November 17, 2025, contemporaneous with access to Gabehart's Google Drive. (Walton Dec. ¶ 17). The reports further indicate that certain websites associated with JGR and JGR's Microsoft Sharepoint website were potentially accessed around this same time. (Walton Dec. ¶¶ 15-16).

manner in which JGR measures and seeks to eliminate subpar pit stops and its bonus structure for its pit crews for successful pit stops; (h) a spreadsheet listing base compensation and bonus for key members of JGR's teams; and (i) a document comparing a JGR driver's performance at a specific race to that of a Spire driver.   (Brown Dec. ¶ 24).

Besides disclosing the scope of information that Gabehart had taken, the forensic review also showed that he had made multiple misrepresentations in his December 17, 2025 response to JGR.  In that letter, Gabehart stated he had not taken any of JGR's documents containing "sensitive financial data." (Am. Compl. ¶ 71). That was false. (*Id.*).   The November 7 Photos included information about JGR's complete team payroll, how much JGR pays its drivers and what it receives from its sponsors and business partners, among other things.  (*Id.* ¶ 94).  Second, he stated the Spire folder on his Google Drive contained only his "notes and personal records."  (*Id.* ¶ 70). Again, that was false.  The Spire folder contained racecar setups, JGR data analytics, and fuel consumption strategies, among other things.  (*Id.* ¶ 97).  The forensics revealed that this was not an inadvertent retention—the materials were accessed multiple times following Gabehart's cessation of services for JGR and during his negotiations with Spire.  (Walton Dec. ¶¶ 14–17).

During the process of negotiating and implementing the forensic review protocol, JGR's counsel unequivocally and repeatedly informed Gabehart's counsel that JGR would insist on a noncompete period.  (Am. Compl. ¶ 75).   JGR's counsel also asked on multiple occasions about the nature of the services Gabehart intended to perform for Spire.  (*Id.* ¶ 72).  Gabehart's counsel declined to answer. (*Id.*).

The process of negotiating and completing the forensic review lasted from December 15, 2025 to February 5, 2026, when known pieces of JGR's Confidential Information and Trade Secrets were deleted from Gabehart's cell phone and Google Drive account.  (*See* Walton Dec.

¶ 31). However, this deletion expressly does not foreclose the possibility that Gabehart may have sent or imaged JGR's information to or on other devices or accounts or used it to benefit Spire prior to December 15, 2025. (*Id.* ¶ 30).

JGR terminated Gabehart's Agreement for cause on February 9, 2026. (Am. Compl. Ex. 2). On February 11, 2026, JGR learned two things for the first time. First, Gabehart would not respect a noncompete period, more than warranted given his misappropriation of JGR's information. (*Id.* ¶ 82). Second, Gabehart finally disclosed that the job offer he received and wished to accept from Spire was to be its Chief Motorsports Officer. (*Id.*). Based on the description of this role provided by Gabehart's counsel, it was clear that this position encompasses ***all*** of the services Gabehart performed for JGR. The role would further benefit from the information Gabehart took that he did not have access to during his employment at JGR. (Brown Dec. ¶¶ 28–29). On February 21, 2026, Spire announced it had hired Gabehart as its Chief Motorsports Officer. (*Id.* ¶ 31).

In sum, Gabehart made material misrepresentations to JGR concerning what he had taken from JGR and the nature of the job he wished to perform at Spire while the parties negotiated and completed the forensic review protocol. Throughout that process, JGR reminded Gabehart it would insist on a noncompete period, such need compounded by his misappropriation of JGR's information. Only after the forensic expert deleted JGR's Confidential Information and Trade Secrets from Gabehart's accounts and devices, did Gabehart inform JGR: (1) he had no intentions of delaying his acceptance of a job with Spire and (2) that the job offer he received from Spire covered the exact same responsibilities he had at JGR.

As it stands, Spire has now appointed Gabehart to a role that is substantially similar to the role he fulfilled at JGR. It made this choice despite knowing that Gabehart intentionally took

JGR's most sensitive Confidential Information and Trade Secrets and regularly accessed those files for more than a month after leaving JGR while in direct discussions with Spire. Had he not been caught, Gabehart clearly planned to use JGR's information in these files in performing services for Spire. Even after the limited remediation provided by the forensic review, the information that Gabehart learned about JGR and took from JGR after his departure would be of immense value to Spire's business and competitive goals while causing irreparable harm to JGR.

## ARGUMENT

### I.   Legal Standard for Injunctive Relief.

Rule 65 of the Federal Rules of Civil Procedure authorizes courts to enter a temporary restraining order and preliminary injunction in appropriate circumstances. Fed. R. Civ. P. 65. Under Rule 65, issuance of either form of interim equitable relief is designed to "balance the equities as the litigation moves forward." *Green v. ABC Companies*, 702 F.Supp.3d 418, 423 (W.D.N.C. 2023) (quoting *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 137 S. Ct. 2080, 2087, 198 L.Ed.2d 643 (2017)).

The Court may issue  both a temporary restraining order and preliminary injunction if a plaintiff can show plaintiff is likely to succeed on the merits, that plaintiff is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in plaintiff's favor, and that an injunction is in the public interest. *Green*, 702 F.Supp.3d at 423 (quoting *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008)) (temporary restraining order); *Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020), *as amended* (Jan. 14, 2020) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008)) (preliminary injunction). Each of these factors weighs in JGR's favor.

"Where multiple causes of action are alleged, plaintiff need only show likelihood of success on one claim to justify injunctive relief." *Atlas Power Tech., Inc. v. Hinton*, No. 5:25-CV-00783-M, 2025 WL 3473362, at *1 (E.D.N.C. Dec. 3, 2025) (quoting *McNeil-PPC v. Granutec, Inc.*, 919 F.Supp. 198, 201 (E.D.N.C. 1995)).

## II.    JGR Has a High Likelihood of Succeeding on the Merits of Its Claims for Relief.

A plaintiff seeking preliminary injunctive relief must only show a clear likelihood of success on the merits and is not required to demonstrate success with certainty. *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013).  Here, the evidence shows JGR has a clear likelihood of prevailing on the merits of multiple claims.

### A.  Breach of Contract.

JGR is likely to succeed on its claim that Gabehart breached the non-competition and non-disclosure provisions of the Agreement. Fourth Circuit courts recognize the availability of injunctive relief for breach of contract claims in addition to trade secret misappropriation claims. *Hoffman Engin. Corp. v. Piscitelli*, No. 3:07-cv-147, 2007 WL 2021965, at *3 (W.D.N.C. July 11, 2007).

"A restrictive covenant between an employer and an employee is valid and enforceable under North Carolina law if it is: '(1) in writing; (2) reasonable as to terms, time, and territory (3) made part of the employment contract; (4) based on valuable consideration; and (5) not against public policy.'" *Carlson Environmental Consultants, PC v. Slayton*, No. 3:17-cv-00149-FDW-DCK, 2017 WL 4225993, at * 7 (W.D.N.C. Aug. 21, 2017) (quoting *Triangle Leasing Co., Inc. v. McMahon*, 327 N.C. 224, 228, 393 S.E.2d 854, 857 (1990)).  Restrictive covenants are enforceable when the scope is necessary to protect the employer's legitimate business interests. *Id.* (citing *Med. Staffing Network, Inc. v. Ridgway*, 194 N.C. App. 649, 656, 670 S.E.2d 321, 327 (2009)).

Here, Gabehart negotiated his Agreement with JGR for a position that, by its very definition, gave access to extremely sensitive competitive secrets.  As the highly-compensated Competition Director for a nationally known sports team, Gabehart was in a unique position of trust and authority.  The scope of the noncompetition restriction was limited to services he performed for JGR in the year prior to his departure.  (Am. Compl., Ex. 1 § 6).  Even more, the restriction only limits Gabehart from providing the same services he provided JGR to "any other NASCAR Xfinity Series or NASCAR Cup Series racing team (or their respective successor series) or any vehicle manufacturing company or other person or entity that provides goods or services to such a team." (*Id.*).  This restriction applies to a small number of entities involved in NASCAR and is easily discernable to individuals involved in the industry.  As such, the Agreement is no wider than it must be to protect JGR's legitimate business interest.

Additionally, because Gabehart was not terminated "without cause", the noncompetition restriction applies for eighteen (18) months.  North Carolina courts regularly enforce noncompetition restrictions of up to twenty-four (24) months.  *Harwell Enters., Inc. v. Heim*, 276 N.C. 475, 481, 173 S.E.2d 316 (1970) (upholding a two-year restriction); *Triangle Leasing Co.*, 327 N.C. at 229.  The noncompetition provision is enforceable as a matter of law.

Spire has publicly acknowledged Gabehart has been retained as its Chief Motorsports Officer.  In that role, he is overseeing all of Spire's competitive efforts in NASCAR. Gabehart's role as Competition Director for JGR was to be one of the leaders of JGR's competitive racing strategy and implementation.  Accepting this position plainly violates the language of Section 6 of the Agreement.

Gabehart has also violated critical terms of the Agreement prohibiting him from using JGR's Confidential Information and Trade Secrets for a purpose other than for benefitting JGR.

He stopped providing services for JGR on November 10, 2025. Yet, he accessed the materials in the Spire folder on at least six different days after that date. This demonstrates he was using those materials for a purpose other than serving JGR's interest, namely his own and Spire's. Likewise, Gabehart did not take the November 7 Photos or the materials saved in the Spire folder for a legitimate business purpose.

### B. Tortious Interference.

JGR has offered sufficient evidence Spire tortiously interfered with JGR's Agreement with Gabehart. Under North Carolina law, the elements are: "(1) a valid contract between the plaintiff and a third person; (2) the defendant's knowledge of the contract; (3) that the defendant intentionally induced the third person not to perform the contract; (4) that the defendant acted without justification; and (5) that the plaintiff suffered actual damage." *dmarcian, Inc. v. dmarcian Eur. BV*, 60 F.4th 119, 142 (4th Cir. 2023) (affirming grant of preliminary injunction on tortious interference claim).

JGR and Gabehart had a valid contract. Spire knew about that contract by no later than the filing of this lawsuit. Less than 48 hours after JGR filed this widely reported litigation, specifically alleging Gabehart would violate his noncompete obligations under the Agreement by going to work for Spire as its Chief Motorsports Officer, Spire hired him for that very role. There is no reasonable justification for Spire to hire Gabehart to a role that almost entirely overlaps with his role at JGR knowing it would cause Gabehart to violate his noncompete obligation to JGR. Lastly, JGR has been damaged by Spire's hiring of Gabehart because JGR is no longer receiving the benefit of a noncompete provision Gabehart negotiated with the Company. JGR has shown a likelihood of success on the merits.

## C. Trade Secrets and Unfair and Deceptive Trade Practices.

The federal Defend Trade Secrets Act, 18 U.S.C. §§ 1836 *et seq.* ("DTSA") provides relief when the plaintiff establishes "(1) the existence of a trade secret, (2) the trade secret's misappropriation, and (3) that the trade secret implicates interstate or foreign commerce." *See dmarcian, Inc.*, 60 F.4th at 141. The DTSA broadly defines trade secret to include "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes . . . ." 18 U.S.C. § 1839(3).These categories of information constitute "trade secrets" when (1) the owners thereof take reasonable measure to keep the information secret and (2) when the information derives economic value from being secret. *Id.* JGR has employed reasonable measures to protect the confidentiality of its trade secrets. JGR derives substantial economic benefit from keeping these trade secrets confidential as their confidentiality allows JGR to compete at the highest levels of racing that its competitors cannot replicate absent the significant expenditure of time, capital, and resources. JGR satisfies the first element of its DTSA claim.

As to the second element, Gabehart's conduct meets the DTSA's definition of "misappropriation." "Misappropriation" includes, in relevant part, (1) *acquisition* of trade secrets by improper means, (2) unauthorized *disclosure* of trade secrets acquired through improper means or by a person who had a duty to maintain secrecy thereof, or (3) unauthorized *use* of trade secrets acquired through improper means or by a person who had a duty to maintain secrecy thereof. 18 U.S.C. § 1839(5) (emphasis added).

JGR has also shown Gabehart misappropriated JGR's trade secrets by improperly acquiring them and using them without JGR's authorization. Gabehart *acquired* JGR's trade secrets by

improperly saving JGR's Confidential Information and Trade Secrets on his personal cell phone and in his personal Google Drive. Among other things, he also *used* them to make himself more valuable in obtaining a job with one of JGR's competitors—Spire—in which he will continue to *use* JGR's Confidential Information and Trade Secrets to benefit JGR's competitor. Indeed, Gabehart continuously accessed these materials after November 10, 2026. Significant portions of the materials Gabehart took reflect financial information that was not within Gabehart's purview as JGR's Competition Director. The Court should conclude from these allegations Gabehart took those materials to help him in his role at Spire which encompasses the services he provided JGR and services pertaining to the financial side of racing. Spire has now confirmed Gabehart is working for it in a role that includes performing the same services Gabehart provided JGR and that would benefit from additional materials Gabehart took that were outside of the scope of his duties at JGR.

As to the third and final element, the trade secrets that Gabehart improperly accessed, retained, used, and disclosed are within, and intended to be used in, interstate commerce. JGR uses its Confidential Information and Trade Secrets in NASCAR races held across various states, and NASCAR racing is plainly a national business.

Gabehart had no legitimate business need to acquire information regarding JGR's Confidential Information and Trade Secrets—particularly after he decided to leave JGR. The Agreement and JGR's policies specifically prohibited him from using or disclosing JGR's trade secrets on behalf of a competitor. Having made a prima facie showing on each element, JGR has demonstrated a likelihood of succeeding on its DTSA claim.

For similar reasons as described *infra*, JGR is also likely to prevail on its claim under the North Carolina Trade Secrets Protection Act, N.C. Gen. Stat. §§ 66-152, *et seq*. ("NCTSPA"). The

NCTSPA's definition of "trade secret" is nearly identical to the definition set forth in the DTSA. *See* N.C. Gen. Stat. § 66-152(1)[6]; *see also Rels. Ins., Inc. v. Pilot Risk Mgmt. Consulting, LLC*, No. 22-cvs-4285, 2024 WL 3549145, at *16 (noting the court did not identify any differences in the analysis for DTSA and NCTSPA claims and collecting cases for that proposition). Additionally, under the NCTSPA, direct evidence of misappropriation is not required for a plaintiff to recover—circumstantial evidence is sufficient. *See*, e.g., *Bridgetree, Inc. v. Red F. Marketing LLC*, 2013 WL, at * 8 (W.D.N.C. Feb. 5, 2013) (citations omitted).

JGR's prima facie showings in support of its statutory trade secret claims also demonstrate its likelihood of succeeding on its claim under the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1, *et seq.* ("UDTPA"). The UDTPA prohibits unfair and deceptive trade practices and permits entities injured by such practices to bring a private action to pursue relief. N.C. Gen. Stat. § 75-1.1(a), 75–16. An injured party is entitled to relief upon proving "(1) an unfair or deceptive act or practice; (2) in or affecting commerce; which (3) proximately caused actual injury to the claimant or its business." N.C. Gen. Stat. § 75-1.1. *See also Hatteras/Cabo Yachts, LLC v. M/Y EPIC*, 423 F.Supp.3d 181, 191 (E.D.N.C. 2019) (denying plaintiff's motion to dismiss defendant's UDTPA counterclaim).

Gabehart's misappropriation of JGR's Confidential Information and Trade Secrets was *per se* an unfair or deceptive trade practice. *See Grout Dr. Glob. Fran. Corp. v. Groutman, Inc.*, No. 7:14-CV-105-BO, 2015 WL 2353698, at *5 (E.D.N.C. May 15, 2015) ("Misappropriation of trade secrets constitutes an unfair or deceptive act or practice as a matter of law.") (citation omitted).

---

[6] A plaintiff states a prima facie case for misappropriation of trade secret under the NCTSPA upon introduction of evidence that the defendant "(1) [k]nows or should have known of the trade secret" and "(2) [h]as had a specific opportunity to acquire it for disclosure or use or has acquired, disclosed, or used it without the express or implied consent or authority of the owner." N.C. Gen. Stat. § 66-155.

Moreover, Gabehart's surreptitious copying of Confidential Information and Trade Secrets—especially in a manner his past experience informed him was less susceptible to detection—was immoral, unethical, and unscrupulous, thus making it an unfair trade practice. *See Marshall v. Miller*, 302 N.C. 539, 548, 276 S.E.2d 397, 403 (1981).

Gabehart's retention and use of Confidential Information and Trade Secrets to make himself more valuable to JGR's competitor and to benefit JGR's competitor adversely affected JGR's position in the marketplace. It is therefore conduct "in or affecting commerce." *See Grout Dr. Glob. Fran. Corp.*, 2015 WL 2353698, at *5 (In determining whether a party's conduct affects commerce as defined by the [UDTPA], courts should consider the 'impact the practice had in the marketplace.'") (citation omitted). This conduct injured JGR's standing in the marketplace by diminishing the value of its trade secrets, reducing JGR's competitive advantages, and enabling Spire—and potentially other competitors—to unfairly compete against JGR in NASCAR races.

## III. JGR Will Suffer Irreparable Harm If the Court Does Not Grant the Motion.

JGR's actual and potential loss of trade secrets, the imminent reduction of JGR's competitive advantage against Spire individually and collectively constitute irreparable harm warranting injunctive relief. The DTSA and NCTSPA specifically recognize the irreparable harm caused by misappropriation of trade secrets. Furthermore,

> North Carolina courts recognize that misappropriation of a trade secret is an injury of 'such continuous and frequent recurrence that no reasonable redress can be had in a court of law.' The very nature of a trade secret mandates that misappropriation will have significant and continuous long-term effects. The party wronged may forever lose its competitive business advantage or, at the least, a significant portion of its market share.

*Merck & Co. Inc. v. Lyon*, 941 F. Supp. 1443, 1455 (M.D.N.C. 1996) (citations omitted internal citations and quotation formatting removed). [7]

Gabehart misappropriated valuable Confidential Information and Trade Secrets belonging to JGR under circumstances plainly demonstrating he intended to use and/or disclose them to compete against JGR. A substantial portion of the value of this information—if not all of it—is derived from its secrecy and confidentiality. Gabehart has already improperly misused certain of JGR's Confidential Information and Trade Secrets by surreptitiously taking them without authorization, thereby forever destroying the confidentiality and secrecy it enjoyed.

When called to account on this conduct, he did not agree to allow JGR to engage in a robust and complete forensic review of his electronic devices to ensure he did not further use and disclose them. Instead, through his counsel, he told JGR the job offer he received from Spire was "not to provide services similar to those Mr. Gabehart provided to JGR." JGR reasonably relied on that representation in negotiating a paired down forensic review protocol while maintaining it would insist on Gabehart respecting a noncompete period. Only after that forensic review was completed, did JGR learn: (1) the job offer he wished to accept was for substantially the same services he provided JGR and (2) he had no intentions of abiding by his noncompete obligations. Had Gabehart been honest about those two issues once JGR learned of his misappropriation of JGR's trade secrets, which he was not, JGR would have insisted on the initial terms of the forensic review protocol it proposed to ensure Gabehart had not and was not using or disclosing its Confidential Information and Trade Secrets.

---

[7] *See also Vessel Med., Inc. v. Elliot*, No. 6:15-CV-00330-MGL, 2015 WL 5437173, at *9 (D.S.C. Sept. 15, 2015) (acknowledging that "loss of even a single trade secret is irreparable harm, and the ***threatened disclosure*** of a trade secret supports the imposition of injunctive relief.") (emphasis added). More, the loss of a trade secret is difficult to measure in monetary damages because once the secret is lost, it is indeed lost forever." *Vessel Med.*, 2015 WL 5437173, at *9.

Gabehart took JGR's Confidential Information and Trade Secrets in a manner calculated to avoid detection. He took them under circumstances showing he intended to use them to benefit Spire,and he has now begun working for Spire. Pairing this with Gabehart's deceitful interactions with JGR since the Company learned of his actionable behavior by lying about the services he intended to provide JGR's direct competitor without abiding by his noncompete and nondisclosure requirements leads to an inescapable conclusion: Gabehart's plan all along was to immediately compete against JGR without giving JGR any insight on what he did with its trade secrets.

Absent injunctive relief, Gabehart will continue to violate his noncompete obligations by working for Spire and will use JGR's Confidential Information and Trade Secrets to do so. Quantifying those damages will be hard, if not impossible, and the requested injunctive relief will minimize the risk of irreparable harm and continued harm in the future.

## IV.     The Balance of Equities Weighs Heavily in JGR's Favor.

While the risk of irreparable harm to JGR in the absence of injunctive relief is high, the risk of harm to Defendants is non-existent. The "lack of demonstrated irreparable harm to [the] defendant if the injunction is imposed" generally warrants a finding that the balance of equities lies in favor of the plaintiff. *See NovaQuest Cap. Mgmt., L.L.C. v. Bullard*, 498 F.Supp.3d 820, 838 (E.D.N.C. 2020).

The Confidential Information and Trade Secrets that are one focus of this Motion belong to JGR. To the extent the requested injunctive relief inconveniences Defendants—which JGR contends it will not—such inconvenience is trifling in comparison to the grave and irreparable injuries that JGR may sustain in the absence of relief. More importantly, however, Defendants cannot be injured by an injunction prohibiting them from retaining, using, or disclosing information they were not entitled to retain, use or disclose in the first instance. Nor can

Defendants be harmed by an injunction prohibiting Gabehart from violating his agreed to noncompete provisions or prohibiting from Spire employing him in violation of the noncompete provisions.

Notably, the injunction JGR requests would not prohibit Gabehart from working in stock car racing, or Spire, in any fashion. It would only prevent him from performing the same job functions he performed for JGR for a limited and identified number of competitive teams. The balance of equities in enforcing the very terms that Gabehart agreed to, and is now actively violating, strongly lean in JGR's favor.

## V. This Court's Granting of Injunctive Relief Serves the Public's Interest in Protecting Trade Secrets and Enforcing Contractual Terms.

"[T]he public interest favors protection of trade secrets." *Forestry Sys., Inc. v. Coyner*, No. 1:11-CV-295, 2011 WL 1457707, at *2 (M.D.N.C. Apr. 15, 2011). Protecting trade secrets fosters research, development, and refining or advancing business practices and procedures. *See FMC Corp. v. Cyprus Foote Min. Co.*, 899 F.Supp. 1477, 1484 (W.D.N.C. 1995). So critical is the protection of trade secrets to the public interest that Congress has criminalized the act of misappropriating another's trade secrets. *See Title Trading Servs. USA, Inc. v. Kundu*, No. 3:14-CV-225-RJC-DCK, 2014 WL 1765128, at *4 (W.D.N.C. May 2, 2014).

Preliminary injunction will also serve the public's interest in protecting and enforcing binding restrictive covenants. *Maaco Fran., LLC v. Boensch*, No. 3:16-CV-155-GCM, 2016 WL 4746215, at *7 (W.D.N.C. Sept. 12, 2016) ("It is as much a matter of public concern to see that valid covenants are observed as it is to frustrate oppressive ones.") (internal citations and modifications omitted)). Here, public interest is served by enforcing the provisions of the Agreement that Gabehart not use JGR's Confidential Information and Trade Secrets for the benefit of others and not to perform services for JGR's competitor of the kind he performed for the

Company.  Gabehart has demonstrably violated each of these covenants and will continue to do so absent Court intervention.

## CONCLUSION

For the reasons stated herein, JGR prays that this Court issue a temporary restraining order and preliminary injunction as set forth in JGR's Motion that enforces the agreed upon non-compete period and ensures the return and protection of JGR's Confidential Information and Trade Secrets.

This the 24th day of February, 2026.

**PARKER POE ADAMS & BERNSTEIN LLP**

/s/ Sarah F. Hutchins
Sarah F. Hutchins
N.C. Bar No. 38172
Tory Ian Summey
N.C. Bar No. 46437
Keith M. Weddington
N.C. Bar No. 14352
Charles G. Middlebrooks
N.C. Bar No. 55171
Bank of America Tower
620 South Tryon St., Suite 800
Charlotte, North Carolina 28202
sarahhutchins@parkerpoe.com
torysummey@parkerpoe.com
keithweddington@parkerpoe.com
charliemiddlebrooks@parkerpoe.com
*Attorneys for Joe Gibbs Racing, LLC*

## ARTIFICIAL INTELLIGENCE CERTIFICATION

No artificial intelligence was employed in doing the research for the preparation of this Memorandum, with the exception of the standard artificial intelligence embedded in WestLaw. Every statement and every citation to an authority contained in this Memorandum has been checked by an attorney in this case as to the accuracy of the proposition for which it is offered.

**PARKER POE ADAMS & BERNSTEIN LLP**

/s/ Sarah F. Hutchins
Sarah F. Hutchins
N.C. Bar No. 38172
Tory Ian Summey
N.C. Bar No. 46437
Keith M. Weddington
N.C. Bar No. 14352
Charles G. Middlebrooks
N.C. Bar No. 55171
Bank of America Tower
620 South Tryon St., Suite 800
Charlotte, North Carolina 28202
sarahhutchins@parkerpoe.com
torysummey@parkerpoe.com
keithweddington@parkerpoe.com
charliemiddlebrooks@parkerpoe.com
*Attorneys for Joe Gibbs Racing, LLC*

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that the foregoing **PLAINTIFF JOE GIBBS RACING, LLC'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** was electronically filed with the Clerk using the CM/ECF system which will automatically send notice and serve same upon counsel of record via the Court's electronic case filing system.

This the 24th day of February, 2026.

<div style="margin-left:40%">

**PARKER POE ADAMS & BERNSTEIN LLP**

/s/ Sarah F. Hutchins
Sarah F. Hutchins
N.C. Bar No. 38172
Tory Ian Summey
N.C. Bar No. 46437
Keith M. Weddington
N.C. Bar No. 14352
Charles G. Middlebrooks
N.C. Bar No. 55171
Bank of America Tower
620 South Tryon St., Suite 800
Charlotte, North Carolina 28202
sarahhutchins@parkerpoe.com
torysummey@parkerpoe.com
keithweddington@parkerpoe.com
charliemiddlebrooks@parkerpoe.com
*Attorneys for Joe Gibbs Racing, LLC*

</div>