# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
Case No. 3:26-CV-00133-MEO-DCK

| | |
|---|---|
| JOE GIBBS RACING, LLC,<br><br>**Plaintiff,**<br><br>v.<br><br>**CHRISTOPHER GABEHART and SPIRE MOTORSPORTS, LLC,**<br><br>**Defendants.** | **DECLARATION OF CHRISTOPHER GABEHART** |

Christopher Gabehart, being first duly sworn, says:

1.      I am a Defendant in the above-captioned matter. I am a resident of Mooresville, North Carolina, and I am over eighteen years of age. I have personal knowledge of the facts set forth in this Declaration.

2.      I submit this Declaration in opposition to Plaintiff Joe Gibbs Racing, LLC's ("JGR") Motion for a Temporary Restraining Order and Preliminary Injunction. The facts set forth herein demonstrate that JGR's motion should be denied because there has been no misappropriation of trade secrets or confidential information, no irreparable harm will occur absent injunctive relief, and the forensic evidence conclusively establishes that I have not transmitted, distributed, used, or otherwise shared any JGR confidential information. Additionally, the facts herein demonstrate that JGR materially breached the terms of the employment agreement by withholding payment to me, voiding all the rights to enforce any non-compete obligation.

1

**EMPLOYMENT HISTORY WITH JGR AND THE EMPLOYMENT AGREEMENT**

3.      I began working for JGR in 2012. Over the course of thirteen years, I rose from engineer to crew chief to Competition Director, contributing to multiple championships and race victories.

4.      On or about November 15, 2024, JGR and I executed a written Employment Agreement (the "Agreement"), effective December 1, 2024, governing my role as JGR's Competition Director. The Agreement included terms governing, among other things, compensation, termination provisions, confidentiality, and restrictive covenants.

5.      Section 6 of the Agreement contains restrictive covenants, including provisions relating to noncompetition. In its motion for Temporary Restraining Order and Preliminary Injunction, JGR omits critical language contained in the Agreement. Critically, the second paragraph of Section 6 provides that the Noncompete Period (as defined in the Agreement) is reduced to one (1) week and JGR must pay me $100,000 in exchange for a complete mutual release if, after September 1, 2025, and before June 1, 2026: (i) I notified JGR of specific job duties or responsibilities assigned to me that were inconsistent with my reasonable expectations or the job description provided before employment began; (ii) JGR was provided at least sixty (60) days to resolve such inconsistencies to my reasonable satisfaction and JGR failed to do so; and (iii) I provided JGR sixty (60) days' prior written notice of termination without cause due to such unresolved inconsistencies. In addition, if my employment is terminated without cause, no Noncompete Period applies.

6.      During the 2025 season, I became dissatisfied with certain responsibilities in my position as Competition Director at JGR and other aspects of how JGR's race teams were being run. Pursuant to Section 6 of the Agreement, I provided JGR with notice of the same.

7.      Specifically, on or around November 6, 2025, I provided written notice to JGR pursuant to Section 6 of the Agreement (the "Written Notice[1]"). The Written Notice identified specific job duties and responsibilities assigned to me that were materially inconsistent with my reasonable expectations when I accepted the position of Director of Cup Series Competition and with the job description provided by JGR and Coach Gibbs prior to the Start Date.

8.      I notified JGR that the job was not, at all, as advertised. I was promised a COO-type role overseeing all competitive operations with autonomy to lead. Instead, I found myself constantly intertwined with Coach Gibbs, senior JGR executives, and family members when making even routine competition decisions—a dysfunctional organizational structure that I could not continue in.

9.      I further expressed serious concerns about the management of JGR's No. 54 car, which is one of JGR's four Cup Series entries. It was my view that the No. 54 car should be managed and held accountable in the same manner as the organization's other cars. Instead, the No. 54 car was managed directly by Coach Gibbs and everyone in the organization knew it. Beginning early in the 2025 season, Coach Gibbs repeatedly pressured me to take over as crew chief of the No. 54 car. I consistently declined, explaining that as Competition Director, I did not believe this was the right move, that it would undermine the long-term development of the team, and that I did not want to be crew chief of the No. 54 or any other car. Despite my objections, Coach Gibbs and ownership continued pressing, and I eventually conceded to the pressure by first helping the No. 54 team more behind the scenes and then, beginning on June 28, 2025, by publicly serving as the crew chief and calling the races on Sundays for nine consecutive races before

---

[1] I do not have a copy of this notice because it was sent through a JGR email address and I no longer have access to that account.

returning those duties to the original crew chief, Tyler Allen, against the strong desires of ownership, when I made it clear that I did not want to serve as a crew chief for the long term.

10.     I also identified specific examples of the No. 54 team's differential treatment that undermined my position as Competition Director. For example, key personnel decisions were made without my counsel or input despite my role as Competition Director; and critically the No. 54 driver was not held to the same meeting attendance standards as others on the team.

**THE NOVEMBER 6, 2025 MEETING**

11.     On November 6, 2025, after providing the Written Notice, and long after many oral notices were provided to JGR leadership, I met with Coach Gibbs to discuss these concerns in person. During that meeting, I reiterated the issues identified in the Written Notice and expressed my desire for a resolution. Following that meeting, Coach Gibbs and I agreed we needed to begin the process of working out the terms of a separation.[2]

12.     Following that meeting, I understood that JGR would honor the terms of Section 6 and pursue an amicable separation, as contemplated by the Agreement. I believed the parties were working toward a separation agreement consistent with the contractual framework we had agreed upon.

13.     I admit that on November 7, 2025, I took photographs on my phone of a JGR excel file, with multiple tabs, and other notes and files that I created or had a significant role in their development. All of the information contained within the files was relevant to my job at JGR. I understood my confidentiality obligations to JGR and had no intent to violate those obligations

---

[2] Coach Gibbs confirmed this when he was interviewed by SiriusXM Radio at Daytona on or around February 12, 2026. In that interview, Coach Gibbs stated: "After the season, Chris [Gabehart] and I met, and we just decided to go our separate ways." *See, e.g.*, https://athlonsports.com/racing/nascar/joe-gibbs-addresses-offseason-departure-of-chris-gabehart-as-competition-director.

with respect to JGR's confidential or trade secret information. I did not plan to use any such information in future employment and have not done so.

14. On November 10, 2025, following the parties' agreement to begin working on the terms of a separation, JGR placed me on "garden leave" while we worked through a separation agreement. JGR instructed me that if anyone internally asked where I was, I should say I was "on vacation." A copy of the email exchange memorializing this arrangement is attached hereto as **Exhibit A**.

15. JGR leadership also understood that I had exercised my rights under Section 6 of the Agreement. For example, on November 8, 2025, Tim Carmichael, JGR's CFO, who signed the Agreement on behalf of JGR, read the written notice and responded that he did not "believe [my] actual role was what Coach said it would be." He further indicated he did not blame me for exercising my rights. A copy of that text message exchange is attached hereto as **Exhibit B.**

16. On November 10, 2025, JGR presented me with the terms of a proposed separation agreement. I was actively engaged in good-faith discussions toward a mutually agreeable separation framework, which would include provisions concerning the return of specified JGR materials, mutual releases, and reciprocal non-disparagement.

**OFFER OF EMPLOYMENT FROM SPIRE MOTORSPORTS**

17. On November 13, 2025, after Coach Gibbs and I had mutually decided to begin working on a separation agreement following the meeting on November 6, 2025, I received an unsolicited job offer from Spire Motorsports.

18. Throughout the separation agreement process with JGR, and even after receiving the offer from Spire, I remained ready, willing, and able to perform my duties consistent with the

5

Agreement and was engaged in good-faith discussions toward a mutually agreeable separation framework.

19.     Following receipt of the offer from Spire on November 13, 2025, I created a folder in my Google Drive named "Spire" that I used as my personal working space to evaluate the job offer and consider my options since I understood JGR and I were working towards a mutual separation agreement.

20.     I did access that folder after it was created. However, I did not use any confidential JGR information (including any confidential information that was contained in subfolders contained in that file) while working in the folder. At all times, I understood my confidentiality obligations to JGR and had no intent to violate those obligations.

**THE DEMAND LETTER AND MY RESPONSE**

21.     Negotiations toward a mutually agreeable separation agreement ceased, and on December 15, 2025, I received a demand letter from JGR's counsel.

22.     On December 17, 2025, my counsel responded to JGR's demand letter and agreed to return and delete any JGR information in my possession, as defined in the Agreement. In that response, I made clear that no JGR confidential information had been transferred or disseminated.

23.     My counsel and JGR's counsel negotiated a mutually acceptable forensic protocol in which I allowed JGR's forensic examiner of choice to image my Google Drive and personal cell phone and to identify and delete any JGR information that JGR contended it was concerned with.

24.     The forensic examination was conducted pursuant to a detailed Protocol drafted by JGR's own counsel, using a forensic examiner (Reliance Forensics, LLC) selected by JGR. A true

and correct copy of the Forensic Review Protocol (the "Protocol") is attached hereto as **Exhibit C**.

25.     The entire cost of the forensic examination was paid by me personally.

26.     Prior to the examination, I executed a sworn declaration under penalty of perjury certifying that I had conducted a reasonable search of my files and the only confidential JGR information I had in my possession from my employment with JGR was located on my Google Drive and personal cell phone. Accordingly, those are the devices that were reviewed during the forensic examination. I also certified under penalty of perjury that since November 1, 2025, I had not transferred confidential information belonging to JGR to any third party nor had I intentionally allowed any third party to view any confidential information belonging to JGR. A copy of my declaration is attached to the Forensic Review Protocol.

27.     The Protocol required a comprehensive review of my personal cell phone and Google Drive account. The forensic examiner was authorized to: (a) compare files on the devices against known JGR files; (b) search for any reference to JGR, Joe Gibbs Racing, or common variations thereof; (c) search for JGR sponsor names, team names, and equipment references; and (d) perform keyword searches designed to identify JGR data. The examination also reviewed text messages, email attachments, and any evidence of transmission or dissemination of information.

28.     I took my cell phone to JGR's chosen forensic examiner's office on January 12, 2026, and left it there for the day for the forensic examiner to image. On that same day, I provided other relevant credentials to the forensic examiner so they could access other devices and cloud-based storage locations.

29.     The forensic examination was completed. The results confirmed what I had maintained from the outset: there is no evidence that I transmitted, distributed, used, or otherwise

shared any JGR confidential information. No text messages. No email attachments. No dissemination whatsoever. A January 21, 2026 email from the forensic examiner confirmed that he did not locate any text messages or email attachments with the files that JGR had previously identified as being of interest. A copy of that email is attached hereto as **Exhibit D**.

30.     I further consented to the permanent deletion of all flagged items from my personal devices. That deletion occurred at the office of the forensic examiner on February 6, 2026. An email from the forensic examiner to my counsel confirming the same is attached hereto as **Exhibit E**.

31.     After receiving the demand letter, and while undergoing the forensic examination, I hit pause for two additional months on moving forward with future employment with Spire or any other team. My goal and only focus was to prove to JGR, to the best of my ability, that their confidential information had not been transmitted. I wanted to give them assurances that was the case, which was the intent of the forensic examination.

### JGR'S CONFUSION REGARDING MY EMPLOYMENT STATUS AND BREACH OF THE AGREEMENT

32.     JGR's own internal confusion about my employment status further demonstrates that no valid termination for cause occurred in November 2025. On November 24, 2025, I contacted JGR's Chief People Officer, Toni Rogers, to inquire about extending my health insurance through COBRA.

33.     Ms. Rogers responded that same day, acknowledging that she was "awaiting to tell [HR] anything until I get more information" and that JGR would need to "terminate [my] employment to trigger the qualifying event" for COBRA eligibility. Ms. Rogers further stated that

if JGR was "still in limbo" after Thanksgiving, she would work to ensure I received the necessary information. A copy of this email exchange is attached hereto as **Exhibit F**.

34.     Despite this ongoing confusion about my employment status, JGR unilaterally ceased paying me all regular compensation to which I was entitled under the Agreement. Beginning in November 2025, JGR refused to pay amounts owed under the Agreement. No written termination notice was ever issued to me identifying November 10, 2025, as a termination date, nor had the parties finalized or executed a separation agreement or mutual release. Nevertheless, JGR stopped all wage payments while we were actively negotiating a potential separation agreement.

35.     JGR had no basis to withhold my earned wages.

36.     JGR's pattern of withholding compensation extended to my earned performance bonuses for the 2025 season. Although I earned my 2025 season Performance Bonus (approximately $235,000) in early November 2025 following the end of the 2025 NASCAR season, JGR did not pay this bonus until January 20, 2026—more than two months after it was earned and well beyond the timeframe contemplated by the Agreement. This delayed payment came more than a month after my counsel notified JGR's counsel of these issues. JGR has offered no legitimate explanation for this delay.

37.     By unilaterally withholding my wages and other compensation owed under the Agreement, JGR materially breached the Employment Agreement before any of the alleged conduct JGR now cites in its Complaint.

38.     JGR's mishandling of my employment status has caused me concrete harm. Because JGR failed to properly administer the separation process and could not determine whether I was still employed, my health insurance coverage was not properly transitioned to COBRA in a

9

timely manner. As a result, my family and I have had insurance claims denied due to coverage lapses caused entirely by JGR's administrative confusion and failure to effectuate a proper termination.

39. On February 5, 2026, my counsel sent a letter to JGR's counsel explaining that the forensic examination had been completed and validated that I had not transmitted, distributed, or otherwise shared any JGR confidential information. In that letter, my counsel indicated that we were ready to finalize the separation agreement and move forward. My counsel also informed JGR's counsel, among other things, that JGR had not terminated me for cause and was in violation of the North Carolina Wage & Hour Act.

40. In response, on February 9, 2026—three months after I exercised my rights under Section 6, two months after JGR began withholding my wages, and after the forensic examination confirmed no misappropriation—JGR's counsel sent a letter purporting to terminate my employment "for Cause." The letter from JGR's counsel itself repeatedly characterized my departure as a resignation, stating that I "agreed to leave" and "resigned [my] employment," confirming that the termination for cause was a strategic afterthought rather than a good-faith determination. A copy of the alleged termination notice is attached hereto as **Exhibit G**.

41. The alleged termination notice does not state that I transmitted any JGR confidential information. Instead, it speculates that I had JGR confidential information on "personal accounts and devices with the intent to use and/or disclose this information to a direct competitor of JGR's." The alleged termination notice also does not specify how I breached Section 5 of my Employment Agreement. The alleged termination notice also fails to specify what JGR policies or procedures I allegedly violated.

42.     The alleged termination notice was not legitimate. If JGR does not honor the exercising of my rights under the second paragraph in Section 6 of the Agreement, then the termination is without cause pursuant to Section 4(d) of the Agreement, and JGR owes me my salary through the term of the Agreement, which exceeds $2.15 million.

## THE RESTRICTIVE COVENANTS IN THE AGREEMENT

43.     I do not believe there is a legitimate, enforceable noncompetition covenant under the circumstances of my separation from JGR.

44.     I acknowledge that I have certain obligations to JGR arising from my employment, including obligations not to disclose JGR Confidential Information as that term is defined in the Agreement. I have at all times intended to honor these obligations and have conducted myself accordingly. I agree to do the same moving forward.

45.     I acknowledge that I also have obligations regarding the non-solicitation of JGR employees. I was not involved with any JGR employees leaving JGR to go work for Spire. I intend to honor these non-solicitation obligations moving forward.

## SPIRE'S KNOWLEDGE OF MY OBLIGATIONS

46.     As of last week, I became employed by Spire Motorsports as Chief Motorsports Officer. In this role, I do not provide services similar to the general type of services that I provided to JGR during the 2025 season.

47.     I have made Spire Motorsports aware of my confidentiality and other obligations to JGR. Indeed, Spire and I executed a Confidentiality and Non-Disclosure Agreement expressly acknowledging my confidentiality obligations to JGR. In that agreement, I agreed to maintain at all times the confidentiality of JGR Confidential Information and not to disclose JGR Confidential Information to Spire or use JGR Confidential Information for Spire's benefit or in connection with

any services performed for Spire. Spire, for its part, agreed not to solicit, obtain, or use any JGR Confidential Information from me. A true and correct copy of that Confidentiality and Non-Disclosure Agreement is attached hereto as **Exhibit H**.

48. After the forensic examination described above was completed, JGR indicated it was still not satisfied. To further satisfy them, through counsel, I communicated that Spire Motorsports was willing to allow a neutral forensic examiner, under a mutually agreed protocol, to review Spire's own materials solely to confirm that no JGR information had been transmitted to or used by Spire. Spire was also willing to enter into an agreement representing that it had not received any JGR confidential information from me and agreeing not to obtain or use any JGR confidential information from me in the future. A copy of the February 11, 2026 letter stating the same is attached hereto as **Exhibit I**.

49. JGR never responded to this offer. Instead, JGR filed this lawsuit, choosing litigation and public spectacle over the verification it claimed to seek.

## JGR HAS NO BASIS FOR INJUNCTIVE RELIEF

50. JGR cannot establish irreparable harm warranting injunctive relief, particularly where the forensic examination confirmed no misappropriation occurred and there is no evidence to the contrary. The Employment Agreement provides certain protections for JGR's confidential information, which I agree to comply with.

51. I did not misappropriate any trade secrets. A comprehensive forensic examination of my devices—conducted by an examiner of JGR's own selection—confirmed that I did not transmit, distribute, or share any JGR confidential information.

52. The forensic review demonstrated that I did not transmit, distribute, or share JGR confidential information. I had (and have) no "plan" to compete unfairly.

53.     This lawsuit is not about protecting trade secrets—it is about punishing a former employee for daring to leave.

54.     Granting injunctive relief and preventing me from working in NASCAR, where I have dedicated my entire career, would deprive me of my livelihood and ability to work in my chosen profession. Granting the injunctive relief requested by JGR would effectively bar me from pursuing my livelihood in the only industry in which I have developed expertise over the course of my professional career.

55.     NASCAR racing is an extraordinarily specialized field. Unlike many industries where an employee subject to a noncompete agreement might find alternative employment in a related field, there are no comparable alternatives for a professional of my stature and expertise outside of the NASCAR industry. The teams that compete in the NASCAR Cup Series represent an extremely small universe of potential employers, and the positions available at my level are exceptionally rare. An injunction prohibiting me from working in this specialized field will not merely inconvenience me; it will effectively exile me from this profession.

56.     The harm in granting injunctive relief as requested by JGR extends beyond my immediate loss of income, which is substantial. My professional reputation and career trajectory will suffer significant damage if I am prohibited from working in this field. Opportunities in professional motorsports are fleeting, and the position I have accepted at Spire likely will not be available in the future. The consequential harm from missing this career opportunity, including diminished future earning potential and professional standing, must be accounted for if any injunctive relief is granted.

57.     Based on the foregoing, I respectfully submit that JGR's Motion for a Temporary Restraining Order should be denied. The comprehensive forensic examination—conducted by

JGR's own chosen examiner, pursuant to JGR's own drafted protocol, and paid for entirely by me—confirmed that I did not transmit, distribute, or share any JGR confidential information. JGR cannot demonstrate a likelihood of success on the merits, irreparable harm, or any other basis for the extraordinary relief it seeks.

58.     Should the Court deem it warranted, I am willing to consent to further forensic examination, on an expedited basis, to confirm that no trade secrets or confidential data have been misappropriated or used in connection with my employment at Spire.

[*Signature appears on following page*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

This 25th day of February, 2026.

_____
Christopher Gabehart

## CERTIFICATE OF SERVICE

I hereby certify that on this day I electronically filed the foregoing using the Court's electronic filing system which will automatically and electronically serve counsel of record in this matter as follows:

Charles G. Middlebrooks
Keith M. Weddington
Sarah F. Hutchins
Tory I. Summey
Parker Poe Adams & Bernstein LLP
620 South Tryon Street, Suite 800
Charlotte, North Carolina 28202
charliemiddlebrooks@parkerpoe.com
keithweddington@parkerpoe.com
sarahhutchins@parkerpoe.com
torysummey@parkerpoe.com

*Attorneys for Plaintiff Joe Gibbs Racing, LLC*


Additionally, I served the foregoing via First Class U.S. mail on Non CM/ECF Defendant Spire Motorsports, LLC as follows:

Spire Motorsports, LLC
c/o Registered Agent: William D. Anthony
351 Mazeppa Road
Mooresville, North Carolina 28115


s/ Cary B. Davis
Cary B. Davis
Robinson, Bradshaw & Hinson, P.A.
600 South Tryon Street, Suite 2300
Charlotte, North Carolina 28202
704.377.2536
cdavis@rbh.com