# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# CIVIL ACTION NO. 3:26-CV-00133-SCR-DCK

| | |
|---|---|
| JOE GIBBS RACING, LLC,<br><br>                    Plaintiff,<br><br>v.<br><br>CHRISTOPHER GABEHART<br>and SPIRE MOTORSPORTS, LLC,<br><br>                    Defendants. | **TEMPORARY RESTRAINING ORDER** |

**THIS MATTER** is before the Court on the Motion for Temporary Restraining Order and Preliminary Injunction (Doc. No. 9) filed by Plaintiff Joe Gibbs Racing, LLC ("JGR") pursuant to Federal Rule of Civil Procedure 65 (the "Motion"). In its Motion, JGR seeks to restrain and enjoin its former employee, Defendant Christopher Gabehart ("Gabehart"), and Defendant Spire Motorsports, LLC ("Spire"), who recently hired Gabehart, from violating the noncompetition and confidentiality covenants set forth in Gabehart's Employment Agreement with JGR.

On February 27, 2026, this Court held a hearing on the Motion and held the matter open to permit the parties to meet and confer in an attempt to resolve certain issues set forth in Plaintiff's Motion. (Minute Order entered February 27, 2026). The parties later notified the Court that they had not been able to reach an agreement. The Court orally announced its ruling on March 2, 2026, with this written order to follow.

The Court has reviewed the pleadings, applicable law, the evidence of record, and the arguments presented during the hearing. For the reasons set forth below, the Court **GRANTS IN PART** and **DENIES IN PART** JGR's Motion for Temporary Restraining Order ("TRO"). Specifically, the Court will permit a TRO against Gabehart in limited respects for the reasons that

follow. The Court denies any TRO against Spire. The Court will hold in abeyance the Motion for Preliminary Injunction pending further hearing, currently set for March 16, 2026.

## I. FINDINGS OF FACT

This Court makes the following findings of fact for the purposes only of this TRO:

1. JGR is a chartered stock car race team competing in the NASCAR Cup Series and the NASCAR O'Reilly Auto Parts Series.

2. Gabehart began working for JGR in 2012. Gabehart was later promoted to crew chief and then, in December 2024, to Competition Director. (Doc. No. 9-2 at ¶ 4; Doc. No. 12 at ¶ 3).

3. Gabehart's responsibilities included preparation and execution of JGR's car and race strategies, and overseeing development and improvement of analytics, processes, and procedures to improve race performance. (Doc. No. 9-2 at ¶¶ 4 & 6).

4. In connection with Gabehart's promotion to Competition Director, the parties entered into an Employment Agreement effective December 1, 2024 (the "Agreement"). (Doc. No. 9-3 at ¶ 4; Doc. No. 8-2).

5. The Agreement provides that JGR's Confidential Information is "a valuable, special and unique asset of Company's and its affiliates' business, access to and knowledge of which are essential to the performance of employees' duties hereunder." (Doc. No. 8-2 at ¶ 5). "Confidential Information" includes, but is not limited to:

> nonpublic information about Company sponsors and partners, race strategy, engineering information, race car set-ups, pit crew training methods and practices, pit crew analytics, technology and strategy, wind tunnel data and testing of any kind, trade secrets and any Company information that is proprietary or not publicly known. During the Term and for so long as such Confidential Information is not generally known (other than due to Employee's breach), Employee shall not disclose Confidential Information to any third party or use any Confidential Information for any purpose other than as necessary to perform pursuant to this Agreement unless and until such Confidential Information becomes generally known, except as a result of unauthorized disclosure. . . .

<u>Id.</u>

6. Section 6 of the Agreement contains a restrictive covenant not to compete, which, in relevant part, provides:

> To protect the Company's legitimate business interests including, among others, access to the Confidential Information, Employee acknowledges that certain restrictive covenants are necessary and appropriate. Except for termination without cause by Company or Term expiration, during the Term and for the longer balance of the Term including all Extensions, or nine (9) months after the date of termination (but not to exceed eighteen (18) months) (the "Noncompete Period"), Employee shall not provide services of the general type of services that Employee provided to the Company in the year prior to such termination to any other NASCAR Xfinity Series or NASCAR Cup Series racing team (or their respective successors) or any vehicle manufacturing company or other person or entity that provides goods or services to such a team.
>
> Notwithstanding any contrary provision herein, the Noncompete Period will be reduced to one (1) week and Company shall pay Employee $100,000 (in exchange for a complete mutual release and net of all required withholding and deductions) if, at any time after September 1, 2025, and before June 1, 2026: (i) Employee in good faith notifies Company in writing of specific job duties or responsibilities assigned to Employee that are inconsistent with Employee's reasonable expectations or the job description provided by Company prior to the Start Date; (ii) Employee provides Company at least sixty (60) days to resolve such inconsistencies to Employee's reasonable satisfaction and Company fails to do so; and (iii) Employee provides Company sixty (60) days prior written notice of termination without cause due to such unresolved inconsistencies. . . .

(Doc. No. 8-2 at ¶ 6).[1]

7. During a November 6, 2025, in-person meeting, Joe Gibbs ("Gibbs"), owner of JGR, and Gabehart decided to part ways. (Doc. No. 12 at ¶ 11; Doc. No. 9-3 at ¶¶ 6-7). Gabehart turned in his JGR computer on November 10, 2025, and has not provided any services to JGR since that time. (Doc. No. 9-2 at ¶¶ 21-22; Doc. No. 9-3 at ¶ 8).

8. Originally, the parties worked on negotiating a separation agreement, but these negotiations ultimately fell apart. (Doc. No. 9-3 at ¶ 9; Doc. No. 18 at ¶ 8; Doc. No. 12 at ¶ 21).

---

[1] The Agreement provides, and the parties do not dispute, that North Carolina law governs. (Doc. No. 8-2 at ¶ 12).

9. JGR conducted a forensic review of the laptop computer JGR provided to Gabehart in conjunction with his employment. (Doc. No. 9-2 at ¶ 23; Doc. No. 9-4 at ¶¶ 5 & 9).

10. The forensic review revealed that Gabehart had connected his Google Drive to his JGR Computer, and that Gabehart had been conducting online research about Spire during October and November of 2025. (Doc. No. 9-2 at ¶¶ 23-29; Doc. No. 9-4 ¶¶ 5 & 9).

11. Within the Google Drive, Gabehart had created and saved a folder titled "Spire" and a subfolder named "Past Setups." The Past Setups subfolder contained documents detailing JGR's past car setups and simulations for specific races at specific tracks. (Doc. No. 9-4 ¶¶ 12-14).

12. Gabehart accessed the "Spire" folder on his personal Google Drive several times after November 10, 2025, even though he had handed in the JGR Computer. Id. at ¶ 14.

13. In addition, the forensic review revealed that on November 7, 2025, (the day after the meeting wherein Gibbs and Gabehart decided to part ways), Gabehart used his personal cell phone to take at least 20 pictures of items contained on his JGR laptop, which included: comprehensive post-race audit and analyses of team and driver performance for the entire 2025 NASCAR season; complete team payroll details including job titles, contract length, annual compensation, incentive compensation, and compensation plans for prior years; an employee compensation calculator used to project and plan pay for key JGR positions; driver pay for the 2025 and 2026 NASCAR seasons; revenues from sponsors, partners, and other business arrangements for the 2024, 2025, and 2026 NASCAR seasons; JGR's pit crew analytics for the 2024 NASCAR season; and detailed analytics of racecar tires used to assess impact on race results. (Doc. No. 9-2 at ¶ 25; Doc. No. 9-4 ¶ 22).

14. Such information constituted Confidential Information as defined by the Employment Agreement, and taking pictures of this information was done without JGR's consent. (Doc. No. 9-2 at ¶ 26).

15. JGR had taken steps to limit unauthorized access to Confidential Information, including, but not limited to, various security measures. Id. at ¶ 8.

16. Gabehart later admitted to taking the photographs of JGR's information with his cell phone. (Doc. No. 12 at ¶ 13).

17. Certain files were saved in Gabehart's folder titled "Spire," including: (a) a 141 page .pdf file titled "Post Race Data Analysis" for a 2025 Las Vegas race containing all of JGR's data analytics including data JGR measures at races and how it measures that data; (b) more than 20 set up and simulation files which are reports generated by proprietary software using inputs that hundreds of different JGR employees manually add based off their know-how, historical data, and simulations to determine the best possible racecar setup; (c) a document detailing proprietary engine outputs and recommended gear shift points; (d) a document detailing the manner in which JGR sorts and run tires through a race; (e) a document detailing how JGR estimates fuel mileage for its drivers and competitors during races and adjustments to strengthen accuracy; (f) a document showing JGR's process for evaluating performance during races which could immediately help competitors improve race execution and performance; (g) a photo of a document detailing the manner in which JGR measures and seeks to eliminate subpar pit stops and its bonus structure for its pit crews for successful pit stops; (h) a spreadsheet listing base compensation and bonus for key members of JGR's teams; and (i) a document comparing a JGR driver's performance at a specific race to that of a Spire driver. (Doc. No. 9-2 at ¶ 24; Doc. No. 9-4 at ¶ 14).

18. As part of the forensic review and in agreement with Defendant Gabehart, the photographs on the cell phone were deleted along with other files, wherein a total of 235 total files were deleted from Gabehart's cell phone and Google Drive. (Doc. No. 9-4 at ¶ 27).

19. At this time, JGR has not produced evidence that Gabehart sent this information to other devices or accounts (beyond those already identified), or to outside third parties. (Doc. No. 9-4 at ¶ 30).

20. JGR terminated Gabehart's Agreement for cause on February 9, 2026. (Doc. No. 8-3; Doc. No. 12-8).

21. On February 21, 2026, Spire announced it had hired Gabehart as its Chief Motorsports Officer. (Doc. No. 9-2 at ¶ 31). Some, but not all, of the duties overlap with Gabehart's position at JGR as Director of Competition. At this time, Plaintiff has not produced evidence that Gabehart shared any of JGR's Confidential Information with Spire.

22. JGR filed suit against Defendants Gabehart and Spire on February 19, 2026, (Doc. No. 1) and filed an Amended Complaint on February 24, 2026, (Doc. No. 8) along with the present Motion (Doc. No. 9).[2] The claims in the Amended Complaint included: (1) Misappropriation of Trade Secrets - Federal Defend Trade Secrets Act, 18 U.S.C. §§ 1836 et seq. (Gabehart and Spire); (2) Misappropriation of Trade Secrets - North Carolina Trade Secrets Protection Act, N.C. Gen. Stat. §§ 66-152, et seq. (Gabehart and Spire); (3) Unfair Trade Practices - North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §§ 75-1.1, et seq. (Gabehart and Spire); (4) Breach of Contract (Gabehart only); (5) Tortious Interference with Contract (Spire).

## II. CONCLUSIONS OF LAW

The Court makes the following conclusions of law:

23. "Temporary restraining orders and preliminary injunctions are extraordinary remedies that may only be awarded upon a clear showing that the plaintiff is entitled to such relief and may never be awarded as of right." SVB Sec. Holdings LLC v. Drendel, No. 3:22-CV-00457, 2022 WL

---

[2] The Court is unpersuaded by Defendants' arguments challenging the timeliness of Plaintiff's Motion. The Motion was filed in short order after Gabehart's termination letter was sent on February 9, 2026.

4369991, at *3 (W.D.N.C. Sept. 21, 2022) (internal citations omitted) (citing Paradies Shops, LLC v. Brookstone Charlotte, LLC, No. 3:19-cv-00631, 2019 WL 6337818, at *1 (W.D.N.C. Nov. 26, 2019)).

24. In order to obtain a TRO, a party must establish that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20, 129 S. Ct. 365, 374 (2008); see also Rule 65 of the Federal Rules of Civil Procedure.

25. In the instant case, both Defendants have received notice and appeared at the hearings held to date.

26. As to Defendant Gabehart, Plaintiff has shown a likelihood of success on the merits as to its breach of contract and misappropriation claims. See, e.g. XPO Logistics, Inc. v. Northrop, No. 3:19-CV-00348-FDW-DSC, 2019 WL 3543877, at *4 (W.D.N.C. Aug. 2, 2019) (citing Atlantic Pinstriping, LLC v. Atlantic Pinstriping Triad, LLC, 2016 WL 5376294, * 4 (W.D.N.C. Sept. 23, 2016) and Poor v. Hill, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000)) (defining elements of breach of contract and analyzing covenants not to compete under North Carolina law).

27. Plaintiff has established the restrictive covenant not to compete was in writing as part of an employment contract based on valuable consideration and is reasonable as to its terms, time, and territory. See generally, XPO Logistics, Inc., 2019 WL 3543877, at *4; Triangle Leasing Co. v. McMahon, 327 N.C. 224, 228, 393 S.E.2d 854, 857 (1990); Hartman v. W.H. Odell and Assocs., Inc., 117 N.C. App. 307, 311, 450 S.E.2d 912, 916 (1994) (enumerating factors in determining whether the time and geographic scope of a covenant is reasonable). Plaintiff also has shown the

covenant protects a legitimate business interest that is sufficiently limited in scope and is not against public policy. XPO Logistics, Inc., 2019 WL 3543877, at *6-7.

28. Under the Agreement, Plaintiff submits because Defendant Gabehart's termination was with cause, the non-compete covenant term is 18 months and is limited to the "services of the general type of services that [Gabehart] provided to [JGR] in the year prior to such termination to any other NASCAR Xfinity Series or NASCAR Cup Series racing team (or their respective successor series) or any vehicle manufacturing company or other person or entity that provides goods or services to such a team." (Doc. No. 8-2). This covenant does not completely bar an employee from working in the industry. Rather, it restricts the employee from performing services provided to the employer in the year prior to such termination. Similar covenants not to compete with 18-month restrictions in both time, term, and territory have been found reasonable under North Carolina law. See GXO Logistics, Inc. v. Cunningham, No. 323CV000199RJCDCK, 2023 WL 3470894, at *4 (W.D.N.C. May 15, 2023) (finding restrictive covenant "'perform[ing] any competitive services . . . for a Competing Business' anywhere within the United States, Mexico, or Canada for a period of eighteen months after his termination date" to be reasonable, but denying TRO on other grounds) (citing Harwell Enterprises, Inc. v. Heim, 173 S.E. 2d 316, 320 (N.C. 1970) (holding two-year restriction reasonable because "business activities throughout the United States support the reasonableness of the restriction imposed as to the territory covered.") and Okuma Am. Corp. v. Bowers, 638 S.E.2d 617, 622 (N.C. App. 2007)); see also Philips Elecs. N. Am. Corp. v. Hope, 631 F. Supp. 2d 705, 717 (M.D.N.C. 2009) ("As a general proposition, a non-competition agreement of two years is 'well within the range that the North Carolina courts have deemed reasonable.'") (citing Lockhart v. Home–Grown Indus. of Ga., Inc., No. 3:07–CV–297, 2007 WL 2688551, at *5 (W.D.N.C. Sept. 10, 2007)). In light of Gabehart's role and JGR's

business, including the legitimate business interest of needing to protect its information in a competitive racing industry, the Court finds that the covenant not to compete is reasonable and appears valid and enforceable. Gabehart acknowledges taking a new position at Spire that has a different title. The new role has some, but not all, of the same duties that he had at JGR. Gabehart took the role at Spire during the 18-month non-compete period. Considering all of this, Plaintiff has demonstrated a likelihood of success on the merits at to its breach of contract claim.

29. Similarly, Plaintiff has shown a likelihood of success on the merits with respect to its misappropriation claims. See Federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836, et seq. (defining trade secret to include "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes . . . ."); North Carolina Trade Secrets Protection Act ("NCTSPA"), N.C. Gen. Stat. §§ 66-152, et seq.; see also dmarcian, Inc. v. dmarcian Eur. BV, 60 F.4th 119, 142 (4th Cir. 2023); Philips Elecs. N. Am. Corp., 631 F. Supp. 2d at 721. Plaintiff has shown that Gabehart took copies of JGR's Confidential Information on his personal cell phone and his personal Google Drive without JGR's consent. The information included, but is not limited to, comprehensive post-race audit and analyses of team and driver performance for the entire 2025 NASCAR season; complete team payroll details including job titles, contract length, annual compensation, incentive compensation, and compensation plans for prior years; an employee compensation calculator used to project and plan pay for key JGR positions; driver pay for the 2025 and 2026 NASCAR seasons; revenues from sponsors, partners, and other business arrangements for the 2024, 2025, and 2026 NASCAR seasons; JGR's pit crew analytics for the 2024 NASCAR season; and detailed analytics of racecar tires used to assess impact on race results. This, by definition, constitutes trade secrets. See

dmarcian, Inc., 60 F.4th at 141; Philips Elecs. N. Am. Corp., 631 F. Supp. 2d at 721-22; RLM Commc'ns, Inc. v. Tuschen, 831 F.3d 190, 202 (4th Cir. 2016) (explaining "[w]hen an employer brings a misappropriation claim against an employee, admitting that the employee had authorized access to its trade secrets at all relevant times, the employer must raise an inference of actual acquisition or use of trade secrets.").

30. Plaintiff has further established irreparable harm in the absence of preliminary relief as to Defendant Gabehart. In a competitive racing industry, loss of trade secrets leads to the immediate and irreparable harm to JGR's ability to compete. Merck & Co. Inc. v. Lyon, 941 F. Supp. 1443, 1455 (M.D.N.C. 1996) ("The very nature of a trade secret mandates that misappropriation will have significant and continuous long-term effects. The party wronged may forever lose its competitive business advantage or, at the least, a significant portion of its market share.") (quoting Barr-Mullin, Inc. v. Browning, 108 N.C. App. 590, 597, 424 S.E. 2d 226, 230 (1993)).

31. The balance of equities tips in favor of Plaintiff as there is great harm in release of Confidential Information in a highly competitive racing industry. There is little harm to Defendant Gabehart in granting this TRO, which requires Defendant to do that which he is already required to do under his Agreement with JGR. Defendant Gabehart was not authorized to take JGR's Confidential Information. Further, Defendant Gabehart may retain his position at Spire (or any other competitor not prohibited by the Agreement), but he cannot perform the same duties that he performed at JGR in the year prior to his termination. Accordingly, a limited TRO with these provisions preserves the status quo of the parties and prevents irreparable harm to Plaintiff.

32. Lastly, the public interest is furthered by the granting of a TRO as it is in the public interest to protect legitimate business interests by protecting Confidential Information of businesses that was disclosed without authorization and to enforce valid non-compete covenants.

33.     Accordingly, this Court concludes that the issuance of a TRO is appropriate as to Defendant Gabehart.

34.     As to Defendant Spire, Plaintiff has neither established a likelihood of success on the merits nor has it shown irreparable harm.  Plaintiff has not shown that Spire has any of JGR's Confidential Information.  Such a notion is speculative, at best, and insufficient for a TRO.  See also RLM Commc'ns, Inc., 831 F.3d at 203 (citing Peoples Sec. Life Ins. Co. v. Hooks, 367 S.E.2d 647, 649–50 (N.C. 1988) (recognizing "that a competitor is not liable for tortious interference for hiring employees away from an employer and placing them in competition with the employer, so long as the competitor was motivated by competition rather than malice."))[3]

### III.    CONCLUSION

For the reasons set forth above, the Court **GRANTS IN PART** and **DENIES IN PART** JGR's Motion for Temporary Restraining Order.  Specifically, the Court will permit a TRO against Gabehart in limited respects as set forth below.  The Court denies any TRO against Spire.  In all other respects, Plaintiff's Motion is denied.

**IT IS THEREFORE ORDERED** that:

(i)     Defendant Gabehart shall immediately cease and desist from retaining, transferring, using or copying any of JGR's Confidential Information and Trade Secrets;

(ii)    Defendant Gabehart shall cease and desist from using or disclosing JGR's Confidential Information and Trade Secrets;

(iii)   Defendant Gabehart shall return any of JGR's Confidential Information and Trade Secrets in his possession to JGR;

---

[3] The Court's analysis herein is for the purposes of this Motion only based on the current record and does not forecast any future rulings on the merits.

(iv) Defendant Gabehart shall be restrained from violating Section 6 of his Employment Agreement, which prohibits providing services of the general type of services that Defendant Gabehart provided to JGR in the year prior to his termination. For the sake of clarity, the Court is not requiring Gabehart to resign from his position at Spire or prohibiting him from working for Spire. Other services not performed at JGR in the year prior to his termination are permissible.

**IT IS FURTHER ORDERED** that Plaintiff post a $100,000 bond by March 9, 2026.

**IT IS FURTHER ORDERED** that this Temporary Restraining Order shall expire on March 16, 2026, at 11:59pm EST.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Preliminary Injunction is held in abeyance pending further presentation of evidence and briefing by the parties. Plaintiff may submit supplementations in support of its Motion for Preliminary Injunction by March 6, 2026. Defendants' responses are due no later than March 11, 2026, and Plaintiff's reply to be filed by March 13, 2026.

**SO ORDERED**.   Signed: March 5, 2026

_____
Susan C. Rodriguez
United States District Judge