**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**Case No. 3:26-CV-00133-SCR-DCK**

| | |
|---|---|
| JOE GIBBS RACING, LLC, | **PLAINTIFF JOE GIBBS RACING,** |
| Plaintiff, | **LLC'S SUPPLEMENTAL** |
| | **MEMORANDUM OF LAW IN** |
| v. | **SUPPORT OF MOTION FOR** |
| | **PRELIMINARY INJUNCTION** |
| CHRISTOPHER GABEHART and SPIRE | |
| MOTORSPORTS, LLC, | |
| Defendants. | |

Plaintiff Joe Gibbs Racing, LLC ("JGR" or the "Company"), by and through counsel, pursuant to Rule 65 of the Federal Rules of Civil Procedure, respectfully submits this Supplemental Memorandum of Law in Support of the Motion for Preliminary Injunction ("Motion") to enjoin Christopher Gabehart's ("Gabehart") and Spire Motorsports, LLC's ("Spire") from competing against JGR in violation of Gabehart's contractual obligations and from retaining, using, disclosing, and misappropriating JGR's confidential information and trade secrets.

## INTRODUCTION

JGR is one of the most prominent and preeminent teams in NASCAR racing. Thirty-five years ago, Coach Joe Gibbs started a single racecar team with his two sons and seventeen employees. Together, Gibbs and his sons have grown JGR into a gold-standard racing team with approximately 450 employees. Over the course of decades, JGR has invested hundreds of millions of dollars to find high-quality team members and drivers, refine its racing strategies, and develop the expertise and resources that give JGR its competitive edge. From the time JGR aligned with Toyota approximately 18 years ago, no other NASCAR Cup Series team has won more. All told, JGR has won 448 races between the Cup Series and the O'Reilly Series, more than almost any

other team in NASCAR history. JGR's trajectory of success in the NASCAR industry is a direct result of its commitment to investing in innovation of its racing strategies and its team members. Any NASCAR team with access to JGR's carefully crafted "secret sauce" could use it as a roadmap to success—sidestepping the decades' worth of investment needed to develop winning NASCAR racing strategies independently.

This "secret sauce" that separates JGR from other NASCAR teams is precisely what Gabehart stole from JGR. As this Court has already determined based on Gabehart's litany of misconduct, including taking photos of JGR's competitively sensitive information, moving JGR files into a folder named "Spire," and making numerous misrepresentations, Gabehart has unequivocally misappropriated JGR's trade secrets.

Gabehart did not act solely for his own benefit—at the time of his misconduct, Gabehart was engaged in communications with Spire, his new employer. It is clear that Gabehart's intention is to use JGR's confidential and proprietary information for Spire's benefit. In stark contrast to JGR's longstanding tenure and success in the NASCAR industry, Spire has participated in the NASCAR Cup Series for a handful of years and has only one Cup Series race win to its name. If permitted to use the JGR trade secrets Gabehart misappropriated, Spire stands to save millions of dollars and many years' worth of investment in employees and technology to develop its own racecar setups and strategies and solicit JGR's sponsors and employees—all at JGR's expense.

In acknowledgement of the irreparable harm posed to JGR from the misappropriation of its confidential information and trade secrets, on March 5, 2026, the Court issued a Temporary Restraining Order ("TRO") ordering that:

> (i)    Defendant Gabehart shall immediately cease and desist from retaining, transferring, using or copying any of JGR's Confidential Information and Trade Secrets;

<blockquote>
(ii)    Defendant Gabehart shall cease and desist from using or disclosing JGR's Confidential Information and Trade Secrets;

(iii)    Defendant Gabehart shall return any of JGR's Confidential Information and Trade Secrets in his possession to JGR; and

(iv)    Defendant Gabehart shall be restrained from violating Section 6 of his Employment Agreement, which prohibits providing services of the general type of services that Defendant Gabehart provided to JGR in the year prior to his termination. For the sake of clarity, the Court is not requiring Gabehart to resign from his position at Spire or prohibiting him from working for Spire. Other services not performed at JGR in the year prior to his termination are permissible.
</blockquote>

TRO [Dkt. 26] at 11–12.

The Court should continue this relief by entering a preliminary injunction.

All evidence previously submitted in support of JGR's request for a temporary restraining order is expressly incorporated by reference. This brief summarizes supplemental and additional evidence that independently and collectively supports the issuance of a preliminary injunction, including the following:

- Proposed Injunctive Relief. *See* Ex. A

- A supplemental declaration from Walter Brown: This declaration supplements the original declaration with additional information regarding the scope of Gabehart's duties at JGR and the specific activities that he engaged in during the year prior to the conclusion of his employment with JGR. *See* Ex. B, Brown Suppl. Decl.

- A declaration from Ryan Simpson, a private investigator contracted by JGR: This declaration details surveillance of Gabehart's activities on December 2, 2025, including a lunch with Spire's co-owner, Jeff Dickerson. *See* Ex. C, Simpson Decl.

- A declaration from Eric Schaffer, Executive Vice President, Chief Commercial Officer, and in-house counsel of JGR: This declaration describes that after learning of a December 2, 2025 meeting between Gabehart and Spire co-owner Jeff Dickerson, he called Spire's President Bill Anthony on December 3, 2025, to inform Spire that Gabehart was bound by a noncompete agreement and

warning that hiring Gabehart into a position that would violate this agreement would constitute tortious interference. *See* Ex. D, Schaffer Decl.

- A declaration from David Alpern, President of JGR: This declaration demonstrates that Gabehart represented that he had not discussed employment with Spire and said that Alpern should "trust him." These representations were false. *See* Ex. E, Alpern Decl.

- A declaration from Greg Heyer, an executive involved with Zep Inc.'s NASCAR sponsorship program: This declaration describes Zep's sponsorship of Joe Gibbs Racing for the 2026 NASCAR Cup season and details solicitations from Spire's COO for Heyer to attend an event in Phoenix, Arizona during a NASCAR race weekend. *See* Ex. F, Heyer Decl.

- A declaration from Bill Lealos, a representative from Saia Inc.: This declaration describes Saia's sponsorship of JGR for the 2026 NASCAR Cup season and details solicitations from Spire requesting meetings to discuss the racing industry. *See* Ex. G, Lealos Decl.

- A declaration from Denny Hamlin, NASCAR driver and minority owner of 23XI Racing: This declaration details Gabehart's involvement with JGR's proprietary racing information, trade secrets, and the potential harm to JGR and NASCAR if confidential car setups, simulation data, and race strategies are misappropriated by competitors like Spire Motorsports. *See* Ex. H, Hamlin Decl.

- A declaration from Bob Jenkins, owner of Front Row Motorsports: This declaration emphasizes the importance of confidentiality in NASCAR racing strategies and the need for employees to honor confidentiality agreements to protect competitive advantages and prevent unauthorized transfer of sensitive information between teams. *See* Ex. I, Jenkins Decl.

- A declaration from Andy Graves, Executive Competition Director for Toyota Racing Development USA: This declaration describes Toyota Racing Development USA's ("TRD") involvement with the Competition Director of JGR and the value of TRD and JGR's proprietary racing information. *See* Ex. J, Graves Decl.

- A second supplemental declaration from Clark Walton: This declaration supplements the original declaration by setting forth the forensic activity in chronological order and providing additional information regarding the specific files accessed by Gabehart, the numerous encounters with cloud storage websites, and instances of deletion and threat of potential lost metadata. *See* Ex. K, Walton Second Suppl. Decl.

- A declaration from Joe Gibbs, owner of Joe Gibbs Racing: This declaration further underscores JGR's history, achievements, and the critical importance of

maintaining confidentiality regarding racecar setups and proprietary analytics to protect JGR's competitive advantage and ability to secure sponsorships. *See* Ex. L, Gibbs Decl.

Based on the above additional evidence, JGR respectfully requests that the Court extend the injunctive relief granted to JGR in three ways. First, the Court should extend the portion of its order pertaining to JGR's Confidential and Trade Secrets Order to also enjoin Spire from engaging retaining, transferring, using, copying, or disclosing JGR's Confidential Information and Trade Secrets. JGR has presented evidence showing that Spire conspired with Gabehart to misappropriate its trade secrets, and therefore demonstrated entitlement to injunctive relief preventing both Defendants from using and disclosing its trade secrets.

Second, the Court may now provide additional detail regarding the scope of the services that Gabehart provided at JGR during the last year of his employment which he should now be prohibited from providing at Spire. In short, Gabehart should not be allowed to have any involvement in the NASCAR Cup Series or Xfinity Series (n/k/a NASCAR O'Reilly Auto Parts Series), or be allowed in physical proximity to where Spire is preparing for or participating in those competitions.

Third, the Court should order Gabehart to submit to a forensic examination of any device or account on which he potentially stored, transmitted, or accessed JGR's Confidential Information or Trade Secrets—relief that Gabehart's counsel agreed to provide before the TRO hearing but that was never finalized due to a subsequent breakdown in negotiations. The limited forensic review conducted to date examined only Gabehart's cell phone and Google Drive, leaving unexamined his personal computer, Gmail account, OneNote, and other locations where JGR's proprietary information may reside. This Court should also permit JGR to review the forensic images of Gabehart's phone, email account, and Google Drive that were previously collected but which

Gabehart has refused to allow access to outside of the limited prior review protocol. Given Gabehart's demonstrated pattern of deception and the calculated nature of his theft, including his photographing of computer images specifically to avoid detection, and his multiple demonstrably false statements apparently designed to cover his tracks, a complete forensic examination is warranted.[1]

## SUPPLEMENTAL FACTUAL BACKGROUND

I.  **Spire Actively Solicited Gabehart Who Had Longstanding and Nearly Unfettered Access to JGR's Prized Confidential Information and Trade Secrets.**

In a full-scale, Championship NASCAR organization, trade secrets and confidential information are not developed by a single individual. Rather, they are the product of a team effort involving hundreds of team members across various disciplines—one that requires a substantial investment of time, money, sweat, trial and error, and patience across hundreds of employees at multiple levels of the organization. *See* Ex. L, Gibbs Decl. at ¶¶ 3–4. This collaborative effort spans departments focused on engineering, data science, analytics, aerodynamics, and race strategy.

From 2012 to 2024, Gabehart worked in multiple of these areas, rising from engineer, to crew chief, and ultimately to Competition Director. *See* Gabehart Decl. [Dkt. 12] at ¶ 3; Amended Complaint [Dkt. 8] at ¶¶ 28–30. As a crew chief, Gabehart already had extensive access to JGR's most sensitive Confidential Information and Trade Secrets, working closely with a specific team and spending each week leading up to a race analyzing data, adjusting car setups, developing race strategies, and making real-time decisions during the race itself. *See* Ex. H, Hamlin Decl. at ¶ 8; Ex. L, Gibbs Decl. at ¶ 8. His access expanded significantly when he became Competition Director, a role in which he was responsible for overseeing the preparation and execution of JGR's vehicle

---

[1] JGR is concurrently filing a motion for expedited discovery.

and race strategies across all of JGR's cars—not just a single team. Ex. H, Hamlin Decl. at ¶ 10. This access is paramount, as the Competition Director is the key individual who interacts with every department to help build and set up JGR's racecars to ensure they achieve their fastest speeds for each unique NASCAR track. *See id.* at ¶ 11; Ex. B, Brown Suppl. Decl. at ¶ 68.

Thus, by the time Gabehart assumed this role, he had been privy to JGR's trade secrets at nearly every level of the racing operation for thirteen years. Spire then approached him about employment with the company.

## II. Gabehart Concurrently Copied JGR's Crown Jewels to a Folder Dedicated to Spire While Misleading JGR About His Discussions with its Competitor.

On October 21, 2025, while still serving as JGR's Competition Director, Gabehart met with Spire's co-owner, Dan Towriss, to discuss a potential job. Berrier Decl. [Dkt. 22-2] at ¶ 4. This meeting was only days before the "cut-off" race at Martinsville Speedway on October 26, 2025, to determine the final four drivers for the Championship.[2] This particular race presented a historic opportunity for JGR because JGR was poised to have three of the final four drivers make the Championship race. Gabehart was at the Martinsville race purportedly in his role for JGR. But that same day he engaged with the Spire website and performed searches of Spire into the evening. *See* Ex. K, Second Suppl. Walton Decl. at ¶ 8. Gabehart engaged the Spire website again the very next day on October 27th. *Id.* at n. 2. Two days later, on October 29, 2025, and just days before two of JGR's drivers were competing for the Cup Series Championship, Gabehart engaged in significant activity with (1) his Google Drive, (2) a previously undisclosed OneDrive account associated with his Gmail, and (3) numerous JGR cloud storage locations that house JGR's Confidential Information and Trade Secrets. *See* Ex. K, Second Suppl. Walton Decl. at 9. At that same time,

---

[2] For the 2025 NASCAR Cup Series season, drivers earned points based on their performance at each race. The drivers with the most points then competed against each other to secure one of four spots for the Cup Series Championship on November 2, 2025 at Phoenix Raceway.

Gabehart's spouse traveled on an airplane belonging to Spire co-owner Dickerson to the NASCAR Championship race on November 2, 2025. Ex. E, Alpern Decl. at ¶ 4.

The next week, he requested a meeting with JGR's owner, Joe Gibbs ("Coach Gibbs"). That meeting, however, was not to disclose that one of JGR's competitors was actively seeking to hire its Competition Director. Instead, on November 6, 2025, Gabehart met with Coach Gibbs to presumably discuss dissatisfaction with his role, while concealing his ongoing discussions with Spire. Ex. L, Gibbs Decl. at ¶ 9. When Coach Gibbs declined to grant Gabehart *carte blanche* authority over all racing decisions, Gabehart informed him that he preferred to leave JGR. Amended Complaint [Dkt. 8] at ¶¶ 57–59; Ex. L, Gibbs Decl. at ¶ 9; Gabehart Decl. [Dkt. 12] at ¶ 11.

The very next day, while connected to JGR's network, Gabehart accessed his JGR computer and, over the course of fifteen consecutive minutes, he accessed JGR's most sensitive Confidential Information and Trade Secrets. *See* Ex. K, Walton Second Suppl. Decl. at ¶ 10; Amended Complaint [Dkt. 8] at ¶ 91; Gabehart Decl. [Dkt. 12] at ¶ 13. Using his personal cell phone, he then took at least twenty photographs of his laptop screen. *Id.* On November 10, 2025, Gabehart—now disgruntled—returned his JGR laptop and ceased providing services to the company after having already secured multiple copies of JGR's "crown jewels" on his personal device. *See* Ex. K, Walton Second Suppl. Decl. at ¶¶ 10–12; Amended Complaint [Dkt. 8] at ¶¶ 102–103. That same week, beginning no later than on November 12, 2025, he interacted with a folder titled "Spire" on his personal Google Drive. Walton Decl. [Dkt. 9-4] at ¶ 14. That folder contained, among other things, a subfolder labeled "Past Setups"—one of the most paramount trade secrets that have led to JGR's competitive advantage and repeated success throughout the years. *See* Walton Decl. [Dkt. 9-4] ¶ at 14.

Gabehart then conveniently received an "unsolicited" job offer from Spire the very next day, November 13, 2025. Amended Complaint [Dkt. 8] at ¶ 105; Gabehart Decl. [Dkt. 12] at ¶ 17. After receiving this offer from JGR's competitor, Gabehart repeatedly engaged with JGR's most valuable trade secrets—specifically interacting with files in the "Spire\Past Setups" folder on dozens of occasions throughout the afternoon of November 23, 2025. *See* Ex. K, Walton Second Suppl. Decl. at ¶ 19. A full list of the files he is known to have accessed from his Google Drive well after he ceased providing services to JGR is provided in the Second Supplemental Declaration of Clark Walton. *See id.* at ¶ 19. The accessed files include files that clearly show race analytics, information about tire usage, shift points, and other material. Gabehart further accessed his Spire folder the morning of December 2, 2025. *Id.* at ¶ 22. Shortly thereafter, on December 2, 2025, Gabehart met Spire's owner, Jeff Dickerson, for lunch. *See generally* Ex. C, Simpson Decl. That same day, he continued accessing JGR documents stored in the Spire folder. Ex. K, Walton Second Suppl. Decl. at ¶ 22.[3]

On December 2, 2025, JGR's Executive Vice President and Chief Commercial Officer, Eric Schaffer, learned of the lunch meeting. Ex. D, Schaffer Decl. at ¶ 3. On December 3, 2025, Schaffer called Spire's President, Bill Anthony, and informed him that Gabehart's Employment Agreement with JGR contained a noncompete provision. *Id.* at ¶¶ 4–5. Schaffer further warned that if Spire hired Gabehart into a role that violated that agreement, JGR would consider Spire to be tortiously interfering with JGR's contractual rights. *Id.* at ¶ 5. Anthony did not provide a substantive response and never subsequently returned Schaffer's call. *See id.* at ¶ 6. Yet within hours of JGR's warning

---

[3] As set forth in the Second Supplemental Declaration of Clark Walton, JGR's access to information related to Gabehart's Google Drive was cut off on December 8, 2025. Defendants have not permitted access to the Google Drive by Mr. Walton outside of the previously limited forensic review protocol and have denied subsequent imaging. Ex. K, Walton Second Suppl. Decl. at ¶ 4.

to Spire regarding tortious interference, Gabehart suddenly decided to conduct a Google search for the term "indemnify" at 12:15 a.m. on December 4, 2025. Ex. K, Walton Second Suppl. Decl. at ¶ 23.

On the evening of December 3, 2025, Gabehart also texted JGR's President, Alpern, and stated "[w]ould it do us any good to have a discussion about what needs to happen from here? Surely no one really wants to do the other any harm? I know I don't." Ex. E, Alpern Decl. at ¶ 3. The next morning, December 4, 2025, at 11:19 a.m., Alpern spoke with Gabehart by phone. *Id.* at ¶ 4. Alpern told Gabehart to be honest about his plans for employment and asked about Spire. *Id.* Gabehart acknowledged his recent contact with Spire but claimed that he was only friends with Dickerson and "that they had not discussed employment." *Id.* At the end of the call, Gabehart told Alpern to "trust him." *Id.*

These statements were demonstrably false. At the time he texted Alpern saying he did not wish to do JGR any harm, Gabehart was in possession of hundreds of pages of JGR's trade secrets stored in a folder labeled "Spire" on his personal Google Drive and on his personal cell phone,[4] had accessed numerous JGR documents well after he stopped providing services to JGR, had received a job offer from Spire, and had met with Spire's owner two days earlier—facts he deliberately concealed from JGR's President.

### III. After Later Hiring Gabehart in a Nearly Identical Role, Spire Started Approaching JGR's Sponsors and Partners to Discuss the "Industry."

On February 21, 2026, Spire confirmed to news outlets that it had hired Gabehart as its Chief Motorsports Officer. Brown Decl. [Dkt. 9-2] at ¶ 31. Despite Gabehart's prior

---

[4] In preparation for this filing, counsel for JGR asked permission to conduct narrow analysis of Gabehart's communications with Spire relating to JGR and employment and to review the other contents of the Spire folder. These items are contained on forensic images in the possession of Mr. Walton. Gabehart declined.

representations to JGR that the job offer he received from Spire "was not to provide services similar to those [he] provided to JGR," Spire structured his role as Chief Motorsports Officer to encompass precisely the same services he performed for JGR as Competition Director. Amended Complaint [Dkt. 8] at ¶¶ 72, 82–84. Indeed, Spire's own co-owner, Jeff Dickerson, publicly acknowledged that Spire is giving Gabehart "the autonomy to do what he needs to do—again not just to help the NASCAR program." Burn Decl. [Dkt. 21-1] at 3. Notably, among the information Gabehart photographed on November 7, 2025, were details concerning revenues JGR received from sponsors, partners, and other business arrangements. Amended Complaint [Dkt. 8] at ¶ 94. Unsurprisingly, Spire is now actively targeting JGR's sponsors and partners who are "crucial to the financial health and continued operation of JGR." *See* Ex. F, Heyer Decl. at ¶¶ 4–6; Ex. G, Lealos Decl. at ¶¶ 4–6; Ex. L, Gibbs Decl. at ¶ 4. Yet Spire seeks to avoid a preliminary injunction while engaging in targeted outreach to JGR's sponsors and partners—all while employing the very individual who misappropriated JGR's confidential sponsor and partnership information and who cannot unlearn the industry knowledge he acquired over more than thirteen years at JGR.

## ARGUMENT

**I.    The Court Should Apply the Restrictive Covenant Provision to Ensure that JGR's Trade Secrets and Confidential Information Are Not Disclosed to Spire.**

In the TRO hearing, Gabehart's counsel admitted that "there's certainly some subject matter overlap" between Gabehart's JGR duties as competition director and his desired duties at Spire. *See* Motion for Temporary Restraining Order H'rg Tr. at 38:25-39:1. The Court's TRO found that the "covenant not to compete is reasonable and appears valid and enforceable." TRO at 9. The Court further found that Gabehart's new role at Spire "has some, but not all, of the same duties that he had at JGR." The Court also found that Gabehart took copies of JGR's Confidential Information and trade secrets, including the following:

- comprehensive post-race audit and analyses of team and driver performance for the entire 2025 NASCAR season;

- complete team payroll details including job titles, contract length, annual compensation, incentive compensation, and compensation plans for prior years;

- an employee compensation calculator used to project and plan pay for key JGR positions;

- driver pay for the 2025 and 2026 NASCAR seasons;

- revenues from sponsors, partners, and other business arrangements for the 2024, 2025, and 2026 NASCAR seasons;

- JGR's pit crew analytics for the 2024 NASCAR season; and detailed analytics of racecar tires used to assess impact on race results.

TRO at 9.

Additional evidence submitted in support of this motion further establishes that in Gabehart's roles as Competition Director for JGR, his services touched every aspect of JGR's NASCAR race strategy and execution. *See generally* Ex. B, Brown Suppl. Decl. (thoroughly describing the scope of Gabehart's job duties at JGR); *see also* Ex. H, Hamlin Decl. at ¶ 11. For example, his competition director duties included overseeing race-related operations, technical coordination, and driver-crew communication on a week-to-week basis. *See* Ex. H, Hamlin Decl. at ¶ 11. Gabehart regularly attended meetings with team members from every discipline touching race strategy and execution strategy meetings, pit meetings, race engineering meetings, and competition meetings. Ex. B, Brown Suppl. Decl. at ¶¶ 12–45. At JGR's weekly competition meetings, JGR's leadership, drivers, crew chiefs, and competition director for Toyota Racing Development USA ("TRD") reviewed that weekend's race performance and discussed any developments with respect to strategy or testing results that may improve JGR's performance. *See* Ex. J, Graves Decl. at ¶ 4; Ex. B, Brown Suppl. Decl. at ¶¶ 15–17.

Moreover, "[d]uring race weekends, the Competition Director is one of the most prominent faces of the JGR track." Ex. B, Brown Suppl. Decl. at ¶ 51. As such, on race day, Gabehart traveled to race venues, participated in NASCAR technical inspections, and interacted directly with NASCAR officials and team personnel on compliance and technical issues. *Id.* at ¶¶ 43–44. In this capacity, he was present throughout practice, qualifying and race sessions, supporting crew chiefs by monitoring competitor behavior, tire wear, strategy trends, and race wide conditions. *Id.* at ¶¶ 45–46. He also participated in driver and crew chief debriefs, postrace technical inspections, and immediate postrace analysis, and was exposed to confidential technical data and driver feedback. *Id.* at ¶ 49. During race weekends, he also served as a visible representative of JGR, regularly interacting with sponsors and the media on the organization's behalf. *Id.* at ¶¶ 51.

In addition to his Competition Director duties, Gabehart also served as the crew chief for JGR's No. 54 car during the year prior to his departure. Ex. B, Brown Suppl. Decl. at ¶ 48–50; *see also* Ex. H, Hamlin Decl. at ¶ 8. In this role, his responsibilities included determining strategy and adjustments during the race, communicating with the driver and controlling operation behind the scenes, helping to guide race operations. *See* Ex. B, Brown Suppl. Decl. at ¶ 48; *see also* Ex. H, Hamlin Decl. at ¶ 8.

The plain language of the restrictive covenant, consistent with the Court's TRO, restricts "services of the general type of services that Employee provided to Company in the year prior to such termination to any other NASCAR Xfinity Series or NASCAR Cup Series racing team . . . ." Amended Complaint Ex. 1 [Dkt. 8-2], Employment Agreement at Section 6. Even without the trade secret misappropriation issues, the Court should clarify the scope of this provision based on unrebutted evidence concerning the broad scope of his services with respect to every aspect of JGR's NASCAR competition efforts. Given Gabehart's clear misappropriation of trade secrets, the

need for clarification and robust enforcement of the covenant according to its plain terms is even more imperative.

Accordingly, it is reasonable to prohibit Gabehart's activities in the manner set forth in Exhibit A, including but not limited to prohibiting Gabehart's involvement with crew chief and race strategy activities, meetings and strategic discussions, technical and engineering activities, analytics and data analysis, personnel and organizational management, department coordination and information hub activities, executive and strategic planning activities, NASCAR and sanctioning body interactions, race weekend and track activities, and simulator and alliance team developments.

Further, considering the evidence of Gabehart's misappropriation and further pattern of deception, including particularly taking screenshots of trade secret information to avoid detection, the Court should order Gabehart to maintain detailed contemporaneous records of all work activities and job duties performed for Spire Motorsports. These records should be required to be made available to Joe Gibbs Racing's counsel on a bi-weekly basis or, in the alternative, on request with forty-eight (48) hours' reasonable notice. This reporting requirement is necessary to ensure ongoing compliance with the Court's order and to provide JGR with the ability to monitor whether Gabehart is adhering to the restrictions imposed by the restrictive covenant as enforced by this Court. *See, e.g.*, *United States v. Fairfax Cnty., Va.*, 629 F.2d 932, 942 (4th Cir. 1980) (finding error where "the district court should have granted injunctive relief against future discrimination. [And

in] granting injunctive relief, it should have . . . imposed requirements for periodic reports to enable it to monitor compliance with its decree.").

## II.    The Court Should Enjoin Both Gabehart and Spire Based on the Actual and/or Threatened Misappropriation of Trade Secrets and Confidential Information.

The Court's TRO found that JGR has demonstrated a likelihood of success on its trade secret claims and irreparable harm stemming from Gabehart's admitted taking of JGR trade secrets and Confidential Information. TRO [Dkt. 26] at ¶ 26–29. Specifically, this Court correctly found that Gabehart took confidential and proprietary JGR business and racing information that "by definition, constitutes trade secrets," *Id.* at ¶ 29, and that "[i]n a competitive racing industry, loss of trade secrets leads to the immediate and irreparable harm to JGR's ability to compete." *Id.* at ¶ 30. The Court should extend the current relief as to Gabehart and, based on the substantial evidence of threatened disclosure, extend such relief to Spire.

As delineated above, JGR has provided substantial additional evidence supporting its claims for injunctive relief against Gabehart for misappropriation of JGR's Confidential Information and Trade Secrets including evidence regarding the highly confidential and competitively valuable nature of the information Gabehart took from JGR (*see* Ex. I, Jenkins Decl. at ¶¶ 3–5; Ex. H, Hamlin Decl. at ¶¶ 13–14); misrepresentations by Gabehart to JGR (*see generally* Ex. E, Alpern Decl.); a clandestine meeting between Gabehart and Jeff Dickerson of Spire (*see generally* Ex. C, Simpson Decl.); the heightened competition in the NASCAR industry resulting from the implementation of NextGen racecars (Ex. I, Jenkins Decl. at ¶ 4; Ex. L, Gibbs Decl. at ¶ 7); and the damage it would do to fair competition in the sport of NASCAR if such trade secrets were disseminated (Ex. I, Jenkins Decl. at ¶ 5; Ex. H, Hamlin Decl. at ¶ 15).

Enjoining Spire in the same way this Court has already enjoined Gabehart is consistent with existing precedent. The Defend Trade Secrets Act provides courts "authority to issue the

injunctive relief upon a showing of either actual *or threatened* misappropriation of its 'trade secrets.'" *Glytec LLC v. Prisma Health*, 2025 WL 1750441, at *6 (D.S.C. 2025) (citing 18 U.S.C. § 1839(b)(3)(A)(i)) (emphasis added). Here, the record shows ample evidence to support a finding of threatened misappropriation by Spire.

Even though Gabehart has purportedly returned the wrongfully taken documents, at the very least he still retains knowledge of JGR's Confidential Information and Trade Secrets, such as the terms of the key sponsorship and employment terms and strategies, and likely at least some race-related information. The evidence showing Gabehart's pattern of misconduct alone, combined with his ability and incentive to share the secrets with Spire, establishes a credible threat that Gabehart will disclose this information to Spire, if he has not already.

In addition to Gabehart's pattern of misconduct, JGR has put forth new evidence that Spire is contacting JGR partners and sponsors that Spire had never contacted prior to Gabehart's employment at Spire (*see* Ex. F, Heyer Decl. at ¶¶ 4–6; Ex. G, Lealos Decl. at ¶¶ 4–6) as well as evidence of Spire's apparent disregard for Gabehart's restrictive covenants (*see generally* Ex. D, Schaffer Decl.). Spire targeted JGR's sponsors only after Gabehart took information pertaining to JGR's sponsorship revenue and business arrangements and transitioned to Spire, further establishing at least a "threat" of trade secret misappropriation.

Moreover, Courts have enjoined new employers on the basis of trade secret misappropriation claims under similar circumstances, even where the plaintiff relied on circumstantial evidence of threatened misappropriation, particularly when there is evidence of misconduct by the departing employee. *See e.g., Bridgetree, Inc. v. Red F Mktg. LLC*, 2013 WL 443698, at *7–8 (W.D.N.C. 2013) (permanently enjoining plaintiff's former employees and their new employer on the basis of trade secret misappropriation based on circumstantial evidence of

misappropriation, including former employee's "downloading of [trade secret] information from Plaintiff's servers" and new employer's speedy development of new programs); *Prysmian Cables & Systems USA, LLC v. Szymanski*, 573 F. Suppl. 3d 1021, 1044 (D.S.C. 2021) (enjoining plaintiff's former employee and new employer where former employee emailed himself plaintiff's "business blueprint," and "initiated plans for an analogous [project] to compete with" plaintiff based on circumstantial evidence of irreparable harm despite dispute regarding new employers' access to and acquisition of alleged trade secrets); *see also Med. Staffing Network, Inc. v. Ridgway*, 194 N.C. App. 649, 670 S.E.2d 321, 329 (N.C. App. 2009) (noting that misappropriation of trade secrets "may be proven through circumstantial evidence," and finding misappropriation where former employee accessed plaintiff's " 'game plan' and other confidential documents . . . with unusual frequency" and recruited plaintiff's employees to new employer).

The supplemental evidence provided by JGR demonstrates a likelihood of success on the merits of its trade secret misappropriation claims against Spire.

**III.  The Court Should Order a Forensic Review of Gabehart's Electronic Devices and Accounts to Ensure the Full Return and Protection of JGR's Trade Secrets and Confidential Information.**

The Court should order Gabehart to submit to a forensic examination of any device or account used to potentially store JGR Confidential Information or Trade Secrets, including but not limited to his computer, his Gmail account, his OneNote account, and his wife's Google and Gmail accounts. If the Court provides injunctive relief as requested, we are confident the parties can work out the other details concerning the review, including timing, identification of devices, and review protocol.

This issue was not discussed in detail or resolved at the TRO hearing because the parties reported to the Court that an agreement on forensics was likely. Gabehart's counsel represented before the Court that Gabehart would provide the requested forensic access, and the Court

instructed the parties to work out the details. After the hearing, however, no agreement could be reached, and the Court declined to enter an order in the absence of one.

During the parties' ensuing negotiations concerning the agreement ordered by the Court, Gabehart's counsel acknowledged the propriety of this relief, including regarding the listed devices. In particular, in a March 1, 2026, correspondence, counsel agreed to a forensic protocol that "would examine the specific items you identified as not being included in Clark's initial review: Mr. Gabehart's new computer, his Gmail, OneNote, and his wife's Google Photos." JGR is entitled to *at least* this relief. The record establishes that Gabehart accessed his Spire folder on his personal Google Drive on at least six occasions after leaving JGR—November 12, 13, 15, 26, 27, and December 2, 2025. Walton Decl. [Dkt. 9-4] ¶ at 14. Evidence also shows an Unknown OneDrive account associated with Gabehart's Gmail address with activity on October 29, 2025, and November 17, 2025, and that certain websites associated with JGR and JGR's Microsoft SharePoint were potentially accessed around this same time. *Id.* at ¶¶ 15–17.

In light of the evidence of Gabehart's pattern of untrustworthy conduct, the limited forensic review previously conducted—which provided limited access to only Gabehart's cell phone and Google Drive—does not provide adequate assurance that Gabehart did not transmit JGR's information to other devices or accounts, or use it to benefit Spire. *Id.* at ¶ 30. In particular, the evidence establishes that Gabehart deliberately took JGR's most sensitive Confidential Information and Trade Secrets in a manner calculated to avoid detection—using his personal cell phone to photograph confidential documents and saving proprietary files to a folder on his personal Google Drive labeled "Spire." *Id.* at ¶¶ 14, 22, 28; Brown Decl. [Dkt. 9-2] at ¶¶ 24–26. And while the limited forensic review resulted in deletion of JGR's files from Gabehart's cell phone and Google Drive on February 5, 2026, that deletion does nothing to account for any copies or

transmissions made before JGR discovered the misappropriation. Walton Decl. [9-4] at ¶¶ 30–31. Given Gabehart's demonstrated pattern of deception and the calculated nature of his theft, a forensic examination of any device or account where JGR's Confidential Information or Trade Secrets may reside is warranted. JGR should further be permitted re-access to the images it collected of Gabehart's phone and Google Drive that Gabehart now attempts to block.

## CONCLUSION

For the reasons stated herein, JGR prays that this Court issue a temporary restraining order and preliminary injunction as set forth in JGR's Motion, including Exhibit A, that enforces the agreed upon non-compete period and ensures the return and protection of JGR's Confidential Information and Trade Secrets.

This the 6th day of March, 2026

**KING & SPALDING LLC**

/s/ *Danielle T. Williams*
Danielle T. Williams
dwilliams@kslaw.com
N.C. Bar No. 23283
300 South Tryon Street, Suite 1700
Charlotte, NC 28202

Thomas M. Melsheimer – *Pro Hac Vice*
tmelsheimer@kslaw.com
Chad B. Walker – *Pro Hac Vice*
cwalker@kslaw.com
Tracea Rice – *Pro Hac Vice*
trice@kslaw.com
Alexandra Moore - *Pro Hac Vice*
almoore@kslaw.com
2601 Olive Street, Suite 2300
Dallas, TX 75201

**PARKER POE ADAMS & BERNSTEIN LLP**
Sarah F. Hutchins
N.C. Bar No. 38172
Tory Ian Summey
N.C. Bar No. 46437

Keith M. Weddington
N.C. Bar No. 14352
Charles G. Middlebrooks
N.C. Bar No. 55171
Madelyn R. Candela
N.C. Bar No. 63827
Bank of America Tower
620 South Tryon St., Suite 800
Charlotte, North Carolina 28202
sarahhutchins@parkerpoe.com
torysummey@parkerpoe.com
keithweddington@parkerpoe.com
charliemiddlebrooks@parkerpoe.com
madelyncandela@parkerpoe.com

*Attorneys for Joe Gibbs Racing, LLC*

## ARTIFICIAL INTELLIGENCE CERTIFICATION

No artificial intelligence was employed in doing the research for the preparation of this Memorandum, with the exception of the standard artificial intelligence embedded in WestLaw. Every statement and every citation to authority contained in this Memorandum has been checked by an attorney in this case as to the accuracy of the proposition for which it is offered.

This the 6th day of March, 2026

**KING & SPALDING LLC**

/s/ *Danielle T. Williams*
Danielle T. Williams
dwilliams@kslaw.com
N.C. Bar No. 23283
300 South Tryon Street, Suite 1700
Charlotte, NC 28202
Thomas M. Melsheimer – *Pro Hac Vice*
tmelsheimer@kslaw.com
Chad B. Walker – *Pro Hac Vice*
cwalker@kslaw.com
Tracea Rice – *Pro Hac Vice*
trice@kslaw.com
Alexandra Moore - *Pro Hac Vice*
almoore@kslaw.com
2601 Olive Street, Suite 2300
Dallas, TX 75201

**PARKER POE ADAMS & BERNSTEIN LLP**
Sarah F. Hutchins
N.C. Bar No. 38172
Tory Ian Summey
N.C. Bar No. 46437
Keith M. Weddington
N.C. Bar No. 14352
Charles G. Middlebrooks
N.C. Bar No. 55171
Madelyn R. Candela
N.C. Bar No. 63827
Bank of America Tower
620 South Tryon St., Suite 800
Charlotte, North Carolina 28202
sarahhutchins@parkerpoe.com
torysummey@parkerpoe.com

keithweddington@parkerpoe.com
charliemiddlebrooks@parkerpoe.com
madelyncandela@parkerpoe.com

*Attorneys for Joe Gibbs Racing, LLC*

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that the foregoing **PLAINTIFF JOE GIBBS RACING, LLC'S SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF THE MOTION FOR PRELIMINARY INJUNCTION w**as electronically filed with the Clerk using the CM/ECF system which will automatically send notice and serve same upon counsel of record via the Court's electronic case filing system.

This the 6th day of March, 2026

**KING & SPALDING LLC**

/s/ *Danielle T. Williams*
Danielle T. Williams
dwilliams@kslaw.com
N.C. Bar No. 23283
300 South Tryon Street, Suite 1700
Charlotte, NC 28202
Thomas M. Melsheimer – *Pro Hac Vice*
tmelsheimer@kslaw.com
Chad B. Walker – *Pro Hac Vice*
cwalker@kslaw.com
Tracea Rice – *Pro Hac Vice*
trice@kslaw.com
Alexandra Moore - *Pro Hac Vice*
almoore@kslaw.com
2601 Olive Street, Suite 2300
Dallas, TX 75201

**PARKER POE ADAMS & BERNSTEIN LLP**
Sarah F. Hutchins
N.C. Bar No. 38172
Tory Ian Summey
N.C. Bar No. 46437
Keith M. Weddington
N.C. Bar No. 14352
Charles G. Middlebrooks
N.C. Bar No. 55171
Madelyn R. Candela
N.C. Bar No. 63827
Bank of America Tower
620 South Tryon St., Suite 800
Charlotte, North Carolina 28202
sarahhutchins@parkerpoe.com

torysummey@parkerpoe.com
keithweddington@parkerpoe.com
charliemiddlebrooks@parkerpoe.com
madelyncandela@parkerpoe.com

*Attorneys for Joe Gibbs Racing, LLC*