IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Case No. 3:26-CV-00133-SCR-DCK

| | |
|---|---|
| JOE GIBBS RACING, LLC,<br><br>Plaintiff,<br><br>v.<br><br>CHRISTOPHER GABEHART and SPIRE MOTORSPORTS, LLC,<br><br>Defendants. | SECOND DECLARATION OF CHRISTOPHER GABEHART<br><br>[REDACTED] |

Christopher Gabehart, being first duly sworn, says:

1. I am a Defendant in the above-captioned matter. I am a resident of Mooresville, North Carolina, and I am over eighteen years of age. I have personal knowledge of the facts set forth in this Declaration.

2. I submit this Declaration in opposition to Plaintiff Joe Gibbs Racing, LLC's ("JGR") Motion for Preliminary Injunction.

**EMPLOYMENT AT JGR**

3. I began working for JGR in 2012. Over the course of thirteen years, I served in positions including engineer, crew chief, and, most recently, Cup Series Director of Competition.

4. During the 2025 NASCAR Cup Series season, my official title at JGR was Cup Series Director of Competition. Despite that title, for a good portion of the season I performed crew-chief-level responsibilities for JGR's No. 54 Cup team. This included publicly serving as the crew chief and calling the races on Sundays for nine consecutive races beginning on June 28, 2025, as well as extensive behind-the-scenes crew-chief-level work before and after that period.

1

5. The divergence between my official title and my actual day-to-day responsibilities in 2025 was a material point of concern for me and a subject I raised with JGR leadership, as detailed in my prior declaration.

6. In addition to serving as crew chief for the No. 54 car, the job duties I performed during the 2025 NASCAR Cup Series season for JGR included:

- Running the weekly team crew chief meeting;
- Ensuring that action items developed in the weekly crew chief meeting got implemented;
- Running weekly post-race competition meetings with Cup Series drivers, crew chiefs and key shop personnel;
- Promoting commonality and best practices across JGR's four Cup Series teams;
- Assisting in hiring and onboarding Cup Series team personnel;
- Coordinating race weekend strategy initiatives across JGR's Cup Series teams;
- Running post-practice competition meetings with Cup Series drivers and crew chiefs;
- Communicating with shop departments on the needs of the Cup Series teams concerning best practices and efficiencies for race car fabrication, aerodynamics, simulation tools, and analytics development and evaluation;
- Communicating with Toyota Racing Development concerning OEM technical support for the Cup Series teams;
- Communicating with counterparts at 23XI Racing (alliance team member of JGR) to develop best practices and information sharing techniques at a Cup team level;
- Participating in internal meetings/discussions around medium-to-long-term planning projects as the advocate in the room for the four Cup Series teams; and
- Interfacing with NASCAR officials on behalf of JGR's four Cup Series team on issues such as rules and race logistics.

## EMPLOYMENT AT SPIRE

7. I am now employed by Spire Motorsports, LLC ("Spire") as the team's Chief Motorsports Officer. My first day providing any services for Spire was February 16, 2026, pursuant to a Confidentiality and Non-Disclosure Agreement executed that day. My formal employment began on February 17, 2026, which is also the date I officially signed my employment paperwork. The paperwork was backdated to February 9, 2026 for purposes of payroll calculation – so I could start getting paid as of that date.

8. In my role as Chief Motorsports Officer, my focus is enterprise-wide and strategic. I am focused on high-level program development, long-term organizational strategy, structure and process, personnel development at the executive and technical leadership levels, vendor and manufacturer relationships, and long-horizon resource allocation across Spire's motorsports portfolio.

9. At Spire, I do not perform services of the general type that I performed for JGR during the 2025 NASCAR Cup Series season.

10. I do not act as a crew chief for any Spire entry, I do not call races, and I am not responsible for car-by-car Cup Series setup decisions, race engineering, or Sunday race management.

11. I do not hold or perform the Cup Series Competition Director function at Spire. Matt McCall serves as the Competition Director for the Cup Series. His role corresponds to the position I held at JGR in title and area of focus. Spire also has crew chiefs for the No. 7, No. 77, and No. 71 Cup Series cars. I do not fill any of those roles. Spire also employs a Technical Director and a head of Vehicle Optimization. I do not serve in either of those roles.

12. Spire's racing profile extends well beyond NASCAR.

3

Case 3:26-cv-00133-SCR-DCK    Document 37    Filed 03/11/26    Page 3 of 15

13. Spire's racing profile is substantially broader than JGR's. JGR competes exclusively in the NASCAR Cup Series and the NASCAR O'Reilly Auto Parts Series (formerly Xfinity). Spire, by contrast, fields entries across multiple distinct racing series, including the NASCAR Cup Series, NASCAR Truck Series, High Limit Sprint Car Series, Dirt Late Model racing, Pavement Late Model racing, and USAC Silver Crown. Beyond that, Spire is part of a larger racing conglomerate, TWG Motorsports, which fields entries in Formula One (F1), the IndyCar Series, Formula E, IMSA, and Supercars. *See* https://www.twgmotorsports.com/teams/.

14. Of all NASCAR Cup Series chartered teams, Spire has by far the widest racing profile. The chart attached as **Exhibit A** shows Spire's racing platform as compared to the other charter teams in the NASCAR Cup Series.

15. The breadth of Spire's racing program is central to my role as Spire's Chief Motorsports Officer. Whereas my position at JGR was confined to NASCAR Cup Series competition, my responsibilities at Spire focus on strategic initiatives and operational oversight across Spire's entire multi-series motorsports enterprise. My job also involves interfacing regularly with TWG Motorsports teams to discuss and develop common best practices amongst the teams. This is currently done through periodic meetings and event visitation by team principals from each discipline that encourage communication and observation of all of the forms of racing in the TWG Motorsports platform.

16. My current role at Spire sits at the executive level and encompasses strategic oversight across all of Spire's racing programs, not just the NASCAR Cup Series.

17. This structural difference is significant. At JGR, I reported within the NASCAR Cup Series hierarchy. At Spire, I operate at the executive leadership level with responsibility

4

spanning multiple racing series and organizational functions. The scope and seniority of my position at Spire involves duties of an entirely different character than those I performed at JGR.

18. The organizational structure of my role at Spire is also materially different from my role at JGR. At JGR, I was one of several directors focused on NASCAR Cup Series operations, alongside positions such as Production Director, Aero Director, and Technical Director. My role at JGR was organizationally parallel to these other director-level positions within a single racing series.

19. At Spire, my responsibilities span Spire's broader motorsports activities and related business interests, which further differentiates my role from any position I held at JGR that was focused on JGR's NASCAR Cup Series teams.

20. The organizational charts attached as **Exhibit B** illustrate just how markedly different the role I play at Spire is compared to the role I had at JGR in terms of levels of authority and responsibility.

21. The job duties I am expected to perform at Spire include:

- Owners advocate: Deploying ownership's strategic vision across all motorsports aspects of the business.
- Medium- and long-term strategic planning of competitive initiatives across all Spire Motorsports racing platforms, including:
    - Evaluating opportunities to expand into new racing series;
    - Maximizing the development potential within and across the various racing series within which Spire competes (i.e., building out a cohesive development program for drivers and crew members); and
    - Ensuring that the Spire competitive and branding standards are met within each series.

- Ensuring proper resource allocation across all our series and intra-company departments.
- Medium- to long-term infrastructure growth planning and execution.
- Growing and stewarding our relationship with Chevrolet (current OEM partner of Spire Motorsports) to further acquire the resources needed from an OEM perspective for Spire to succeed.
- Growing and stewarding Spire's relationship with Hendrick Motorsports (current NASCAR parent alliance company of Spire Motorsports) to further acquire the resources needed for Spire to succeed and also develop Spire's ability to become an asset to Hendrick Motorsports.
- Working with TWG Motorsports (Spire's parent company that operates F1 and IndyCar teams) to articulate and prove out the needs of Spire Motorsports where tool development and strategic initiatives across all TWG Motorsports teams are concerned.
- Working with NASCAR and other series at an executive level as a voice for Spire Motorsports.

22. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

23. Consistent with my obligation to safeguard JGR's confidential information, I have made Spire aware of my confidentiality obligations to JGR. On February 16, 2026, Spire and I executed a Confidentiality and Non-Disclosure Agreement in which I agreed to maintain the confidentiality of JGR's confidential information and not to disclose or use it for Spire's benefit, and in which Spire agreed it would not solicit, obtain, or use any JGR confidential information from me.

24. I have not used, transmitted, or disclosed any JGR confidential information in connection with my work for Spire. Before JGR filed this lawsuit, I agreed to a comprehensive forensic examination conducted by a forensic expert selected by JGR and pursuant to a protocol drafted by JGR's counsel. The forensic examination found no evidence that I transmitted, distributed, or shared JGR confidential information. JGR's forensic consultant permanently deleted from my cell phone and cloud-based accounts all files and data that the forensic review flagged as potentially containing JGR confidential information. That process was completed on or about February 6, 2026.

25. I did not receive access to Spire IT systems or a Spire-issued laptop until February 17, 2026, after the forensic deletions were completed. I therefore had no JGR materials to bring to or use at Spire when my access began.

## RESPONSE TO OTHER DECLARATIONS FILED

26. I have read the Declaration of Tim Carmichael filed on February 24, 2026 and his Second Declaration dated February 27, 2026. To the extent Mr. Carmichael suggests that the parties did not agree to proceed under Section 6, Paragraph 2 of my Employment Agreement, or that I did not provide written notice, he is mistaken. The contemporaneous record shows both that I provided written notice and that JGR and I proceeded under Section 6, Paragraph 2.

27. On November 6, 2025, I met in person with Coach Gibbs to address that my assigned duties materially diverged from the position I was promised when JGR promoted me to Competition Director. At that meeting, I left him a written document outlining the specific inconsistencies and issues. The next morning, on November 7, 2025, I emailed Tim Carmichael to keep him in the loop, expressly stating that, for completeness, I was sharing the written version of my discussion with Coach Gibbs and what I left with him the prior night.

7

28. In that email, I set forth, in writing, detailed examples of how my job was not as advertised, including that senior leaders and I were constantly intertwined on even low-to-medium competition decisions; that the No. 54 car was operated outside the same structure and accountability as JGR's other entries; and that specific personnel and accountability decisions were being made without my counsel or input. Those written specifics are exactly the type of assigned duties and structural inconsistencies that Section 6, Paragraph 2 contemplates.

29. Mr. Carmichael's contemporaneous messages confirm his receipt of, and engagement with, my written notice. On November 8, 2025, after closely reading my email, he texted me that he did not believe my actual role was what Coach had said it would be, and he expressly framed my email as reflecting the issues I had raised. That acknowledgment is consistent with Section 6, Paragraph 2's requirement that I identify in writing the assigned duties or responsibilities that were inconsistent with my reasonable expectations or the pre-employment job description.

30. The parties then acted within the Section 6, Paragraph 2 framework. On November 10, 2025, Mr. Carmichael transmitted proposed separation terms that included base pay through November 10, 2025, my earned bonus, and a $100,000 buyout, along with mutual non-disparagement and a commitment that JGR would present a mutual release within 24 hours once checklist items were completed. The inclusion of a $100,000 buyout matches up exactly with Section 6, Paragraph 2's one-week noncompete and $100,000 payment construct. That was not a "coincidence," contrary to what I heard JGR's counsel represent in open court on February 27, 2026.

31. JGR did not insist on following the process set forth in Section 6, paragraph 2 of my employment agreement, including the 60-day resolution period, because JGR agreed that the

conditions for termination under Section 6, paragraph 2 had been met – i.e., my job duties were not consistent with what JGR promised and the parties were not going to be able to resolve those inconsistencies.

32. Mr. Carmichael notes that I have not signed a complete mutual release agreement with JGR. That is accurate only in the limited sense that the parties did not ultimately finalize a separation agreement. After November 10, 2025, I remained engaged in good-faith discussions and then, in December, responded to JGR's demand letter by agreeing to a comprehensive forensic review designed and directed by JGR. The parties' failure to finalize a release was the result of JGR's unilateral decision to change course, not because I failed to proceed under the Section 6, Paragraph 2 pathway we had been following in November.

33. I have also reviewed the declaration submitted by Todd Berrier. It asserts that on or about October 21, 2025, I told him that I had a meeting with Spire co-owner Dan Towriss about a potential job and that I later texted him confirming that I had that meeting. Mr. Berrier is mistaken.

34. The first time I met Mr. Towriss was on February 28, 2026, at an IndyCar race in St. Petersburg, Florida. Any contrary statement is incorrect.

35. I have also reviewed the declaration submitted by Greg Heyer. I understand from his declaration that Mr. Heyer is an executive with Zep, Inc., a sponsor of JGR for the 2026 NASCAR Cup season. I have never spoken or interacted with Mr. Heyer. I have never shared any information with respect to Zep, Inc. or its sponsorship of JGR with Spire, nor have I been involved in any conversations with Zep, Inc. on behalf of Spire.

36. I have also reviewed the declaration submitted by Bill Lealos. I understand from his declaration that Mr. Lealos works for Saia, Inc., a sponsor of JGR for the 2026 NASCAR

season. I have never spoken or interacted with Mr. Lealos. I have never shared any information with respect to Saia, Inc. or its sponsorship of JGR with Spire, nor have I been involved in any conversations with Saia, Inc. on behalf of Spire.

37. I have also reviewed the declaration submitted by Ryan Simpson. Mr. Simpson is apparently a private investigator who was retained by JGR to conduct surveillance on me. I was unaware that JGR was spying on me. I do not know why JGR was spying on me or for how long. The meeting with Jeff Dickerson referenced in Mr. Simpson's declaration was held in public at a restaurant in Mooresville, North Carolina. I was not trying to conceal that meeting.

[*Signature appears on following page*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

This 11th day of March, 2026.

_____
Christopher Gabehart

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Case No. 3:26-CV-00133-SCR-DCK

JOE GIBBS RACING, LLC,

    Plaintiff,

v.

CHRISTOPHER GABEHART and SPIRE MOTORSPORTS, LLC,

    Defendants.

INDEX OF EXHIBITS TO:

SECOND DECLARATION OF CHRISTOPHER GABEHART
[**Filed Provisionally Under Seal**]

| EXHIBIT: | DESCRIPTION: | SEALING STATUS: |
|:---:|---|---|
| A | NASCAR Cup Series Teams Global Competitive Participation Table | Filed Publicly/No Sealing |
| B | Spire vs. JGR Organizational Comparison Chart | Filed Provisionally Under Seal |

# EXHIBIT A

**NASCAR Cup Series Teams Global Competitive Participation Table**

| | | Racing Series | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | NASCAR Cup | NASCAR OAPS | NASCAR Trucks | High Limit Sprint Car Series | Dirt Late Model Team | Pavement Late Model Team | USAC Silver Crown Team | Formula 1 | Indy Car Series | Formula E | IMSA | Austrailian Supercars | MOTO GP | American Flat Track | NHRA Drag Racing | World Supercross |
| NASCAR Cup Chartered Teams | Spire Motorsports | x | | x | x | x | x | x | x* | x* | x* | x* | x* | | | | |
| | Joe Gibbs Racing | x | x | | | | | | | | | | | | | | |
| | Hendrick Motorsports | x | x | | | | | | | | | | | | | | |
| | Penske Racing | x | | | | | | | | x | | | | | | | |
| | 23XI Racing | x | | | | | | | | | | | | | | | |
| | RFK Racing | x | | | | | | | | | | | | | | | |
| | Track House Racing | x | | | | | | | | | | | | x | | | |
| | Richard Childress Racing | x | x | | | | | | | | | | | | | | |
| | Legacy Motor Club | x | | | | | | | | | | | | | | | |
| | Front Row Motorsports | x | | x | | | | | | | | | | | | | |
| | Kaulig Racing | x | | x | | | | | | | | | | | | | |
| | Wood Brother Racing | x | | | | | | | | | | | | | | | |
| | HAAS Factory Team | x | x | | | | | | x | | | | | | | | |
| | HYAK Motorsports | x | | | | | | | | | | | | | | | |
| | Rick Ware Racing | x | | | | | x | | | | | | | | x | x | x |

* TWG Motorsports teams. One of my roles as CMO for Spire Motorsports is to work with these teams in the TWG Motorsports Umbrella to discuss and develop common best practices amongst the teams.

# EXHIBIT B
## [FILED UNDER SEAL]

Spire vs. JGR Organizational Comparison Chart