# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
Case No. 3:26-CV-00133-SCR-DCK

JOE GIBBS RACING, LLC,

        Plaintiff,

v.

CHRISTOPHER GABEHART and SPIRE
MOTORSPORTS, LLC,

        Defendants.

**DEFENDANT CHRISTOPHER
GABEHART'S BRIEF IN OPPOSITION
TO PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................ 1

II. STATEMENT OF FACTS ................................................................................. 3

    A. Mr. Gabehart's Employment Agreement with JGR ................................. 3

    B. JGR and Mr. Gabehart Begin Negotiating a Separation Agreement ..................... 4

    C. The November 7 Photographs Were Acknowledged by Mr. Gabehart and
    Then Cured Through a Comprehensive Forensic Process That Confirmed
    No Transmission, Use, or Disclosure ................................................... 5

    D. The Spire Offer and Safeguards in Place ................................................ 6

    E. JGR's "Termination Notice" Is Not Legitimate ..................................... 8

III. LEGAL STANDARD ........................................................................................ 9

IV. ARGUMENT ................................................................................................... 10

    A. JGR Is Not Likely to Succeed on the Merits ....................................... 10

        1. Breach of Contract ................................................................ 11

            a. JGR Materially Breached the Agreement and Is Not
            Deserving of Relief ..................................................... 11

            b. Mr. Gabehart Properly Exercised His Rights Under Section
            6, Reducing the Noncompete Period to One Week .................... 12

            c. The Noncompete Provision Is Unenforceable ............................ 14

                (1) The Noncompete Is Not Reasonably Necessary to
                Protect JGR's Legitimate Business Interests ................. 14

                (2) The Noncompete Provision Is Overbroad........................ 16

            d. Mr. Gabehart Is Complying With the Noncompete
            Provision in Any Event ............................................... 17

        2. Misappropriation of Trade Secrets........................................... 20

    B. JGR Has Failed to Establish Irreparable Harm ..................................... 21

        1. JGR's Delay Defeats Any Claim of Irreparable Harm ............................ 21

        2. No Harm Has Occurred Because No Disclosure Has Occurred ............. 22

    C. The Balance of Equities Favors Denying the Injunction ................................ 24

V. CONCLUSION................................................................................................. 25

ARTIFICIAL INTELLIGENCE CERTIFICATION ............................................ 27

Defendant Christopher Gabehart ("Mr. Gabehart"), by and through undersigned counsel, respectfully submits this Memorandum of Law in Opposition to Plaintiff Joe Gibbs Racing, LLC's ("JGR" or "Plaintiff") Motion for Preliminary Injunction (the "Motion") and states as follows:

## I. INTRODUCTION

Plaintiff's request for a preliminary injunction[1] should be denied. The extraordinary relief it seeks rests on speculation, not proof. The record shows no transmission, use, or disclosure of JGR's Confidential Information (as defined in the Employment Agreement, ECF 8-2) by Mr. Gabehart. A forensic review—conducted in accordance with a JGR-drafted forensic protocol—confirmed as much. And JGR's own conduct, including its separation negotiations with Mr. Gabehart and its months-long foot-dragging with respect to Mr. Gabehart's employment status (all while withholding his wages), undercuts any claim of irreparable harm or likelihood of success on the merits of its claims.

The law does not enjoin a livelihood on conjecture, and it does not reward a party that breached first and then tried to convert a disputed separation into a punitive sit-out. Plaintiff's Motion should be denied to preserve the status quo, protect due process, and prevent the unwarranted sidelining of a career that spans more than a decade in an extraordinarily narrow industry.

JGR's recently filed Supplemental Memorandum of Law does nothing to alter this conclusion. In fact, JGR's supplemental filing only serves to highlight the fundamental weaknesses in its position. Across hundreds of pages of declarations, exhibits, and briefing, JGR fails to

---

[1] The Court held a hearing on Plaintiff's Motion on February 27, 2026. *See* February 27, 2026 Text Order. The Court subsequently issued an order on Plaintiff's Motion for Temporary Restraining Order but held Plaintiff's Motion for Preliminary Injunction in abeyance pending the parties' upcoming March 16, 2026 hearing. ECF 26. Therefore, Mr. Gabehart's brief in opposition to Plaintiff's Motion opposes the preliminary injunction that Plaintiff seeks, and references hereinafter to Plaintiff's "Motion" refer to its seeking a preliminary injunction.

identify a single piece of JGR Confidential Information that Mr. Gabehart actually transmitted, used, or disclosed to any third party, including Spire Motorsports, LLC ("Spire"). *See* ECF 35. This glaring omission is fatal to JGR's request for extraordinary relief. Moreover, the expanded injunctive relief JGR now seeks in its supplemental filing—which would effectively bar Mr. Gabehart from any involvement in NASCAR Cup Series or Xfinity Series racing and require him to maintain detailed logs of his daily activities—goes far beyond the scope of his Employment Agreement and reveals the true purpose of this litigation: to punish Mr. Gabehart for exercising his contractual rights and to sideline a competitor. The Court should reject JGR's request.

Despite JGR's recent flood of declarations, including several from Mr. Gabehart's former colleagues, the record before this Court establishes the following critical facts:

- A comprehensive forensic examination, conducted pursuant to a mutually agreed-upon protocol by a neutral forensic examiner and paid for by Mr. Gabehart, confirmed that Mr. Gabehart did not transmit, distribute, use, or otherwise share any JGR Confidential Information with any third party, including Spire.

- All JGR Confidential Information that was identified on Mr. Gabehart's personal devices has been permanently deleted and certified as removed by the forensic examiner.

- JGR materially breached the Employment Agreement by illegally withholding Mr. Gabehart's wages and delaying his earned performance bonus for more than two months, which bars JGR from seeking equitable relief to enforce the noncompete.

- Mr. Gabehart exercised his contractual rights under Section 6 of the Employment Agreement, which expressly contemplates scenarios in which the noncompete period is reduced to one week. JGR's refusal to acknowledge these rights does not negate their existence.

- The Employment Agreement itself demonstrates that JGR does not consider the noncompete essential to protecting its business interests in all circumstances, as it permits termination scenarios—including termination without cause and term expiration—where no noncompete applies at all.

- Both Mr. Gabehart and Spire have executed a Confidentiality and Non-Disclosure Agreement in which Spire agrees not to solicit, obtain, or use any JGR Confidential Information, and Mr. Gabehart agrees to maintain the confidentiality of such information.

- Prior to this lawsuit, Spire offered to submit to a forensic examination to confirm that no JGR information was transmitted to or used by Spire—an offer JGR ignored.

Under these circumstances, JGR cannot establish that enforcement of a purported noncompete is necessary to protect any legitimate business interest. The information upon which JGR bases its Motion and lawsuit has been deleted, no disclosure occurred, and robust safeguards are in place to prevent any future misuse. Regardless, in his role as Chief Motorsports Officer ("CMO") at Spire, Mr. Gabehart does not provide services of the general type he provided at JGR and therefore is not in breach of any noncompete.

The Court has now issued its ruling on JGR's Motion for Temporary Restraining Order (the "Order"). Mr. Gabehart is willing to consent to a preliminary injunction that is consistent with the language of subsections (i), (ii), and (iii) of the Order, ECF 26, which require him to cease and desist from retaining, transferring, using, or copying JGR's Confidential Information and Trade Secrets; cease and desist from using or disclosing such information; and return any such information in his possession to JGR. That provides JGR all— and no more than—the relief it needs and to which it is arguably entitled.

## II.     STATEMENT OF FACTS

### A.     Mr. Gabehart's Employment Agreement with JGR

For more than thirteen years, Mr. Gabehart built his career at Joe Gibbs Racing, advancing from engineer to crew chief and ultimately to Competition Director. ECF 12 ¶ 3 ("Gabehart Decl."). In connection with that promotion, he and JGR executed a written Employment Agreement (the "Agreement") on or about November 15, 2024, effective December 1, 2024, that set his compensation, duties, termination provisions, confidentiality obligations, and restrictive covenants. *Id.* ¶ 4.

3

Section 6 of the Agreement is pivotal: it reduces any noncompete to one week and requires JGR to pay Mr. Gabehart $100,000 for a complete and mutual release if, after September 1, 2025, and before June 1, 2026, Mr. Gabehart identifies job duty inconsistencies, JGR fails to cure the same within sixty days, and Mr. Gabehart provides sixty days' written notice of termination without cause due to the inconsistencies. *See* ECF 8-2 at 4. If Mr. Gabehart's employment is terminated without cause, no noncompete applies at all. Gabehart Decl. ¶ 5. JGR's Motion omits any mention of this. Indeed, Section 6 expressly provides that the restrictive covenants apply "[e]xcept for termination without cause by Company or Term expiration," meaning that if JGR had terminated Mr. Gabehart without cause, or if he had remained employed through the term's expiration, he would be free to work for any competitor immediately—without any noncompete restriction. *See* ECF 8-2 at 4.

**B.    JGR and Mr. Gabehart Begin Negotiating a Separation Agreement**

During the 2025 season, as his Competition Director role diverged from the position he was promised, Mr. Gabehart invoked Section 6 and provided written notice to JGR of those inconsistencies. Gabehart Decl. ¶¶ 6-8. Rather than the leadership role he was promised, Mr. Gabehart found himself intertwined with Coach Gibbs and senior executives when making routine competition decisions. *Id.* ¶ 8. He also expressed concerns about management of JGR's No. 54 car and was pressured to serve as its crew chief despite his objections—scenarios that are exactly why Section 6's second paragraph was included in the Agreement. *Id.* ¶¶ 9-10.

Mr. Gabehart's concerns prompted a November 6 meeting with Coach Gibbs in which Mr. Gabehart and Coach Gibbs both agreed to begin working out separation terms consistent with the Agreement's framework. Gabehart Decl. ¶ 11; ECF 18, Ex. 1 at 6-7 ("Second Carmichael Decl.").

After the November 6 meeting, Mr. Gabehart understood—and JGR confirmed—that the parties would honor Section 6 and pursue an amicable separation. Gabehart Decl. ¶ 12. Coach

Gibbs himself publicly confirmed this mutual decision during a SiriusXM Radio interview at Daytona on or around February 12, 2026,[2] stating: "After the season, Chris and I met, and we just decided to go our separate ways." *Id.* ¶ 11 n.2. On November 10, JGR instructed Mr. Gabehart that, if asked internally, he should say he was "on vacation," a direction memorialized in a contemporaneous email. *Id.* ¶ 14. JGR's CFO, who signed the Agreement, read Mr. Gabehart's written notice, acknowledged the role was not what Coach Gibbs had represented, and stated he did not blame Mr. Gabehart for exercising his contractual rights. *Id.* ¶ 15; Ex. B. That same day, November 10, JGR circulated concrete separation terms—pay through that date, a $100,000 buyout, COBRA through December, mutual non-disparagement, and return-of-property logistics—while turning off his access and beginning the transition out. *Id.* ¶ 16. These admissions and conduct confirm both parties were unwinding the relationship pursuant to the process described in Section 6, Paragraph 2 of the Agreement. *Id.* ¶¶ 11, 14-16. Mr. Gabehart relied on JGR's actions and conduct in proceeding down this path, reasonably believing that the parties had mutually agreed to proceed under Section 6, Paragraph 2.

C.     **The November 7 Photographs Were Acknowledged by Mr. Gabehart and Then Cured Through a Comprehensive Forensic Process That Confirmed No Transmission, Use, or Disclosure**

On November 7, 2025, after the parties had agreed to pursue a separation agreement, Mr. Gabehart took photographs on his personal phone of a JGR Excel file and certain notes relating to work he had performed; he regrets this lapse in judgment, but he understood his confidentiality obligations to JGR and had no intent to violate those obligations or to use the information in future employment. Gabehart Decl. ¶ 13. When JGR's tone shifted from separation discussions to

---

[2] Coach Gibbs gave this interview three days *after* he purported to terminate Mr. Gabehart "for cause."

demands, Mr. Gabehart promptly agreed through counsel to return and delete any JGR Confidential Information in his possession and submit to a rigorous forensic review. *Id.* ¶¶ 22-23.

The parties negotiated and signed a forensic protocol using JGR's chosen examiner, Reliance Forensics; JGR drafted the protocol. *Id.* ¶¶ 23-24. Mr. Gabehart personally paid the cost of the forensic examination as further evidence of his commitment to transparency and remediation. *Id.* ¶ 25. Before the review, Mr. Gabehart certified that he had conducted a reasonable search of his files, accounts, and devices and that based on his search the only JGR Confidential Information in his possession was located on his personal phone and his Google Drive. He further certified that since November 1, 2025, he had not transferred JGR Confidential Information to any third party or allowed any third party to view it. *Id.* ¶ 26. The protocol authorized a comprehensive imaging and analysis of his phone and Google Drive, including file-hash comparisons, keyword searches for JGR identifiers, sponsors, teams, and equipment, and a review of texts and email attachments for any evidence of transmission or dissemination. *Id.* ¶ 27.

Reliance Forensics imaged his devices and then on January 12, 2026 reported it "did not locate any text messages or email attachments" containing the files of interest—i.e., no evidence that the flagged files had left Mr. Gabehart's possession. *Id.* ¶ 29, Ex. D at 2. On February 6, 2026, Reliance Forensics supervised the permanent deletion of all flagged items from his phone and Google Drive. *Id.* ¶¶ 28-30, Ex. E at 2. During this two-month process, Mr. Gabehart paused on finalizing future employment with Spire or any other team. His goal and only focus was to prove to JGR, to the best of his ability, that its Confidential Information had not been transmitted, so that the parties could complete the separation process under Section 6. *Id.* ¶ 31.

## D. The Spire Offer and Safeguards in Place

On November 13, 2025, a week after he and Coach Gibbs agreed to pursue a separation agreement, Mr. Gabehart received an unsolicited offer from Spire. Gabehart Decl. ¶ 17. To

evaluate the offer from Spire and consider his options, Mr. Gabehart created a personal Google Drive folder named "Spire," which he used as his own working space in light of the ongoing separation process. *Id.* ¶ 19. He accessed that folder thereafter, but he did not use any JGR Confidential Information, understood his confidentiality obligations at all times, and had no intent to violate those obligations. *Id.* ¶ 20.

Mr. Gabehart started working at Spire as the team's CMO on February 16, 2026.[3] He made Spire expressly aware of his confidentiality obligations to JGR, and before performing any services for his new team, he and Spire executed a stand-alone Confidentiality and Non-Disclosure Agreement under which he agreed not to disclose JGR Confidential Information and Spire agreed not to solicit or use any such information. ECF 20 ¶¶ 5-7 ("Masterson Decl."); Gabehart Decl. ¶¶ 46-47. In addition, Mr. Gabehart and Spire offered JGR the opportunity to conduct a neutral forensic review of Spire's systems to verify no JGR Confidential Information had been transmitted—an offer JGR ignored. Gabehart Decl. ¶¶ 48-49.

Mr. Gabehart's role at Spire is fundamentally different from the position he held at JGR. At JGR, Mr. Gabehart served as Cup Series Director of Competition, a role focused on running weekly crew chief meetings, ensuring implementation of action items, running post-race competition meetings with drivers, promoting commonality across JGR's four Cup Series teams, coordinating race weekend strategy, and communicating with shop departments on race car fabrication, aerodynamics, simulation tools, and analytics. ECF 37 ¶ 6 ("Second Gabehart Decl."). By contrast, as Spire's CMO, Mr. Gabehart's focus is enterprise-wide and strategic— encompassing high-level program development, long-term organizational strategy, executive-level personnel development, vendor and manufacturer relationships, and resource allocation

---

[3] Mr. Gabehart's employment agreement with Spire reflects an effective date of February 9, 2026. The agreement was backdated by a week for payroll computation purposes. Second Gabehart Decl. ¶ 7.

across Spire's entire multi-series motorsports portfolio. *Id.* ¶¶ 8, 21. His current role sits at the executive level above the Director of Competition level and spans strategic oversight across all of Spire's racing programs—not just NASCAR Cup Series. *Id.* ¶¶ 16-17. Importantly, Spire employs Matt McCall as its Cup Series Competition Director, the role that corresponds to Mr. Gabehart's former position at JGR; Mr. Gabehart does not perform that function. *Id.* ¶ 11. Further, Spire's racing profile is substantially broader than JGR's—while JGR competes only in NASCAR Cup and Xfinity Series, Spire fields entries across NASCAR Cup, NASCAR Truck, High Limit Sprint Car, Dirt Late Model, Pavement Late Model, and USAC Silver Crown, and is part of TWG Motorsports, which operates Formula One and IndyCar teams. *Id.* ¶¶ 12–15.

Mr. Gabehart acknowledges that he has certain obligations to JGR arising from his employment, including obligations not to disclose JGR Confidential Information. He has at all times intended to honor these obligations and has conducted himself accordingly, and he agrees to do the same moving forward. Gabehart Decl. ¶ 44. Mr. Gabehart also acknowledges his non-solicitation obligations and confirms he was not involved with any JGR employees leaving JGR to work for Spire. *Id.* ¶ 45.

## E.     JGR's "Termination Notice" Is Not Legitimate

JGR's own communications show that, weeks after the parties began separation talks, JGR's Human Resources department still lacked clarity about Mr. Gabehart's status. Indeed, on November 24, JGR's Chief People Officer acknowledged she had told Human Resources nothing and noted that JGR would need to "terminate" employment to trigger COBRA eligibility, underscoring that Mr. Gabehart continued to be employed. Gabehart Decl. ¶¶ 32–33. Despite that limbo and without issuing a written notice identifying November 10 as Mr. Gabehart's termination date, JGR unilaterally stopped paying his regular wages and then delayed his earned 2025

performance bonus—approximately $235,000—until January 20, 2026, more than two months late. *Id.* ¶¶ 34, 36. JGR's withholdings caused a lapse in his family's health coverage. *Id.* ¶¶ 35, 38. As a result of JGR's administrative confusion and failure to effectuate a proper termination, Mr. Gabehart and his family have had insurance claims denied due to coverage lapses. *Id.* ¶ 38.

*Fast forward a few months.* In response to a February 5, 2026 letter from Mr. Gabehart's counsel confirming the forensic review was complete and validated no transmission, JGR sent a February 9, 2026 letter purporting to terminate him "for Cause." *Id.* ¶¶ 39-40. Tellingly, that letter does not state that Mr. Gabehart wrongfully disclosed any JGR Confidential Information—it merely speculates that he had information "with the intent to use and/or disclose" it. *Id.* ¶ 41. The notice also fails to specify how Mr. Gabehart breached Section 5 of his Employment Agreement or what policies he allegedly violated. *Id.*

The "for cause" termination notice was an invalid, post-hoc, pretextual maneuver sent in an effort to trigger a punitive 18-month noncompete period. To the extent JGR refuses to honor the Section 6 separation pathway that the parties were following, any separation is without cause under Section 4(d) of the Agreement, and JGR owes Mr. Gabehart his salary through the term, which exceeds $2.15 million. *Id.* ¶ 42.

## III.    LEGAL STANDARD

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 22 (2008). A preliminary injunction is a remedy "to be applied 'only in [the] limited circumstances' which clearly demand it." *Philips Med. Sys. v. Tec Holdings, Inc.*, No. 3:19-CV-373, 2022 WL 10208557, at *10 (W.D.N.C. Oct. 17, 2022) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp*, 952 F.2d 802, 811 (4th Cir. 1991)). Further, "an injunction should not

be issued merely to allay the fears and apprehensions or to soothe the anxieties of a party. Nor will an injunction be issued to restrain one from doing that which he is not attempting to do." *FMC Corp. v. Cyprus Foote Min. Co.*, 899 F. Supp. 1477, 1484 (W.D.N.C. 1995) (citing *Travenol Lab'ys, Inc. v. Turner*, 30 N.C. App. 686, 696 (1976)) (cleaned up).

A plaintiff seeking the rare relief that a preliminary injunction affords must demonstrate the following: (1) it is likely to succeed on the merits of its claims; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Metro. Reg'l Info. Sys. v. Am. Home Realty Network, Inc.*, 722 F.3d 591, 595 (4th Cir. 2013) (citing *Winter*, 555 U.S. at 20.). If a plaintiff fails to satisfy *even one* of these elements, a court may stop its analysis and deny relief without addressing the remaining elements. *Henderson for Nat'l Lab. Rels. Bd. v. Bluefield Hosp. Co., LLC*, 902 F.3d 432, 439 (4th Cir. 2018); *Vitkus v. Blinken*, 79 F.4th 352, 361 (4th Cir. 2023).

## IV.    ARGUMENT

### A.    JGR Is Not Likely to Succeed on the Merits[4]

To satisfy this element of the *Winter* analysis, JGR must "make a clear showing that [it] is likely to succeed at trial." *Doe v. Wake Forest Univ.*, No. 1:23-CV-00114, 2023 WL 2239475, at *4 (M.D.N.C. Feb. 27, 2023) (quoting *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017)). JGR's burden is "far stricter" than demonstrating "only a grave or serious question for litigation." *Sarsour v. Trump*, 245 F. Supp. 3d 719, 729 (E.D. Va. 2017). JGR cannot satisfy that tall burden.

---

[4] The arguments throughout this brief are preliminary in nature, made at the preliminary injunction stage prior to the completion of any discovery. Mr. Gabehart expressly reserves all rights to supplement, modify, or raise additional arguments regarding the merits of JGR's claims. Nothing herein shall constitute a waiver of any argument, defense, or legal position, whether or not expressly raised at this stage of the proceedings.

### 1. Breach of Contract

JGR is unlikely to succeed on its breach of contract claim against Mr. Gabehart for multiple reasons. First, JGR, itself, has unclean hands. Second, even if JGR's hands were clean, Mr. Gabehart satisfied his end of the bargain by complying with Section 6's prescribed method of separation, thus reducing the noncompete period to one week per the terms of the Agreement. Third, even if JGR properly terminated Mr. Gabehart for cause (it did not), the noncompete provision is unenforceable as a matter of law because it is overbroad and unnecessary. And finally, even if the noncompete is enforceable, Mr. Gabehart is not in violation because he performs entirely different services for Spire.

#### a. JGR Materially Breached the Agreement and Is Not Deserving of Relief

A party seeking injunctive relief must itself have clean hands. Thus, a preliminary injunction "to enforce the terms of a contract will not be granted [to] a party who has himself breached the terms of the contract when his breach is substantial and material and goes to the heart of the agreement." *See Combined Ins. Co. of Am. v. McDonald*, 36 N.C. App. 179, 182-83 (1978).

JGR does not come to this Court with clean hands. Instead, it breached perhaps its most fundamental obligation under the Agreement—to compensate Mr. Gabehart in a timely manner. While separation negotiations were ongoing, and before any separation agreement was finalized by the parties, JGR unilaterally ceased paying Mr. Gabehart all regularly earned compensation in violation of Section 3(a) of the Agreement. *See* Gabehart Decl. ¶¶ 34, 37; ECF 8-2 at 2. JGR then proceeded to delay paying Mr. Gabehart his earned performance bonus by more than two months, in violation of Section 3(b) of the Agreement. Gabehart Decl. ¶ 36; ECF 8-2 at 2-3.

Mr. Gabehart's compensation goes to the heart of his Agreement with JGR and JGR's failure to pay him was a material breach. *See Inmar Brand Sols., Inc. v. Infinity Sales Grp., LLC*, No. 1:18-CV-761, 2019 WL 5597894, at *5 (M.D.N.C. Oct. 30, 2019) (citing *Morris v. Scenera*

*Research, LLC,* 368 N.C. 857, 867 (2016)). JGR is not entitled to injunctive relief on this basis alone. *See Maaco Franchising, LLC v. Ghirimoldi*, No. 3:15-CV-99, 2015 WL 4557382, at *6-7 (W.D.N.C. July 28, 2015) (denying plaintiff's motion for preliminary injunction to enforce noncompete because defendant raised sufficient factual allegations which would support a material breach by plaintiff that undermined "the very reason defendants sought out plaintiff").

### b. Mr. Gabehart Properly Exercised His Rights Under Section 6, Reducing the Noncompete Period to One Week

Even if JGR's hands were clean (they are not), Mr. Gabehart was not subject to any substantial noncompete provision because he was terminated without cause pursuant to the Agreement. Section 6 provides an express mechanism for reducing the noncompete period to one week if certain conditions are met. *See* ECF 8-2 at 4. Mr. Gabehart satisfied those conditions. In early November 2025 Mr. Gabehart provided written notice and met with Coach Gibbs to discuss job duties and responsibilities that were inconsistent with his reasonable expectations when he accepted the position. Gabehart Decl. ¶¶ 7-8, 11. This meeting, combined with the subsequent negotiations that followed, *id.* ¶¶ 14-17, constituted Mr. Gabehart's exercise of his rights under Section 6 to be terminated without cause, thus reducing his noncompete obligation to one week.

JGR contends that Mr. Gabehart did not provide the required "written" notice. Second Carmichael Decl. ¶¶ 4-6. But the evidence attached to JGR's own declaration proves otherwise. Exhibit 1 to the Second Carmichael Declaration shows that Mr. Gabehart left written notice with Coach Gibbs at the November 6, 2025 meeting, as Mr. Gabehart's email to Mr. Carmichael states: "below is the written version of my discussion with Coach and what I left him with last night." That written notice expressly states, "Job Description - Not, at all, as advertised," which is precisely what Section 6, Paragraph 2 of the Agreement requires: notice of "specific job duties or responsibilities assigned to Employee that are inconsistent with Employee's reasonable

expectations or the job description provided." Moreover, the parties' subsequent conduct, including extensive separation negotiations, demonstrates that JGR understood Mr. Gabehart was invoking his rights under Section 6.[5] This reason alone defeats JGR's motion for injunctive relief. *See Novacare Orthotics & Prosthetics E., Inc. v. Speelman*, 137 N.C. App. 471, 476 (2000) (denying preliminary injunction where there was a question as to whether a noncompete was triggered by proper termination).

JGR cannot now claim ignorance of Mr. Gabehart's intent after engaging in months of negotiations premised on that very invocation. Further, the fact that JGR offered Mr. Gabehart $100,000 as part of the proposed separation agreement—the precise amount specified in Section 6—confirms that JGR understood Mr. Gabehart triggered Section 6's provisions for termination without cause. *See* Gabehart Decl., Ex. A at 2 (referencing a "buyout of $100k"). *That is no "coincidence."* Mr. Gabehart cooperated fully in the forensic process because he understood that returning JGR's Confidential Information was a condition of the Section 6 separation process. *See* ECF 9-3 ¶ 9. Once that process (that he paid for) was completed, Mr. Gabehart expected the parties would close out the mutual separation on the terms outlined by Mr. Carmichael. He did not know JGR had been spying on him (*see* ECF 35-4) and had no intention of acting in good faith.

---

[5] JGR's litigation strategy to pretend Mr. Gabehart never exercised his termination right under Section 6, Paragraph 2 of the Agreement does JGR no good. JGR ceased paying Mr. Gabehart as of November 10, 2025 – a de facto or constructive termination – which is consistent with its stated position that it longer employed Mr. Gabehart as of that date, Am. Compl. at 1. *See Wyatt v. Nash Johnson & Sons Farms, Inc.*, 91 N.C. App. 255, 259 (1988) (explaining that an employment relationship was terminated when, among other factors, "plaintiff work[ed] and [was] paid until but not after that time"); *iEntertainment Network, Inc. v. Hammett*, No. 5:14-CV-157, 2014 WL 3891319, at *3 (E.D.N.C. Aug. 7, 2014) (denying injunctive relief to enforce noncompete where defendants argued that plaintiff's failure to pay base salary prescribed in relevant agreement "voided the restrictions therein."). JGR had no grounds to terminate Mr. Gabehart "for cause" at the time it stopped paying him. Thus, Mr. Gabehart's termination was either under Section 6, Paragraph 2 or was "without cause" under Section 4(d) – in either event, the 18-month noncompete does not apply.

### c. The Noncompete Provision Is Unenforceable

Should the Court determine that Mr. Gabehart failed to exercise his right to termination without cause, the noncompete provision of the Agreement is not enforceable because it is not designed to protect a legitimate business interest and it is overbroad.

North Carolina courts "have a long history of carefully scrutinizing covenants that prevent an employee from competing with his former employer." *Chemimetals Processing Inc. v. McEneny*, 124 N.C. App. 194, 197 (1996). Restrictive covenants are not viewed favorably under North Carolina law, and "[e]ven where there is an otherwise permissible covenant not to compete, the restraint is unreasonable and void if it is greater than is required for the protection of the promisee or if it imposes an undue hardship upon the person who is restricted." *Phelps Staffing, LLC v. C.T. Phelps, Inc.*, 226 N.C. App. 506, 509-10 (2013). To be enforceable, a covenant not to compete must be: (1) in writing; (2) reasonable as to time and territory; (3) part of the employment contract; (4) based on valuable consideration; and (5) designed to protect a legitimate business interest of the employer. *Hartman v. Odell & Assocs.*, 117 N.C. App. 307, 311 (1994).

To establish a likelihood of success in seeking a preliminary injunction to enforce a noncompete, the employer must make a prima facie showing that the covenant is valid and enforceable. *Novacare*, 137 N.C. App. at 475. The party seeking enforcement bears the burden of proving reasonableness, which is a matter of law for the court. *Medical Staffing Network, Inc. v. Ridgway*, 194 N.C. App. 649, 655 (2009).

### (1) The Noncompete Is Not Reasonably Necessary to Protect JGR's Legitimate Business Interests

A noncompete covenant must be "designed to protect a legitimate business interest of the employer," *Young v. Mastrom, Inc.*, 99 N.C. App. 120, 123 (1990), and the covenant "must be no wider in scope than is necessary to protect the business of the employer." *Hartman*, 117 N.C. App.

at 316. If a noncompete covenant is "too broad to be a reasonable protection to the employer's business it will not be enforced." *Whittaker Gen. Med. Corp. v. Daniel*, 324 N.C. 523, 528 (1989).

North Carolina recognizes two legitimate business interests that justify the enforcement of restrictive covenants: (1) protection of customer relationships and goodwill, and (2) protection of confidential information. *United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 651 (1988). JGR's Motion rests entirely on the second basis. However, this basis was eliminated as a factual matter by the forensic examination, which confirmed that Mr. Gabehart did not transmit, disclose, or use any JGR Confidential Information and that all such information has been permanently deleted from his devices. Gabehart Decl. ¶¶ 29-30, Ex. D. Under these circumstances, there is no confidential information—and thus no legitimate business interest—left to protect.

JGR worries that Mr. Gabehart retains JGR's confidential information in his memory, but if memory alone justified enforcement of a noncompete, then every noncompete would be enforceable in every circumstance. North Carolina law does not permit such a result. *See Asheboro Paper & Packaging, Inc. v. Dickinson*, 599 F. Supp. 2d 664, 677-78 (M.D.N.C. 2009). Moreover, there are at least three other mechanisms already in place to adequately protect JGR's Confidential Information: (1) the Agreement's Confidentiality provision; (2) the Non-Disclosure Agreement between Mr. Gabehart and Spire; and (3) the provisions of the Order, to which Mr. Gabehart consents to including in a Preliminary Injunction order, that prohibit Mr. Gabehart from disclosing or using JGR's Confidential Information.

Further, the structure of the Agreement itself further undermines JGR's position. Section 6 expressly provides that the restrictive covenants apply "[e]xcept for termination without cause by Company or Term expiration." ECF 8-2 at 4. If JGR truly believed that Mr. Gabehart's knowledge posed such a grave competitive threat that he must be barred from the industry, it never

would have agreed to scenarios where he could immediately join a competitor. The fact that JGR did agree to such exceptions demonstrates that the noncompete serves non-legitimate purposes.

### (2) The Noncompete Provision Is Overbroad

North Carolina courts have established six factors for determining whether the scope of a covenant not to compete is reasonable: (1) the area or scope of the restriction, (2) the area assigned to the employee, (3) the area where the employee actually worked, (4) the area in which the employer operated, (5) the nature of the business involved, and (6) the nature of the employee's duty and his knowledge of the employer's business operation. *Horner Int'l Co. v. McKoy*, 232 N.C. App. 559, 565-66 (2014). Application of these factors leads to one conclusion: the noncompete is impermissibly overbroad. The noncompete attempts to prevent Mr. Gabehart from "provid[ing] services of the general type of services" that he provided to JGR. The vagueness of this language renders it unenforceable. Indeed, the North Carolina Business Court recently struck down similar language in *Accelerando, Inc. v. Relentless Sols., Inc.*, where the term "services" was undefined in a noncompete because it does not "reasonably put [Defendant] on notice of what services he is prohibited from providing." 2025 NCBC 29 ¶ 48 (N.C. Super. June 19, 2025).

The noncompete's overbreadth is further illustrated by JGR's own conduct in this litigation. In its Supplemental Memorandum, JGR now attempts to define, post-hoc, what the phrase "services of the general type of services" means in practice. *See* ECF 35 at 13-14, Ex. A. This after-the-fact effort to give substance to an undefined contractual term only underscores the inherent ambiguity of the provision. If the meaning of "services of the general type" were clear and definable, JGR would not need to file supplemental briefing enumerating a laundry list of prohibited activities that appears nowhere in the Agreement itself. The fact that JGR now feels the need to submit a Proposed Order that devotes eight pages to explaining what JGR wants the

noncompete to say demonstrates that the provision fails to "reasonably put [Mr. Gabehart] on notice of what services he is prohibited from providing." *Accelerando*, 2025 NCBC 29 ¶ 48.

Moreover, as JGR admits, NASCAR standardized its cars such that all teams "now race the same car" and "obtain their car components from the same manufacturers." ECF 9-2 ¶¶ 13,15 ("Brown Decl."). Due to the similar nature, function, and supplies of stock car race teams, the terms of the noncompete could theoretically apply to virtually *any* services performed for *any* of the limited number of other race teams that are of the same "general type" of services that Mr. Gabehart performed for JGR, regardless of whether the services are actually similar. Thus, the scope of this "general" restriction is overbroad. *See VisionAIR, Inc. v. James*, 167 N.C. App. 504, 508-09 (2004); *Hartman*, 117 N.C. App. at 317.

Further, the nature of the business and the nature of Mr. Gabehart's duties support the conclusion that the noncompete is overbroad. Mr. Gabehart cannot simply find a job elsewhere— his skillset is tailored to the NASCAR industry, which comprises a handful of race teams world-wide with limited leadership positions. Barring Mr. Gabehart from providing to any other NASCAR Xfinity Series or NASCAR Cup Series racing team the general type of services that he performed at JGR could effectively leave him jobless in this unique market. Gabehart Decl. ¶ 55.

In sum, the noncompete is overbroad in scope and extends beyond what is necessary to protect any legitimate interest after Confidential Information in Mr. Gabehart's possession was deleted and there are judicial and contractual safeguards in place to ensure it remains protected.

### d.  Mr. Gabehart Is Complying With the Noncompete Provision in Any Event

Even if the Court concludes the noncompete is likely enforceable, Mr. Gabehart is nevertheless complying with its terms. His current role as Spire's CMO involves high-level program development, multi-year competitive road-mapping, organizational structure and process, personnel development at the executive and technical leadership levels, vendor and manufacturer

relationships, and long-horizon resource allocation across Spire's motorsports portfolio. Second Gabehart Decl. ¶ 8. By contrast, Mr. Gabehart's role as Competition Director at JGR involved running weekly crew chief meetings, ensuring action item implementation, running post-race competition meetings with drivers and crew chiefs, promoting commonality across JGR's four Cup Series teams, coordinating race weekend strategy, communicating with shop departments on fabrication and analytics, and interfacing with NASCAR officials on behalf of JGR's teams. *Id.* ¶ 6. These positions do not involve provision of the same general type of services, do not require the same level of skill and responsibility, and are not similarly situated within the team's organizational structure. Mr. Gabehart's salary increased significantly at Spire, reflecting the breadth and seniority of his new enterprise-level responsibilities. *Id.* ¶ 22. Further evidencing the distinction, Spire has employed Matt McCall to serve as its Cup Series Competition Director—the equivalent role to what Mr. Gabehart held at JGR—while Mr. Gabehart serves in an entirely different capacity. *Id.* ¶ 11.

JGR attempts to argue that Mr. Gabehart's role at Spire "plainly violates the language of Section 6 of the Agreement" because both positions involve competitive efforts and strategy. Br. at 17. As a practical matter, there are few, if any, roles within competitive stock car racing that do not concern competition in some way. JGR's argument itself reflects the overbreadth of the noncompete it seeks to enforce. In reading JGR's Supplemental Memorandum, the ambiguity of the provision is further reinforced by JGR's invitation for the Court to fill in the gaps left by the Agreement and request that the Court "clarify the scope of this provision." Suppl. Mem. 13. Indeed, JGR's proposed injunctive relief invites the Court to fill that gap with 13 numbered paragraphs and more than 50 numbered subpoints that are found nowhere in the Agreement. *See* ECF 35-2. Such a request is improper. *See RLM Commc'ns, Inc. v. Tuschen*, 831 F.3d 190, 197-

98 (4th Cir. 2016) (finding a court cannot rewrite a noncompete to "save it from its fatal flaws"); *VisionAIR*, 167 N.C. App. at 508 ("[C]ourts will not rewrite a [noncompete] if it is too broad but will simply not enforce it."); *Beverage Sys. of the Carolinas, LLC v. Associated Beverage Repair, LLC*, 368 N.C. 693, 700 (2016) ("Allowing litigants to assign to the court their drafting duties as parties to a contract would put the court in the role of a scrivener … [w]e see nothing but mischief in allowing such a procedure.").

Notably, the North Carolina Business Court denied a TRO in a nearly identical scenario involving a NASCAR employee. In *RCR Enters., LLC v. McCall*, a race engineer subject to a noncompete left to become a crew chief at a competing NASCAR team. 2014 NCBC 68 ¶¶ 17-19 (N.C. Super. Dec. 19, 2014). The court found the plaintiff unlikely to succeed on its breach of contract claim because the new position—which involved "significant supervisory responsibility," "substantial decision-making responsibility," and "significant leadership responsibilities" that the defendant lacked in his prior role—was not sufficiently similar to his prior role. *Id*. ¶¶ 28-30. The fact that the defendant's new salary was three times his old one bolstered the court's conclusion. *Id*. ¶ 30. Critically, the court noted that the defendant was bound by a confidentiality provision, the new employer had instructed the defendant not to disclose confidential information, and the plaintiff had "not brought forward evidence of specific actions that indicate that [defendant] intends to disclose or use [plaintiff's] alleged trade secret information." *Id*. ¶ 41. Here, as in *McCall*, Mr. Gabehart's new CMO role involves fundamentally different responsibilities—high-level strategic development and enterprise-wide oversight across multiple racing series rather than day-to-day NASCAR Cup Series competition management—and comes with a significant salary increase. Second Gabehart Decl. ¶¶ 8, 16, 22. And just like the defendant in *McCall*, Mr. Gabehart

is bound by confidentiality obligations, Spire has instructed him not to disclose JGR information, and JGR has presented no evidence of any intent to disclose.

### 2. Misappropriation of Trade Secrets

JGR's trade secret claims will also likely fail. To prevail on its federal trade secret misappropriation claim, JGR must show "(1) the existence of a trade secret, (2) the trade secret's misappropriation, and (3) that the trade secret implicates interstate or foreign commerce." *MichJeff, LLC v. FCX Glob., Inc.*, No. 7:24-CV-449, 2025 WL 594979, at *10 (E.D.N.C. Feb. 24, 2025). Similarly, to prevail on a claim under the North Carolina equivalent, JGR must show (1) that it possesses trade secrets, and (2) that misappropriation was accomplished. *Amerigas Propane, L.P. v. Coffey*, 2015 NCBC 93 ¶ 50 (N.C. Super. Oct. 15, 2015).

JGR cannot satisfy the misappropriation element of either claim because Mr. Gabehart has neither used nor disclosed any JGR trade secret, and JGR has not presented evidence to the contrary. *See Savaria USA, Inc. v. Elevator Works, LLC*, No. CV RDB-24-1311, 2024 WL 2212914, at *8-9 (D. Md. May 16, 2024) (denying TRO where plaintiffs "could not demonstrate that [d]efendants actually have used or are using their trade secrets" despite pointing to screenshot of defendant's cloud account as circumstantial evidence). Similarly, JGR points to now-erased files in Mr. Gabehart's possession, but that is insufficient to show a likelihood of success.

A plaintiff cannot prevail on a trade secret misappropriation claim "if it offers only mere speculation of misappropriation instead of evidence supported by the facts." *Amerigas*, 2015 NCBC 93 ¶ 54. Merely alleging the possibility of misappropriation is insufficient. *See FMC Corp.*, 899 F. Supp. at 1481; *Analog Devices, Inc. v. Michalski*, 157 N.C. App. 462, 466 (2003) (upholding denial of preliminary injunction where plaintiff "failed to show a likelihood of success on the merits because [it] has not produced sufficient evidence establishing actual or threatened

misappropriation"). Concrete evidence—not speculation—is required to warrant this extraordinary remedy.

Mr. Gabehart no longer possesses JGR's Confidential Information, and using his generally acquired knowledge and skillset within his work at Spire does not constitute misappropriation of JGR's trade secrets. *See RLM Commc'ns, Inc. v. Tuschen*, 66 F. Supp. 3d 681, 696 (E.D.N.C. 2014), *aff'd,* 831 F.3d 190 (4th Cir. 2016) ("Acquiring and using such knowledge and experience [gained during employment] does not constitute misappropriation of trade secrets under North Carolina law."). JGR's UDTPA claim similarly fails because it is based on the same alleged conduct as its trade secret claims. *See Evergreen Builder Sols., LLC v. Taylor*, 2025 NCBC 77 ¶ 78 (N.C. Super. Dec. 29, 2025) ("North Carolina courts have previously concluded that when the UDTP claim rests solely upon other claims . . . which the court determines should be dismissed, the UDTP claim must fail as well.").

## B.     JGR Has Failed to Establish Irreparable Harm

To obtain a preliminary injunction, JGR must make a clear showing that without the injunction it is likely to suffer irreparable harm. *Philips Med. Sys*., 2022 WL 10208557, at *17. The required irreparable harm must be "neither remote nor speculative, but actual and imminent." *Clean & Sober Media LLC v. Renew Counseling Ctr. of NC, LLC*, No. 5:20-CV-00252, 2021 WL 2056985, at *2 (E.D.N.C. May 21, 2021) (quoting *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 283 (4th Cir. 2002)). Moreover, the "mere possibility of irreparable harm is insufficient in order to obtain preliminary relief." *Microban Int'l, Ltd. v. Kennedy*, No. 322-CV-00620, 2023 WL 2533085, at *5 (W.D.N.C. Mar. 15, 2023).

### 1.  JGR's Delay Defeats Any Claim of Irreparable Harm

JGR's "failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." *Moon Dot,*

*Inc. v. Q Shack Corp.*, No. 3:25-CV-00396, 2025 WL 2420990, at *6 (W.D.N.C. Aug. 21, 2025).

JGR admits that it had concerns regarding Mr. Gabehart's possession of JGR Confidential Information by December 15, 2025 at the latest, Am. Compl. ¶¶ 67-69, and JGR had concerns about Mr. Gabehart's employment with Spire by December 3, 2025. *See* ECF 35-5 ¶¶ 4-5 ("Schaffer Decl."). Yet JGR *still* waited more than two months to file suit. ECF 1. This delay alone undercuts its claim of irreparable harm. *See Southtech Orthopedics, Inc. v. Dingus*, 428 F. Supp. 2d 410, 420-21 (E.D.N.C. 2006) (holding that plaintiff's six-to-nine-week delay between discovery of competitive activity and filing suit weighed against injunction).

### 2. No Harm Has Occurred Because No Disclosure Has Occurred

The forensic examination confirmed that Mr. Gabehart did not transmit, disclose, or use any JGR Confidential Information. The forensic examiner did not see any evidence that the documents in question were transmitted and "did not locate any text messages or email attachments with the files." *See* Gabehart Decl., Ex. D at 2. All JGR information that was identified on Mr. Gabehart's devices has been permanently deleted. *See* Gabehart Decl., Ex. E at 2.

JGR's Supplemental Memorandum, despite spanning dozens of pages and incorporating numerous declarations and exhibits, does not change this fundamental reality. JGR has submitted hundreds of pages of evidence in support of its motion, yet *nowhere in this voluminous record does JGR identify a single instance where Mr. Gabehart transmitted, disclosed, or used any JGR Confidential Information*. The absence of such evidence is telling. If Mr. Gabehart had actually shared JGR's trade secrets with Spire, JGR would have highlighted that fact prominently. Instead, JGR asks the Court to infer harm from the mere fact that Mr. Gabehart possessed certain information—information that has since been permanently deleted under a forensic protocol that JGR itself drafted. Speculation and inference cannot substitute for the concrete evidence of harm that a preliminary injunction requires.

JGR's motion rests entirely on speculation that disclosure might occur in the future—a foundation too fragile to support the extraordinary remedy of preliminary injunctive relief. North Carolina courts have long recognized that speculative threats of misappropriation, without more, are insufficient to justify injunctive relief.

This Court addressed the same issue in *Microban*, denying a preliminary injunction where the plaintiff "identified no specific trade secret that has been misappropriated" and "only makes generalized claims that [the defendant] had 'access' to 'trade secrets' and that he will 'inevitably' disclose them." 2023 WL 2533085, at *5-6. The court credited the defendant's sworn statements that he had not disclosed confidential information—just as Mr. Gabehart has sworn here. *Id.* at *3. JGR, like the plaintiff in *Microban*, fails to identify any trade secret that has been misappropriated.

Other North Carolina courts have also expressed reluctance to apply the doctrine of inevitable disclosure. In *Allegis Group, Inc. v. Zachary Piper LLC*, 2013 NCBC 13 ¶ 52 (N.C. Super. Feb. 25, 2013), the court observed that "North Carolina courts are reluctant to grant injunctive relief solely on the basis of threatened misappropriation without proof of actual misappropriation." And even if relief is permitted, it "should be used only to limit the scope of an employee's new employment duties while not preventing any and all employment with the plaintiff's competitor." *Id.* ¶ 53.

Likewise, in *McCall*, the Business Court declined to apply the inevitable disclosure doctrine, noting that it "has not yet been firmly adopted by the North Carolina courts." 2014 NCBC 68 ¶ 37. Critically, the court found that the defendant, who was going to be a crew chief at a competitive race team, was already bound by a confidentiality provision, the new employer had instructed the defendant not to disclose confidential information, and the plaintiff had "not brought forward evidence of specific actions that indicate that [defendant] intends to disclose or use

[plaintiff's] alleged trade secret information." *Id.* ¶ 41; *see also Analog Devices*, 157 N.C. App. at 470 (2003) (declining to apply inevitable disclosure doctrine and noting that "if the doctrine is applied as urged by [Plaintiff], then no employee could ever work for its former employer's competitor on the theory that disclosure of confidential information is inevitable.") The same is true here.

In sum, the record establishes that no disclosure occurred, all JGR information has been permanently deleted, and binding confidentiality agreements are in place. Moreover, multiple safeguards adequately protect JGR's interests: Mr. Gabehart remains bound by Section 5 of the Employment Agreement's confidentiality provisions; the Spire Confidentiality Agreement prohibits disclosure or use of JGR information; Spire offered to submit to a forensic examination to verify no JGR information was received—an offer JGR ignored; and the provisions of the TRO, to which Mr. Gabehart consents to including in a Preliminary Injunction order, that prohibit Mr. Gabehart from disclosing or using JGR's Confidential Information. Gabehart Decl. ¶¶ 48-49. JGR's refusal of Spire's invitation to conduct a forensic review, while simultaneously claiming irreparable harm, reveals that this litigation is punitive rather than protective. JGR cannot establish the "high likelihood of disclosure" required for irreparable harm, and an injunction is unnecessary.

## C.     The Balance of Equities Favors Denying the Injunction

Even if JGR could establish likelihood of success on the merits or some potential harm, the balance of equities overwhelmingly favors Mr. Gabehart because "the harm [that Mr. Gabehart] will incur if an injunction is improperly granted substantially outweighs any harm that [JGR] will incur from a failure to grant the preliminary injunction." *Southtech*, 428 F. Supp. 2d at 419-20.

Mr. Gabehart has dedicated his entire professional career to NASCAR racing—an extraordinarily specialized field with no comparable alternatives. Gabehart Decl. ¶ 55. Unlike many industries where an employee subject to a noncompete might find alternative employment

in a related field, there are no such options for a professional of Mr. Gabehart's stature and expertise outside of NASCAR. *Id*. The teams that compete in the NASCAR Cup Series represent an extremely small universe of potential employers, and the positions available at his level are exceptionally rare. *Id*. An eighteen-month prohibition from working in his profession would not merely inconvenience Mr. Gabehart—it would effectively exile him from the only industry in which he has developed expertise over the course of his professional career. *Id*.

North Carolina courts have recognized that noncompete agreements impose significant restraints on an employee's ability to earn a living. *See Phelps Staffing, LLC v. C.T. Phelps, Inc.*, 226 N.C. App. 506, 510-12 (2013). Courts must balance this substantial right against the employer's interests. Here, where JGR's asserted interests have been fully protected through the forensic examination and deletion process, the balance tips decisively in Mr. Gabehart's favor.

## V.     CONCLUSION

For the foregoing reasons, Defendant Christopher Gabehart respectfully requests that this Court deny Plaintiff Joe Gibbs Racing, LLC's Motion for Preliminary Injunction. Mr. Gabehart, however, is willing to consent to a preliminary injunction that is consistent with the language of subsections (i), (ii), and (iii) of the Court's Temporary Restraining Order, ECF 26.

Respectfully submitted,

This the 11th day of March, 2026.

By: _/s/ Cary B. Davis___
Cary B. Davis
N.C. Bar No. 36172
cdavis@rbh.com

Spencer T. Wiles
N.C. Bar No. 53664
swiles@rbh.com

William M. Miller
N.C. Bar No. 36946
wmiller@rbh.com

Anna Claire Tucker
N.C. Bar No. 59457
atucker@rbh.com

ROBINSON, BRADSHAW & HINSON, P.A.
600 S. Tryon Street, Suite 2300
Charlotte, North Carolina 28202
(704) 377-2536

*Attorneys for Defendant Christopher Gabehart*

**ARTIFICIAL INTELLIGENCE CERTIFICATION**

Pursuant to the Court's June 18, 2024 Order, 3:24-mc-104, I hereby certify that:

- No artificial intelligence was employed in doing the legal research for the preparation of this document, with the exception of such artificial intelligence embedded in standard on-line legal research sources such as Westlaw, Lexis, FastCase, and Bloomberg; and

- Every statement and every citation to an authority contained in this document has been checked by an attorney at this firm and/or paralegal working at their direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

This the 11th day of March, 2026.

/s/ *Cary B. Davis*
Cary B. Davis