**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

| | | |
|---|---|---|
| JOE GIBBS RACING, LLC, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Case No: 3:26-cv-00133 |
| | ) | |
| CHRISTOPHER GABEHART and SPIRE | ) | |
| MOTORSPORTS, LLC, | ) | Honorable Susan Rodriguez |
| *Defendants*. | ) | |
| | ) | |
| | ) | |

**DEFENDANT SPIRE MOTORSPORTS, LLC'S MEMORANDUM OF LAW IN
OPPOSITION TO PLAINTIFF JOE GIBBS RACING, LLC'S
<u>MOTION FOR A PRELIMINARY INJUNCTION</u>**

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 1

FACTUAL BACKGROUND .................................................................................. 2

    A.    Spire's Business. ........................................................................................ 2

    B.    JGR and Spire Agree to a Trade of Competition Personnel. ................... 3

    C.    Spire Becomes Aware of Tension at JGR Surrounding the No. 54 Car and Begins Positioning Itself as an Alternative Employer for Gabehart...................... 4

    D.    At No Point in Time Prior to this Lawsuit Did JGR Indicate that Gabehart's Employment at Spire Would Violate Any Non-Compete Provision. ................................................................................................... 5

    E.    Spire Hires Gabehart as Chief Motorsports Officer After JGR's Investigation Reveals That Gabehart No Longer Possesses JGR's Confidential Information. .................................................................................. 6

    F.    Spire Offers JGR the Opportunity to Inspect Spire's Systems, and JGR Declines........................................................................................................ 7

    G.    JGR Sues Spire and Asks the Court to Permit Extraordinary Intrusions into Spire's Business on the Basis of Flimsy Allegations. .................... 8

ARGUMENT......................................................................................................... 8

    I.    JGR IS NOT ENTITLED TO A PRELIMINARY INJUNCTION. ...................... 8

        A.    JGR Is Unlikely To Succeed On The Merits Of Any Of Its Claims........... 9

            1.    JGR Is Not Likely To Succeed On Its Claim That Spire Misappropriated Trade Secrets Because There Is No Evidence of Misappropriation By Spire. ........................................ 9

            2.    JGR is Unlikely to Succeed on its Claim that Spire Violated the North Carolina Unfair and Deceptive Trade Practices Act............................................................................................... 12

            3.    JGR is Unlikely to Succeed on its Tortious Interference with Contract Claim.............................................................. 13

            a.    Spire Did Not Act "Without Justification" When It Hired Gabehart. ............................................................................... 13

            b.    The 18-Month Non-Compete Restriction is Inapplicable Because Gabehart Was Terminated Without Cause and JGR Breached the Employment Agreement .................... 16

            c.    The 18-Month Non-Compete Is Unenforceable as a Matter of Law ........................................................................ 19

            d.    Gabehart Is in Compliance With the 18-Month Non-Compete.... 22

        B.    JGR Cannot Establish a Risk of Irreparable Harm. ................................ 23

        C.    The Balance of the Equities Counsels Against a Preliminary Injunction. ................................................................................................ 24

CONCLUSION...................................................................................................... 24

## <u>TABLE OF AUTHORITIES</u>

### CASES

*2311 Racing LLC v. Nat'l Ass'n for Stock Car Auto Racing, LLC*,
  139 F.4th 404 (4th Cir. 2025) ............................................................................ 8

*Accelerando, Inc. v. Relentless Sols., Inc.*,
  No. 24CV028428-400, 2025 WL 1721497 (N.C. Super. Ct. June 19, 2025) .......................... 20

*Analog Devices, Inc. v. Michalski*,
  157 N.C. App. 462 (N.C. Ct. App. 2003) ............................................................... 9, 10

*Artistic S. Inc. v. Lund*,
  No. 12 CVS 11789, 2015 WL 8476587 (N.C. Super. Ct. Dec. 9, 2015) ................................ 13

*Beverage Sys. of Carolinas, LLC v. Assoc. Beverage Repair, LLC*,
  368 N.C. 693 (2016) ....................................................................................... 13

*Bowman v. Drum*,
  97 N.C. App. 505 (N.C. Ct. App. 1990) ............................................................. 18, 19

*Bridgetree, Inc. v. Red F Mktg., LLC*,
  No. 13-cv-00228, 2013 WL 443698 (W.D.N.C. 2013) .................................................... 12

*Clinical Staffing, Inc. v. Worldwide Travel Staffing Ltd.*,
  60 F. Supp. 3d 618 (E.D.N.C. 2013) ............................................................... 14, 15

*Direx Israel, Ltd. v. Breakthrough Med. Corp.*,
  952 F.2d 802 (4th Cir. 1991) ............................................................................. 23

*Evergreen Builder Sols., LLC v. Taylor*,
  No. 25CV003575-640, 2025 WL 3765677 (N.C. Super. Ct. Dec. 29, 2025) ............................. 13

*Farr Assocs., Inc. v. Baskin*,
  138 N.C.App. 276 (2000) ................................................................................. 19

*Free Spirit Aviation, Inc. v. Rutherford Airport Auth.*,
  191 N.C. App. 581 (2008) ................................................................................ 24

*FS Med. Supplies, LLC v. Tanner Pharma UK Ltd.*,
  No. 3:23-cv-000598, 2023 WL 6812565 (W.D.N.C. Oct. 16, 2023) ................................ 23, 24

*Hughes Network Sys., Inc. v. Interdigital Commc'ns Corp.*,
  17 F.3d 691 (4th Cir. 1994) ............................................................................. 23

*iEntertainment Network, Inc. v. Hammett*,
  No. 5:14-CV-157-BO, 2014 WL 3891319 (E.D.N.C. Aug. 7, 2014) ...................................... 18

*Inmar Brand Sols., Inc. v. Infinity Sales Grp., LLC*,
  No. 1:18-CV-761, 2019 WL 5597894 (M.D.N.C. Oct. 30, 2019) ..................................... 18, 19

*Integrated Direct Mktg., LLC v. May*,
  690 F. App'x 822 (4th Cir. 2017) ..................................................................... 9, 10

*JF Acquisition, LLC v. Pedchenko*,
  No. 5:18-CV-123-BO, 2018 WL 4154249 (E.D.N.C. Aug. 29, 2018) ..................................... 20

*Long v. Dunlop Sports Grp. Ams., Inc.*,
  506 F.3d 299 (4th Cir. 2007) ......................................................................... 17, 18

*Manning v. N.C. St. Univ.*,
724 F. Supp. 3d 438 (E.D.N.C. 2024)................................................................. 14, 15

*Med. Staffing Network, Inc. v. Ridgway*,
194 N.C. App. 649 (2009) ...................................................................................... 12

*Morris v. Scenera Rsch., LLC*,
368 N.C. 857 (2016) ............................................................................................... 18

*Peoples Sec. Life Ins. Co. v. Hooks*,
322 N.C. 216 (1988) ......................................................................................... 14, 15

*Prometheus Grp. Enters. v. Gibson*,
No. 22 CVS 14236, 2023 WL 2589284 (N.C. Super. Ct. Mar. 21, 2023)........ 13, 16

*Prometheus Grp. Enters., LLC v. Viziya Corp.*,
No. 5:14-CV-32-BO, 2014 WL 3854812 (E.D.N.C. Aug. 5, 2014)........................ 11

*Prysmian Cables & Sys. USA, LLC v. Szymanski*,
573 F. Supp. 3d 1021 (D.S.C. 2021).................................................................... 12

*RCR Enterps., LLC v. McCall*,
No. 14 CVS 3342, 2014 WL 7591977 (N.C. Super. Ct. Dec. 19, 2014)............... 22

*RLM Commc'ns, Inc. v. Tuschen*,
831 F.3d 190 (4th Cir. 2016) ...................................................................... 11, 14, 16

*Scotts Co. v. United Indus. Corp.*,
315 F.3d 264 (4th Cir. 2002) ................................................................................. 24

*Static Control Components, Inc. v. Summix, Inc.*,
No. 1:08CV928, 2012 WL 1379380(M.D.N.C. Apr. 20, 2012) ............................ 10

*United Labs., Inc. v. Kuykendall*,
322 N.C. 643 (1988) ............................................................................................... 21

*Vessel Med., Inc. v. Elliot*,
No. 6:15-cv-00330, 2015 WL 5437173 (D.S.C. Sep. 15, 2015) ........................... 23

*VisionAIR, Inc. v. James*,
167 N.C. App. 504 (N.C. Ct. App. 2004) ...................................................... 19, 20, 21

*Wells Fargo Ins. Servs. USA, Inc. v. Link*,
No. 17 CVS 12848, 2018 WL 2123700 (N.C. Super. Ct. May 8, 2018) ................ 19

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008)..................................................................................................... 9

*Wyatt v. Nash Johnson & Sons Farms, Inc.*,
91 N.C. App. 255 (1988) .................................................................................. 17, 18

*XPO, Inc. v. Byrd*,
No. 3:25-CV-00243, 2025 WL 2557708, at *6 (W.D.N.C. June 11, 2025) ........... 21

## STATUTES

18 U.S.C. § 1839................................................................................................... 9

N.C. Gen. Stat. § 66-152....................................................................................... 10

N.C. Gen. Stat. § 66-155....................................................................................... 10

N.C. Gen. Stat. § 75-1.1........................................................................................ 13

iv

## INTRODUCTION

Joe Gibbs Racing is struggling on the racetrack because of nepotism and internal dysfunction. That dysfunction forced one of its elite employees—Christopher Gabehart—to leave for another team, Spire. JGR could have taken the high road and wished Gabehart farewell as his career continues in another direction. JGR instead chose to sue Gabehart and Spire using speculation and flimsy legal theories. This case is unmistakably the desperate effort of a once-great team to harm an up-and-coming competitor.

The truth is that Spire lawfully competed to hire Gabehart as its Chief Motorsports Officer, offering him the culture, autonomy, responsibilities, and compensation that JGR denied him. At the time Spire hired him, Spire understood—based on JGR's conduct—that Gabehart was not subject to a non-compete and that JGR had terminated his employment without cause.

Nevertheless, JGR now seeks extraordinarily broad injunctive relief that would effectively bar Gabehart from virtually any work that comes close to a high-performance vehicle. It asks the Court to foreclose nearly every tangentially competition-related function, including race strategy, team oversight, technical input on testing, data analysis, simulator work, personnel management, strategic planning, liaison work with NASCAR and OEMs. JGR even asks the Court to dictate Gabehart's (and, by extension, Spire's) interpersonal interactions, communications, and physical whereabouts. JGR also seeks an unprecedented order requiring Gabehart to "maintain detailed contemporaneous records" of all work he performs for Spire, giving JGR a continuous, intrusive window into Spire's internal operations and competitive strategies. This is not a narrow effort to protect confidential information; it is a categorical attempt to sideline a competitor's key executive and monitor its business from the inside.

As this Court recognized in its Temporary Restraining Order ("TRO"), JGR has not shown a reasonable likelihood of success on its claims as to Spire, and JGR's post-TRO filings only

reinforce that conclusion. There is no evidence that Gabehart ever disclosed JGR's trade secrets to Spire or that Spire played any role in the alleged misappropriation, nor that Spire acted for any purpose other than lawful competition in hiring him as Chief Motorsports Officer. The non-compete JGR seeks to enforce never went into effect or was for, at most, a one-week period. And even if it were triggered, it is vague, fatally overbroad, and not tailored to any legitimate business interest. JGR also has not identified any irreparable harm it will suffer absent an injunction—an unsurprising failure given that JGR's own forensic examiner confirmed that there is no evidence of an imminent risk of trade secret misappropriation. Absent the threat of misappropriation, the balance of the equities weighs against an injunction, as JGR's mid-season request would wreak havoc on Spire's business—which may be just JGR's point. The Motion should be denied.

**FACTUAL BACKGROUND**

### A. Spire's Business.

The NASCAR industry has grown from its bootlegging and dirt-track roots into a multi-billion-dollar industry. The sport attracts millions of TV viewers for its Cup Series races and maintains a national fanbase that follows a 10-month season, which includes about 36 events held at racetracks across the United States. Despite this nationwide popularity, most NASCAR teams are headquartered in or around Charlotte, Concord, and Mooresville, North Carolina. Given this proximity and the tight-knit nature of the industry, it is common for long-term relationships to develop between members of various teams. It is also common for employees to move from team to team in careers. The motorsports labor market is fierce and competitive—as it should be.

2

Spire is a professional stock car racing team that competes in the NASCAR Cup Series and NASCAR Craftsman Truck Series, among others.[1] Declaration of Jeffrey Dickerson[2] ("Dickerson Dec.") ¶ 3. Spire first entered the NASCAR Cup Series in 2019 with a single entry. By 2024, Spire had three full-time Cup Series entries, as it remains to this day. Since its inception as a NASCAR outfit seven years ago, Spire has worked its way up the grid, in part due to a technical alliance with Hendrick Motorsports (who holds the record for Cup Series wins). *See Id.* ¶ 46. Jeff Dickerson—one of Spire's co-owners—has known Defendant Christopher Gabehart since 2009, when, while working for Kyle Busch Motorsports, Dickerson hired Gabehart. *Id.* ¶¶ 7, 10. Since then, Dickerson and Gabehart have been close acquaintances. *Id.* ¶ 10.

### B. JGR and Spire Agree to a Trade of Competition Personnel.

In the spring of 2025, JGR attempted to recruit Robert Smith, who at that time was a car chief for Spire's No. 7 car and one of NASCAR's most accomplished car chiefs, to be the car chief for JGR's No. 54 car. *Id.* ¶¶ 14, 16. A car chief is the individual responsible for ensuring that a car meets NASCAR's standards and specifications and is optimized for peak performance. Spire informed JGR that Smith was subject to a non-compete clause that extended through the remainder of Mr. Smith's contractual term. *Id.* ¶ 15. Given JGR's desperate need for help with the No. 54 car, Spire suggested that—in the event Smith was interested in JGR's offer—it would mutually release Smith from his contract so he could immediately begin working for JGR, in exchange for JGR extending the same waiver for waiver for an employee that Spire would identify in the future (the "Trade Understanding"). *Id.* ¶ 17. JGR agreed, although it insisted on having the option to pay Spire $100,000 in lieu of a so-called trade. *Id.* Spire agreed. Coach Gibbs and others at JGR

---

[1] A "series" in the motorsports industry refers to an organized, season-long championship in which teams compete in multiple points-based races featuring similar vehicle standards, rules, and regulations. The NASCAR Cup Series is the premier American stock car racing series in the motorsports industry.

[2] The Declaration of Jeffrey Dickerson is attached hereto as Exhibit A.

3

were aware of this arrangement. *Id.* ¶ 19. Smith accepted JGR's offer and joined JGR as the car chief of the No. 54 car in April 2025. Spire upheld its end of the deal, mutually terminating Smith's contract, awaiting JGR's $100,000 payment or the opportunity to hire a JGR employee. *Id.* ¶ 20.

### C. Spire Becomes Aware of Tension at JGR Surrounding the No. 54 Car and Begins Positioning Itself as an Alternative Employer for Gabehart.

The NASCAR community is small, talkative, and closely watched by the media. During the 2025 NASCAR season, it became apparent in the media and within the tight-knit racing community that there was tension at JGR—particularly with respect to JGR's treatment of the No. 54 Cup Team, driven by Joe Gibbs' grandson, Ty Gibbs, *id.*. ¶ 24, and JGR's decision to install Gabehart as the crew chief of the No. 54 car in June 2025. *Id.* ¶ 25.

In June 2025, Dickerson asked JGR whether it would be willing to release the prior crew chief for the No. 54 car from his contract so that Spire could hire him. *Id.* ¶ 22. JGR declined and later declined a similar request by Spire to hire a JGR car chief. *Id.* ¶ 22. On October 16, 2025— six months after Smith joined JGR pursuant to the Trade Understanding without JGR holding up its end of the bargain—Dickerson and Gabehart had dinner to catch up and to revisit the Trade Understanding. *Id.* ¶ 27. During the meal, Gabehart reported that he was not happy at JGR. *Id.* ¶ 29; *see also* Dkt. 12 ("Gabehart Dec.") ¶¶ 9–10. Dickerson asked Gabehart what would happen if his situation at JGR did not improve. Gabehart stated that he hoped it could be resolved but that he would pursue other opportunities if a resolution was not possible. Dickerson Dec. ¶ 30.

Following the October 16 meeting, Dickerson began thinking of a role that could suit Gabehart's talents. Dickerson had long been hoping to create a new role—Chief Motorsports Officer—that would relieve Dickerson of day-to-day management of Spire Motorsports. *Id.* ¶¶ 36–37. As Dickerson envisioned it, the Chief Motorsports Officer would act as an "owner's advocate," deploying Dickerson's strategic vision in all aspects of the business, to include

4

motorsports, executive-level management of personnel, and other business initiatives. *Id.* ¶¶ 36–37, 57; *see also id.* ¶ 59 (explaining that the Chief Motorsports Officer was designed to take over Dickerson's own role). The Chief Motorsports Officer would be responsible for strategic planning, resource allocation across departments, infrastructure growth, growing and stewarding Spire's various technical partnerships, collaborating with TWG Motorsports, and interfacing with NASCAR at an executive level as an advocate for Spire. *Id.* ¶¶ 36–37, 57–59.

On or around November 11, 2025, Gabehart informed Dickerson that he and JGR had agreed to a mutual separation on November 6, 2025. *Id.* ¶ 33. Gabehart also stated that he was subject to a one-week non-compete. *Id.*. Dickerson took Gabehart at his word regarding his employment agreement with JGR. *Id.* In fact, the first time Dickerson saw the employment agreement between Gabehart and JGR was when it was filed as an exhibit to this lawsuit. *Id.* On November 13, 2025, Dickerson gave Gabehart the general framework for an offer, and the two discussed Gabehart's possible employment with Spire in the months that followed. *Id.* ¶¶ 34, 38.

Gabehart met with Dickerson on December 2, 2025, at Barcelona Burger and Beer Garden located adjacent to Toyota Gazoo Racing's performance facility in Mooresville. *Id.* ¶¶ 40–42. The meeting was held in public and, apparently, was documented by a private investigator hired by JGR to spy on Gabehart and reported to JGR immediately thereafter. *See* Dkt. 35-4 ¶¶ 2–8.

### D. At No Point in Time Prior to this Lawsuit Did JGR Indicate that Gabehart's Employment at Spire Would Violate Any Non-Compete Provision.

Despite being aware of Spire's interest in hiring Gabehart since at least December 2, 2025, at no point prior to the filing of this lawsuit did JGR indicate to Spire that it had concerns that Spire's employment of Gabehart would violate any applicable non-compete provision. JGR's

assertion to the contrary is false.[3]  Declaration of William Anthony[4] ("Anthony Dec.") ¶¶ 6–14. Rather, Spire took Gabehart at his word regarding his Employment Agreement with JGR, Dickerson Dec. ¶ 33, and later learned that JGR stopped paying Gabehart, cut him off from JGR systems, stripped him of his employee benefits, and instructed him to stop performing services for JGR beginning on November 10, 2025. Gabehart Dec. ¶¶ 14, 34–36.  JGR's conduct constituted termination of Gabehart's employment without cause.

### E. Spire Hires Gabehart as Chief Motorsports Officer After JGR's Investigation Reveals That Gabehart No Longer Possesses JGR's Confidential Information.

After JGR sent a demand letter to Mr. Gabehart on December 15, 2025, Dickerson learned that JGR's counsel had accused Gabehart of taking JGR's confidential information, demanding that Gabehart submit certain devices for forensic examination.  Dickerson Dec. ¶ 45.  Gabehart complied.  Gabehart Dec. ¶¶ 23–29.  In January 2026, JGR's forensic examiner ("Reliance") concluded that, although it located certain photographs and files on Gabehart's personal devices that appeared to contain JGR's confidential information, there was no evidence of that information having been transmitted or shared with anyone.  Dkt. 9–4 ("Walton Dec.") ¶ 30.  Reliance also deleted the offending material from Gabehart's devices.  Walton Dec. ¶ 31.  Gabehart executed a declaration swearing that the only JGR confidential information in his possession was maintained on these two devices, and that since November 1, 2025, Gabehart had not transferred such information to, or allowed it to be viewed by, anyone.  Gabehart Dec. ¶ 26; Dkt. 12-4 at 4.

To date, Spire has never seen the documents that Gabehart allegedly maintained from JGR. Spire has no interest in or need for JGR's documents or data.  Dickerson Dec. ¶ 46.  Spire's alliance

---

[3] *See* Dkt. 35-5. Even accepting JGR's contentions as true (which the Court should not), the proffered declaration in a single paragraph simply states that Mr. Schaffer told Spire that "Gabehart's Employment Agreement with JGR contained a noncompete provision."  Importantly, Mr. Schaffer does not state that he told Spire the length of the noncompete provision, provided a copy of the provision, or otherwise followed up with Spire in writing thereafter.
[4] The Declaration of William Anthony is attached hereto as Exhibit B.

with Hendrick, as well as the fact that its cars are manufactured by Chevy, make data from other race teams largely irrelevant. *Id.* ¶ 47. Race data from other teams would have little use, given that the programs Spire uses to model scenarios and optimize performance are controlled by GM, which supplies all data relevant to Spire's Chevy-manufactured vehicles, and that information stales quickly in this dynamic, fast-paced environment. *Id.* ¶ 47. As such, Spire never asked for and did not want or need any of the information JGR accuses Gabehart of taking. *Id.* ¶¶ 46, 50.

On January 27, 2026, Spire extended its first written employment agreement proposal to Gabehart. Anthony Dec. ¶ 18. Spire had initially intended for Gabehart to begin work on February 9, 2026. *Id.* ¶ 19. As a result of negotiation delays, Gabehart did not begin working for Spire until February 16, 2026, and signed his employment agreement with Spire the next day. *Id.* ¶ 19; Dkt. 20 ¶¶ 5, 8. The same day, Gabehart executed an agreement stating that he agreed to "maintain at all times the confidentiality of JGR Confidential Information" and to "not disclose" or "use" such information "for the Company's benefit or in connection with any services performed for or on behalf of the Company." Dkt. 12-9. Also on February 17, Spire issued Gabehart a laptop and gave him access to Spire's IT resources, including a Spire email address, Microsoft teams account, and Spire's document management system. Dkt. 19 ("Bridges Dec.") ¶ 4.

**F. Spire Offers JGR the Opportunity to Inspect Spire's Systems, and JGR Declines.**

Spire offered JGR the opportunity to inspect Spire's systems in order to evaluate whether Gabehart shared any of JGR's trade secrets with Spire. JGR declined that option. Dkt. 12-10; Dickerson Dec. ¶ 52. Spire also offered to enter into an agreement representing that it had not obtained or used any such information and would not do so in the future. Dkt. 12-10; Dickerson Dec. ¶ 55. JGR declined that opportunity as well. Gabehart Dec. ¶ 48–49; Dickerson Dec. ¶ 56.

### G. JGR Sues Spire and Asks the Court to Permit Extraordinary Intrusions into Spire's Business on the Basis of Flimsy Allegations.

On February 19, 2026—three months after it learned of Gabehart's interest in Spire, two months after it learned of Gabehart's possession of JGR's information, and weeks after deleting all of the purported trade secrets it could identify from Gabehart's devices and accounts—JGR filed this lawsuit against Gabehart. Dkt. 1. Despite the lack of any material change in the facts available to it, JGR then amended the complaint five days later to name Spire as a defendant, and for the first time asserting a breach of non-compete claim. Dkt. 8 ¶ 86. As to Spire, JGR speculates (1) that Spire misappropriated JGR's purported trade secrets; and (2) that Spire tortiously interfered with JGR's contract with Gabehart. Despite an attempted supplementation of the record, Dkt. 35 ("Supp. Br."), this speculation remains unsupported. Now, JGR seeks extraordinary relief: Court-mandated oversight of one of Spire's most senior executives, ongoing reporting to a competitor regarding Spire's business operations, and injunctive relief that precludes Gabehart from doing virtually ***any job*** he has developed the skills to perform.

## ARGUMENT[5]

### I.    JGR IS NOT ENTITLED TO A PRELIMINARY INJUNCTION.

A preliminary injunction is an "extraordinary and drastic remedy" that "should be granted only sparingly and in limited circumstances." *2311 Racing LLC v. Nat'l Ass'n for Stock Car Auto Racing, LLC*, 139 F.4th 404, 408 (4th Cir. 2025) (citation omitted). To obtain a preliminary injunction, the movant bears the burden of proving four things: "(1) that he is likely to succeed on the merits; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor," and (4) "that an injunction is

---

[5] Given that this case is in its preliminary stages and discovery has not commenced, Spire expressly reserves the right to raise, and does not waive, any alternative theories, arguments, defenses, or counterclaims.

in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). JGR is unable to satisfy any of the four preliminary injunction factors, so its motion should be denied.

### A. JGR Is Unlikely To Succeed On The Merits Of Any Of Its Claims.

JGR's motion for a preliminary injunction should be denied because JGR has not "established a likelihood of success on the merits," *id.*, on any of its Spire-related claims. At the TRO stage, this Court found JGR's arguments "speculative, at best, and insufficient," Dkt. 26 ¶ 34. Evidentiary developments since then only confirm that conclusion.

#### 1. JGR Is Not Likely To Succeed On Its Claim That Spire Misappropriated Trade Secrets Because There Is No Evidence of Misappropriation By Spire.

Relevant here, "misappropriation," under the federal Defend Trade Secrets Act, means "acquisition," "disclosure," or "use" of a trade secret "by a person who" knows or should know that the trade secret was acquired by "improper means." 18 U.S.C. § 1839(5). The North Carolina Trade Secrets Act similarly prohibits the "acquisition, disclosure, or use of a trade secret of another without express or implied authority or consent." N.C. Gen. Stat. §§ 66-152(1), 66-155.

Courts routinely reject misappropriation of trade secrets claims brought against new employers where—as here—there is no evidence that the new employer was involved in the alleged misappropriation. *See Analog Devices, Inc. v. Michalski*, 157 N.C. App. 462, 471 (N.C. Ct. App. 2003) (affirming denial of preliminary injunction where former employee-defendants "signed agreements not to divulge confidential information belonging to" the former-employer plaintiff, the new-employer defendant "has instructed them not to do so, and there is no evidence that any party to this litigation intends to induce them to break their agreement."); *Integrated Direct Mktg., LLC v. May*, 690 F. App'x 822, 824 (4th Cir. 2017) (affirming grant of summary judgment in defendant-competitor's favor given "substantial evidence that it did not obtain or use" plaintiff's confidential pricing information); *Static Control Components, Inc. v. Summix, Inc.*, No.

1:08CV928, 2012 WL 1379380, at *7 (M.D.N.C. Apr. 20, 2012) (granting summary judgment to defendant-competitor where plaintiff's circumstantial evidence did "not appear in any way to support" its contention that defendant used plaintiff's confidential information).

JGR has no reasonable likelihood of success on the merits of its trade secrets claims as to Spire because "Plaintiff has not produced evidence that Gabehart shared any of JGR's Confidential Information with Spire." Dkt. 26 ¶ 21; *see Analog Devices*, 157 N.C. App. at 471; *Integrated Direct Mktg.*, 690 F. App'x at 824; *Static Control*, 2012 WL 1379380, at *7. This was true at the TRO stage, Dkt. 26 ¶ 21, and remains true. JGR's allegations focus exclusively on Gabehart—whom they contend "acquired" and "used" JGR's trade secrets for his personal benefit—and JGR nowhere identifies any action by Spire that constitutes "misappropriation." Dkt. 8 ¶¶ 132–37, 146–50. The evidence shows that Spire did not recruit or encourage Gabehart to access or retain the information, and only learned of the alleged misappropriation in December 2025, weeks after employment discussions began. Dickerson Dec. ¶ 45. Spire also instructed Gabehart not to disclose JGR's confidential information, entered into an agreement prohibiting such disclosure, and offered both a forensic examination and an agreement confirming it did not have and would not use the information—offers to which JGR never responded. Dkts. 12-9, 12-10; Gabehart Dec. ¶¶ 48–49. Moreover, Spire's IT Director confirmed that Gabehart did not receive access to Spire's network until February 17, 2026, Bridges Dec. ¶ 5—over ten days after Reliance deleted the information from his devices. Walton Dec. ¶¶ 27, 31; Bridges Dec. ¶ 9.

JGR incorrectly claims that the record "support[s] a finding of threatened misappropriation by Spire." Dkt. 35 at 16. JGR first posits that the threat of misappropriation exists because Gabehart "retains knowledge of JGR's Confidential Information," Supp. Br. 16, but the law does not protect "information that is held in the memory of an employee who has departed." *Prometheus*

*Grp. Enters., LLC v. Viziya Corp.*, No. 5:14-CV-32-BO, 2014 WL 3854812, at *7 (E.D.N.C. Aug. 5, 2014); *RLM Commc'ns, Inc. v. Tuschen*, 831 F.3d 190, 200 (4th Cir. 2016) ("[K]nowledge and opportunity [do not] suffice for a prima facie case of misappropriation").

JGR next argues that the threat of misappropriation exists because "JGR has put forth new evidence that Spire is contacting JGR partners and sponsors that Spire had never contacted prior to Gabehart's employment at Spire." Supp. Br. 16. JGR is connecting unrelated events. First, the identity of NASCAR sponsors is public knowledge—not a trade secret—as the purpose of a sponsorship is for the sponsoring company to have their names and logos *publicly associated* with a particular team. JGR does not allege Gabehart took information related to the specific sponsors Spire contacted (Zep and SAIA), nor that Spire's conversations with these companies involved anything more than social invitations, Dkt. 35-7 ("Heyer Dec.") ¶¶ 4–5, or requests to discuss "the racing industry" at large, Dkt. 35-8 ("Lealos Dec.") ¶¶ 4–5. Second, as Spire's declarants explain, cultivating relationships with potential sponsors is a long-term endeavor, as it is "not uncommon for sponsors," including Zep itself, to "change their sponsorships after a season ends." Declaration of Stephen D'Hondt[6] ("D'Hondt Dec.") ¶ 12.

For example, Spire's COO has known Zep's Greg Heyer since 2024 and has had many conversations with him about sponsoring Spire prior to the time periods relevant to this case. D'Hondt Dec. ¶¶ 7–8; *see also* Declaration of Cameron Sieradzan[7] ("Sieradzan Dec.") (explaining that contact with Bill Lealos in February 2026 was "for the purpose of networking and building a relationship with a well-known industry leader"). There is no logical or other basis to infer that Spire misappropriated information related to, for instance "post-race audit and analyses" and

---

[6] The Declaration of Stephen D'Hondt is attached hereto as Exhibit D.
[7] The Declaration of Cameron Sieradzan is attached hereto as Exhibit E.

"employment compensation," Supp. Br. 12, simply because other Spire employees recently contacted two of JGR's publicly-known sponsors.

The cases upon which JGR relies to argue that an employer can be enjoined on the basis of "circumstantial evidence of threatened misappropriation," Supp. Br. 16–17, are inapposite. In *Bridgetree, Inc. v. Red F Mktg., LLC*, No. 13-cv-00228, 2013 WL 443698, at *7–8 (W.D.N.C. 2013), the defendant rapidly developed a computer program after hiring the plaintiff's former employee, who brought the plaintiff's proprietary code for the same type of program. Likewise, in *Prysmian Cables & Sys. USA, LLC v. Szymanski*, 573 F. Supp. 3d 1021, 1044 (D.S.C. 2021), the former employee took a "business blueprint" for plaintiff's plant expansion and used it to initiate plans for an analogous plant for the competitor. Unlike in *Bridgetree* and *Prysmian*, where the misappropriated trade secret directly enabled the competing products, the only alleged "use" of JGR's information is Spire's outreach to JGR's sponsors, whose identities are publicly known and easily identifiable, and which did not result in any change to JGR's sponsorships. And in *Med. Staffing Network, Inc. v. Ridgway*, 194 N.C. App. 649, 659 (2009), the former employee engaged in targeted solicitation of the plaintiff's contractors, after which the defendant experienced a "substantial turnaround" and the plaintiff a "substantial decrease" in business. *Id.* Here, Spire is alleged only to have contacted JGR's publicly known sponsors, and there is no evidence that this outreach caused any change in either company's sponsorships or business positions.

### 2. JGR is Unlikely to Succeed on its Claim that Spire Violated the North Carolina Unfair and Deceptive Trade Practices Act

JGR is unlikely to succeed on the merits of its claim under the North Carolina Unfair and Deceptive Trade Practices Act ("NCUDTPA") because there is no evidence that Spire engaged in an "unfair or deceptive act or practice, or an unfair method of competition." N.C. Gen. Stat. § 75-1.1. Because JGR's claim for violation of NCUDTPA rests on the same facts underlying JGR's

misappropriation of trade secrets claims, *see* Dkt. 10 ("Initial Br.") at 21 (stating that Gabehart's misappropriation "was *per se* an unfair or deceptive trade practice"), JGR's failure to demonstrate a reasonable likelihood of success as to that claim, *see supra* pp. 9–13, is fatal to his ability to do so with respect to the NCUDTPA.[8] *See Evergreen Builder Sols., LLC v. Taylor*, No. 25CV003575-640, 2025 WL 3765677, at *12 (N.C. Super. Ct. Dec. 29, 2025) ("[W]hen the UDTP claim rests solely on other claims, . . . which the court determines should be dismissed, the UDTP claim must fail as well." (citation omitted)).

### 3. JGR is Unlikely to Succeed on its Tortious Interference with Contract Claim.

To prevail on a claim for tortious interference with contract, a plaintiff must prove: "(1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage." *Beverage Sys. of Carolinas, LLC v. Assoc. Beverage Repair, LLC*, 368 N.C. 693, 700 (2016) (citation omitted). "There can be no tortious interference with contract if there is no breach of contract upon which the tortious interference claim is based," *Artistic S. Inc. v. Lund*, No. 12 CVS 11789, 2015 WL 8476587, at *10 (N.C. Super. Ct. Dec. 9, 2015), or if the contract is unenforceable or inapplicable. *See Prometheus Grp. Enters. v. Gibson*, No. 22 CVS 14236, 2023 WL 2589284, at *10 (N.C. Super. Ct. Mar. 21, 2023). JGR is unlikely to succeed on its tortious interference claim for four reasons.

#### a. Spire Did Not Act "Without Justification" When It Hired Gabehart.

---

[8] JGR yet again speculates that Gabehart took the information at issue "to make himself more valuable" to "Spire" and "to benefit" Spire in a manner that "adversely affected JGR's position in the marketplace," Br.22, without providing any evidence to support these bold claims. *See Allstate Ins. Co.*, 2018 WL 4186421 (preliminary injunction requires "actual and specific" evidence to support reasonable likelihood of success).

Acts of a "non-outsider" to a contract—meaning, a party with a "legitimate business interest in the subject matter" of the contract—"are presumed to have been done in the interest of the [c]orporation and are therefore justified." *Manning v. N.C. St. Univ.*, 724 F. Supp. 3d 438, 462 (E.D.N.C. 2024) (cleaned up). Although "tortious interference claims against non-outsiders generally fail" for this reason, "a plaintiff can overcome this presumption by showing that the non-outsider . . . acted with malice and for a reason not reasonably related to the protection of a legitimate business interest." *Id.* (citation omitted). As this Court recognized in its TRO Order, "a competitor is not liable for tortious interference for hiring employees away from an employer . . . so long as the competitor was motivated by competition rather than malice." Dkt. 26 ¶ 34 (quoting *RLM Commc'ns*, 831 F.3d at 203).

A company does not act with malice simply by recruiting a competitor's employee—even if the company knows that the employee is bound by a non-compete agreement. *See Peoples Sec. Life Ins. Co. v. Hooks*, 322 N.C. 216, 220 (1988) (rejecting tortious interference claim based on allegations that the "defendant offered the plaintiff's employees job opportunities which induced them to . . . breach the noncompetition clauses contained in their contracts with the plaintiff"); *Clinical Staffing, Inc. v. Worldwide Travel Staffing Ltd.*, 60 F. Supp. 3d 618, 627 (E.D.N.C. 2013) (defendant did not act "without justification" even though it was "aware of the non-competition provision in the former [ ] employees' contracts when it recruited, hired, and placed" them).

Here, JGR cannot demonstrate a likelihood of success on the merits of its tortious interference claim because JGR cannot rebut the presumption that Spire's hiring of Gabehart was "justified." *Manning*, 724 F. Supp. 3d at 462. Spire's legitimate business interest in Gabehart's employment prospects make it a "non-outsider," so its actions are "presum[ably] . . . justified," *id.*, and JGR points to no evidence rebutting that presumption. Instead of malice, the record reflects

legitimate competition: Dickerson and Gabehart are longtime friends; Gabehart is widely respected and well-credentialed in the industry; and Dickerson believed Gabehart was free to join Spire in November 2025 based on Gabehart's representation that his non-compete's duration was only one week.[9] Dickerson Dec. ¶¶ 33, 39. Acting on that understanding (and with the Trade Understanding in place, to boot), Spire began discussing the framework for an offer on November 13, 2025, followed by a formal agreement executed months later on February 17, 2026. Anthony Dec. ¶ 19. And while JGR (falsely, *see* Anthony Dec. ¶¶ 6–14) claims to have informed Spire about the duration of Gabehart's non-compete in December 2025, mere knowledge of a restriction does not convert an employer's hiring decisions into tortious interference. *See Hooks*, 322 N.C. at 221 (no tortious interference even where defendant knew about non-compete); *Clinical Staffing, Inc.*, 60 F. Supp. 3d at 627 (same). Moreover, the information Gabehart allegedly misappropriated is largely irrelevant to Spire, given its own technical alliance with Hendrick and use of a different OEM. Dickerson Dec. ¶¶ 46–47. Taken together, these facts show competitive motive and above-board conduct, not malice or wrongful interference.

Yet again, JGR relies on speculation—not evidence. JGR theorizes that Spire must have "in bad faith induced Gabehart to breach his contract with JGR," Dkt. 8 ¶ 168, merely because Spire hired him to a role that supposedly "overlaps with his role at JGR knowing it would cause" a non-compete violation. Initial Br. 18. But Gabehart's new role does not "overlap" with his role at JGR, *see infra* pp. 22–24, and Spire offered employment to Gabehart believing Gabehart was *no longer subject to a non-compete restriction* and that Gabehart had already been terminated without cause, Dickerson Dec. ¶¶ 33, 39; *infra* pp. 17–19. JGR's speculation that Gabehart "used"

---

[9] The fact that Spire reasonably relied on Gabehart's representations about the duration of his Non-Compete Provision and waited one week before extending an informal offer or employment—and over two months before extending a formal offer—additionally serves as evidence that Spire did not "intentionally induce" Gabehart to breach the employment agreement. *Manning*, 724 F. Supp. 3d at 462; *see also* Dickerson Dec. ¶¶ 33, 38.

15

the purported trade secrets "to make himself more valuable in obtaining a job" with Spire, Initial Br. 20 (emphasis omitted), is also wrong. Gabehart is a household name in NASCAR, and Spire began pursuing him in earnest after he had separated from JGR. Dickerson Dec. ¶¶ 33–39. There is no evidence that Gabehart leveraged this information to secure employment, nor that he "will continue to use" JGR's information to benefit Spire. Initial Br. 20 (emphasis omitted). To the contrary, the record reflects that Gabehart did not have access to Spire's systems until after JGR's forensic examiner deleted the information from Gabehart's devices. Bridges Dec. ¶ 9; Walton Dec. ¶¶ 27, 31. In any event, the information JGR claims was taken (which Spire still have never seen) is presumably of little to no value to Spire given its use of a different OEM, the granularity of the data at issue, and its alliance with Hendrick.[10] Dickerson Dec. ¶¶ 46–47. A plaintiff's "reasonable belief" that a competitor is using its trade secrets based solely on the employee's prior access and its assumption of a "nearly identical" role is "not enough" to state a misappropriation claim. *Prometheus*, 2023 WL 2589284, at *13–14. In the absence of evidence that Spire acted maliciously, there is no reasonable basis to conclude that Spire was "motivated by anything other than competition," *RLM Commc'ns*, 831 F.3d at 204, when it offered to hire Gabehart.

### b. The 18-Month Non-Compete Restriction is Inapplicable Because Gabehart Was Terminated Without Cause and JGR Breached the Employment Agreement

The restrictive covenant in Gabehart's Employment Agreement provides that "[e]xcept for termination without cause," Gabehart "shall not provide services of the general type of services that [he] provided to [JGR] in the year prior to such termination to any other NASCAR Xfinity Series or NASCAR Cup Series racing team . . . or any vehicle manufacturing company or any

---

[10] As explained above, JGR's declarations stating that Spire has recently contacted JGR's sponsors to discuss the NASCAR industry does not constitute evidence that Spire was involved in Gabehart's alleged misappropriation of JGR's trade secrets because information about these sponsors is publicly available and contact with sponsors committed to other teams is common during the NASCAR season. D'Hondt Dec. ¶¶ 4–14; *see supra* pp. 11–12.

16

other person that provides goods or services to such a team," for a period of up to 18 months following termination ("18-Month Non-Compete"). Dkt. 8-2 § 6(b).

The 18-Month Non-Compete does not apply because Gabehart was terminated "without cause" by JGR on November 10, 2025, when JGR ceased paying Gabehart. JGR recognizes that November 10 was Gabehart's last day of employment—stating, in the opening line of its Amended Complaint, that "Until November 2025, Gabehart served as one of JGR's most senior leaders." Dkt. 8 at 1. There is no evidence that, on or around November 10, 2025, JGR gave Gabehart a reason for his termination—let alone any of the specific reasons identified in Section 4 of the Employment Agreement as valid bases for termination with cause. Dkt. 8-2 § 4(c). Thus, when Spire discussed the framework for a job offer with Gabehart on November 13, 2025, and then made a formal job offer on January 27, 2026, Gabehart had been terminated without cause, rendering the 18-Month Non-Compete inapplicable. *See* Dickerson Dec. ¶¶ 39; *see Wyatt v. Nash Johnson & Sons Farms, Inc.*, 91 N.C. App. 255, 259 (1988) (employer/employee relationship terminated where, among other specifics, "plaintiff work[ed] and [was] paid until but not after that time"); *Long v. Dunlop Sports Grp. Ams., Inc.*, 506 F.3d 299, 303 (4th Cir. 2007) ("When an employer commits to continue payment of wages . . . the employment relationship has not ended").

JGR's argument that it "terminated Gabehart's Agreement for cause on February 9, 2026" is unavailing. Initial Br. 14; Dkt. 12–8. JGR's letter is an after-the-fact attempt to rewrite the story of Gabehart's departure and render enforceable the 18-Month Non-Compete that JGR had already given up. JGR first sent Gabehart a letter purporting to terminate his employment for cause on February 9, 2026—three months after JGR ceased paying Gabehart as contemplated by the Employment Agreement, Dkt. 8-2 § 3, despite Gabehart remaining "ready, willing, and able to perform" during that period, Gabehart Dec. ¶ 18, and despite Gabehart's contractual obligation,

under Section 4(d), to immediately "seek employment for reasonable compensation" in the event of termination without cause, Dkt. 8-2 § 4(c); *Wyatt*, 91 N.C. App. at 259; *Long*, 506 F.3d at 303.

Alternatively, and even if JGR's February 9, 2026 termination letter did somehow establish that Gabehart's termination was "for cause," the 18-Month Non-Compete would be unenforceable because JGR's failure to pay Gabehart as of November 10, 2025, Gabehart Dec. ¶ 34, constitutes a material breach of the Employment Agreement that precludes JGR from seeking to enforce the 18-Month Non-Compete. Indeed, "[f]ailure to pay at the time required for services actually performed as agreed in a contract is a material breach." *Inmar Brand Sols., Inc. v. Infinity Sales Grp., LLC*, No. 1:18-CV-761, 2019 WL 5597894, at *5 (M.D.N.C. Oct. 30, 2019); *see Morris v. Scenera Rsch., LLC*, 368 N.C. 857, 867 (2016) (failure to pay an employee a promised bonus constituted material breach). And it is a fundamental tenet of North Carolina law that "one who breaches a material provision of a contract may not ask a court of equity to enforce the rest of the agreement." *Bowman v. Drum*, 97 N.C. App. 505 (N.C. Ct. App. 1990). Therefore, because JGR materially breached the Employment Agreement by failing to pay Gabehart as of November 10, 2025, *Inmar Brands*, 2019 WL 5597894, at *5; Gabehart Dec. ¶ 34, JGR has no basis to seek the enforcement of the non-compete restriction here as to Gabehart, and no basis to hold Spire liable for tortious interference. *Bowman*, 97 N.C. App. at 506; *iEntertainment Network, Inc. v. Hammett*, No. 5:14-CV-157-BO, 2014 WL 3891319, at *3 (E.D.N.C. Aug. 7, 2014) (denying preliminary injunction seeking enforcement of non-compete where parties disputed whether non-payment of wages and nature of potentially-without cause termination "voided the restrictions therein").

At bottom, JGR is not entitled to equitable relief, regardless how this Court views the timing of Gabehart's termination. If Gabehart were terminated without cause on November 10, 2025, as Spire asserts, the 18-Month Non-Compete does not apply per the terms of the

Employment Agreement. Dkt. 8-2 § 6. And if Gabehart was terminated with cause on February 9, 2026, as JGR asserts, then Gabehart is entitled to have been paid for that time period, and JGR's failure to do so constitutes a material breach of the Agreement. *See Inmar Brands*, 2019 WL 5597894, at *5. JGR does not dispute that Gabehart was not paid following November 10, 2025, so JGR, with unclean hands, is not entitled to relief. *Bowman*, 97 N.C. App. at 506.

### c. The 18-Month Non-Compete Is Unenforceable as a Matter of Law

"Covenants not to compete between an employer and employee are 'not viewed favorably in modern law.'" *Farr Assocs., Inc. v. Baskin*, 138 N.C. App. 276, 279 (2000) (citation omitted), Thus, such restrictions must be "reasonable," and "no wider in scope than is necessary to protect the business of the employer." *VisionAIR, Inc. v. James*, 167 N.C. App. 504, 508 (N.C. Ct. App. 2004) (citation omitted). "The party seeking enforcement of a restrictive covenant has the burden of proving its reasonableness." *Wells Fargo Ins. Servs. USA, Inc. v. Link*, No. 17 CVS 12848, 2018 WL 2123700, at *4 (N.C. Super. Ct. May 8, 2018), *aff'd*, 372 N.C. 260 (2019) (per curiam). In the event a restrictive covenant is "too broad," the court may not "rewrite [the] contract," "but will simply not enforce it." *VisionAIR*, 167 N.C. App. at 508 (citation omitted). JGR has failed to demonstrate that the 18-Month Non-Compete—which prohibits Gabehart from providing "services of the general type of services that [he] provided to [JGR]" to "any vehicle manufacturing company or other person or entity that provides good or services to such a team," Dkt. 8-2—is reasonable or sufficiently tailored. *See Wells Fargo Ins. Servs.*, 2018 WL 2123700, at *4.

The 18-Month Non-Compete is impermissibly vague as to the types of employment Gabehart is prohibited from accepting during the duration of the restriction. Neither the 18-Month Non-Compete, nor any other provision of the Employment Agreement shed light on what "general type of services" Gabehart performed for JGR, rendering the provision vague and, therefore,

19

unenforceable. *See Accelerando, Inc. v. Relentless Sols., Inc.*, No. 24CV028428-400, 2025 WL 1721497, at *6 (N.C. Super. Ct. June 19, 2025) (refusing to enforce non-compete that prohibited performance of undefined "services" because such language does not "reasonably put [Defendant] on notice of what services he is prohibited from providing"); *JF Acquisition, LLC v. Pedchenko*, No. 5:18-CV-123-BO, 2018 WL 4154249, at *2 (E.D.N.C. Aug. 29, 2018) (invalidating prohibition on performance of "substantially similar" work for a competitor as vague and overbroad). JGR's post-hoc attempt to define such "services" in its eight-page proposed order for injunctive relief, Dkt. 35-2, highlights the inherent ambiguity in the 18-Month Non-Compete.

The 18-Month-Non-Compete Provision is also fatally overbroad, particularly if this Court accepts JGR's characterization of the "services" it asks this Court to prohibit Gabehart from performing. *See VisionAIR*, 167 N.C. App. at 508; Dkt. 35-2. In JGR's view, virtually anything conceivably related to NASCAR competition in any way—including "meetings and strategic discussions," "analytics and data analysis," "executive and strategic planning activities" and "race weekend and track activities," Dkt. 35-2; Supp. Br. 14—would qualify as a "service" of the Competition Director, and therefore a "service" that Gabehart would be prohibited from providing not only to a competitor, but also to any "vehicle manufacturing company" or entity that "provides goods or services" to a racing team. Dkt. 8-2 §6. JGR's interpretation raises absurd questions, such as whether Gabehart would be prohibited from performing "personnel . . . management" tasks in the Human Resources department of a "vehicle manufacturing company," or doing administrative "data analysis" for an "entity that provides goods," such as helmets, race suits, or harnesses, "to such a team." Dkt. 8-2 § 6; Dkt. 35-2. JGR's interpretation would make it impossible for Gabehart to work in the only industry in which he has substantively trained and gained experience. North Carolina law does not abide by that result. *See XPO, Inc. v. Byrd*, No.

3:25-CV-00243, 2025 WL 2557708 (W.D.N.C. June 11, 2025) ("[R]estrictive covenants are unenforceable where they prohibit the employee from engaging in future work that is distinct from the duties actually performed by the employee" (citation omitted)).

JGR's characterization of "services" would also make the 18-Month Non-Compete "wider than is necessary" to protect JGR's business interest. *See VisionAIR*, 167 N.C. App. at 508. JGR's suggestion that "robust enforcement" of the restriction is necessary "[g]iven Gabehart's clear misappropriation of trade secrets," Supp. Br. 13–14, is wrong. Although the protection of confidential information can be a valid basis for enforcement of a non-compete, *see United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 651 (1988), there is no need for such a restraint here—let alone one as broad as JGR seeks. There is no evidence that Gabehart has transmitted, used, or disclosed any of JGR's confidential information, and all such information has been deleted from Gabehart's devices. Gabehart Dec. ¶¶ 29–30; Dkt. 12-5. Spire and Gabehart have executed an agreement prohibiting Gabehart from disclosing any such information to Spire, and Spire has initiated a forensic investigation to ensure that no JGR information has ever been accessed on its system. Because JGR's information is already adequately protected, the enforcement of the 18-Month Non-Compete in the manner JGR seeks would constitute an unjustified restraint of trade.

Finally, the 18-Month Non-Compete is facially inconsistent with JGR's claim that the restriction is designed to protect its confidential information because it applies only in the event of termination with cause and is subject to a carve-out that limits the duration of the non-compete period to one week in circumstances entirely within the employee's control. Dkt.8-2 § 6. JGR's willingness to waive non-competes for competition employees pursuant to the Trade Understanding, Dickerson Dec. ¶ 17, similarly shows that JGR does not view such restrictions as necessary to protect any purported trade secrets.

21

*d. Gabehart Is in Compliance With the 18-Month Non-Compete.*

JGR is also unlikely to succeed on its tortious interference claim because the roles of Chief Motorsports Officer and Competition Director do not involve the same "general type of services." Dkt. 8-2 § 6. As Competition Director, Gabehart optimized the race-day performance of JGR's teams—overseeing car setup, race strategy, technical compliance, and the day-to-day work of engineers, crew chiefs, and mechanics, while liaising with NASCAR officials. Further, Gabehart publicly served as the No. 54 Car's crew chief—focusing on a single racing team and overseeing decisions outside the scope of a Competition Director's purview. Gabehart Dec. ¶¶ 9.

These responsibilities are fundamentally different from those of the Chief Motorsports Officer. Spire's Chief Motorsports Officer has substantially more authority, autonomy, and responsibility than Gabehart did as Competition Director (as well as an increased salary commensurate with these elevated responsibilities). Dickerson Dec. ¶¶ 57–59. Spire designed the role to allow Dickerson to step away from day-to-day management of Spire Motorsports. *Id.* ¶¶ 36–37, 59. Unlike a Competition Director, the Chief Motorsports Officer sits above all individual teams and programs, with authority over every racing operation, long-term planning, budgeting, infrastructure, and organizational relationships. *Id.* ¶¶ 36–37, 57–59. Gabehart's salary as Chief Motorsports Officer also greatly exceeds his Competition Director salary—another "indicator" that this role is "fundamentally different from the role that he held with" JGR. *See RCR Enterps., LLC v. McCall*, No. 14 CVS 3342, 2014 WL 7591977, at *4 (N.C. Super. Ct. Dec. 19, 2014) (denying preliminary injunction seeking to enforce a non-compete restriction where role as crew chief involved more "supervisory responsibility," "decision-making," "leadership responsibilities," and a higher salary than prior role as race engineer).

JGR's suggestion that the Competition Director and Chief Motorsports Officer perform the same "services" because both positions involve oversight of "competitive racing strategy" and efforts, Initial Br. 17, is wrong. For one, this position ignores the practical differences between these positions. *See supra* pp. 22–23. For another, JGR's position would again render the 18-Month Non-Compete fatally overbroad, given that there are few, if any, jobs within the NASCAR or competitive racing industry that do not involve some "aspect of . . . race strategy and execution." Supp. Br. 12. Thus, JGR's description of the "services" it seeks to prohibit Gabehart from performing are so numerous and broad that, if enforced, Gabehart would be prohibited from earning a living in the racing industry—in contravention of North Carolina law. *Supra* pp. 21–22.

## B. JGR Cannot Establish a Risk of Irreparable Harm.

A plaintiff must also demonstrate "that irreparable injury is likely" without relief. *Winter*, 555 U.S. at 22 (emphasis omitted). Harm is not "irreparable" if it can be compensated through damages. *See Hughes Network Sys., Inc. v. Interdigital Commc'ns Corp.*, 17 F.3d 691, 694 (4th Cir. 1994). Harm must also be "actual and imminent," *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991), and delay in seeking preliminary relief weighs against such finding, *see FS Med. Supplies, LLC v. Tanner Pharma UK Ltd.*, No. 3:23-cv-000598, 2023 WL 6812565, at *4 (W.D.N.C. Oct. 16, 2023). JGR has not satisfied its burden of demonstrating a risk of irreparable harm. *See* Dkt. 26 ¶ 34. There is no "actual and imminent risk," *Direx*, 952 F.2d at 812, that Gabehart will "use JGR's Confidential Information" in connection with his "work[ ] for Spire," Initial Br. 24, absent an injunction.[11] Gabehart has never disclosed any of JGR's confidential information, Gabehart and Spire have entered into an agreement prohibiting

---

[11] JGR's reliance on *Vessel Med., Inc. v. Elliot*, No. 6:15-cv-00330, 2015 WL 5437173 (D.S.C. Sep. 15, 2015), Initial Br. 23 n.7 (emphasis omitted), is misplaced. There, the court issued a preliminary injunction where "Plaintiffs have already lost certain of its client relationships . . . and also experienced damage to business goodwill" as a result of the alleged misappropriation. 2015 WL 5437173, at *9. The record here contains no such evidence of actual harm.

Gabehart from using or providing such information to Spire in any way, Dkt. 12-9, and Spire hired Gabehart after JGR's forensic examiner deleted the offending information from Gabehart's devices, Gabehart Dec. ¶¶ 30, 48–49.  There is no cognizable harm if he continues working there while this case is pending.  Even if JGR had identified a risk of actual harm, that harm would be compensable through damages if JGR were to prevail, *see Free Spirit Aviation, Inc. v. Rutherford Airport Auth.*, 191 N.C. App. 581, 586 (2008), and thus does not warrant "extraordinary" relief.

JGR's delay in moving for a preliminary injunction also undermines the alleged "imminence" of its harms.  *See FS Med. Supplies, LLC*, 2023 WL 6812565, at *4.  Disagreements between JGR and Gabehart were public in the latter half of 2025, Dickerson Dec. ¶¶ 24–25, and JGR admits to becoming "suspicious," Dkt. 8 ¶ 66, in November 2025.  JGR's decision to wait three months before seeking relief is inconsistent with protecting trade secrets and instead suggests an intent to disrupt Spire by sidelining its Chief Motorsports Officer at a critical point in the season.

### C.    The Balance of the Equities Counsels Against a Preliminary Injunction.

A mistake in the context of preliminary injunctive relief is "substantial," so the balance of the equities ensures that the court chooses "the course of action that will minimize the costs of being mistaken." *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 284 (4th Cir. 2002) (citation omitted).  Thus, the relevant inquiry is "the degree of harm that will be suffered by the plaintiff or the defendant if the injunction is *improperly* granted or denied." *Id.*  JGR's alleged harm is speculative: there is no evidence Spire or Gabehart possess or could use JGR's information to harm JGR. *See supra* pp. 10–12.  The harm to Spire if an injunction is wrongfully issued, however, would be extreme, as the removal of Gabehart in the middle of the NASCAR season substantially harm Spire's business. The balance of equities thus favors Spire.

### CONCLUSION

The Court should deny JGR's motion for a preliminary injunction.

Dated: March 11, 2026

Respectfully submitted,

*/s/ Joshua D. Davey*
Joshua D. Davey
Lawrence J. Cameron
Troy C. Homesley, III
TROUTMAN PEPPER LOCKE LLP
301 S. College St., 34th Floor
Charlotte, NC 28202
Telephone: (704) 916-1503
Joshua.Davey@troutman.com
Lawrence.Cameron@troutman.com
Troy.Homesley@troutman.com

John S. "Evan" Gibbs III
TROUTMAN PEPPER LOCKE LLP
600 Peachtree St, NE #3000
Atlanta, GA 30308
Telephone: (404) 885-3093
Evan.Gibbs@troutman.com

*Attorneys for Defendant Spire Motorsports, LLC*

## CERTIFICATION CONCERNING USE OF ARTIFICIAL INTELLIGENCE

Pursuant to the United States District Court for the Western District of North Carolina's June 18, 2024 Standing Order, I hereby certify that no artificial intelligence was employed in doing the research for the preparation of this document, with the exception of artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg. I further certify that every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Dated: March 11, 2026

*/s/ Joshua D. Davey*

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing **MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF JOE GIBBS RACING, LLC'S MOTION FOR A PRELIMINARY INJUNCTION** with the Clerk of Court using the CM/ECF system, which will automatically notice and serve this document on all counsel of record.

Dated: March 11, 2026

*/s/ Joshua D. Davey*