# Exhibit A

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CASE NO. 3:26-CV-00133-SCR-DCK**

| | |
|---|---|
| JOE GIBBS RACING, LLC,<br><br>            Plaintiff,<br><br>v.<br><br>CHRISTOPHER GABEHART and SPIRE<br>MOTORSPORTS, LLC,<br><br>            Defendants. | **DECLARATION OF JEFFREY<br>DICKERSON** |

**DECLARATION OF JEFFREY DICKERSON**

I, Jeffrey Dickerson, declare under penalty of perjury, as follows:

1. I am a resident of Denver, North Carolina, and I am over eighteen years of age. The statements below are made on the basis of my personal knowledge and belief.

2. I swear to this Declaration with the understanding that it be used to oppose Plaintiff Joe Gibbs Racing, LLC's ("JGR") Motion for a Preliminary Injunction.

3. I am the co-owner of Spire Motorsports, LLC ("Spire"), a company that owns a NASCAR Cup Series Team with three entries, a NASCAR Craftsman Truck Series Team with two full-time entries and one part-time entry, a High Limit Sprint Car Series, a Dirt Late Model Team, a Pavement Late Model Team, and a USAC Silver Crown Team, among others. TWG Motorsports also has an ownership interest in Spire. As co-owner, I am familiar with every aspect of Spire's business and strategic vision. I also co-own and operate various other businesses focused on our motorsports teams, including Spire's chassis, manufacturing, and fabrication arms.

4. I have been working in the motorsports industry in some form or fashion since I was 12 years old in a variety of roles. I was a mechanic and crew chief for various Midget, Sprint

1

Car and Silver Crown teams in my late-teens, very early 20's. I accomplished my dream of being able to drive at high levels in go-karts, mini-sprints, TQ's, Sprint Cars, but predominately in the Midget ranks. I was Team Manager of an IndyCar team when I was 24 and was introduced to the NASCAR industry as an Agent/Manager with Motorsports Management International ("MMI") in 2002. I also earned notoriety for being a spotter in the Cup Series for Jeff Gordon, Kyle Busch and Juan Pablo Montoya. In fact, I worked for Joe Gibbs Racing in this capacity for the 2008, 2009 and part of the 2010 NASCAR Season earning a championship in what was then called the Nationwide Series in 2009. As a result of my experience in the industry, I am deeply familiar with how the industry works, how teams operate, and racing more generally.

5. I have been made generally familiar with the allegations in this lawsuit. In connection with Spire's inquiry into same, I reviewed the relevant company records pertaining to Spire's employment of Christopher Gabehart ("Mr. Gabehart").

## SPIRE'S HISTORY

6. Spire Sports & Entertainment ("SSE") was formed as a talent management and sports consulting agency in 2010 by me and T.J. Puchyr, with a handful of employees. Through my work at MMI, we managed and represented some of the most high-profile drivers and sponsors in NASCAR, and we consulted with nearly every team in the garage. My relationship with JGR tracked back to my origins at MMI, including placing sponsorships with them and helping negotiate their signing of Kyle Busch back in 2007. I also served as a spotter for Busch during his first few years at JGR. Our small agency at SSE continued that tradition of supporting and helping NASCAR stakeholders, including specifically JGR in the 2010s. We assisted JGR in the handling of a difficult situation with Erik Jones when JGR did not have a seat available for him despite him being under contract with JGR. We also helped JGR with securing millions of dollars of

2

sponsorship for its NASCAR Cup Series program over many years with another one of our clients. SSE also provided consulting services and supported Toyota (JGR's manufacturer) for many years. Our group of industry veterans dedicated every day to serving and promoting the sport and the interests of others. Each year, we grew slowly and our ambitions continued to grow as well. Nothing was ever given to us, and we earned our way to a path to NASCAR team ownership through hard work and dedication. We went into debt to purchase the assets needed to compete on equal footing with accomplished race teams like JGR. We respect the contributions of all team owners, including Coach Gibbs and his family, and we are honored to have the privilege of being colleagues with them.

7. Spire Motorsports, LLC was founded in 2018 by myself and T.J. Puchyr. Spire first entered the NASCAR Cup Series ("Cup Series") in 2019 with a single chartered entry acquired from Furniture Row Racing who had went out of business after being a technical partner of Joe Gibbs Racing. After acquiring two more team charters, by the start of the 2024 Cup Series season, Spire had three full-time Cup Series entries, as it remains to this day. Spire's Cup Series bodies are manufactured by Chevrolet and engines are built by Hendrick Motorsports. We now have 175 dedicated Motorsports employees spread across our competition and business functions. Since its inception as a Cup Series outfit seven years ago, Spire has worked its way up the grid from legitimately a last place team to now consistently leading laps in races, contending for wins and earning stage points. This is in part due to a technical alliance Spire has with Hendrick Motorsports but also because of Spire's story that has attracted fans, employees, and sponsors alike.

8. Spire has literally grown up in front of the industry and is a true underdog story. Besides being a marketing and management company that provided services to drivers,

manufacturers and teams in the NASCAR ranks, including JGR, we had no natural path to being NASCAR team owners. We didn't own a conglomerate of fast-food franchises, didn't own any car dealerships, we weren't titans of industry, we had never won any super bowls, heck we could barely afford to attend Super Bowls on our own dime. We have never won any NBA Championships, didn't own our own brand of shoes, hadn't won seven NASCAR championships as a driver, and weren't carrying on the family legacy like some of our colleagues in the Cup Series. We had no name recognition or gimmick to attract sponsors or employees. No family money or any wealth to speak of to give comfort to anyone that we had any staying power at all. What we had was our vision to build a team one brick at a time, not to cut corners, stay disciplined with our process and steadily improve. Our legitimacy was questioned both publicly and privately in the industry. Nobody could understand why we would take on a challenge this big. I do not believe anybody is doubting our capabilities now.

9. We are a home-grown story of perseverance and progress in NASCAR. We stand firmly behind our core value of respect, and our integrity is of the utmost importance to us as an organization. NASCAR is full of a lot of great business and life stories. JGR is one of those, and so are we. In recent years, we have also added several additional new chapters to our story, by expanding into ownership of several teams in minor league hockey and becoming involved in motorsports event promotion. The spirit of our organization also still lives in our agency which continues to find ways to grow and help the sport.

### MY PRE-EXISTING RELATIONSHIP WITH MR. GABEHART

10. I have known Mr. Gabehart since the fall of 2009 when, while working for MMI and representing Kyle Busch, I helped him procure his first professional contract with Kyle Busch Motorsports. Mr. Gabehart had a reputation for being more than just a good driver in Late Models,

but also a superb engineer. I worked hard to recruit Mr. Gabehart to Kyle Busch Motorsports and also assisted with negotiating his first crew chief contract. I knew that he had a bright future because of his technical expertise combined with business acumen. I stayed in contact with Mr. Gabehart from that time to the present day with periodic phone calls and informal meetings at various racetracks. Over the last 16 years, I have also regularly enjoyed meals with Mr. Gabehart to catch up about our careers and life more generally. I always had a particularly strong bond with Mr. Gabehart because both of us were working diligently to help start up Kyle Busch Motorsports in 2009 and 2010. It is common in our tight-knit industry to have long-term relationships with members of various teams across various racing series. This is partly because it is common for employees to move from team-to-team across the span of their careers, and many of the industry's employees and executives live in or around Mooresville, North Carolina, so we are in close geographic proximity. That is simply part of the motorsports business.

### JGR AND SPIRE AGREE TO A TRADE

11.     In the spring of 2025, I had a conversation with Coach Gibbs at Las Vegas Motor Speedway following an incident on pit road involving Spire's No. 77 car driven by Carson Hocevar and the JGR No. 54 car driven by Ty Gibbs. During that conversation, Coach Gibbs asked me whether there had been a prior incident between the No. 54 car and a Spire car. I reminded him of an incident at the Cook Out Clash at Bowman Gray Stadium a few weeks prior during which the No. 54 car rammed Spire's No. 7 car during a yellow caution flag. Coach Gibbs appeared disappointed by Ty Gibbs.

12.     I deeply respect Coach Gibbs and admire him, although I am surprised by his organization's conduct in the course of (and leading up to) this litigation. After our conversation

in the spring of 2025, I sensed that Coach Gibbs needed a more mature and experienced group who could try to help Ty Gibbs improve his performance.

13.     Soon after that race, I reached out to JGR's then-Competition Director Chris Gabehart to float the possibility that Spire had the crew chief and car chief that JGR would benefit from.

14.     Around the same time, I learned that Coach Gibbs and Heather Gibbs had been in contact with the car chief for the No. 7 Spire car, Robert Smith. I learned that Heather Gibbs, in particular, had a friendship with Mr. Smith, and that Coach Gibbs and Heather Gibbs were actively recruiting Mr. Smith. Of course, conversations of this kind are entirely normal within the industry.

15.     Mr. Smith was under an active contract with Spire that contained a non-compete provision extending through the remainder of Mr. Smith's contractual term.

16.     Mr. Smith is one of the most accomplished car chiefs in NASCAR's Cup Series, so I was torn between releasing him from his contract and doing the right thing for JGR and Mr. Smith, and what was best for Spire.

17.     Given JGR's interest in Mr. Smith, and given that he was under an active contract with a term that did not expire for many months and also subject to a non-compete that would not allow for the immediate relief JGR was seeking for Ty Gibbs, I told JGR that if it made an offer to Mr. Smith that was acceptable to him and he accepted that offer, Spire would agree to mutually terminate Robert Smith's contract, which would allow him  to begin working for JGR immediately—in exchange for JGR extending the same waiver for an employee that Spire would identify in the future. Mr. Gabehart, at the direction of Coach Gibbs and Heather Gibbs, insisted that JGR have the option to fulfill the agreement by making a $100,000 payment as an alternative

to extending a waiver for an employee that Spire would identify in the future. I agreed to that proposal, with the understanding that JGR would make good on our deal by the end of 2025.

18. In common parlance, what we agreed to was a "trade," and that is how I and JGR referred to it in our conversations. In this declaration and for ease of reference, I will refer to this agreement as the "Trade Understanding."

19. Joe Gibbs and other executives at JGR were aware of (and involved in) the Trade Understanding.

20. Ultimately, Robert Smith chose to accept JGR's offer in April 2025, Spire released him from his then-active contract, and Spire waived the non-compete provision in his contract. Spire did so in full reliance on JGR's representation that it would either allow Spire to hire a high-profile competition employee from JGR in the future or pay Spire $100,000.

21. Spire then waited for JGR's $100,000 payment, or for the opportunity to pursue a JGR employee of Spire's choosing.

22. In late June 2025, after JGR reassigned Mr. Gabehart as the crew chief for the No. 54 car, I asked JGR whether it would be willing to release the prior crew chief for the No. 54 car from his contract so that Spire could potentially hire him. A couple of months after that request was rejected, I also asked JGR whether it would be willing to release the car chief who Mr. Smith replaced from his contract so that Spire could potentially hire him. JGR rejected each of those requests.

23. Importantly, Robert Smith, as a car chief, was part of the competition leadership arm at Spire, and JGR understood that Spire's next attempted hire from JGR under the Trade Understanding would come from the competition arm, if not leadership, from JGR. That did not stop JGR from entering into the Trade Understanding.

## DETERIORATING SITUATION AT JGR

24.     As a part of my role as co-owner of Spire, it is my job to know as much as possible about what is happening with the other teams in the Cup Series.  As a result, I closely follow the week-to-week dynamics and disputes amongst Spire's competitors, which are closely watched and reported upon by the media.  During the 2025 Cup Series season, anyone with a radio during a Cup Series race could hear the rising tension occurring with the Ty Gibbs Car.[1]  It was common knowledge in the Cup Series garage that there was friction between Mr. Gabehart, JGR, and Ty Gibbs.

25.     Specifically, it was apparent that JGR had taken one of the most decorated crew chiefs in the NASCAR Cup Series off the JGR No. 11 car, made him a competition director for a few months, and then relegated Mr. Gabehart to a role he did not want or deserve—to essentially babysit the house car driven by the grandson of JGR's owner—Ty Gibbs.  The issues were well documented and well known in the Cup Series garage, for example[2]:

> "We're (expletive) right now, so we've gotta do something different," Gibbs told Gabehart, who has been assisting No. 54 crew chief Tyler Allen with calling the shots on the team.
>
> Gabehart, who was having none of it, replied "You can call the strategy if you want, or we can keep rolling. But I would do the best I could to go as fast as I can."
>
> From that point on, it was a full-scale implosion. Gibbs surrendered track position in a hurry before making his final scheduled pit stop, in which the car fell off the jack. Then, with a few laps to go, the team decided to pit again as a Hail Mary strategy, the logic being that if a caution came out, everybody else would come in. It didn't work, and the No. 54 team finished 33rd.

---

[1] *See, e.g.*, Kyle Dalton, *Larry McReynolds Identifies Problem for Ty Gibbs to Start 2025 Season*, Yahoo Sports (Mar. 27, 2025), https://sports.yahoo.com/article/larry-mcreynolds-identifies-problem-ty-214340481.html.

[2] Ryan McCafferty, *The reason for Ty Gibbs' struggles has never been clearer*, Beyond the Flag (Aug. 14, 2025), https://beyondtheflag.com/reason-ty-gibbs-struggles-never-clearer-01k2j78wxsyb.

## MY OCTOBER 16, 2025 DINNER WITH MR. GABEHART

26.     By October 2025, it had been six months since Robert Smith joined JGR pursuant to the Trade Understanding and JGR had still not upheld its side of the bargain—it hadn't agreed to any reciprocal trade and hadn't paid $100,000.  At this point, it was clear that it was time for me to more seriously pursue the other option under the parties' Trade Understanding by finding a JGR employee to eventually work at Spire.

27.     On October 16, 2025, Mr. Gabehart and I met over dinner at a popular restaurant in Mooresville, North Carolina to catch up.  I also wanted to discuss who may be available to fulfill JGR's end of the Trade Understanding.  The meeting was held publicly because we had nothing to hide.  Several members of the motorsports business were at the same restaurant that night, and that was of no concern to me.

28.     During our meeting, we discussed our kids, pavement late models, the current state of the motorsports industry and the sport at large, and each of our professional experiences.

29.     When the conversation turned to our professional experiences, Mr. Gabehart offered that he had serious concerns and misgivings with his experience at JGR, and that he intended to have a serious conversation with Coach Gibbs to try to fix the current situation and chart a path for the future.

30.     I then asked Mr. Gabehart what would happen if the current situation at JGR could not be resolved.  He stated that he thought, and hoped, that it could be resolved.  But, in the event it could not be resolved, he could pursue other opportunities.

31.     I could tell that Mr. Gabehart did not take pleasure in the possibility of leaving his long-time employer.  I knew that Mr. Gabehart had devoted most of his career across more than a decade to serving JGR.  I could tell when he spoke that it pained him to consider the possibility of

leaving. I knew then that the workplace environment at JGR must have been toxic and unsustainable.

32.     At the conclusion of our dinner, we still had no agreement on who might be traded back to Spire.

## MR. GABEHART'S PARTING WITH JGR

33.     On or around November 11, 2025, Mr. Gabehart informed me that he and Coach Gibbs had agreed to a mutual separation on November 6, 2025. Mr. Gabehart also stated that he was subject to a one-week non-compete provision. I took Mr. Gabehart at his word regarding his employment agreement with JGR. In fact, the first time I had ever seen the employment agreement between Mr. Gabehart and JGR was when it was filed as an exhibit in this lawsuit on February 24, 2026. Dkt. 8-2. At no point in time did anyone tell me that Mr. Gabehart was subject to anything other than a one-week non-compete. When JGR first sued Mr. Gabehart (before pulling in Spire), JGR also did not claim that Mr. Gabehart had any applicable non-compete or allege that he had breached any non-compete agreement.

34.     On or around November 11, 2025, I told Mr. Gabehart we would be pleased to hire him at Spire if he were released from his contract and did not have any applicable non-compete. I did not extend him a formal offer at this time.

35.     Mr. Gabehart stated that any future role he took would not be a lateral move. Instead, he said that if he left JGR, he would be looking for a completely different role that would present a new challenge for him. He most certainly had no interest in doing what he was doing for JGR at the time.

36.     My interest in Mr. Gabehart arose from the fact that I needed an experienced lieutenant to help me manage Spire's wide-ranging business affairs. Prior to hiring Mr. Gabehart,

I (as co-owner of Spire) had been managing the day-to-day operations of our racing programs and varied ancillary businesses. This included everything from accounting to human resources, travel, and competition-related tasks across a number of different teams, racing series, and businesses. I also had the role of interfacing with TWG Motorsports, the organization that owns a majority stake in Spire. TWG Motorsports is a division of TWG Global Holdings, LLC, and is responsible for managing all of TWG Global's motorsport teams. Those teams include, in addition to Spire, Andretti Global (and its IndyCar team, Andretti Autosport), Cadillac Formula 1 Team, Walkinshaw TWG Racing, and Wayne Taylor Racing. Synchronizing among these various sister programs is extremely time intensive.

37. Long before my conversation with Mr. Gabehart, I had realized that it was not sustainable for me to be the co-owner and to also have such an active role in day-to-day management (while also raising two daughters). I needed someone who could report to me and manage the business on a day-to-day basis, freeing me to spend my time on strategic initiatives. I thought that Mr. Gabehart would be a good fit for helping me manage the business at a more global scale. Of course, I also knew that many teams would be vying for Mr. Gabehart if he departed JGR, so I simply waited to see if such an opportunity would actually materialize.

38. On November 13, 2025, I gave Mr. Gabehart a loose framework of what an offer might look like as we began those conversations. No formal offer was extended or accepted at that time.

39. Sometime in mid-November, Mr. Gabehart informed me that JGR had stopped paying him. This surprised me, because I expected JGR to place Mr. Gabehart on "gardening leave" by paying him for a period of time even though he was not actively working. Nevertheless, I took JGR's decision to stop paying Mr. Gabehart as a clear indication that I needed to act fast if

11

I wanted to hire Mr. Gabehart before other competitors took him off the market. Word quickly spread within the industry that Mr. Gabehart's employment with JGR had ended.

40. On December 2, 2025, Mr. Gabehart and I met again, this time for lunch at Barcelona Burger and Beer Garden in Mooresville, North Carolina, which is adjacent to the Toyota Gazoo Racing Garage. We sat down at the table I am known to sit at, at a restaurant that I frequent.

41. The Toyota GR Garage is a high performance motorsports testing garage used by Toyota, which is in a technical alliance with JGR. Workers from the Toyota GR Garage routinely eat lunch at Barcelona Burger and Beer Garden. I had absolutely no concerns about any of those workers seeing me eating lunch with Mr. Gabehart because I understood that there was no applicable non-compete in place at the time I met with Mr. Gabehart. And, even if a non-compete had been in place, there is nothing that prevents me from eating lunch with a friend.

42. Unbeknownst to me, JGR had hired a private investigator to follow Mr. Gabehart around. Dkt. 35-4. The private investigator apparently took photographs of me eating lunch with Mr. Gabehart. *Id*. I was surprised and, quite frankly, disturbed to learn that a competitor in our industry had hired someone to follow its *former* employee around. I cannot stress this enough: It is extraordinary for an organization in our business to hire a private investigator to follow around any employee, let alone a *former* employee. In my twenty-five years of experience in this industry, I have never once heard of a team doing so.

43. Despite JGR being well aware that Spire was recruiting Mr. Gabehart as early as December 2, 2025, no one at JGR ever contacted me to claim that Mr. Gabehart was subject to an applicable non-compete (until JGR filed this lawsuit). Even during the forensic examination process described below, no one at JGR ever contacted me to claim that Mr. Gabehart was subject to an applicable non-compete.

44.    On December 3, 2025, the Associated Press confirmed that Mr. Gabehart was no longer employed by JGR, as shown below.[3]



**FORENSIC EXAMINATION OF MR. GABEHART'S DEVICES**

45.    After JGR sent a demand letter to Mr. Gabehart on December 15, 2025, I became aware for the first time that JGR had accused Mr. Gabehart of obtaining JGR's confidential information and had demanded that Mr. Gabehart submit to a forensics test of Mr. Gabehart's devices.

46.    To be clear, Spire never asked for, did not want or need, and does not want or need any information from Mr. Gabehart that was the property of JGR. Spire has its own technical alliance with Hendrick Motorsports, who holds the Cup Series record for wins at 320 and 15 championships, and otherwise has no need for JGR's information. Spire also works with General

---

[3] Jenna Fryer, *Twitter Post* (Dec. 3, 2025) ("During a break in court, I confirmed Chris Gabehart has left JGR. Denny Hamlin said he had no comment"), https://x.com/jennafryer/status/1996312226328674471?s=46.

Motors for data purposes. Spire also has its own drivers, its own equipment, its own crews, its own engineers, its own crew chiefs, its own vehicle and engine manufacturers, its own sponsors, its own funding sources, and its own strategy.

47. Spire is a Chevrolet team with a different body and different engine from what JGR races in. The outerbody and underbody work together, such that information from JGR would not be an easy carry over for performance. Spire receives support from General Motors which supplies all of Spire's aerodynamics data, tools and simulation. Spire is not in control of these programs and can only make recommendations for improvements. As a result, any data from JGR would be almost impossible to use. Additionally, in the Cup Series in particular, optimal engineering changes on a day-to-day and week-by-week basis, such that information that is not current would not be relevant or useful to Spire. Spire obtains its engines from Hendrick Motorsports and is not in control of any development, which is another reason why information and data from JGR would not be useful or relevant. General Motors and Hendrick Motorsports are the most recent champions in the Cup Series, so Spire believes that it already has access to the best information available. Spire, therefore, believes that it already has access to any information that will allow it to be a successful team, and is not looking for information from JGR. Ultimately, I believe that any JGR information available could actually harm Spire—we have absolutely no way to validate outside information because in this sport the manufacturers control aerodynamics and tire testing data.

48. To make this clear, before formally hiring Mr. Gabehart, Spire signed a contract (the "Confidentiality Agreement") with Mr. Gabehart in which he agreed to "maintain at all times the confidentiality of JGR Confidential Information" and to "not disclose" or "use" such information "for the Company's benefit or in connection with any services performed for or on

behalf of the Company." Gabehart Dec. Ex. H at 2. Spire additionally agreed "not to solicit, obtain or use any JGR Confidential Information from Gabehart." Gabehart Dec. Ex. H at 2. Spire has always complied with that agreement, and Spire has no reason to believe that Mr. Gabehart has not complied with that agreement.

49.     Spire's primary focus is to analyze the data it receives from Hendrick Motorsports and General Motors, and doing so is extremely time consuming.

50.     Spire would never use a competitor's trade secrets for its benefit, and would aggressively protect its own trade secrets in the event they were distributed to or shared with another team. That is not a line that I or any of my fellow owners in the Cup Series garage are willing to cross. As a result, I have never even conceptualized of the possibility of using another team's trade secrets for Spire's benefit.

51.     To date and as far as I know, no one at Spire has ever seen the documents that Mr. Gabehart allegedly took from JGR.

52.     Because no JGR information was ever given to Spire, nor did Spire ever ask for it, Spire let the forensic examination process of Mr. Gabehart's devices run its course and patiently waited for an outcome before hiring him.

## SPIRE'S OFFERS TO JGR AND HIRING OF MR. GABEHART

53.     Once the forensic examination was complete, with what Spire understood to be a conclusion that there was no evidence that information was given to any third party including Spire, Spire was ready to move forward with employing Mr. Gabehart. Mr. Gabehart's first day with Spire was supposed to be February 9, 2026. Because of a delay in negotiating his employment agreement, he did not officially start working until February 16, 2026.

54.     I was shocked when I learned that JGR sent Mr. Gabehart a February 9, 2026 letter purporting to terminate his employment for cause. Dkt. No. 12-8. This was bizarre to me because

my understanding was that Mr. Gabehart and Mr. Gibbs had agreed to part ways on November 6, 2025, that JGR had stopped paying Mr. Gabehart on November 10, 2025, and that Mr. Gabehart had not performed any work for JGR after that date. Due to my experience as a business owner, I thought it was clear that JGR had terminated Mr. Gabehart on November 10, 2025, when they stopped paying him, and in any event, Mr. Gabehart had informed me that he had mutually separated from JGR as early as November 6, 2025.[4]  Because this termination occurred prior to JGR's discovery of the information that led to the for cause termination (and well after, as I understood it, JGR had parted ways with Mr. Gabehart), I did not see any legitimate grounds for JGR's assertion that it terminated Mr. Gabehart's employment for cause. In my experience, if an employer stops paying their employee, the employee is no longer employed by the employer, or the employer is getting free work. It became apparent to me that JGR regretted letting Mr. Gabehart onto the market, and was upset that it had lost him.

55. On February 11, 2026, as a showing of good faith to JGR, Gabehart's counsel, on behalf of Spire, sent a letter to JGR offering to "allow a neutral forensic examiner, under a mutually agreed protocol, to review its materials solely to confirm that no JGR information was transmitted to or used by Spire." Dkt. No. 12-10. Spire also offered "to enter into an agreement [with JGR] representing that it has not received any JGR Confidential Information from Mr. Gabehart and agreeing not to obtain or use any JGR Confidential Information from Mr. Gabehart in the future." *Id.*

---

[4] Coach Gibbs confirmed this when he was interviewed by SiriusXM Radio at Daytona on or around February 12, 2026. In that interview, Coach Gibbs stated: "After the season, Chris [Gabehart] and I met, and we just decided to go our separate ways." *See, e.g.*, https://athlonsports.com/racing/nascar/joe-gibbs-addresses-offseason-departure-of-chris-gabehart-as-competition-director.

56.     JGR never responded to this offer and instead filed this lawsuit against Mr. Gabehart on February 19, 2026, and later added Spire as a defendant on February 24, 2026. Dkt. Nos. 1, 8.

## MR. GABEHART'S ROLE AT SPIRE

57.     Mr. Gabehart's role at Spire is that of the "owner's advocate." Mr. Gabehart will be principally responsible for deploying my strategic vision in all aspects of the business, including motorsports, executive-level management of personnel, and other business initiatives. Mr. Gabehart's second declaration sets forth in detail the scope of his duties at Spire. March 11, 2026 Second Declaration of Chris Gabehart. I have consulted with Mr. Gabehart regarding the scope of those duties, read Mr. Gabehart's description of the scope of those duties, and agreed to the scope of those duties.

58.     Among other things, Mr. Gabehart will be responsible for ensuring proper resource allocation across all racing series Spire is entered into, medium to long term infrastructure growth planning and execution, growing and stewarding Spire's relationship with Chevrolet, growing and stewarding the technical partnership with Hendrick Motorsports, collaborating with TWG Motorsports, and working with NASCAR on the executive level as an advocate for Spire.

59.     Mr. Gabehart's role is that of the "athletic director," not the "head coach." As an example of this, when I told Daniel Suarez that we were pursuing Chris Gabehart, Suarez asked me "Whose job is Chris Gabehart taking?" I responded: "Mine."

## SPONSORS

60.     I am quite frankly confused by JGR's allegations that Spire improperly pursued JGR's sponsors in 2026. Dkts. 35-7, 35-8. Spire has every right to pursue sponsors, and that is part of the business.

61.     JGR knows this, because it is exactly what JGR does.  JGR frequently pursues sponsors who it knows are already under contract with other teams.  In fact, just this past weekend, JGR was openly pursuing a sponsor who currently sponsors a different team in the NASCAR O'Reilly Auto Parts Series.  If JGR obtains that sponsor and gets the sponsor to move to JGR, it will present an existential threat for that team.

62.     As an example, I am aware that JGR called one of Spire's anchor sponsors within the last year and offered to match what the sponsor was paying to Spire or to allow them to pay less if they chose to sponsor JGR.  Ultimately, that sponsor chose to remain with Spire.

63.     This conduct is part of the racing business.  It may be viewed as overly competitive, but there is nothing untoward about it.  Sponsors are free to choose which teams they sponsor, and teams are free to pursue their preferred sponsors.

64.     To be absolutely clear, Spire does not need any sponsorship information from JGR. Spire has its own sponsors and its own strategic sponsorship initiatives.  Also, we have eyes—we can see on the side of cars and at tracks and in advertising which sponsors are sponsoring JGR. We don't need Chris Gabehart to tell us anything about who JGR's sponsors are, just like JGR does not need Robert Smith to tell JGR who Spire's sponsors are.

## SPIRE'S RELATIONSHIP WITH JGR

65.     JGR's accusation that Spire has attempted to pull sponsors away from JGR is inconsistent with Spire's prior treatment of JGR and other teams.  To be clear, Spire (and, previously, SSE) has repeatedly over a period of many years actually helped to drive sponsors toward JGR.

66.     Part of the reason that Spire has traditionally funneled sponsors to JGR is because I have immense respect for Coach Gibbs and the JGR organization.  I have gone out of my way to leverage my connections and relationships over the years to assist Coach Gibbs and JGR when

they told me they were in need of help. I did so long before Spire even had a NASCAR Cup Series entry.

67.     Given my history with Coach Gibbs and JGR, it saddens me to see the accusations that JGR has lodged against myself and Spire.

68.     Rather than respect for Spire's place in the world of motorsports, what Spire has received from JGR is scorn.

## ATTACKS ON SPIRE'S INTEGRITY

69.     It appears to me that JGR has intentionally staged this litigation to interfere with Spire's legitimate business operations and to disrupt Spire's motorsports teams mid-season. Rather than taking the opportunity that Spire offered to allow for a forensic inspection of Spire's systems, JGR chose to run to court, long after it knew what Mr. Gabehart had done, long after a digital forensics examiner found no hint of Mr. Gabehart sharing or distributing any trade secrets to Spire, and long after it knew Mr. Gabehart was pursuing employment with Spire.

70.     JGR's repeated attacks on Spire's integrity are not well taken. Spire and JGR are colleagues in this industry. Both teams are entitled to respect. Both teams are on an equal footing and have the same charters that allow them to compete.

71.     This lawsuit is an effort to stifle Spire as it attempts to build a team that, one day, could rack up the number of wins that JGR touts. Rather than allowing that competition to play out on the track, and rather than considering what brought JGR here in the first place, JGR has chosen to attack, disparage, and demean Spire.

72.     JGR's loss of talent and potential loss of sponsorships is an internal problem, not a Spire problem. That is a difficult proposition for JGR to accept.

73.     Ultimately, JGR lost a star employee because it could not deliver him the workplace experience and role that he desired. And, in the end, as I understand JGR's publicly-filed contract

with Mr. Gabehart and the facts, he was free to take employment anywhere at the time Spire hired him.

**SPIRE WOULD SUFFER HARM IF GABEHART WERE FORCED TO LEAVE SPIRE**

74. Hiring in the motorsports industry is not easy. If Mr. Gabehart were barred from working for Spire in any capacity, Spire would face dire immediate consequences, including the reality that I would not be able to continue managing and operating Spire's various business initiatives without additional assistance.

75. Spire would also suffer the opportunity cost of having spent months negotiating with an elite professional like Mr. Gabehart without any benefit from that investment of time and resources.

76. Additionally, if Spire is barred from employing Mr. Gabehart, the motorsports industry as a whole would suffer, because such an order would sideline one of the preeminent experts in motorsports management. Such an order would be the equivalent of telling the Athletic Director for the University of North Carolina that he could no longer play any role in managing UNC's athletic teams because Duke University thought doing so would harm their competitive position.

77. Finally, forcing Mr. Gabehart to stop working for Spire would send the message to fans and other teams that Spire is a bad actor. Spire is not a bad actor, and has done nothing wrong. Spire would suffer substantial harm to its reputation, goodwill, and good standing in the motorsports industry and among fans and the media if Mr. Gabehart is ordered not to work for Spire anymore.

78. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 11, 2026

Jeffrey Dickerson