# Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CASE NO. 3:26-CV-00133-SCR-DCK

| | |
|---|---|
| JOE GIBBS RACING, LLC,<br><br>    Plaintiff,<br><br>v.<br><br>CHRISTOPHER GABEHART and SPIRE MOTORSPORTS, LLC,<br><br>    Defendants. | DECLARATION OF WILLIAM ANTHONY |

## DECLARATION OF WILLIAM ANTHONY

I, William Anthony, declare under penalty of perjury, as follows:

1. I am a resident of Mooresville, North Carolina, and I am over eighteen years of age. The statements below are made on the basis of my personal knowledge and belief.

2. I swear to this Declaration with the understanding that it be used to oppose Plaintiff Joe Gibbs Racing, LLC's ("JGR") Motion for a Preliminary Injunction.

3. I am the President of Spire Motorsports, LLC ("Spire"), a company that owns a NASCAR Cup Series Team with three entries, a NASCAR Craftsman Truck Series Team with two full-time entries and one part-time entry, a High-Limit Sprint Car Team and a Dirt Late Model Team, among others. As President, I am familiar with most aspects of Spire's business operations.

4. I am also an attorney actively licensed in the State of North Carolina and the State of California and provide services as in-house counsel to Spire.

5. I have been made aware of a declaration submitted in this case by Eric Schaffer ("Schaffer") on March 6, 2026 (the "Schaffer Declaration," Dkt. 35-5). The Schaffer Declaration purports to provide the details of a phone call conversation I had with Schaffer on December 3,

1

2025, regarding a meeting between Jeff Dickerson ("Mr. Dickerson") and Christopher Gabehart's ("Mr. Gabehart").

## MY DECEMBER 3, 2025, CALL WITH SCHAFFER

6. I did receive a call from Schaffer on December 3, 2025. Respectfully, however, Schaffer's recounting of that conversation is inaccurate.

7. On December 3, 2025, I received a call from Schaffer. My recollection is that Schaffer began the conversation by informing me that he "knew what Spire's owner was doing." He went on to say, "we know that he [Mr. Dickerson] and Mr. Gabehart had lunch yesterday in Mooresville." At the time of the call, I had no personal knowledge of any lunch meeting between Mr. Dickerson and Mr. Gabehart. Subsequent to my call with Schaffer, I learned that Mr. Dickerson and Mr. Gabehart had lunch on December 2, 2025, and I presumed that was the lunch meeting to which Schaffer was referring on the call. Dkt. 35 at 9.

8. I recall that I then acknowledged Schaffer's statement, saying "okay," and he then continued by saying, "We will have to consider what action we will take." There was then a pause in the conversation, and I asked, "Do you have a specific ask?" Schaffer simply stated that he wanted to let me know that he was aware of communication between Mr. Dickerson and Mr. Gabehart and that JGR would be considering its options. Schaffer then volunteered the assertion that JGR had paid Spire $100,000 for car chief Robert Smith (Mr. Smith), presumably referring to the Spire's agreement earlier in 2025 to permit Mr. Smith to leave Spire despite the terms of his employment agreement with Spire and sign a new employment agreement with JGR. *See* Mar. 11, 2026 Declaration of Jeffrey Dickerson.

9. I remember that I then informed Mr. Schaffer that JGR had not paid Spire the $100,000 that had been discussed in connection with Spire releasing Mr. Smith from his non-

2
Case 3:26-cv-00133-SCR-DCK    Document 45-3    Filed 03/11/26    Page 3 of 6

compete obligations. Mr. Schaffer strongly disputed that assertion, and I again reiterated that no such payment had been made. That was the end of our call. I have inquired with the relevant Spire staff members, and Spire has no record of JGR paying Spire $100,000 under the parties' arrangement (or any amount of money from February 2025 to the present).

10. I was confused by Mr. Schaffer's phone call. Mr. Schaffer seemed nervous, was not clearly expressing himself, and seemed uncertain about his words. It was an odd conversation.

11. I do not recall discussing with Mr. Schaffer on this phone call the employment agreement between JGR and Mr. Gabehart (the "JGR Employment Agreement") or any non-compete provisions of the JGR Employment Agreement, nor did Schaffer ever explicitly state that Mr. Gabehart was subject to a non-compete. Mr. Schaffer did not even use the words "tortious interference," let alone threaten any tortious interference claim against Spire. My understanding at that time, and to this day, is that Mr. Gabehart was not subject to an applicable non-compete.

12. I was also, at the time, not independently aware of any of the specific terms and conditions of the JGR Employment Agreement because the first time I ever saw the JGR Employment Agreement was when it was filed as an exhibit in this lawsuit. Dkt. 8-2.

13. The next time I heard from Mr. Schaffer was on February 24, 2026. On that day, Mr. Schaffer called me to say that JGR intended to add Spire to this lawsuit. I was aware of the lawsuit that had been filed against Mr. Gabehart, and I was also aware that the original complaint filed by JGR in this case did not allege that Mr. Gabehart had breached any non-compete agreement or that any applicable non-compete agreement was in place. Therefore, I did not understand why or how JGR would be adding Spire to this lawsuit.

14. I asked Mr. Schaffer what claims JGR was planning to assert against Spire. Specifically, I asked whether JGR was contending that Mr. Gabehart was subject to an applicable

non-compete. Mr. Schaffer responded "Yes." That was the first time I had ever discussed any non-compete with respect to Mr. Gabehart with anyone at JGR. Before that time, no one at JGR had informed me of JGR's view that Mr. Gabehart was subject to an applicable non-compete.

15. I understand that David Alpern was also on this February 24, 2026 phone call. Spire's CFO was also on this phone call because I received the call while I was driving and Spire's CFO was in the car with me at the time.

### EMPLOYMENT NEGOTIATIONS WITH MR. GABEHART

16. I did not have direct contact with Mr. Gabehart prior to January 27, 2026.

17. At no point during my interactions with Mr. Gabehart did I ask for, pursue, or need any information from Mr. Gabehart that was the property of JGR. That is still true to this day. Spire has its own technical alliance with Hendrick Motorsports, its own vehicles, its own engines, its own data analytics, its own engineers, its own drivers, its own crew chiefs, and its own strategy. Spire has absolutely no need for JGR's information, documents, or data.

18. The first time I or, to my knowledge, Spire sent Mr. Gabehart a draft employment agreement containing specific terms and conditions was on January 27, 2026 (the "Spire Employment Agreement").

19. Spire originally planned to start Mr. Gabehart's employment on February 9, 2026. However, negotiations with Mr. Gabehart regarding the terms and conditions of the Spire Employment Agreement prolonged to February 17, 2026, when the final agreement was signed.

20. At this time, Spire decided to backdate Mr. Gabehart's pay to February 9, 2026, which corresponded to Mr. Gabehart's original anticipated start date.

21. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 11, 2026

_____
William Anthony