**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**Case No. 3:26-CV-00133-SCR-DCK**

JOE GIBBS RACING, LLC,

  Plaintiff,

v.

CHRISTOPHER GABEHART and SPIRE
MOTORSPORTS, LLC,

                Defendants.

**PLAINTIFF JOE GIBBS RACING,
LLC'S REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY
INJUNCTION**

# TABLE OF CONTENTS

I.  JGR is Likely to Succeed on the Merits of Each of its Claims Against Defendants. ............ 1

A. Gabehart's Noncompete Provision is Enforceable............................................................. 1

B. Gabehart is Performing the Same General Services for Spire That He Performed for JGR. ..................................................................................................................................... 2

C. Gabehart Did Not Satisfy Multiple Conditions Required To Exercise Rights Under the Second Paragraph of Section 6. ............................................................................................ 3

D. JGR Did Not Commit a Prior Material Breach of the Agreement ..................................... 5

E. JGR is Likely to Succeed on Its Tortious Interference Claim. .......................................... 7

   i. Spire Had Knowledge of the Non-Compete Agreement. ................................................ 7

   ii. Spire Unjustifiably Interfered with Gabehart's Non-Compete Agreement. ................... 8

F. JGR Is Likely To Prevail On Its Trade Secret and UDTPA Claims.................................... 9

II. JGR Has Established Ongoing Irreparable Harm. ................................................................. 14

III. The Balance of Equities Strongly Weighs in JGR's Favor. ................................................. 15

CONCLUSION................................................................................................................................ 15

ARTIFICIAL INTELLIGENCE CERTIFICATION ..................................................................... 17

CERTIFICATE OF SERVICE ...................................................................................................... 19

**Cases**

*American Air Filter Company, Inc. v. Price*,
    2017 WL 485517 (N.C. Super., 2017)................................................................13, 15

*Analog Devices, Inc. v. Michalski*,
    157 N.C. App. 462 (N.C. Ct. App. 2003) .......................................................................15

*Biesse Am., Inc. v. Dominici*,
    2019 WL 3916806 (N.C. Super. 2019)............................................................................18

*Bridgetree, Inc. v. Red F Marketing LLC*,
    2013 WL 443698 (W.D.N.C., 2013) ........................................................................13, 16

*Clear Blue Ins. Co. v. Yachtinsure Servs., Inc.*,
    2025 WL 1782579 (W.D.N.C. 2025) ..............................................................................19

*Combs v. City Elec. Supply Co.*,
    203 N.C. App. 75 (2010) .................................................................................................11

*FMC Corp. v. Cyprus Foote Min. Co.*,
    899 F. Supp. 1477 (W.D.N.C. 1995) ..............................................................................16

*Grout Dr. Glob. Franchise Corp. v. Troutman, Inc.*,
    2015 WL 2353698 (E.D.N.C. 2015).................................................................................12

*GXO Logistics, Inc. v. Cunningham*,
    2023 WL 3470894 ..............................................................................................................4

*Horner Int'l Co. v. McKoy*,
    754 S.E.2d 852 (N.C. App., 2014)............................................................................13, 16

*Integrated Direct Mktg., LLC v. May*,
    690 F. App'x 822 (4th Cir. 2017) ....................................................................................15

*Local Social, Inc. v. Stallins*,
    2018 WL 2148595 (N.C. Super Ct. 2018).........................................................................6

*Microban Int'l, Ltd. v. Kennedy*,
    2023 WL 2533085 (W.D.N.C. 2023) ..............................................................10, 13, 15

*NovaQuest Cap. Mgmt., L.L.C. v. Bullard*,
    498 F. Supp. 3d 820 (E.D.N.C. 2020)...............................................................................5

*Philips Elecs. N. Am. Corp. v. Hope*,
　631 F. Supp. 2d 705 (M.D.N.C. 2009) ................................................................5

*Prysmian Cables & Sys. USA, LLC v. Szymanski*,
　573 F. Supp. 3d 1021 (D.S.C. 2021) ...........................................................16, 18

*RLM Commc'ns, Inc. v. Tuschen*,
　66 F. Supp. 3d 681 (E.D.N.C. 2014), *aff'd*, 831 F.3d 190 (4th Cir. 2016) ...........11

*Seaboard Industries, Inc. v. Blair*,
　10 N.C. App. 323 (N.C. Ct. App. 1971) ...............................................................4

*Static Control Components, Inc. v. Summix, Inc.*,
　2012 WL 1379380 (M.D.N.C. 2012).................................................................15

*TSG Finishing, LLC v. Bollinger*,
　238 N.C. App. 586 (2014) .................................................................................18

*United Lab'ys, Inc. v. Kuykendall*,
　322 N.C. 643, 370 S.E.2d 375 (1988)...............................................................11

*Univ. of Tex. v. Camenisch*,
　451 U.S. 390 (1981) ..........................................................................................13

*Vessel Med., Inc. v. Elliot*,
　2015 WL 5437173 (D.S.C. 2015) ......................................................................17

**Statutes**

18 U.S.C. § 1836(3)(A)(i).............................................................................12, 13

N.C. Gen. Stat. 95-25.2(16) ...................................................................................8

N.C. Gen. Stat. § 66-154(a) ...........................................................................12, 13

**Other Authorities**

29 CFR 541.602(b)(6)...............................................................................................8

Company." Gabehart's " ...........................................................................................8

Gabehart's "Base Salary" ..........................................................................................8

iii

## I.    JGR is Likely to Succeed on the Merits of Each of its Claims Against Defendants.

### A.    *Gabehart's Noncompete Provision is Enforceable.*

Gabehart begins his attack on the noncompete with a puzzling assertion that JGR does not have a legitimate business interest in its confidential information because the forensic examination "eliminated" all of JGR's confidential information in his possession, and therefore, there is no legitimate business interest "left to protect." Gabehart Resp. at 17. As such, Gabehart appears to argue that a noncompete may only be enforced if an employee steals confidential information and refuses to give it back. North Carolina courts regularly find noncompete agreements enforceable even where there was no accompanying theft of confidential information. *See e.g. GXO Logistics, Inc. v. Cunningham*, 2023 WL 3470894, at *6 (W.D.N.C. 2023).

Citing no authority, Gabehart argues that the noncompete is invalid because it would not apply if Gabehart were terminated "without cause by Company or Term expiration." Gabehart Resp. at 17. However, North Carolina courts have enforced restrictions with similar exceptions. *See e.g. Seaboard Industries, Inc. v. Blair*, 10 N.C. App. 323 (N.C. Ct. App. 1971). Gabehart's noncompete restrictions exist only when he exits the company in a manner that does not allow JGR to mitigate the competitive harm it would suffer if he immediately joined a competitor. This explains JGR's legitimate business interests in protecting its competitive advantage.

Gabehart also attacks the scope of the restriction requiring that he not perform "'services of the general type of services' that he provided to JGR." Gabehart Resp. at 18. Notably, Gabehart begins this argument by selectively omitting an important part of the Agreement—the restriction only applies to services that Gabehart provided to JGR within the last year before his employment ended. Employment Agreement at 4. Yet Gabehart argues that this language does not reasonably put him on notice of the services he is prohibited from providing. Gabehart Resp. at 19. This contradicts Gabehart's admission that "there's certainly some subject matter overlap [between the

1

position with JGR and Spire]." TRO Hr'g Tr. 38:24-39:1. Even more, Gabehart understood the language of the noncompete sufficiently to file a declaration listing a dozen of his regular job duties at JGR. *See* Gabehart Sec. Decl. at ¶ 6. North Carolina courts routinely enforce noncompetes that prohibit the provision of similar or the general type of services. *See Philips Elecs. N. Am. Corp. v. Hope*, 631 F. Supp. 2d 705 (M.D.N.C. 2009) (enforcing agreement prohibiting "performing ... services... that is or are substantially the same as or substantially similar...."); *see also NovaQuest Cap. Mgmt., L.L.C. v. Bullard*, 498 F. Supp. 3d 820, 834 (E.D.N.C. 2020).

Finally, Gabehart argues that the scope of the restriction is overbroad because he "cannot simply find a job elsewhere" and enforcing the restriction "could effectively leave him jobless in this unique market [NASCAR]." Gabehart Resp. at 19. This argument should be rejected. Gabehart admits that his current duties for Spire go beyond his services for JGR, arguing that Spire involves "high-level" work "across Spire's motorsports portfolio" beyond NASCAR. *Id*. at 19–20. This portfolio includes ***ten*** racing series outside of NASCAR, Gabehart Sec. Decl. at ¶ 13, and Gabehart is free to work in any of them or in other potential roles even within NASCAR. TRO Tr., at 23.

### B. Gabehart is Performing the Same General Services for Spire That He Performed for JGR.

Gabehart also argues he has not breached the terms of the noncompete because his role at Spire involves "high-level" responsibilities "across Spire's motorsports portfolio." Gabehart Resp. at 20. This argument should be rejected. First, Gabehart conceded that "there's certainly some subject matter overlap [between the positions]." TRO Hr'g Tr. 38:25-39:1. Second, Gabehart has reaffirmed that his role at Spire involves responsibilities over its NASCAR Cup Series team. *See* Gabehart Sec. Decl. at ¶¶ 15–16. Third, even Gabehart's carefully worded declarations demonstrate an overlap of certain duties. Both roles involve (a) developing "best practices" among NASCAR Cup Series teams; (b) interfacing with NASCAR officials; (c) coordinating with an

2

allied NASCAR team; (d) supporting the relationship with each team's OEM; and, most importantly (e) developing and deploying "of competitive initiatives" within the NASCAR Cup Series. *Compare* Gabehart Sec. Decl. at ¶ 6 *with* ¶¶ 5, 15, 21.

### C. Gabehart Did Not Satisfy Multiple Conditions Required To Exercise Rights Under the Second Paragraph of Section 6.

Contrary to Gabehart's argument, Gabehart's noncompete period was never reduced to one week under Section 6, paragraph 2 of the Agreement ("Section 6") because he failed to satisfy multiple material conditions. Section 6 requires a three-step procedure: (1) notice of specific duties assigned by JGR that were inconsistent with Gabehart's expectations; (2) 60 days for JGR to cure; and (3) 60-day notice of termination without cause. Gabehart fails the first step—he sought more responsibilities, not relief from duties JGR assigned.

Regarding the first step, Gabehart predictably ignores that his notice must be made **"in good faith."** Agreement at 4 (emphasis added). Gabehart's conduct both before and after November 6, 2025 shows that he was not acting with "honesty in belief and purpose." *Local Social, Inc. v. Stallins*, 2018 WL 2148595, at *4 (N.C. Super Ct. 2018) (quoting *Black's Law Dictionary* (10th ed. 2014)). To the contrary, by November 6, 2025, Gabehart had engaged in detailed discussions about employment with Spire, even meeting with Spire's co-owner on October 16, 2025, just days before JGR was competing at Martinsville to qualify three teams for the Cup Series Championship. *See* Dickerson Decl. at 9–10.

During the November 6 meeting, Gabehart demanded unilateral control of JGR's competitive activities, knowing JGR would not approve. Carmichael Second Decl. at 7 ("I don't expect that you trust me with any of it as a whole"). His purported "notice" to Coach Gibbs included only criticism, not solutions, and did not include any language invoking Section 6 or describing duties assigned to him that were inconsistent with his expectation---only *additional*

3

assigned duties he wanted. Carmichael Decl., Ex. 1 at 6–7 ("I've been embarrassed[,]" "That is a dysfunctional organizational structure[,]" "you don't value and/or trust my leadership abilities"). Rather than giving JGR sixty days to resolve his concerns, Gabehart summed up his gripes by stating "[t]rust has been broken. Seemingly on both sides. I am not sure this can be repaired." *Id.* at 7; *see also* Gabehart Decl., Ex. B at 3 (Carmichael text stating he wished the message "was in a tone that was trying to solve the issues").

Then, Gabehart forwarded his pretextual grievances to Carmichael at 10:46 a.m. on November 7, 2025. Only four hours later, Gabehart surreptitiously took pictures of JGR's Confidential Information and Trade Secrets with his phone and hours after that, interacted with a "Spire" folder on his Google Drive. Walton Sec. Suppl. Decl. at ¶ 10. Gabehart's admission "he regrets this lapse in judgment"—only after he got caught—underscores his lack of good faith *at the time*. Gabehart Resp. at 7.

In addition, Gabehart admits that he agreed to pursue a "mutual separation" with JGR— *not* invocation of Section 6's language which would have allowed *him* to unilaterally terminate the Agreement without cause. After the November 6 meeting, Gabehart admits, he and JGR "agreed we needed to begin the process of working out the terms of a separation." Gabehart Decl. at 4; *see also* Gabehart Resp. at 13 ("Mr. Gabehart expected the parties would close out the mutual separation on the terms outlined by Mr. Carmichael"). A mutual separation is inconsistent with Gabehart's invocation of Section 6 or a termination without cause by JGR.[1]

The terms outlined by Carmichael on November 10, 2025, demonstrate this distinction conclusively. "On November 10, 2025, JGR presented [Gabehart] with the terms of a proposed

---

[1] By pursuing a mutual separation, Gabehart also failed to comply with the conditions he (a) provide JGR with sixty days to resolve his concerns, and (b) provide sixty days prior written notice of termination without cause. Employment Agreement at 4. Gabehart ignores these conditions.

separation agreement." Gabehart Decl. at 5. That proposal included terms that are not included or contemplated by the Agreement. Gabehart Decl., Ex. A at 1–2 (including COBRA, two-year non-solicit, and mutual non-disparagement). Even Gabehart admits the parties then "engaged in ... discussions towards a mutually agreeable separation framework," confirming the parties were pursuing a new *mutual* agreement rather than proceeding according to the language of Section 6. Gabehart Decl. at 5; Gabehart Resp. at 13.[2]

### D.    JGR Did Not Commit a Prior Material Breach of the Agreement

Defendants claim that Gabehart was relieved of his noncompete because JGR stopped paying his salary after his last day of work. This contention is without merit. The Agreement plainly states Gabehart's "Base Salary" was payment for "the services Employee provides the Company." Gabehart's "prior material breach" defense rests on the untenable premise that JGR was obligated to pay him a salary while he performed no services for JGR and instead actively worked to benefit its competitor, Spire. This common-sense proposition—that an employee is only paid for services provided—is echoed in state and federal law. N.C. Gen. Stat. § 95-25.2(16) (emphasis added) (defining "wage" as "compensation *for labor or services rendered by an employee*"); 29 CFR § 541.602(b)(6) ("an employer may pay a proportionate part of an employee's full salary for the time actually worked in the first and last week of employment").

JGR complied with the Agreement by making payment for all time worked by Gabehart through November 10, 2025 on the regularly scheduled November 21, 2025 payroll. Ex. A, T.

---

[2] By asking the Court to invalidate his noncompete, Gabehart asks the Court to enforce the terms of a mutual separation agreement that he was offered and chose not to sign before JGR discovered his duplicity. Carmichael Decl. at 2 (detailing agreement offered to Gabehart); Gabehart Sec. Decl. at 9 (admitting "that the parties did not ultimately finalize a separation agreement")

Rogers Decl. at ¶ 3.[3] Gabehart does not argue that he provided any services to JGR after November 10, 2025. By then, Gabehart had returned his JGR computer and had engaged in "discussions towards a mutually agreeable separation framework[.]" Gabehart Decl. at 5. Instead, Gabehart has admitted to using the time after November 10, 2025, to negotiate employment with Spire. Gabehart Decl. at 5-6. He further used the time to wrongly and continuously access the information he stole from JGR. Walton Sec. Suppl. Decl. ¶¶ 13–22. These are not services provided to JGR.

Gabehart also incorrectly argues that JGR breached the Agreement by delaying payment of a performance bonus. *See* Gabehart Resp. at 13. Under Section 2(b) of the Agreement, any Earned Performance Bonuses were to be paid within forty-five (45) days after JGR received the requisite prize money. Agreement at 2. JGR received prize money from NASCAR on November 18, 2025. T. Rogers Decl. at ¶ 4. Therefore, any bonus payment under the Agreement would have been due by January 2, 2026. T. Rogers Decl. at ¶ 4; Agreement at 2. By January, however, JGR discovered Gabehart's misappropriation and was in negotiations about a protocol to address his conduct. On January 2, 2026, counsel for JGR requested approval to deduct a portion of the expected forensics costs and the cost of an extra hotel room for the Phoenix race from the claimed bonus. On January 7, 2026, through counsel, Gabehart agreed. Ex. B, Summey Decl. at ¶¶ 1–4. The net bonus payment was made to Gabehart on January 19, 2026. T. Rogers Decl. at ¶ 5. Payment of this bonus, while the parties were actively involved in negotiations regarding Gabehart's admitted taking of JGR's information and how the bonus would be amended to address part of the forensic payment, is not a material breach going to the heart of the Agreement. To the contrary, if any party was in breach of the Agreement by January 2, 2026, it was Gabehart through his

---

[3] In fact, JGR actually overpaid Gabehart by one day, as his November 21, 2025, paycheck included pay through November 11, 2025.

misappropriation of JGR's Confidential Information and Trade Secrets and his cessation of services on November 10, 2025.

### E.     *JGR is Likely to Succeed on Its Tortious Interference Claim.*

JGR is likely to prevail on its tortious interference claim because the record demonstrates that Spire knowingly induced his breach and then attempted to obscure its conduct through self-serving denials contradicted by the forensic evidence. Above, JGR has fully addressed the first element of tortious interference: the existence of "a valid contract between the plaintiff[.]" *dmarcian, Inc. v. dmarcian Eur. BV*, 60 F.4th 119, 142 (4th Cir. 2023); *see* Section I.A, *supra*. With respect to Spire's remaining contentions concerning its knowledge of the contract and justification for interference, these arguments amount to contested allegations for which the logical inferences highly favor JGR. *Microban Int'l, Ltd. v. Kennedy*, 2023 WL 2533085, at *4 (W.D.N.C. 2023).

### i.     Spire Had Knowledge of the Non-Compete Agreement.

Spire denies that it had prior knowledge of Gabehart's non-compete. This denial is belied by the evidence. Dickerson admits that no later than November 11, 2025, Gabehart stated he was subject to a one-week noncompete provision. Dickerson Decl. at 10. Dickerson then apparently took no steps to verify this assertion. Nevertheless, on December 3, 2025, Anthony spoke with Schaffer about JGR's concerns about the potential hiring of Gabehart. Anthony Decl. at 2. Spire would have the Court believe that, again, it did nothing to inquire about Gabehart's contractual obligations. However, the forensics say otherwise. Gabehart conducted a Google search for the term "indemnify" at 12:15 a.m. on December 4, 2025—only hours after Schaffer's call. It begs the question, why would Gabehart suddenly research indemnification in the middle of the night? The logical inference is because Spire had just warned him about potential legal exposure and agreed to pay his expenses.

###### ii.  Spire Unjustifiably Interfered with Gabehart's Non-Compete Agreement.

Spire claims it is a "non-outsider" whose actions "are presumed to have been done in the interest of the [c]orporation and are therefore justified." Spire Resp. at 14 (citing *Manning v. N. Carolina State Univ.*, 724 F. Supp. 3d 438, 462 (E.D.N.C. 2024)). This argument is misplaced. Courts have routinely considered competitors affected by non-compete provisions as outsiders. *See RLM Commc'ns, Inc. v. Tuschen*, 66 F. Supp. 3d 681, 694 (E.D.N.C. 2014), *aff'd*, 831 F.3d 190 (4th Cir. 2016) (addressing a former employer's competitor as an outsider to a non-compete agreement). Moreover, Spire itself does not contend it has a legitimate business interest in the *subject matter of the Agreement*—a requirement to be a "non-outsider." *Combs v. City Elec. Supply Co.*, 203 N.C. App. 75, 84 (2010). Rather, it claims it has a "legitimate business interest in *Gabehart's employment prospects.*" Spire Resp. at 14. This vaguely asserted interest is insufficient to give rise to a presumption of justifiable behavior as it does not amount to a legitimate business interest in the Agreement itself.

When a competitor knows a newly hired employee is subject to a noncompete, tells the employee it will pay all legal expenses incurred due to breaching the covenant, and then solicits the plaintiff's customers with information supplied by the employee, an inference may be drawn that the competitor interfered with the employment agreement without justification. *United Lab'ys, Inc. v. Kuykendall*, 322 N.C. 643, 663, 370 S.E.2d 375, 387 (1988). Here, the evidence favors finding that Spire had knowledge of Gabehart's non-compete agreement and agreed to pay his legal fees, as Gabehart suddenly researched "indemnify" hours after JGR warned Spire of his contractual obligations. Walton Sec. Suppl. Decl. at ¶ 23; Schaffer Decl. at ¶¶ 4–6. Moreover, the evidence demonstrates that Gabehart took JGR's trade secrets concerning JGR's sponsorships, met with Spire's owner after acquiring this information, and then Spire initiated contact with multiple

JGR sponsors shortly after hiring Gabehart. Walton Sec. Suppl. Decl. at ¶ 10; Simpson Decl. at ¶¶ 4–8; Lealos Decl. at ¶¶ 4–6; Heyer Decl. at ¶¶ 4–5. Accordingly, there is a strong inference that Spire acted "without justification" when it interfered with Gabehart's non-compete.[4]

### F. JGR Is Likely To Prevail On Its Trade Secret and UDTPA[5] Claims.

Defendants repeatedly attempt to recast JGR's claims as resting on mere "speculation" and "possibility." But this characterization ignores both the governing legal standard and the undisputed facts. The DTSA and TSPA expressly authorize injunctive relief to prevent "threatened misappropriation"—that is precisely what a preliminary injunction is designed to do. N.C. Gen. Stat. § 66-154(a); 18 U.S.C. § 1836(3)(A)(i). And this is not a case of mere possibility: the record is replete with evidence of *actual* misappropriation and multiple acts of deception and concealment. Gabehart improperly acquired JGR's trade secrets—including by taking photos of his computer screen to avoid detection—and stored more than 200 JGR proprietary files in a folder earmarked "Spire" for future use. Gabehart and Spire's owners met on multiple occasions while Gabehart was improperly acquiring this information; Gabehart continued to access the stolen materials after he stopped working for JGR and had an offer from Spire; and Spire apparently began targeting JGR sponsors it had never previously contacted shortly after Gabehart's arrival. This is sufficient evidence to establish an ongoing threat of misappropriation as to *both* defendants.

A motion for preliminary injunction is determined "on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). JGR "is not required to prove his case in full at a preliminary-injunction hearing." *Id.* Direct evidence that Gabehart shared JGR's information with Spire is not a

---

[4] Spire's argument that Gabehart's role does not involve the same type of services provided to JGR, fails for the reasons described above. *See also* Spire Resp. at 22.

[5] JGR is also likely to succeed on its UDTPA claim. *See Grout Dr. Glob. Franchise Corp. v. Troutman, Inc.*, 2015 WL 2353698, at *5 (E.D.N.C. 2015).

prerequisite to the issuance of an injunction as to both Gabehart and Spire. *See* N.C. Gen. Stat. § 66-154(a) (emphasis added); *see also* 18 U.S.C. § 1836(3)(A)(i). North Carolina courts have "expressly rejected the contention that evidence of actual misappropriation is required to obtain injunctive relief under the TSPA." *American Air Filter Company, Inc. v. Price*, 2017 WL 485517, at *7 (N.C. Super., 2017) (citing *Horner Int'l Co. v. McKoy*, 754 S.E.2d 852, 859–60 (N.C. App., 2014)). North Carolina law "permits preliminary injunctions where a prima facie case for 'actual or threatened misappropriation of a trade secret' is established." *Microban*, 2023 WL 2533085, at *5 (quoting N.C. Gen. Stat. § 66-154(a)).

Gabehart's actual misappropriation of JGR's Confidential Information and Trade Secrets has been established. It is undisputed that he took photos of his computer screen with his cell phone and saved more than 200 JGR proprietary files in a folder named "Spire." This is sufficient to support a preliminary injunction as to Gabehart. *Horner Int'l Co. v. McKoy*, 232 N.C. App. 559, 569-70, 754 S.E.2d 852, 859 (2014) (quoting N.C.G.S. § 66-154(a)).

There is likewise substantial evidence of an ongoing and future threat of misappropriation of JGR's trade secrets by both Gabehart and Spire. "It is well-settled under North Carolina law, '[d]irect evidence [ ... ] is not necessary to establish a claim for misappropriation of trade secrets; rather, such a claim may be proven through circumstantial evidence.'" *Bridgetree, Inc. v. Red F Marketing LLC*, 2013 WL 443698, at *8 (W.D.N.C., 2013) (quoting *Med. Staffing Network, Inc. v. Ridgway*, 670 S.E.2d 321, 329 (N.C. App. 2009)). After returning his JGR laptop on November 10, 2025, Gabehart continued accessing and deleting JGR files through December—conduct only discoverable because of his 'technical blunder' in failing to disable cloud syncing before returning the computer. Walton Sec. Suppl. Decl. ¶¶ 13–22. Like photographing his screen rather than taking screenshots, Gabehart clearly believed these actions would evade detection. The fact that he

10

engaged in this conduct only because he thought it was undetectable is itself powerful evidence of wrongful intent, and of the ongoing threat of misappropriation. Further, the circumstantial evidence demonstrates more than a possibility of ongoing or future trade secret misappropriation as to Gabehart and Spire. The record establishes:

- Gabehart accumulated JGR's proprietary information (more than 200 files) in secret in the months leading up to moving to Spire (*see* Walton Decl. at ¶ 14; *see also* Hamlin Decl. at ¶ 14[6]);

- Gabehart took photos of his laptop screen depicting JGR's confidential and trade secret information on his personal cell phone to avoid detection (*see* Walton Sec. Suppl. Decl. at ¶ 10);

- Gabehart and Spire's owners met on more than one occasion during the time Gabehart was improperly acquiring JGR's trade secrets (*see* generally Simpson Decl.; Berrier Decl. at ¶ 4; Ex. C, Berrier Supp. Decl. at ¶ 1);

- The JGR files Gabehart took were stored in a folder named "Spire" on his personal Google Drive, including a "Past Setups" subfolder containing JGR's racecar setup information. (*see* Walton Decl. at ¶ 14);

- Gabehart accessed JGR documents he accumulated in the "Spire" folder and attempted to access JGR's SharePoint containing its confidential information and trade secrets on multiple occasions after he stopped providing services to JGR and had a job offer from Spire (*see, e.g.,* Walton Sec. Suppl. Decl. at ¶¶ 15–19);

- All NASCAR teams, including JGR and Spire, use standardized NextGen racecars, making "variations in car setup as small as two one-hundredths of an inch [] a material competitive advantage" (Hamlin Decl. at ¶ 16; *see also* Jenkins Decl. at ¶4);

- Spire has targeted JGR sponsors that it had never contacted prior to Gabehart's employment at Spire (*see* Heyer Decl. at ¶¶ 4–6; Lealos Decl. at ¶¶ 4–6); and

- Gabehart has refused to permit examination of his communications with Spire relating to JGR and employment or allow JGR to review the other contents of the Spire folder (JGR Suppl Br. at 10, n.4).

Based on this circumstantial evidence, the Court can and should reasonably infer that there is a threat of ongoing or future misappropriation of JGR's trade secrets by Defendants. *Microban*,

---

[6] Mr. Hamlin's Declaration at paragraphs 14–17 also details the value Spire obtains from having JGR's car setups despite the teams using different OEMs.

2023 WL 2533085, at *4 ("'[A] district court . . . is not required to resolve factual disputes in favor of the non-moving party.' . . . '[T]he court must 'assess the facts [and] draw whatever reasonable inferences it might favor . . . .'") (citations omitted). Taken as a whole, Defendants' conduct creates a strong inference that Spire has or will improperly acquire JGR's trade secrets from Gabehart.

Spire argues this evidence is speculative. However, in each of Spire's cases, there existed little to no evidence from which actual or threatened misappropriation could be inferred, and in some cases, there was evidence directly contradicting an inference of misappropriation. *See Analog Devices, Inc. v. Michalski*, 157 N.C. App. 462, 466 (N.C. Ct. App. 2003) (defendant's product was "too divergent [from plaintiff's] to allow interchangeable use of [plaintiff's] trade secrets"); *Integrated Direct Mktg., LLC v. May*, 690 F. App'x 822, 824 (4th Cir. 2017) (plaintiff could not identify the allegedly misappropriated information, whereas defendant presented evidence it did not use plaintiff's information); *Static Control Components, Inc. v. Summix, Inc.*, 2012 WL 1379380, at *7 (M.D.N.C. 2012) (plaintiff put forth two pieces of wholly speculative evidence regarding access and use of its trade secrets). JGR has provided a substantial amount of circumstantial evidence, summarized above. *See also Am. Air Filter Co., Inc. v. Price*, 2017 WL 485517, at *7 (N.C. Super. 2017) (enjoining former employee and new employer based on threat of misappropriation where former employee downloaded plaintiff's trade secrets, performed same kind of duties at competitor, and contacted plaintiff's customers).

Further, Spire's argument that it may not be enjoined because JGR has not provided evidence that Spire "used" its trade secrets to compete with JGR is without merit. That the new employers in *Bridgetree* and *Prysmian* quickly developed competing products was one of many pieces of circumstantial evidence the courts considered in finding misappropriation, not the only dispositive factor. *See, e.g., Bridgetree*, 2013 WL 443698, at *7; *Prysmian Cables & Sys. USA,*

12

*LLC v. Szymanski*, 573 F. Supp. 3d 1021, 1044 (D.S.C. 2021). Here, because each NASCAR racetrack is unique and requires a particular racecar setup, JGR may not have the opportunity to identify Spire's specific use of its competitive strategies and car setups until after Spire uses them to compete against JGR in a given race. *See* Hamlin Decl. at ¶ 16. Accordingly, that such an instance might not yet have occurred does not obviate the future threat.

Critically, neither the forensic deletion nor Defendants' denials preclude a finding of threatened misappropriation. Gabehart's knowledge and opportunity to use trade secrets at Spire create a continuing threat. *Horner*, 754 S.E.2d at 859. What's more, the forensic examiner did *not* ameliorate the concern that Gabehart transmitted any of JGR's files or confirm that there is no "evidence of an imminent risk of trade secret misappropriation." Gabehart Resp. at 22; Spire Resp. at 2. The forensic review conducted to-date has important limitations, including the inability to review Gabehart, Dickerson, and Towriss' text messages or identify or access the Unknown OneDrive Account associated with Gabehart's email address that accessed JGR's SharePoint. *See* Walton Decl. at ¶¶ 15–17. Consequently, the forensic examiner expressly stated that he could not "exclude the possibility of [JGR] files being sent via email from a web portal, being sent via text message then deleted the message, shared directly via Google Photos or any other fileshare site" based on his examination. Gabehart Decl., Ex. D at 2; *see also* Walter Decl. at ¶ 30.

Although Gabehart purports to have disposed of all JGR files in his possession and entered into an NDA with Spire, this evidence must be viewed in light of Gabehart's disregard for his contractual obligations and proclivity to deceive. *See FMC Corp. v. Cyprus Foote Min. Co.*, 899 F. Supp. 1477, 1484 (W.D.N.C. 1995) (noting that defendants' representations disavowing intent to disclose trade secrets alone were not dispositive). Gabehart deliberately stole JGR's proprietary documents and breached the confidential information provision in his Agreement. Likewise, as

13

recognized by this Court, Gabehart put his credibility in question by changing his story throughout the course of these proceedings. TRO Hr'g Tr. 36:16–19. A tangible and imminent threat of Defendants' misappropriation of JGR's Confidential Information and Trade Secrets remains.

## II.     JGR Has Established Ongoing Irreparable Harm.

Defendants argue that the timing of this lawsuit undercuts JGR's claim of irreparable harm. "While unexplained delay in seeking a preliminary injunction may defeat the presumption of irreparable injury, delay attributable to good faith investigation or a failure to realize the severity of the infringement does not." *Bear U.S.A., Inc. v. A.J. Sheepskin & Leather Outerwear, Inc.*, 909 F. Supp. 896, 909 (S.D.N.Y. 1995). The forensic review lasted from December 8, 2025, when JGR discovered Gabehart's misappropriation, to February 5, 2026, when known pieces of JGR's information were deleted from Gabehart's cell phone and Google Drive. Walton Decl. at ¶¶ 5–9, 31; *see also* Gabehart Decl. at ¶ 21. JGR filed suit shortly after, on February 19, 2026. JGR diligently investigated Gabehart's misappropriation in good faith before filing suit.

Further, Defendants' position that there is no irreparable harm in the absence of any direct evidence of disclosure similarly fails. First, as to Gabehart, irreparable harm has been established as he admits to taking JGR's most coveted trade secrets. TRO at ¶ 26–29. The "loss of even a single trade secret *is* irreparable harm." *Vessel Med., Inc. v. Elliot*, 2015 WL 5437173, at *9 (D.S.C. 2015) (emphasis added). Second, as to both Gabehart and Spire, the threat of use or disclosure remains very much alive. Irreparable harm exists where an employee had an "opportunity to misappropriate the confidential information and trade secrets" and the competitor hiring the employee could "benefit by having [his] knowledge of [the former] employer's trade secrets because it could produce similar products without expending resources or research and development." *TSG Finishing, LLC v. Bollinger*, 238 N.C. App. 586, 602 (2014). Here, Gabehart admitted to misappropriating JGR's trade secrets. TRO at ¶ 26–29. This information is JGR's most

14

valuable information. Hamlin Decl. at ¶¶ 14, 16. Thus, it is no accident that over the past two decades, JGR has outperformed every other NASCAR Cup team, while Spire has struggled competitively year after year, making JGR's winning trade secrets particularly valuable to Spire who stands to benefit from that knowledge.

Finally, Defendants claim that "[t]he forensic examination confirmed that Mr. Gabehart did not transmit, disclose, or use any JGR Confidential Information," is false and misleading as the forensic examiner never made such representations. Gabehart Resp. at 22. The examiner expressly stated that files could have been saved or disseminated through other means. Walton Decl. at ¶ 30. Yet, Defendants now attempt to block additional forensic review—and their contention that the permanent deletion of JGR's trade secrets from his devices remedies this harm is simply untrue. *Biesse Am., Inc. v. Dominici*, 2019 WL 3916806, at *7 (N.C. Super. 2019) (rejecting argument that the return of confidential information after TRO "cured" any harm).

## III.    The Balance of Equities Strongly Weighs in JGR's Favor.

The balance of equities here favors the issuance of an injunction. JGR stands to suffer the loss of its competitive edge in the NASCAR industry, including damage to relationships with sponsors and fans, the ability to attract top-tier drivers, and its reputation. In contrast, Defendants will not be harmed from an injunction prohibiting the acquisition or use of JGR's trade secrets. Dickerson Decl. at ¶ 46; *see Biesse*, 2019 WL 3916806, at *7 (finding no harm to defendants from "an injunction against the use and disclosure of the claimed trade secrets"); *see also Prysmian*, 573 F.Supp.3d at 1044–45. Gabehart faces no harm from mandated compliance with his Agreement. *See Clear Blue Ins. Co. v. Yachtinsure Servs., Inc.*, 2025 WL 1782579, at *3 (W.D.N.C. 2025).

## CONCLUSION

For these reasons, JGR prays that this Court issue a preliminary injunction as set forth in JGR's Motion.

This the 13th day of March, 2026

**KING & SPALDING LLC**

/s/ *Danielle T. Williams*
Danielle T. Williams
dwilliams@kslaw.com
N.C. Bar No. 23283
300 South Tryon Street, Suite 1700
Charlotte, NC 28202
Thomas M. Melsheimer – *Pro Hac Vice*
tmelsheimer@kslaw.com
Chad B. Walker – *Pro Hac Vice*
cwalker@kslaw.com
Tracea Rice – *Pro Hac Vice*
trice@kslaw.com
Alexandra Moore - *Pro Hac Vice*
almoore@kslaw.com
2601 Olive Street, Suite 2300
Dallas, TX 75201

Sarah F. Hutchins
N.C. Bar No. 38172
Tory Ian Summey
N.C. Bar No. 46437
Keith M. Weddington
N.C. Bar No. 14352
Charles G. Middlebrooks
N.C. Bar No. 55171
Madelyn R. Candela
N.C. Bar No. 63827
Bank of America Tower
620 South Tryon St., Suite 800
Charlotte, North Carolina 28202
sarahhutchins@parkerpoe.com
torysummey@parkerpoe.com
keithweddington@parkerpoe.com
charliemiddlebrooks@parkerpoe.com
madelyncandela@parkerpoe.com

*Attorneys for Joe Gibbs Racing, LLC*

16

## ARTIFICIAL INTELLIGENCE CERTIFICATION

No artificial intelligence was employed in doing the research for the preparation of this Memorandum, with the exception of the standard artificial intelligence embedded in WestLaw. Every statement and every citation to authority contained in this Memorandum has been checked by an attorney in this case as to the accuracy of the proposition for which it is offered.

This the 13th day of March, 2026

**KING & SPALDING LLC**

/s/ *Danielle T. Williams*
Danielle T. Williams
dwilliams@kslaw.com
N.C. Bar No. 23283
300 South Tryon Street, Suite 1700
Charlotte, NC 28202
Thomas M. Melsheimer – *Pro Hac Vice*
tmelsheimer@kslaw.com
Chad B. Walker – *Pro Hac Vice*
cwalker@kslaw.com
Tracea Rice – *Pro Hac Vice*
trice@kslaw.com
Alexandra Moore - *Pro Hac Vice*
almoore@kslaw.com
2601 Olive Street, Suite 2300
Dallas, TX 75201

Sarah F. Hutchins
N.C. Bar No. 38172
Tory Ian Summey
N.C. Bar No. 46437
Keith M. Weddington
N.C. Bar No. 14352
Charles G. Middlebrooks
N.C. Bar No. 55171
Madelyn R. Candela
N.C. Bar No. 63827
Bank of America Tower
620 South Tryon St., Suite 800
Charlotte, North Carolina 28202
sarahhutchins@parkerpoe.com

17

torysummey@parkerpoe.com
keithweddington@parkerpoe.com
charliemiddlebrooks@parkerpoe.com
madelyncandela@parkerpoe.com

*Attorneys for Joe Gibbs Racing, LLC*

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that the foregoing **PLAINTIFF JOE GIBBS RACING, LLC'S REPLY IN SUPPORT OF THE MOTION FOR PRELIMINARY INJUNCTION w**as electronically filed with the Clerk using the CM/ECF system which will automatically send notice and serve same upon counsel of record via the Court's electronic case filing system.

This the 13th day of March, 2026

**KING & SPALDING LLC**

/s/ *Danielle T. Williams*
Danielle T. Williams
dwilliams@kslaw.com
N.C. Bar No. 23283
300 South Tryon Street, Suite 1700
Charlotte, NC 28202
Thomas M. Melsheimer – *Pro Hac Vice*
tmelsheimer@kslaw.com
Chad B. Walker – *Pro Hac Vice*
cwalker@kslaw.com
Tracea Rice – *Pro Hac Vice*
trice@kslaw.com
Alexandra Moore - *Pro Hac Vice*
almoore@kslaw.com
2601 Olive Street, Suite 2300
Dallas, TX 75201

Sarah F. Hutchins
N.C. Bar No. 38172
Tory Ian Summey
N.C. Bar No. 46437
Keith M. Weddington
N.C. Bar No. 14352
Charles G. Middlebrooks
N.C. Bar No. 55171
Madelyn R. Candela
N.C. Bar No. 63827
Bank of America Tower
620 South Tryon St., Suite 800
Charlotte, North Carolina 28202
sarahhutchins@parkerpoe.com

torysummey@parkerpoe.com
keithweddington@parkerpoe.com
charliemiddlebrooks@parkerpoe.com
madelyncandela@parkerpoe.com

*Attorneys for Joe Gibbs Racing, LLC*