# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
#### Case No. 3:26-CV-00133-SCR-DCK

| | |
|---|---|
| JOE GIBBS RACING, LLC, <br><br> Plaintiff, <br><br> v. <br><br> CHRISTOPHER GABEHART and SPIRE MOTORSPORTS, LLC, <br><br> Defendants. | **DEFENDANT CHRISTOPHER GABEHART'S SUPPLEMENTAL FILING IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** <br><br> **[REDACTED]** |

## I.  INTRODUCTION

Defendant Christopher Gabehart ("Mr. Gabehart"), by and through undersigned counsel, respectfully submits this Supplemental Filing in Opposition to Plaintiff Joe Gibbs Racing, LLC's ("JGR" or "Plaintiff") Motion for Preliminary Injunction. Mr. Gabehart incorporates by reference all facts and arguments set forth in his Memorandum of Law in Opposition to Plaintiff's Motion for Preliminary Injunction (ECF 42) and does not repeat them here.

The expedited discovery authorized by this Court has only reinforced what Mr. Gabehart has maintained from the outset: JGR's motion rests on speculation, not proof. Despite extensive discovery, JGR has failed to identify a single instance in which Mr. Gabehart transmitted, disclosed, or used any JGR Confidential Information. And JGR's own documents confirm that it engaged in separation negotiations with Mr. Gabehart under Section 6 of the Employment Agreement, withheld his wages in breach of the Agreement, and then manufactured a pretextual "for cause" termination after retrieving from Mr. Gabehart all of its Confidential Information and finding no evidence of wrongful sharing or disclosure.

Mr. Gabehart's discovery responses expose the hollowness of JGR's Motion: There is no indemnification agreement with Spire, and there are no communications with Spire relating to JGR's race setups, analytics, sponsorships, or employee recruitment. JGR's request for an eighteen-month prohibition on Mr. Gabehart's livelihood finds no support in the evidence.

As he has previously indicated, Mr. Gabehart will consent to a preliminary injunction consistent with the confidentiality provisions of the Court's Temporary Restraining Order—relief that fully protects JGR's legitimate interests in its Confidential Information and Trade Secrets without the extraordinary measure of enforcing a legally-overbroad, factually-inapplicable noncompete. For the reasons set forth below and in Mr. Gabehart's prior memorandum, the Motion should be denied as to the noncompete claim.

## II.     ARGUMENT

### A.     Expedited Discovery Confirms JGR's Mishandling of the Termination Process

JGR seeks to enforce an 18-month noncompete that would effectively exile Mr. Gabehart from the industry to which he has devoted his entire career. To obtain that extraordinary relief, JGR must make it all the way down a multi-level "Waterfall"—clearing multiple independent hurdles, *each of which requires a clear showing that JGR is likely to prevail at trial*. The expedited discovery authorized by this Court disclosed internal JGR documents and communications that only reinforce the multiple reasons why the Court should deny JGR's request for enforcement of the noncompete.

"Waterfall" Level One: Unclean Hands. A party seeking equitable relief must itself have clean hands. "[I]njunctive relief to enforce the terms of a contract will not be granted a party who has himself breached the terms of the contract when his breach is substantial and material and goes to the heart of the agreement." *Combined Ins. Co. of Am. v. McDonald*, 36 N.C. App. 179, 182-83 (1978). JGR fails this threshold test:

- JGR stopped paying Mr. Gabehart's wages after November 10, 2025, even though he remained a contract employee until Coach Gibbs' purported "for cause" termination notice on February 9, 2026. Nothing can be more material in an employment contract than payment of wages. *See* N.C. Gen. Stat. § 95-25.6 (requiring payment on regular payday); N.C. Gen. Stat. § 95-25.7 (requiring payment upon termination on or before next regular payday).

- JGR_0000058-61[1]: JGR withheld Mr. Gabehart's earned 2025 performance bonus –approximately $235,000 – until after the contractual deadline, paying it only after counsel intervened. Compensation goes to the heart of an employment agreement. *See Inmar Brand Sols., Inc. v. Infinity Sales Grp., LLC*, No. 1:18-CV-761, 2019 WL 5597894, at *5 (M.D.N.C. Oct. 30, 2019). A copy of this document is attached hereto as **Exhibit A**.

- JGR_0000047: As late as November 17-18, JGR's Chief People Officer was still asking Mr. Carmichael for ▮▮▮▮▮▮▮▮▮▮▮ because ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ JGR's internal confusion over Mr. Gabehart's status – while simultaneously withholding his pay – demonstrates the administrative chaos that accompanied JGR's breach. A copy of this document is attached hereto as **Exhibit B**.

- JGR_0000306-308: On November 18, Mr. Carmichael texted that ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Yet JGR stopped paying Mr. Gabehart on November 10, breaching both its statutory wage obligations and its own executive's contemporaneous understanding of Mr. Gabehart's entitlement to compensation during the Section 6.2 process. A copy of this document is attached hereto as **Exhibit C**.

JGR forfeited any right to enforce a noncompete when it breached first. *See Maaco Franchising, LLC v. Ghirimoldi*, No. 3:15-CV-99, 2015 WL 4557382, at *6-7 (W.D.N.C. July 28, 2015) (denying preliminary injunction to enforce noncompete where defendant raised sufficient factual allegations supporting material breach by plaintiff). This is a black-and-white issue. JGR cannot clear this hurdle. The Court can stop here.

"Waterfall" Level Two: Was This a "For Cause" Termination? Even if JGR had clean hands (it does not), JGR still must show the 18-month noncompete was triggered. Under the

---

[1] Mr. Gabehart does not agree that all of the Confidential JGR Documents qualify as "Confidential" under the parties' Protective Order and believes that many of the Confidential JGR Documents actually fail to meet the requisite standard. But given the expedited timeline for this briefing, Mr. Gabehart's counsel has not had the opportunity to address these concerns through the meet-and-confer process contemplated by the Protective Order.

Employment Agreement, restrictive covenants apply "[e]xcept for termination without cause by Company or Term expiration." ECF 8-2 at 4. JGR's only path to the 18-month restriction is the February 9 "for cause" letter. Expedited discovery confirms at least two independent reasons why that termination was something other than "for cause."

(a) <u>Mr. Gabehart Invoked the Second Paragraph of Section 6, Reducing the Noncompete to One Week</u>. The second paragraph of Section 6 ("Section 6.2") provides an express mechanism for termination without cause upon written notice of job inconsistencies. Mr. Gabehart invoked this provision, and JGR's own documents show this was universally understood:

- JGR_0000008: On October 26, 2025, Mr. Gabehart emailed Mr. Carmichael documenting his conversation with Coach Gibbs, in which ███████ ████████████████████████████████████████████ This shows the parties were contemplating the Section 6.2 process. A copy of this document is attached hereto as **Exhibit D**.

- JGR_0000320-322[2]: On November 7, Mr. Gabehart sent Mr. Carmichael a detailed written memorandum titled "End of Year Job Resolution" documenting specific job inconsistencies, including that his "Job Description" was "Not, at all, as advertised." This satisfies Section 6.2's requirement of written notice identifying "specific job duties or responsibilities assigned to Employee that are inconsistent with Employee's reasonable expectations." ECF 8-2 at 4. A copy of this document is attached hereto as **Exhibit E**.

- JGR_0000277-278: On November 8, Mr. Carmichael texted Mr. Gabehart: "I don't believe your actual role was what Coach said it would be." Mr. Carmichael—the JGR executive who negotiated the Employment Agreement—thus acknowledged contemporaneously that Mr. Gabehart had valid grounds for invoking Section 6.2. A copy of this document is attached hereto as **Exhibit F**.

- JGR_0000030: On November 10, Mr. Carmichael sent separation terms including "Buyout of $100k" and "JGR will pay COBRA through December." The $100,000 figure is the precise amount Section 6.2 specifies for a mutual release—not a "coincidence." Days later, JGR sent Mr. Gabehart a draft separation agreement— waiving formalities such as the 60-day waiting period and cutting to the chase of

---

[2] As an example of JGR's over designation, JGR has now marked this document as "Confidential," yet it has previously filed it on the public docket. *See* ECF 18 at 6.

the "mutual release" called for in Section 6.2. A copy of this document is attached hereto as **Exhibit G**.

- JGR_0000055-056: On November 19, JGR's in-house counsel Eric Schaffer wrote that ███████████████████████████████ ██████ and that JGR was ████████████ ████ JGR's own in-house counsel understood the framework under which the parties were operating and negotiating a mutual release. A copy of this document is attached hereto as **Exhibit H**.

- JGR_0000306-308: Most significantly, on November 18, Mr. Carmichael texted Wally Brown: ██████████████████████████████ ███████████████████████████████ ███████████████████████████████ ██████████ triggering the framework that Section 6.2 prescribes.

  o *This contemporaneous text message is fundamentally at odds with the representations Mr. Carmichael made in his Second Declaration submitted in support of JGR's Motion for Temporary Restraining Order (ECF 18). In that sworn declaration, Mr. Carmichael stated under penalty of perjury that he was "not aware that Gabehart delivered any such written notice to JGR on or about November 6, 2025 or at any other time," and that he "did not understand Gabehart's email dated November 7, 2025 at 10:46 a.m. to constitute written notice under his Employment Agreement." See ECF 18 ¶¶ 4, 6. Yet on November 18, 2025—eleven days after receiving Mr. Gabehart's written notice—Mr. Carmichael texted Wally Brown that Mr. Gabehart "gave notice that coach wasn't living up to his contract so we have 60 or (120 days to give him what he wants or he can go somewhere else." This is not a matter of interpretation. Mr. Carmichael's November 18 text message demonstrates that he understood, contemporaneously, that Mr. Gabehart had invoked the notice provisions of Section 6.2. His subsequent sworn statements to the contrary—made three months later in an effort to support JGR's litigation position—cannot be reconciled with his own real-time communications.*

Because Mr. Gabehart invoked his right to a Section 6.2 termination, the 18-month noncompete does not apply. The fact that JGR breached Section 6.2 by failing to consummate the contractually-required separation does not change the result. Thus, Mr. Gabehart was subject (at most) to a one-week restriction, which has long since expired. *See Novacare Orthotics & Prosthetics E., Inc. v. Speelman*, 137 N.C. App. 471, 476 (2000) (denying preliminary injunction where there was a question as to whether a noncompete was triggered by proper termination).

(b) <u>Alternatively, JGR Effected a *De Facto* Termination Without Cause on November 10</u>.

Even if Section 6.2 were not invoked, JGR's conduct on November 10 constituted a de facto termination without cause—which also eliminates the noncompete:

- JGR_0000304-305: On November 6, Mr. Carmichael texted Wally Brown in reference to Mr. Gabehart's meeting with Coach Gibbs: ███████████████████ ████████████████████████████ Notably absent: any mention of misconduct, any reference to "for cause," any suggestion of wrongdoing. A copy of this document is attached hereto as **Exhibit I**.

- JGR stopped paying Mr. Gabehart on November 10 and initiated the Section 4(e) return-of-property process. *See Wyatt v. Nash Johnson & Sons Farms, Inc.*, 91 N.C. App. 255, 259 (1988) (employment terminated when plaintiff "work[ed] and [was] paid until but not after that time").

- JGR_0000250: JGR's internal Termination Payroll Notice lists the termination reason as ████████████████—not "for cause." The form notes ██████████ and ██████ ████████ reflecting uncertainty about the separation's nature. Regardless, "voluntary resignation" is not a "termination with cause" under Sections 4(a)-(c); it is a "termination without cause" under Section 4(d). Section 6's 18-month noncompete does not apply in the event of a "termination without cause." A copy of this document is attached hereto as **Exhibit J**.

The timeline creates a devastating dichotomy for JGR: If JGR refuses to accept Mr. Gabehart's invocation of Section 6.2, JGR either terminated Mr. Gabehart "without cause" on November 10 when it stopped paying him or, as JGR insists, on February 9, in which case it breached first by withholding wages for three months. Either way, there is no valid 18-month noncompete.

(c) <u>The February 9 "For Cause" Notice Was a Post-Hoc Litigation Maneuver</u>. JGR's February 9 termination letter came three months after JGR understood that Mr. Gabehart had validly exercised his termination right under Section 6.2. This timing reveals the February 9 letter for what it was: a strategic litigation maneuver to trigger a punitive noncompete. Coach Gibbs himself confirmed the mutual nature of the Section 6.2

6

separation in a February 12, 2026 SiriusXM interview—three days after the "for cause" letter—stating: "After the season, Chris and I met, and we just decided to go our separate ways."

- Notably, JGR's production in response to the expedited discovery did not include any nonprivileged documents related to the February 9 termination, strongly suggesting the long-belated "termination" was devised by counsel.

"Waterfall" Level Three: Even If the Noncompete Applies, It Is Unenforceable. Should the Court reach this level in the noncompete analysis (it should not), the noncompete fails as a matter of law for the reasons set forth in Mr. Gabehart's Memorandum of Law in Opposition to Plaintiff's Motion for Preliminary Injunction (ECF 42). The provision here attempts to bar Mr. Gabehart from "provid[ing] services of the general type of services" he provided to JGR. This language is impermissibly vague and overbroad. *See Accelerando, Inc. v. Relentless Sols., Inc.*, 2025 NCBC 29 ¶ 48 (striking down similar undefined "services" language). JGR's own filings confirm the ambiguity: it submitted a proposed order devoting eight pages to explaining what it *wishes* the noncompete said—terms that appear nowhere in the Agreement. Courts do not rewrite contracts to save them from fatal flaws. *See VisionAIR, Inc. v. James*, 167 N.C. App. 504, 508 (2004).

"Waterfall" Level Four: Even If Enforceable, Mr. Gabehart Is Not Violating It. Finally, even assuming the noncompete is enforceable (it is not), JGR cannot clearly show Mr. Gabehart is violating it because he is not "provid[ing] services of the general type of services" he provided in his final year at JGR. At Spire, Mr. Gabehart functions as an "Owners advocate." ECF 37 ¶ 21 ("Gabehart Second Decl."). He provides executive-level, enterprise-wide strategic and management services across multiple racing series—not the day-to-day Cup Series competition management he performed at JGR. *Id.* ¶ 17. Spire employs Matt McCall as its Competition

7

Director, the role corresponding to Mr. Gabehart's former position. *Id.* ¶ 11. As discussed in Mr. Gabehart's initial Memorandum in Opposition of JGR's Motion for Preliminary Injunction, Judge Bledsoe denied a TRO in a nearly identical NASCAR scenario in *RCR Enters., LLC v. McCall,* 2014 NCBC 68. In *McCall*, the court found the defendant's move from race engineer to crew chief did not violate his noncompete – which, like JGR's noncompete, prohibited him from being employed in a similar capacity with a competitor – because the new position involved "significant supervisory responsibility" and "substantial decision-making responsibility" that he lacked before. 2014 NCBC 68 at ¶¶ 28-31.

At every step of the "Waterfall," JGR is more likely than not to lose. The Court should therefore deny injunctive relief on the noncompete.

**B.     Expedited Discovery Has Further Demonstrated That Mr. Gabehart Has Not Disclosed Any JGR Confidential Information**

The expedited discovery process has only reinforced what Mr. Gabehart has maintained throughout these proceedings and what the earlier forensic examination showed: he has not transmitted, disclosed, or used any JGR Confidential Information.  JGR still cannot identify a single instance in which Mr. Gabehart transmitted, disclosed, or used any JGR Confidential Information.

This absence of evidence is fatal to JGR's motion. "An injunction should not be issued merely to allay the fears and apprehensions or to soothe the anxieties of a party. Nor will an injunction be issued to restrain one from doing that which he is not attempting to do." *FMC Corp. v. Cyprus Foote Min. Co.*, 899 F. Supp. 1477, 1484 (W.D.N.C. 1995). JGR asks the Court to infer harm from the mere fact that Mr. Gabehart once possessed certain information—information that has since been permanently deleted under a forensic protocol that JGR designed and agreed to.

Speculation and inference cannot substitute for the concrete evidence of harm that a preliminary injunction requires.

The confidentiality-related relief set forth in the Court's Temporary Restraining Order—to which Mr. Gabehart consents to including in a preliminary injunction order—provides JGR all the protection it needs and to which it is legally entitled. Specifically, Mr. Gabehart consents to a preliminary injunction requiring him to: (i) cease and desist from retaining, transferring, using, or copying JGR's Confidential Information and Trade Secrets; (ii) cease and desist from using or disclosing such information; and (iii) return any such information in his possession to JGR. Mr. Gabehart has also consented to further forensic examination, which the parties are working towards completing under a mutually agreed upon protocol. These provisions directly address the only legitimate interest JGR can claim—protection of its confidential information—while avoiding the extraordinary and unnecessary measure of enforcing an overbroad noncompete.

## C.      JGR Conflates Its Trade Secret and Noncompete Claims

Throughout its briefing, JGR has attempted to blur the line between its trade secret and noncompete claims. The law does not permit this conflation. These are distinct causes of action with different elements, different burdens of proof, and different remedies. *See RLM Commc'ns, Inc. v. Tuschen*, 66 F. Supp. 3d 681, 689, 695 (E.D.N.C. 2014), *aff'd,* 831 F.3d 190 (4th Cir. 2016) (listing different elements of breach of contract vs. trade secret misappropriation claims). No matter how hard JGR pushes to merge the two, the noncompete question must be analyzed separately from the trade secret question. Confusion on this point risks granting relief that is not legally available for the claim actually at issue.

For trade secret misappropriation, the appropriate relief at this stage is a preliminary injunction against disclosure or use of the trade secrets themselves—precisely the relief to which

Mr. Gabehart has consented. *See* N.C. Gen. Stat. § 66-154(a). Trade secret laws are "meant to be a shield to preserve the trust in confidential relationships, 'not a sword to be used by employers to retain employees by the threat of rendering them substantially unemployable in the field of their experience.'" *Katch, LLC v. Sweetser*, 143 F. Supp. 3d 854, 867 (D. Minn. 2015) (quoting *E.W. Bliss Co. v. Struthers-Dunn, Inc.*, 408 F.2d 1108, 1112-13 (8th Cir. 1969)); *see also Vexas, LLC v. Hill Enters., LLC,* No. A-09-CA-791-SS, 2010 WL 11602723, at *2 (W.D. Tex. Mar. 30, 2010) ("Plaintiffs' arguments consistently conflate their claims for breach of contract and misappropriation of trade secrets.").

Noncompete enforcement, by contrast, is a remedy available only for breach of a contractual noncompete provision – and only where the movant can demonstrate the provision was triggered, is enforceable, and is being violated. JGR cannot bootstrap inadequate evidence of trade secret misappropriation into an eighteen-month prohibition on Mr. Gabehart's ability to work in his chosen profession. *See Katch*, 143 F. Supp. 3d at 867-68 (explaining that trade secret misappropriation claims "should not act as an ex post facto covenant not to compete.").

The practical implications are significant. Mr. Gabehart consents to preliminary relief that fully protects JGR's trade secrets. He is also bound by the confidentiality obligations in Section 5 of the Employment Agreement and his NDA with Spire. JGR's legitimate interest in protecting its confidential information is fully addressed through these mechanisms. What JGR seeks on the noncompete claim is something different entirely: an order essentially barring Mr. Gabehart from working in his profession for eighteen months. That relief is available, if at all, only if JGR can demonstrate likelihood of success on its breach of contract claim—which, for the reasons set forth above and confirmed through the expedited discovery, it cannot. The Court should analyze the noncompete claim on its own merits and deny relief because JGR has failed to meet its burden.

## D. Update on Discovery and Forensic Matters

In his response to JGR's expedited discovery requests seeking communications relating to Mr. Gabehart's potential employment and role at Spire, Mr. Gabehart disclosed the following:

> Mr. Gabehart further responds that his text messages with Mr. Dickerson prior to November 15, 2025 were deleted and are not available at this time. The deletion occurred on November 15, 2025, before litigation was threatened or reasonably anticipated, and therefore Mr. Gabehart was under no legal duty at that time to preserve information related to this lawsuit. Mr. Gabehart did exchange texts with Mr. Dickerson before November 15, 2025, and to the best of his memory at least one of those texts would be responsive to this Request. In particular, Mr. Gabehart recalls receiving a text from Mr. Dickerson on or around November 13, 2025 in which Mr. Dickerson communicated the framework of an unsolicited offer to become the Chief Motorsports Officer at Spire. Mr. Gabehart does not deny that texts with Mr. Dickerson prior to November 15, 2025 regarding potential employment at Spire would be discoverable, if available, and every effort is being made to recover them.

JGR doubtless will attempt to exploit Mr. Gabehart's disclosure. Given the seriousness of a spoliation remedy, courts typically only consider spoliation motions later in a proceeding after a full discovery process has supplied important context. *See, e.g.*, *Taylor v. Walter Kidde Portable Equip., Inc.,* No. 1:21-CV-839, 2025 WL 1758347, at \*15 (M.D.N.C. May 28, 2025), *report and recommendation adopted,* No. 1:21-CV-839, 2025 WL 1755911 (M.D.N.C. June 25, 2025) (collecting cases) ("A motion for sanctions for spoliation is more appropriate later in the case when the court is considering motions in limine and other trial administration topics."); *Bullens v. OpenAI L.P.*, No. 1:25-CV-01024, 2025 WL 2097419, at \*3 (S.D. Ind. July 25, 2025) (denying sanctions motion as premature when discovery had not yet begun); *Groves Inc. v. R.C. Bremer Mktg. Assocs.*, No. 22 CV 50154, 2024 WL 4871368, at \*5 (N.D. Ill. Nov. 22, 2024) ("There are some excellent reasons for delaying a decision on alleged spoliation."). For multiple reasons, the Court should not indulge any request for a spoliation finding, adverse inference, or any other sanction – especially not at such an early stage of the case.

First, the deletion occurred on November 15, 2025, at a time when litigation was nowhere on anyone's mind, much less threatened or reasonably anticipated. At that time, Mr. Gabehart had not even provided comments to the draft of the separation agreement JGR provided to him in connection with his exercise of his contractual Section 6.2 termination right. *See, e.g.*, JGR_0000002-03 (attached hereto as **Exhibit K**). Mr. Gabehart was therefore under no legal duty to preserve the texts at the time he deleted them. Under Rule 37(e), sanctions are available only when ESI "should have been preserved in the anticipation or conduct of litigation." Fed. R. Civ. P. 37(e). The duty arises "somewhere between knowledge of the dispute and direct, specific threats of litigation." *Bhattacharya v. Murray*, No. 3:19-CV-00054, 2022 WL 1510550, at *4 (W.D. Va. May 12, 2022).

On November 15, no external event triggering a duty to preserve had occurred: The parties were negotiating an amicable separation; no accusations of wrongdoing had been made; and no preservation demand or threat of litigation had been communicated. *See Matthews v. Herc Rentals Inc.*, No. 7:21-CV-89-BO, 2023 WL 8190155, at *3 (E.D.N.C. Nov. 27, 2023) (no spoliation where deletion occurred prior to triggering of preservation duty).

Second, as Mr. Gabehart's response states, efforts to recover the texts are ongoing. They could still be recovered. In addition, there are means by which to discover the same substantive information. Already, Mr. Gabehart has produced a spreadsheet he created on November 13 memorializing the framework of the Spire offer as relayed in the text of the same day that he references in his discovery response. Depositions are another means. *See ,e.g., Paul v. W. Express, Inc.*, No. 6:20-CV-00051, 2021 WL 8083473, at *4 (W.D. Va. Oct. 27, 2021).

Third, any adverse inference JGR requests would be contrary to the known facts. For the Court to assume that texts between Mr. Gabehart and Mr. Dickerson would somehow be harmful,

there would need to be some evidentiary basis to connect Mr. Dickerson to a claim against Mr. Gabehart. No such evidentiary nexus exists. There was no noncompete in play on November 15—the "for cause" termination did not occur until February 9, 2026. There is no evidence that JGR Confidential Information was shared with Spire. Both Mr. Gabehart and Mr. Dickerson have declared under oath that no JGR information has been shared or disclosed. And common sense confirms the point: If Mr. Gabehart had shared confidential information via text and then deleted the texts to cover his tracks, surely he would have deleted the files themselves from his phone and Google Drive at the same time. As the Court is well aware, he did not.

Pursuant to this Court's March 18, 2026 Order (ECF 48), the Court directed Mr. Gabehart to permit a forensic review of all devices and accounts pursuant to a protocol agreed to by the parties. The parties are currently working through the final details of the forensic examination protocol. Already, though, all of Mr. Gabehart's devices and accounts—including his personal laptop, smartphones, and cloud storage—have been imaged and preserved by a third-party forensic expert, Alvarez & Marsal. This comprehensive preservation ensures that all potentially relevant electronically stored information has been captured and secured pending completion of the agreed-upon protocol.

### III. CONCLUSION

For the foregoing reasons and those included in prior filings, Defendant Christopher Gabehart respectfully requests that this Court deny Plaintiff Joe Gibbs Racing, LLC's Motion for Preliminary Injunction. Mr. Gabehart, however, is willing to consent to a preliminary injunction that is consistent with the language of subsections (i), (ii), and (iii) of the Court's Temporary Restraining Order, ECF 26.

Respectfully submitted,

This the 25th day of March, 2026.

By: */s/ Cary B. Davis*
Cary B. Davis
N.C. Bar No. 36172
cdavis@rbh.com

Spencer T. Wiles
N.C. Bar No. 53664
swiles@rbh.com

William M. Miller
N.C. Bar No. 36946
wmiller@rbh.com

Anna Claire Tucker
N.C. Bar No. 59457
atucker@rbh.com

ROBINSON, BRADSHAW & HINSON, P.A.
600 S. Tryon Street, Suite 2300
Charlotte, North Carolina 28202
(704) 377-2536

*Attorneys for Defendant Christopher Gabehart*

# ARTIFICIAL INTELLIGENCE CERTIFICATION

Pursuant to the Court's June 18, 2024 Order, 3:24-mc-104, I hereby certify that:

- No artificial intelligence was employed in doing the legal research for the preparation of this document, with the exception of such artificial intelligence embedded in standard on-line legal research sources such as Westlaw, Lexis, FastCase, and Bloomberg; and

- Every statement and every citation to an authority contained in this document has been checked by an attorney at this firm and/or paralegal working at their direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

This the 25th day of March, 2026.

/s/ *Cary B. Davis*
Cary B. Davis

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
### Case No. 3:26-CV-00133-SCR-DCK

| | |
|---|---|
| **JOE GIBBS RACING, LLC,**<br><br>**Plaintiff,**<br><br>v.<br><br>**CHRISTOPHER GABEHART and SPIRE MOTORSPORTS, LLC,**<br><br>**Defendants.** | **INDEX OF EXHIBITS TO:**<br><br>**DEFENDANT CHRISTOPHER GABEHART'S SUPPLEMENTAL FILING IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>**[Filed Provisionally Under Seal]** |

| EXHIBIT: | DESCRIPTION: | SEALING STATUS: |
|---|---|---|
| A | Email dated 11/25/2025 regarding Gabehart Performance Bonus | Filed Provisionally Under Seal |
| B | Emails dated 11/17 and 11/18/2025 regarding Gabehart Pay | Filed Provisionally Under Seal |
| C | Text message dated 11/18/2025 regarding Gabehart Meeting | Filed Provisionally Under Seal |
| D | Email dated 10/26/2025 regarding Gabehart Job Duties | Filed Provisionally Under Seal |
| E | Email dated 11/7/2025 regarding Gabehart Job Duties | Filed Provisionally Under Seal |
| F | Text message dated 11/8/2025 regarding Meeting and Notice | Filed Publicly/No Sealing |
| G | Email dated 11/10/2025 regarding Gabehart Separation Details | Filed Publicly/No Sealing |
| H | Email dated 11/20/2025 regarding Gabehart Separation Agreement | Filed Provisionally Under Seal |
| I | Text message dated 11/6/2025 regarding Gabehart Meeting | Filed Provisionally Under Seal |
| J | Gabehart Payroll Notice dated 11/11/2025 | Filed Provisionally Under Seal |
| K | Email dated 11/17/2025 regarding Gabehart Separation Agreement | Filed Provisionally Under Seal |

# EXHIBIT A

# [Filed Under Seal]

# EXHIBIT B

## [Filed Under Seal]

# EXHIBIT C

## [Filed Under Seal]

# EXHIBIT D

# [Filed Under Seal]

# EXHIBIT E

## [Filed Under Seal]

# EXHIBIT F

# Short Message Report

| Conversations: 1 | Participants: 3 |
| Total Messages: 2 | Date Range: 11/8/2025 |

## Outline of Conversations

 • 2 messages on 11/8/2025 • Chris Gabehart • Tim Carmichael

JGR_0000277



**TC**    **Tim Carmichael** ·                                    ► 11/8/2025, 8:21 AM

I wouldn't say unreasonable, but some of your conclusions I don't necessarily agree with.

This is all a little difficult for me to comment on because I don't believe your actual role was what Coach said it would be.  It is difficult for me because I believe what is best for JGR is for you to run competition not everything…. But that is irrelevant because that is not what you want and not what you were told you would have.

I read this as you are done and you want to tell him all the things they did wrong on your way out. I don't have an issue with you voicing your opinions, but I wish it was in a tone that was trying to solve the issues.  I do not read your email as trying to reach a place you could both live with and where JGR could be successful and I wish you were seeking a different outcome, though I don't blame you.

> **CG**    **Chris Gabehart** ·                                    ◄ 11/8/2025, 8:39 AM

Well, without the meetings context, what I wrote missed the mark then.

My intentions are to be honest with my issues as of today so, through awareness,  we can work to resolve them.

Ultimately, I have a hard time understanding how all of it isn't part of competition, outside of keeping up with the business aspects of the decisions we make which I would gladly leave to someone like you. In fact,  I thought you've said all along that you felt like what Michael was hired to do and what he had drawn up as competition director was 2 roles where you thought it should be one.

The 54 piece is obviously the hard one, in the end. I fundamentally believe how it is being handled isn't what's best for the company. And, though I 100% agree its his right to do what he wants for his family and would never want to take that away from him (and told him so), I can't support something of that magnitude that I think isn't good for the company.

Receipts • Tim Carmichael                      [R:11/8/2025, 8:44 AM]

# EXHIBIT G

**From**: Tim Carmichael [tcarmichael@JoeGibbsRacing.com]
**Sent**: 11/10/2025 3:22:50 PM
**To**: chris.gabehart@gmail.com
**Subject**: JGR Separation Details

JGR is presenting the following for a mutual agreement for JGR and Chris to each go in a different direction immediately.

1.      Base pay through the end of today 11/10/25

2.      Bonuses earned through today - I believe that is $235k

3.      Buyout of $100k

4.      JGR will pay COBRA through December

5.      2-year non-solicitation contract for all employees and contract laborers who are employed/working for JGR as of 11/10/25 or are under contract as of 12/1/25 (new employees/contractors signed but starting as of our new fiscal year)

6.      Chris/JGR will agree on a mutual non-disparagement language to be put in the separation agreement as an exhibit.  There will be financial and other penalties if either side breaches (JGR is Coach/Heather/Pern/Michael).

7.      Chris/JGR will agree on PR talking points/when we will go public/whether there will be one release for both parties or a separate release for both parties.

8.      JGR will turn off building and computer access as of 11/10/25.

9.      Chris turns in computer/credit card/keys/etc by 11/14/25.

10.     Chris turns in company car no later than 11/26/25.

11.     If asked, both sides will represent publicly that Chris is on vacation until the agreement is final.

12.     Chris will let Tim know by tomorrow what he accepts and if there is anything he does not accept he will present a counter proposal or additional points by tomorrow.

13.     Once both sides complete the items on this list, JGR will present a mutual release contract to Chris within 24 hours.

Please let me know if there is anything you want me to present to Coach/Heather differently, otherwise I will send the same email to them.

Thanks,
Tim

# EXHIBIT H

# [Filed Under Seal]

# EXHIBIT I

## [Filed Under Seal]

# EXHIBIT J

## [Filed Under Seal]

# EXHIBIT K

## [Filed Under Seal]