JOE GIBBS RACING, LLC,

     Plaintiff,

     v.

CHRISTOPHER GABEHART and SPIRE
MOTORSPORTS, LLC,

     Defendants.

**PLAINTIFF JOE GIBBS RACING,
LLC'S SECOND SUPPLEMENTAL
BRIEF IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION**

1

**INTRODUCTION**

Plaintiff Joe Gibbs Racing, LLC ("JGR") respectfully submits this Second Supplemental Brief in Support of its Motion for Preliminary Injunction. Since the Court's hearing on JGR's application for a temporary restraining order and subsequent hearing concerning additional requested discovery, expedited discovery from Defendant Christopher Gabehart ("Gabehart") has produced evidence that reinforces JGR's entitlement to the requested injunctive relief against both Gabehart and Defendant Spire Motorsports, LLC ("Spire").

That evidence reveals Gabehart did not merely take JGR's trade secrets—he immediately operationalized them for Spire's benefit, creating a detailed "Focus Plan" referencing the very categories of misappropriated materials, replicating JGR's proprietary analytics tools for Spire's use, and apparently actively participating in Spire's NASCAR race-day operations while still subject to his restrictive covenant. Equally troubling, Gabehart has now admitted the deletion of an unknown number of responsive text messages with Spire's co-owner, Jeff Dickerson—communications deleted in the days immediately following his misappropriation—depriving JGR of critical evidence and warranting an adverse inference that the deleted messages would have further implicated both Defendants in the joint misappropriation of JGR's trade secrets. In short, the cumulative record amply justifies broad injunctive relief—coupled with court-ordered monitoring—can protect JGR from the "threat" of irreparable harm that continues to unfold.

The expedited evidence also confirms that Gabehart did not invoke the shortened non-compete period, and that JGR is also entitled to the requested relief based on its breach of contract and tortious interference causes of action.

2

**I.** **The Expedited Evidence Bolsters JGR's Entitlement to Trade Secret Relief Against Both Gabehart and Spire.**

**A.** *Gabehart's Deletion of Evidence Underscores the Risk of Ongoing Misappropriation and Supports Injunctive Relief Against Spire.*

The expedited discovery has revealed the "credibility issues" that the Court identified at the TRO hearing. *See* TRO Hr'g Tr. 36:16–19. The record now shows that Gabehart not only misappropriated JGR's trade secrets and sought to conceal that theft, but also destroyed the very evidence that could further reveal how those secrets were used and with whom they were shared. *See generally* Walton Decl. [Dkt. 9-4]; *see also* Gabehart's Resp. to Pl.'s First Set of RFPs No. 1.

In response to JGR's expedited discovery requests, Gabehart admitted that he deleted "text messages with Mr. Dickerson, the Spire co-owner, prior to November 15, 2025," rendering them "not available at this time." *See* Gabehart's Resp. to Pl.'s First Set of RFPs No. 1. The timing of this deletion is telling. Gabehart deleted these communications the week after misappropriating JGR's trade secrets on November 7, 2025—and he accessed his "Spire" Google Drive folder on that very same day, November 15. Walton Decl. [Dkt. 9-4] at ¶ 14. This sequence of events— misappropriation, followed days later by manual and selective deletion of communications with the co-owner of the very company to which the stolen information would have such value— justifies JGR's request for an injunction to protect against threatened misappropriation, a claim recognized under both federal and North Carolina trade secret law.

Gabehart now concedes that "to the best of his memory at least one of those texts would be responsive to" JGR's expedited discovery requests. Gabehart's Resp. to Pl.'s First Set of RFPs No. 1. But he fails to provide any explanation for why he deleted what he acknowledges was an unspecified number of responsive messages. *Id.* Rather than explain why he selectively purged communications with Spire's co-owner shortly after misappropriating JGR's trade secrets, Gabehart argues the deletion preceded any duty to preserve because there was no threat of litigation

at the time. *Id.* That legal argument may be a defense to a formal obstruction of justice charge, but it does not make his conduct any less relevant to the issue before this Court. Under well-established North Carolina law, "[t]he obligation to preserve evidence may arise prior to the filing of a complaint where the opposing party is on notice that litigation is likely to be commenced." *Arndt v. First Union Nat. Bank*, 170 N.C. App. 518, 528, (2005). As such, a formal litigation demand is not required to trigger a preservation duty; rather, notice of a "*potential claim* at the time of the destruction" is sufficient. *Id.* (citation and quotation omitted) (emphasis added). "The duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation." *Silvestri v. GMC*, 271 F.3d 583, 591 (4th Cir. 2001).

Thus, the question is not whether Gabehart subjectively understood the specific contents of his communications would be "relevant," but whether he knew—or should have known—that litigation was likely once his misconduct came to light. Here, the surviving texts show that, by at least November 18, 2025—contemporaneous with the November 15 deletion—both Gabehart and Dickerson were discussing a potential lawsuit, rendering litigation reasonably foreseeable by both defendants. GABEHART00047 (mentioning "settlement talks" and a "[l]awsuit"). As such, he either anticipated his actions would eventually be discovered and deleted the messages to eliminate evidence central to the dispute—the essence of spoliation, or he believed he could avoid being caught and deleted them as part of a scheme to reduce the likelihood of exposure. In either scenario, he cannot now invoke the resulting evidentiary void as a shield.

Further, Gabehart has offered no innocent explanation for why he singled out his text messages with Dickerson—and only those messages—for deletion on November 15, 2025. Given that Gabehart has provided no contrary explanation, the logical inference is that he deleted these

messages precisely because he knew they could be harmful in anticipated litigation. Additional evidence of Gabehart's anticipation of litigation on or before November 15, 2025, includes: (1) his decision on November 7, 2025, to photograph JGR's trade secrets and confidential information, by taking pictures of his laptop screen rather than forwarding or downloading files—a method plainly designed to avoid forensic detection, *see* Walton Supp. Decl. [Dkt. 35-12] at ¶ 10; and (2) his accessing documents in the "Spire' Google Drive folder on November 12, 13, and 15 to use for Spire's benefit. Walton Decl. [Dkt. 9-4] at ¶ 14.

Moreover, Gabehart's own experience at JGR gave him specific, concrete knowledge of how JGR responds to trade secret theft—and thus every reason to anticipate litigation. In 2024, while serving as JGR's Competition Director, Gabehart played a central role in investigating another employee who attempted to take JGR's confidential information after accepting employment with a direct competitor. Brown Decl. [Dkt. 9-2] at ¶¶ 18–20. Because Gabehart worked closely with JGR's senior leadership, he was directly involved in JGR's response to that employee's misconduct, including the legal actions JGR pursued against that employee. *Id.* Gabehart thus knew precisely how JGR responds to trade secret theft and was on clear notice of the consequences that would follow if his own misconduct were discovered.

Gabehart's destruction of evidence has significantly impaired JGR's ability to determine whether and the extent to which JGR's confidential information was transmitted to Spire in advance of the hearing on JGR's Motion for Preliminary Injunction. Because expedited discovery was limited to Gabehart alone, JGR has had no ability to obtain corresponding documents from Spire to fill the gaps that Gabehart's spoliation has created. As JGR's forensic examiner attested, the forensic review could not exclude the possibility that JGR information was shared through deleted text messages, web-based email portals, Google Photos, or other file-sharing platforms.

Walton Decl. [Dkt. 9-4] at ¶ 30. Nor could the review determine whether Gabehart possessed undisclosed devices, accounts, or repositories containing JGR information. *Id.* The review permitted to date further could not reveal whether Gabehart shared access to files via cloud storage or file-sharing accounts, both of which he possessed and used during the relevant time frame. The destruction of messages that may have discussed such access that would not be revealed through email or other transmissions compounds these limitations. Gabehart's Resp. to Pl.'s First Set of RFPs No. 1.

Gabehart's spoliation therefore deprives JGR of critical evidence bearing on: whether Gabehart shared JGR's trade secrets with Spire's co-owner; the scope and substance of his pre-departure communications with Spire; whether he coordinated with Spire to target specific JGR materials; whether Spire directed or encouraged solicitation of other JGR employees; and the extent of Spire's knowledge of—or participation in—Gabehart's scheme to arm himself with JGR's trade secrets before assuming his role as Spire's Chief Motorsports Officer. The full extent of Gabehart's communications with Spire now remains concealed behind evidence that Defendants alone destroyed or continue to withhold.

Yet, even the limited evidence that has been produced definitively demonstrates multiple instances of Gabehart operationalizing confidential JGR information use with Spire. *See infra* Section I.B; Brown Supp. Decl. ¶¶ 5–19. Gabehart's deliberate destruction of evidence both factually and legally warrants an adverse inference that the deleted communications were damaging to both him and Spire. While the conduct need only be intentional, the evidence establishes both intentional and bad-faith spoliation that implicates both Defendants. *See Turner v. United States*, 736 F.3d 274, 282 (4th Cir. 2013). Gabehart systematically concealed his misconduct: he secretly photographed JGR's trade secrets to avoid forensic detection, stockpiled

them in a Google Drive folder labeled "Spire," repeatedly accessed that cache after his departure, and now, only through objected to expedited discovery, it is revealed that Gabehart deleted relevant text messages with Spire's co-owner. Walton Supp. Decl. [Dkt. 35-12] at ¶¶ 10–11, 15, 17–18, 21, 26. This pattern of concealment points directly to Spire—the entity now paying Gabehart a ███████████████████████████████████████ contract. Gabehart Second Decl. [Dkt. 38] at ¶ 22. The terms of that agreement only heighten the inference that both parties understood Gabehart would be bringing JGR's competitive advantages with him. On the limited, non-spoliated record alone, the evidence surpasses speculation and supports an inference of coordinated wrongdoing by Gabehart and Spire.

The law squarely supports an adverse inference under these circumstances. In *Bimbo Bakeries USA, Inc. v. Botticella*, the Third Circuit affirmed an adverse inference based on a defendant's failure to present testimony at a preliminary-injunction hearing, recognizing that trade-secret claims are often proven through circumstantial evidence and that a party's silence permits the inference that the missing evidence would be unfavorable. 613 F.3d 102, 117–18 (3d Cir. 2010) (quoting *SI Handling Sys., Inc. v. Heisley*, 753 F.2d 1244, 1261 (3d Cir. 1985)). Gabehart's conduct is more egregious. He not only remained silent during his objections to discovery requests, but also destroyed the very evidence that would reveal what he communicated to Spire's co-owner. If silence justifies an adverse inference, intentional destruction compels one. North Carolina courts likewise permit an adverse inference where a party destroys relevant communications while anticipating litigation. *See Rel. Ins., Inc. v. Pilot Risk Mgmt. Consulting, LLC*, No. 22 CVS 4285, 2024 WL 3549145, at *15 (N.C. Super. July 12, 2024). Accordingly, an adverse inference against both Gabehart and Spire—that the deleted messages evidenced their joint misappropriation of

JGR's trade secrets—is warranted and abundantly supports the issuance of broad injunctive relief against both Gabehart and Spire.

### B. The Expedited Evidence Confirms the Necessity of Enjoining Spire from Using, Retaining, or Disclosing JGR's Trade Secrets.

The expedited discovery confirms what the existing record already strongly suggested: Gabehart accessed JGR's most competitively sensitive information, systematically operationalized it for Spire's benefit, and did so with Spire's knowledge and encouragement. The newly produced evidence establishes four independent grounds—each sufficient on its own and overwhelming in combination—demonstrating far more than "a mere remote and speculative possibility of harm" and warranting injunctive relief against Spire.

North Carolina courts have expressly rejected the contention that plaintiffs must establish actual misappropriation to obtain an injunction against a competitor. *Am. Air Filter Co., Inc. v. Price*, No. 16 CVS 13610, 2017 WL 485517, at *7 (N.C. Super. Feb. 3, 2017) (rejecting defendant's argument that "a preliminary injunction should issue only where actual misappropriation is demonstrated") (internal quotations omitted). Rather, a "[d]efendant's knowledge of trade secrets and opportunity to use those in his work for his new employer create a threat of misappropriation" by both defendant and his new employer. *Id.* at *7. It is particularly proper to enjoin *both* defendants in circumstances that demonstrate an employee is using the plaintiff's trade secrets to directly benefit its competitor. *See Prysmian Cables & Systems USA, LLC v. Szymanski*, 573 F. Supp. 3d 1021, 1044 (D.S.C. 2021) (enjoining both the former employee and new employer where the former employee emailed himself plaintiff's "business blueprint" and "initiated plans for an analogous [project] to compete with" plaintiff). The expedited discovery

bolsters four compelling grounds that demonstrate "more than a mere remote and speculative possibility of harm" that warrants extending trade secret relief to Spire.[1]  *Id.* at 1044.

Like the plaintiff in *Prysmian* Cables, Gabehart did not merely take JGR's trade secrets, he immediately set out to operationalize them for Spire.  *Id.*  Within fifteen days of ceasing to provide services for JGR and days after receiving Spire's lucrative offer, Gabehart created a "Focus Plan" for his new employer, produced in the expedited discovery.  GABEHART00092. That document functions as a roadmap for leveraging JGR's confidential information, expressly referencing specific categories of documents Gabehart misappropriated from JGR, including setup procedures, CC (Crew Chief) audits, driver debriefs, and performance analytics. *Compare* GABEHART00092, *with* Walter Decl.at Ex. 4; para. 23  [9-4] ; Walton Supp. Decl. at para. 10, 19 [35-12] . Gabehart then migrated the plan into *Spire*-branded materials. *Compare* GABEHART00092, *with* GABEHART00094. As JGR's current Competition Director testified, each of these categories reflects highly sensitive trade secrets developed through years of confidential engineering, data analysis, and competitive experience. Brown Second Decl. [Dkt. 35-3] ¶¶ 57–58, 65.  The expedited discovery further shows that Gabehart moved beyond planning to execution. In January 2026, Gabehart then created a Spire spreadsheet that closely replicates JGR's proprietary race-performance analytics tool. GABEHART00222; Brown Third Decl. [Ex. B] ¶¶ 5–6, 13. The

---

[1] While some of the subsequent authorities invoke "inevitable disclosure" by name—a label North Carolina has not formally adopted—their reasoning applies with full force here because North Carolina recognizes the same functional concept under its threatened-misappropriation framework. In *Merck & Co. v. Lyon*, the court—after surveying North Carolina precedent—concluded that North Carolina would enjoin threatened misappropriation on an inevitable-disclosure theory where relief is narrowly tailored to specifically identified trade secrets, guided by factors such as role similarity, the value of the information, safeguards by the new employer, and the employee's lack of candor. 941 F. Supp. 1443, 1458–60 (M.D.N.C. 1996).  Drawing from *Travenol Laboratories, Inc. v. Turner*, North Carolina evaluates the risk of disclosure by considering the circumstances of departure, the employee's position and duties, and the nature and competitive value of the information. 30 N.C. App. 686 (1976). And where the trade secrets are clearly established, the risk of disclosure is high, and the value to a competitor is great, North Carolina courts will issue an injunction even absent bad faith. *Merck*, 941 F. Supp. at 1459–60. Here, the record goes further: it reflects affirmative concealment and coordinated conduct that materially strengthens the case for injunctive relief against Spire.

spreadsheet duplicates JGR's confidential metrics, diagnostic categories, and analytical methodology—including uniquely JGR-specific classifications—and it was already being populated with Spire race data during the Daytona 500 Race. *Id.* ¶¶ 8, 14, 16–19; GABEHART00406–407. The resemblance is not coincidental; it reflects the direct migration of JGR's trade-secret framework to Spire—conferring an immediate competitive advantage to Spire that is grounded in stolen information. Put simply, JGR "finds itself in the position of a coach, one of whose players has left, playbook in hand, to join the opposing team before the big game." *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1270 (7th Cir. 1995).

Second, Gabehart continued to harvest JGR's trade secrets after receiving an employment offer from Spire—conduct North Carolina courts have found sufficient to warrant injunctive relief. In *American Air Filter*, the court enjoined a former employee who, after receiving a competing job offer, remained employed and accessed confidential systems and files for weeks. 2017 WL 485517, at *9. The parallels here are striking—and the facts more egregious. As shown in previously submitted evidence, Gabehart was in active discussions with Spire by October 2025, meeting with its principals and repeatedly accessing Spire's website. Berrier Second Decl. [Dkt. 46-4] ¶¶ 2–3; Walton Decl. [Dkt. 9-4] ¶¶ 12–13. While still employed by JGR, he accessed and photographed its most sensitive trade-secret materials on November 7, 2025. Walton Decl. ¶¶ 22–23. After departing JGR, he repeatedly accessed a Google Drive folder labeled "Spire" containing JGR's trade secrets throughout November and December 2025. *Id.* ¶ 14.

Newly produced expedited discovery reinforces this pattern. On November 13—one of the same days he accessed the Spire folder—Gabehart was already running compensation projections tied to NASCAR performance for Spire, modeling ▮▮▮▮▮▮ earnings labeled "My Cut." GABEHART00029; Walton Decl. [Dkt. 9-4] ¶¶ 12–13. In January, Gabehart communicating

10

with Spire's human resources personnel concerning onboarding. GABEHART000265–66. By early February 2026, he was coordinating directly with Spire's President regarding organizational structure and attending in-person meetings—weeks before his supposed start date and before JGR had terminated him for cause. *Id.*; GABEHART000290; GABEHART000292; *see also* Dkt. 8-3. In short, Gabehart's conduct mirrors *American Air Filter* in every material respect—and exceeds it in scope.

Third, Gabehart's agreement with Spire not to disclose or use JGR's confidential information does nothing to diminish the threat of misappropriation, particularly where the record suggests it was only crafted for public appearances. On February 11, 2026, as JGR prepared to seek emergency relief, but before this action was filed on February 19, 2026, the expedited discovery shows Gabehart and Spire's co-owner exchanged text messages strategizing over the potential lawsuit. GABEHART000398–99. In those messages, Dickerson explicitly described the request for emergency relief as signaling that "it's on," and Gabehart later remarked that the only remaining issue with the employment agreement was how to frame language referencing JGR "given all of this." *Id.* This admission suggests that the February 16, 2026, Confidentiality and Non-Disclosure Agreement was not a bona fide safeguard, but a reactive document hastily assembled once litigation became inevitable and designed to manufacture the appearance of compliance rather than protect JGR's interests. Dkt. 12-9. The court need not credit such a transparent post-hoc stratagem, particularly where the surrounding evidence shows the parties were prepared to proceed until JGR intervened.

Fourth, the expedited discovery supports the inference that Spire agreed to indemnify Gabehart—conduct North Carolina courts recognize as probative of tortious interference. *See United Lab'ys, Inc. v. Kuykendall*, 322 N.C. 643, 663 (1988). As previously shown, on December

11

4, 2025—one day after JGR's Chief Commercial Officer warned Spire's President that hiring Gabehart would constitute tortious interference—Gabehart searched "indemnify" shortly after midnight. Walton Supp. Decl. [Dkt. 22-3] ¶¶ 7–8. Later text messages between Dickerson and Gabehart—obtained in expedited discovery—supply additional context that support an inference of interference under *United Laboratories*, 322 N.C. at 663. That is, on February 22, 2026, while expressing "everyone [was] excited to see [Gabehart's response]," presumably to JGR's claims filed two days before, Dickerson stated Spire was also "in the boat." GABEHART000551-553; *See generally* Original Complaint [Dkt. 1]. Gabehart responded that Dickerson's support meant "the world" to him. GABEHART000551. Read alongside Gabehart's contemporaneous indemnity search and escalating litigation exposure, this exchange is indicative of Spire's commitment to stand behind Gabehart financially during the litigation. Given the entire record, the Court has solid grounds to draw this inference.

In sum, the expedited discovery eliminates any doubt that Spire is a knowing beneficiary of Gabehart's misappropriation. Gabehart operationalized JGR's trade secrets for Spire's benefit, continued harvesting confidential information after accepting Spire's offer, coordinated with Spire's leadership to obscure his activities, and destroyed evidence of his communications with Spire's co-owner—all while Spire committed ███████████ to secure his services and signaled its willingness to accept the consequences. Under these circumstances, injunctive relief against Spire is not merely appropriate—it is necessary to prevent the continued exploitation of JGR's trade secrets.

### C. Under the Present Circumstances It is Proper to Enjoin Gabehart and Spire from Violating the Restrictive Covenant.

The record establishes a dual basis for relief against Gabehart and Spire as it relates to Gabehart's restrictive covenant: Spire knowingly induced and benefited from Gabehart's breach

12

of his restrictive covenant, and the facts demonstrate a concrete, non-speculative risk that JGR's trade secrets are being used to accelerate Spire's NASCAR performance.

First, North Carolina courts recognize that outsized compensation offered by a competitor may be probative of improper motive in relation to a tortious interference claim. In *Building Center*, the court considered the defendant competitor's offer of "increased compensation . . . significantly above the market rate" as evidence supporting the inference that the competitor had hired plaintiff's employees "not simply for legitimate reasons of competition." *The Bldg. Ctr., Inc. v. Carter Lumber, Inc.*, No. 16 CVS 4186, 2016 WL 6142993, at *6 (N.C. Super. Oct. 21, 2016). Here, Gabehart earned ██████████████████ at JGR in 2025, and Spire offered a ████████ ████████ contract—starting with ████████████████████████████████ ████████████████████████████████████████████. Gabehart Second Decl. [Dkt. 38] ¶ 22. Thus, Spire's offer is not a modest raise. Further, Gabehart's compensation package ██ ██████████████████████ rewards the very competitive gains the covenant exists to prevent. More specifically, Gabehart's incentive compensation is tied exclusively to ████████████ ████████████████████████████████████████████████ ████████████████. GABEHART00030. That NASCAR-only structure defeats Defendants' claim that Gabehart's Spire role is "fundamentally different" from his NASCAR-focused role at JGR. Accordingly, the inference is straightforward: Spire is not paying for general management skills. Rather, it is paying a premium to win NASCAR races using the exact competitive knowledge the restrictive covenant was designed to protect. As such, restricting Spire's ongoing tortious interference is warranted.

Second, equity empowers the Court to craft targeted relief to prevent threatened misuse where the risk of irreparable harm is imminent, and the relief JGR seeks is well within that

authority. The Third Circuit has confirmed that a complete restriction on employment may be imposed as "one weapon in an equity court's arsenal to prevent the threatened misappropriation of trade secrets," particularly where the risk is as substantial as the newly discovered evidence demonstrates. *Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 112, 114 (3d Cir. 2010); *see supra* Section I.B. Here, JGR seeks far less. It does not request a blanket prohibition on employment, but a narrowly tailored order barring Spire from employing Gabehart in a NASCAR-competitive role that necessarily implicates the very information protected by his restrictive covenant and confidentiality obligations. If a total employment bar is permissible in appropriate cases, the focused injunction requested here falls comfortably within the Court's equitable discretion.

## II. The Evidence Uncovered in Expedited Discovery Reinforces the Need for Enforcement of Gabehart's Restrictive Covenant.

### A. The Additional Discovery Produced by Gabehart Confirms Gabehart's Role at Spire Focuses on NASCAR and the Same General Services He Performed for JGR.

The documents produced in expedited discovery highlight that Gabehart's role at Spire is—and was always intended to be focused primarily on improving Spire's performance in NASCAR Cup series races—just as he did while serving as Competition Director for JGR. Accordingly, absent a preliminary injunction, Gabehart will continue "provid[ing] services of the general type of services that [Gabehart] provided to [JGR] in the year prior to such termination" to a direct competitor, in violation of Section 6 of his Employment Agreement. Employment Agreement, Section 6 [8-2].

The language of Gabehart's newly produced Spire Employment Agreement and the structure of Spire's business confirm that Gabehart's role at Spire falls squarely within the ambit of the restrictive covenant in his JGR Employment Agreement—contrary to the representations Gabehart and Spire have made to this Court and publicly that Gabehart's role at Spire is broader

14

than and materially different from his role at JGR. The Spire Employment Agreement states that

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

Although the Spire Employment Agreement references other racing series in the job description,

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████ *See* GABEHART_00030; *see also* GABEHART00471–72. The fact that the job description was expanded from the initial draft to include other series only after the involvement of lawyers, while the compensation structure remained nearly-exclusively NASCAR Cup-focused, strongly suggests that the broader job description was a post-hoc effort to obscure the true NASCAR Cup-centric nature of Gabehart's role. *See* GABEHART00196 (January 27, 2026, draft employment agreement without a job description); GABEHART00220 (Dickerson suggesting the addition of other series to the job description); GABEHART00239–42 (revised agreement expanding position description but leaving bonus structure unchanged). Although Spire competes in some spaces outside of the NASCAR sphere, this portion of its business is minimal when compared to the breadth of the organization that focuses on the NASCAR Cup Series. *See* GABEHART00308.

Gabehart's own conduct further confirms that his role at Spire was designed to encompass and oversee precisely the same competitive strategy and decision-making in NASCAR that he focused on at JGR. His "Team Address" script, prepared for his kickoff meeting with Spire personnel, focuses exclusively on NASCAR—referencing "a new manufacturer" (*i.e.*, Chevrolet,

15

confirming the discussion concerned NASCAR) and making no mention of sprint cars, Formula One, or any non-NASCAR racing series. *See* GABEHART00343–45. What is more, the restrictive covenant contained in Gabehart's own Spire Employment Agreement specifically prohibits future involvement in NASCAR activities—reinforcing that the focus of the Chief Motorsports Officer role is NASCAR. Specifically, the Spire Employment Agreement prohibits Gabehart from █████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████ GABEHART00479. The scope of conduct prohibited in the Spire Employment Agreement bears a strong similarity to the scope of activity prohibited by the restrictive covenant in Gabehart's JGR Employment Agreement—further evidencing the similarity between the two roles. *See* Employment Agreement, Section 6 [8-2] (prohibiting Gabehart from providing similar services to "any other NASCAR Xfinity Series or NASCAR Cup Series racing team").

In addition to Gabehart's own admissions regarding the overlap between his roles, *see* Gabehart Sec. Decl. at ¶¶ 5–6, 15–16, 21, the direct parallel between the duties Gabehart performs for Spire and those he performed for JGR is underscored by his conduct after receiving a job offer from Spire. On November 25, 2025—just twelve days after he purportedly first received an offer from Spire and before JGR terminated him for cause—Gabehart began working on a "Focus Plan" that specifically references documents he had taken from JGR relating to competition and race strategy, including materials related to "Setup" (including "setup procedure, measuring QC"), "CC Audit," "Driver Debrief Forms," and various analytics evaluations. *See* GABEHART00092. Substantially similar points from the Focus Plan were later incorporated into a Spire-branded

16

presentation. *See* GABEHART00094. The Focus Plan reads as a roadmap for how Gabehart intended to apply JGR's processes and materials at Spire.

Since that time, Gabehart has attended at least one NASCAR Cup Series race with Spire and was in a position to participate in competition and race-day strategy. On February 22, 2026, the day of the Autotrader 400 NASCAR Cup Series race at Atlanta, Gabehart and Spire co-owner Jeff Dickerson exchanged text messages in which Dickerson directed Gabehart to go to Spire's "war room"—a term that, in the NASCAR context, refers to the operational hub where race-day competitive decisions are made. *See* GABEHART00551. Gabehart's own text messages suggest that he understood this participation could trigger enforcement of his restrictive covenant. Shortly after agreeing to go to the war room, Gabehart commented: "Over/under percentage on a TRO filed tomorrow?" and then added: "Tomorrow is tomorrow. Good luck today. Have fun." GABEHART00551. This exchange indicates that Gabehart was aware his involvement in Spire's race-day competitive operations would violate his noncompete with JGR—yet he and Dickerson proceeded anyway. Dickerson's response—"They already know you're here. They knew it on 11/3"—and his subsequent comment that "[w]e are in the boat" further suggest that Spire was prepared to accept the consequences of Gabehart's participation. GABEHART00551.[2]

Taken together with the evidence already in the record—including the Brown Declaration, the terms of the JGR Employment Agreement, and the testimony of JGR's witnesses regarding Gabehart's access to confidential information and trade secrets—the newly produced discovery materials leave no serious question that Gabehart is performing the same type of services for Spire that he performed for JGR, that he and Spire knew as much from the outset, and that they chose to

---

[2] Notably, Defendants' suggestion that JGR "already knew" of Gabehart's participation is unfounded. JGR had no knowledge that Gabehart was participating in Spire's race-day operations or present in Spire's war room. Any assertion to the contrary reflects Defendants' own internal assumptions, not JGR's actual knowledge.

proceed in deliberate disregard of Gabehart's contractual obligations.

### B. The Additional Evidence Produced by JGR Confirms Gabehart Did Not Invoke Section 6 of His Employment Agreement.

The additional evidence produced in expedited discovery also re-confirms that Gabehart never properly invoked Section 6, paragraph 2 of his Employment Agreement ("Section 6") to reduce his noncompete period. Indeed, there is no indication in any of the newly produced documents that Gabehart invoked that provision. The only evidence that could even arguably be construed to favor this argument shows, at most, that one JGR employee—Tim Carmichael—was speculating about the potential impact of the provision on payroll should it be triggered.

To briefly recap the existing record as context for the new evidence, the document Gabehart left for Coach Gibbs during their November 6, 2025, meeting, entitled "End of Year Job Resolution"—notably written by Gabehart two days before the meeting as a foregone conclusion of the meeting's results —and Gabehart's November 7, 2025, email to Tim Carmichael with the subject line "RE: Future Planning" did not invoke any rights under Section 6. *See* JGR_0000323; Sec. Carmichael Decl., Ex. 2 [18]. These communications contained complaints and criticisms of JGR but failed to provide notice of specific duties assigned by JGR that were inconsistent with Gabehart's expectations, an opportunity for JGR to cure, or a notice of termination without cause as required to invoke Section 6. Through the content of the document and Gabehart's conduct with Spire leading up to November 6, 2025, it is clear that Gabehart did not approach the discussion in "good faith" aimed at resolution of any purported job inconsistencies. Moreover, his immediate actions that followed, including accessing a "Spire" folder and taking pictures of JGR's Confidential Information and Trade Secrets within hours, underscores this lack of good faith.

It is apparent that no one involved in the separation process understood Gabehart to be invoking Section 6 to shorten his noncompete period. On November 6, 2025, Coach Gibbs'

18

disappointed reaction to Gabehart's "End of Year Job Resolution" led Tim Carmichael to remark that "Coach wants [Gabehart] gone" and that he "would be shocked if there was any other outcome"—indicating that Gabehart's communications did not sufficiently put anyone at JGR on notice that Gabehart was attempting to exercise his rights under Section 6. *See* JGR_0000310; Moreover, on or about November 10, 2025, immediately following those communications, Gabehart and JGR began negotiations for a mutual separation agreement—conduct that wholly contradicts an intent to exercise rights under Section 6. *See* Gabehart Decl., Ex. A [12-2]. That contradiction is confirmed by Gabehart's intent to seek an early release from his eighteen-month non-compete. JGR0000055.

Additional newly produced evidence reinforces this conclusion. Gabehart's own conduct is fundamentally inconsistent with any belief that he had properly invoked Section 6 to reduce his noncompete to one week. If Gabehart truly believed that his November communications had triggered a one-week noncompete period, one would expect him to have said so—to JGR, to his attorneys, or at least in his private communications with Dickerson or Spire. Yet in Gabehart's text messages with Dickerson on February 22, 2026, when Gabehart quipped "Over/under percentage on a TRO filed tomorrow?" after agreeing to go to Spire's war room, he did not express any confidence that his noncompete had been reduced or that he was free to participate in NASCAR activities for Spire. *See* GABEHART00551. To the contrary, his comment reflects an awareness that his participation in Spire's race-day operations could trigger enforcement of the very restrictive covenant he now claims to have shortened.

At any point, Gabehart could have provided express written notice to JGR that he was exercising his rights under Section 6, provided a specific end date for his employment at JGR, and given some indication—prior to this litigation—that he believed he was subject to only a one-week

19

noncompete period. He declined to do so. Indeed, Gabehart never afforded JGR the 60-day cure period required under Section 6, which JGR did not waive, nor did he satisfy the remaining requirements to invoke the reduced non-compete period. Defendants' *post hoc* interpretations of Gabehart's November 6 and 7, 2025, complaints as proper invocations of Section 6 (which they are not) are merely an attempt to evade liability for Gabehart's blatant violations of his restrictive covenant, and nothing in the expedited discovery changes that reality.[3]

### III. Gabehart's Demonstrated Lack of Credibility Necessitates Monitoring His Conduct to Ensure Compliance with the Court's Order.

The Court should order Gabehart to maintain detailed contemporaneous records of all work activities and job duties performed for Spire to make available to JGR's counsel on a bi-weekly basis to ensure that Gabehart complies with the terms of his restrictive covenant and any order issued by this Court. Gabehart has participated in numerous NASCAR Cup races and events on behalf of Spire this season.

For example, Gabehart was invited by Spire ownership into Spire's "war room" on race-days, and was recently spotted at the March 22, 2026, NASCAR Cup Series Race at Darlington, sitting in the stands with a radio near where race teams' spotters typically sit, and discussing the race with Spire employees in the garage area after the race. *See* GABEHART00551; *see also* Sec. Schaffer Decl. at ¶¶ 9–11. Gabehart's choice to watch the race from the grandstands, rather than from the team suite or alongside Spire personnel—as would be expected given his role—further supports the inference that he was attempting to avoid notice. His repeated attendance at and participation in race-day activities for Spire, including in areas and communication means that would allow him to discuss race strategy in real time, underscores the imminent threat of

---

[3] It is also important to remember that even if the non-compete is found to be unenforceable, the nondisclosure provision is independently enforceable. *Static Control Components, Inc. v. Darkprint Imaging, Inc.*, 135 F. Supp. 2d 722, 730 (M.D.N.C. 2001).

20

misappropriation of JGR's trade secrets given race day is exactly the context in which JGR's competition strategies may be employed.

Further, Gabehart has the ability to convey this information in a way verbally by radio or in person, in ways that are virtually unrecordable and undetectable. These circumstances, combined with Gabehart's demonstrated credibility issues and previous efforts to use JGR information for Spire's benefit, necessitate a reporting requirement to mitigate the threat of misappropriation of JGR's trade secrets—Gabehart cannot be simply *trusted* to comply. *See PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1270 (7th Cir. 1995) (noting defendant's history of impaired credibility supported a conclusion that defendant "could not be trusted to act with the necessary sensitivity and good faith under the circumstances in which the only practical verification that he was not using plaintiff's secrets would be defendant[]'s word to that effect."). A rigorous court-ordered reporting requirement is essential to verifying Gabehart's activities and ensuring accountability for violating the order.

### REQUEST FOR EXPEDITED TRIAL SETTING[4]

The record confirms the need to expedite trial and to allow for immediate commencement of discovery from the Defendants and third-parties. Pursuant to Western District of North Carolina Local Rule 16.1 and Federal Rule of Civil Procedure 16, JGR respectfully requests that the Court (a) order the parties to submit Rule 26 Disclosures by April 2, 2026 and (b) enter a Pretrial Order and Case Management Order setting an expedited trial date in 2026. See Local Rule 16.1(a) ("As soon as practicable . . . the parties or their counsel must confer as provided by Fed. R. Civ. P. 26(f) and conduct an 'Initial Attorney's Conference'"). An expedited trial date will eliminate unnecessary delays in discovery and promote an efficient resolution of the instant dispute. See

---

[4] If the Court determines that an expedited trial setting and accelerated Rule 26 obligations should be sought by motion, JGR respectfully requests leave to file such a motion on an expedited basis.

Local Rule 16.1(f) ("Court-enforceable discovery does not commence until issues have joined and a Scheduling Order has been entered . . . .").

**CONCLUSION**

For these reasons, JGR prays that this Court issue a preliminary injunction as set forth in JGR's Motion, including Exhibit A to JGR's Supplemental Brief in Support of its Motion [35-2], that enforces the agreed upon non-compete period and ensures the return and protection of JGR's Confidential Information and Trade Secrets, and set an expedited trial date in 2026.

This the 25th day of March, 2026

**KING & SPALDING LLC**
/s/ *Danielle T. Williams*
Danielle T. Williams
dwilliams@kslaw.com
N.C. Bar No. 23283
300 South Tryon Street, Suite 1700
Charlotte, NC 28202
Thomas M. Melsheimer – *Pro Hac Vice*
tmelsheimer@kslaw.com
Chad B. Walker – *Pro Hac Vice*
cwalker@kslaw.com
Tracea Rice – *Pro Hac Vice*
trice@kslaw.com
Alexandra Moore - *Pro Hac Vice*
almoore@kslaw.com
2601 Olive Street, Suite 2300
Dallas, TX 75201

Sarah F. Hutchins
N.C. Bar No. 38172
Tory Ian Summey
N.C. Bar No. 46437
Keith M. Weddington
N.C. Bar No. 14352
Charles G. Middlebrooks
N.C. Bar No. 55171
Madelyn R. Candela
N.C. Bar No. 63827
Bank of America Tower
620 South Tryon St., Suite 800

22

Charlotte, North Carolina 28202
sarahhutchins@parkerpoe.com
torysummey@parkerpoe.com
keithweddington@parkerpoe.com
charliemiddlebrooks@parkerpoe.com
madelyncandela@parkerpoe.com

*Attorneys for Joe Gibbs Racing, LLC*

**ARTIFICIAL INTELLIGENCE CERTIFICATION**

No artificial intelligence was employed in doing the research for the preparation of this Memorandum, with the exception of the standard artificial intelligence embedded in WestLaw. Every statement and every citation to authority contained in this Memorandum has been checked by an attorney in this case as to the accuracy of the proposition for which it is offered.

This the 25th day of March, 2026

**KING & SPALDING LLC**

/s/ *Danielle T. Williams*
Danielle T. Williams
dwilliams@kslaw.com
N.C. Bar No. 23283
300 South Tryon Street, Suite 1700
Charlotte, NC 28202
Thomas M. Melsheimer – *Pro Hac Vice*
tmelsheimer@kslaw.com
Chad B. Walker – *Pro Hac Vice*
cwalker@kslaw.com
Tracea Rice – *Pro Hac Vice*
trice@kslaw.com
Alexandra Moore - *Pro Hac Vice*
almoore@kslaw.com
2601 Olive Street, Suite 2300
Dallas, TX 75201

Sarah F. Hutchins
N.C. Bar No. 38172
Tory Ian Summey
N.C. Bar No. 46437
Keith M. Weddington
N.C. Bar No. 14352
Charles G. Middlebrooks
N.C. Bar No. 55171
Madelyn R. Candela
N.C. Bar No. 63827
Bank of America Tower
620 South Tryon St., Suite 800
Charlotte, North Carolina 28202
sarahhutchins@parkerpoe.com
torysummey@parkerpoe.com

24

keithweddington@parkerpoe.com
charliemiddlebrooks@parkerpoe.com
madelyncandela@parkerpoe.com

*Attorneys for Joe Gibbs Racing, LLC*

The undersigned counsel hereby certifies that the foregoing **PLAINTIFF JOE GIBBS RACING, LLC'S SECOND SUPPLEMENTAL BRIEF IN SUPPORT OF THE MOTION FOR PRELIMINARY INJUNCTION** was electronically filed with the Clerk using the CM/ECF system which will automatically send notice and serve same upon counsel of record via the Court's electronic case filing system.

This the 25th day of March, 2026

**KING & SPALDING LLC**

/s/ Danielle T. Williams
Danielle T. Williams
dwilliams@kslaw.com
N.C. Bar No. 23283
300 South Tryon Street, Suite 1700
Charlotte, NC 28202
Thomas M. Melsheimer – *Pro Hac Vice*
tmelsheimer@kslaw.com
Chad B. Walker – *Pro Hac Vice*
cwalker@kslaw.com
Tracea Rice – *Pro Hac Vice*
trice@kslaw.com
Alexandra Moore - *Pro Hac Vice*
almoore@kslaw.com
2601 Olive Street, Suite 2300
Dallas, TX 75201

Sarah F. Hutchins
N.C. Bar No. 38172
Tory Ian Summey
N.C. Bar No. 46437
Keith M. Weddington
N.C. Bar No. 14352
Charles G. Middlebrooks
N.C. Bar No. 55171
Madelyn R. Candela
N.C. Bar No. 63827
Bank of America Tower
620 South Tryon St., Suite 800
Charlotte, North Carolina 28202

26

sarahhutchins@parkerpoe.com
torysummey@parkerpoe.com
keithweddington@parkerpoe.com
charliemiddlebrooks@parkerpoe.com
madelyncandela@parkerpoe.com

*Attorneys for Joe Gibbs Racing, LLC*