| | |
|---|---|
| **JOE GIBBS RACING, LLC,**<br><br>**Plaintiff,**<br><br>v.<br><br>**CHRISTOPHER GABEHART and SPIRE MOTORSPORTS, LLC,**<br><br>**Defendants.** | **THIRD DECLARATION OF CHRISTOPHER GABEHART** |

Christopher Gabehart, being first duly sworn, says:

1. I am a Defendant in the above-captioned matter. I am a resident of Mooresville, North Carolina, and I am over eighteen years of age. I have personal knowledge of the facts set forth in this Declaration.

2. I submit this Declaration in Response to Plaintiff Joe Gibbs Racing, LLC's ("JGR") Notice of Supplemental Authority.

### PRESENCE AT BRISTOL MOTOR SPEEDWAY

3. I attended the Food City 500 race weekend at Bristol Motor Speedway in my capacity as Chief Motorsports Officer of Spire Motorsports. My presence at this major NASCAR Cup Series event was consistent with my executive-level responsibilities overseeing Spire's multi-series motorsports operation. Race weekend attendance is an essential and expected part of any motorsports executive's role—it enables direct observation of team operations and real-time engagement with personnel. Other executives at the ownership and senior leadership level routinely attend races, as well as practice and qualifying sessions, for the same reasons.

4. The scale of executive and administrative presence at a NASCAR Cup Series race underscores how routine my attendance was. At the Food City 500 race weekend at Bristol Motor Speedway, there were 37 entrants representing 16 organizations. Each entrant is permitted to have approximately 15 rostered participants on the grounds at all times, resulting in well over 550 people present just for rostered entrant-level personnel. In addition, each organization may roster up to 3 organizational-level personnel who are on the property doing Cup competition-oriented activities—positions that include Competition Directors, Technical Directors, IT personnel, and similar roles. This puts the total number of rostered personnel on site at over 600 people.

5. Beyond rostered personnel, there are also "Admin level" individuals permitted on property with the proper credentials. This category includes owners, team presidents, executives, and similar personnel—individuals who are not directly affiliated with race-day competition operations and do not need to be rostered as such. Numerous such individuals, including myself, were present at Bristol Motor Speedway for practice, qualifying, and the race itself in this non-competition capacity. This is standard for every NASCAR Cup Series event. For example, in addition to Coach Gibbs and JGR President Dave Alpern, other team executives in attendance at Bristol included Legacy Motor Club President Michael Guttilla (until last week the Chief Operating Officer at JGR), Hendrick Motorsports Vice Chairman Jeff Gordon, and 23XI Racing President Steve Lauletta.

6. I was not performing Competition Director responsibilities at Bristol Motor Speedway because that is not my job at Spire. Matt McCall serves as the Competition Director for Spire's Cup Series operations and was on the Bristol roster and present in that capacity. I do not call races, serve as a crew chief, or make car-by-car Cup Series setup decisions, race engineering determinations, or Sunday race management calls.

2

7. My use of radio equipment and proximity to Spire personnel at Bristol was entirely routine. Hundreds of individuals at NASCAR Cup Series events—including owners, executives, sponsor representatives, and administrative personnel—commonly wear radios when Cup cars are on track and stand in similar proximity to their teams. This is true for executives at JGR, including Coach Gibbs and Dave Alpern, among others, who based off my experience regularly use radio equipment at races.

8. The radios allow team personnel to listen to the team radio traffic to monitor team performance. The driver, crew chief and spotter are the ones communicating over the radio on competition matters. I did not. As the photographs indicate, I only wore earbuds with no microphone and therefore had no way to communicate via the radio, I could just listen to the radio traffic. Accordingly, I did not discuss any competition-related issues on the radio.

9. As Chief Motorsports Officer, my presence near Spire's race car drivers is a natural and expected part of my executive oversight responsibilities. I was not performing any services in a Competition Director-type role at Bristol.

10. Two photos in particular illustrate the silliness of JGR's spies taking pictures so my replacement, Mr. Brown, can speak out under oath (ECF 71-1) about what JGR's lawyers want the Court to believe I was doing. Mr. Brown and JGR's lawyers have no idea what I was doing. In fact, in the photograph shown at ECF 71-1 ¶ 13, I was looking up at the speedway's Jumbotron watching television coverage of qualifying. In the photograph shown at ECF 71-1 ¶ 11, I was watching two monitors mounted on a cart: one showing the live TV broadcast of practice and the other showing the real-time ranking order of the teams and drivers in the practice session and their corresponding lap times. Again, despite Mr. Brown's speculation under oath, I was not performing any services in a Competition Director-type role at Bristol.

3

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

This 14th day of April, 2026.

_____
Christopher Gabehart