**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**CIVIL ACTION NO. 3:26-CV-00133-SCR-DCK**

| | |
|---|---|
| **JOE GIBBS RACING, LLC,** | |
| **Plaintiff,** | |
| **v.** | **ORDER** |
| **CHRISTOPHER GABEHART** **and SPIRE MOTORSPORTS, LLC,** | |
| **Defendants.** | |

**THIS MATTER** is before the Court on Joe Gibbs Racing, LLC's ("JGR") Motion for Preliminary Injunction (Doc. No. 9). JGR seeks to enjoin Defendant Christopher Gabehart ("Gabehart"), its former employee, and Defendant Spire Motorsports, LLC's ("Spire"), who recently hired Gabehart, from misappropriating and threatening to misappropriate JGR's trade secrets and to enforce the noncompete and nondisclosure provisions of Gabehart's Employment Agreement.[1] The Court has reviewed and carefully considered the evidence of record, applicable law, and the arguments of the parties. For the reasons set forth below, Plaintiff's Motion for Preliminary Injunction (Doc. No. 9) is **GRANTED IN PART** and **DENIED IN PART.**

## I.      PROCEDURAL HISTORY

JGR filed suit against Gabehart on February 19, 2026, (Doc. No. 1), and filed an Amended Complaint against Gabehart and Spire on February 24, 2026, (Doc. No. 8), along with the present Motion (Doc. No. 9). The claims in the Amended Complaint include: (1) Misappropriation of Trade Secrets - Federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836 et seq. (Gabehart

---

[1] JGR also has asked the Court to order additional forensic review. (Doc. No. 35, Ex. A at 9). The Court will address this requested relief separately when ruling on JGR's pending motion for expedited discovery. (Doc. No. 65).

and Spire); (2) Misappropriation of Trade Secrets - North Carolina Trade Secrets Protection Act ("TSPA"), N.C. Gen. Stat. §§ 66-152, et seq. (Gabehart and Spire); (3) Unfair Trade Practices - North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §§ 75-1.1, et seq. (Gabehart and Spire); (4) Breach of Contract (Gabehart); and (5) Tortious Interference with Contract (Spire). (Doc. No. 8).

On March 5, 2026, following a hearing where all parties were represented by counsel, this Court entered a Temporary Restraining Order (the "TRO") granting in part and denying in part JGR's requested relief. (Doc. No. 26). Specifically, the Court ordered Defendant Gabehart: (i) to cease and desist from retaining, transferring, using or copying any of JGR's Confidential Information (as defined infra) and trade secrets; (ii) to cease and desist from using or disclosing JGR's Confidential Information and trade secrets; (iii) to return any of JGR's Confidential Information and trade secrets in his possession to JGR; and (iv) to be restrained from violating Section 6 of his Employment Agreement (as defined infra), which prohibits providing services of the general type of services that Defendant Gabehart provided to JGR in the year prior to his termination. Id. at 11-12. The Court denied the requested relief as to Spire. Id. at ¶ 34.[2]

The Court held a second hearing on March 16, 2026, at which it granted in part and denied in part Plaintiff's First Motion for Expedited Discovery (Doc. No. 22), and continued the hearing on Plaintiff's Motion for Preliminary Injunction to allow the expedited discovery process to occur. (See Text-Only Order Entered 3/16/26). On March 26, 2026, the Court heard arguments from the parties on the request for preliminary injunction, including evidence based on the results of the

---

[2] The TRO was extended with the parties' consent until April 9, 2026, and was subsequently extended for good cause until April 23, 2026. (See Text-Only Orders Entered 3/26/26, 4/9/26, 4/16/26, and 4/21/26).

expedited discovery.  (See Text-Only Order Entered 3/26/26).  The Court took the matter under advisement with a written order to follow.  Id.

## II.  FINDINGS OF FACT

The Court makes the following Findings of Fact for the purposes of this preliminary injunction:[3]

### A.  Gabehart's Employment with JGR

1.  JGR is a chartered stock car race team competing in the NASCAR Cup Series and the NASCAR O'Reilly Auto Parts Series.  (Doc. No. 35-13 ¶ 3).

2.  Gabehart began working for JGR as an engineer in 2012.  (Doc. No. 38 ¶ 3).  Gabehart was later promoted to crew chief and then, in December 2024, to Competition Director.  (Doc. No. 9-2 ¶ 4; Doc. No. 12 ¶ 3).

3.  As the Competition Director, Gabehart's responsibilities included preparation and execution of JGR's car and race strategies, and overseeing development and improvement of analytics, processes, and procedures to improve race performance in the NASCAR Cup Series and the NASCAR O'Reilly Auto Parties Series.  (Doc. No. 9-2 ¶¶ 4 & 6; Doc. No. 35-3 ¶¶ 2, 4–68).

4.  In addition to his role as Competition Director, Gabehart also served as crew chief for the No. 54 car for a portion of the 2025 racing season.  (Doc. No. 12 ¶ 9).

5.  In connection with Gabehart's promotion to Competition Director, the parties entered into an Employment Agreement effective December 1, 2024 (the "Employment Agreement").  (Doc. No. 9-3 ¶ 4; Doc. No. 8-2).[4]  The Employment Agreement includes a nondisclosure provision

---

[3] To the extent any Findings of Fact constitute Conclusions of Law, they are so adopted.  Further, the Court's findings and analysis herein is for the purposes of this Motion only based on the current record and does not forecast any future rulings on the merits.

[4] The Agreement provides, and the parties do not dispute, that North Carolina law governs.  (Doc. No. 8-2 ¶ 12).

prohibiting disclosure of JGR's "Confidential Information" and a restrictive covenant not to compete. (Doc. No. 8-2 ¶¶ 5–6).

6. Regarding the nondisclosure provision, the Employment Agreement provides that JGR's Confidential Information is "a valuable, special and unique asset of Company's and its affiliates' business, access to and knowledge of which are essential to the performance of Employees' duties hereunder." Id. ¶ 5. "Confidential Information" includes, but is not limited to:

> nonpublic information about Company sponsors and partners, race strategy, engineering information, race car set-ups, pit crew training methods and practices, pit crew analytics, technology and strategy, wind tunnel data and testing of any kind, trade secrets and any Company information that is proprietary or not publicly known.

Id.

7. Defendant Gabehart agreed by signing the Employment Agreement that:

> During the Term and for so long as such Confidential Information is not generally known (other than due to Employee's breach), Employee shall not disclose Confidential Information to any third party or use any Confidential Information for any purpose other than as necessary to perform pursuant to this Agreement unless and until such Confidential Information becomes generally known, except as a result of unauthorized disclosure. . . .

Id.

8. Section 6 of the Employment Agreement contains a restrictive covenant not to compete, which, in relevant part, provides:

> To protect the Company's legitimate business interests including, among others, access to the Confidential Information, Employee acknowledges that certain restrictive covenants are necessary and appropriate. Except for termination without cause by Company or Term expiration, during the Term and for the longer of the balance of the Term including all Extensions, or nine (9) months after the date of termination (but not to exceed eighteen (18) months) (the "Noncompete Period"), Employee shall not provide services of the general type of services that Employee provided to the Company in the year prior to such termination to any other NASCAR Xfinity Series or NASCAR Cup Series racing team (or their respective successors) or any vehicle manufacturing company or other person or entity that provides goods or services to such a team.

4

Notwithstanding any contrary provision herein, the Noncompete Period will be reduced to one (1) week and Company shall pay Employee $100,000 (in exchange for a complete mutual release and net of all required withholding and deductions) if, at any time after September 1, 2025, and before June 1, 2026: (i) Employee in good faith notifies Company in writing of specific job duties or responsibilities assigned to Employee that are inconsistent with Employee's reasonable expectations or the job description provided by Company prior to the Start Date; (ii) Employee provides Company at least sixty (60) days to resolve such inconsistencies to Employee's reasonable satisfaction and Company fails to do so; and (iii) Employee provides Company sixty (60) days prior written notice of termination without cause due to such unresolved inconsistencies. . . .

Id. ¶ 6.

9. At some point in 2025, Gabehart became dissatisfied with his employment at JGR and met with Joe Gibbs ("Gibbs"), owner of JGR, to discuss his dissatisfaction. (Doc. No. 12 ¶¶ 6–7, 11).

10. During a November 6, 2025 in-person meeting, Gibbs and Gabehart decided to part ways. (Doc. No. 12 ¶ 11; Doc. No. 9-3 ¶¶ 6–7).

11. Gabehart turned in his JGR computer on November 10, 2025, and has not provided any services to JGR after that time. (Doc. No. 9-2 ¶¶ 21–22; Doc. No. 9-3 ¶ 8).

12. Following Gabehart's meeting with Gibbs, the parties began negotiating a separation agreement. (Doc. No. 9-3 ¶ 9; Doc. No. 18 ¶ 8; Doc. No. 12 ¶ 21). JGR provided a draft separation agreement to Gabehart on November 10, 2025, for consideration. (Doc. No. 12 ¶ 16; Doc. No. 9-3 ¶ 9).

13. Ultimately, the separation agreement negotiations fell apart, and the agreement was never executed. (Doc. No. 12 ¶ 21; Doc. No. 62-3 ¶ 4).

14. Gabehart was paid his base salary through and including November 11, 2025, via the November 21, 2025 regularly scheduled payroll. (Doc. No. 46-2 ¶ 3). On January 19, 2026, JGR paid Gabehart his 2025 Earned Performance Bonus on January 19, 2026. (Doc. No. 46-2 ¶¶ 4–5; Doc. No. 8-2 ¶ 3).

5

### B. Forensic Review

15. Beginning December 8, 2025, JGR began conducting a forensic review of the computer JGR provided to Gabehart in conjunction with his employment. (Doc. No. 9-2 ¶ 23; Doc. No. 9-4 ¶¶ 5 & 9). Gabehart ultimately retained counsel and voluntarily submitted to this forensic examination. (Doc. No. 12 ¶¶ 21–22).

16. The forensic review revealed that Gabehart had connected his Google Drive to his JGR computer, and that Gabehart had been conducting online research about Spire during October and November of 2025. (Doc. No. 9-2 ¶¶ 23-29; Doc. No. 9-4 ¶¶ 12-13; Doc. No. 35-12 ¶ 20, Ex. 2-3). Gabehart searched the word "indemnify" on or around December 4, 2025. (Doc. No. 22-3, ¶ 8).

17. Within the Google Drive, Gabehart had created and saved a folder titled "Spire" and a subfolder named "Past Setups." The Past Setups subfolder contained documents detailing JGR's past car setups and simulations for specific races at specific tracks. (Doc. No. 9-4 ¶ 14; Doc. No. 35-12 ¶ 11). Gabehart accessed the "Spire" folder on his personal Google Drive several times after November 10, 2025. (Doc. No. 9-4 ¶ 14; Doc. No. 35-12 ¶¶ 20-22).

18. On December 15, 2025, the forensic firm received access to a Microsoft OneDrive associated with Gabehart. (Doc. No. 9-4 ¶ 20). This forensic review revealed that on November 7, 2025, (the day after the meeting wherein Gibbs and Gabehart decided to part ways), Gabehart used his personal cell phone to take approximately 16 pictures of items contained on his JGR computer, which included: comprehensive post-race audit and analyses of team and driver performance for the entire 2025 NASCAR season; complete team payroll details including job titles, contract length, annual compensation, incentive compensation, and compensation plans for prior years; an employee compensation calculator used to project and plan pay for key JGR

6

positions; driver pay for the 2025 and 2026 NASCAR seasons; revenues from sponsors, partners, and other business arrangements for the 2024, 2025, and 2026 NASCAR seasons; JGR's pit crew analytics for the 2024 NASCAR season; and detailed analytics of racecar tires used to assess impact on race results. (Doc. No. 9-2 ¶ 25; Doc. No. 9-4 ¶ 22; Doc. No. 35-12 ¶ 10, Ex. 8).

19.    Such information constituted Confidential Information as defined by the Employment Agreement, (Doc. No. 8-2 ¶ 5) and taking pictures of this information was done without JGR's consent. (Doc. No. 9-2 ¶ 26-27).

20.    JGR had taken steps to limit unauthorized access to Confidential Information, including, but not limited to, various security measures, such as password protection, multi-factor authentication, restriction of system access based on job function, and requiring employees to sign confidentiality agreements, among other things. Id. ¶ 8.

21.    Gabehart later admitted to taking photographs of JGR's information with his cell phone. (Doc. No. 12 ¶ 13).

22.    Certain files were saved in Gabehart's folder titled "Spire," including: (a) a 141 page .pdf file titled "Post Race Data Analysis" for a 2025 Las Vegas race containing all of JGR's data analytics including data JGR measures at races and how it measures that data; (b) more than 20 set up and simulation files which are reports generated by proprietary software using inputs that hundreds of different JGR employees manually add based off their know-how, historical data, and simulations to determine the best possible racecar setup; (c) a document detailing proprietary engine outputs and recommended gear shift points; (d) a document detailing the manner in which JGR sorts and run tires through a race; (e) a document detailing how JGR estimates fuel mileage for its drivers and competitors during races and adjustments to strengthen accuracy; (f) a document showing JGR's process for evaluating performance during races which could immediately help

7

competitors improve race execution and performance; (g) a photo of a document detailing the manner in which JGR measures and seeks to eliminate subpar pit stops and its bonus structure for its pit crews for successful pit stops; (h) a spreadsheet listing base compensation and bonus for key members of JGR's teams; and (i) a document comparing a JGR driver's performance at a specific race to that of a Spire driver. (Doc. No. 9-2 ¶ 24; Doc. No. 9-4 ¶ 14).

23. On January 12, 2026, **Gabehart** provided a cell phone for forensic review, and by agreement of the parties, the 16 photographs identified were deleted on the cell phone. (Doc. No. 9-4 ¶ 27).

24. At the preliminary injunction hearing, JGR submitted evidence of two documents that appear to be created by Gabehart using JGR's Confidential Information and trade secrets. The first is an Excel spreadsheet that was last modified by Gabehart on or about January 28, 2026, that references Spire and its car numbers and appears similar to JGR's proprietary audit spreadsheet. See GABEHART00222. The spreadsheet appears to be a template with analytical data yet to be populated. Id. The second is a document labeled "Focus Plan" that contains a Spire logo,[5] and appears very similar to JGR's proprietary Focus Plan. See GABEHART00094.

25. On February 5, 2026, as part of the forensic review and in agreement with Gabehart, approximately 235 total files were deleted from Gabehart's cell phone and drives. (Doc. No. 9-4 ¶¶ 27, 31).

26. JGR terminated Gabehart's Employment Agreement for cause on February 9, 2026. (Doc. No. 8-3; Doc. No. 12-8).

---

[5] While the Court inquired about the matter at the hearing, the current record is unclear how Defendant Gabehart acquired the Spire logo prior to his employment with Spire for use in the document at issue. Defense counsel pointed out that JGR also used the Spire logo in its presentation to the Court noting it was widely available via the internet. As a result, the Court will not speculate and must rely on the present record before the Court.

27.    While the forensic analysis could not rule out the possibility, (Doc. No. 9-4 ¶ 30), at this time, JGR has not produced evidence that Gabehart sent this information to other outside third parties, such as Spire.

**C.    Gabehart's Relationship and Employment with Spire**

28.    Spire also competes in the NASCAR Cup Series Team and the NASCAR Craftsman Truck Series, among other racing endeavors, and is a competitor of JGR's.  (Doc. 45-2 ¶ 3).

29.    Jeffrey Dickerson ("Dickerson") is the co-owner of Spire.  Id.

30.    Gabehart has known Dickerson since 2009, and the two have regularly met over the years, including for meals.  Id. ¶ 10.  On October 16, 2025, while Gabehart was still employed at JGR, Dickerson and Gabehart met for dinner in Mooresville, North Carolina.  Id. ¶ 27.

31.    On or around November 13, 2025, Spire made an offer—whether formal or informal—to Gabehart for employment.  (Doc. No. 45-2 ¶ 38; Doc. No. 12 ¶ 17; Doc. No. 35-12 ¶ 15, 17, Ex. 13).

32.    On November 15, 2025, Gabehart deleted text messages he had exchanged with Dickerson.  (Doc. No. 62-1 at 3–5).  Dickerson also no longer has the text messages he exchanged with Gabehart during this time due to a 30-day auto-delete feature on his iPhone, which feature was removed on February 26, 2026.  (Doc. No. 68-1 ¶ 11).[6]

33.    On or about December 3, 2025, JGR in-house counsel Eric Schaffer ("Schaffer") called Bill Anthony ("Anthony") at Spire to notify him that Gabehart was subject to a covenant not to compete contained in his Employment Agreement.  (Doc. No. 35-5 ¶¶ 4–5).  Anthony acknowledges there was a call between the two, but disputes Schaffer's characterization and substantive representations of that call.  (Doc. No. 45-3 ¶¶ 6, 11).

---

[6] The Court is not making any finding as to expedited discovery or spoliation at this time.  This issue will be briefed separately by the parties and taken up by the Court with a more fulsome record.

34.     Spire sent Gabehart a draft employment agreement on or about January 27, 2026.  (Doc. No. 45-3 ¶ 18).  Gabehart ultimately signed an employment agreement with Spire on or about February 16, 2026, (Doc. No. 20 ¶ 5; Doc. No. 38 ¶ 7; Doc. No. 45-2 ¶ 53; Doc. No. 45-3 ¶ 19), though his pay was backdated to February 9, 2026, which corresponded to Gabehart's anticipated start date.  (Doc. No. 38 ¶ 7, Doc. No. 45-2 ¶ 53; Doc. No. 45-3 ¶ 20).

35.     Spire agreed to pay Gabehart for his role as Chief Motorsports Officer a base salary that is substantially higher than the base salary that he made at JGR for his role as Director of Competition.  (Doc. No. 38 ¶ 22).

36.     As part of his employment agreement with Spire, Gabehart agreed to "maintain at all times the confidentiality of JGR Confidential Information" and to "not disclose" or "use" such information "for [Spire's] benefit or in connection with any services performed for or on behalf of [Spire]."  (Doc. No. 12-9 at 2; Doc. No. 45-2, ¶ 48). Spire, for its part, agreed "not to solicit, obtain or use any JGR Confidential Information from Gabehart."  Id.

37.     Dickerson maintains that Spire "never asked for, did not want or need, and does not want or need any information from Mr. Gabehart that was the property of JGR."  (Doc. No. 45-2 ¶ 46).

38.     At this point, there is no evidence in the record that Gabehart shared JGR's information with Spire or that Gabehart's conduct was done at the behest or knowledge of Spire.

39.     Gabehart's employment contract with Spire also includes a covenant not to compete.  (Doc. No. 60-1 Ex. 13).

40.     Gabehart received access to Spire's IT systems on February 17, 2026.[7]  (Doc. No. 19 ¶¶ 5-6).

---

[7] Through counsel, Defendant Spire has represented to the Court that it has since confiscated and quarantined Gabehart's Spire computer and, on March 18, 2026, cut off Gabehart's access to Spire's email and other IT systems. (Doc. No. 56 at 2-3).

41. Spire publicly announced Gabehart's employment on February 21, 2026. (Doc. No. 9-2 ¶ 31).

42. Some, but not all, of Gabehart's duties as Chief Motorsports Officer overlap with Gabehart's position at JGR as Director of Competition. (Doc. No. 26 ¶ 21). Dickerson describes Gabehart's role at Spire as that of the "owner's advocate," "principally responsible for deploying strategic vision in all aspects of the business, including motorsports, executive-level management of personnel, and other business initiatives." (Doc. No. 45-2 ¶ 57). Dickerson states that Gabehart is responsible for "ensuring proper resource allocation across all racing series Spire is entered into, medium to long term infrastructure growth planning and execution, growing and stewarding Spire's relationship[s] . . . and working with NASCAR on the executive level as an advocate for Spire." Id. ¶ 58.

## III. CONCLUSIONS OF LAW

The Court makes the following Conclusions of Law:[8]

### A. Preliminary Injunction Standard

43. In order to obtain a preliminary injunction, a party must establish that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008); see also Fed. R. Civ. P. 65; 2311 Racing LLC v. Nat'l Ass'n for Stock Car Auto Racing, LLC ("NASCAR"), 139 F.4th 404, 408 (4th Cir. 2025) ("To grant such an injunction, a court must conclude that the plaintiff made a clear showing that it 'is *likely* to succeed on the merits— along with the risk of irreparable harm, the balance of equities, and the public interest.'") (quoting Lackey v. Stinnie, 604 U.S. 192, 200 (2025)). The

---

[8] To the extent any Conclusions of Law constitute Findings of Fact, they too are so adopted.

moving party bears the burden of proving all four elements by a preponderance of the evidence. Prysmian Cables & Sys. USA, LLC v. Szymanski, 573 F. Supp. 3d 1021, 1035 (D.S.C. 2021).

44.     A preliminary injunction is an "extraordinary" remedy "'that may only be awarded upon a clear showing that the plaintiff is entitled to such relief' and may never be awarded 'as of right.'" SVB Sec. Holdings LLC v. Drendel, No. 3:22-CV-00457, 2022 WL 4369991, at *3 (W.D.N.C. Sept. 21, 2022) (quoting Paradies Shops, LLC v. Brookstone Charlotte, LLC, No. 3:19-cv-00631, 2019 WL 6337818, at *1 (W.D.N.C. Nov. 26, 2019)); see also Robinson v. Nat'l Collegiate Athletic Ass'n, No. 25-2003, 2026 WL 914055, at *6 (4th Cir. Apr. 3, 2026) (citing Munaf v. Geren, 553 U.S. 674, 689 (2008) and Winter, 555 U.S. at 22).

45.     The purpose of preliminary injunctive relief "is not to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward." Trump v. Int'l Refugee Assistance Project, 582 U.S. 571, 580 (2017) (citation omitted). "Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." Id. (citing Winter, 555 U.S. at 20 and 11A WRIGHT & MILLER'S FEDERAL PRACTICE & PROCEDURE § 2948 (3d ed. 2013)). The court "need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of the particular case." Id. (citing WRIGHT, supra, § 2947, at 115); see also Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981)) ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits.").

12

**B.** **Likelihood of Success on the Merits**

46. The party seeking the preliminary injunction must make a "clear showing" that the party is likely to succeed on the merits. <u>Winter</u>, 555 U.S. at 22; <u>Pashby v. Delia</u>, 709 F.3d 307, 321 (4th Cir. 2013), <u>abrogated on other grounds by</u> <u>Stinnie v. Holcomb</u>, 37 F. 4th 977 (4th Cir. 2022); <u>Prysmian Cables</u>, 573 F. Supp. 3d at 1034; <u>XPO Logistics, Inc. v. Northrop</u>, No. 3:19-CV-00348-FDW-DSC, 2019 WL 3543877 at *4 (W.D.N.C. Aug 2, 2019). This does not require a party to show a "certainty of success." <u>Northrop</u>, 2019 WL 3543877 at *4 (citing <u>Pashby</u>, 709 F.3d at 321); <u>see also</u> <u>Robinson</u>, 2026 WL 914055 at 7. Indeed, courts should not improperly equate "likelihood of success" with "success." <u>Glytec LLC v. Prisma Health</u>, No. 6:25-CV-03211-DCC, 2025 WL 1750441, at *3 (D.S.C. June 25, 2025) (quoting <u>Camenisch</u>, 451 U.S. at 394).

47. Defendant Gabehart has consented to preliminary injunctive relief regarding the use and disclosure of confidential information and trade secrets previously outlined in (i), (ii), and (iii) of the TRO (Doc. No. 53 at 2). Therefore, sections (i), (ii), and (iii) of the TRO as it relates to Defendant Gabehart will be converted into a preliminary injunction. However, Defendant Gabehart challenges the other interim relief that JGR requests, as more fully described below, as it relates to the restrictive covenant not to compete in his Employment Agreement with JGR.

48. At the TRO stage, the Court declined to grant any relief as to Spire, and Spire continues to maintain that any preliminary injunctive relief is not appropriate under the <u>Winter</u> standard and applicable law. At this stage of the litigation, the Court agrees for the reasons stated below.

**i.** **Actual or Threatened Misappropriation of Trade Secrets**

49. While Defendant Gabehart has consented to aspects of a preliminary injunction, the Court still undergoes this analysis to the extent Defendant Gabehart takes issue that JGR's identified files constitute trade secrets and as background for the analysis related to JGR's claims against Spire.

13

50. Under both the DTSA and North Carolina's TSPA, a plaintiff must establish that (1) it owns a trade secret; and (2) the trade secret was misappropriated. Sysco Mach. Corp. v. DCS USA Corp., 143 F.4th 222, 228–29 (4th Cir. 2025); see also Samuel Sherbrooke Corp., Ltd v. Mayer, 159 F.4th 252, 256 (4th Cir. 2025); Recon Grp. LLP v. Lowe's Home Centers, LLC, 743 F. Supp. 3d 737, 748 (W.D.N.C. 2024) (citing N.C. Gen. Stat. § 66-153).

51. The DTSA and North Carolina's TSPA define a trade secret in substantially the same terms. Sysco Machinery Corp., 143 F.4th at 228.

52. The DTSA defines "trade secret" as:

all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if--
    (A) the owner thereof has taken reasonable measures to keep such information secret; and
    (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3).

53. North Carolina law similarly defines "trade secrets" as:

business or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that:

a. Derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and

b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

N.C. Gen. Stat. § 66-152(3).

14

54. "According to both statutes, a trade secret is information that is subject to 'reasonable measures to keep such information secret' and which 'derives independent economic value' from its secrecy." Sysco Mach. Corp., 143 F.4th at 228 (citing 18 U.S.C. § 1839(3); accord N.C. Gen. Stat. § 66-152(3)). These requirements have been described as "the reasonable secrecy requirement" and "the independent economic value requirement," which are linked because the information's value "lies in the competitive advantage over others that [the plaintiff] enjoys by virtue of its exclusive access" to it. Id. (citing Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1012 (1984)).

55. Once a party has established the existence of a trade secret, the DTSA and North Carolina's TSPA authorize a court to issue injunctive relief upon a showing of actual or threatened misappropriation of those trade secrets. N.C. Gen. Stat. § 66-154(a) and 18 U.S.C. § 1836(b)(3)(A).[9]

56. Under both federal and North Carolina law, misappropriation generally involves (a) "acquisition" of that trade secret by "improper means"; or (b) "disclosure" or "use" or without consent. 18 U.S.C. § 1839(5); accord N.C. Gen. Stat. § 66-152(1); see also Sysco Mach. Corp, 143 F.4th at 229. The DTSA further provides that the "improper means" of acquiring a trade secret "includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain

---

[9] In relevant part, the DTSA provides:

> In a civil action brought under this subsection with respect to the misappropriation of a trade secret, a court may--
> (A) grant an injunction--
> (i) to prevent any actual or threatened misappropriation described in paragraph (1) on such terms as the court deems reasonable, provided the order *does not*--
> (I) prevent a person from entering into an employment relationship, and that conditions placed on such employment shall be based on evidence of threatened misappropriation and not merely on the information the person knows. . . .

18 U.S.C. § 1836(3)(A)(i)(I) (emphasis added).

15

secrecy, or espionage through electronic or other means" but does not include "reverse engineering, independent derivation, or any other lawful means of acquisition." 18 U.S.C. § 1839(6).

57. Under North Carolina law, misappropriation is established by introducing "substantial evidence" that the defendant: "(1) knows or should have known of the trade secret; and (2) has had a specific opportunity to acquire it for disclosure or use or has acquired, disclosed, or used it without the express or implied consent or authority of the owner." N.C. Gen. Stat. § 66-155.

### a. Defendant Gabehart

58. JGR has shown a likelihood of success on the merits with respect to its misappropriation claims against Defendant Gabehart. JGR has shown that Defendant Gabehart had access to JGR's Confidential Information, as defined in his Employment Agreement, and Gabehart agreed to not disclose such information. Despite this, Defendant Gabehart took copies of JGR's Confidential Information on his personal cell phone and his personal storage drives without JGR's consent. Gabehart later admitted to taking the photographs of JGR's information with his cell phone. (Doc. No. 12 at ¶ 13).

59. "Courts in the Fourth Circuit have routinely held that a former employee sending trade secrets to his or her personal devices in similar circumstances constitutes actual or threatened misappropriation. . . ." Laz Karp Assocs., Inc. v. Starre, No. 1:25-CV-2111 (RDA/WBP), 2025 WL 3562612, at *7 (E.D. Va. Dec. 12, 2025) (collecting cases); Northrop, 2019 WL 3543877, at *8 ("The fact that after the filing of this matter, the information has been forensically examined and removed from [plaintiff's] email account indicates [plaintiff's] willingness to comply with this provision; however, it does not moot the need for an injunction under these facts.").

16

60.    JGR has specifically enumerated the files containing trade secrets that Defendant Gabehart acquired through improper means, including, but not limited to, comprehensive post-race audit and analyses of team and driver performance for the entire 2025 NASCAR season; complete team payroll details including job titles, contract length, annual compensation, incentive compensation, and compensation plans for prior years; an employee compensation calculator used to project and plan pay for key JGR positions; driver pay for the 2025 and 2026 NASCAR seasons; revenues from sponsors, partners, and other business arrangements for the 2024, 2025, and 2026 NASCAR seasons; JGR's pit crew analytics for the 2024 NASCAR season; and detailed analytics of racecar tires used to assess impact on race results.  (Doc. No. 9-2 at ¶ 25; Doc. No. 9-4 ¶ 22).

61.    Other files identified by JGR that contained trade secrets included: (a) a 141 page .pdf file titled "Post Race Data Analysis" for a 2025 Las Vegas race containing all of JGR's data analytics including data JGR measures at races and how it measures that data; (b) more than 20 set up and simulation files which are reports generated by proprietary software using inputs that hundreds of different JGR employees manually add based off their know-how, historical data, and simulations to determine the best possible racecar setup; (c) a document detailing proprietary engine outputs and recommended gear shift points; (d) a document detailing the manner in which JGR sorts and run tires through a race; (e) a document detailing how JGR estimates fuel mileage for its drivers and competitors during races and adjustments to strengthen accuracy; (f) a document showing JGR's process for evaluating performance during races which could immediately help competitors improve race execution and performance; (g) a photo of a document detailing the manner in which JGR measures and seeks to eliminate subpar pit stops and its bonus structure for its pit crews for successful pit stops; (h) a spreadsheet listing base compensation and bonus for key members of

17

JGR's teams; and (i) a document comparing a JGR driver's performance at a specific race to that of a Spire driver. (Doc. No. 9-2 at ¶ 24; Doc. No. 9-4 at ¶ 14).[10]

62. The Court concludes these materials are trade secrets under both the DTSA and North Carolina's TSPA because they contain business, financial, or technical information, among other things, and the files contain information which JGR developed based on its extensive research and collection of data points about different cars, drivers, tracks, tires, and race conditions (to name a few), that would be extremely valuable in the hands of a competitor. The information also was developed by JGR based on months and years of research and data collection, throughout race car seasons, which JGR took reasonable steps to keep secret, including among other things, requiring Gabehart and other employees to sign confidentiality agreements and JGR's setting limits on access to such information.

63. Defendants have pointed out that certain parts of files identified by JGR are publicly available. While some portions of a compilation of confidential information may be publicly available, the entire compilation itself can still be considered as a trade secret. 18 U.S.C. § 1839(3); N.C. Gen. Stat. § 66-152(3) (recognizing compilations of information as trade secrets); see also Glytec, 2025 WL 1750441, at *4; IHS Global Ltd. v. Trade Data Monitor, LLC, No. 2:18-CV-01025-DCN, 2021 WL 2134909, at *7 (D.S.C. May 21, 2021). "Courts have long recognized that 'a trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret.'" AirFacts, Inc. v. de Amezaga, 909 F.3d 84, 96 (4th Cir. 2018) (quoting Imperial Chem. Indus. v. Nat'l Distillers &

---

[10] In addition, JGR has rightly expressed concerns related to Gabehart's use of JGR's Confidential Information to create new documents, such as GABEHART00222 and GABEHART00094, discussed *supra*.

Chem. Corp., 342 F.2d 737, 742 (2d Cir. 1965)); see also Prysmian Cables, 573 F. Supp. 3d at 1037, 1043–1044.

64.     The effort, skill, and know-how to compile the information into a coordinated document and to use that information to a racing team's benefit demonstrates the significance of its secrecy. Indeed, the effort required of the competitor or unauthorized user to re-create the compilation "underscores why such information is considered a trade secret in the first place: it requires competitors to expend employee effort and perform substantial competitive intelligence as opposed to simply referring to a comprehensive stolen document which neatly lays everything bare."  Prysmian Cables, 573 F. Supp. 3d at 1042 n.8; see also ClearOne Advantage, LLC v. Kersen, 710 F. Supp. 3d 425, 436 (D. Md. 2024).

65.     Considering Plaintiff has made a clear showing as to both elements, the Court concludes that Plaintiff has shown that it is likely to succeed on the merits as to its misappropriation of trade secrets claims against Defendant Gabehart.

### b.      Defendant Spire

66.     Conversely, the Court concludes that JGR has not established likelihood of success on the merits as to its misappropriation of trade secret claims against Defendant Spire.  JGR has not clearly shown that Spire acquired, used, or disclosed any of the JGR trade secrets resulting in actual or threatened misappropriation.  In fact, JGR has not identified a specific trade secret that Defendant Spire has misappropriated, but instead generally points to the information obtained by Defendant Gabehart.  See e.g., Analog Devices, Inc. v. Michaelski, 579 S.E.2d 449, 453 (N.C. Ct. App. 2003) (affirming denial of preliminary injunction and noting that a party asserting misappropriation "must identify a trade secret with sufficient particularity so as to enable a

19

defendant to delineate that which he is accused of misappropriating and a court to determine whether a misappropriation has or is threatened to occur.").

67.     JGR correctly states that "[d]irect evidence [. . .] is not necessary to establish a claim for misappropriation of trade secrets; rather, such a claim may be proven through circumstantial evidence."  Bridgetree, Inc. v. Red F Marketing LLC, No. 3:10-cv-00228-FDW-DSC, 2013 WL 443698, at *8 (W.D.N.C. 2013) (quoting Med. Staffing Network, Inc. v. Ridgway, 670 S.E.2d 321, 329 (N.C. Ct. App. 2009)).  But the evidence offered by JGR as to Spire, whether proven directly or by circumstantial evidence, is not sufficient.

68.     JGR claims, based on Defendant Gabehart's conduct, that Spire now has access to trade secrets through Defendant Gabehart's new employment with Spire, and thus, there is a threat of misappropriation by Spire and a high risk that Spire will use such information.  For example, JGR relies on Defendant Gabehart's use of JGR's information to create a "Spire" Focus Plan, but there has yet to be sufficient evidence that this document was ever shared with Spire or created with Spire's knowledge or at its behest.  Further, as Spire argues, Gabehart created this document before he began his employment at Spire.

69.     JGR relies on PepsiCo., Inc. v. Redmond, 54 F.3d 1262, 1269 (7th Cir. 1995), as discussed by Merck & Co. Inc. v. Lyon, 941 F. Supp. 1143 (M.D.N.C. 1996), and Bimbo Bakeries USA, Inc. v. Botticella, 613 F.3d 102, 117–18 (3d Cir. 2010), in support of its request for an injunction against Spire, all of which address the doctrine of inevitable disclosure.

70.     The doctrine of inevitable disclosure posits that an employee who has trade secrets of his employer and leaves that employer for a competitor will inevitably use or disclose trade secrets of the first employer in the course of the new employment.  See FMC Corp. v. Cyprus Foote Min. Co., 899 F. Supp. 1477, 1482 (W.D.N.C. 1995); Analog Devices, 579 S.E.2d at 455; Se.

20

Anesthesiology Consultants, PLLC v. Charlotte-Mecklenburg Hosp. Auth., No. 18 CVS 5899, 2018 WL 3304441, at *19 (N.C. Super. June 22, 2018).

71.     As it relates to North Carolina's TSPA, North Carolina courts have discussed but declined to adopt the doctrine of inevitable disclosure.  See FMC Corp., 899 F. Supp. at 1482; Analog Devices, 579 S.E.2d at 455; RCR Enters., LLC v. McCall, No. 14 CVS 3342, 2014 WL 7591977, at *6 (N.C. Super. Dec. 19, 2014) (rejecting the inevitable disclosure doctrine); Se. Anesthesiology Consultants, 2018 WL 3304441, at *19 (recognizing North Carolina courts have "only addressed the doctrine on limited occasions and has declined to apply the doctrine where invited to do so" and observing that a federal district court's prediction that North Carolina would adopt and apply the inevitable disclosure doctrine "ha[d] still not come to fruition" nearly twenty-two years later.) (referring to Merck & Co. Inc., 941 F. Supp. at 1459 and collecting other cases).

72.     As it relates to the DTSA, federal courts within the Fourth Circuit with an opportunity to address the issue have concluded the inevitable disclosure doctrine is not recognized.  Peraton, Inc. v. Hussain, No. DKC 25-2164, 2025 WL 2829750, at *5 (D. Md. Oct. 6, 2025) ("Plaintiff has not directed the court to any precedent in the Fourth Circuit for applying the doctrine under federal law, and the court is unaware of any. It would be inappropriate, then, to pioneer the inevitable disclosure doctrine in service of an extraordinary remedy."); Sirius Fed., LLC v. Jelen, No. 22-CV-00223-LKG, 2023 WL 2213929, at *11 (D. Md. Feb. 24, 2023) (noting Maryland courts have rejected the inevitable disclosure theory under the federal Defend Trade Secrets Act).

73.     JGR acknowledges that the doctrine has not been formally adopted in North Carolina despite some courts discussing it, but in a roundabout fashion still attempts to get the Court to apply the underlying premise.  Therein lies the problem. JGR has not specifically identified which trade secrets that Spire has misappropriated or threatened to misappropriate other than the

21

information taken by Defendant Gabehart, which at its core is based on the theory that Defendant Gabehart will inevitably disclose such information to Spire. Considering the North Carolina courts as well as federal courts in this Circuit addressing DTSA have declined to adopt such a theory, the Court also declines to "pioneer the inevitable disclosure doctrine in service of an extraordinary remedy" against Spire at this time. Peraton, Inc., 2025 WL 2829750, at *5; Analog Devices, 579 S.E.2d at 455; FMC Corp., 899 F. Supp. at 1482.

74.    Spire also searched its company files and, to date, maintains it has not identified any of JGR's trade secrets in its possession. Spire also has undertaken proactive steps to remove Defendant Gabehart's computer access at Spire as of March 18, 2026, in light of the present litigation, and it revoked his access to all Spire systems. Spire instructed Gabehart not to disclose JGR's information and entered into an agreement with Gabehart prohibiting such disclosure. Analog Devices, 579 S.E.2d at 471 (affirming trial court denial of injunctive relief and noting, among other things, that defendant new employer instructed employee not to divulge confidential information belonging to former employer).

75.    JGR also asserts that Defendant Spire recently began contacting its sponsors, but, as Defendant Spire counters, the name of the sponsor is public (and typically displayed on the racecar itself) and the solicitations did not involve Defendant Gabehart or any Confidential Information allegedly misappropriated by him (i.e., JGR's records as to revenue from sponsors). Defendant Spire also emphasizes that it previously assisted JGR in identifying sponsor information in a consultant capacity, and that it independently has many relationships with sponsors. (Doc. No. 45-2 ¶¶ 6, 66). Therefore, this assertion alone could not form the basis of a threat of misappropriation claim.[11]

---

[11] JGR relies on Am. Air Filter Co., Inc. v. Price, 16 CVS 13610, 2017 WL 485517, at *8 (N.C. Super. Feb. 3, 2017), in support of its request that injunctive relief be extended to Spire. However, the facts are different in that case in that

76. JGR also points to deleted text messages by Defendant Gabehart[12] and Defendant Spire's co-owner Jeff Dickerson, who had an auto-delete feature enabled on his phone, seeking an adverse inference that the deleted evidence may prove transmission of JGR's information to Spire. However, the Court declines to adopt such an inference at this time without a more fulsome record about the underlying circumstances.

77. The Fourth Circuit recently affirmed injunctive relief against former employees who were subject to confidentiality and nonsolicitation provisions in their employment agreements, but reversed the issuance of the injunction against the new firm for too broadly enjoining the new firm where the firm was not party to the underlying employment agreements and did not "raid" the information of the former firm. Salomon v. Ludwin, 150 F. 4th 268, 271 (4th Cir. 2025). The plaintiff in Salomon similarly had brought claims for violations of the Defend Trade Secrets Act under 18 U.S.C. 1836(b)(1) against all defendants, both the former employees and the new firm, with a corresponding state law claim. Id. at 273. The plaintiff also alleged tortious interference with business relations against all defendants and breach of contract against the former employees. Id. The Court observed that the former employees "all but admitted" that the client information of the former employer constitutes a trade secret, and there was a strong likelihood of success on the merits of its trade secrets claims as to the former employees. Id. at 278. But, the Fourth Circuit took issue with the scope of the district court's preliminary injunction broadly enjoining all defendants. Id. at 271, 273-74, 278-79. Ultimately, the Fourth Circuit concluded that while it was proper to enjoin the former employees, it was an abuse of discretion to enjoin the new firm under the applicable facts. Id. at 271, 278-79. With this in mind, the Court has attempted to fashion

---

the defendant "admitted that he has contacted several of his former. . . customers since becoming employed with [his new employer]" and was still contacting them "despite [d]efendant's promises that he would not do so." Id.

[12] Defendant Gabehart acknowledges that he deleted certain text messages with Jeff Dickerson on November 15, 2025.

23

injunctive relief molded to the exigencies of this particular case and preserving the status quo without issuing an overly broad injunction.[13]

78.     Thus, the Court concludes that JGR has not made a clear showing of the likelihood of success of the merits as to its misappropriation claims against Spire.

### ii.     Breach of Contract - Defendant Gabehart[14]

79.     JGR alleges a breach of contract claim against Defendant Gabehart based on violations of the nondisclosure and noncompete provisions under his Employment Agreement.  Under North Carolina law, a party alleging breach of contract must establish: (1) the existence of a valid contract and (2) the breach of the terms of that contract.  Northrop, 2019 WL 3543877 at *4; Poor v. Hill, 530 S.E.2d 838, 843 (2000).  The Court will address each of these in turn.

### a.     Covenant Not to Compete

80.     Covenants not to compete are disfavored in North Carolina.  RLM Commc'ns, Inc. v. Tuschen, 831 F.3d 190, 196 (4th Cir. 2016).  North Carolina courts "have a long history of carefully scrutinizing . . . covenants that prevent an employee from competing with his former employer." ChemiMetals Processing v. McEneny, 476 S.E.2d 374, 376 (N.C. Ct. App. 1996) (citing United Labs., Inc. v. Kuykendall, 370 S.E.2d 375, 380 (N.C. 1988)); Prometheus Grp. Enters., LLC v. Gibson, No. 22 CVS 14236, 2023 WL 2589284, at * 4 (N.C. Super. Mar. 21, 2023) (citing Hartman v. W.H. Odell & Assocs., 450 S.E.2d 912, 916 (N.C. Ct. App. 1994)).

81.      A restrictive covenant not to compete between an employer and an employee is valid and enforceable under North Carolina law if it is "(1) in writing; (2) made a part of the employment

---

[13] The Court notes that Defendant Gabehart is enjoined from retaining, transferring, using, copying, or disclosing any of JGR's Confidential Information and trade secrets to anyone else, including Spire.

[14] Given the Court's analysis related to the North Carolina's TSPA as to both Defendants, the Court need not further address the Unfair and Deceptive Trade Practices for the purposes of this preliminary injunction.  The Court notes, however, that "[a] violation of the Trade Secrets Protection Act constitutes an unfair practice under N.C. Gen. Stat. § 75-1.1 N.C. Gen. Stat. § 66-146 (2007)."  See Med. Staffing Network, 670 S.E.2d at 329.

24

contract; (3) based on valuable consideration; (4) reasonable as to time and territory; and (5) not against public policy." Northrop, 2019 WL 3543877, at *5 (citing Milner Airco, Inc. v. Morris, 433 S.E.2d 811, 813 (N.C. Ct. App. 1993)).

82. Restrictive covenants must also be necessary to protect the employer's legitimate business interests. Med. Staffing Network, 670 S.E.2d at 327. The party seeking enforcement of the agreement bears the burden of proving its reasonableness. Id.

83. Plaintiff has made a clear showing of likelihood of success in establishing the restrictive covenant not to compete was in writing as part of an employment contract based on valuable consideration, and thus, satisfies the first three elements.

84. As to the fourth element, a "court should consider the time and territory restrictions in tandem." Northrop, 2019 WL 3543877, at *5. In determining whether the time geographic scope of a covenant is reasonable, North Carolina courts have considered factors such as:

> (1) the area, or scope, of the restriction; (2) the area assigned to the employee; (3) the area where the employee actually worked or was subject to work; (4) the area in which the employer operated; (5) the nature of the business involved; and (6) the nature of the employee's duty and his knowledge of the employer's business operation.

Hartman, 450 S.E.2d at 917.

85. Under the Employment Agreement, Plaintiff submits because Defendant Gabehart's termination was with cause, the noncompete covenant term is 18 months and is limited to the "services of the general type of services that [Gabehart] provided to [JGR] in the year prior to such termination to any other NASCAR Xfinity Series or NASCAR Cup Series racing team (or their

25

respective successor series) or any vehicle manufacturing company or other person or entity that provides goods or services to such a team."[15] (Doc. No. 8-2).

86. Defendant Gabehart argues that he invoked Paragraph 2 of Section 6 of his Employment Agreement, which would have imposed a reduced one-week noncompete period. However, Paragraph 2 of Section 6 by its plain language contemplates a "termination without cause." Id. While there is evidence the parties initially discussed Paragraph 2 of Section 6, all bets were off once JGR uncovered Defendant Gabehart's taking photographs on his personal cell phone of JGR's Confidential Information and taking other files without its permission. Considering all of this, JGR has demonstrated the termination was for cause and the separation agreement between JGR and Gabehart had not yet been executed. Thus, the 18-month covenant not to compete is operative.

87. JGR also has made a clear showing that the covenant not to compete is reasonable as to its terms, time, and territory. Gabehart held a high-level position at JGR and worked there since 2012. Given the length of his career and the position he held, he had deep knowledge of JGR's business operations and confidential information. Further, the scope of the covenant does not completely bar an employee from working in the industry. Rather, it restricts the employee from performing services provided to the employer in the year prior to such termination.

88. Similar covenants not to compete with 18-month restrictions in both time, term, and territory have been found reasonable under North Carolina law. See GXO Logistics, Inc. v.

---

[15] JGR asks this Court to adopt a long list of duties that Gabehart may not perform for Spire and to require Gabehart to maintain "detailed contemporaneous records of all work activities and job duties performed for Spire." (Doc. No. 35, Ex. A at 2-8). The Court declines to do so. The Court will enforce the Employment Agreement as it is written and will not re-write or expand its plain language. Nor does the Court elect to "blue pencil" the covenant not to compete. See, e.g., Tech. Partners, Inc. v. Hart, 298 F. App'x 238, 243 (4th Cir. 2008) (noting that North Carolina's "blue pencil" rule is narrow and within a court's discretion, and, "at most" allows a court to choose "not to enforce a distinctly separable part of a covenant in order to render the provision reasonable." The court "may not otherwise revise or rewrite the covenant.")

26

Cunningham, No. 3:23-CV-000199-RJC-DCK, 2023 WL 3470894, at *4 (W.D.N.C. May 15, 2023) (finding restrictive covenant "'perform[ing] any competitive services . . . for a Competing Business' anywhere within the United States, Mexico, or Canada for a period of eighteen months after his termination date" to be reasonable, but denying TRO on other grounds) (citing Harwell Enterprises, Inc. v. Heim, 173 S.E. 2d 316, 320 (N.C. 1970) (holding two-year restriction reasonable because "business activities throughout the United States support the reasonableness of the restriction imposed as to the territory covered.") and Okuma Am. Corp. v. Bowers, 638 S.E.2d 617, 622 (N.C. Ct. App. 2007)); see also Philips Elecs. N. Am. Corp. v. Hope, 631 F. Supp. 2d 705, 717 (M.D.N.C. 2009) ("As a general proposition, a noncompetition agreement of two years is 'well within the range that the North Carolina courts have deemed reasonable.'") (citing Lockhart v. Home–Grown Indus. of Ga., Inc., No. 3:07–CV–297, 2007 WL 2688551, at *5 (W.D.N.C. Sept. 10, 2007)).

89.     JGR also has made a clear showing that the restrictive covenant is necessary to protect its legitimate business interests, including protecting its Confidential Information and trade secrets in a competitive racing industry, and that it is not against public policy. See Carlson Env't Consultants, PC v. Slayton, No. 3:17-CV-00149-FDW-DCK, 2017 WL 4225993, at *7 (W.D.N.C. Sept. 21, 2017); Northrop, 2019 WL 3543877, at *6 (recognizing confidential information is a legitimate business interest that supports enforcement of noncompetition restrictions); Med. Staffing Network, 670 S.E.2d at 327.

90.     "[A] further consideration by this Court, in recognizing the validity of these covenants, is that at the time of entering these contracts containing covenants not to compete both parties apparently regarded the restrictions as reasonable and desirable." Kennedy v. Kennedy, 584 S.E.2d 328, 333 (N.C. Ct. App. 2003) (quoting United Labs, 370 S.E.2d at 380). At the hearing,

27

the parties acknowledged that even Spire has a noncompete included in its employment contract with Gabehart.

91.     Defendant Gabehart asks this Court to find the Employment Agreement unenforceable on a separate basis – that JGR has "unclean hands" over final compensation Defendant Gabehart contends is owed to him.  North Carolina courts have long recognized that a party seeking injunctive relief must come to the court with "clean hands."  Kennedy, 584 S.E.2d at 337.  To render the restrictive covenant unenforceable on this basis, defendants must show the alleged breach was "substantial and material and goes to the heart of the agreement."  Kennedy, 584 S.E.2d at 336 (citing Combined Ins. Co. of America v. McDonald, 243 S.E.2d 817, 819 (N.C. Ct. App. 1978).  An immaterial breach does not, however, bar a plaintiff from obtaining injunctive relief. Id.

92.     Defendants have cited to Maaco Franchising, LLC, v. Ghirimoldi, No. 3:15-CV-99, 2015 WL 4557382, at *7 (W.D.N.C. July 28, 2015), in which the court denied equitable relief where defendants established multiple, significant breaches by plaintiff, including failing to adhere to multiple aspects of the Franchise Agreement which undermined Defendants' ability to succeed as a Maaco franchise.  (Doc. No. 42 at 12; Doc. No. 53 at 3).  But Maaco is quite different.  Defendant Gabehart has neither shown multiple, significant breaches.  While the payment of his earned performance bonus may have been delayed by approximately seventeen days, such a delay does not give rise to a "substantial and material" breach, nor go to the heart of the Employment Agreement, as would be required to deny equitable relief.  It is also unclear whether JGR would owe any additional compensation to Defendant Gabehart under the Employment Agreement. (Doc. No. 8-2 ¶¶ 3-4).

28

93.     For all of these reasons, the Court concludes that JGR has made a clear showing that the covenant not to compete is reasonable and enforceable.

**b.      Nondisclosure of Confidential Information**

94.     Plaintiff also has made a clear showing of likelihood of success in establishing that Defendant Gabehart breached the Employment Agreement by taking JGR's Confidential Information, as defined therein.  (Doc. No. 8-2 ¶ 5).

95.     North Carolina law distinguishes between restrictive covenants, which seek to prevent a person from engaging in competition with the prior employer and, therefore, act as a restraint on trade, and confidentiality agreements, which aim "to prevent the disclosure or use of confidential information," and, therefore, do not restrain trade.  ChemiMetals Processing, 476 S.E.2d at 374. But, as with restrictive covenants, such nondisclosure covenants must be "narrowly tailored to protect a legitimate business interest of the employer to be enforceable."  Prometheus Grp. Enter., 2023 WL 2589284, at *4 (citing Sterling Title Co., v. Martin, 831 S.E.2d 627, 631 (N.C. Ct. App. 2019)). Protecting proprietary information is a legitimate business interest.  A.E.P. Industries v. McClure, 302 S.E.2d 754 (N.C. 1983).

96.     The Court need not belabor its analysis on the enforceability of the nondisclosure provision in Defendant Gabehart's Employment Agreement.  Defendant Gabehart agreed by signing the Employment Agreement to "not disclose Confidential Information to any third party or use any Confidential Information for any purpose other than as necessary to perform pursuant to this Agreement."  Id.

97.     JGR has made a clear showing of likelihood of success on the merits that Gabehart violated this provision of his Employment Agreement when he took approximately 16 screenshots with his personal cell phone and sent other JGR files to his personal devices and drives.

29

### iii. Tortious Interference with Contract - Defendant Spire

98. The Court concludes that JGR has not made a clear showing of the likelihood of success on the merits related to the tortious interference with contract claim against Spire.

99. To establish a claim for tortious interference with contract under North Carolina law, a plaintiff must show: "(1) a valid contract between plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so [defendant] acts without justification; (5) resulting in actual damage to the plaintiff." United Labs, 370 S.E.2d at 387 (citing Childress v. Abeles, 84 S.E.2d 176, 181-82 (N.C. 1954)).

100. A complaint alleging tortious interference "must admit of no motive for interference other than malice." Filmar Racing, Inc. v. Stewart, 541 S.E.2d 733, 738 (N.C. Ct. App. 2001) (affirming dismissal of tortious interference with a contract claim); see also Privette v. Univ. of N. Carolina at Chapel Hill, 385 S.E.2d 185, 191 (N.C. Ct. App. 1989) (same); Prometheus Grp. Enter., 2023 WL 2589284, at *10.

101. "Numerous authorities have recognized that competition in business constitutes justifiable interference in another's business relations and is not actionable so long as it is carried on in furtherance of one's own interests and by means that are lawful." Peoples Sec. Life Ins. Co. v. Hooks, 367 S.E.2d 647, 650 (N.C. 1954); see also RLM Communications, 831 F.3d at 203.

102. If a defendant's interference is for "a legitimate business purpose, his actions are privileged." Hooks, 367 S.E.2d at 650. This privilege is conditional or qualified and will be lost if exercised for a wrong purpose. Id. "[A] wrong purpose exists where an act is done other than as a reasonable and *bona fide* attempt to protect the interest of the defendant." Id. (quoting Smith

30

v. Ford Motor Co., 221 S.E.2d 282, 294 (N.C. 1976) (emphasis in original)). "If the defendant's only motive is a malicious wish to injure the plaintiff, his actions are not justified." Id.

103. "The malice required to overcome a justification of business competition is legal malice, and not actual malice." The Bldg. Ctr., Inc. v. Carter Lumber, Inc., No. 16 CVS 4186, 2016 WL 6142993, at *6 n.1 (N.C. Super. Oct. 21, 2016) (citing Childress, 84 S.E.2d at 182).[16] "Legal malice" "denotes the intentional doing of the harmful act without legal justification." Childress, 84 S.E.2d at 182. "It is not necessary, however, to allege and prove actual malice in the sense of personal hatred, ill will, or spite in order to make out a case [for tortious interference with contract]." Id.

104. In reviewing the Amended Complaint, the Court is dubious that JGR has sufficiently pled this claim against Defendant Spire in light of the above case law. (Doc. No. 8). However, even assuming JGR has sufficiently pled such a claim, JGR has not presented sufficient evidence that: (1) Spire intentionally induced Gabehart not to perform his Employment Agreement with JGR; or (2) that Spire acted without justification.

105. As to the intentional inducement, Gabehart and JGR had already decided to part ways as early as November 6, 2025, or, at the latest, by November 10, 2025, when Gabehart returned his JGR computer and the parties were negotiating a separation agreement. Based on the facts as presently known, this was before Spire made a job offer to Gabehart on or around November 13, 2025, and before JGR's call to Spire to notify them of Gabehart's noncompete, which is disputed, on December 3, 2025.

---

[16] Plaintiff relies on Carter Lumber and Gabehart's increased compensation at Spire to support its tortious interference claim. 2016 WL 6142993, at *6. However, the North Carolina Business Court in Carter Lumber also cited multiple factors that are not currently present here, including that the new employer expanded and "acquired several of plaintiff's most important and critical customers." Id. Further, the Court's decision involved denying defendant's motion to dismiss at the Rule 12(b)(6) stage. Id. at 2, 5-7.

31

106.     Additionally, JGR and Spire are competitors.  Spire is therefore entitled to a conditional privilege, meaning Spire would not be liable for hiring away an employee from a competitor so long as the motivation was competition rather than malice.  Hooks, 367 S.E.2d at 650; see also RLM Communications, 831 F.3d at 203. Plaintiff has not presented sufficient evidence at this stage that Spire acted with malice or otherwise induced Defendant Gabehart to acquire, use, or disclose Plaintiff's trade secrets.

107.     As a result, Plaintiff has not established a likelihood of success on the merits for its tortious interference claim against Spire.

### C.     Irreparable Harm[17]

108.     Plaintiffs seeking preliminary relief must make a clear showing "that irreparable injury is *likely* in the absence of an injunction."  Winter, 555 U.S. at 22 (emphasis in original).  Such harm must neither be "remote nor speculative, but actual and imminent."  Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell, 915 F.3d 197, 216 (4th Cir. 2019) (citing Direx Israel, Ltd. v. Breakthrough Med. Corp., 952 F.2d 802, 812 (4th Cir. 1991)).  A party suffers irreparable harm when the party "cannot be fully rectified by the final judgment after trial." Id.; see also Northrop, 2019 WL 3543877, at *8 (noting "irreparable injury is suffered when monetary damages are difficult to ascertain or are inadequate.") (quoting Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co., 22 F.3d 546, 551 (4th Cir. 1994)).

109.     Here, Plaintiff has made a clear showing that irreparable injury is likely in the absence of an injunction against Gabehart.  Courts have recognized that "loss of even a single trade secret

---

[17] Given that the Court has found JGR has not shown a clear likelihood of success on the merits as it relates to Spire, the Court is not required to further analyze the remaining Winter factors as to Spire.  See SVB Sec. Holdings, 2022 WL 4369991, at *6 ("Because Plaintiffs failed to demonstrate a likelihood of success on the merits, the Court need not consider the remaining factors.")  However, as noted previously in its TRO (Doc. No. 26), the Court has already found that Plaintiff has not shown irreparable harm as to Spire given the speculative nature of whether Spire has acquired, used, or disclosed JGR's trade secrets —or even threatened to do so—based on the present record, as discussed *supra*.

32

constitutes irreparable harm, and the threatened disclosure of a trade secret supports the imposition of injunctive relief." Prysmian Cables, 573 F.Supp.3d at 1044 (citing Nucor Corp. v. Bell, No. 2:06-CV-02972-DCN, 2008 WL 9894350, at *20 (D.S.C. Mar. 14, 2008)).  Also, courts often find irreparable harm and grant an injunction when there is a substantial risk a defendant will "continue to divulge or misappropriate trade secrets in the absence of court action."  ClearOne Advantage, 710 F.Supp.3d at 436 (quoting Brightview Grp. LP v. Teeters, 441 F. Supp. 3d 115, 142 (D. Md. 2020)).

110.    JGR has made a clear showing that it has suffered and will continue to suffer irreparable harm without an injunction to prevent further misappropriation by Defendant Gabehart of JGR's Confidential Information and trade secrets, and to enforce Gabehart's contractual obligations.  See Northrop, at *8 (analyzing irreparable harm and noting the necessity of injunctive relief was heightened where there were multiple breaches of an employment agreement and secret misappropriation of the employer's proprietary files).  The fact that the Confidential Information has been forensically removed from his personal devices, while indicative of his willingness to comply with the legal process at this juncture, does not moot or negate the need for injunctive relief under these facts.  See id.

### D.    Balance of Equities

111.    The third element that JGR must establish is that the balance of equities tips in its favor. Winter, 555 U.S. at 20.  Here, the balance of equities weighs in favor of JGR as there is great harm in the release of JGR's Confidential Information and trade secrets in a highly competitive racing industry.  There is little harm to Gabehart in granting this TRO, which requires Gabehart to do that which he is already required to do under his Employment Agreement with JGR.  Accordingly, a limited injunction with these provisions preserves the status quo of the parties.

33

### E. Public Interest

112. The final factor that the Court must consider is public interest. "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." Winter, 555 U.S. at 24 (citations omitted).

113. The Court concludes the public interest is furthered by the granting of a preliminary injunction because it is in the public interest to protect confidential information of businesses that was disclosed without authorization and to enforce valid noncompete covenants. JGR has a legitimate business interest in being able to share confidential information with its employees without fearing that it will land in the hands of a competitor. Northrop, at *9; see also Philips Elecs., 631 F. Supp. 2d at 717. Further, "[i]t is as much a matter of public concern to see that valid [covenants] are observed as it is to frustrate oppressive ones." Northrop at *9 (quoting United Labs, 370 S.E.2d at 380).

## IV. CONCLUSION

For the reasons set forth above, the Court **GRANTS IN PART** and **DENIES IN PART** JGR's Motion for Preliminary Injunction. (Doc. No. 9). Specifically, the Court will preliminarily enjoin Gabehart as set forth below. The Court denies without prejudice the preliminary injunction against Spire at this time.

 **IT IS THEREFORE ORDERED** that during the pendency of this action:

(i) Defendant Gabehart shall immediately cease and desist from retaining, transferring, using or copying any of JGR's Confidential Information and trade secrets;

(ii) Defendant Gabehart shall cease and desist from using or disclosing JGR's Confidential Information and trade secrets;

34

(iii)	Defendant Gabehart shall return any of JGR's Confidential Information and trade secrets in his possession to JGR;

(iv)	Defendant Gabehart shall be restrained from violating Section 6 of his Employment Agreement, which prohibits providing services of the general type of services that Defendant Gabehart provided to JGR in the year prior to his termination. For the sake of clarity, the Court is not requiring Gabehart to resign from his position at Spire or prohibiting him from working for Spire. Other services not performed at JGR in the year prior to his termination are permissible. This Order does not prohibit Gabehart from attending the NASCAR Cup Series and the NASCAR O'Reilly Auto Parts Series or prevent him from performing other services at those races not implicated by Section 6 of his Employment Agreement.

**IT IS FURTHER ORDERED** that Plaintiff maintain its posted bond of $100,000 pursuant to Federal Rule of Civil Procedure 65(c), which the Court finds is appropriate and adequate.

**SO ORDERED**.	Signed: April 23, 2026

_____
Susan C. Rodriguez
United States District Judge