# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
### Case No. 3:26-CV-00133-SCR-DCK

JOE GIBBS RACING, LLC,

        Plaintiff,

        v.

CHRISTOPHER GABEHART and SPIRE
MOTORSPORTS II, LLC,

        Defendants.

**SECOND AMENDED COMPLAINT**

Plaintiff Joe Gibbs Racing, LLC ("JGR" or the "Company"), by and through counsel, complaining of Defendant Christopher Gabehart ("Gabehart") and Spire Motorsports II, LLC ("Spire") (together Gabehart and Spire are referred to as "Defendants"), alleges and states as follows:

## INTRODUCTION

Until November 10, 2025, Gabehart served as one of JGR's most senior leaders with respect to all competitive aspects of the business. After his demands for additional authority were rebuffed by JGR's owner, Gabehart immediately embarked on a brazen scheme to steal JGR's most sensitive information and use it for the benefit of a direct competitor in NASCAR—Spire. In this action, JGR seeks to recover its extensive damages and enjoin Defendants from violating Gabehart's contractual obligations and wrongfully using or disclosing JGR's confidential information and trade secrets.

1

## JURISDICTION, PARTIES, AND VENUE

1.     JGR is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business in Huntersville, North Carolina.  JGR is in legal existence and is in good standing with the capacity to sue.

2.     Gabehart is a resident of Mooresville, North Carolina.

3.     Spire is a limited liability company organized and existing under the laws of the State of North Carolina with its principal place of business in Mooresville, North Carolina.

4.     The Court has subject-matter jurisdiction over the federal claim in this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1836(c).

5.     The Court has supplemental jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367(a) because the claims are so related to the federal claim that they constitute part of the same case and controversy.

6.     The Court has personal jurisdiction over Defendants because they are domiciled within the State of North Carolina and within this Judicial District.

7.     Venue is proper in the Western District of North Carolina pursuant to 28 U.S.C. § 1392(b)(1) because Defendants reside within this Judicial District.

## FACTUAL BACKGROUND

### I.     JGR's Confidential Information and Trade Secrets.

8.     JGR is a chartered stock car race team that has multiple drivers and supporting teams that compete in the NASCAR Cup Series and NASCAR O'Reilly Auto Parts Series.

9.     JGR began competing in the NASCAR Cup Series in 1992 and began competing in the NASCAR O'Reilly Auto Parts Series in 1997.  Over its history, JGR has amassed 448 wins,

2

five NASCAR Cup Series Championships, and four NASCAR O'Reilly Auto Parts Series Championships.

10. NASCAR operates within an exceptionally competitive environment, where on-track results directly impact substantial financial interests, professional reputations, and the livelihoods of teams, drivers, sponsors, and countless industry employees. NASCAR commands an intensely engaged fan base that closely follows race outcomes and expects those outcomes to be determined by fair competition.

11. JGR competes directly against other NASCAR teams in both series.

12. JGR's exceptional results are the result of decades of technical and process driven collection of proprietary data, research, refinement, and innovation among other things. JGR's analyses, processes, and strategies are highly specialized and technically complex.

13. Like all NASCAR teams, JGR is constantly innovating to improve race performance via technical racecar setup, racecar component specifications, maximizing the performance of racecar components, processes to improve driver and supporting team member performance, and processes and strategies to attract and retain the best team members and sponsors to support JGR's product.

14. Through the efforts and activities described above, JGR has created and compiled sensitive, confidential, and proprietary information, including trade secrets and other valuable intellectual property ("Confidential Information and Trade Secrets"). JGR's Confidential Information and Trade Secrets include, without limitation:

      a. Technical information regarding racecar setups, the proprietary technology JGR uses to run simulations to determine the most advantageous racecar setups, and the results of those simulations;

b.  JGR's analytics and the processes and technologies for measuring racecar performance, pit crew performance, and driver performance;

c.  JGR's processes, procedures and analysis for improving racecar performance, pit crew performance, and driver performance;

d.  JGR's processes, procedures, technologies used in analyzing performance of competitors' racecars, pit crews and drivers;

e.  JGR's processes and procedures for evaluating fuel consumption of JGR's racecars and competitors' racecars used before and during races;

f.  Base compensation and bonus information for certain JGR employees supporting racecar performance including engineers, crew chiefs, pit crew members, and mechanics; and

g.  The amount of payment JGR receives from its sponsors and business partners.

15.  Each of these categories of JGR's Confidential Information and Trade Secrets is the product of JGR's substantial investment of time, effort, and capital over a period of decades.

16.  A significant portion of the value of JGR's Confidential Information and Trade Secrets is derived from the secrecy and confidentiality of such information. The Confidential Information and Trade Secrets generally are not known outside of the Company and cannot be readily ascertained through independent development.

17.  JGR takes precautions to avoid both the deliberate and inadvertent disclosure or dissemination of its Confidential Information and Trade Secrets. The precautions include, but are not limited to:

4

a. Password protection for all Company devices and systems with access to Confidential Information and Trade Secrets;

b. Regular password change requirements;

c. Multi-factor authentication;

d. Restriction of system access based on job function;

e. Restriction of access to JGR's facilities;

f. Conditioning employment of key personnel, like Gabehart, on execution of agreements including requirements of confidentiality, non-solicitation, and non-competition;

g. Maintaining comprehensive policies and procedures regarding the treatment of Confidential Information and Trade Secrets, which employees are required to acknowledge;

h. Providing regular training to employees in order to prevent third-party access to JGR systems; and

i. Endpoint and network security monitoring via a suite of tools to prevent unauthorized intrusion and anomalies in JGR's network.

18. JGR reasonably relies on its employees' strict adherence to the covenants and terms in the employment agreements and employment policies and procedures to protect its Confidential Information and Trade Secrets from unauthorized disclosure or dissemination to persons outside of the Company.

19. Disclosure or dissemination of JGR's Confidential Information and Trade Secrets—especially to its direct competitors and their partners—would substantially diminish the value of such information and destroy JGR's competitive advantage.

5

20.     Competitor acquisition—including acquisition by third parties supporting JGR's competitors—of JGR's Confidential Information and Trade Secrets would allow those competitors and their partners to reap the benefits of JGR's substantial investments without expending comparable time, effort, or capital.  Possession of this information would enable competitors to improve their race teams and equipment in ways they could not achieve through independent development, thereby allowing them to unfairly compete with JGR by bypassing or accelerating the research and development process and negating the expertise JGR has built over decades of success.

21.     In 2022, NASCAR introduced the NextGen car in order to modernize the cars, reduce costs, improve safety, tighten competition, and make racing more relevant to contemporary automotive technology. These changes significantly narrowed technical and equipment differences between teams by standardizing racecars and requiring all teams to obtain their car components from the same manufacturers.

22.     Prior to the introduction of the NextGen car, teams obtained a competitive advantage by designing and building their own cars with significant variations among teams. Following the introduction of the NextGen car, variations in car setup as small as two one hundredths of an inch provide a material competitive advantage.  NASCAR wins are often achieved by a margin of a fraction of a second.

23.     Because all teams now race the same car and obtain car components from the same suppliers, understanding only a small portion of the details of how a competitor sets up its cars would allow other teams to extrapolate on that information and recreate a successful car setup.

6

24. As a result, car setup, analytics, and race strategy have become increasingly important as competitive differentiators in NASCAR since the introduction of the NextGen car in 2022. This information is highly guarded.

25. Consequently, such misuse, disclosure, or dissemination of JGR's Confidential Information and Trade Secrets would result in impaired ability to compete, lost profits and business opportunities, and reputational harm, among other injuries.

26. JGR treats its Confidential Information and Trade Secrets with such seriousness that it has taken legal action to protect them in the past. Indeed, because Gabehart worked in such a senior position, and was trusted by JGR in such a degree, in 2024, Gabehart was involved in JGR's response to an employee misappropriating its Confidential Information and Trade Secrets. Specifically, Gabehart worked with senior leadership at JGR to investigate and address that employee's misconduct of misappropriating JGR's Confidential Information and Trade Secrets after the employee obtained an offer to go work for a direct competitor. He was also involved in JGR's decision to force that employee to comply with the confidentiality obligations in his employment agreement via legal action.

27. Through this process, through the protective measures detailed above, and through participation in the closely guarded secrets of competitive racing to which Gabehart helped direct for JGR, Gabehart learned the protection of JGR's Confidential Information and Trade Secrets is of the utmost importance to JGR, that JGR enforces its employment agreements requiring employees to protect and not use or share JGR's Confidential Information and Trade Secrets, and how JGR conducts computer forensic investigations of employees who it suspects of misappropriating its Confidential Information and Trade Secrets.

**II. Gabehart Promises to Safeguard JGR's Confidential Information and Trade Secrets.**

28. Gabehart worked for JGR starting in 2012.

29. Gabehart worked his way up from engineer, to crew chief, and eventually to Competition Director.

30. As a condition of his promotion to Competition Director, JGR and Gabehart entered into an Employment Agreement on December 1, 2024, and an amendment thereto on June 26, 2025 (as amended, the "Agreement"). The Agreement is attached hereto as **<u>Exhibit 1</u>**.

31. Prior to signing the Agreement, Gabehart negotiated the Agreement's terms including, in particular, the language regarding his ability to accept employment with a competitor of JGR following the end of his employment.

32. The Agreement is written, valid, and enforceable.

33. As Competition Director, Gabehart was ultimately responsible for many competitive aspects of JGR's business. He oversaw preparation and execution of JGR's vehicle and race strategies. He also contributed significantly to the development and improvement of its internal analytics, processes, and procedures, in order to improve race performance.

34. To enable Gabehart to perform his job functions, JGR entrusted him with access to some of the Company's Confidential Information and Trade Secrets including, but not limited to:

    a. Technical information regarding racecar setups for particular race tracks under particular conditions, the technology JGR uses to run simulations to determine the most advantageous racecar setups, and the results of those simulations;

    b. JGR's analytics and the processes and technologies for measuring racecar performance, pit crew performance, and driver performance;

8

c.      JGR's processes, procedures and analysis for improving racecar performance, pit crew performance, and driver performance;

d.      JGR's processes, procedures, technologies used in analyzing performance of competitors' racecars and drivers;

e.      JGR's processes and procedures for evaluating fuel consumption of JGR's racecars and competitors' racecars used before and during races; and

f.      Base compensation and bonus information for certain JGR employees supporting racecar performance including engineers, crew chiefs, pit crews members, and mechanics.

35.      Gabehart was restricted from access to JGR's Confidential Information and Trade Secrets that did not relate to his job duties, including, but not limited to, information about JGR's drivers, sponsor, business partners, and payroll unrelated to competitive activities.

36.      Gabehart acknowledged in the Agreement that JGR's Confidential Information "is a valuable and unique asset of Company's and its affiliates' business, access to and knowledge or which are essential to the performance of [Gabehart's] duties hereunder."

37.      The Agreement also provides:

"***Confidential Information***" includes but is not limited to non-public information about Company sponsors and partners, race strategy, engineering information, race car set-ups, pit crew training methods and practices, pit crew analytics, technology and strategy, wind tunnel data and testing of any kind, trade secrets and any Company information that is proprietary or not publicly known.

38.      Gabehart agreed in Section 5 of the Agreement as follows:

During the Term and for so long as such Confidential Information is not generally known (other than due to Employee's breach), Employee shall not disclose Confidential Information to any third party or use any Confidential Information for any purpose other than as necessary to perform pursuant to

9

this Agreement unless and until such Confidential Information becomes generally known, except as a result of unauthorized disclosure.

39. The Agreement also provides that "Employee acknowledges receipt of the Company's written policies and procedures, which are incorporated herein, and Employee shall comply with such policies and procedures now in force and from time to time adopted by the Company."

40. JGR's current Employee Handbook the ("JGR Handbook") provides:

> JGR considers certain types of information about its operation as confidential or proprietary. Disclosing this information to other race teams, suppliers, fans or members of the public could significantly harm the company's interests. For this reason, employees are forbidden to disclose any trade secrets or confidential information, data learned or developed by them in the course of, or after their employment at JGR, to individuals not employed by the company, except with the prior written permission by an officer of the company. This restriction applies to active or inactive employees, so before an employee leaves JGR, the employee must return all JGR related information and property that they have in their possession, including, without limitation, documents, files, records, manuals, information stored on a personal computer or on a computer disc, supplies or equipment.

41. JGR supplied Gabehart with a Company-owned laptop computer (the "JGR Computer") to use for his service to JGR. Gabehart was expected to use the JGR Computer for work purposes. The JGR Handbook specifically states that "[s]ince the computer system belongs to JGR and it is for business purposes, you should not expect privacy in anything you create, store, send, or receive on the company's system. Do not store personal/private information to a company computer."

42. During his tenure with JGR, Gabehart used the JGR Computer to access JGR's information—including Confidential Information and Trade Secrets—to perform his job duties.

43. During his tenure with JGR, Gabehart performed a substantial portion of his job duties while physically present at JGR's facility in Huntersville, North Carolina.

44. JGR personnel and management also communicated Confidential Information and Trade Secrets to Gabehart verbally.

45. Gabehart was physically present at JGR's facility in Huntersville, North Carolina, when he received certain of these verbal communications.

46. JGR communicated, and permitted Gabehart's access to, Confidential Information and Trade Secrets for the express and limited purpose of enabling Gabehart to serve the interests of the Company.

47. JGR trusted Gabehart not to use his access to, and knowledge of, the Company's Confidential Information and Trade Secrets for his personal benefit, the benefit of JGR's competitors, or other third parties.

48. JGR also trusted Gabehart to act in the Company's best interests.

49. JGR would not have provided Gabehart access to its Confidential Information and Trade Secrets unless he agreed to the provisions contained in the Agreement.

**III. Gabehart Promises to Protect JGR's Key Relationships.**

50. In addition to promising to protect JGR's Confidential Information and Trade Secrets, Gabehart promised to protect certain key relationships.

51. Gabehart negotiated and agreed in Section 6 of the Agreement as follows:

> Except for termination without cause by Company or Term expiration, during the Term and for the longer of the balance of the Term including all Extensions, or nine (9) months after the date of termination (but not to exceed eighteen (18) months) (the "***Noncompete Period***"), Employee shall not provide services of the general type of services that Employee provided to the Company in the year prior to such termination to any other NASCAR Xfinity Series or NASCAR Cup Series racing team (or their respective successor series) or any vehicle manufacturing company or other person or entity that provides goods or services to such a team.

52. Gabehart also agreed in Section 6 of the Agreement as follows:

11

During the Term and for a period of eighteen (18) months after the date of termination or expiration of this Agreement, Employee shall not recruit or induce other Company employees to terminate their employment with Company.

53. Given the level of authority and access provided to Gabehart, the Agreement's terms impose reasonable restrictions to protect JGR's legitimate business interests.

54. Gabehart agreed that these restrictions were necessary. In the Agreement, which Gabehart negotiated, he "acknowledge[d]" that the restrictive covenants were "necessary and appropriate." *See* Section 6 of the Agreement.

## IV. Gabehart Demands More Authority and, When Denied, Decides to Leave JGR.

55. Over the course of the 2025 season, Gabehart became dissatisfied with his position as Competition Director at JGR. He wanted complete responsibility and control over all departments supporting JGR's competition efforts instead of working with other departments supporting JGR's competition efforts as a peer.

56. At no point in time did Gabehart ever give JGR oral or written notice that the Company gave him job duties or responsibilities that were inconsistent with Gabehart's expectations of his job duties or responsibilities as Competition Director.

57. Eventually, Gabehart's dissatisfaction reached a boiling point, and he requested a meeting with JGR owner, Joe Gibbs ("Coach Gibbs"), to voice his demands. Coach Gibbs agreed to meet Gabehart on November 6, 2025. During that meeting, Gabehart requested additional job authority that would give Gabehart *carte blanche* authority over all racing decisions.

58. Coach Gibbs declined to provide Gabehart with the authority he wanted and asked whether Gabehart wished to stay with JGR or leave the Company.

59. Gabehart informed Coach Gibbs he preferred to leave JGR.

60. Following that meeting and acting upon Gabehart's expressed intention that he preferred to leave JGR, the parties began working towards an amicable separation. To that end, JGR began preparing a generous separation agreement for Gabehart's consideration. Gabehart had other plans.

**V.     Gabehart Rejects a Separation Agreement and Raises JGR's Suspicions.**

61. On November 10, 2025, JGR presented Gabehart with the terms of a proposed separation agreement. Under those terms, Gabehart would have received severance pay and been permitted to work for another NASCAR team on the conditions that he (1) return all JGR equipment and information in his possession, (2) continue to abide by the confidentiality provisions in the Agreement, and (3) not solicit JGR's key employees and contractors.

62. JGR was only willing to offer these terms to Gabehart because at the time he had represented that he was unsure about his future employment, and JGR had no reason to believe that Gabehart intended to harm JGR or breach his obligations not to disclose or use JGR's Confidential Informaiton or Trade Secrets. That would soon change.

63. During the course of negotiations, Gabehart made repeated edits to the draft agreement, which appeared calculated to allow him to immediately solicit JGR employees to leave JGR.

64. JGR also learned that in the days following his departure from JGR, Gabehart had been meeting personally with Jeff Dickerson—the owner of Spire.

65. Spire is a competitor to JGR that was recently formed in 2018. Upon information and belief, it operated as a one-car NASCAR racing team from 2019 until 2023 and, as of 2024, now operates as a three-car racing team.

13

66. As a result of learning that Gabehart was having conversations with Spire, JGR became suspicious of Gabehart's intentions.

67. Consequently, JGR undertook a forensic investigation of Gabehart's JGR Computer. The results were shocking.

**V. JGR Uncovers Gabehart's Brazen Theft of its Confidential Information and Trade Secrets.**

68. Through its investigation, JGR learned the following, among other things:

    a.    Gabehart had synced his personal Google Drive with his JGR Computer;

    b.    Gabehart had repeatedly conducted Google searches and online research about Spire during October and November of 2025;

    c.    The Google Drive contained a folder titled "Spire" and a subfolder titled "Past Setups"; and

    d.    Gabehart had possession of more than a dozen photos of the screen of his JGR Computer taken on November 7, 2025. These photos contained images of JGR files containing Confidential Information and Trade Secrets and there was no legitimate business reason for Gabehart to take photos of such information.

69. As a result, JGR ceased negotiations with Gabehart and, on December 15, 2025, sent him a demand letter demanding that he refrain from using or disclosing JGR's Confidential Information and Trade Secrets and cooperate in a forensic review to identify and return or securely delete such information.

70. On December 17, 2025, counsel for Gabehart responded by agreeing to return any JGR information in Gabehart's possession but objecting to a forensic review. Gabehart

represented that the "Spire" folder on his Google Drive "was used to store his own notes and personal records." This was ultimately found to be untrue.

71. In the December 17th letter from Gabehart's counsel, Gabehart also represented that he "has not retained documents concerning JGR's sensitive financial data." This was also untrue, as the photos taken by Gabehart on November 7, 2025, set forth more fully below, contained a significant amount of sensitive financial information. Instead of acknowledging what he did, Defendant undertook a smoke and mirrors campaign to deflect from his true conduct.

72. In that same December 17, 2025 letter, Gabehart disclosed for the first time that he "receive[d] an unsolicited offer from Spire on November 13[.]" Gabehart claimed that "the offer was not to provide services similar to those [he] provided to JGR." When JGR asked what role Gabehart had been offered, it was met with silence.

73. Through negotiations, the parties ultimately agreed to a forensic protocol under which a third-party expert would (a) image Gabehart's Google Drive and personal cell phone; (b) identify JGR information on those devices; and (c) securely delete confirmed JGR information. In the forensic protocol, JGR reserved "the right to pursue any and all available legal remedies relating to Gabehart's conduct" and the parties agreed that the "[p]rotocol shall not be construed as a waiver of any of the Company's or Gabehart's potential rights and remedies." The protocol did not allow for unfettered and continuing access to the contents of Gabehart's Google Drive or any other asset collected from Gabehart pursuant to the protocol. Gabehart did not identify any other cloud storage account in his possession besides his Google Drive account.

74. In an effort to secure critical trade secrets as quickly as possible, JGR agreed to the negotiated forensic review protocol that provided for the return of the known JGR materials. Significant limitations in understanding the scope of Gabehart's activity persisted due to

Gabehart's objection to a comprehensive examination of whether material was transferred, stored, or shared in other locations. This limitation was conveyed to Gabehart's counsel including by the third-party expert review team. With its critical trade secrets vulnerable, and the NASCAR 2026 season on the cusp of starting, JGR accepted this limitation with the stated expectation that Gabehart would not compete in the marketplace pursuant to the terms of his Agreement.

75. JGR consistently and uniformly informed Gabehart that the Company would be forced to bring legal action against Gabehart if he did not respect a noncompete period, during which he would not provide services supporting another team's competition efforts.

76. Upon information and belief, Gabehart did not agree to the wholesale forensic review of his electronic devices because he knew such a review would demonstrate he had wrongfully taken, used and/or disclosed JGR's Confidential Information and Trade Secrets for the benefit of third parties, including Spire.

77. Indeed—and in contrast with his affirmations in the December 17 letter—the review did demonstrate that he improperly accessed and used JGR's Confidential Information and Trade Secrets which he stored in a folder labeled "Spire" for his competitive, 'short-cut' scheme.

78. Gabehart provided his personal cell phone and credentials to his Google Drive account to the examiner on January 12, 2026. The examiner provided files located on Gabehart's personal cell phone and Google Drive account to Gabehart's counsel on January 16, 2026. Gabehart's counsel provided files to JGR's counsel on January 27, 2026.

79. At this point, and as set out in further detail below, JGR learned for the first time that the "Spire" folder contained, among other JGR information, 20 of JGR's racecar setup files and that Gabehart possessed additional photos of information displayed on his JGR Computer that he had taken on November 7, 2025.

80. The examiner completed the deletion of identified JGR files from Gabehart's Google Drive and personal cell phone on February 4, 2026.

81. On February 9, 2026, the Company formally terminated the Agreement for cause due to Gabehart's misappropriation of JGR's Confidential Information and Trade Secrets, which violated his contractual obligations, Company policy, and state and federal law, in addition to being an act involving moral turpitude, fraud, willful misconduct, gross negligence, and/or dishonesty. A true and accurate copy of the termination notice is attached hereto as **Exhibit 2.**

82. On February 11, 2026, JGR learned, for the first time, that Gabehart planned to take the position of Chief Motorsports Officer at Spire. In that position, he would be responsible for all of Spire's racing strategy and operations.

83. This was new information to JGR, as Gabehart previously represented to JGR on December 17, 2025, that the job offer he received from Spire was for a role in which he would not provide Spire with services similar to the services he provided JGR.

84. Upon information and belief, the position of Chief Motorsports Officer at Spire provides services of the general type of services that Gabehart provided to JGR as Competition Director.

85. Upon information and belief, Gabehart misrepresented on December 17, 2025, the nature of the job offer he obtained from Spire in order to avoid JGR insisting on a comprehensive forensic review protocol that would demonstrate Gabehart had misappropriated and disclosed JGR's Confidential Information and Trade Secrets to third parties, including Spire.

86. On February 21, 2026, Spire confirmed to news outlets that it had hired Gabehart as Chief Motorsports Officer.

## VI. The Full Scope of Gabehart's Misconduct Comes into Focus.

87. The forensic review of Gabehart's computer and phone, albeit limited, and the events that have taken place since that review, demonstrate a plan, and Gabehart's execution of that plan, to compete unfairly against JGR using the Confidential Information and Trade Secrets that Gabehart had promised to keep sacred.

88. On October 26, 2025, Gabehart communicated to Tim Carmichael, JGR's Chief Financial Officer, that he was uncertain whether he would continue to work with JGR after the 2025 race season.

89. On October 29, 2025, Gabehart interacted with an unknown Microsoft One Drive while contemporaneously interacting with http://joegibbsracing-mysharepoint.com. Upon information and belief this OneDrive account appears to be associated with Gabehart's Gmail address.

90. Gabehart then met with Coach Gibbs on November 6, 2025. Gabehart was dissatisfied with the outcome.

91. The next day, at 2:45 p.m. eastern on November 7, 2025, Gabehart accessed his JGR Computer while it was connected to JGR's network. For fifteen consecutive minutes, he accessed JGR's most sensitive Confidential Information and Trade Secrets and, using his personal cell phone, took at least 20 photos of his laptop screen (the "November 7 Photos") for no legitimate business purpose on behalf of JGR. JGR subsequently discovered these photos only because they synced with Gabehart's Microsoft OneDrive account associated with Gabehart's JGR email address (not his Gmail address). Upon information and belief, Gabehart did not intend to return the Confidential Information and Trade Secrets he took from JGR unless and until the Company learned he took them and demanded he return them.

92. Gabehart used his personal cell phone to take photos of his laptop screen in order to conceal that he was accessing and taking JGR's Confidential Information and Trade Secrets. Utilizing photos, rather than moving or sending files, would avoid electronic "paper trails" to show the stealing of Confidential Information and Trade Secrets.

93. The November 7 Photos were saved to Gabehart's personal cell phone and personal Google Photos account. These are unsecured systems that JGR did not approve for him to use to store JGR information. Additionally, Gabehart's Google Photos account was accessible to third parties, including his spouse.

94. The November 7 Photos included:

   a. Comprehensive post-race audit and analyses of team and driver performance for the entire 2025 NASCAR season;

   b. Complete team payroll details including job titles, contract length, annual compensation, incentive compensation, and compensation plans for prior years;

   c. An employee compensation calculator used to project and plan pay for key JGR positions;

   d. Driver pay for the 2025 and 2026 NASCAR seasons;

   e. Revenues from sponsors, partners, and other business arrangements for the 2024, 2025, and 2026 NASCAR seasons;

   f. JGR's pit crew analytics for the 2024 NASCAR season; and

   g. Detailed analytics of racecar tires used to assess impact on race results.

95. Gabehart also synced his Google Drive account with his JGR Computer.

19

96.     In his Google Drive account, Gabehart created a folder named "Spire" and a subfolder named "Past Setups."

97.     The following materials, all of which are JGR's Confidential Information and Trade Secrets, were saved within the Spire Folder:

a.      A 141 page .pdf file titled "Post Race Data Analysis" for a 2025 Las Vegas race containing all of JGR's data analytics including, what data JGR measures at races, how it measures that data, and the specific recommendations derived from the analysis.  This document demonstrates JGR's analysis of the performance of all race participants on a variety of different areas.  This analysis was generated at great expense by JGR's internal analytics department;

b.      More than 20 set up and simulation Files, which are reports generated by proprietary software using inputs that hundreds of different JGR employees manually add based off their know-how, historical data, and simulations to determine the best possible racecar setup.  These documents were developed using a proprietary system developed by JGR over many years and it specifies hundreds of different details regarding the specific equipment and settings used on JGR's racecars;

c.      A Post Race Debrief Survey that JGR's drivers complete following every race showing the data and driver inputs JGR documents following each race and the manner in which it documents that information.  This document included specific comments from JGR's drivers about issues impacting

performance, effectiveness of specific pre-race preparations, and performance of numerous aspects of the vehicle;

d.　A document detailing proprietary engine outputs and recommended gear shift points;

e.　Pictures of racecar diffuser skirts along with post-race measurements following a 2025 race. This document demonstrates sensitive information about JGR's "ride height" which is a part of car setup that is crucial to performance--impacting air flow under and around the car and the amount of downforce the car may produce;

f.　A document detailing the manner in which JGR sorts, selects, and runs tires through a race. The system utilized to sort and select tires throughout a race is an area of competitive advantage for JGR;

g.　A document detailing JGR's initiative to transport equipment and racecars to and from races for less costs and in a way that increases centralized communication and collaboration between its engineers. This document includes detailed information about JGR's current transportation operations and expenses that could be replicated by another team to obtain a business advantage;

h.　A document detailing how JGR estimates fuel mileage for its drivers and competitors during races and adjustments to strengthen accuracy. Being able to accurately measure fuel intake and to estimate a competitor's fuel intake provides JGR with crucial insights that often are the difference between winning and losing races. Determining how much fuel a JGR

competitor has and the rate at which it is burning that fuel, as compared to the amount of fuel and burn rate for a JGR car translate to positions on the race track based on judgments made about when a car must pit for fuel, whether the driver can run faster using full throttle as opposed to needing to conserve fuel due to having less fuel on board or because of the efficiency of the car's use of that fuel;

i.  A document showing JGR's process for evaluating performance during races which could immediately help competitors improve race execution and performance;

j.  A photo of a document detailing the manner in which JGR measures and seeks to eliminate subpar pitstops and its bonus structure for its pit crews for successful pit stops.  This document shows for JGR incentives pit crew performance and the specific items that JGR measures in order to make its pitstops as effective as possible.  Fractions of a second spent in the pit box quickly translate to feet on the racetrack.  JGR's confidential information regarding the strategy and techniques used by its pit crews can allow its drivers to spend less time on pit stops, putting the driver back on the track more quickly with better track position;

k.  A spreadsheet listing base compensation and bonus for key members of JGR's teams; and

l.  A document comparing a JGR driver's performance at a specific race to that of a Spire driver. This document specifically demonstrates areas of

improvement for the Spire Motorsports driver and areas of advantage for the JGR driver.

98. Each of these categories of JGR's Confidential Information and Trade Secrets is the product of JGR's substantial investment of time, effort and capital over a period of decades. NASCAR series run on dozens of different tracks. Each track is unique and the cars react differently based on, among other things, the track's configuration, size, surface type, level of grip, banking, radius of turns and pit road configurations. Cars are assembled and tuned to maximize the car's speed and handling on each unique track. JGR keeps detailed records of each set-up along with every change during an event. Enormous amounts of Data is collected from tests and race events. This body of data is meticulously analyzed to determine the best combination of inputs which will yield optimized results for every given track. Given the standardization of the Next Gen cars and the fact that parts are sourced from common suppliers, the set up of a car and adjustments made are critical factors in a car's performance on any given day. Improvements and adjustments based on these sorts of factors can improve lap speeds by fractions of a second. In the level of racing in which JGR competes, hundredths of a second can and do make the difference in whether a team wins a given race. For example, during the 2025 Cup Series season, at least a half dozen races were decided by a difference of less than one second. Details matter. These details are hard earned and of immense value to competitors in NASCAR.

99. At least some of the foregoing materials regarding JGR's overall payroll, cost of providing benefits, cost of compensating JGR's drivers, and JGR's incurred expenses for hotels and rentals were in a document Gabehart created himself. This information was unrelated to his position as Competition Director. Gabehart did not have authorized access to this information in his role as Competition Director and did not possess this knowledge until execution of his plan to

23

improperly compete with JGR.  Indeed, in piecemeal fashion, Gabehart appeared to have obtained this information through verbal and other inquiries under the guise of needing it for projects he was working on to support JGR's competition efforts.  In actuality, Gabehart was surreptitiously obtaining these pieces of information to use for the benefit of Spire upon departing JGR.

100.    The pictures of JGR's files Gabehart took on November 7, 2025, and the materials saved in the Spire Folder are the exact set of Confidential Information and Trade Secrets any of JGR's competitors would want in order to: (a) understand JGR's processes, technological capabilities, and payment structures that has led to JGR's overwhelming success; (b) use them to improve their teams to obtain a competitive advantage over JGR; and (c) short-cut the decades long process it took JGR to build its place in the marketplace.

101.    Gabehart knew or should have known that his actions were unlawful given his prior experience.  He worked with JGR's highest levels of leadership in investigating a former JGR employee taking JGR's Confidential Information and Trade Secrets and knew that JGR considered protecting its Confidential Information and Trade Secrets  a matter of paramount importance.  He was also involved in JGR's decision to resort to legal process to enforce the provisions of that employee's employment agreement and restraining him from taking and using them to benefit one of JGR's direct competitors.  Given Gabehart's involvement in and understanding of how JGR investigates employees who are suspected of taking its Confidential Information and Trade Secrets, Gabehart took intentional steps to avoid JGR detecting his misappropriation of JGR's trade secrets.  Upon information and belief, Gabehart searched for ways to hide his digital trail by searching things like One Note activity monitoring at the time he was misappropriating JGR's Confidential Information and Trade Secrets.

102.    On November 10, 2025, Gabehart returned his JGR Computer to the Company.

103. Gabehart has not provided any services or performed any work for JGR since November 10, 2025.

104. Unaware of Gabehart's conduct, JGR and Gabehart began negotiating the terms of a generous separation agreement.

105. On November 13, 2025, Gabehart received a job offer from Spire.

106. After Gabehart ceases providing services for JGR and in the days immediately before and after receiving a job offer from Spire, Gabehart potentially interacted with the following websites:

    a. https://apps.jgrcloud.com on the evening of November 10, 2025 and November 17, 2025;

    b. https://analytics.joegibbsracing.com on November 17, 2025;

    c. https://joegibbsracing-my.sharepoint.com on November 17, 2025; and

    d. https://trdhydra.toyota.com on November 13, 2025 and November 17, 2025.

107. While potentially visiting the websites addressed in the foregoing paragraph, Gabehart was contemporaneously interacting with his personal Google Drive account.

108. On December 2, 2025, Gabehart personally met with Jeff Dickerson, Owner of Spire.

109. On December 4, 2025, Gabehart spoke to JGR's President and falsely stated he had not spoken to any individuals associated with Spire about employment or any other potential employers about job opportunities.

110. Gabehart repeatedly accessed and interacted with the Spire Folder on November 12, 13, 15, 23, 25, 26, 27, and finally on December 2 of 2025—the same day he met with Jeff Dickerson.

25

111. Upon information and belief, after November 10, 2025, Gabehart accessed JGR's Confidential Information and Trade Secrets for the purpose of obtaining a job with Spire, to disclose JGR's Confidential Information and Trade Secrets to Spire, and/or to use them for Spire's benefit or his own benefit in enticing Spire to offer him a job.

112. Upon information and belief, Gabehart's use and disclosure of JGR's Confidential Information and Trade Secrets gives Spire an unfair competitive advantage over JGR.

113. Upon information and belief, Gabehart's disclosure to Spire and/or use of Confidential Information and Trade Secrets was a knowing and deliberate act intended to financially benefit Gabehart and to provide Spire a competitive advantage over JGR.

114. Upon information and belief, Gabehart's disclosure and/or use of Confidential Information and Trade Secrets was also a knowing and deliberate act intended to maliciously damage JGR.

115. JGR did not consent to Gabehart's retention, disclosure, or use of Confidential Information and Trade Secrets.

116. Since Gabehart ceased providing services to JGR on November 10, 2025, Gabehart informed multiple JGR employees and personnel including one of its drivers that he no longer worked for JGR and was going to join Spire.

117. Upon information and belief, Spire allowed Gabehart to enter its race shop during December 2025 and January 2026 while Spire was preparing for the 2026 NASCAR season and after Spire knew of Gabehart's noncompete, non-solicitation, and confidentiality provisions under the Agreement.

118. Upon information and belief, Jeff Dickerson has informed other individuals that he possesses portions of JGR's Confidential Information and Trade Secrets Gabehart took from JGR.

119.    Since Gabehart ceased providing services to JGR on November 10, 2025, and after Gabehart received a job offer to work at Spire on November 13, 2025, at least one JGR employee who supported JGR's competition efforts has departed JGR and joined Spire.

120.    Specifically, one of JGR's employees supporting JGR's competition efforts left JGR's employment on January 3, 2026, and began working for Spire in the same or similar role immediately thereafter.  Upon information and belief, Spire agreed to pay that employee a salary significantly exceeding what the employee earned at JGR.

121.    Upon information and belief, Gabehart used JGR's Confidential Information and Trade Secrets he stole from JGR concerning the compensation JGR paid its employees for the purpose of soliciting and recruiting JGR employee[s] to depart the Company's employ and begin working for Spire.

**VII.    Gabehart Joins Spire and Makes False Public Statement.**

122.    After JGR filed its initial Complaint on February 19, 2026, Gabehart made a public statement on his X Account on February 20, 2026.  It stated:



> **Chris Gabehart** ✔
> @CG1751
>
> Yesterday afternoon, Joe Gibbs Racing filed a lawsuit claiming – falsely – that I shared JGR confidential information with Spire Motorsports and/or other unnamed third parties. I feel compelled to speak out today and forcefully and emphatically deny these frivolous and retaliatory claims.
>
> I look forward to the opportunity to demonstrate to the Court that I have not shared JGR's confidential information with anyone. In fact, I have already demonstrated that to JGR. A third-party forensic expert retained by JGR recently examined my laptop, cell phone and personal Google Drive and found no evidence to support the baseless allegations in JGR's lawsuit. We even offered JGR the opportunity to do a similar review of Spire's systems. JGR refused that offer and filed this spiteful lawsuit instead.
>
> Stay tuned. We will have much more to say in the legal response we will be filing in the coming days.
>
> 5:08 PM · Feb 20, 2026 · **284.7K** Views

123. The statement was materially false and misleading. First, the forensic expert engaged by JGR confirmed that Defendant had taken JGR's Confidential Information and Trade Secrets, including financial information Gabehart expressly denied taking on December 17, 2025. Second, the forensic expert informed Gabehart through his counsel that the review did <u>not</u> demonstrate Gabehart had not shared JGR's Confidential Information and Trade Secrets with third parties or saved the materials Gabehart did take in different locations. Indeed the forensic review team noted that the review "did not exclude the possibility of [JGR] files being sent via email from a web portal, being sent via text message then deleted the message, shared directly via Google Photos or any other fileshare site."

124. The next day—February 21, 2026— Fox Sports reported that Spire confirmed that it hired Gabehart as its Chief Motorsports Officer.

**VIII. Spire Requires Gabehart to Perform the Same or Similar Services for Spire as he Performed for JGR During the Prior Year**

125. Spire is aware of the Agreement and has been aware of it since no later than December 3, 2025 when Eric Schaffer called Bill Anthony and expressly informed him that Gabehart was subject to noncompete, non-solicitation, and confidentiality provisions preventing him from providing the same or similar services to Spire to those he provided JGR in the prior year. Spire has undoubtedly been aware of the Agreement and its terms since no later than February 19, 2026, when JGR filed this action.

126. Knowing the Agreement contained noncompete, non-solicitation, and confidentiality provisions preventing Gabehart from, among other things, providing Spire with the same or similar services he provided JGR within the last year, Spire created a bespoke role for Gabehart which required him to perform the same or similar services he provided JGR in the prior year. Spire hired him to that role and has continuously induced Gabehart to violate his noncompete and confidentiality obligations by permitting and/or requiring him to perform the same or similar services he provided JGR in the prior year at at least the March 22, 2026 Goodyear 400 and the April 12, 2026 Food City 500, including during Spire's preperation for those races in the days leading up to each race.

127. Spire hired Gabehart so Gabehart could provide it with the same services he provided JGR in the prior year. Spire's sole motive in creating the specific role it created for Gabehart was deception. In particular, Spire created a role that gives the appearance of Gabehart providing significant services for non-NASCAR Cup Series competition, when that was not Spire's intent for his services, nor on information and belief what he is doing. The deceptive title was created solely to attempt to give a plausible explanation for Gabehart to be present at NASCAR Cup Series events at times and in places where he can violate his restrictive covenant

29

by advising on competition in a way that is very difficult for an outsider to detect or prove. There is no legal justification for this deceptive conduct.

128. Spire saw fit to require Gabehart to enter into an employment agreement containing a noncompete provision restricting him from providing services to another NASCAR team after departing Spire as well as non-solicitation provision. Spire therefore knows noncompete provisions for certain personel are necessary to protect a NASCAR team's interests.

129. A Spire employee has informed a JGR employee that Gabehart is in charge of and/or significantly participating in Spire's competition strategy and decisions. Employees were instructed not to discuss the fact Gabehart is leading and/or participating in Spire's competition and strategy decisionmaking process outside of Spire. There is no legal justification for advising its employees to conceal the true nature of Gabehart's services. Spire is aware that Gabehart leading and/or participating in Spire's competition strategy and decision-making violates his noncompete obligations setforth in the Agreement.

130. Upon information and belief, Spire employees who support competition efforts work with Gabehart on competition strategy and decisions. Spire is aware that Gabehart leading Spire's competition strategy and decisions-making violates his noncompete obligations setforth in the Agreement.

131. Spire's website espouses that "[w]e embrace our role as underdog.[1] We want to earn our accolades. We are not looking for handouts or the easy path." Spire's website claims that the company embraces the phrase of "respect" indeed incorporating it into its branding:

---

[1] Spire's website page on their respect motto is available at https://www.spire-motorsports.com/about-respect.



**respect** competition

Joining the fight for the future of NASCAR. Building the next generation Cup Series team from the ground up, one dedicated member at a time.

132. Despite the restrictive covenants in the Agreement and Gabehart's misappropriation of trade secrets, Spire has hired Gabehart. Spire's hiring of Gabehart and the competitive information he has used and improperly retained will give Spire a competitive advantage in the marketplace. It is a short cut to replicate JGR's Confidential Information and Trade Secrets that have been the lynchpin of its success. Spire hired Gabehart to a role requiring him to perform the same or similar services to those he performed for JGR in the prior year with knowledge that Gabehart was bound by his agreement not to perform those services for Spire. Spire's decision to hire Gabehart to a role that violated the Agreement's noncompete provision was done intentionally to violate that agreement and to use JGR's Confidential Information and Trade Secrets for Spire's benefit.

133. At the latest, Spire was aware Gabehart was subject to an enforceable noncompete prohibiting him from providing services to Spire of the same kind or similar to those he provided JGR in the prior year on March 2, 2026. Since that time, Spire has allowed Gabehart to perform services for Spire of the same kind or similar to those he provided for JGR in the prior year.

134. Since becoming aware that Gabehart wrongfully acquired and possessed JGR's Confidential Information and Trade Secrets, Spire has continued to employ Gabehart. On

31

information and belief, Spire has induced and encouraged Gabehart to use its Trade Secrets and confidential information to help Spire and to damage JGR's competitive standing in the NASCAR Cup Series. There is no legal justification for Spire to induce and encourage Gabehart to unlawfully help Spire in these ways.

135. Prior to the filing of this Second Amended Complaint, JGR demanded return of Confidential Information and Trade Secrets, adherence to court ordered review to ensure that all Confidential Information and Trade Secrets were returned, and enforcement of the Agreement's terms. JGR was informed that Defendants would not agree to all of these terms.

136. Spire's decision to create a bespoke and intentionally misleading title and role for Gabehart and hire him to that role was not motivated by a desire to further its competitive interests fairly. Rather, Spire decision to employ Gabehart was motivated by a desire to compete unfairly against JGR and to intentionally harm JGR's competitive interests through unlawful means.

137. On April 27, 2026, Jeff Dickerson posted a document to his X account which purports to be an unfiled declaration, similar to those Spire has filed in this litigation. In the unfiled declaration, he appears to joke about the allegations in this lawsuit and brags about Spire's first NASCAR Cup Series win since 2019 and second win ever.



This sudden improvement in Spire's Cup Series performance of course comes on the heels of Gabehart misappropriating JGR's Confidential Information and Trade Secrets and providing Spire the same or similar services he provided JGR in the last year.  A copy of Dickerson's X post is attached hereto as **Exhibit 3.**

## FIRST CLAIM FOR RELIEF
**(Misappropriation of Trade Secrets - Federal Defend Trade Secrets Act, 18 U.S.C. §§ 1836 *et seq.* - Gabehart and Spire)**

138.  JGR realleges and reincorporates the foregoing paragraphs as if fully set forth herein.

139.  Section 1836(b)(1) of the Defend Trade Secrets Act, 18 U.S.C. §§ 1836 *et seq.*, creates a private right of action for "[a]n owner of a trade secret that is misappropriated . . . if the

trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."

140. JGR owns and possesses confidential trade secrets that are used in, and are intended to use in, interstate or foreign commerce.

141. JGR's trade secrets are confidential, and JGR has taken reasonable measures to safeguard its trade secrets.

142. JGR's trade secrets derive independent economic value from not being generally known to, or readily ascertainable by, other persons who could obtain economic value from them, which gives JGR a valuable economic and competitive advantage over its competitors.

143. Independent development by JGR's competitors or the public of materials identical or comparable to JGR's trade secrets would be impossible or extraordinarily difficult and expensive.

144. Defendants acquired JGR's trade secrets under circumstances giving rise to a duty to maintain their secrecy and limit their use.

145. Defendants misappropriated JGR's trade secrets when Gabehart wrongfully acquired and retained them without JGR's consent.

146. Defendants also misappropriated JGR's trade secrets when, upon information and belief, Gabehart used and relied upon the trade secrets to perform work for or serve the interests of Spire and/or other third parties without JGR's consent.

147. Gabehart further misappropriated JGR's trade secrets when, upon information and belief, Gabehart used and relied upon the trade secrets to make himself more valuable to Spire or other third parties in attempting to obtain employment from Spire and/or other third parties.

148. Defendants further misappropriated JGR's trade secrets when, upon information and belief, Gabehart disclosed them to Spire and/or other third parties without JGR's consent.

149. The trade secrets Defendants misappropriated include, but are not limited to:

a. Technical information regarding racecar setups, the technology JGR uses to run simulations to determine the most advantageous racecar setups, and the results of those simulations;

b. JGR's analytics and the processes and technologies for measuring racecar performance, pit crew performance, and driver performance;

c. JGR's processes, procedures and analysis for improving racecar performance, pit crew performance, and driver performance;

d. JGR's processes, procedures, technologies used in analyzing performance of competitors' racecars and drivers;

e. JGR's processes and procedures for evaluating fuel consumption of JGR's racecars and competitors' racecars used before and during races;

f. Base compensation for JGR's drivers;

g. Base compensation and bonus information for certain JGR employees supporting racecar performance including engineers, crew chiefs, pit crew members, and mechanics; and

h. The amount of payment JGR receives from team sponsorships.

150. Defendants' misappropriation of JGR's trade secrets was in bad faith, willful, and malicious.

151. As a direct and proximate cause of Defendants' misappropriation of JGR's trade secrets, JGR has suffered damages, including the diminution in value of its trade secrets. JGR will

35

continue to suffer irreparable harm unless and until Defendants are restrained from using or disclosing JGR's trade secrets and returns all JGR trade secrets in their possession, custody, or control to JGR.

152. Pursuant to 18 U.S.C. § 1836(b)(3), JGR is entitled to injunctive relief and judgment against Defendants in an amount to be determined at the trial of this action and presently believed to exceed $8,000,000 for compensatory and other damages, doubled damages, and attorneys' fees.

**SECOND CLAIM FOR RELIEF**
**(Misappropriation of Trade Secrets - North Carolina Trade Secrets Protection Act,**
**N.C. Gen. Stat. §§ 66-152, *et seq.* - Gabehart and Spire)**

153. JGR reincorporates the foregoing paragraphs as if fully set forth herein.

154. The data Gabehart retained belonging to JGR constitutes JGR's trade secrets and confidential and proprietary information.

155. JGR's trade secrets are confidential, and JGR has taken reasonable measures to safeguard its trade secrets.

156. JGR's trade secrets derive independent economic value from not being generally known to, or readily ascertainable by, other persons who could obtain economic value from them, which gives JGR a valuable economic and competitive advantage over its competitors.

157. Independent development by JGR's competitors or the public of materials identical or comparable to JGR's trade secrets would be impossible or extraordinarily difficult and expensive.

158. Gabehart acquired JGR's trade secrets under circumstances giving rise to a duty to maintain their secrecy and limit their use.

159. Gabehart misappropriated JGR's trade secrets when he wrongfully retained them without JGR's consent.

160. Defendants also misappropriated JGR's trade secrets when, upon information and belief, Gabehart used and relied upon the trade secrets to perform work for or serve the interests of Spire and/or other third parties without JGR's consent.

161. Defendants further misappropriated JGR's trade secrets when, upon information and belief, Gabehart used and relied upon the trade secrets to make himself more valuable to Spire or other third parties in attempting to obtain employment from Spire and/or other third parties.

162. Defendants further misappropriated JGR's trade secrets when, upon information and belief, Gabehart disclosed them to Spire and/or other third parties without JGR's consent.

163. The trade secrets Defendants misappropriated include, but are not limited to:

    a. Technical information regarding racecar setups, the technology JGR uses to run simulations to determine the most advantageous racecar setups, and the results of those simulations;

    b. JGR's analytics and the processes and technologies for measuring racecar performance, pit crew performance, and driver performance;

    c. JGR's processes, procedures and analysis for improving racecar performance, pit crew performance, and driver performance;

    d. JGR's processes, procedures, technologies used in analyzing performance of competitors' racecars and drivers;

    e. JGR's processes and procedures for evaluating fuel consumption of JGR's racecars and competitors' racecars used before and during races;

    f. Base compensation for JGR's drivers;

g.    Base compensation and bonus information for certain JGR employees supporting racecar performance including engineers, crew chiefs, pit crew members, and mechanics; and

h.    The amount of payment JGR receives from team sponsorships.

164.    Defendants' misappropriation of JGR's trade secrets was in bad faith, willful, and malicious.

165.    As a direct and proximate cause of Defendant's misappropriation of JGR's trade secrets, JGR has suffered damages, including the diminution in value of its trade secrets. JGR will continue to suffer irreparable harm unless and until Defendants are restrained from using or disclosing JGR's trade secrets and returns all JGR trade secrets in his possession, custody, or control to JGR.

166.    Pursuant to N.C. Gen. Stat. § 66-154, JGR is entitled to injunctive relief and judgment against Defendants in an amount to be determined at the trial of this action and presently believed to exceed $8,000,000 for compensatory and other damages, punitive damages, and attorneys' fees.

## THIRD CLAIM FOR RELIEF
### (Unfair Trade Practices - North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §§ 75-1.1, *et seq.* - Gabehart and Spire)

167.    JGR reincorporates the foregoing paragraphs as if fully set forth herein.

168.    Gabehart's conduct before and following his agreement to leave JGR's employ and stop providing JGR services, including, without limitation, wrongful acquisition and, upon information and belief, use and disclosure of Confidential Information and Trade Secrets to and for the benefit of Spire and/or other third parties, was conduct in or affecting commerce within the meaning of N.C. Gen. Stat. § 75-1.1.

169. Defendants' conduct as alleged herein, including, without limitation, his surreptitious copying of Confidential Information and Trade Secrets in a manner calculated to avoid detection, and Spire's behavior in accepting the benefit of Gabehart's misconduct, was immoral, unethical, and unscrupulous.

170. Defendants' actions proximately caused damage to JGR.

171. Pursuant to N.C. Gen. Stat. §§ 75-16 and 75-16.1, JGR is entitled to a judgment against Defendants in an amount to be determined at the trial of this action and presently believed to exceed $8,000,000 for compensatory damages, treble damages, and attorneys' fees.

## FOURTH CLAIM FOR RELIEF
### (Breach of Contract - Gabehart)

172. JGR reincorporates the foregoing paragraphs as if fully set forth herein.

173. The Agreement is a written, valid, and enforceable contract between JGR and Gabehart.

174. Gabehart breached Section 5 of the Agreement by, upon information and belief, using JGR's Confidential Information and Trade Secrets for a purpose other than providing services to JGR pursuant to the Agreement and disclosing JGR's Confidential Information and Trade Secrets to Spire and/or other third parties.

175. Gabehart breached Section 6 of the Agreement by, upon information and belief, providing services to Spire of the general type he provided to JGR pursuant to the Agreement during the term of the Agreement and following his termination for cause from JGR.

176. Each of Gabehart's breaches of the Agreement have caused, and will continue to cause, irreparable injury and damages.

177.    JGR reincorporates the foregoing paragraphs as if fully set forth herein.

178.    Gabehart entered into a valid and enforceable Agreement containing restrictive covenants.

179.    Spire was on notice of and aware of JGR's contractual rights and Gabehart's contractual obligations to JGR.

180.    Spire was also on notice that Gabehart wrongfully maintained access to and did in fact access JGR's Confidential Information and Trade Secrets once his employment with JGR ended.  Upon information and belief, Spire induced and encouraged Gabehart to unlawfully use JGR's Confidential Information and Trade Secrets to improve Spire's performance in Cup Series races.

181.    Spire knowingly, intentionally, unjustifiably, and in bad faith induced Gabehart to breach his contract with JGR by (1) soliciting and hiring him to work for Spire, (2) requesting, encouraging, or otherwise inducing him to disclose or use Plaintiff's trade secrets or confidential information, (3) allowing him to perform the same or similar services he provided JGR in the prior year to Spire and while using JGR's Confidential Information and Trade Secrets, and on information belief, actively encouraging and inducing him to do so and (4)  creating a role specifically designed to allow Gabehart to breach his noncompete obligations in a manner that makes it more difficult to detect the breach of his noncompete obligations.

182.    As a direct and proximate result of Spire's misconduct, Plaintiff has suffered and continues to suffer damages in an amount to be proven at trial, and irreparable harm by way of, among other things, loss of competitive advantage, loss of confidential information, and denial of

the benefit of the noncompete, non-solicitation, and confidentiality provisions contained in the Agreement.

183. Spire's employment of Gabehart and continued inducement for Gabehart to violate the noncompete, non-solicitation, and confidentiality provisions contained in the Agreement, were motivated by Spire's desire to compete unfairly with JGR and to intentionally harm JGR's competitive interests.

184. By reason of the foregoing, JGR is entitled to recover compensatory and punitive damages against Spire.

**SIXTH CLAIM FOR RELIEF**
**(Preliminary and Permanent Injunctive Relief)**

185. JGR reincorporates the foregoing paragraphs as if fully set forth herein.

186. JGR will continue to suffer irreparable harm unless and until Gabehart is restrained from using or disclosing JGR's Confidential Information and Trade Secrets and returns any such information and data still within his possession to JGR, and from working for Spire in a role that violates his noncompete obligations set forth in the Agreement.

187. JGR will continue to suffer irreparable harm unless and until Spire is restrained from employing Gabehart in a roll that violates his noncompete obligations set forth in the Agreement and unless and until Spire is restrained from using or disclosing JGR's Confidential Information and Trade Secrets and returns any such information and data within its possession to JGR.

188. Any harm Defendants may suffer as a result of such injunctive relief is substantially outweighed by the immediate and irreparable harm that JGR will continue to suffer.

189. JGR is entitled to entry of a temporary restraining order, preliminary injunction, and permanent injunction directing to Gabehart to:

a. Cease and desist working or performing any services for Spire similar to those he provided to JGR for the 18 months following February 9, 2026;

b. Immediately cease and desist from retaining, transferring, using or copying any Confidential Information and Trade Secrets;

c. Return any Confidential Information and Trade Secrets in his possession to JGR;

d. Transfer to the custody of JGR's counsel any device used to store the Confidential Information and Trade Secrets and, through an agreed upon Court ordered process, allow the forensic preservation and review of these devices for identification of Confidential Information and Trade Secrets, the return of any identified Confidential Information and Trade Secrets to JGR, and the removal of any identified Confidential Information and Trade Secrets from the devices; and

e. Cease and desist from using or disclosing JGR's Confidential Information and Trade Secrets to third parties.

190. JGR is entitled to entry of a temporary restraining order, preliminary injunction, and permanent injunction directing Spire to cease employing or accepting services from Gabehart in violation of Gabehart's noncompete obligations under the Agreement and using, retaining, or disclosing any of JGR's Confidential Information and Trade Secrets in its possession, custody, or control.

## PRAYER FOR RELIEF

WHEREFORE, JGR respectfully prays this Court for relief on all Claims for Relief, including:

1. For trial by jury as to all issues that may be so tried;

2. For entry of a temporary restraining order, preliminary injunction, and permanent injunctive relief;

3. For compensatory damages in an amount to be determined at the trial of this action;

4. For doubled or trebled damages;

5. For punitive damages;

6. For pre- and post-judgment interest, as appropriate;

7. For reasonable attorneys' and other legal fees;

8. For taxation of the costs of this action against Defendants; and

9. Such other and further relief as it deems just and appropriate.

[*Signature on following page*]

This the 15th day of June, 2026.

**PARKER POE ADAMS & BERNSTEIN LLP**

/s/ Sarah F. Hutchins
Sarah F. Hutchins
N.C. Bar No. 38172
Tory Ian Summey
N.C. Bar No. 46437
Keith M. Weddington
N.C. Bar No. 14352
Charles G. Middlebrooks
N.C. Bar No. 55171
Madelyn R. Candela
N.C. Bar No. 63827
Bank of America Tower
620 South Tryon St., Suite 800
Charlotte, North Carolina 28202
sarahhutchins@parkerpoe.com
torysummey@parkerpoe.com
keithweddington@parkerpoe.com
charliemiddlebrooks@parkerpoe.com
madelyncandela@parkerpoe.com

**KING & SPALDING LLC**

Danielle T. Williams
dwilliams@kslaw.com
N.C. Bar No. 23283
300 South Tryon Street, Suite 1700
Charlotte, NC 28202
Thomas M. Melsheimer – *Pro Hac Vice*
tmelsheimer@kslaw.com
Chad B. Walker – *Pro Hac Vice*
cwalker@kslaw.com
Tracea Rice – *Pro Hac Vice*
trice@kslaw.com
Alexandra Moore - *Pro Hac Vice*
almoore@kslaw.com
2601 Olive Street, Suite 2300
Dallas, TX 75201

*Attorneys for Joe Gibbs Racing, LLC*

44

**CERTIFICATE OF SERVICE**

I hereby certify that on this date the foregoing **SECOND AMENDED COMPLAINT** was electronically filed with the Clerk using the CM/ECF system which will automatically send notice and serve same upon counsel of record via the Court's electronic case filing system.

This the 15th day of June, 2026.

**PARKER POE ADAMS & BERNSTEIN LLP**

/s/ Sarah F. Hutchins
Sarah F. Hutchins
N.C. Bar No. 38172
Bank of America Tower
620 South Tryon St., Suite 800
Charlotte, North Carolina 28202
sarahhutchins@parkerpoe.com
*Attorney for Joe Gibbs Racing, LLC*
