**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**Case No. 3:26-CV-00133-SCR-DCK**

| | |
|---|---|
| **JOE GIBBS RACING, LLC,** | |
| **Plaintiff,** | |
| **v.** | **ANSWER AND COUNTERCLAIM** |
| **CHRISTOPHER GABEHART and SPIRE MOTORSPORTS, LLC,** | |
| **Defendants.** | |

Defendant Christopher Gabehart ("Mr. Gabehart" or "Defendant"), by and through undersigned counsel, hereby answers Plaintiff Joe Gibbs Racing, LLC's ("JGR" or "Plaintiff") Second Amended Complaint as follows:

## INTRODUCTION

JGR's Second Amended Complaint spins a tale of corporate espionage and betrayal. The truth is far simpler—and far less dramatic. Four months after filing this lawsuit and subjecting Mr. Gabehart to a *second* comprehensive forensic examination of his personal devices, cloud accounts, and digital communications, JGR still cannot point to a single piece of JGR information that Mr. Gabehart has used, transmitted, or disclosed to anyone at Spire or elsewhere in NASCAR. Not one document. Not one file. Not one text message. Nothing. Across hundreds of pages of declarations, exhibits, and briefing, JGR has failed to identify any improper sharing or use of JGR information— because there was none. JGR's claims of trade secret theft are baseless, and its lawsuit is nothing more than a smear campaign designed to punish an employee for daring to leave. JGR's decision to pursue this litigation is all the more striking given NASCAR's historically fluid labor market

where, like all professional sports leagues, changing teams is a deeply-ingrained and accepted practice—one JGR itself has tolerated, and even benefited from, for years.

What JGR's Second Amended Complaint omits is telling. In an effort to prove that he had done nothing wrong and ensure that JGR's confidential information was returned before he left the company's employment, Mr. Gabehart voluntarily submitted to a *pre-litigation* forensic review—conducted by an examiner of JGR's own choosing, pursuant to a protocol drafted by JGR's counsel, and paid for out of Mr. Gabehart's own pocket. The results were unequivocal: there was no evidence that Mr. Gabehart transmitted, distributed, used, or otherwise shared any JGR confidential information. And when that was not enough, the other target of JGR's claims, Spire, offered to have its own files forensically examined. JGR ignored this offer—because it wanted a lawsuit more than the truth.

Also missing from the Second Amended Complaint is any acknowledgment of the industry norm JGR seeks to upend. In NASCAR, it is standard practice for key personnel—including crew chiefs, engineers, and senior executives—to move between teams. JGR has historically raised no objection when its employees depart for Toyota-aligned competitors like 23XI Racing or Legacy Motor Club—even though those teams compete directly against JGR every week. Yet now, JGR seeks to prevent Mr. Gabehart from working for Spire, a Chevrolet-aligned team that does not share the same manufacturer relationship. This selective enforcement reveals that JGR's true objective is not to protect legitimate business interests, but to punish Mr. Gabehart for leaving.

JGR's conduct further undermines its own confidentiality claims. Despite representations regarding the extensive security measures it employs to protect information it considers confidential—including employee compensation—JGR attached Mr. Gabehart's unredacted Employment Agreement, inclusive of all payment terms, to its original Complaint. Those terms

2

have since been widely reported. JGR cannot credibly claim that employee compensation constitutes a protectable trade secret while publishing that information in a public court filing.

The irony deepens upon examination of JGR's on-track performance. Despite claims that Mr. Gabehart misappropriated confidential information causing irreparable competitive harm, JGR is having a remarkable 2026 NASCAR season. Two JGR drivers currently sit in the top five of the Cup Series points standings. And Tyler Reddick, who races for 23XI Racing and benefits from a technical alliance that provides access to JGR information, currently leads the series. If JGR's confidential information were truly so valuable and vulnerable—or "stolen" as JGR claims—one would expect to see JGR suffering competitively, not thriving while its technical partner dominates.

On March 5, 2026, the Court entered a temporary restraining order. ECF 26 (the "TRO"). On April 23, 2026, the Court entered a preliminary injunction that mirrors and continues the relief set forth in the TRO. ECF 78 (the "P.I."). Mr. Gabehart has complied with both orders. This lawsuit is not about protecting trade secrets. It is about taking competition from the track to the courtroom.

## ANSWER AND FIRST DEFENSE

Mr. Gabehart denies all allegations not specifically admitted herein. Mr. Gabehart answers the correspondingly numbered paragraphs of the Second Amended Complaint as follows:

*JURISDICTION, PARTIES, AND VENUE[1]*

1.      Admitted.

2.      Admitted.

3.      Admitted.

---

[1] The headings in Plaintiff's Second Amended Complaint are repeated for organizational purposes only. All allegations or characterizations contained within them are expressly denied.

4. Paragraph 4 states a legal conclusion to which no response is required. To the extent a response is required, Mr. Gabehart admits that this Court has subject-matter jurisdiction over Plaintiff's federal claim.

5. Paragraph 5 states a legal conclusion to which no response is required. To the extent a response is required, denied.

6. Admitted.

7. Paragraph 7 states a legal conclusion to which no response is required. To the extent a response is required, Mr. Gabehart does not contest venue in this District.

*FACTUAL BACKGROUND*

I. *JGR's Confidential Information and Trade Secrets.*

8. Admitted.

9. Admitted, upon information and belief.

10. Admitted that NASCAR operates in a competitive environment. The remaining characterizations are denied as argumentative or as stating legal conclusions. Except as expressly admitted herein, the allegations of Paragraph 10 are denied.

11. Admitted that JGR races against other race teams in applicable series. Except as expressly admitted herein, the allegations of Paragraph 11 are denied.

12. Denied. Mr. Gabehart lacks knowledge or information sufficient to admit or deny JGR's internal characterization of its purported success.

13. Admitted that NASCAR teams, including JGR, seek to improve race performance. Except as expressly admitted herein, the allegations of Paragraph 13 are denied.

14. Mr. Gabehart admits that JGR possesses certain confidential business information but denies that all information described constitutes legally protectable "trade secrets" under applicable law. Except as expressly admitted herein, the allegations of Paragraph 14 are denied.

15. Denied.

16. Denied.

17. Admitted that, upon information and belief, JGR employs certain security measures. Denied to the extent this paragraph suggests such measures are relevant to the claims against Mr. Gabehart. Except as expressly admitted herein, the allegations of Paragraph 17 are denied.

18. Mr. Gabehart admits that his employment agreement provides certain protections for confidential information. Mr. Gabehart expressly denies that any such terms have been violated. Except as expressly admitted herein, the allegations of Paragraph 18 are denied.

19. Paragraph 19 states a legal conclusion to which no response is required. To the extent a response is required, denied. Mr. Gabehart further responds that JGR, in fact, sells and otherwise shares certain competition-related information it claims is confidential and/or a trade secret to other NASCAR teams, including 23XI Racing and Legacy Motor Club.

20. Paragraph 20 contains speculation and argues a legal conclusion to which no response is required. To the extent a response is required, denied. Mr. Gabehart further responds that JGR, in fact, sells and otherwise shares certain competition-related information it claims is confidential and/or a trade secret to other NASCAR teams, including 23XI Racing and Legacy Motor Club.

21. Mr. Gabehart admits that in 2022, NASCAR introduced the NextGen car, which to some degree standardized racecars. Mr. Gabehart lacks knowledge or information sufficient to admit or deny JGR's characterization of why NASCAR did certain things. Except as expressly admitted herein, the allegations of Paragraph 21 are denied.

5

22. Mr. Gabehart lacks knowledge or information sufficient to form a belief as to the specific technical claims in Paragraph 22 and therefore denies the same.

23. Denied.

24. Mr. Gabehart admits that car setup, analytics, and race strategy are important as they have always been. Except as expressly admitted herein, the allegations of Paragraph 24 are denied.

25. Paragraph 25 contains speculation and argues a legal conclusion to which no response is required. To the extent a response is required, denied.

26. Mr. Gabehart admits he is aware of a prior incident in 2024 in which JGR sought enforcement of certain confidentiality obligations from an employee. Those facts are dissimilar to those here. Paragraph 26 mischaracterizes and overstates Mr. Gabehart's involvement with that incident. Except as expressly admitted herein, the allegations of Paragraph 26 are denied.

27. Denied. Paragraph 27 contains speculation and mischaracterizes Mr. Gabehart's knowledge and involvement.

II. *Gabehart's Promises to Safeguard JGR's Confidential Information and Trade Secrets.*

28. Admitted.

29. Admitted.

30. Mr. Gabehart admits that he and JGR entered into the Agreement. The Agreement speaks for itself, and any characterization inconsistent with its terms is denied.

31. Mr. Gabehart admits that the terms of the Agreement were negotiated. The Agreement speaks for itself, and any characterization inconsistent with its terms is denied.

32. Mr. Gabehart admits that the Agreement exists. Paragraph 32 is denied to the extent this paragraph asserts that all provisions are enforceable as written.

33. Mr. Gabehart admits that he served as Competition Director. Mr. Gabehart denies the remaining allegations of Paragraph 33.

34. Mr. Gabehart admits that he had access to certain JGR information necessary to perform his job duties. Paragraph 34 is denied to the extent this paragraph characterizes all such information as "trade secrets." Except as expressly admitted herein, the allegations of Paragraph 34 are denied.

35. Denied.

36. Paragraph 36 refers to the Agreement, which speaks for itself and any characterization inconsistent with its terms is denied.

37. Paragraph 37 refers to the Agreement, which speaks for itself and any characterization inconsistent with its terms is denied.

38. Paragraph 38 refers to the Agreement, which speaks for itself and any characterization inconsistent with its terms is denied.

39. Paragraph 39 refers to the Agreement, which speaks for itself and any characterization inconsistent with its terms is denied.

40. Paragraph 40 refers to a document, which speaks for itself and any characterization inconsistent with its terms is denied.

41. Mr. Gabehart admits that JGR supplied him with a company-owned laptop computer in connection with his employment. The remaining allegations of Paragraph 41 refer to a document, which speaks for itself and any characterization inconsistent with its terms is denied.

42. Mr. Gabehart admits that during his tenure with JGR, he used his company-issued laptop to perform his job duties. Paragraph 42 is denied to the extent this paragraph characterizes

all such information as "trade secrets." Except as expressly admitted herein, the allegations of Paragraph 42 are denied.

43. Admitted.

44. Mr. Gabehart admits that JGR personnel and management also communicated information to him verbally. Paragraph 44 is denied to the extent this paragraph characterizes all such information as "trade secrets."

45. Mr. Gabehart admits that JGR personnel and management communicated some information to him verbally during the course of his employment when he was present at JGR's facility in Huntersville, North Carolina. Paragraph 45 is denied to the extent this paragraph characterizes all such information as "trade secrets."

46. Mr. Gabehart lacks knowledge or information sufficient to admit or deny allegations of JGR's intent. Paragraph 46 is denied to the extent this paragraph characterizes all such information as "trade secrets." Except as expressly admitted herein, the allegations of Paragraph 46 are denied.

47. Mr. Gabehart lacks knowledge or information sufficient to admit or deny allegations of JGR's intent. Paragraph 47 is denied to the extent this paragraph characterizes all such information as "trade secrets." Except as expressly admitted herein, the allegations of Paragraph 47 are denied. Mr. Gabehart further responds that he has not used any confidential JGR information for his personal benefit, the benefit of JGR's competitors, or other third parties.

48. Mr. Gabehart lacks knowledge or information sufficient to admit or deny allegations of JGR's intent. Therefore, the allegations of Paragraph 48 are denied.

49. Mr. Gabehart lacks knowledge or information sufficient to admit or deny allegations of JGR's intent. Therefore, the allegations of Paragraph 49 are denied.

8

*III.    Gabehart Promises to Protect JGR's Key Relationships.*

50.    Paragraph 50 appears to refer to the Agreement, which speaks for itself and any characterization inconsistent with its terms is denied.  Except as expressly admitted herein, the allegations of Paragraph 50 are denied.

51.    Paragraph 51 appears to refer to the Agreement, which speaks for itself and any characterization inconsistent with its terms is denied.  Mr. Gabehart further responds that the allegations of Paragraph 51 omit material language from Section 6 of the Agreement.

52.    Paragraph 52 appears to refer to the Agreement, which speaks for itself and any characterization inconsistent with its terms is denied.  Mr. Gabehart further responds that the allegations of Paragraph 52 omit material language from Section 6 of the Agreement.

53.    The allegations of Paragraph 53 contain arguments as to the reasonableness and enforceability of the Agreement's restrictions, which are legal conclusions that are disputed.  To the extent a response is required, denied.

54.    Paragraph 54 appears to refer to the Agreement, which speaks for itself and any characterization inconsistent with its terms is denied.  Mr. Gabehart further responds that the allegations in the Second Amended Complaint omit material language from Section 6 of the Agreement.

*IV.    Gabehart Demands More Authority and, When Denied, Decides to Leave JGR.*

55.    Mr. Gabehart admits that during the 2025 season, he became dissatisfied with some of the responsibilities in his position as Competition Director at JGR and other aspects of how JGR's race teams were being run.  Pursuant to Section 6 of the Agreement, he provided JGR with notice of the same.  Except as expressly admitted herein, the allegations of Paragraph 55 are denied.

56.    Denied.

57. Mr. Gabehart admits that on November 6, 2025, he and Coach Gibbs met, pursuant to Section 6 of the Agreement, to discuss his job duties. The remaining allegations of Paragraph 57 are denied.

58. Mr. Gabehart admits that disagreements remained as to his job duties as Competition Director and that he and Coach Gibbs mutually decided to part ways following the meeting pursuant to Section 6 of the Agreement. The remaining allegations of Paragraph 58 are denied.

59. Mr. Gabehart admits that disagreements remained as to his job duties as Competition Director and that he and Coach Gibbs mutually decided to part ways following the meeting pursuant to Section 6 of the Agreement. The remaining allegations of Paragraph 59 are denied.

60. Mr. Gabehart admits that he understood that the parties would pursue an amicable separation pursuant to Section 6 of the Agreement. The remaining allegations of Paragraph 60 are denied.

*V.     Gabehart Rejects a Separation Agreement and Raises JGR's Suspicions.*

61. Mr. Gabehart admits that on November 10, 2025, JGR presented Defendant with the terms of a proposed separation agreement. That document speaks for itself and any characterization inconsistent with its terms is denied. The remaining allegations of Paragraph 61 are denied.

62. Denied.

63. Denied.

64. Mr. Gabehart lacks knowledge or information sufficient to form a belief as to JGR's sources of information and therefore denies the same. Mr. Gabehart admits that he did meet with

Jeff Dickerson, one of the owners of Spire Motorsports, after he and Coach Gibbs mutually decided to part ways following the meeting on November 6, 2025.

65. Admitted.

66. Denied.

67. Mr. Gabehart admits, upon information and belief, that JGR undertook a forensic investigation of Mr. Gabehart's JGR-issued laptop, including looking through any personal files Mr. Gabehart had (and potentially privileged communications with his counsel). JGR claims this took place on or around December 8, 2025. The remaining allegations of Paragraph 67 are denied.

V. *JGR Uncovers Gabehart's Brazen Theft of its Confidential Information and Trade Secrets.*[2]

68. Mr. Gabehart admits that his personal Google Drive synced with the JGR-issued laptop, that he has conducted internet searches that related to Spire, and that, among other folders, his Google Drive contained a folder labeled "Spire." Mr. Gabehart also admits that on November 7, 2025, he took photographs of his laptop screen. Mr. Gabehart denies that any of this conduct constitutes "theft" or misappropriation. Paragraph 68 is denied to the extent this paragraph characterizes all such information as "trade secrets." Except as expressly admitted herein, the allegations of Paragraph 68 are denied.

69. Mr. Gabehart admits that negotiations toward a separation agreement ceased and on December 15, 2025, he received a demand letter from JGR, which speaks for itself. The remaining allegations of Paragraph 69 are denied.

70. Mr. Gabehart admits that on December 17, 2025, his counsel responded to JGR's demand letter and agreed to return and delete any JGR information in Mr. Gabehart's possession. That letter speaks for itself. The remaining allegations of Paragraph 70 are denied.

---

[2] JGR's Second Amended Complaint contains two Sections numbered V. That duplicative labeling is repeated here for organizational purposes.

71. The allegations of Paragraph 71 refer to a document that speaks for itself and any characterization inconsistent with the text of such document is denied.

72. The allegations of Paragraph 72 refer to a document that speaks for itself and any characterization inconsistent with the text of such document is denied.

73. Mr. Gabehart admits that his counsel and JGR's counsel negotiated a mutually acceptable forensic protocol in which Mr. Gabehart allowed JGR's forensic examiner of choice to image his Google Drive and personal cell phone and to identify and delete any JGR information that JGR contended it was concerned with. That process was completed. The forensic examination protocol was drafted by JGR's counsel. As part of that process, Mr. Gabehart also certified that since November 1, 2025, he had not transferred confidential information belonging to JGR to any third party nor had he intentionally allowed any third party to view any confidential information belonging to JGR. Mr. Gabehart also responds that he personally paid for the forensic examination. Mr. Gabehart further responds that the allegations of Paragraph 73 refer to a document that speaks for itself and any characterization inconsistent with the text of such document is denied. Except as expressly admitted herein, the allegations of Paragraph 73 are denied.

74. Denied.

75. Denied.

76. Denied.

77. Denied.

78. Mr. Gabehart admits that he took his cell phone to JGR's chosen forensic examiner's office on January 12, 2026, and left it there for the day for the forensic examiner to image. On that same day, Mr. Gabehart provided other relevant credentials to the forensic

12

examiner so they could access other devices. It is admitted that on or around January 16, 2026, the forensic examiner began providing files to Mr. Gabehart's counsel for review. It is further admitted that on or around January 27, 2026, Mr. Gabehart's counsel in turn provided files to JGR's counsel. Except as expressly admitted herein, the allegations of Paragraph 78 are denied.

79. Denied.

80. Admitted.

81. Mr. Gabehart admits that JGR purported to terminate Mr. Gabehart's employment on February 9, 2026, although in that same communication it was stated that Mr. Gabehart previously resigned. It is denied that JGR had "cause" to terminate Mr. Gabehart's employment, and the characterizations of Mr. Gabehart's conduct are denied.

82. Mr. Gabehart admits that on February 11, 2026, JGR was informed that he intended to take the position of Chief Motorsports Officer at Spire. The remaining allegations of Paragraph 82 are denied.

83. Denied.

84. Denied.

85. Denied.

86. Admitted.

VI. *The Full Scope of Gabehart's Misconduct Comes into Focus.*

87. Denied. The forensic review demonstrated that Mr. Gabehart did not transmit, distribute, use, or share JGR confidential information. There was no "plan" to compete unfairly.

88. Admitted that toward the end of the 2025 NASCAR season, Mr. Gabehart had conversations with JGR representatives, including Mr. Carmichael, expressing displeasure with his job duties consistent with Section 6.2 of the Agreement. Except as expressly admitted herein, the allegations of Paragraph 88 are denied.

89. Mr. Gabehart lacks knowledge or information sufficient to admit or deny allegations of this paragraph. Therefore, the allegations of Paragraph 89 are denied.

90. Mr. Gabehart admits that he met with Coach Gibbs on November 6, 2025. Except as expressly admitted herein, the allegations of Paragraph 90 are denied.

91. Mr. Gabehart admits that he accessed his JGR laptop on November 7, 2025, and took photographs. It is denied that this constitutes accessing "most sensitive" information or any wrongdoing. Paragraph 91 is denied to the extent this paragraph characterizes all such information as "trade secrets." Except as expressly admitted herein, the allegations of Paragraph 91 are denied.

92. Denied.

93. Mr. Gabehart admits that certain photographs were saved to Mr. Gabehart's personal phone and Google Photos account. JGR employees regularly used their personal devices to conduct JGR business as JGR did not offer company phones. It is denied that these systems were "unsecured" or that storage thereon was improper or that the accounts were "accessible to third parties." Except as expressly admitted herein, the allegations of Paragraph 93 are denied.

94. The allegations of Paragraph 94 refer to documents and photographs that speak for themselves and any characterization inconsistent with the same is denied.

95. Mr. Gabehart admits that his Google Drive account was synced on his JGR-issued laptop during his employment with JGR. Except as expressly admitted herein, the allegations of Paragraph 95 are denied.

96. Mr. Gabehart admits that his Google Drive account included folders named "Spire" and "Past Setups." Except as expressly admitted herein, the allegations of Paragraph 96 are denied.

97. Mr. Gabehart admits that certain JGR-related files were located in the referenced folder. Mr. Gabehart denies the characterization of the materials listed in subparts (a)-(l). Mr.

14

Gabehart further denies that all such materials constitute "Confidential Information and Trade Secrets" or that their presence demonstrates wrongdoing. Except as expressly admitted herein, the allegations of Paragraph 97 are denied.

98. Admitted that NASCAR series run on different tracks. The remaining characterizations are denied as argumentative, speculative, and/or as stating legal conclusions. Except as expressly admitted herein, the allegations of Paragraph 98 are denied.

99. Denied.

100. Denied.

101. Denied.

102. Admitted.

103. Mr. Gabehart admits that on November 10, 2025, he and JGR began negotiating the terms of a separation agreement. Except as expressly admitted herein, the allegations of Paragraph 103 are denied.

104. Mr. Gabehart admits that on November 10, 2025, he and JGR began negotiating the terms of a separation agreement. Except as expressly admitted herein, the allegations of Paragraph 104 are denied.

105. Admitted.

106. Mr. Gabehart lacks knowledge or information sufficient to form a belief as to the specific technical claims in Paragraph 106 and therefore denies the same.

107. Mr. Gabehart lacks knowledge or information sufficient to form a belief as to the specific technical claims in Paragraph 107 and therefore denies the same.

108. Admitted.

109. Denied.

110.    Mr. Gabehart admits that he accessed files in his personal Google Drive during the referenced period.  It is denied that such access demonstrates wrongdoing.  Except as expressly admitted herein, the allegations of Paragraph 110 are denied.

111.    Denied.

112.    Denied.

113.    Denied.

114.    Denied.

115.    Denied.

116.    Denied.

117.    Denied.

118.    Denied.

119.    Mr. Gabehart lacks knowledge or information sufficient to form a belief as to the employment decisions of other individuals and therefore denies the same. Mr. Gabehart denies that he was involved in any JGR employees leaving JGR to go work for Spire, to the extent any employees did so. JGR has still not identified the employee it references in the Paragraph.

120.    Mr. Gabehart lacks knowledge or information sufficient to form a belief as to the employment decisions of other individuals and therefore denies the same. Mr. Gabehart denies that he was involved in any JGR employees leaving JGR to go work for Spire, to the extent any employees did so. JGR has still not identified the employee it references in the Paragraph.

121.    Denied.

VII.    *Gabehart Joins Spire and Makes False Public Statement.*

122.    Paragraph 122 refers to a document which speaks for itself and any characterization inconsistent with its content is denied.

16

123. Paragraph 123 appears to refer to a document, which speaks for itself and any characterization inconsistent with its terms is denied. Except as expressly admitted herein, the allegations of Paragraph 123 are denied.

124. Admitted.

VIII. *Spire Requires Gabehart to Perform the Same or Similar Services for Spire as he Performed for JGR during the Prior Year.*

125. Mr. Gabehart admits that JGR filed this action on February 19, 2026, and that Exhibit 1 to JGR's original complaint contained an unredacted copy of Mr. Gabehart's employment agreement with JGR. Except as expressly admitted herein, the allegations of Paragraph 125 are denied.

126. Denied.

127. Denied.

128. Paragraph 128 refers to a document, which speaks for itself and any characterization inconsistent with its terms is denied. Except as expressly admitted herein, the allegations of Paragraph 128 are denied.

129. Mr. Gabehart lacks knowledge or information sufficient to form a belief as to what an unnamed Spire employee may have stated to an unnamed JGR employee. Paragraph 129 is denied to the extent this paragraph alleges any violation by Mr. Gabehart of his obligations under the preliminary injunction currently in effect (ECF 78). Further, Paragraph 129 states a legal conclusion to which no response is required. Except as expressly admitted herein, the allegations of Paragraph 129 are denied.

130. Denied.

131. Paragraph 131 refers to a website, which speaks for itself and any characterization inconsistent with its content is denied.

17

132. Admitted that Spire hired Mr. Gabehart on February 16, 2026. Except as expressly admitted herein, the allegations of Paragraph 132 are denied.

133. Denied.

134. Admitted that Mr. Gabehart is currently employed by Spire. Paragraph 134 also states a legal conclusion to which no response is required. Except as expressly admitted herein, the allegations of Paragraph 134 are denied.

135. Admitted that the Court has ordered a forensic review of all devices and accounts in which Mr. Gabehart used, accessed, or stored JGR materials (ECF 48). Mr. Gabehart is currently undergoing that process. Except as expressly admitted herein, the allegations of Paragraph 135 are denied.

136. Denied.

137. Paragraph 137 refers to a document, which speaks for itself and any characterization inconsistent with its terms is denied. The remaining allegations of Paragraph 137 are denied.

### FIRST CLAIM FOR RELIEF
*(Misappropriation of Trade Secrets - Federal Defend Trade Secrets Act,*
*18 U.S.C. §§ 1836 et seq. – Gabehart and Spire)*

138. Mr. Gabehart's responses to the allegations in all previous paragraphs are incorporated herein by reference.

139. The allegations of Paragraph 139 constitute a legal conclusion, which requires no response. To the extent a response is required, Mr. Gabehart denies the allegations of Paragraph 139.

140. The allegations of Paragraph 140 constitute a legal conclusion, which requires no response. To the extent a response is required, Mr. Gabehart denies the allegations of Paragraph 140.

141. Denied.

142. Denied.

143. Denied.

144. Denied.

145. Denied.

146. Denied.

147. Denied.

148. Denied.

149. Denied.

150. Denied.

151. Denied.

152. Denied.

*SECOND CLAIM FOR RELIEF*
*(Misappropriation of Trade Secrets - North Carolina Trade Secrets Protection Act,*
*N.C. Gen. Stat. §§ 66-152, et seq. – Gabehart and Spire)*

153. Mr. Gabehart's responses to the allegations in all previous paragraphs are incorporated herein by reference.

154. Denied.

155. Denied.

156. Denied.

157. Denied.

158. Denied.

159. Denied.

160. Denied.

161. Denied.

19

162. Denied.

163. Denied.

164. Denied.

165. Denied.

166. Denied.

### THIRD CLAIM FOR RELIEF
*(Unfair Trade Practices - North Carolina Unfair and Deceptive Trade Practices Act,*
*N.C. Gen. Stat. §§ 75-1.1, et seq. – Gabehart and Spire)*

167. Mr. Gabehart's responses to the allegations in all previous paragraphs are incorporated herein by reference.

168. Denied.

169. Denied.

170. Denied.

171. Denied.

### FOURTH CLAIM FOR RELIEF
*(Breach of Contract – Gabehart)*

172. Mr. Gabehart's responses to the allegations in all previous paragraphs are incorporated herein by reference.

173. Mr. Gabehart admits that the Agreement exists but denies that all provisions are enforceable as JGR contends. Except as expressly admitted herein, the allegations of Paragraph 173 are denied.

174. Denied.

175. Denied.

176. Denied.

### FIFTH CLAIM FOR RELIEF

20

*(Tortious Interference with Contract – Spire)*

177. Mr. Gabehart's responses to the allegations in all previous paragraphs are incorporated herein by reference.

178. This claim is not directed at Mr. Gabehart and therefore no response is required. To the extent a response is required, denied.

179. This claim is not directed at Mr. Gabehart and therefore no response is required. To the extent a response is required, denied.

180. This claim is not directed at Mr. Gabehart and therefore no response is required. To the extent a response is required, denied.

181. This claim is not directed at Mr. Gabehart and therefore no response is required. To the extent a response is required, denied.

182. This claim is not directed at Mr. Gabehart and therefore no response is required. To the extent a response is required, denied.

183. This claim is not directed at Mr. Gabehart and therefore no response is required. To the extent a response is required, denied.

184. This claim is not directed at Mr. Gabehart and therefore no response is required. To the extent a response is required, denied.

### SIXTH CLAIM FOR RELIEF
*(Preliminary and Permanent Injunctive Relief)*

185. Mr. Gabehart's responses to the allegations in all previous paragraphs are incorporated herein by reference.

186. Denied.

187. Denied.

188. Denied.

189. Denied.

190. Denied.

*PRAYER FOR RELIEF*

Mr. Gabehart denies that JGR is entitled to any relief, including, without limitation, the relief requested in the nine paragraphs of JGR's prayer for relief.

**SECOND DEFENSE**
**(Failure to State a Claim)**

JGR has failed to state a claim upon which relief can be granted against Mr. Gabehart.

**THIRD DEFENSE**
**(No Misappropriation)**

Mr. Gabehart did not misappropriate any trade secrets. No unauthorized acquisition occurred, and a comprehensive forensic examination of his devices—conducted by an examiner of JGR's own selection—confirmed that there was no evidence suggesting that Mr. Gabehart transmitted, distributed, used, or shared any JGR confidential information.

**FOURTH DEFENSE**
**(No Trade Secret Status)**

The information identified in the Second Amended Complaint does not qualify for trade secret protection under the Defend Trade Secrets Act or the North Carolina Trade Secrets Protection Act because it is not secret, does not derive independent economic value from secrecy, and/or was not subject to reasonable measures to maintain secrecy.

**FIFTH DEFENSE**
**(Unclean Hands)**

JGR's claims are barred by the doctrine of unclean hands. Among other things, JGR unlawfully withheld Mr. Gabehart's earned wages in violation of his employment agreement, North Carolina law, and federal law, as a coercive tactic during separation negotiations. JGR further comes to this Court with unclean hands by selectively enforcing its restrictive covenants

against Mr. Gabehart while permitting other senior personnel to depart without objection or legal action.

## SIXTH DEFENSE
### (No Breach)

JGR's claims are barred because Mr. Gabehart did not breach any contractual or other legal duty he may have owed to JGR.

## SEVENTH DEFENSE
### (Lack of Consideration / Unenforceability)

The restrictive covenants in Mr. Gabehart's employment agreements are unenforceable for lack of adequate consideration, overbreadth, and/or unreasonableness.

## EIGHTH DEFENSE
### (No Damages/ Failure to Mitigate)

JGR's claims are barred because it has suffered no cognizable damages. To the extent JGR claims damages, it has failed to mitigate.

## NINTH DEFENSE
### (No Irreparable Harm)

JGR cannot establish irreparable harm warranting injunctive relief, particularly where the forensic examination demonstrated no misappropriation occurred, there is no evidence to the contrary, and the employment agreement provides certain protections for JGR's confidential information, which Mr. Gabehart agrees to comply with.

## TENTH DEFENSE
### (No Conduct in Commerce)

Mr. Gabehart's alleged conduct did not occur "in or affecting commerce" within the meaning of N.C. Gen. Stat. § 75-1.1, and the North Carolina Unfair and Deceptive Trade Practices Act does not apply to employer-employee disputes.

23

## ELEVENTH DEFENSE
### (Good Faith)

At all relevant times, Mr. Gabehart acted in good faith and in accordance with his understanding of his rights and obligations.

## TWELFTH DEFENSE
### (Prior Material Breach)

JGR's claims are barred, in whole or in part, by the doctrine of prior material breach. JGR first breached the Employment Agreement by, among other things, unilaterally ceasing to pay Mr. Gabehart all compensation to which he was entitled. JGR's prior material breach excuses any alleged subsequent breach by Mr. Gabehart and bars JGR from recovering on its claims.

## THIRTEENTH DEFENSE
### (Selective Enforcement / Disparate Treatment)

JGR's claims are barred by the doctrine of selective enforcement and disparate treatment. It is standard and accepted practice in NASCAR for key personnel—including crew chiefs, engineers, and executives—to move between teams. JGR has historically permitted, and indeed benefited from, the movement of personnel to and from other teams, without objection. Most recently, in April 2026, Michael Guttilla—who served as JGR's Chief Operating Officer, a position senior to Mr. Gabehart—departed JGR to become President of Legacy Motor Club, a direct competitor. JGR did not pursue litigation, seek injunctive relief, or publicly accuse Mr. Guttilla of wrongdoing. By contrast, JGR now seeks to enforce its restrictive covenants against Mr. Gabehart for joining Spire Motorsports. JGR's selective enforcement of its restrictive covenants against Mr. Gabehart, while permitting similar or more significant departures, demonstrates that JGR's claims are motivated by animus and retaliation rather than the protection of legitimate business interests.

## FOURTEENTH DEFENSE
### (Waiver, Laches, Estoppel, and Other Equitable Defenses)

JGR's claims are barred, in whole or in part, by the equitable doctrines of waiver, laches, and estoppel. JGR had knowledge of Mr. Gabehart's alleged conduct—including his departure from JGR and his discussions with Spire—no later than early December 2025, yet JGR waited until February 19, 2026 to file this lawsuit and did not seek a temporary restraining order until after Mr. Gabehart had already begun working for Spire. JGR's unreasonable delay in asserting its claims and seeking injunctive relief constitutes waiver of any right to the relief sought. JGR's delay was also unreasonable and prejudicial to Mr. Gabehart, who relied on JGR's inaction in accepting employment with Spire and restructuring his professional and personal affairs accordingly. JGR's claims are further barred by any and all other equitable defenses arising from JGR's unreasonable delay in filing this action and seeking injunctive relief.

Mr. Gabehart reserves the right to assert and rely on any additional affirmative defenses, including based on information learned during the course of this litigation, including discovery, trial, or otherwise.

## FIFTEENTH DEFENSE, AND BY WAY OF COUNTERCLAIM

Counterclaim-Plaintiff Christopher Gabehart ("Mr. Gabehart") alleges in his counterclaim against Joe Gibbs Racing, LLC ("JGR") as follows:

### INTRODUCTION

1. This action arises from JGR's calculated campaign to punish a dedicated former employee for exercising his contractual rights. After more than a decade of distinguished service—during which Mr. Gabehart rose from engineer to crew chief to Competition Director, contributing to multiple championships—JGR repaid his loyalty with unlawful wage withholding, invasive demands, and a lawsuit designed not to protect legitimate business interests, but to exact retribution

and create a public spectacle. JGR's conduct is all the more egregious given the well-established practice in NASCAR of personnel moving freely between teams—a practice JGR has tolerated, and even benefited from, when it suits its interests.

2.      When Mr. Gabehart properly invoked Section 6 of his Employment Agreement—notifying JGR of job duties inconsistent with his reasonable expectations—JGR's response was not to resolve the issues in good faith. Instead, JGR unilaterally stopped paying Mr. Gabehart his earned wages, spied on him through private investigators, subjected him to an invasive forensic examination, and then filed this lawsuit even after that examination demonstrated no evidence of wrongdoing. JGR's own CFO acknowledged in contemporaneous text messages that Mr. Gabehart had valid grounds for invoking Section 6, yet JGR later submitted sworn declarations to this Court claiming ignorance of Mr. Gabehart's notice—sworn statements that cannot be reconciled with the documentary record.

3.      The forensic examination—conducted by an examiner of JGR's own choosing, pursuant to a protocol drafted by JGR's own counsel, and paid for by Mr. Gabehart—confirmed what Mr. Gabehart has maintained from the beginning: he did not transmit, distribute, use, or share any JGR confidential information.  No text messages.  No email attachments.  No dissemination whatsoever.

4.      Mr. Gabehart's new employer, Spire Motorsports ("Spire"), even offered to have its systems examined by a neutral forensic examiner to further verify that no JGR information had been transmitted. JGR ignored this offer. Instead, it filed suit—choosing litigation and publicity over verification and resolution. JGR's refusal of Spire's invitation to conduct a forensic review, while simultaneously claiming irreparable harm from disclosure, reveals that this litigation is punitive rather than protective.

5. JGR's selective prosecution of this lawsuit against Mr. Gabehart—while permitting other senior personnel to depart for competitors without consequence—reveals the true nature of this litigation. In NASCAR, lateral movement of key personnel between teams is routine and accepted. JGR and other teams, including 23XI Racing and Legacy Motor Club, regularly exchange talent, and JGR has historically raised no objection when employees depart for these Toyota competitors—even though such teams compete directly against JGR on the track every week. Yet JGR now seeks to prevent Mr. Gabehart from working for Spire Motorsports, a Chevrolet-aligned team that does not share the same manufacturer relationship with JGR.

6. The double standard is exemplified by JGR's treatment of Michael Guttilla. Mr. Guttilla served as JGR's Chief Operating Officer—a position senior to Mr. Gabehart's role as Competition Director. In April 2026, during the middle of this racing season, Mr. Guttilla departed JGR to become President of Legacy Motor Club, a Toyota-aligned team that competes directly against JGR in the NASCAR Cup Series. JGR did not pursue litigation against Mr. Guttilla. JGR did not seek injunctive relief. JGR did not publicly accuse Mr. Guttilla of theft, espionage, or betrayal. JGR did not demand that Mr. Guttilla submit to an invasive forensic examination of his personal devices. The contrast between JGR's treatment of Mr. Guttilla and its treatment of Mr. Gabehart could not be more stark, and it underscores that JGR's claims against Mr. Gabehart are not motivated by legitimate business protection, but by personal animus and a desire to punish him for his departure.

7. JGR's litigation strategy has been to convert a disputed separation into a punitive sit-out. The February 9, 2026 "for cause" termination letter—sent three months after Mr. Gabehart exercised his Section 6 rights and JGR stopped paying his wages, and days after the forensic examination was completed—reveals that JGR manufactured a post-hoc justification to trigger an

27

18-month noncompete it would not otherwise have. The timeline creates an inescapable dichotomy: if JGR refuses to accept Mr. Gabehart's Section 6 invocation, JGR either terminated him without cause on November 10 when it stopped paying him (in which case no noncompete applies), or terminated him for cause on February 9 (in which case JGR breached first by withholding wages for three months, forfeiting any right to enforce restrictive covenants). Either way, the 18-month noncompete JGR seeks to enforce does not exist.

## PARTIES, JURISDICTION, AND VENUE

8. Mr. Gabehart is a resident of Mooresville, North Carolina.

9. JGR is a limited liability company organized under the laws of Delaware with its principal place of business in Huntersville, North Carolina.

10. This Court has supplemental jurisdiction over these Counterclaims pursuant to 28 U.S.C. § 1367 because they arise from the same case or controversy as JGR's claims.

11. Venue is proper in this District.

## FACTUAL ALLEGATIONS

12. Mr. Gabehart began working for JGR in 2012. Over thirteen years, he rose from engineer to crew chief to Competition Director. His dedication to JGR was beyond question-until he exercised his contractual right to address job duties that had become inconsistent with his reasonable expectations.

13. On or about November 15, 2024, Mr. Gabehart and JGR executed a written Employment Agreement (the "Agreement"), effective December 1, 2024, governing Mr. Gabehart's service to JGR, including compensation, termination provisions, confidentiality, and restrictive covenants.

14. Under Section 3 of the Agreement, JGR agreed to pay Mr. Gabehart a Base Salary plus performance-based bonuses, including awards tied to Cup Series team performance and race

outcomes, with earned bonuses payable within forty-five (45) days after JGR's receipt of the applicable prize money.

15. Section 4 of the Agreement sets forth termination provisions, including "termination with cause" and "termination without cause," and provides that upon termination without cause JGR must pay the Base Salary for the shorter of the remaining Term or the Noncompete Period, subject to mitigation and the Agreement's other terms.

16. Section 6 of the Agreement contains restrictive covenants, including a noncompetition covenant. Critically, however, Section 6 provides that the Noncompete Period is reduced to one (1) week and JGR must pay $100,000 in exchange for a complete mutual release if, after September 1, 2025, and before June 1, 2026: (i) the employee in good faith notifies JGR of specific job duties or responsibilities assigned to him that are inconsistent with his reasonable expectations or the job description provided before employment began; (ii) the employee provides JGR at least sixty (60) days to resolve such inconsistencies to his reasonable satisfaction and JGR fails to do so; and (iii) the employee provides sixty (60) days prior written notice of termination without cause due to such unresolved inconsistencies.

17. On November 6, 2025, Mr. Gabehart met with Coach Gibbs to address that his assigned duties materially diverged from the position he was promised when JGR promoted him to Competition Director. At that meeting, Mr. Gabehart left Coach Gibbs a written document outlining the specific inconsistencies and issues pursuant to Section 6 of the Agreement (the "Written Notice"). The next morning, on November 7, 2025, Mr. Gabehart emailed Tim Carmichael to keep him in the loop, expressly stating that he was sharing the written version of his discussion with Coach Gibbs. The Written Notice identified specific job duties and responsibilities assigned to Mr. Gabehart that were materially inconsistent with his reasonable expectations when

he accepted the position as Director of Cup Series Competition and with the job description provided by JGR prior to the Start Date. The substance of Mr. Gabehart's concerns, as set forth in the Written Notice, is described below.

18.     *Lack of Internal and External Support*.  Mr. Gabehart notified JGR that JGR asked him to perform a job but then provided no internal or public support to actually perform it.  Mr. Gabehart expressed concern that this damage to his professional credibility—with NASCAR officials, with competitor teams such as 23XI Racing, and with internal JGR personnel—could not be repaired, as first impressions are difficult to undo.

19.     *Job Description Inconsistent with Reality*.  Mr. Gabehart notified JGR that the job was "not, at all, as advertised."  He was promised a COO-type role overseeing all competitive operations with autonomy to lead.  Instead, he found himself "constantly intertwined" with Coach Gibbs, senior JGR executives, and family members in making even routine competition decisions—a "dysfunctional organizational structure" that he could not continue in.

20.     *Compromised Leadership of the No. 54 Team*.  Mr. Gabehart expressed serious concerns about the management of JGR's No. 54 car, driven by Ty Gibbs, which is one of JGR's four Cup Series entries.  In Mr. Gabehart's view, the No. 54 team should be managed and held accountable in the same manner as the organization's other cars.  Instead, the No. 54 team was managed directly by Coach Gibbs and everyone in the organization knew it.  Beginning early in the 2025 season, Coach Gibbs repeatedly pressured Mr. Gabehart to take over as crew chief of the No. 54 car.  Mr. Gabehart consistently declined, explaining that as Competition Director he did not believe this was the right move, that it would undermine the long-term development of the team, and that he did not want to be crew chief of the No. 54 car or any other car.  Despite Mr. Gabehart's objections, Coach Gibbs and ownership continued pressing, and Mr. Gabehart

eventually conceded to the pressure by first helping the No. 54 team more behind the scenes and then, beginning on June 28, 2025, by publicly serving as the crew chief and calling the races on Sundays for nine consecutive races before returning those duties to the original crew chief, Tyler Allen.

21. Mr. Gabehart identified specific examples of the No. 54 team's differential treatment that undermined his position: key personnel decisions were made without his counsel or input despite his role as Competition Director; the No. 54 driver, Ty Gibbs, was not held to the same meeting attendance standards as others; and Coach Gibbs consulted everyone except Mr. Gabehart on weekly performance matters, undermining his credibility with those who reported to him. While that was Coach Gibbs' prerogative, Mr. Gabehart believed this differential treatment compromised the leadership and values structure that everyone else in the organization was being held accountable to—creating a long-term problem with unsustainable consequences.

22. These examples demonstrated that JGR did not value or trust Mr. Gabehart's leadership abilities. If JGR did not trust him with responsibility for the No. 54 team, Mr. Gabehart reasonably concluded that JGR did not trust him with the Cup Series operation as a whole.

23. JGR's pressure campaign to get Mr. Gabehart to serve as crew chief for the No. 54 car extended beyond verbal demands. On or about March 27, 2025, Heather Gibbs—the mother of the No. 54 driver, Ty Gibbs—wrote a personal check in the amount of $500,000 payable to Mr. Gabehart. This payment, made outside of Mr. Gabehart's Employment Agreement with JGR and unrelated to his duties as Competition Director, was a further attempt to induce Mr. Gabehart to perform crew chief services for the No. 54 car—which went directly against what Mr. Gabehart was told when he agreed to leave the role of Crew Chief of the No. 11 car in November 2024. Mr. Gabehart left that role under the promise of being given autonomy to lead all of competition for

31

JGR's Cup teams. Yet this payment forced Mr. Gabehart into an untenable position: refuse and risk permanent damage to his relationship with ownership, or accept and continue trying to balance the Gibbs family's personal desires with the company's best competitive interests. Notably, the payment was subsequently reported on a Form 1099-NEC issued by Ty Gibbs Racing, LLC, reflecting the same $500,000 as nonemployee compensation for calendar year 2025.

24.     These actions demonstrate a persistent pattern of pressure by JGR and the Gibbs family to divert Mr. Gabehart from his legitimate duties as Competition Director and to coerce him into serving as crew chief for a car that was managed differently than JGR's other entries. Rather than respecting Mr. Gabehart's professional judgment and his contractual role, JGR sought to extract crew chief services through financial inducements and relentless pressure—conduct that materially contributed to the deterioration of the employment relationship and Mr. Gabehart's invocation of his rights under Section 6 of the Agreement.

25.     This deterioration in the relationship was the primary reason Mr. Gabehart felt compelled to exercise his rights under Section 6 of the Agreement. Following Mr. Gabehart's communication to JGR's CFO Tim Carmichael on October 26, 2025, expressing uncertainty about his future with the company, Mr. Gabehart made genuine efforts to address these concerns through meetings with Coach Gibbs, culminating in the November 6, 2025 meeting at which the parties mutually agreed to part ways.

26.     On November 6, 2025, Mr. Gabehart met with Coach Gibbs to discuss these concerns in person. During that meeting, Mr. Gabehart reiterated the issues identified in his written communications and expressed his desire for a resolution. Following that meeting, the parties mutually agreed to part ways. Mr. Gabehart understood that JGR would honor the terms of Section 6 and pursue an amicable separation, as contemplated by the Agreement.

32

27. On November 6, 2025, Mr. Carmichael texted Wally Brown in reference to Mr. Gabehart's meeting with Coach Gibbs: "Coach wants him gone. I would be shocked if there is any other outcome"—notably absent is any mention of misconduct, any reference to "for cause," or any suggestion of wrongdoing.

28. Instead of honoring the Agreement's terms, JGR began a course of unlawful and coercive conduct. On November 10, 2025, following the parties' agreement to mutually separate, JGR placed Mr. Gabehart on "garden leave" while they worked through a separation agreement. JGR instructed Mr. Gabehart that if anyone internally asked where he was, he should say he was "on vacation." Despite this arrangement, and while the parties were actively negotiating a potential separation agreement, JGR unilaterally ceased paying Mr. Gabehart all compensation to which he was entitled under the Agreement and North Carolina law. No written termination notice was ever issued identifying November 10, 2025 as a termination date.

29. JGR's withholding of Mr. Gabehart's earned wages was not a good-faith business decision—it was a calculated pressure tactic designed to coerce him into compliance with JGR's demands during separation negotiations. Those demands far exceeded what was required under the Employment Agreement. JGR stopped payment while negotiations were ongoing and without any effective termination, using economic leverage to extract concessions from an employee who was exercising his contractual rights.

30. JGR acknowledged that Mr. Gabehart properly exercised his termination right under the second paragraph of Section 6 of the Agreement. JGR's Chief Financial Officer, Tim Carmichael, conceded in a text message to Mr. Gabehart on November 8, 2025 that "I don't believe your actual role was what Coach said it would be" or "what you were told you would have." Mr. Carmichael further indicated he did not blame Mr. Gabehart for exercising his rights. Two days

33

later, on November 10, 2025, Mr. Carmichael sent Mr. Gabehart an email presenting JGR's terms for a mutual termination agreement. The terms included payment of $100,000—the exact amount owed under the second paragraph of Section 6. JGR's counsel's representation in open court that this amount was a "coincidence" strains credulity; the $100,000 figure directly tracks the Section 6, Paragraph 2 payment construct.

31. Despite acknowledging Mr. Gabehart's invocation of his Section 6 termination rights, JGR refused to honor its contractual obligations or otherwise deal with Mr. Gabehart in good faith. Section 6 requires the parties to execute a "complete mutual release." JGR insisted on material terms above and beyond a mutual release, including new non-solicitation and non-disparagement provisions and a punitive liquidated damages clause. Mr. Gabehart rightfully rejected these new terms, but JGR refused to back down. As a result of JGR's unreasonable refusal to honor the Agreement, the parties never signed a separation agreement.

32. On November 18, 2025, Mr. Carmichael texted Wally Brown that Mr. Gabehart "gave notice that coach wasn't living up to his contract so we have 60 or 120 days to give him what he wants or he can go somewhere else," explicitly acknowledging that Mr. Gabehart had invoked the notice provisions of Section 6.

33. On November 19, 2025, JGR's in-house counsel Eric Schaffer wrote that "CG has asked to be released from his contract that carried an 18-month non-compete" and that JGR was "accepting his request (in addition to $100k on top of that)."

34. JGR apparently never intended to honor Mr. Gabehart's Section 6 rights or otherwise deal with him in good faith. On December 2, 2025, JGR directed a private investigator to conduct surveillance on Mr. Gabehart. The private investigator, Ryan Simpson, took video footage of Mr. Gabehart having lunch *in public* with Spire co-owner Jeff Dickerson. The next

day, JGR Executive Vice President and Chief Commercial Officer, Eric Schaffer, placed a call to Bill Anthony, Spire's president. By his own sworn account, Mr. Schaffer told Mr. Anthony that Mr. Gabehart was subject to a noncompete and warned Spire not to violate JGR's contractual rights. There was no noncompete on December 3, 2025. As of that date, Mr. Gabehart and JGR were still negotiating in good faith – or so Mr. Gabehart thought – a separation agreement *with no noncompete*.

35. Behind the scenes, JGR's invasive conduct extended to Mr. Gabehart's personal devices and accounts. Mr. Gabehart returned his JGR-issued devices on November 10, 2025. On December 8, 2025, JGR employee Chris Gilligan—and potentially others—accessed Mr. Gabehart's JGR-issued laptop and other devices that had been synced with Mr. Gabehart's personal accounts, including his Gmail account. That Gmail account contained privileged attorney-client communications between Mr. Gabehart and his counsel relating to the negotiation of his separation agreement with JGR. The full scope of what Mr. Gilligan and others reviewed remains unclear. On that same date, JGR retained Reliance Forensics, LLC to perform a forensic examination of Mr. Gabehart's devices—without Mr. Gabehart's knowledge or consent at the time.

36. Since JGR and Reliance Forensics, LLC gained access to Mr. Gabehart's accounts and devices, Mr. Gabehart has received numerous alerts of suspicious and unauthorized login attempts across his personal accounts, reflecting login attempts that Mr. Gabehart was not responsible for and from locations where he was not present. These ongoing security incidents further demonstrate the consequences of JGR's invasive and unauthorized access to Mr. Gabehart's personal information.

35

37.    JGR's own internal confusion about Mr. Gabehart's employment status further demonstrates that no valid termination occurred in November 2025 and caused Mr. Gabehart concrete harm. On November 24, 2025, Mr. Gabehart contacted JGR's Chief People Officer, Toni Rogers, to inquire about extending his health insurance through COBRA. Ms. Rogers responded that same day, acknowledging that she was "awaiting to tell [HR] anything until I get more information" and that JGR would need to "terminate [Mr. Gabehart's] employment to trigger the qualifying event" for COBRA eligibility. This communication confirms that as of late November 2025, JGR had not terminated Mr. Gabehart's employment and was uncertain about his status. Because JGR failed to properly administer the separation process, Mr. Gabehart's health insurance coverage was not properly transitioned to COBRA in a timely manner, and Mr. Gabehart and his family have had insurance claims denied due to coverage lapses caused entirely by JGR's administrative confusion.

38.    No written termination notice was issued to Mr. Gabehart identifying November 10, 2025 as a termination date, and the parties had not finalized or executed a separation agreement or mutual release.

39.    Prior to JGR's nonpayment, Mr. Gabehart had exercised his contractual rights under Section 6 of the Agreement by notifying JGR, in good faith, of specific job duties and responsibilities assigned to him that were inconsistent with his reasonable expectations and the job description provided by JGR prior to the Start Date, and by affording JGR an opportunity to cure those issues, after which JGR failed to resolve them to Mr. Gabehart's reasonable satisfaction.

40.    Meanwhile, JGR demanded that Mr. Gabehart submit to an invasive forensic examination of his personal devices—at his own expense—to prove a negative. Despite JGR's unlawful withholding of his wages, Mr. Gabehart agreed to cooperate.

41. The forensic examination was conducted pursuant to a detailed Protocol drafted by JGR's own counsel, using a forensic examiner (Reliance Forensics, LLC) selected by JGR. Mr. Gabehart paid for the examination. Prior to the examination, Mr. Gabehart executed a sworn declaration certifying that he had not transferred JGR confidential information to any third party and had not intentionally allowed any third party to view such information.

42. The Protocol required a comprehensive review of Mr. Gabehart's personal cell phone and Google Drive account. The forensic examiner was authorized to: (a) compare files on the devices against known JGR files; (b) search for any reference to JGR, Joe Gibbs Racing, or common variations thereof; (c) search for JGR sponsor names, team names, and equipment references; and (d) perform keyword searches designed to identify JGR data. The examination also reviewed text messages, email attachments, and any evidence of transmission or dissemination of information.

43. Mr. Gabehart agreed to this invasive examination in good faith and in the interest of resolving the parties' dispute, even while JGR was unlawfully withholding his earned wages.

44. On January 27, 2026, the forensic examination was completed. The results confirmed what Mr. Gabehart had maintained from the outset: there is no evidence that he transmitted, distributed, used, or otherwise shared any JGR confidential information. Critically, the forensic examiner did not locate any text messages or email attachments transmitting the files—the only copies found were local files that were never sent to anyone. Mr. Gabehart further consented to the permanent deletion of all flagged items from his personal devices, demonstrating

37

his continued good faith. The deletion process was completed on or about February 6, 2026[3]—three days before JGR purported to terminate Mr. Gabehart "for cause."

45.     During this same period, Mr. Gabehart remained ready, willing, and able to perform his duties consistent with the Agreement and was engaged in good faith discussions toward a mutually agreeable separation framework, including return of specified JGR materials, mutual releases, and reciprocal non-disparagement.

46.     Notwithstanding the foregoing and the absence of an effective termination with cause, JGR refused to pay Mr. Gabehart wages and bonuses that had been earned and unlawfully withheld compensation, including performance-based bonuses due under Section 3, the $100,000 payment specified under Section 6 upon the unresolved job-duty inconsistencies and resulting termination without cause framework, and other accrued compensation owed pursuant to the Agreement and the North Carolina Wage and Hour Act.

47.     JGR's pattern of withholding compensation extended to Mr. Gabehart's earned performance bonuses for the 2025 season. Although Mr. Gabehart earned his 2025 season bonus in November 2025, JGR did not pay this bonus until January 20, 2026—long after it was earned and well beyond the timeframe contemplated by the Agreement. To date, JGR has offered no legitimate explanation for this delay. The timing of the eventual payment—in the midst of separation negotiations—further demonstrates JGR's use of Mr. Gabehart's earned compensation as leverage rather than honoring its contractual obligations in good faith.

---

[3] Mr. Gabehart did not receive access to Spire IT systems or a Spire-issued laptop until February 17, 2026—after the forensic deletions were completed. He therefore had no JGR materials to bring to or use at Spire when his access began, further demonstrating that no misappropriation for Spire's benefit occurred.

48.     JGR stopped paying Mr. Gabehart's wages on or about November 10, 2025, even though he remained a contract employee until JGR's purported "for cause" termination notice on February 9, 2026.

49.     JGR's refusal to remit owed compensation has damaged Plaintiff and constitutes a breach of the Agreement and a willful violation of the North Carolina Wage and Hour Act.

50.     Mr. Gabehart has fully complied with his material obligations under the Agreement, including confidentiality obligations, and has taken appropriate steps to coordinate the return of discrete JGR materials identified by JGR, without conceding any characterization of ownership or confidentiality and without any disclosure or use of nonpublic JGR information.

51.     Mr. Gabehart offered JGR an extraordinary additional measure of assurance. Through counsel, Mr. Gabehart communicated that Spire Motorsports was willing to allow a neutral forensic examiner, under a mutually agreed protocol, to review Spire's own materials solely to confirm that no JGR information had been transmitted to or used by Spire. Spire was also willing to enter into an agreement representing that it had not received any JGR confidential information from Mr. Gabehart and agreeing not to obtain or use any JGR confidential information from him in the future. JGR never responded to this offer. Instead, JGR filed this lawsuit, choosing litigation and public spectacle over the verification it claimed to seek.

52.     On February 9, 2026—three months after Mr. Gabehart exercised his rights under Section 6 and JGR began withholding his wages, and days after the forensic examination demonstrated no misappropriation—JGR's counsel sent a letter purporting to terminate Mr. Gabehart's employment "for Cause." The letter itself repeatedly characterized Mr. Gabehart's departure as a resignation, stating that he "agreed to leave" and "resigned his employment," confirming that the termination for cause was a strategic afterthought. JGR was fully aware that

39

Mr. Gabehart had exercised Section 6, triggering the contractual mechanism that reduced the noncompete period to one week. Rather than honor these contractual obligations, JGR devised a strategy to recharacterize the separation as a termination "for cause"—thereby attempting to eliminate Mr. Gabehart's entitlement to severance and to invoke an 18-month noncompete it would not otherwise have.

53. The February 9, 2026 termination letter was issued only after Mr. Gabehart had cooperated completely with JGR's demands, including submitting to a forensic examination that confirmed no wrongdoing. Yet JGR's counsel nonetheless cited the very conduct that the forensic examination had exonerated as the purported "cause" for termination—a post-hoc rationalization designed to deprive Mr. Gabehart of his contractual rights.

54. JGR's purported termination for cause lacks any legitimate basis. The Agreement permits termination "for cause" only in limited circumstances, including breach of the Agreement, failure to perform assigned duties, or acts of dishonesty or willful misconduct. Mr. Gabehart did none of these things. He exercised his contractual rights under Section 6. He cooperated fully with JGR's forensic examination demands. He consented to the permanent deletion of flagged materials from his personal devices. The forensic examination confirmed he did not share or disclose any information. Under these circumstances, no reasonable employer acting in good faith could conclude that "cause" existed for termination.

55. JGR's bad faith is further evidenced by its own internal records. JGR's Termination Payroll Notice lists the termination reason as "Voluntary Resignation"—not "for cause"—demonstrating that JGR's internal personnel records are inconsistent with its litigation position.

56. Indeed, Coach Gibbs himself publicly confirmed the mutual nature of the separation in a February 12, 2026 SiriusXM interview—three days after the purported "for cause" letter—stating: "After the season, Chris and I met, and we just decided to go our separate ways."

57. Mr. Gabehart acknowledges that he has certain obligations to JGR arising from his employment, including obligations not to disclose JGR Confidential Information as defined in the Employment Agreement. Mr. Gabehart has at all times intended to honor these obligations and has conducted himself accordingly.

58. Mr. Gabehart made Spire Motorsports aware of these obligations. Indeed, Mr. Gabehart and Spire executed a Confidentiality and Non-Disclosure Agreement expressly acknowledging Mr. Gabehart's confidentiality obligations to JGR. In that agreement, Mr. Gabehart agreed to maintain at all times the confidentiality of JGR Confidential Information and not to disclose JGR Confidential Information to Spire or use JGR Confidential Information for Spire's benefit or in connection with any services performed for Spire. Spire, for its part, agreed not to solicit, obtain, or use any JGR Confidential Information from Mr. Gabehart.

59. Since the filing of this lawsuit, Mr. Gabehart has undergone further extensive forensic review. Pursuant to the Forensic Analysis Protocol executed on April 22, 2026—proposed by JGR's counsel and agreed to by Mr. Gabehart—forensic examiners have been authorized to image, search, and analyze approximately eight devices and cloud accounts identified by JGR's counsel or in Mr. Gabehart's possession. JGR's counsel has proposed more than 425 separate search terms to be run across these devices and accounts—encompassing specific race analytics file names, setup files, simulation data, payroll-related terms, sponsor names, and technical terminology—representing a comprehensive examination of virtually every file and communication that could conceivably relate to JGR.

60. Despite this extensive and invasive forensic process going on for months—and despite having direct access to complete directories, forensic logs, and search hit reports generated from Mr. Gabehart's devices and accounts—JGR has failed to identify a single, legitimate piece of JGR data that constitutes a trade secret or confidential information that Mr. Gabehart has used, transmitted, or disclosed to any third party to this point. This failure is not incidental. It is because no such evidence exists. JGR cannot credibly point to any transmission, distribution, or use of its confidential information because there was none. The forensic record confirms what Mr. Gabehart has maintained from the outset: he did not misappropriate JGR's trade secrets, and JGR's claims to the contrary are baseless and retaliatory.

61. JGR's conducting of the forensic review, though, has been marked by carelessness and disregard for Mr. Gabehart's rights. During the course of the forensic examination, JGR's forensic examiner, working under the supervision of JGR's counsel, improperly disclosed dozens of Mr. Gabehart's privileged attorney-client communications—emails between Mr. Gabehart and his counsel—*directly to JGR's counsel*. This disclosure was a serious breach of the forensic protocol and a violation of Mr. Gabehart's attorney-client privilege. As a direct result of this negligence and breach of the protocol, Mr. Gabehart has been forced to incur substantial additional attorneys' fees in addressing and remedying this improper disclosure.

62. JGR's purported concern for confidentiality is further belied by its own conduct in this litigation. Despite claiming that employee compensation information constitutes a trade secret warranting injunctive relief, JGR attached Mr. Gabehart's unredacted Employment Agreement— inclusive of all payment terms—to its original Complaint filed with this Court. Those terms have since been widely reported across multiple news outlets, rendering any assertion that such information retains its protectable confidential status neither credible nor legally supportable and

further invading Mr. Gabehart's privacy by publicly disclosing the financial terms of his contract with JGR, which continues to cause Mr. Gabehart harm to this day. JGR cannot, in good faith, claim that employee compensation constitutes a trade secret while simultaneously publishing that very information in a public court filing. This conduct demonstrates that JGR's purported confidentiality concerns are pretextual and that this lawsuit is motivated not by the protection of legitimate business interests, but by a desire to punish Mr. Gabehart for exercising his contractual rights and pursuing employment with a competitor.

<u>**FIRST CLAIM FOR RELIEF**</u>
***Breach of Contract***

63.     Mr. Gabehart realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

64.     The payment provisions in the Agreement are valid and enforceable and supported by adequate consideration.

65.     JGR breached the Agreement by failing and refusing to pay Mr. Gabehart compensation owed, including earned wages and bonuses under Section 3 and other amounts due under Sections 4 and 6 of the Agreement.

66.     JGR further breached the Agreement by failing and refusing to complete the contractually contemplated separation process under Section 6 after Mr. Gabehart properly invoked his rights thereunder.

67.     JGR further breached the implied covenant of good faith and fair dealing inherent in the Agreement by: (a) withholding earned wages as a coercive tactic during separation negotiations rather than in good-faith reliance on any contractual right; (b) manufacturing a "for cause" termination after the forensic examination confirmed no wrongdoing, purely in service of JGR's bad-faith, punitive, spiteful objectives; and (c) selectively enforcing the Agreement's

restrictive covenants against Mr. Gabehart while permitting other senior personnel to depart for competitors without objection or legal action, thereby demonstrating that JGR's enforcement efforts against Mr. Gabehart are motivated by personal animus rather than legitimate business protection.

68.     As a direct and proximate result of JGR's breaches, Mr. Gabehart has suffered damages in an amount to be proven at trial, including but not limited to unpaid wages, unpaid bonuses, interest, contractual amounts, damages as a result of JGR failing and refusing to complete the contractually contemplated separation process under Section 6, and other damages permitted by law and equity.

### SECOND CLAIM FOR RELIEF
*Violation of the North Carolina Wage and Hour Act (N.C. Gen. Stat. § 95-25.1 et seq.)*

69.     Mr. Gabehart realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

70.     At all relevant times, Mr. Gabehart was an "employee" and JGR was his "employer" within the meaning of N.C. Gen. Stat. § 95-25.2.

71.     The compensation JGR failed to timely pay—including base wages accrued through separation, performance-based bonuses earned under the Agreement, and the additional amounts owed under the Agreement's terms when the applicable conditions were met—constitutes "wages" within the meaning of N.C. Gen. Stat. § 95-25.2(16).

72.     JGR intentionally failed to pay wages and bonuses due and owing to Mr. Gabehart in violation of the North Carolina Wage and Hour Act, N.C. Gen. Stat. § 95-25.6 and § 95-25.22.

73.     JGR lacked a good-faith basis for withholding wages and bonuses owed to Mr. Gabehart, and its failure to pay was willful.

44

74. Mr. Gabehart is entitled to recover unpaid wages and bonuses, interest, an additional equal amount as liquidated damages, and reasonable attorneys' fees and costs as provided by N.C. Gen. Stat. § 95-25.22.

### THIRD CLAIM FOR RELIEF
*Declaratory Relief – Noncompete Inapplicable, Unenforceable, Not Violated*

75. Mr. Gabehart realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

76. Mr. Gabehart properly invoked his termination right under the second paragraph of Section 6 of the Agreement, thereby obligating JGR to honor Mr. Gabehart's right to a termination in strict compliance with that provision. JGR contends otherwise.

77. JGR contends it terminated Mr. Gabehart's employment "for cause" by notice dated February 9, 2026, thereby triggering the Agreement's 18-month noncompete. Mr. Gabehart rejects the factual basis and legal effect of the purported "for cause" notice.

78. Under JGR's theory, Mr. Gabehart remained employed pursuant to the Agreement until February 9, 2026, and was therefore owed his salary through that date. JGR ceased paying Mr. Gabehart on or around November 10, 2025. JGR's breach of its payment obligations under the Agreement voids the noncompete. JGR contends otherwise.

79. The 18-month noncompete is unenforceable as a matter of North Carolina law. It is facially overbroad, vague, and not reasonably limited to protecting JGR's legitimate business interests. Indeed, as applied to Mr. Gabehart, JGR seeks to deploy the noncompete for purely punitive reasons. JGR's selective enforcement of this provision—targeting Mr. Gabehart while permitting senior personnel such as Michael Guttilla to depart for direct competitors without challenge—further demonstrates that JGR is not seeking to protect legitimate competitive interests, but rather to punish Mr. Gabehart for his departure. JGR contends otherwise.

80. In the event the 18-month noncompete applies and is enforceable, JGR contends Mr. Gabehart is violating it in his current role as Spire's Chief Motorsports Officer. He is not. The services Mr. Gabehart is providing to Spire are not "of the general type of services" he provided during his last year at JGR.

81. An actual and justiciable controversy therefore exists between Mr. Gabehart and JGR regarding whether (i) Mr. Gabehart's termination was "for cause" as JGR contends, thereby triggering the 18-month noncompete, or rather "without cause" or pursuant to the second paragraph of Section 6 in which case there is either a one-week noncompete or none at all; (ii) whether JGR's nonpayment of Mr. Gabehart's salary voids the noncompete; (iii) whether the 18-month noncompete is enforceable as a matter of North Carolina law; and (iv) in the event the 18-month noncompete applies and is enforceable, whether Mr. Gabehart's current role as Spire's Chief Motorsports Officer violates the terms of the noncompete.

82. Declaratory relief is therefore appropriate pursuant to 28 U.S.C. § 2201.

**FOURTH CLAIM FOR RELIEF**
*Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030*

83. Mr. Gabehart realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

84. At all relevant times, Mr. Gabehart's personal devices and accounts, including his personal cell phone, Google Drive and/or Gmail accounts, constituted "protected computers" within the meaning of 18 U.S.C. § 1030(e)(2) because they were used in and affected interstate commerce and communication.

85. The Forensic Analysis Protocol executed on April 22, 2026 limited JGR's forensic examiner's authority to access Mr. Gabehart's personal devices and accounts. The scope of that authorization was expressly defined and limited by the terms of the protocol.

86. JGR, through its agents and forensic examiner, intentionally exceeded the authorized access granted under the court-ordered protocol by accessing, copying, and intentionally disclosing to JGR's counsel dozens of Mr. Gabehart's privileged attorney-client communications—materials that were expressly outside the scope of the protocol's authorization. In addition to the disclosure of privileged information, JGR, through its agents and forensic examiner, disclosed the content of files and communications outside of the scope of the protocol's authorization. By disclosing materials beyond the parameters defined by the protocol, JGR's agents obtained information in areas that were "off limits" under the court-ordered Forensic Analysis Protocol, thereby "exceeding authorized access" within the meaning of 18 U.S.C. § 1030(a)(2).

87. Upon information and belief, JGR employees, including but not limited to Chris Gilligan, also intentionally accessed Mr. Gabehart's personal accounts without authorization on or about December 8, 2025, when Mr. Gabehart's JGR-issued laptop—which had been synced with his personal accounts—was accessed after his employment had effectively ended and without his knowledge or consent.

88. As a direct and proximate result of JGR's violations of 18 U.S.C. § 1030, Mr. Gabehart has suffered loss aggregating at least $5,000, including but not limited to costs of responding to the protocol violation, legal fees incurred in seeking suppression and remediation of improperly disclosed materials, costs of conducting a damage assessment, and other consequential damages.

89. Mr. Gabehart is entitled to recover compensatory damages, injunctive relief, other appropriate relief pursuant to 18 U.S.C. § 1030(g), and other relief permitted by law and equity.

### FIFTH CLAIM FOR RELIEF
***Violation of the North Carolina Computer Trespass Act, N.C. Gen. Stat. § 14-458***

90. Mr. Gabehart realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

91. Under N.C. Gen. Stat. § 14-458, it is unlawful for any person to use a computer or computer network without authority and with the intent to make or cause to be made an unauthorized copy of computer data, computer programs, or computer software, or to alter or erase any computer data, computer programs, or computer software.

92. Under N.C. Gen. Stat. § 14-453(1a), a person acts "without authority" when the person uses a computer in a manner exceeding the right or permission granted.

93. The Forensic Analysis Protocol executed on April 22, 2026 limited JGR's forensic examiner's authority to access Mr. Gabehart's personal devices and accounts. The scope of that authorization was expressly defined and limited by the terms of the protocol, which did not authorize disclosure of privileged attorney-client communications or the contents of other files or communications to JGR's counsel.

94. JGR, through its agents and forensic examiner, used Mr. Gabehart's personal devices and accounts without authority—specifically, in a manner exceeding the right or permission granted under the court-ordered protocol—and with the intent to make unauthorized copies of computer data, by copying and disclosing to JGR's counsel dozens of Mr. Gabehart's privileged attorney-client communications that were outside the scope of the protocol's authorization. In addition to the disclosure of privileged information, JGR, through its agents and forensic examiner, disclosed the content of files and communications outside of the scope of the protocol's authorization.

95. Upon information and belief, JGR employees, including but not limited to Chris Gilligan, also used Mr. Gabehart's personal accounts without authority on or about December 8,

2025, when Mr. Gabehart's JGR-issued laptop—which had been synced with his personal accounts, including his Gmail account containing privileged attorney-client communications—was accessed without Mr. Gabehart's knowledge or consent and in a manner exceeding any right or permission.

96.     As a direct and proximate result of JGR's violations of N.C. Gen. Stat. § 14-458, Mr. Gabehart has been injured in his property and person, including but not limited to the costs of responding to the protocol violation, legal fees incurred in seeking suppression and remediation of improperly disclosed materials, other damages recoverable under N.C. Gen. Stat. § 1-539.2A, and other relief permitted by law and equity.

**<u>SIXTH CLAIM FOR RELIEF</u>**
***Violation of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1 et seq.***

97.     Mr. Gabehart realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

98.     North Carolina's Unfair and Deceptive Trade Practices Act prohibits "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1(a).

99.     As alleged in the Fourth and Fifth Claims for Relief, JGR, through its agents and forensic examiner, violated the CFAA and engaged in computer trespass in violation of N.C. Gen. Stat. § 14-458 by using Mr. Gabehart's personal devices and accounts without authority—specifically, in a manner exceeding the right or permission granted under the court-ordered Forensic Analysis Protocol—and with the intent to make unauthorized copies of computer data by copying and disclosing to JGR's counsel privileged attorney-client communications and other materials outside the scope of the protocol's authorization.

49

100.     JGR's conduct constitutes an unfair act or practice within the meaning of N.C. Gen. Stat. § 75-1.1 because violating the law by engaging in computer trespass is not legitimate business activity and constitutes conduct that is unethical and unscrupulous.

101.     JGR's conduct was in or affecting commerce within the meaning of N.C. Gen. Stat. § 75-1.1 because the wrongful conduct was not contained within a single business entity; rather, it involved JGR's agents and forensic examiner's disclosure of Mr. Gabehart's privileged and confidential materials to JGR's counsel.

102.     As a direct and proximate result of JGR's violations of N.C. Gen. Stat. § 75-1.1, Mr. Gabehart has been injured in his business and property, including but not limited to the costs of responding to the protocol violation, legal fees incurred in seeking suppression and remediation of improperly disclosed materials, harm to his competitive position, and other consequential damages.

103.     Mr. Gabehart is entitled to recover treble damages pursuant to N.C. Gen. Stat. § 75-16 and reasonable attorneys' fees pursuant to N.C. Gen. Stat. § 75-16.1.

## **PRAYER FOR RELIEF**

WHEREFORE, Counterclaim-Plaintiff Christopher Gabehart respectfully requests that the Court enter judgment in his favor and award the following relief:

1.     Damages for breach of contract in an amount to be determined at trial, including unpaid wages, bonuses, and other amounts owed under the Agreement's terms, and all other contractual damages, plus pre- and post-judgment interest as allowed by law;

2.     For violations of the North Carolina Wage and Hour Act, an award of unpaid wages and bonuses, an additional equal amount as liquidated damages, reasonable attorneys' fees, and costs pursuant to N.C. Gen. Stat. § 95-25.22;

3.      A declaratory judgment finding that Mr. Gabehart is not subject to the 18-month noncompete in his Employment Agreement;

4.      For violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, an award of compensatory damages in an amount to be determined at trial, injunctive relief, and such other relief as provided by 18 U.S.C. § 1030(g);

5.      For violations of the North Carolina Computer Trespass Act, N.C. Gen. Stat. § 14-458, an award of damages sustained and the costs of this suit pursuant to N.C. Gen. Stat. § 1-539.2A;

6.      For violations of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1, an award of treble damages pursuant to N.C. Gen. Stat. § 75-16 and reasonable attorneys' fees pursuant to N.C. Gen. Stat. § 75-16.1;

7.      The costs and expenses of this action, including attorneys' fees as permitted by law and the Agreement, including pursuant to N.C. Gen. Stat. § 75-16.1;

8.      Trial by jury on all issues so triable; and

9.      Such other and further relief as the Court deems just and proper.

This the 24th day of June, 2026.

*/s/ Cary B. Davis*
Cary B. Davis
N.C. Bar No. 36172
cdavis@rbh.com

Spencer T. Wiles
N.C. Bar No. 53664
swiles@rbh.com

William Miller
N.C. Bar No. 36946
wmiller@rbh.com

Anna Claire Tucker

51

N.C. Bar No. 59457
atucker@rbh.com

**ROBINSON, BRADSHAW & HINSON, P.A.**
600 S. Tryon Street, Suite 2300
Charlotte, North Carolina 28202
(704) 377-2536

*Attorneys for Defendant Christopher Gabehart*

52