| | |
|---|---|
| JOE GIBBS RACING, LLC, <br><br> Plaintiff, <br><br> v. <br><br> CHRISTOPHER GABEHART and SPIRE MOTORSPORTS, LLC, <br><br> Defendants. | **PLAINTIFF JOE GIBBS RACING, LLC'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS DEFENDANT GABEHART'S COUNTERCLAIMS** |

Plaintiff Joe Gibbs Racing, LLC ("JGR"), by and through counsel, submits this Memorandum of Law in support of Plaintiff JGR's Motion to Dismiss the Counterclaims of Defendant Christopher Gabehart ("Gabehart") in its entirety pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## **INTRODUCTION**

Until November 10, 2025, Gabehart was one of JGR's most senior leaders. After Coach Gibbs rejected his demands for greater authority and the parties agreed to pursue a mutual separation, Gabehart immediately pursued a brazen scheme to take JGR's most sensitive information and use it for the benefit of Spire, a direct NASCAR competitor. Through his counterclaims ("Counterclaims"), Gabehart now seeks to paint himself as the victim and to illogically claim that JGR is somehow liable for its discovery of his nefarious conduct. Gabehart's own allegations defeat his supposed claims.

Gabehart's breach of contract and wage related claims suffer fatal deficiencies in that he cannot show that he earned any additional compensation beyond what he has admittedly received,

1

especially in light of his admission that he ceased providing services to JGR after November 10, 2025. Dkt. 100 at ¶ 28.

Gabehart's remaining Counterclaims fare no better. Gabehart's Computer Fraud and Abuse Act and North Carolina Computer Trespass Act claims are predicated on the allegations that (a) JGR accessed a computer that it owns; and (b) a court-ordered forensic review approved by Gabehart was later conducted in a manner he disputes. Simply put, Gabehart does not and cannot plausibly allege that JGR accessed his computer without authorization. Finally, Gabehart's unfair and deceptive trade practices claim merely repackages his deficient computer-access allegations and an employment-related compensation dispute into a Chapter 75 claim. Because the Counterclaims' factual allegations and the Employment Agreement itself[1] demonstrate that Gabehart has failed to plead facts establishing a breach of contract, unpaid wages, unauthorized computer access, or conduct actionable under Chapter 75, each of the challenged Counterclaims should be dismissed pursuant to Rule 12(b)(6).

## STATEMENT OF FACTS[2]

Christopher Gabehart began working for Joe Gibbs Racing, LLC ("JGR") in 2012 and rose from engineer to crew chief to Competition Director. Dkt. 100 at ¶ 12. On November 15, 2024,

---

[1] Gabehart's counterclaim specifically identifies and relies upon the Agreement. Consequently, JGR may reference and rely on the Agreement in support of this Motion. *See Goines v. Valley Community Services Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016) (explaining that a trial court may consider "documents that are explicitly incorporated into the complaint by reference" and "a document submitted by the movant that was not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity") (*citing Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127 S.Ct. 2499 (2007); *Sec'y of State for Defence v. Trimble Nav. Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007)); *see also Mason v. Mach. Zone, Inc.*, 851 F.3d 315, 317 n.2 (4th Cir. 2017) (same).

[2] For purposes of this Memorandum of Law in Support of Plaintiff's Motion to Dismiss only, Plaintiff takes as true all of Defendant Gabehart's non-conclusory and non-contradictory allegations set forth in Defendant Gabehart's Counterclaims (D.E. 100).

PPAB 13973098v6

Gabehart and JGR executed an Employment Agreement (the "Agreement"), effective December 1, 2024. *Id.* at ¶ 13; *see also* Dkt. 95-2. Section 3 of the Agreement required JGR to pay him a base salary and performance-based bonuses Dkt. 100 at ¶ 14; Section 4 governed termination with and without cause Dkt. 100 at ¶ 15; and Section 6 imposed restrictive covenants, including an 18-month noncompete Dkt. 100 at ¶ 16.

Gabehart alleges that Section 6 reduces the noncompete period "to one (1) week" and requires JGR to pay "$100,000 in exchange for a complete mutual release" if, between September 1, 2025 and June 1, 2026, Gabehart (i) notifies JGR in good faith of assigned duties inconsistent with his reasonable expectations, (ii) gives JGR at least 60 days to resolve the inconsistencies and JGR fails to do so, and (iii) provides 60 days' prior written notice of termination without cause. Dkt. 100 at ¶ 16.

Gabehart alleges that his role as Competition Director differed materially from the "COO-type role overseeing all competitive operations with autonomy to lead" that JGR purportedly promised him. Dkt. 100 at ¶ 19. He claims that, instead, he was "constantly intertwined with Coach Gibbs, senior JGR executives, and family members" in competition-related decisions, making the role "not, at all, as advertised." Dkt. 100 at ¶¶ 18–19. Gabehart further alleges that Coach Gibbs directly managed the No. 54 team and "pressured him" to serve as its crew chief despite his Competition Director title. Dkt. 100 at ¶ 20. According to Gabehart, he ultimately assisted the team behind the scenes and then publicly served as crew chief for nine consecutive races beginning June 28, 2025 through amendment to the Agreement, before later returning those duties to the original crew chief, Tyler Allen. *Id.*

Gabehart claims that his dissatisfaction with his highly compensated role led him to invoke Section 6 of the Agreement. Dkt. 100 at ¶¶ 25–26. According to Gabehart, on November 6, 2025,

3

he met with Coach Gibbs and allegedly provided him with a written document, which he refers to as the "Written Notice," identifying the duties he believed were inconsistent with his expectations and job description. Dkt. 100 at ¶ 17. Gabehart contends that the two "mutually agreed to part ways" and that he "understood JGR would honor the terms of Section 6 and pursue an amicable separation." Dkt. 100 at ¶¶ 25–26.

On November 10, 2025, Gabehart alleges that JGR placed him on what he calls "garden leave," told him not to return, and stopped paying him during separation agreement discussions. Dkt. 100 at ¶ 28. Gabehart alleges that JGR never issued a written notice identifying November 10, 2025, as his termination date and that the parties never executed a separation agreement or release. Dkt. 100 at ¶ 28. Also on November 10, 2025, Carmichael allegedly emailed him "JGR's terms for a mutual termination agreement," which included "payment of $100,000" but allegedly also demanded terms "beyond a mutual release"—new non-solicitation, non-disparagement, and liquidated-damages provisions. Dkt. 100 at ¶¶ 30–31. Gabehart admittedly rejected JGR's offer, and as a result, the parties never signed a separation agreement. Dkt. 100 at ¶ 31.

On December 2, 2025, while the separation agreement negotiations continued, Gabehart contends that JGR hired a private investigator who filmed him having lunch with Spire co-owner Jeffrey Dickerson. Dkt. 100 at ¶ 34. The next day, JGR's Executive Vice President and Chief Commercial Officer, Eric Schaffer, called Spire's president Bill Anthony to state that Gabehart was subject to a noncompete. *Id.* According to Gabehart, "there was no noncompete on December 3, 2025" while at the same time inconsistently acknowledging that the parties were still negotiating a separation agreement with no noncompete provision. *Id.*[3]

---

[3] Gabehart's allegation begs the question—if he was not bound by a non-competition provision on December 3, 2025, then why was he trying to negotiate a mutual separation agreement without a non-competition clause on that same date?

PPAB 13973098v6

Gabehart claims that he returned his JGR-issued devices on November 10, 2025. Dkt. 100 at ¶ 35. On December 8, 2025, JGR personnel accessed those JGR-issued devices and retained Reliance Forensics to perform a forensic examination of the JGR devices without his knowledge or consent. *Id.* In the same breath, however, Gabehart admits that he synced with his personal accounts, including a Gmail account with those JGR-owned devices, and that he possessed JGR files on those accounts. Dkt. 100 at ¶¶ 35, 44.

Gabehart further alleges he later agreed to submit to a forensic examination of his personal devices "at his own expense." Dkt. 100 at ¶ 40. Prior to the examination, he executed a sworn declaration "certifying that he had not transferred JGR confidential information to any third party and had not intentionally allowed any third party to view such information." Dkt. 100 at ¶ 41. He contends that the examination concluded on January 27, 2026, and found "no evidence that he transmitted, distributed, used, or otherwise shared any JGR confidential information," but that the examiner located local files that he alleges were never sent to anyone, and that all flagged items were allegedly deleted on February 6, 2026. Dkt. 100 at ¶ 44. On February 9, 2026, JGR sent Gabehart a letter terminating his employment "for Cause." Dkt. 100 at ¶ 52.

After JGR filed its lawsuit, Gabehart alleges that he underwent additional forensic review under an April 22, 2026 protocol that authorized forensic examiners to image, search, and analyze approximately eight devices and cloud accounts. Dkt. 100 at ¶ 59. Gabehart alleges that, during this forensic process, the examiner "improperly disclosed dozens of Mr. Gabehart's privileged attorney-client communications—emails between Mr. Gabehart and his counsel—*directly to JGR's counsel*." Dkt. 100 at ¶ 61.[4]

---

[4] Gabehart strategically omits the fact that upon becoming aware of the potential presence of attorney-client communications, undersigned counsel took immediate steps to segregate the files and ensure their secure deletion. Indeed, counsel for Gabehart is aware that undersigned counsel certified that no potentially privileged communications were ever reviewed by any counsel for JGR.

PPAB 13973098v6

<u>**LEGAL STANDARD**</u>

Under Rule 12(b)(6), "the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff." *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). To be well-pleaded, a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Facial plausibility means that the court can "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Merely reciting the elements of a claim supported by conclusory statements is not sufficient. *Id.* "The plausibility standard requires a plaintiff to demonstrate more than a 'sheer possibility that a defendant has acted unlawfully.'" *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Twombly*, 550 U.S. at 570). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

Additionally, the court is not required to accept the plaintiff's legal conclusions drawn from the facts or to accept unwarranted inferences, unreasonable conclusions, or arguments. *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). "Dismissal with prejudice is proper if there is no set of facts the plaintiff[] could present to support [his] claim." *Witherspoon v. State Employees' Credit Union*, 733 F. Supp. 3d 446, 453 (E.D.N.C. 2024) (quoting *Weigel v. Maryland*, 950 F. Supp. 2d 811, 826 (D. Md. 2013)); *see also Cozzarelli v. Inspire Pharmaceuticals Inc.*, 549 F.3d 618, 630–31 (4th Cir. 2008).

<u>**ARGUMENT**</u>

**A. Gabehart's Allegations Defeat His Breach of Contract Claim**

In order to state a claim for breach of contract under North Carolina law, a plaintiff must allege "(1) existence of a valid contract and (2) breach of the terms of the contract." *Poor v. Hill*,

6

138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000); *see also, Jackson v. Carolina Hardwood Co.*, 120 N.C. App. 870, 871, 463 S.E.2d 571, 572 (1995); *McLamb v. T.P. Inc.*, 173 N.C. App. 586, 588, 619 S.E.2d 577, 580 (2005), *disc. rev. denied*, 360 N.C. 290, 627 S.E.2d 621 (2006). Here, Gabehart claims that JGR breached his Agreement by (a) failing to pay him wages and a bonus following November 10, 2025, and (b) "refusing to complete the contractually contemplated separation process under Section 6[.]" Dkt. 100 at ¶¶ 65–66. Gabehart also alleges that JGR breached the implied covenant of good faith and fair dealing by "withholding wages as a coercive tactic during separation negotiations,"[5] "manufacturing a 'for cause' termination after the forensic examination confirmed no wrongdoing," and "selectively enforcing" the Agreement's restrictive covenants against him. Dkt. 100 at ¶ 67. None of Gabehart's allegations, even if they were true which JGR disputes, can support a claim for breach of contract.

With respect to his claim relating to wages and a bonus, Gabehart must adequately plead that he was entitled to continued compensation under the Agreement and that JGR failed to pay him a bonus. He fails on both counts. First, Gabehart admits that he stopped providing services to JGR on November 10, 2025, and that he agreed to part ways with JGR. Dkt. 100 at ¶ 28. Gabehart's Agreement provided that he was to be provided with a base salary "[f]or all the services [Gabehart] provides [JGR]." Dkt. 95-2 at 2. The Agreement therefore explicitly conditions Gabehart's salary on him providing services he performs for JGR. *Id.*; *see also Mayo v. N.C. State Univ.*, 168 N.C. App. 503, 508, 608 S.E.2d 116, 120 aff'd, 360 N.C. 52, 619 S.E.2d 502 (2005) ("When the contract language is unambiguous, our courts have a duty to construe and enforce the contract as written, without disregarding the express language used.") (citations omitted). Nothing in the Agreement

---

[5] The fact that Gabehart makes this allegation while simultaneously admitting that JGR paid him a lucrative bonus on January 20, 2026—before the forensic examination was even complete—is baffling. Dkt. 100 at ¶¶ 44, 47.

PPAB 13973098v6

provides that Gabehart is entitled to continue receiving salary indefinitely after he ceases performing services.

Nevertheless, Gabehart appears to contend that JGR should have kept paying him even though he had ceased providing any services and was, in fact, actively engaged in taking JGR's files. Dkt. 100 at ¶¶ 35, 44. Adopting Gabehart's view of the Agreement, he could have ceased providing services, drug out the negotiations surrounding his separation agreement for as long as possible, stalled on any recovery of JGR's files remaining on his personal devices and accounts, and ***still*** been owed salary that he did not earn. This absurd result is not supported by the language of the contract. To the contrary, the salary provision expressly provides compensation in exchange for services rendered. Having affirmatively alleged that he performed no services for JGR after November 10, 2025, Gabehart cannot plausibly allege that JGR breached the Agreement by declining to continue paying him a salary after that date.

Gabehart attempts to avoid this conclusion by alleging that he technically remained an employee until February 9, 2026, because JGR later issued a termination-for-cause notice on that date. Dkt. 100 at ¶ 48. This allegation does not support his claim for breach of contract. To start, Gabehart contradicts this allegation elsewhere in his Counterclaims as he alleges that after returning his "JGR-issued devices on November 10, 2025," "his employment had effectively ended[.]" *Id.* at ¶¶ 35, 87 (making allegations in support of the unfounded argument that JGR somehow violated Gabehart's rights by accessing his JGR-owned computer after November 10, 2025). Nevertheless, even accepting the allegation that Gabehart remained an employee until February 9, 2026, as true for purposes of the Motion, this does not establish a contractual entitlement to salary. The operative question is not whether Gabehart believes his employment relationship formally ended on February 9, 2026, but whether the Agreement obligated JGR to

8

continue paying salary when Gabehart admittedly was not providing any services. *See e.g. Wyatt v. Nash Johnson & Sons Farms, Inc.*, 91 N.C. App. 255, 371 S.E.2d 515 (1988) (holding that the employer's obligation to pay salary, vacation pay, and other service-linked benefits ceased at the moment the employee stopped working). The Agreement links salary to services performed, and Gabehart admits he provided none after November 10, 2025. Dkt. 100 at ¶ 45. Consequently, the Counterclaim fails to identify any contractual provision requiring JGR to continue paying salary during the period in which Gabehart admittedly ceased all services. *Id.* at ¶¶ 26, 45.

Next, Gabehart alleges that JGR breached his Agreement by failing to pay earned bonuses. *Id.* at ¶ 65. This allegation is disproven by Gabehart's own allegations. He specifically admits that JGR paid his 2025 season bonus on January 20, 2026, but complains that the payment was made "beyond the timeframe contemplated by the Agreement." *Id.* at ¶ 47. Tellingly, Gabehart fails to allege when the bonus allegedly should have been paid. Given that he has admitted to receiving the full amount of his bonus and has not even provided facts to support his claim that the payment was late, this claim should be dismissed.

For similar reasons, Gabehart's allegation that JGR breached the Agreement by failing to pay him $100,000 allegedly owed under Section 6 also fails. Gabehart alleges that he exercised his rights under Section 6 of the Agreement by providing "Written Notice" of the inconsistencies and issues with his job, *Id.* at ¶ 47, thereby entitling him to the $100,000 payment specified under the framework provided by Section 6. *Id.* at ¶ 46. However, Gabehart openly admits that he rejected signing a mutual release with JGR, which was a condition precedent to any payment being owed under Section 6. *Id.* at ¶ 31. Thus, Gabehart seeks to recover amounts allegedly arising from an unconsummated separation process while simultaneously alleging that negotiations broke down

and no final agreement was reached. Those allegations may describe a disputed negotiation, but they do not plausibly establish that JGR breached an existing contractual obligation.

Gabehart alleges that "JGR further breached the Agreement by failing and refusing to complete the contractually contemplated separation process under Section 6 after Mr. Gabehart properly invoked his rights thereunder." *Id.* at ¶ 66. This claim fails because Gabehart's allegations demonstrate that in fact he did not comply with multiple conditions required under Section 6 of his Employment Agreement. *Id.* at ¶ 16. Among other things, Gabehart does not allege that he provided JGR at least sixty days to resolve alleged inconsistencies about his job duties. He also does not allege that he provided JGR with sixty days prior written notice of termination without cause. Finally, Gabehart openly concedes that he rejected the proposed separation agreement and mutual general release offered by JGR, which was another condition precedent for his invocation of Section 6. *Id.* at ¶ 31. Gabehart cannot show that JGR had any obligation to complete a "separation process" he has not alleged the conditions precedent to triggering that provision were met.

Finally, failing to show any violation of the express language of the Agreement, Gabehart turns to alleged violations of the implied covenant of good faith and fair dealing. Dkt. 100 at ¶ 43. He claims that JGR violated this duty by (a) "withholding earned wages as a coercive tactic"; (b) "manufacturing a 'for cause' termination after the forensic examination confirmed no wrongdoing"; and (c) "selectively enforcing the Agreement's restrictive covenants against Mr. Gabehart while permitting other senior personnel to depart for competitors[.]" Dkt. 100 at ¶ 67. None of those three allegations support the claim.

To start, as discussed above, even taking Gabehart's allegations as true as it must, JGR did not improperly withhold earned wages from Gabehart. Gabehart stopped providing services to

JGR. Gabehart cannot sustain a claim for breach of the implied covenant of good faith and fair dealing based on JGR's compliance with the express terms of the Employment Agreement. *See Heron Bay Acquisition, LLC v. United Metal Finishing, Inc.*, No. 12 CVS 5505, 2014 WL 1878885, at \*5 (N.C. Super. Ct. May 7, 2014), *aff'd*, 245 N.C. App. 378, 781 S.E.2d 889 (2016) (citing *Rezapour v. Earthlog Equity Grp., Inc.*, 5:12CV105-RLV, 2013 WL 3326026 (W.D.N.C. July 1, 2013)) ("[a] breach of good faith and fair dealing claim 'cannot be used to contradict the express terms of a contract.'"). Next, Gabehart's allegation that JGR "manufactured" a "for cause" termination after the forensic examination purportedly "confirmed no wrongdoing" is directly belied by Gabehart's own allegations. Focusing only on what has been pled in Gabehart's Counterclaims, Gabehart admits that he has synced his personal accounts to his JGR-issued laptop, he possessed "local" versions of sensitive JGR files on these personal accounts, that these files were so significant that he agreed to permit an "invasive forensic examination of his personal devices[,]" and that he agreed to the removal of JGR files on his personal accounts. Dkt. 100 at ¶¶ 35, 40, 44. Gabehart cannot plausibly square these admissions, along with his repeated admissions in Court, with the idea that JGR "manufactured" a "for cause" termination.

Finally, Gabehart does not plausibly allege that JGR engaged in "selective enforcement" of restrictive covenants as an indication of a breach of good faith. Gabehart does not identify any other employee who was permitted to leave JGR and join a competitor despite a restrictive covenant. Moreover, requiring Gabehart to comply with the plain language of his agreements cannot support a claim for breach of the implied covenant of good faith and fair dealing. "[A] breach of good faith and fair dealing claim 'cannot be used to contradict the express terms of a contract.'" *Heron Bay Acquisition, LLC*, 2014 WL 1878885, at \*15; *see also JTG Equip. & Supply, LLC. V. EBay, Inc.,* No. 14 CVS 8822, 2015 WL 303589, at \*5 (N.C. Super. Ct. Jan. 23,

2015) (citing *Campbell v. Blount,* 24 N.C. App. 368, 371, 210 S.E.2d 513, 515 (1975)) ("Courts will not apply an implied covenant of good faith and fair dealing to override the express terms of a contract"). Gabehart's claim that he was asked to abide by the language of his non-competition agreement, but other unidentified individuals subject to unidentified contracts were not, cannot plausibly support a claim for breach of the duty of good faith and fair dealing.

**B. Gabehart's North Carolina Wage and Hour Act ("NCWHA") Claim Fails**

The NCWHA provides a private right of action to protect employees from being denied earned wages. N.C. Gen. Stat. § 95-25.1 et seq.; *Hamilton v. Memorex Telex Corp.*, 118 N.C. App. 1, 10, 454 S.E.2d 278, 282 (1995). Thus, a claim under the Wage and Hour Act is only appropriate where the employee has actually earned the wages "owed." *Narron v. Hardee's Food Sys.*, 75 N.C. App. 579, 583, 331 S.E.2d 205, 208 (1985). A plaintiff, therefore, cannot succeed under the Wage and Hour Act on a claim seeking contractual damages: (a) that the plaintiff has not earned and/or (b) that are to be earned in the future. *Myers v. Roush Fenway Racing, LLC*, No. 1:09CV508, 2009 WL 5215375, at *5 (M.D.N.C. Dec. 28, 2009) ("In sum, Plaintiff's Wage and Hour Act claim is fatally deficient because he is attempting to transform alleged contractual damages into a claim for wages under the Act . . . The North Carolina courts have consistently interpreted the Act to exclude recovery of future, unearned wages.").

In support of his NCWHA claim, Gabehart alleges that JGR failed to pay his salary after November 10, 2025, performance-based bonuses earned under the employment agreement, and "additional amounts owed under the Agreement's terms when the applicable conditions were met." Dkt. 100 at ¶71. As noted above, Gabehart's NCWHA claim should be dismissed to the extent he seeks the recovery of wages due after "his employment had effectively ended" on November 10th, as he did not provide any services to **earn** any additional wages after that date. *See Myers v. Roush*

PPAB 13973098v6

*Fenway Racing, LLC*, No. 1:09CV508, 2009 WL 5215375, at *5 (M.D.N.C. Dec. 28, 2009), *report and recommendation adopted in part, rejected in part*, No. 1:09CV508, 2010 WL 2765378 (M.D.N.C. July 12, 2010) (citing *Narron v. Hardee's Food Sys., Inc.*, 75 N.C. App. 579, 583 (1985) ("the Act only requires an employer to pay those wages and benefits due when the employee has *actually performed the work* required to earn them")). Additionally, Gabehart admits that JGR voluntarily paid his bonus in full on January 20, 2026, and provides no facts to plausibly allege that the bonus was owed at any earlier date.

In addition, Gabehart's disputed payment that he contends arises under Section 6 of the Agreement is not an earned wage. Gabehart's own allegations confirm that the alleged $100,000 sum was part of a negotiated contractual separation framework, not compensation earned for labor performed, and thus, the contractual separation requirements must be met for the payment to be earned. *See, e.g., Myers*, 2009 WL 5215375, at *5 ("Finally, to the extent that Plaintiff contends that the Wage and Hour Act can be 'reasonably interpreted' to allow him to recover unearned contractual damages, this court is bound to apply the Act as it has been interpreted by the North Carolina courts. The North Carolina courts have consistently interpreted the Act to exclude recovery of future, unearned wages"). Section 6 required, among other things, notice of job-duty inconsistencies, a cure period, official notice of termination, and a complete mutual release. Dkt. 100 at ¶ 16; *see also* N.C.G.S. § 95-25.2(16) (stating that wages must be paid "to an employee . . . for labor or services rendered by an employee. . ."). Gabehart alleges that JGR proposed a mutual separation agreement containing a $100,000 payment, but he also admits that he rejected that agreement, and the parties never signed a mutual release. Dkt. 100 at ¶¶ 30–31.

Gabehart's allegations defeat any attempt to treat the Section 6 payment as a vested statutory wage. A contingent payment that is triggered only by satisfaction of contractual

PPAB 13973098v6

separation conditions and execution of a release is not compensation earned by performing work; it is a disputed contractual benefit. *See* Dkt. 100 at ¶ 16 (providing that the $100,000 payment would be made "in exchange for a complete mutual release."). The NCWHA protects earned wages, including calculable bonuses or commissions when they have vested under an employer's wage policy or agreement. *Irwin v. Fed. Express Corp.*, No. 1:14-CV-00557, 2016 WL 7053383, at *8 (M.D.N.C. Dec. 5, 2016) (holding that for purposes of the NCWHA, "earned wages" are "those wages and benefits due when the employee has actually performed the work required to earn them.") (citations omitted). In addition to admitting that a release agreement was never entered into, Gabehart does not even allege that the 60-day cure period elapsed without resolution or that he provided a 60-day prior written notice of termination in compliance with Section 6. As such, Gabehart cannot even show that he fully satisfied the Section 6 contractual terms for the payment to be considered an earned wage.

Lastly, Gabehart contends, without any details, that he earned his 2025 season bonus in November 2025, but JGR did not pay this bonus until January 20, 2026. Dkt. 100 at ¶ 47. From the face of Gabehart's counterclaim, he admits that he was paid the full amount of his performance bonus, so it is unclear what damages Gabehart seeks related to his NCWHA claim for the performance bonus.[6]

Additionally, Gabehart has not provided any facts to plausibly show that the bonus was paid late. Dkt. 100 at ¶ 47. Furthermore, the Agreement provides that any "[e]arned Performance Bonuses will be paid within forty-five (45) days after [JGR]'s receipt of the prize money for the

---

[6] Even if this Court agrees that a violation of the NCWHA occurred regarding any late payment of Gabehart's 2025 performance bonus, because Gabehart admits that the payment was made, any conceptual liability would be limited to any "interest" that accrued over the late payment period. *See* N.C.G.S. § 95-25.22 ("Any employer who violates the provisions of . . . G.S. 95-25.6 . . . shall be liable to the employee or employees affected in the amount of . . . their unpaid amounts due under G.S. 95-25.6 . . . plus interest at the legal rate set forth in G.S. 24-1, from the date each amount first came due.").

applicable performance." Dkt. 95-2 at 2–3. Gabehart does not allege when JGR received the prize money for the applicable performance or provide any other factual allegations as to when the bonus should have been paid. Therefore, because Gabehart has not alleged a plausible claim under the NCWHA, there is no further relief the Court can grant Gabehart under the NCWHA, and Gabehart's NCWHA claim should be dismissed.

### C. Gabehart's Declaratory Relief Counterclaim Is Derivative

Gabehart's declaratory relief counterclaim should be dismissed for the reasons set forth in support of dismissal of the underlying claims upon which it is based. In addition, if declaratory judgment counterclaims are the "mirror image" of plaintiffs' claims, a court may dismiss them. *See Sprint Nextel Corp. v. Simple Cell, Inc.*, No. CCB-13-617, 2014 WL 883982, at *2 (D. Md. Mar. 4, 2014); *see also Biltmore Co. v. NU U, Inc.*, No. 1:15-CV-00288-MR, 2016 WL 7494474, at *3 (W.D.N.C. Dec. 30, 2016) (declining to dismiss declaratory judgment counterclaim that was "not entirely duplicative or redundant" of plaintiff's claim.). Here, Gabehart's Declaratory Relief claim asks the Court to determine that JGR's noncompete is inapplicable, unenforceable, and not violated. Dkt. 100 at ¶¶ 79–81. Those are the very issues JGR's affirmative claims already place before the Court; resolving JGR's claims will necessarily resolve the noncompete's applicability and enforceability. Gabehart's counterclaim seeks no relief beyond the rejection of JGR's claims and presents no independent controversy or disparity of remedies. Undoubtedly, the Court's resolution of the claims within JGR's Second Amended Complaint will result in a full and complete resolution of the allegations asserted within Gabehart's Declaratory Relief claim, such that the Declaratory Relief claim is redundant.

As a result, Gabehart's counterclaim only serves to create additional unnecessary work for the parties and the Court. If not dismissed, Gabehart's counterclaim would result in the parties

PPAB 13973098v6

repeating the same positions throughout the course of the Court's consideration of the claims with no impact other than increasing the amount of court filings, the amount of time to review and respond to court filings, and the length of the docket. Dismissal of Gabehart's redundant counterclaim is appropriate.

### D. Gabehart's Computer Fraud and Abuse Act ("CFAA") Fails

The CFAA is concerned with the unauthorized access of protected computers. 18 U.S.C. § 1030(g). The elements of a CFAA claim are (1) commission of an act prohibited by the statute and (2) "damage" or "loss" within the meaning of the statute. *Id.* As to the first element and as relevant to this action, the CFAA renders liable a person who "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains ... information from any protected computer," in violation of § 1030(a)(2)(C) or "intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage[,] or . . . causes damage and loss," in violation of § 1030(a)(5)(B)–(C). *WEC Carolina Energy Sols. LLC v. Miller,* 687 F.3d 199, 201 (4th Cir. 2012) (quoting 18 U.S.C. § 1030.).

"Although the CFAA does not define 'without authorization,' the Fourth Circuit has provided guidance, reasoning that 'authorization' means a 'formal warrant, or sanction' and based on this definition access 'without authorization' occurs when an individual 'gains admission to a computer without approval.'" *TELECO, Inc. v. Mutolo*, No. 6:23-CV-03563-DCC, 2025 WL 1654613, at *9 (D.S.C. June 10, 2025) (quoting *WEC Carolina,* 687 F.3d at 205). By contrast, "exceeds authorized access" refers to situations where an individual has permission to access a computer but uses that access to "obtain or alter information" beyond the scope of approved authority. *Van Buren v. United States*, 593 U.S. 374, 379 (2021) (quoting § 1030(e)(6)). Importantly, neither definition encompasses the mere misuse of information that was validly

16

accessed or, indeed, simply using a computer to transmit even allegedly false information. *See WEC Carolina*, 687 F.3d at 205.

The CFAA requires unauthorized access or exceeding authorized access of a protected computer; the misuse of information after lawful access falls outside its scope. *Id*. (finding no CFAA liability "for the improper use of information that is accessed with authorization"); *see also Van Buren*, 593 U.S. at 378 (explaining that the CFAA "covers those who obtain information from particular areas in the computer—such as files, folders, or databases—to which their computer access does not extend. It does not cover those who, like *Van Buren*, have improper motives for obtaining information that is otherwise available to them"). The Fourth Circuit reads the statute narrowly, holding that its terms do "not extend to the improper use of information validly accessed," and refusing to turn the CFAA into "a vehicle for imputing liability to workers who access . . . information in bad faith, or who disregard a use policy." *WEC Carolina*, 687 F.3d at 207. Copying, indeed *misusing* files, one was authorized to access does not violate the CFAA. *Mod. Remodeling, Inc. v. Tripod Holdings, LLC*, 477 F. Supp. 3d 399, 405 (D. Md. 2020).

a. *JGR Did Not Violate the CFAA by Accessing Its Own Computer and/or Personal Accounts That Gabehart Synced to That Computer*

First, Gabehart alleges that JGR employees violated the CFAA by accessing his "JGR-issued laptop" on December 8, 2025. This is incorrect for several reasons. To start, a company's access to its own device is ***not*** access "without authorization." *See Owen v. Cigna*, 188 F. Supp. 3d 790, 793 (2016) (dismissing claim that "employer exceeded authority to access its own computer"); *Christie v. Nat'l Inst. For Newman Studies*, Case. No. 16-6572 (FLW), 2019 WL 1916204, at * 7 (D.N.J. Apr. 30, 2019) ("because [the employee] Plaintiff cannot exercise ownership rights over the devices, he cannot, as a threshold matter, accuse [the employer] Defendants of violating the CFAA by accessing computers that they own"); *Van Buren*, 593 U.S.

PPAB 13973098v6

at 395–96 (holding that an individual cannot be considered to have exceeded his authorized access when he obtains information that is otherwise available to him, even if he does so with an improper motive or purpose).

Perhaps recognizing the challenges with his claim relating to JGR's access to its own computer, Gabehart next claims that JGR violated the CFAA by accessing his "personal accounts without authorization on or about December 8, 2025, when Mr. Gabehart's JGR-issued laptop—which had been synced with his personal accounts—was accessed after his employment had effective ended and without his knowledge or consent." Dkt. 100 at ¶ 87. Gabehart's attempt to recast his own blunder in deciding to sync his personal accounts to his JGR computer while engaged in a scheme to misappropriate JGR's Confidential Information and Trade Secrets but failing to remove his synced personal accounts—as a violation of the CFAA—should be rejected out of hand.

Even more, to the extent that Gabehart alleges improper access to his "personal accounts," the CFAA protects against "unauthorized access to computers, not unauthorized access to web-based accounts." *Owen*, 188 F. Supp. 3d at 793 (citing 18 U.S.C. § 1030(a)(2)). Finally, with respect to JGR's alleged access to his personal accounts, Gabehart does not allege that JGR possessed his passwords, attempted to access areas of his personal accounts beyond what he decided to sync to his JGR computer, or did anything besides view material that was on his JGR computer.

> b. *JGR Did Not Violate the CFAA in Connection with the Forensic Protocol Undertaken During This Case*

Next, Gabehart alleges that JGR violated the CFAA in April 2026 during the forensic examination undertaken by agreement during this case when the forensic examiner inadvertently sent potentially privileged communications to counsel for JGR through reporting provided to

18

counsel under the Forensic Protocol. Dkt. 100 at ¶ 85. [7] These allegations fail to sustain a claim under CFAA.

To start, in relevant part, the Forensic Analysis Protocol provided that the forensic examiner was permitted to "create byte-for-byte images of the Subject Devices and Accounts and any backups related thereto to the extent possible based on the nature of the particular Subject Device or Account (individually, 'Image,' and collectively, 'Images')." Exhibit A, p 3. Gabehart readily admits that the forensic examiners **had the authority** to make copies of the devices at issue, alleging that the "forensic examiners have been authorized to image, search, and analyze" identified Gabehart devices. Dkt. 100 at ¶ 59.This alone is fatal to his CFAA claim because he admits the examiner's access was authorized.

Instead of arguing that the examiner accessed his devices without authorization or exceeded such authorization, Gabehart claims that the examiner misused its authorized access by "careless[ly]" and "improperly disclos[ing] dozens of Mr. Gabehart's privileged attorney-client communications . . . *directly to JGR's counsel*." *Id.* at ¶ 61 (emphasis in original). As such, Gabehart argues, at the very most, that the examiner misused its authorized access.[8] But the CFAA does not cover such allegations. *WEC Carolina Energy Solutions LLC v. Miller*, 687 F.3d 199, 207 (4th Cir. 2012) (affirming dismissal of CFAA claim where employee used authorized access to misuse confidential information belonging to the company); *see also Van Buren*, 593 U.S. at 379; *WEC Carolina*, 687 F.3d at 205. Therefore, Gabehart's CFAA Counterclaim should be dismissed.

---

[7] The Forensic Analysis Protocol, which Gabehart's allegations rely upon, is attached hereto as **Exhibit A**.

[8] While required to assume the veracity of Gabehart's allegations for purposes of this Motion, JGR, and the examiner, vehemently deny even the implication that the examiner intentionally misused access to Mr. Gabehart's accounts and devices to disclose privileged communications. JGR believes this allegation is not well-founded and reserves all rights to take appropriate action.

19

**E. Gabehart's North Carolina Computer Trespass Claim Fails Because the Counterclaim Does Not Plausibly Allege Use of a Computer "Without Authority" or the Required Statutory Intent.**

North Carolina law prohibits a person from using "a computer or computer network without authority and with the intent to . . . [m]ake or cause to be made an unauthorized copy" of information residing there. N.C. Gen. Stat. § 14-458(a); s*ee also CHGYM LLC v. Unify Athletics, LLC*, No. 1:21CV911, 2022 WL 112208, at *5 (M.D.N.C. Jan. 12, 2022). The North Carolina computer trespass statute provides that "a person is 'without authority' when ... the person uses a computer in a manner exceeding the[ir] right or permission[.]" N.C.G.S. § 14-458(a).

Similar to his CFAA claim, Gabehart's allegation that JGR employees accessed its own "JGR-issued laptop" on December 8, 2025, cannot support a claim under the North Carolina Computer Trespass Act because JGR's access to its own devices was not access "without authorization." *See* N.C.G.S. § 14-458(a) ("a person is 'without authority' when (i) the person has no right or permission of the owner to use a computer, or the person uses a computer in a manner exceeding the right or permission[.]"). Gabehart concedes that the devices were "JGR-issued" devices that he returned to JGR on November 10, 2025. Dkt. 100 at ¶ 35. Again, Gabehart's mistake in covering his tracks and syncing and failing to remove his personal accounts from his JGR-computer does not plausibly support an affirmative claim by Gabehart.

Even more, Gabehart's claim relating to JGR's access of its own computer in December 2025 fails for the independent reason that Gabehart does not allege that JGR accessed his personal accounts with the intent to do any of the actions listed in N.C. Gen. Stat. § 14-458(a), such as altering or erasing computer data or making an unauthorized copy. To the contrary, Gabehart merely alleges that JGR "accessed" his personal accounts through his own syncing on the JGR-issued computer previously issued to Gabehart. Dkt. 100 at ¶ 95.

PPAB 13973098v6

Gabehart next contends that JGR through its agents "exceed[ed] the right or permission granted under the court-ordered protocol and with the intent to make unauthorized copies of computer data . . . ." Dkt. 100 at ¶ 94. On April 22, 2026, JGR and Gabehart entered into a Forensic Analysis Protocol. *Id.* at ¶ 59. As discussed above, Gabehart readily admits that the forensic examiners had the authority to make copies of the devices at issue, alleging that the "forensic examiners have been authorized to image, search, and analyze" Gabehart's devices. Dkt. 100 at ¶ 59. Because the Forensic Analysis Protocol expressly authorized the forensic examiners to make copies of the devices in their entirety and later inspect those devices, the examiners did not exceed the authority granted to them under the Forensic Analysis Protocol. *See CHGYM LLC*, 2022 WL 112208, at *5 (finding that "[a]ny greater utilization of that access would exceed his 'right or permission,' thus qualifying as 'without authority' for purposes of the North Carolina computer trespass statute.") (citing N.C. Gen. Stat. § 14-458(a)).

Instead, Gabehart contends that violations of the North Carolina Computer Trespass Act occurred when JGR's forensic examiners "disclos[ed] to JGR's counsel dozens of Mr. Gabehart's privileged attorney-client communications that were outside the scope of the protocol's authorization." Dkt. 100 at ¶ 94. There are, at least, three problems with this theory. First, Gabehart appears to concede that the disclosure communications came from an authorized copy, not from his actual devices. Second, the North Carolina Computer Trespass Act does not prohibit or address "unauthorized disclosure" of information accessed with authority. Third, Gabehart does not plausibly allege that the examiner intended to engage in any of the actions listed in N.C. Gen. Stat. § 14-458(a) (1-6). Instead, Gabehart characterizes the disclosure as an act of "carelessness."

PPAB 13973098v6

Dkt. 100 at ¶ 61.[9]  The Court should therefore dismiss Gabehart's claim under the North Carolina Computer Trespass Act.

### F. Gabehart's North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA") Fails Because It Does Not Arise from Conduct "In or Affecting Commerce."

a. *Gabehart's UDTPA Claim Is Wholly derivative of His CFAA Claim and NC Computer Trespass Act Claims*

Gabehart's UDTPA claim rests entirely on the conduct "alleged in the Fourth and Fifth Claims for Relief." Dkt. 100 at ¶ 99. A UDTPA claim predicated on other claims "rises and falls" with them and must be dismissed when they fail. *See, e.g., Silverdeer, LLC v. Berton*, No. 11 CVS 3539, 2013 WL 1792524, at *10 (N.C. Super. Ct. Apr. 24, 2013) (holding that a UDTPA claim derivative of fraud and other claims "rises and falls" with those claims.); *Combs & Assocs., Inc. v. Kennedy*, 147 N.C. App. 362, 373–74, 555 S.E.2d 634 (2001) (affirming summary judgment dismissing unfair or deceptive trade practices claim when the underlying claims had been dismissed and plaintiff had alleged no other unfair or deceptive acts). Because Gabehart's CFAA and North Carolina Computer Trespass claims must fail, so should his UDTPA claim.

b. *The Alleged Conduct Is Not "In or Affecting Commerce."*

Section 75-1.1 declares unlawful "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce[.]" N.C.G.S. § 75-1.1(a). "'[C]ommerce' includes all business activities, however denominated, but does not include professional services rendered by a member of a learned profession." *Id*. § 75-1.1(b). UDTPA reaches "interactions between different market participants," not "purely internal business

---

[9] Gabehart does not disclose the fact that undersigned counsel and the forensic examiner took immediate steps to remedy the potential disclosure of privileged communications. Both parties have represented repeatedly that the material Gabehart claims as privileged was not substantively reviewed. As such, JGR believes that Gabehart's allegations may not be well-founded and reserves all rights to take appropriate action.

PPAB 13973098v6

operations" or conduct "contained solely within a single business." *White v. Thompson*, 364 N.C. 47, 47–48, 691 S.E.2d 676, 676–77 (2010). And it "usually is not applicable to employment disputes." *Durling v. King*, 146 N.C. App. 483, 488, 554 S.E.2d 1, 4 (2001). Absent an impact "beyond the parties' employment relationship[]," such conduct is not in or affecting commerce. *Id*. at 489, 554 S.E.2d at 5.

At its heart, Gabehart's UDTPA claim is an employment dispute. It arises from his employment agreement, his separation from JGR, JGR's alleged withholding of compensation, JGR's alleged enforcement of restrictive covenants, and forensic-review disputes arising from litigation over his alleged misconduct. Those allegations concern the breakdown of an employment relationship and subsequent litigation between an employer and former employee. They do not describe marketplace conduct directed toward consumers or commercial counterparts.

Gabehart attempts to avoid this limitation by alleging that the forensic examiner "carelessly" disclosed privileged and confidential materials to JGR's counsel through the forensic protocol. Dkt. 100 at ¶ 99. However, simply adding outside litigation-related agents to an employment dispute does not transform the dispute into commerce. Circumstances in which an employee's allegedly unfair or deceptive acts are in or affecting commerce tend to "'involve 'outside businesses,' 'distinct corporate entities,' or the interruption of a 'commercial relationship' between two market participants." *Alexander v. Alexander*, 250 N.C. App. 511, 518, 792 S.E.2d 901, 906 (2016). The alleged conduct occurred in connection with a forensic protocol in this lawsuit. Dkt. 100 at ¶ 59. It was not a commercial transaction, marketing practice, competitive marketplace act, or consumer-facing business activity. It was litigation conduct arising from an employment dispute. Gabehart's Counterclaims arise from conduct occurring during a dispute regarding his employment relationship, and thus, he has failed to show that the alleged actions

PPAB 13973098v6

were "in or affecting commerce," and this claim should be dismissed. *See Tai Sports, Inc. v. Hall*, No. 09 CVS 2201, 2012 WL 6753681, at *21 (N.C. Super. Ct. Dec. 28, 2012) (dismissing unfair or deceptive trade practices claim where the relationship between plaintiff and defendants was "nothing more than that of employer and employee.").

    c. *Gabehart Does Not Allege Egregious Conduct*

"To be 'deceptive' within the meaning of § 75–1.1, a misleading act must occur under egregious or aggravating circumstances, and the harm resulting from the alleged deceptive practice must be such that the plaintiff could not reasonably avoid it." *Exclaim Mktg., LLC v. DirecTV, LLC*, 134 F. Supp. 3d 1011, 1024 (E.D.N.C. 2015), *aff'd*, 674 F. App'x 250 (4th Cir. 2016) (citations omitted); *see also Ellis v. Louisiana-Pacific Corp*, No. 3:11CV191, 2011 WL 5402878, at *2 (W.D.N.C. Nov. 8, 2011) (finding where a UDTPA claim is alleged in conjunction with a breach of contract claim, "[e]gregious or aggravating circumstances must be alleged before the provisions of the [UDTPA] may take effect … [which] include conduct of the breaching party that is deceptive."). "In all cases, the UDTPA only applies where egregious or aggravating circumstances are proved." *Exclaim Mktg., LLC*, 134 F. Supp. 3d 1024 (citing *Dalton v. Camp*, 353 N.C. 647, 657, 548 S.E.2d 704 (2001)).

Here, Gabehart's counterclaim is devoid of any supporting facts plausibly supporting "[e]gregious or aggravating circumstances … [which] include conduct of the breaching party that is deceptive." *Ellis*, 699 F.3d at 787 (citing *Becker v. Graber Builders, Inc.*, 149 N.C. App. 787, 561 S.E.2d 905, 910 (2002)). Instead, Gabehart pleads a barebones unfair and deceptive trade practices claim generally alleging that JGR's actions constituted unfair and deceptive trade practices. This "formulaic recital of the elements" of claim that requires JGR and the Court to guess which actions Gabehart refers to should not survive dismissal under Rule 12(b)(6). *See Iqbal*,

24

556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). At most, Gabehart alleges that JGR violated the UDTPA by accessing a JGR-owned computer and by receiving potentially privileged communications that were inadvertently disclosed during an agreed forensic protocol. Neither allegation, even taken as true, demonstrates egregious or aggravating circumstances required to support a claim under UDTPA.

## CONCLUSION

For the foregoing reasons, JGR respectfully requests that the Court dismiss Gabehart's Counterclaims in their entirety with prejudice.

This the 15th day of July, 2026.

**PARKER POE ADAMS & BERNSTEIN LLP**

/s/ Sarah F. Hutchins
Sarah F. Hutchins
N.C. Bar No. 38172
Tory Ian Summey
N.C. Bar No. 46437
Keith M. Weddington
N.C. Bar No. 14352
Charles G. Middlebrooks
N.C. Bar No. 55171
Madelyn R. Candela
N.C. Bar No. 63827
Bank of America Tower
620 South Tryon St., Suite 800
Charlotte, North Carolina 28202
sarahhutchins@parkerpoe.com
torysummey@parkerpoe.com
keithweddington@parkerpoe.com
charliemiddlebrooks@parkerpoe.com
madelyncandela@parkerpoe.com

PPAB 13973098v6

**KING & SPALDING LLC**

Danielle T. Williams
dwilliams@kslaw.com
N.C. Bar No. 23283
300 South Tryon Street, Suite 1700
Charlotte, NC 28202
Thomas M. Melsheimer – *Pro Hac Vice*
tmelsheimer@kslaw.com
Chad B. Walker – *Pro Hac Vice*
cwalker@kslaw.com
Tracea Rice – *Pro Hac Vice*
trice@kslaw.com
Alexandra Moore - *Pro Hac Vice*
almoore@kslaw.com
2601 Olive Street, Suite 2300
Dallas, TX 75201

*Attorneys for Joe Gibbs Racing, LLC*

26

## ARTIFICIAL INTELLIGENCE CERTIFICATION

No artificial intelligence was employed in doing the research for the preparation of this Motion, with the exception of the standard artificial intelligence embedded in Westlaw. Every statement and every citation to an authority contained in this Motion has been checked by an attorney in this case as to the accuracy of the proposition for which it is offered.

**PARKER POE ADAMS & BERNSTEIN LLP**

/s/ Sarah F. Hutchins
Sarah F. Hutchins
N.C. Bar No. 38172
Bank of America Tower
620 South Tryon St., Suite 800
Charlotte, North Carolina 28202
sarahhutchins@parkerpoe.com
*Attorney for Joe Gibbs Racing, LLC*

27

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this date the foregoing **PLAINTIFF JOE GIBBS RACING, LLC'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS DEFENDANT GABEHART'S COUNTERCLAIMS** was electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send notice and serve same upon counsel of record via the Court's electronic case filing system.

This the 15th day of July, 2026.

**PARKER POE ADAMS & BERNSTEIN LLP**

/s/ Sarah F. Hutchins
Sarah F. Hutchins
N.C. Bar No. 38172
Bank of America Tower
620 South Tryon St., Suite 800
Charlotte, North Carolina 28202
sarahhutchins@parkerpoe.com
*Attorney for Joe Gibbs Racing, LLC*

PPAB 13973098v6