**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Case No. 3:26-CV-00133-SCR-DCK**

| | |
|---|---|
| JOE GIBBS RACING, LLC,<br><br>**Plaintiff,**<br><br>v.<br><br>CHRISTOPHER GABEHART and SPIRE MOTORSPORTS II, LLC,<br><br>**Defendants.** | **DEFENDANT CHRISTOPHER GABEHART'S OPPOSITION TO PLAINTIFF JOE GIBBS RACING, LLC'S MOTION TO DISMISS COUNTERCLAIMS** |

Defendant Christopher Gabehart ("Mr. Gabehart"), by and through undersigned counsel, respectfully submits this Opposition to Plaintiff Joe Gibbs Racing, LLC's ("JGR") Motion to Dismiss Defendant Gabehart's Counterclaims (ECF No. 115). The Court should deny JGR's Motion for the reasons set forth below.

## I.     INTRODUCTION

After more than thirteen years of distinguished service—during which Chris Gabehart rose from engineer to crew chief to Competition Director, contributing to multiple championships—JGR repaid his loyalty with unlawful wage withholding, invasive demands, manufactured legal pretexts, and a lawsuit designed not to protect legitimate business interests, but to punish Mr. Gabehart for daring to leave.

JGR's motion to dismiss rests on a fundamental mischaracterization of the facts. JGR asks this Court to accept, at the pleading stage, its self-serving interpretation of the Employment Agreement while ignoring Mr. Gabehart's well-pleaded allegations that JGR breached the contract first by withholding his wages, derailed a negotiated separation process in bad faith, and then manufactured a post-hoc "for cause" termination—issued only after a forensic examination

confirmed no use or transmittal of any JGR confidential information—to trigger an 18-month noncompete that would not otherwise exist.

The facts, viewed in the light most favorable to Mr. Gabehart, tell a straightforward story: Mr. Gabehart properly exercised his contractual rights under Section 6 of the Agreement when his job duties diverged materially from what he was promised. Rather than honor those rights, JGR stopped paying him, subjected him to an invasive forensic examination, and—after that examination confirmed what Mr. Gabehart had been telling JGR—filed this lawsuit and sent a "for cause" termination letter citing the very conduct the examination had exonerated. JGR's internal records confirm the charade: its own Termination Payroll Notice lists the termination reason as "Voluntary Resignation," and Coach Gibbs himself publicly stated that he and Mr. Gabehart "just decided to go our separate ways."

JGR's selective enforcement reveals the true nature of this litigation. In NASCAR, lateral movement of personnel between teams is routine and accepted. JGR has raised no objection when employees depart for Toyota-aligned competitors like 23XI Racing or Legacy Motor Club—even when those employees hold positions more senior than Mr. Gabehart's. Just months ago, JGR's Chief Operating Officer Michael Guttilla departed to become President of Legacy Motor Club, a direct competitor. JGR did not file suit. JGR did not seek injunctive relief. JGR did not demand forensic examinations. Yet JGR seeks to prevent Mr. Gabehart from working for Spire, a Chevrolet-aligned team that does not share the same manufacturer relationship. This double standard is not the protection of legitimate business interests—it is retaliation.

Mr. Gabehart's Counterclaims plausibly allege breach of contract, violations of the North Carolina Wage and Hour Act, a claim for declaratory relief, violations of the Computer Fraud and Abuse Act and North Carolina Computer Trespass Act, and unfair and deceptive trade practices.

2

At the motion to dismiss stage, Mr. Gabehart need only plead facts that, taken as true, state a plausible claim for relief. He has done so.

JGR's motion should be denied in its entirety.

## II. FACTUAL BACKGROUND

Mr. Gabehart began working for JGR in 2012. ECF No. 100 ¶ 12. Over thirteen years, he rose from engineer to crew chief to Competition Director, contributing to multiple JGR championships along the way. *Id.* His dedication to JGR was beyond question—until he exercised his contractual right to address job duties that had become inconsistent with his reasonable expectations. *Id.*

On or about November 15, 2024, Mr. Gabehart and JGR executed an Employment Agreement effective December 1, 2024. *Id.* ¶ 13. Section 3 of the Agreement required JGR to pay Mr. Gabehart a base salary plus performance-based bonuses, with earned bonuses payable within forty-five days after JGR's receipt of the applicable prize money. *Id.* ¶ 14. Section 4 governed termination. *Id.* ¶ 15. And Section 6 contained restrictive covenants—including a unique and specifically negotiated provision that critically limited JGR's ability to enforce an 18-month noncompete. *Id.* ¶ 16.

Section 6 specifically provides that the Noncompete Period is reduced to one week and JGR must pay $100,000 in exchange for a complete mutual release if, after September 1, 2025, and before June 1, 2026: (i) the employee in good faith notifies JGR of specific job duties or responsibilities that are inconsistent with his reasonable expectations or the job description provided before employment began; (ii) the employee provides JGR at least sixty days to resolve such inconsistencies; and (iii) the employee provides sixty days prior written notice of termination without cause. *Id.* ¶ 16.

When Mr. Gabehart was promoted to Competition Director, he was promised a COO-type role overseeing all competitive operations with autonomy to lead. *Id.* ¶ 19. The reality was different. Mr. Gabehart found himself "constantly intertwined" with Coach Gibbs, senior JGR executives, and family members in making even routine competition decisions—a dysfunctional organizational structure that materially diverged from the position Mr. Gabehart was promised. *Id.*

Coach Gibbs repeatedly pressured Mr. Gabehart to take over as crew chief of the No. 54 car, driven by Ty Gibbs, despite Mr. Gabehart's consistent objections. *Id.* ¶ 20. The No. 54 team was managed differently from JGR's other cars: key personnel decisions were made without Mr. Gabehart's input, Ty Gibbs was not held to the same meeting attendance standards as others, and Coach Gibbs consulted everyone except Mr. Gabehart on weekly performance matters—undermining Mr. Gabehart's credibility with those who reported to him. *Id.* ¶¶ 20-21. The pressure campaign even extended to a $500,000 personal check from Heather Gibbs—Ty Gibbs's mother—payable to Mr. Gabehart outside his Employment Agreement, in an attempt to induce him to perform crew chief services for the No. 54 car. *Id.* ¶ 23.

This deterioration in the relationship was the primary reason Mr. Gabehart felt compelled to exercise his rights under Section 6 of the Agreement. *Id.* ¶ 25. On November 6, 2025, Mr. Gabehart met with Coach Gibbs to address these concerns and left him a written document (the "Written Notice") outlining the specific inconsistencies pursuant to Section 6 of the Agreement. *Id.* ¶ 17. The next morning, Mr. Gabehart emailed JGR's CFO Tim Carmichael to keep him informed, expressly stating that he was sharing the written version of his discussion with Coach Gibbs. *Id.* Following that meeting, the parties mutually agreed to part ways. *Id.* ¶ 26. Mr. Carmichael texted a colleague that same day: "Coach wants him gone. I would be shocked if there

4

is any other outcome." *Id.* ¶ 27. Notably absent were any mentions of misconduct or termination "for cause." *Id.* ¶ 27.

On November 10, 2025, JGR placed Mr. Gabehart on "garden leave" while the parties worked through a separation agreement. *Id.* ¶ 28. JGR instructed him to tell anyone internally that he was "on vacation." *Id.* Despite this arrangement, JGR unilaterally ceased paying Mr. Gabehart all compensation to which he was entitled. *Id.* No written termination notice was issued identifying November 10, 2025, as a termination date. *Id.*

JGR's own executives acknowledged Mr. Gabehart's invocation of his Section 6 rights. Mr. Carmichael texted Mr. Gabehart on November 8, 2025, that "I don't believe your actual role was what Coach said it would be" or "what you were told you would have." *Id.* ¶ 30. On November 18, 2025, Mr. Carmichael texted a colleague that Mr. Gabehart "gave notice that coach wasn't living up to his contract so we have 60 or 120 days to give him what he wants or he can go somewhere else"—explicitly acknowledging Mr. Gabehart's invocation of Section 6. *Id.* ¶ 32. And on November 19, 2025, JGR's in-house counsel Eric Schaffer wrote that "CG has asked to be released from his contract that carried an 18-month non-compete" and that JGR was "accepting his request (in addition to $100k on top of that)." *Id.* ¶ 33.

Instead of honoring the Agreement's terms, JGR began a course of unlawful and coercive conduct. *Id.* ¶ 28. JGR's withholding of Mr. Gabehart's earned wages was not a good-faith business decision. *Id.* ¶ 29. It was a calculated pressure tactic designed to coerce him into compliance with JGR's demands during separation negotiations. *Id.* JGR presented Mr. Gabehart with a proposed separation agreement that demanded material terms far beyond what Section 6 required, including new non-solicitation and non-disparagement provisions and a punitive

liquidated damages clause. *Id.* ¶¶ 30-31. Section 6 requires only a "complete mutual release," but JGR refused to honor that straightforward obligation. *Id.*

JGR apparently never intended to honor Mr. Gabehart's Section 6 rights or otherwise deal with him in good faith. *Id.* ¶ 34. On December 2, 2025, JGR directed a private investigator, Ryan Simpson, to conduct surveillance on Mr. Gabehart. *Id.* Mr. Simpson took video footage of Mr. Gabehart having lunch in public with Spire co-owner Jeff Dickerson. *Id.* The next day, JGR's Executive Vice President called Spire's president to warn that Mr. Gabehart was subject to a noncompete, but there was no noncompete on December 3, 2025, as the parties were still negotiating a separation agreement with no noncompete. *Id.*

JGR's invasive conduct soon extended to Mr. Gabehart's personal devices and accounts. Although Mr. Gabehart had returned his JGR-issued devices on November 10, JGR employees accessed his JGR-issued laptop on December 8, 2025, along with other devices that had been synced with his personal accounts, including his Gmail account, which contained privileged attorney-client communications with his counsel relating to the separation negotiations. *Id.* ¶ 35.

Despite JGR's unlawful withholding of his wages, Mr. Gabehart agreed to cooperate with an invasive forensic examination of his personal devices—at his own expense—in a good-faith effort to resolve the parties' dispute. *Id.* ¶¶ 40, 43. The examination was conducted pursuant to a detailed protocol drafted by JGR's own counsel and performed by a forensic examiner of JGR's choosing, Reliance Forensics, LLC. ECF No. 100 ¶ 41. Before the examination began, Mr. Gabehart executed a sworn declaration certifying that he had not transferred JGR confidential information to any third party. *Id.*

On January 27, 2026, the forensic examination was completed. *Id.* ¶ 44. The results confirmed what Mr. Gabehart had maintained from the outset: there is no evidence that he

transmitted, distributed, used, or otherwise shared any JGR confidential information. *Id.* Critically, the forensic examiner did not locate any evidence that the files were transmitted or transferred. *Id.* The only copies found were local files that were never sent to anyone. *Id.* Mr. Gabehart further consented to the permanent deletion of all flagged items from his personal devices, and the deletion process was completed on or about February 6, 2026, three days before JGR purported to terminate Mr. Gabehart "for cause." *Id.* Notably, Mr. Gabehart did not receive access to Spire IT systems or a Spire-issued laptop until February 17, 2026—after the forensic deletions were completed— meaning Mr. Gabehart had no JGR materials to bring to or use at Spire when his access began. *Id.* ¶ 44 n.3.

On February 9, 2026—three months after Mr. Gabehart exercised his Section 6 rights and JGR began withholding his wages, and days after the forensic examination was completed—JGR's counsel sent a letter purporting to terminate Mr. Gabehart's employment "for Cause." *Id.* ¶ 52. The letter itself repeatedly characterized Mr. Gabehart's departure as a resignation, stating that he "agreed to leave" and "resigned his employment," confirming that the termination for cause was a strategic afterthought. *Id.* JGR cited the very conduct that the forensic examination had exonerated as the purported "cause" for termination—a post-hoc rationalization designed to trigger an 18-month noncompete that would not otherwise exist. *Id.* ¶¶ 52-53.

JGR's bad faith is further evidenced by its own internal records. JGR's Termination Payroll Notice lists the termination reason as "Voluntary Resignation," not "for cause." *Id.* ¶ 55. And Coach Gibbs himself publicly confirmed the mutual nature of the separation in a February 12, 2026 SiriusXM interview—three days after the purported "for cause" letter—stating: "After the season, Chris and I met, and we just decided to go our separate ways." *Id.* ¶ 56.

JGR's selective enforcement of its restrictive covenants confirms this lawsuit's retaliatory purpose. Michael Guttilla served as JGR's Chief Operating Officer, a position senior to Mr. Gabehart's. *Id.* ¶ 6. In April 2026, Mr. Guttilla departed JGR to become President of Legacy Motor Club, a Toyota-aligned team that competes directly against JGR every week. *Id.* JGR did not pursue litigation. *Id.* JGR did not seek injunctive relief. *Id.* JGR did not publicly accuse Mr. Guttilla of wrongdoing. *Id.* JGR did not demand a forensic examination. *Id.* The contrast between JGR's treatment of Mr. Guttilla and its treatment of Mr. Gabehart could not be more stark.

Since the filing of this lawsuit, Mr. Gabehart has undergone further extensive forensic review. Pursuant to the Forensic Analysis Protocol executed on April 22, 2026 (the "April 22 Protocol"), forensic examiners were authorized to image, search, and analyze approximately eight devices and cloud accounts. *Id.* ¶ 59. JGR's counsel has proposed more than 425 separate search terms to be run across the data. *Id.* Despite this extensive and invasive process—and despite having direct access to complete directories, forensic logs, and search hit reports—JGR has failed to identify a single piece of JGR data that Mr. Gabehart has used, transmitted, or disclosed to any third party. *Id.* ¶ 60. This failure is because no such evidence exists.

JGR's conducting of the forensic review has been marked by an utter disregard for Mr. Gabehart's rights. During the course of the examination, JGR's forensic examiner improperly disclosed dozens of Mr. Gabehart's privileged attorney-client communications—emails between Mr. Gabehart and his counsel—directly to JGR's counsel. *Id.* ¶ 61. JGR's forensic examiner's unauthorized access and disclosure occurred at a time when JGR's counsel was not yet entitled to see any of the content from Mr. Gabehart's personal accounts and devices—let alone his privileged and confidential communications with his lawyers. *Id.* ¶¶ 59, 85. This serious breach of the April 22 Protocol and violation of the attorney-client privilege has forced Mr. Gabehart to incur

substantial additional attorneys' fees. *Id.* ¶ 61. The unauthorized access that occurred during the April 22 Protocol compounded the unauthorized access by JGR employees into Mr. Gabehart's personal accounts, which had been synced to his JGR-issued laptop, on or about December 8, 2025, after his employment had effectively ended and without his knowledge or consent. *Id.* ¶ 87.

### III.    ARGUMENT

#### A.    Standard of Review

Under Rule 12(b)(6), when analyzing a motion to dismiss, courts should "accept all well-pleaded facts as true and draw all reasonable inferences in favor of the plaintiff." *United States ex rel. Aarow/IET LLC v. Hartford Fire Ins. Co.*, 838 F. App'x 736, 743 (4th Cir. 2020). Under Rule 8(a)(2), the Counterclaims need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief in order to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation modified).

#### B.    The Counterclaims Plausibly Allege Breach in Multiple Respects.

To state a claim for breach of contract, a plaintiff must plead "(1) the existence of a valid contract and (2) a breach of that contract by Defendant." *T.W.T. Distrib., Inc. v. Johnson Prods. Co.*, 966 F. Supp. 2d 576, 580 (W.D.N.C. 2013). JGR does not dispute that the Agreement is a valid contract, ECF No. 116 at 6-12, leaving only the question of breach, an issue on which the Counterclaims plead ample facts.

The Counterclaims allege that JGR breached the Agreement in several respects: by failing to pay earned wages and bonuses under Section 3 and other amounts due under Sections 4 and 6, ECF No. 100 ¶ 65; by failing to complete the contractually contemplated separation process under Section 6, *id.* ¶ 66; and by breaching the implied covenant of good faith and fair dealing through withholding earned wages, *id.* ¶¶ 28-29, manufacturing a "for cause" termination, *id.* ¶¶ 52-56,

9

and selectively enforcing the Agreement's restrictive covenants, *id.* ¶¶ 5-6. JGR's arguments in support of its motion to dismiss are premised on disputing the alleged facts and disputing Mr. Gabehart's interpretation of the contract, but at the 12(b)(6) stage, Mr. Gabehart's well-pleaded facts must be accepted and all reasonable inferences drawn from them. *See United States ex rel. Aarow/IET LLC*, 838 F. App'x at 743.

Mr. Gabehart alleges that he was owed his salary until the purported "for cause" termination on February 9, 2026. ECF No. 100 ¶ 48. JGR argues that Section 2 of the Agreement "conditions Gabehart's salary on him providing services he performs for JGR." ECF No. 116 at 7. This argument fails for several reasons. First, it was *JGR*—not Mr. Gabehart—that stopped his services: JGR placed him on "garden leave," told him not to return, and instructed him to tell anyone who asked that he was "on vacation." ECF No. 100 ¶ 28. Second, under JGR's own view, Mr. Gabehart remained an employee of JGR until it terminated him on February 9, 2026. *Id.* ¶ 52. Third, Section 4(c) of the Agreement states that "[u]pon termination with cause, Company will promptly pay Employee the Base Salary and any other compensation earned through the date of termination." ECF No. 95-2 at 2. This provision contains no language limiting payment of the Base Salary to the exact day and time the employee stopped performing services. Finally, JGR's own internal records confirm Mr. Gabehart remained employed: on November 24, 2025, JGR's Chief People Officer acknowledged that JGR would need to "terminate [Mr. Gabehart's] employment to trigger the qualifying event" for COBRA eligibility. ECF No. 100 ¶ 37. For these reasons, Mr. Gabehart has stated a breach of contract claim for unpaid wages.

JGR argues that Mr. Gabehart's claim for an unpaid performance bonus fails because he does not allege when the bonus was due and admits that JGR paid the full bonus amount on January 20, 2026. ECF No. 116 at 9. But the Agreement provides that earned bonuses are due within forty-

five days after JGR's receipt of the applicable prize money. ECF No. 100 ¶ 14. Mr. Gabehart need not plead the exact date JGR received that money to state a plausible claim that the January 20, 2026 payment was untimely. *See Kopplin v. Sugar Mountain Resort, Inc.*, No. 1:24-CV-00306-MR-WCM, 2025 WL 2525057, at *2 (W.D.N.C. Aug. 12, 2025), *report and recommendation adopted,* No. 1:24-CV-00306-MR-WCM, 2025 WL 2524132 (W.D.N.C. Sept. 2, 2025) (holding that plaintiff need not plead the exact date of a marriage to state a plausible loss of consortium claim when the complaint alleged that the parties were married to each other "[a]t all material times").

JGR argues that the failure to complete the contractually contemplated separation process under Section 6 of the Agreement was because of "a disputed negotiation." ECF No. 116 at 9-10. But JGR's own executives acknowledged that Mr. Gabehart properly invoked Section 6. JGR's Chief Financial Officer, Tim Carmichael, texted on November 8, 2025: "I don't believe your actual role was what Coach said it would be" or "what you were told you would have," and indicated he did not blame Mr. Gabehart for exercising his rights. ECF No. 100 ¶ 30. Two days later, Carmichael emailed JGR's terms for a mutual termination agreement, which included payment of $100,000—the exact amount specified in Section 6. *Id.* JGR's counsel's representation in open court that this amount was a "coincidence" strains credulity. *Id.* The negotiations collapsed not because Mr. Gabehart failed to comply with Section 6's procedures, but because JGR demanded material terms far beyond what Section 6 required—including new non-solicitation and non-disparagement provisions and a punitive liquidated damages clause. ECF No. 100 ¶¶ 30-31. Section 6 requires only a "complete mutual release," *id.* ¶ 16, and JGR cannot manufacture a procedural default by Mr. Gabehart out of a negotiation that *JGR itself* derailed by insisting on terms beyond what the Agreement required.

JGR also argues that Mr. Gabehart's implied-covenant claims fail. ECF No. 116 at 10-12. "The implied covenant of good faith and fair dealing is a part of every contract and is breached where one party to a contract does something that injures the right of the other to receive the benefits of the agreement." *Tasz, Inc. v. Indus. Thermo Polymers, Ltd.*, 80 F. Supp. 3d 671, 683 (W.D.N.C. 2015) (citation modified). Mr. Gabehart's allegations adequately plead a breach of good faith and fair dealing.

JGR argues that a good-faith and fair-dealing claim cannot override the express terms of the Agreement. ECF No. 116 at 10-11. But Mr. Gabehart's claims are entirely consistent with the express terms of the contract. First, for the reasons stated above, *supra* Section III.B, Mr. Gabehart has pleaded facts to support the claim that JGR has withheld earned wages under the Agreement as a negotiation tactic during the Section 6 separation process. ECF No. 100 ¶ 29. Mr. Gabehart has also pleaded facts to support his claim that JGR manufactured a "for cause" termination, because the forensic examination confirmed that he had not shared any JGR confidential information with Spire. ECF No. 100 ¶¶ 44, 54. Indeed, JGR's own Termination Payroll Notice lists the reason for termination as "Voluntary Resignation." ECF No. 100 ¶ 55.

Finally, JGR argues that Mr. Gabehart fails to identify any specific comparator who was permitted to leave for a competitor without enforcement. ECF No. 116 at 11-12. This is incorrect. The Counterclaims specifically identify Michael Guttilla, who served as JGR's Chief Operating Officer—a position senior to Mr. Gabehart's role as Competition Director. ECF No. 100 ¶¶ 5-6. In April 2026, Mr. Guttilla departed JGR to become President of Legacy Motor Club, a direct NASCAR competitor. *Id.* JGR did not pursue litigation, seek injunctive relief, or publicly accuse Mr. Guttilla of wrongdoing. *Id.* The stark contrast between JGR's treatment of Mr. Guttilla and its

aggressive litigation against Mr. Gabehart plausibly supports an inference that JGR is selectively enforcing restrictive covenants against Mr. Gabehart.

For these reasons, JGR's motion to dismiss the breach of contract counterclaim should be denied.

### C. JGR Failed to Pay Wages Mr. Gabehart Was Owed, in Violation of the North Carolina Wage and Hour Act.

JGR does not dispute that Mr. Gabehart was an employee and JGR was his employer. ECF No. 116 at 12-15. As discussed above, Mr. Gabehart has pleaded facts to support his claim that he was owed his salary through February 9, 2026, that his performance bonus was paid late, and that he has not been paid the $100,000 payment under Section 6 of the Agreement. *Supra* Section III.B. Under the facts as Mr. Gabehart has pleaded them, JGR has failed to pay him wages owed in violation of the North Carolina Wage and Hour Act.

JGR attempts to avoid this conclusion by arguing that the NCWHA does not protect "unearned" wages and that wages are only earned when the employee "actually performed the work required to earn them." ECF No. 116 at 12-13 (citing *Myers v. Roush Fenway Racing, LLC*, No. 1:09CV508, 2009 WL 5215375, at *5 (M.D.N.C. Dec. 28, 2009)). But JGR ignores the critical fact that it was JGR—not Mr. Gabehart—that prevented him from performing services. JGR placed Mr. Gabehart on "garden leave," told him not to return, and instructed him to say he was "on vacation." ECF No. 100 ¶ 28. Throughout this period, Mr. Gabehart "remained ready, willing, and able to perform his duties consistent with the Agreement." *Id.* ¶ 45. An employer cannot prevent an employee from performing services and then claim those wages were not "earned." Whether wages were earned under these circumstances is a factual question that cannot be resolved on a motion to dismiss.

JGR also argues that the $100,000 Section 6 payment cannot support an NCWHA claim because it is a negotiated separation benefit contingent on satisfaction of Section 6's conditions and execution of a release, not "wages" earned for labor performed under N.C. Gen. Stat. § 95-25.2(16). ECF No. 116 at 13-14. Once the Section 6 conditions are satisfied, however, which would have happened here but for JGR's bad faith during the negotiations process, the $100,000 payment becomes a calculable, vested benefit due under the Agreement, similar to bonuses and severance pay that North Carolina courts have recognized as earned wages under the Act. *Washburn v. Yadkin Valley Bank & Tr. Co.*, 190 N.C. App. 315, 324 (2008) (NCWHA applies to severance pay). At the very least, whether the $100,000 is a "wage" within the meaning of NCWHA is an issue of fact that cannot be resolved in JGR's favor at the pleadings stage. *See Morris v. Scenera Research, LLC*, 368 N.C. 857, 862 (2016) (whether plaintiff was owed patent issuance bonuses under the NCWHA after leaving his former employer was a fact issue properly submitted to the jury).

JGR's motion to dismiss the NCWHA counterclaim should therefore be denied.

### D. Mr. Gabehart's Declaratory Relief Claim Raises Issues Distinct from JGR's Claims.

JGR argues that Mr. Gabehart's declaratory relief counterclaim should be dismissed because it is the "mirror image" of JGR's claims. ECF No. 116 at 15. Mr. Gabehart's declaratory relief counterclaim, however, raises different issues than JGR's claims. JGR brings trade secret misappropriation, unfair trade practices, and breach of contract claims. ECF No. 95 at 33-39. Mr. Gabehart, by contrast, seeks declaratory judgment regarding whether his termination was "for cause" or "without cause" and therefore the length of any applicable noncompete, if any; whether JGR's nonpayment of salary voids the noncompete; whether the noncompete is enforceable as a matter of law; and whether Mr. Gabehart's current role as Spire's Chief Motorsports Officer

violates the terms of the noncompete, if a noncompete is applicable and enforceable. ECF No. 100 ¶¶ 76-81. Thus, Mr. Gabehart's claims are not a "mirror image" of JGR's claims, and his declaratory judgment claim is adequately pleaded.

As one of the cases cited by JGR itself acknowledges, where the remedies sought in the declaratory judgment claim differ from those sought by the plaintiff, the court need not dismiss the claim for declaratory judgment. *Biltmore Co. v. NU U, Inc.*, No. 1:15-CV-00288-MR, 2016 WL 7494474, at *3 (W.D.N.C. Dec. 30, 2016) (cited at ECF No. 116 at 15). Here, the remedies Mr. Gabehart seeks do not directly align with those sought by JGR. For its breach of contract claim, for example, JGR seeks damages. ECF No. 95 ¶ 176. Mr. Gabehart, on the other hand, seeks specific declarations regarding his termination and specific aspects of the noncompete. ECF No. 100 ¶¶ 76-81.

For these reasons, Mr. Gabehart has stated his claim for declaratory relief, and JGR's motion to dismiss this counterclaim should be denied.

**E.      JGR Exceeded Its Authorized Access to Mr. Gabehart's Personal Accounts in Violation of the Computer Fraud and Abuse Act (18 U.S.C. § 1030).**

To state a civil claim under the Computer Fraud and Abuse Act, Mr. Gabehart must plausibly allege that JGR (1) intentionally accessed a protected computer, (2) without authorization or in excess of authorized access, (3) thereby obtained information, and (4) caused a qualifying loss or damage. 18 U.S.C. § 1030(a), (g). Mr. Gabehart's Counterclaims satisfy each element.

JGR contends that its access to its own JGR-issued laptop cannot be "without authorization" under the CFAA, and that because the CFAA protects computers rather than web-based accounts, JGR's viewing of Mr. Gabehart's personal accounts synced to that laptop is not actionable. ECF No. 116 at 17-18. In other contexts, courts have consistently found that an employer cannot claim unfettered access to an employee's personal email account that the

employee used on a company computer, especially when the emails at issue are confidential communications with the employee's attorney. *See Stengart v. Loving Care Agency, Inc.*, 990 A.2d 650, 660-63 (N.J. 2010) (collecting cases). Nor is ownership or control of the device that was improperly accessed a required element of a CFAA claim. *Biden v. Ziegler*, 737 F. Supp. 3d 958, 974 (C.D. Cal. 2024), *appeal docketed*, No. 25-2408 (9th Cir. April 15, 2025).

"Exceeding authorization means entering an area of the protected system that is beyond the parameters of authorization." *Abu v. Dickson*, 107 F.4th 508, 515 (6th Cir. 2024) (citing *Van Buren v. United States*, 593 U.S. 374, 389-90 (2021)). Applying this standard, courts have held that a person exceeds authorized access under the CFAA when the person's initial access is permitted, but the information obtained falls outside the bounds of that approved access. *Space Sys./Loral, LLC v. Orbital ATK, Inc.*, 306 F. Supp. 3d 845, 852 (E.D. Va. 2018); *Agilysys, Inc. v. Hall*, 258 F. Supp. 3d 1331, 1340-43 (N.D. Ga. 2017). That is precisely what occurred here: whatever authorization JGR had to access its own laptop never extended to Mr. Gabehart's personal, non-JGR accounts that merely happened to sync to the device.

Apart from the personal accounts accessed through the JGR-issued laptop, JGR contends that the forensic examiner's access to Mr. Gabehart's devices, including his personal cell phones, was allowed under the April 22 Protocol. ECF No. 116 at 18-19. But the April 22 Protocol's authorization was expressly limited. The April 22 Protocol provided that all credentials would be "solely accessible to the Forensic Examiner and not to JGR or JGR's Counsel." ECF No. 116-1 at 3. JGR and its attorneys therefore had no authority to access those images, let alone the privileged emails on Mr. Gabehart's personal account. The forensic examiner's disclosure of privileged communications directly to JGR's counsel violated this express limitation. Whatever authorization the examiner had to image and search the devices, that authorization never extended to disclosing

16

privileged attorney-client communications—materials that were outside the April 22 Protocol's defined scope—to JGR's counsel.

JGR further argues that, even if the forensic examiner disclosed privileged communications to JGR's counsel, this was at most a misuse of validly authorized access, which the Fourth Circuit has held does not violate the CFAA. ECF No. 116 at 19 (citing *WEC Carolina Energy Sols. LLC v. Miller*, 687 F.3d 199, 207 (4th Cir. 2012)). *WEC Carolina* addressed an insider's misuse of information he was authorized to access; here, JGR's counsel was never authorized to receive or review the privileged communications at all, making JGR's counsel's receipt of that material a separate, unauthorized act of access rather than mere misuse of information properly obtained.

JGR's motion to dismiss the CFAA counterclaim should accordingly be denied.

### F. JGR Used Mr. Gabehart's Personal Accounts Without Authority in Violation of the North Carolina Computer Trespass Act (N.C. Gen. Stat. § 14-458).

For purposes of the North Carolina Computer Trespass Act, a person is "without authority" when the person has no right or permission of the owner to use a computer, or the person uses a computer in a manner exceeding the right or permission. N.C. Gen. Stat. §§ 14-453(1a), 14-458(a). Greater utilization of access than allowed qualifies as "without authority." *CHGYM LLC v. Unify Athletics, LLC*, No. 1:21CV911, 2022 WL 112208, at *5 (M.D.N.C. Jan. 12, 2022); *Miller v. RedGoose, L.L.C.*, No. 23 CVS 25675, 2024 WL 4892114, at *5 (N.C. Super. Nov. 26, 2024). For example, in *State v. Johnston*, the North Carolina Court of Appeals held that an employee who was authorized to access a computer for data entry acted without authorization when she exceeded the scope of her assigned duties, because her permission was defined by those duties, not by the extent of her technical access. 173 N.C. App. 334, 341-42 (2005). This principle applies with equal force where, as here, an examiner's or attorney's access is bounded by a court-ordered protocol rather than an employment policy.

17

Granting JGR's counsel access to images of Mr. Gabehart's personal accounts, including privileged communications with counsel, was outside the scope of the April 22 Protocol's authorization; JGR therefore used Mr. Gabehart's accounts without authority. ECF No. 100 ¶¶ 93-94. JGR also acted without authority when its employees accessed Mr. Gabehart's personal accounts without authorization on December 8, 2025. *Id.* ¶ 95.

JGR argues that Mr. Gabehart's Computer Trespass Act claim regarding the December 8, 2025, access fails because he does not allege that JGR acted with the intent to alter, erase, or make an unauthorized copy of data, as required by N.C. Gen. Stat. § 14-458(a). ECF No. 116 at 20-21. The Counterclaims' allegations that JGR's personnel accessed and reviewed Mr. Gabehart's personal accounts without his knowledge or consent, combined with the broader scheme alleged in the Counterclaims to invade Mr. Gabehart's personal data, seek an advantage in contract negotiations, and limit his ability to work for competitor Spire, support a reasonable inference of the requisite intent at the pleading stage.

JGR also contends that the Computer Trespass Act claim premised on disclosure of privileged material during the April 22 Protocol fails because (a) the disclosure came from an authorized image rather than Mr. Gabehart's actual devices, (b) the statute does not address "disclosure" of properly accessed information, and (c) Mr. Gabehart alleges only carelessness, not intent. ECF No. 116 at 21-22. But again, access to privileged communications by JGR's counsel exceeded the "right or permission" granted under the April 22 Protocol regardless of whether the underlying access to the image was authorized, because the April 22 Protocol only authorized access by the forensic examiner.

JGR's motion to dismiss the Computer Trespass Act counterclaim should therefore be denied.

**G.      JGR's Computer Trespass and Fraud Violated the North Carolina Unfair and Deceptive Trade Practices Act (N.C. Gen. Stat. § 75-1.1).**

To prevail on a UDTPA claim, a plaintiff must show (1) an unfair or deceptive act or practice, (2) in or affecting commerce, and (3) the act proximately caused plaintiff's injury. *Nobel v. Foxmoor Grp., LLC*, 380 N.C. 116, 120 (2022).

Whether an act is unfair or deceptive is a question of law for the court. *Id.* at 119. Courts in North Carolina have held that computer trespass constitutes an unfair practice. *CRH E., LLC v. Berastain*, No. 23 CVS 039534-590, 2025 WL 399385, at *16 (N.C. Super. Feb. 4, 2025). For the reasons discussed above, Mr. Gabehart has stated claims under the CFAA and North Carolina Computer Trespass Act; therefore, his UDTPA claim also survives.

JGR also contends that its computer fraud and trespass are not "in or affecting commerce." ECF No. 116 at 22-23. But JGR's characterization of the impact of its actions is misguided. While the "internal operations" of a business entity are not covered by the UDTPA, conduct that impacts the marketplace is covered. *CRH E., LLC*, 2025 WL 399385 at *16. JGR's argument that Mr. Gabehart's UDTPA claim is an employment dispute ignores that its actions have involved not only JGR, its agents, and Mr. Gabehart, but also Spire, another "market participant." *Alexander v. Alexander*, 250 N.C. App. 511, 518 (2016). JGR's actions are intended to limit Mr. Gabehart's ability to work with Spire, which constitutes a direct effect on a competitor.

Finally, JGR argues that Mr. Gabehart's UDTPA claim should be dismissed because the Counterclaims do not plead any egregious or aggravating circumstances, as required to state a claim under Chapter 75. ECF No. 116 at 24-25. The Counterclaims' allegations that JGR accessed Mr. Gabehart's personal accounts without authorization after his employment ended and that its counsel received privileged attorney-client communications as a result plausibly allege conduct beyond an ordinary breach or accident, sufficient to satisfy the egregiousness requirement at the

pleading stage. *See, e.g.*, *CRH E., LLC*, 2025 WL 399385, at \*16 ("[C]omputer trespass in violation of state law constitutes conduct which a court of equity would consider unfair." (citation modified)); *Matt Logan, Inc. v. Abitz*, No. 25CV025485-400, 2026 WL 1674920, at \*12 (N.C. Super. June 9, 2026) ("Computer trespass may provide a sufficient basis for violation of the UDTPA."); *In re Randolph Hosp., Inc.*, 644 B.R. 446, 471-72 (Bankr. M.D.N.C. 2022) (considering allegations in the aggregate to conclude that plaintiffs alleged egregious conduct sufficient to state a claim for unfair and deceptive trade practices).

JGR's motion to dismiss the UDTPA counterclaim should therefore be denied.

## IV.     CONCLUSION

For the foregoing reasons, Defendant Christopher Gabehart respectfully requests that this Court deny Plaintiff Joe Gibbs Racing, LLC's Motion to Dismiss in its entirety.

If the Court is inclined to grant JGR's motion as to any claims, Mr. Gabehart respectfully requests that the dismissal be without prejudice and requests leave to amend his Counterclaim, as discovery is ongoing.

Respectfully submitted,

This the 29th day of July, 2026.

By: */s/ Cary B. Davis*
    Cary B. Davis
    N.C. Bar No. 36172
    cdavis@rbh.com

    Spencer T. Wiles
    N.C. Bar No. 53664
    swiles@rbh.com

    William M. Miller
    N.C. Bar No. 36946
    wmiller@rbh.com

    Anna Claire Tucker

N.C. Bar No. 59457
atucker@rbh.com

ROBINSON, BRADSHAW & HINSON, P.A.
600 S. Tryon Street, Suite 2300
Charlotte, North Carolina 28202
(704) 377-2536

*Attorneys for Defendant Christopher Gabehart*

21

**Artificial Intelligence Certification**

Pursuant to the Court's June 18, 2024 Order, 3:24-mc-104, I hereby certify that:

- No artificial intelligence was employed in doing the legal research for the preparation of this document, with the exception of such artificial intelligence embedded in standard on-line legal research sources such as Westlaw, Lexis, FastCase, and Bloomberg; and

- Every statement and every citation to an authority contained in this document has been checked by an attorney at this firm and/or paralegal working at their direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

This the 29th day of July, 2026.

/s/ *Cary B. Davis*
Cary B. Davis

22