# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
## CASE NO. 3:26-CV-00133-SCR-DCK

JOE GIBBS RACING, LLC,

       Plaintiff,

v.

CHRISTOPHER GABEHART and SPIRE
MOTORSPORTS II, LLC,

       Defendants.

## SPIRE MOTORSPORTS II, LLC'S OPPOSITION TO JOE GIBBS RACING, LLC'S MOTION TO COMPEL THE PRODUCTION OF ESSENTIAL TECHNICAL DOCUMENTS

Defendant Spire Motorsports II, LLC ("Spire") submits this memorandum in opposition to Plaintiff Joe Gibbs Racing, LLC's ("JGR") Motion to Compel, Dkt. 119.

<u>**INTRODUCTION**</u>

Unable to find evidence supporting its misappropriation claims against Spire, JGR now seeks Spire's most sensitive competitive data—information that also reflects the proprietary and confidential information of Spire's third-party technical partners GM and Hendrick Motorsports. None of these materials resulted from any input from Gabehart, reflect a JGR trade secret, or are relevant here. Spire, 19 Spire employees, and Gabehart have already searched for evidence that Gabehart shared JGR's alleged trade secrets with Spire. There is none.

JGR's motion should be denied for multiple reasons. First, Spire has adequately responded to each at-issue RFP. Second, the setups and analyses JGR now seeks are not responsive to those RFPs. Third, even if responsive, they are not relevant absent evidence that Spire acquired JGR's trade secrets—of which there is none. Fourth, even if relevant, those documents would not prove "implementation" as JGR claims.

<u>**FACTUAL BACKGROUND**</u>

**A.    Spire Acted To Prevent Any Transmission Of JGR Information**

Before this lawsuit began, and before Gabehart began working for Spire, JGR's forensic examiner deleted the JGR materials on Gabehart's devices and found no evidence he had transmitted those materials to anyone. Dkt. 9-4 ¶ 31; Dkt. 20 ¶ 5; see Dkt. 9–4; Dkt. 35–12. Spire nevertheless required Gabehart to sign a non-disclosure agreement and, once litigation began, confiscated his laptop, revoked his systems access, and retained its own forensic examiner to confirm no JGR information had reached Spire's systems. The Court accordingly declined to enter a preliminary injunction against Spire, finding that JGR had not "identified a specific trade secret that [ ] Spire has misappropriated"—let alone that Spire had "acquired, used, or disclosed" any

JGR trade secret, Dkt.78 at 19, and it enjoined only Gabehart from "retaining, transferring, using, or copying" JGR's information, Dkt.78 at 35. JGR does not contend he violated that order.

**B. Discovery Has Not Shown That Spire Acquired Any JGR Trade Secret**

Discovery confirms what Spire has said all along: there is no evidence Spire ever acquired any documents or information JGR contends Gabehart misappropriated. JGR requested documents "related to" and "derived from" its trade secrets but initially refused to identify them, forcing Spire to object on vagueness grounds and agree to search for the file names and contents of the JGR materials deleted from Gabehart's devices. *See* Spire's Objections and Responses to JGR's First Set of Requests for Production (Ex. A). JGR did not identify the trade secrets at issue until July 1, when it identified 204 documents removed from Gabehart's devices. *See* JGR's Second Supplemental Objections and Responses to Spire's First Set of Interrogatories (Ex. B). Spire agreed to search for any documents related to or derived from those materials.

Spire ran 330 search terms—negotiated with JGR under the governing ESI protocol—over documents from 17 custodians, and it responded to 19 third-party subpoenas. None of those documents contain any evidence that the asserted trade secrets were ever transmitted to, received by, or used by Spire. *See* McCall Dep. (Ex. C) 388:17–389:22; Gabehart Dep. (Ex. D) 325:5–11.

Those efforts located only two documents (user files located on Gabehart's Spire laptop) JGR has claimed contain its trade secrets—"CG Master" and "Focus Plan"—which JGR identified as evidence at the preliminary injunction stage. *See generally* Dkt.66. CG Master is a spreadsheet Gabehart created after leaving JGR that JGR contends reflects a format he historically used at JGR, *see* Spire_0000849 (Ex. E); JGR_0000490 (Ex. F), though it was never formally integrated into JGR's official evaluation framework, *see* JGR_0000489 (Ex. G). The Focus Plan is a list of high-level, generic action items for any NASCAR team's success, *see* Spire_0000854–55 (Ex. H), and

2

JGR appears to have abandoned its earlier claim that it is a trade secret, *see* Ex. B at 26–25. Spire's forensic examiner and discovery confirm neither document ever reached anyone at Spire.

### C. JGR Now Seeks To Investigate The Most Sensitive Parts Of Spire's Business

Unable to identify evidence that Spire acquired, let alone used, JGR information, JGR now seeks Spire's *own* sensitive technical materials (the so-called "Priority Documents")—primarily final racecar setup sheets and post-race analysis documents—hoping to find similarities it can recast as evidence of misappropriation.[1] JGR all but admits this is just the beginning, asserting that "the universe of relevant trade secrets is not static" and may include "memorized trade secrets implemented at Spire," JGR's Brief ("Br.") at 6 n.4, even though Gabehart has had no role in Spire's NASCAR Cup Series competition activities. JGR will not stop until it has every Spire competition document, however attenuated. *See* July 16, 2026, email from T. Rice to T. Homesley (Ex. J) (seeking materials from General Motors and Hendrick Motorsports as well).

### ARGUMENT

### I. JGR'S REQUEST FOR PRIORITY DOCUMENTS IS HOPELESSLY VAGUE

As an initial, and independently sufficient matter, JGR's motion should be denied because it is completely unclear what, exactly, JGR's motion seeks. Having abandoned its request for scans, JGR now seeks "setups" and "post-race analysis"—terms with no fixed meaning or settled documentation convention, each potentially spanning numerous variables, tools, and formats. *See* McCall Dec. ¶ 17. Indeed, "setups" is an undefined term that could encompass hundreds of data

---

[1] JGR initially demanded that Spire also produce its Bolt6 scans and Hawkeye scans—scans taken of Spire's vehicles that measure how closely Spire's car's surfaces and aerodynamic characteristics conform to NASCAR's regulations. However, JGR dropped its request for Hawkeye scans in its brief, Br.4 n.2, and on July 23 informed counsel for Spire by email that it also withdrew its request for Bolt6 scans. *See* July 23, 2026, email from C. Walker to T. Homesely re: JGR v. Gabehart/Spire: Bolt 6 Scans (Ex. I).

points, in multiple different iterations. JGR offers no precise definition. Additionally, JGR on July 31 communicated to Spire an offer to withdraw its request for all aerodynamic data—including aerodynamic data contained in Spire's setups—as well as any data from General Motors (Spire's OEM). But JGR's proposal did not appear to contemplate the fact that much of what Spire considers to be its "post race analysis" documents contain ample aerodynamic data points, as well as reproductions of reports and analysis authored by GM. Absent formal confirmation from JGR as to the specifics of its proposal to limit the scope of its Motion to Compel, Spire is unable to meaningfully consider JGR's offer. Spire's ability to respond to this Motion has been prejudiced by JGR's eleventh hour about face.

## II. SPIRE HAS SATISFIED ITS DISCOVERY OBLIGATIONS

### A. Spire Properly Responded To RFPs 11, 12, And 21

As a threshold matter, JGR's motion should be denied because Spire has adequately responded to RFPs 11, 12, and 21. RFPs 11 and 12 seek documents "relating to" or "created or derived" from JGR's confidential information and trade secrets. *See* Ex. A at 17–18. Spire initially objected because those requests required guessing what JGR considered a trade secret, but once JGR identified the 204 at-issue documents, Spire searched for documents containing, referencing, or reflecting those materials, or any portion thereof. That search yielded only two responsive documents, which Spire produced: the CG Master spreadsheet and the Focus Plan. And to be clear—Spire searched for, and would have produced, any documents reflecting the transmission to, or use of, this document by anyone at Spire. No such documents exist. Thus, Spire's production of CG Master and Focus Plan refutes JGR's accusation that Spire "has categorically refused to produce anything beyond what hits on a filename search." Br.12. Neither document would have surfaced from a filename search alone, as neither was on JGR's list of deleted files—confirming that Spire's review reached the substance, not just the file names, of the documents JGR identified.

RFP 21 seeks documents reflecting changes in Spire's Cup Series performance or processes after Gabehart began working for Spire, including communications attributing any change to him. *See* Ex. A at 27. But Spire makes countless process adjustments every season—most obviously, it changes the setup on every racecar before every race—and this lawsuit concerns only Gabehart's alleged misappropriation, so RFP 21 is overbroad and the only conceivably relevant changes are those involving him. There are none. Indeed, Spire's competition director, Matt McCall, testified that "there's nothing [Gabehart] has been doing for the competition side," explaining that competition decisions rest with McCall, the crew chiefs, and Dax Gerringer, Ex. C at 277:14–15, and six Spire competition-side employees confirmed the same in sworn declarations already before this Court, *see* Dkts.104-1–104-6. Contrary to JGR's complaint, this does not let Spire unilaterally decide whether a change is "attributable" to Gabehart, Br.12; rather, Spire questioned its competition personnel and searched for documents reflecting any Gabehart involvement in setups, strategy, analytics, or engineering, and for communications attributing any performance change to him. It found nothing, which is unsurprising, given that Gabehart, an executive officer, has not been involved in these activities. That reasonably diligent search satisfied Spire's obligations under Rule 34. *See Global Dimensions, LLC v. Tackett*, 2024 WL 3460104 (E.D.N.C. July 18, 2024) (litigants "must make a good-faith effort to locate responsive documents and produce them if any are located" (citation omitted)). Spire has also produced documents reflecting even *tangential* Gabehart involvement—down to emails and calendar invites on which he was merely copied—and 19 Spire employees have produced responsive text messages with Gabehart that would reflect any sharing of JGR's setups had that occurred.

**B.      The Priority Documents Are Not Responsive To RFPs 11, 12, and 21**

The Priority Documents JGR now demands are not responsive to RFPs 11, 12, or 21, which seek documents "related to" and "derived from" JGR's confidential information and trade secrets.

Spire has no such documents because it does not possess such JGR information, and it never has. JGR now demands all of Spire's core competition documents so it can unilaterally decide, after production, whether it believes some connection exists. That is a fool's errand. To be clear— there is absolutely no evidence that Spire has ever had access to—let alone used or implemented— JGR's setups. Rather, discovery and testimony confirm that Spire's setups and analyses are generated independently in the ordinary course of business, using aerodynamic information and simulation tools from GM, recommendations from HMS, and the input of Spire's own engineers— not anything originating from JGR. Ex. C 27:17–19; 43:19–21; 379:9–10. Because Spire's setups and analytics are not "related to" or "derived from" JGR's asserted trade secrets, they fall outside RFPs 11 and 12 regardless of any general topical overlap. Other than CG Master, already produced, JGR identifies no Spire document related to or derived from any of the 204 asserted trade secrets, nor any Cup Series setup or post-race analysis involving Gabehart responsive to RFP 21. What JGR actually seeks is unfettered access to Spire's most sensitive competitive records, under its own undefined standard, untethered from the RFPs' language. But JGR, as "the master of its production requests," "must be satisfied with what it asks for," *In re Health Diagnostics Laboratory, Inc.*, 2024 WL 2930904 (E.D. Va. June 10, 2024) (citation omitted), and this Court may not "rewrite" RFPs 11, 12, and 21 because JGR wishes it had asked for more, *see Cohen v. Norcold, Inc.*, 2022 WL 17365231 (E.D.N.C. Dec. 1, 2022).

JGR's own conduct confirms the point: after filing this motion, JGR served a second set of RFPs specifically seeking Spire's setup and post-race analysis materials. *See* JGR's Second Set of RFPs to Spire (Ex. K). This confirms the Priority Documents are not fairly encompassed by RFPs 11, 12, or 21, and JGR's demand for an order compelling them is premature until Spire responds and the parties meet and confer.

6

**III.**     <u>**THE PRIORITY DOCUMENTS ARE NOT RELEVANT OR PROPORTIONAL**</u>

Even if Spire's discovery efforts were insufficient as to RFPs 11, 12, and 21, JGR's motion should still be denied because the Priority Documents are neither relevant nor proportional to the needs of the case. Discovery must be relevant to a claim or defense and proportional considering, among other things, the importance of the issues, the parties' relative access to information, and whether the burden of the proposed discovery outweighs its likely benefit, and JGR bears the burden of establishing both. Fed. R. Civ. P. 26(b)(1). Relevance turns on the elements of the claim, *Brown v. Ford Motor Co.*, 10 Fed. App'x 39 (4th Cir. 2001), not the moving party's preferred narrative, and courts may deny discovery that is irrelevant, disproportionate, or only marginally relevant when its burden outweighs its value. *Avalon Ctr. Inv. Co. v. Com. Defeasance, LLC*, 2010 WL 4226243, at \*1 (W.D.N.C. 2010).

    **A.**     **The Priority Documents Are Irrelevant Absent Threshold Evidence That Spire Ever Acquired JGR's Trade Secrets—Making JGR's Requested Discovery Disproportionate**

JGR's trade-secret claims require proof that Spire acquired, disclosed, or used a valid trade secret. 18 U.S.C. § 1839(5); N.C. Gen. Stat. §§ 66-152, 66-155. A defendant cannot use or disclose a trade secret it never acquired, so acquisition is the logical predicate to JGR's theory. *See Brightview Grp., LP v. Teeters*, 441 F. Supp. 3d 115, 132–33 (D. Md. 2020) (recognizing that misappropriation may be shown "by demonstrating that the defendant acquired the trade secret by improper means, even if the plaintiff cannot show use of that trade secret"). Before ordering production of Spire's most sensitive technical records, the Court should require at least a scintilla of evidence that an identified JGR trade secret reached Spire in some capacity.

JGR does not even attempt that showing: after months of discovery, JGR points to no evidence even remotely suggesting that Spire ever acquired any of the 204 at-issue trade secrets. There is no evidence any of those documents ever appeared on Spire's systems or in the possession

of any Spire custodian—unsurprising, since JGR's forensic examiner deleted these materials from Gabehart's devices before he joined Spire, Dkt. 9–4 ¶ 31, and Spire confiscated his laptop and cut off his system access. Spire's witnesses confirm Gabehart has not shared any JGR confidential information with Spire, directly or indirectly. *See* McCall Dec. ¶¶ 9–12; Ex. C 387:17–19; Dkts.104-1–104-6. Gabehart testified he has never even seen Spire's setups. Ex. D 78:3–5.

JGR's suggestion that Gabehart committed JGR's trade secrets to memory, Br.6 n.4, does not justify broadening discovery into the Priority Documents. JGR never explains what Gabehart supposedly memorized (or how it is humanly possible to memorize the hundreds of correlated data points forming a setup), or how Spire supposedly used it. *See* McCall Dec. ¶ 18. And in any event, the law does not treat an employee's general knowledge and experience as a trade secret, *RLM Comm's, Inc. v. Tuschen*, 66 F. Supp. 681, 696 (E.D.N.C. 2014), because "equity has no power to compel a man who changes employers to wipe clean the slate of his memory," *Engineering Associates, Inc. v. Pankow*, 268 N.C. 137, 139 (1966). North Carolina also rejects the inevitable disclosure doctrine, *Analog Devices, Inc. v. Michalski*, 157 N.C. App. 462, 470–71 (2003), so JGR cannot obtain Spire's technical files merely by asserting that Gabehart's experience will inevitably result in disclosure of unidentified, memorized trade secrets.

JGR's primary argument—that the Priority Documents are the "central mechanism for testing the extent to which" Spire implemented JGR's trade secrets, Br.5—puts the cart before the horse, because implementation cannot occur unless Spire first acquired the information. JGR's theory assumes Spire has trade secrets to implement without any proof of possession or other nexus between the Priority Documents and its claims. This is especially important given the August 31 fact-discovery deadline, which counsels requiring threshold evidence of acquisition before ordering discovery of Spire's most sensitive materials on an unproven premise.

JGR's claim that the record is "replete" with circumstantial evidence of Spire's misappropriation, Br.1, is false.

First, JGR relies on Gabehart's conduct—his possession of later-deleted or returned JGR materials and deleted communications with Dickerson—as circumstantial evidence of misappropriation by Spire. Br.8. But none of that shows Spire received or possessed those materials, the necessary predicate to implementation-related discovery, and JGR offers no basis for drawing an adverse inference against Spire from a co-defendant's alleged conduct.

Second, JGR overstates CG Master (Ex. E), arguing it contains "diagnostic categories . . . unique to JGR's methodology." Br.9. Not so: Gabehart testified he created both the JGR-side CC Audit framework and CG Master personally, that CC Audit merely helped him "subjectively evaluate" crew chiefs' thoughts and did not reveal JGR's race-analysis methodology, and that he recreated CG Master from memory on his personal laptop using public information and his own subjective categories. *E.g.*, Ex. D 294:10-13; 295:5–6. At most, CG Master reflects Gabehart's subjective concepts and public information—not any formal JGR methodology or protectable trade secret—and JGR's own documents confirm it did not consider integrating CC Audit into its "main data and analysis infrastructure" until January 2026, well after Gabehart left JGR. *See* Ex. F. CG Master also contains no setup information and cannot justify inquiry into Spire's setups. Gabehart never shared it with anyone at Spire, and Spire has never used it.

Third, JGR contends that "third-party wind tunnel data suggests that Spire implemented JGR's proprietary aerodynamic design," pointing to a Pocono wind tunnel audit allegedly showing Spire's aerodynamic coefficients are more similar to JGR's than to Hendrick's (another GM team). Br.10. But that document shows JGR's No. 54 car is substantially more aerodynamic than Spire's No. 7 car (or any other car inspected that day) in both downforce and drag—meaning Spire remains

far behind JGR—so it permits no inference that Spire's steady, multi-year improvement has anything to do with JGR's data. *See* Spire_0001441–44 (Ex. L).

Fourth, Spire's on-track improvement is likewise not evidence of misappropriation. Improved results in a competitive sport do not show acquisition, use, or disclosure of JGR information, particularly where Spire has steadily improved each year. *See Propulsion Technologies, Inc. v. Attwood Corp.*, 369 F.3d 896, 905 (5th Cir. 2004) (affirming judgment as a matter of law for defendant despite proof of increased profits because "there is no evidence that [defendant] used [plaintiff's] trade secrets to generate those profits"). JGR's effort to parlay Spire's outcome-based performance into unfettered technical discovery is unwarranted.

Fifth, the information JGR seeks necessarily implicates sensitive and proprietary data provided to Spire by General Motors ("GM") and Hendrick Motorsports ("HMS"), both of which have confidentiality interests in that information. Spire's setups are derived in part from HMS recommendations, its post-race analysis documents incorporate, verbatim, analytical reports prepared by GM, and many of Spire's technical documents are housed on software platforms created by or shared with these third parties. *See* Declaration of Jeffrey Andrews. Allowing JGR this discovery would subvert GM's and HMS's confidentiality and proprietary expectations and give JGR access to its non-party competitors' sensitive, confidential, and proprietary information.

These considerations confirm that JGR's request fails Rule 26(b)(1)'s proportionality test—regardless of relevance. JGR's written discovery responses further confirm the disproportionality of its request, as JGR has not been able to identify a single harm—lost race, revenue, sponsor, etc.—that JGR has experienced as a result of the alleged conduct in this lawsuit. *See generally* JGR's Supplemental Responses to Spire's Second Set of Interrogatories (Ex. M).

## B. The Priority Documents Would Not Prove Use In Any Event

JGR's motion should also be denied because the Priority Documents would not prove implementation or use in any event. JGR's theory is that Gabehart carried JGR setup or post-race analysis concepts to Spire and that Spire altered its own work to mimic JGR. The requested documents cannot prove that theory. Starting with setups, JGR has never identified which of the asserted trade secrets would allow Spire to replicate JGR's final race setups. Nor could it—the only setup materials among the identified trade secrets are simulation files that do not reflect most inputs and, critically, do not show which adjustments JGR ever implemented on its racecars. *E.g.*, JGR_0003022.[2] Comparing JGR's and Spire's setups fails for other reasons, as well.

*First*, a setup is not a single, comparable data point, but the cumulative product of hundreds of interdependent engineering decisions. McCall Dec. ¶ 17. A setup incorporates geometry, springs and shocks, aerodynamics, brakes, powertrain tuning, ballast, and dozens of other variables that interact with one another, such that changing even one component typically requires corresponding downstream adjustments. *Id.* Given that interdependency, it would be virtually impossible to isolate a single adjustment on a Spire car and attribute it to JGR's information, as opposed to the countless engineering decisions Spire's own personnel made independently, informed by Spire's historical data and HMS's recommendations.[3] *Id.*

*Second*, Spire and JGR use outerbodies from different OEMs—Toyota for JGR, Chevrolet for Spire—so the same underbody adjustment would interact differently with each car's aerodynamic profile, meaning even a complete and accurate JGR setup sheet would have no utility

---

[2] JGR's produced JGR_0003022 (and dozens of similar documents) in a "clean room," so Spire is unable to attach the document as an exhibit to this motion. *See* Dkt. 122.

[3] Additionally, Chevrolet redesigned the outerbody for the Chevrolet Camaro ZL1, which Spire uses, earlier this year—requiring changes to Spire's setups for reasons unrelated to JGR.

if applied to a Spire car.  McCall Dec. ¶ 24.  *Third*, any similarity between JGR and Spire's setups would prove nothing because the laws of physics are constant, and skilled engineers working within NASCAR's tolerances will naturally converge on similar solutions.  Every Cup Series team races the same NASCAR-specified chassis and underbody under the same rules and constraints, so teams can be expected to arrive at similar solutions independently.  *Id.*

*Finally,* any valid comparison would require historical and current setup data from *every* Cup Series team to determine whether any similarity between Spire and JGR is a true outlier or simply reflects the convergence expected among cars competing under the same rules and constraints.  McCall Dec. ¶ 24–25.  Without that analysis, any isolated comparison would have no evidentiary value and could not fairly support an inference of misappropriation.  *Id.*  Thus, if the Court grants JGR's request, it should order reciprocal discovery (including production of 2025 and 2026 final setups) from JGR for an initial comparison before further third-party discovery ensues.

JGR's request for post-race analysis documents fares no better.  The phrase is undefined and could cover any debrief, report, note, metric, chart, or evaluation generated after a race, without identifying any JGR comparator.  Much of what Spire generates in this category implicates data provided to it by third parties like GM and HMS.  McCall Dec. ¶ 21.  The only concrete JGR document here is CC Audit, which Gabehart testified—and JGR's documents confirm—was not a formal JGR methodology but a personal framework he used to subjectively evaluate races.  Ex. D 294:10-13; 295:5–6.  Spire produced the only comparable document, CG Master, which  Gabehart created, on his personal laptop, from public information, using his own subjective criteria.  *Id.*

### CONCLUSION

JGR's motion to compel should be denied.

*/s/ Joshua D. Davey*

Joshua D. Davey (N.C. Bar No. 35246)
Jason D. Evans (N.C. Bar No. 27808)
Lawrence J. Cameron (N.C. Bar No. 41922)
Troy C. Homesley, III (N.C. Bar No. 62148)
Anais M. Jaccard (N.C. Bar No. 58438)
Benjamin E. Whorf (N.C. Bar No. 64279)
TROUTMAN PEPPER LOCKE LLP
301 S. College St., 34th Floor
Charlotte, NC 28202
Telephone: (704) 916-1503
joshua.davey@troutman.com
jason.evans@troutman.com
lawrence.cameron@troutman.com
troy.homesley@troutman.com
anais.jaccard@troutman.com
ben.whorf@troutman.com

John S. "Evan" Gibbs III – Pro Hac Vice
TROUTMAN PEPPER LOCKE LLP
600 Peachtree St, NE #3000
Atlanta, GA 30308
Telephone: (404) 885-3093
evan.gibbs@troutman.com

13

## CERTIFICATE OF SERVICE

I hereby certify that on July 31, 2026, I filed the foregoing Spire's Memorandum of Law in Opposition to JGR's Motion to Compel through the Court's ECF system, which will serve all counsel of record.

Dated: July 31, 2026.

*/s/ Joshua D. Davey*