IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| JOE GIBBS RACING, LLC,<br><br>Plaintiff,<br><br>v.<br><br>CHRISTOPHER GABEHART and SPIRE MOTORSPORTS II, LLC,<br><br>Defendants. | Case No. 3:26-CV-00133-SCR-DCK |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR ORDER TO SHOW CAUSE WHY DEFENDANTS SHOULD NOT BE HELD IN CONTEMPT FOR VIOLATING THE TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

**FILED UNDER SEAL**

## TABLE OF CONTENTS

BACKGROUND .......... 2

I. The Court's Orders Against Gabehart .......... 2

A. The Court's temporary restraining order against Gabehart .......... 2

B. Counsel's representations at the preliminary injunction hearing .......... 3

C. The Court's preliminary injunction against Gabehart .......... 4

II. Gabehart Has Provided NASCAR Cup Series Competition Services to Both JGR and Spire. .......... 5

A. Gabehart began providing Cup Series competition services to Spire before both his first official day and the TRO. .......... 6

B. Gabehart has continued to provide Cup Series competition services since the Court entered the TRO. .......... 9

C. Spire has enabled Gabehart's provision of Cup Series competition services. .......... 13

III. Gabehart Retained JGR Confidential Information and Trade Secrets after the Orders. .......... 14

LEGAL STANDARD .......... 16

ARGUMENT .......... 17

I. The Evidence Supports Holding Gabehart and Spire in Contempt for Violating the Orders. .......... 17

A. Gabehart and Spire have knowledge of all the Orders, and the Orders, which are in JGR's Favor .......... 17

B. Gabehart and Spire have knowingly violated the Order through Gabehart's provision of Cup Series competition services for Spire. .......... 17

C. Gabehart violated the Court's Orders by knowingly retaining JGR confidential information and trade secrets. .......... 23

D. JGR Suffered Harm from Gabehart and Spire's Violations .......... 24

II. Gabehart and Spire Did Not Take Reasonable Steps to Comply with the Orders. .......... 24

CONCLUSION .......... 25

Defendants Christopher Gabehart and Spire Motorsports II, LLC ("Spire") have violated the Court's March 2 temporary restraining order ("TRO") and April 23 preliminary injunction ("PI" and, together with the TRO, the "Orders") in two independent respects. Gabehart has provided Spire services of the general type that he provided to JGR in the final year of his employment, and Spire, with full knowledge of the Orders, aided and abetted Gabehart's provision of those services. Gabehart has also violated the Orders by retaining JGR confidential information and trade secrets.

The record on the first violation is extensive. For example, seven weeks after the TRO, at an April 20 Cup Series competition meeting following the Kansas race, Gabehart made technical recommendations for improving power and aerodynamics on Spire's Cup Series race cars—recommendations that track JGR proprietary quality-control and production procedures JGR developed during his tenure. He did not stop when the PI issued: at a May 18 post-race competition meeting nearly a month after the entry of the PI, Gabehart solicited driver input on ride quality and proposed a way to streamline Spire's back-up car process. Gabehart's own testimony confirms the pattern. He has testified that his job "has not changed" since joining Spire—and the evidence establishes that before the TRO he was using JGR trade secrets to analyze the performance of Spire's cars at Cup Series races and providing input on a Spire car's setup, disclosing JGR trade secrets in the process. By his own account, then, that work continued after the TRO issued.

The documentary record confirms that admission. On November 7, 2025—days before his termination—Gabehart photographed JGR's CC Audit, a comprehensive post-race audit and analysis of team and driver performance for the entire 2025 Cup Series season that this Court has already found to be a trade secret, including its proprietary formula for designating a "[redacted]" Gabehart then created and populated his own version of that audit, the "CG

Master," and used it to evaluate Spire's Cup Series performance. An operationalized copy of the CG Master was recovered from Gabehart's Spire-issued computer, and the version he continued to fill in—which contains Spire results from the Daytona, Atlanta, and COTA races—was last modified on March 5, 2026, three days after the Court entered the TRO. Gabehart thus used a JGR trade secret to analyze Spire's Cup Series performance both before and after the TRO issued.

Spire is liable in its own right. It permitted Gabehart to attend and actively participate in Cup Series competition meetings while knowing the Orders barred him from providing services of the general type he performed for JGR—the very services he provided at those meetings.

Gabehart's retention of JGR confidential information and trade secrets after the Orders is a second, independent violation, and the evidence establishing it is undisputed. Gabehart's own counsel has admitted that he retained JGR confidential information and trade secrets—including Cup Series race setups, a category of information the Court has already found to be trade secrets—on an undisclosed personal OneDrive account until at least June 2026, months after both Orders issued. On this record, both Gabehart and Spire should be held in civil contempt.

## BACKGROUND

### I. The Court's Orders Against Gabehart

#### A. The Court's temporary restraining order against Gabehart

On March 2, 2026, this Court granted in part JGR's motion for a temporary restraining order. *See* Text-Only Order (March 2, 2026). On March 5, the Court confirmed its TRO by written order, explaining that JGR had shown a likelihood of success on both its breach of contract and trade secret misappropriation claims and that the loss of trade secrets in a competitive racing industry works "immediate and irreparable harm to JGR's ability to compete." TRO at 8–10 (Dkt. 26). Although the Court permitted Gabehart to retain his position at Spire, it ordered that "he cannot perform the same duties that he performed at JGR in the year prior to his termination." *Id.*

at 10. The Court noted that Gabehart's responsibilities for JGR included "preparation and execution of JGR's car and race strategies, and overseeing development and improvement of analytics, processes, and procedures to improve race performance." TRO at 2.

The TRO ordered Gabehart to (i) cease retaining, transferring, using, or copying JGR's confidential information and trade secrets; (ii) cease and desist from using or disclosing JGR's confidential information or trade secrets, and (iii) return any JGR confidential information or trade secrets in his possession to JGR. *Id.* at 11. Further, the TRO restrained Gabehart from violating section 6 of his employment agreement with JGR, which prohibits him from providing services of the same general type that he provided to JGR in the year prior to his termination. *Id.* at 12. The Court expressly declined to require Gabehart to resign from Spire, permitting him to provide "[o]ther services not performed at JGR in the year prior to his termination." *Id.* The Court ultimately extended the TRO through April 23, 2026. *See* Text-Only Order (March 16, 2026); Text-Only Order (March 26, 2026); Text-Only Order (April 9, 2026); Text-Only Order (April 16, 2026); Text-Only Order (April 21, 2026).

### B. Counsel's representations at the preliminary injunction hearing

The Court held its preliminary injunction hearing on March 26, 2026. Representations by counsel at that hearing bear directly on the violations described below.

For instance, Spire's counsel affirmatively represented that Spire had searched Gabehart's Spire-issued laptop and its systems for JGR's information and found none. Counsel told the Court: "[W]e have reviewed the laptop that Mr. Gabehart was given by Spire. We've preserved it. We've preserved Spire's computer system network, and we've searched it for the information that they've identified as JGR information." Ex. A, PI Hr'g Tr., at 54:24–55:2. The Court pressed the point specifically as to Gabehart's post-race audit spreadsheet (the "CG Master," Ex. B, GABEHART00222)—which the Court noted was strikingly similar to JGR's proprietary CC

Audit, a comprehensive post-race audit that Gabehart photographed on November 7, 2025 and the Court found to be a trade secret. PI at 17–18. The Court asked Spire's counsel: "have you-all looked for a version of that on your system?" Ex. A, PI Hr'g Tr., at 65:18–19. Counsel for Spire told the Court: "We haven't found it, and we don't think there's any evidence that ties it all together." *Id.* at 68:11–12.

However, Spire's own verified interrogatory responses reveal that on March 13—almost two weeks before the preliminary injunction hearing—its forensic examiner identified a version of Gabehart's post-race audit spreadsheet, the CG Master on Gabehart's Spire-issued laptop. Ex. D, Spire R&Os to 1st JGR ROGS, at 28. Further, Spire revoked Gabehart's access to its email, Teams, OneDrive, and SharePoint systems "out of an abundance of caution" specifically because it located the CG Master—as well as Gabehart's Spire-branded "Focus Plan," a roadmap for implementing JGR trade secrets at Spire, *see* Ex. C, GABEHART00094—on Gabehart's work laptop. Ex. D, Spire R&Os to 1st JGR ROGS, at 20.[1] Nevertheless, Spire's counsel represented to the Court that it had not found the CG Master on its "system" without disclosing that the document had already been identified on Gabehart's Spire-issued device.

### C. The Court's preliminary injunction against Gabehart

On April 23, 2026, this Court found JGR had established a likelihood of success on the merits of its misappropriation of trade secret and breach of contract claims against Gabehart and entered a preliminary injunction enjoining Gabehart. PI (Dkt. 78) at 34. The PI noted that the post-race audit and Focus Plan produced by Gabehart "appear[ed] to [have been] created by Gabehart using JGR's Confidential Information and trade secrets." *Id.* at 8. However, relying on the absence

[1] Spire also disclaimed any knowledge of how Gabehart's "Focus Plan"—a roadmap Gabehart created for implementing JGR trade secrets and confidential information at Spire—came to appear on Spire letterhead in a Spire-branded presentation. *See* Ex. C, GABEHART00094; Ex. A, PI Hr'g Tr., at 54:16–17.

of evidence connecting JGR's information to Spire, the Court found that JGR "ha[d] not clearly shown that Spire acquired, used, or disclosed any of the JGR trade secrets," PI at 19, and noted that Spire "searched its company files and, to date, maintains it has not identified any of JGR's trade secrets in its possession," PI at 22.

The PI reiterated the TRO's prohibitions on retaining, using, or disclosing JGR's confidential information and trade secrets and its order for Gabehart to return any such information in his possession to JGR and restrained him from violating section 6 of his employment agreement with JGR by "providing services of the general type" that he provided to JGR in the final year of his employment. *Id.* at 34–35. As with the TRO, the Court did not require Gabehart to resign or prohibit him from working for Spire and noted that he could attend Cup Series races so long as he did not violate section 6 of his employment agreement with JGR. *Id.* As a preliminary injunction under Rule 65, the PI binds not only Gabehart but all persons in active concert or participation with him. FED. R. CIV. P. 65(d)(2).

## II. Gabehart Has Provided NASCAR Cup Series Competition Services to Both JGR and Spire.

The Orders require Gabehart to adhere to section 6 of his employment agreement with JGR, prohibiting him from providing Spire with "services of the general type" as those he provided to JGR in the year prior to his termination. The PI explains that as competition director, "Gabehart's responsibilities included preparation and execution of JGR's car and race strategies, and overseeing development and improvement of analytics, processes, and procedures involved in the NASCAR Cup Series and the NASCAR O'Reilly Auto Part[s] Series;" Gabehart also served as crew chief for the No. 54 car for a portion of the 2025 season. PI at 3.

JGR's competition director, Walter Brown—who held the same position before and after Gabehart and worked directly with him from 2012 to 2025—has described the weekly competitive

cycle that the role requires and confirmed that Gabehart "performed the same core functions and participated in the same weekly competitive cycle." Ex. F, 2nd Brown Decl. (Dkt. 35-1), ¶¶ 4–9. Brown's sworn declaration establishes that, in the year prior to his termination, Gabehart, among other things: participated in JGR's weekly Monday competition meetings, where he engaged in detailed technical and analytical discussions regarding car setups and performance data; communicated priorities and guidance to team personnel through direct conversations and follow-up discussions; attended additional technical meetings including pit crew, race engineering, and car performance meetings; and participated in post-race technical inspections and debriefing activities. *Id.* ¶¶ 11–21, 28, 35–36, 49–50.

Gabehart corroborated Brown's description, testifying that he attended and participated in multiple recurring competition meetings each week; provided input on car setups, aerodynamics, and performance, as well as race strategy to crew chiefs and engineers; participated in post-practice and qualifying debriefs; and monitored all four teams' private intercoms and data streams during races. Ex. G, Gabehart Dep. Tr., at 43:4–19, 50:13–16, 51:9–25, 55:18–56:19, 58:12–60:3. Notably, Spire does not dispute that Gabehart provided these services to JGR in the final year of his employment. *See* Ex. H, Spire 30(b)(6) Dep. (Dickerson) Tr., at 11:16–19:2.

### A. Gabehart began providing Cup Series competition services to Spire before both his first official day and the TRO.

Throughout this litigation, Defendants have insisted that Gabehart has had no involvement in Cup Series competition at Spire. *See* Ex. A, PI Hr'g Tr. at 91:19-22; 94:24-25 (Gabehart's counsel: "Chris is not violating the noncompete."); Ex. I, McCall Dep. Tr., at 277:9-15; 257:13-258:24 (testifying that "there's nothing [Gabehart] has been doing on the competition side" and that he was "literally just observing and reporting back" to Jeff Dickerson); Ex. J, Dickerson Dep.

Tr., at 196:15–18 (testifying that Gabehart is "not in any Cup-related meetings"). This position is flatly contradicted by the record.

Defendants claim that Gabehart's first day at Spire was February 16, 2026. *See* Dkt. 45, Spire Br. in Opp. to Mot. for TRO & PI, at 11 ("Gabehart did not begin working for Spire until February 16, 2026, and signed his employment agreement with Spire the next day." (citing Dkt. 45-3, W. Anthony Decl., ¶ 19l; Dkt. 20, H. Masterson Decl., ¶¶ 5, 8)). But on February 14, 2026—two days before his purported first day—Gabehart was already communicating with Spire's Cup Series competition director, Matt McCall, about the performance of Spire's No. 7 car and receiving detailed pit-stall assignment diagrams for the upcoming Daytona 500. Ex. K, GABEHART01459-61. The next day, during the Daytona 500 itself, Gabehart was physically in Spire's war room, sitting next to Spire's Cup Series technical director, Dax Gerringer, and providing real-time race observations and commentary to Spire co-owner Jeff Dickerson via text.[2] Ex. L, GABEHART01649, at GABEHART01650. Gabehart told Dickerson he was "sitting next to Dax" and had "a couple of observations" about the race, providing input on race execution and strategy. *Id.*; Ex. G, Gabehart Dep. Tr. at 284:1–285:25. Dickerson later confirmed that he wanted Gabehart in the war room during races "to pick up . . . what we're doing here." Ex. J, Dickerson Dep. Tr., at 233:2–234:8.

Gabehart then put JGR's trade secrets to use for Spire, operationalizing the CG Master document about which the Court expressed concerns during the preliminary injunction hearing and using it to analyze Spire's performance at the Daytona 500. Ex. M, Spire_0000849. Gabehart admits that he moved this document from his personal computer to his Spire-issued computer but

---

[2] JGR notes that Spire also provided sworn testimony through the declaration of Heather Masterson that "[b]efore February 16, 2026, Mr. Gabehart had not come into Spire's shop in Mooresville, North Carolina for the purpose of performing services for Spire. As a result, for example, Mr. Gabehart was not in attendance at the Daytona 500, which took place on February 15, 2026." Dkt. 20, Masterson Decl., ¶ 5.

was unable to provide any explanation for why the document appeared to have been moved to "recycle bin" in—i.e., deleted from—his work computer. Ex. G, Gabehart Dep. Tr., at 297:17–298:25.

The next week, Gabehart continued to attend and actively participate in Spire's competition meetings following the Cup Series race in Atlanta. Spire technical director Dax Gerringer's contemporaneous notes from the Atlanta post-race meetings reflect Gabehart's attendance and participation. Ex. N, Gerringer Dep. Ex. 4., at Spire_0002051-52; Ex. O, Gerringer Dep. Tr. at 172:9–183:25. A video recording of a Spire Cup Series competition debrief meeting on February 23 show Gabehart discussing several competition topics—[redacted] and [redacted] Spire_001687 at 20:17–22:00.[3] And, as with Daytona, Gabehart used the CG Master and JGR's confidential information and trade secrets to analyze the performance of Spire's cars in Atlanta. Ex. P, GABEHART01500. Exhibit P (GABEHART01500) is another version of Exhibit B (GABEHART00222) and Exhibit M (Spire_000849). While GABEHART000222 has no data filled in for Spire performances at 2026 races, and Spire_000849 has data only from Daytona, GABEHART01500 contains data from the Daytona, Atlanta, and Circuit of the Americas ("COTA") races, and its metadata indicates that ***it was last modified by Gabehart on March 5, 2026, after the Court entered the TRO***. *See* Text-Only Order (March 2, 2026).

[3] Spire initially produced a redacted version of the video recording of this meeting. *See* Ex. AD, Spire_0001487. After JGR demanded the production of an unredacted version, Spire produced an unredacted video (Spire_0001687) in the "secured room." The unredacted video reveals that Spire redacted portions of Gabehart's statements at the beginning of the meeting as well as portions of his pit-stop statements. *Compare* Spire_0001487 *with* Spire_0001687 at 6:26–10:34, 20:17–45, *and* 21:31–22:00. JGR is therefore unable to provide the Court with the unredacted video and has asked Spire to do so upon the filing of the present motion, which it has refused to do.

At the COTA Cup Series race on March 1, 2026, Gabehart went further still. Travis Peterson, Spire's crew chief for the No. 71 car, testified that he asked Gabehart how Spire's tire pressure compared to JGR's for qualifying sessions at COTA because Peterson [redacted] and that Gabehart told him that [redacted]. Ex. Q, Peterson Dep. Tr., at 165:21–166:20. Peterson further testified that Gabehart told him [redacted]. *Id.*, Peterson Tr. at 166:25–169:25. Not only did Gabehart disclose proprietary information regarding JGR setups to Peterson, but he continued to use the CG Master and JGR's confidential information and trade secrets to analyze Spire's performance at COTA. *See* Ex. P, at GABEHART01500.

**B. Gabehart has continued to provide Cup Series competition services since the Court entered the TRO.**

The primarily[4] pre-TRO conduct detailed above is particularly significant because Gabehart has admitted that his role in Spire's Cup Series competition has not changed since the TRO. When asked whether at some point in his time at Spire he had scaled back his involvement in Cup Series competition at Spire, Gabehart testified: "No." Ex. G, Gabehart Dep. Tr. at 280:17–23. When asked whether there was ever a directive from anyone at Spire that he needed to change what he was doing with respect to Cup Series competition, he answered: "There has been no change in my job." *Id.* at 281:1–4. And Spire did not pull Gabehart from Cup Series competition meetings until "late May or early June"—several months after the TRO. Ex. H, Spire 30(b)(6) Dep. (Dickerson) Tr., at 56:22–57:6. Thus, taking Gabehart at his word, the same competition

[4] Though discussed in the pre-TRO section, Gabehart used JGR's CC Audit and [redacted] trade secrets ***after*** the Court entered the TRO on March 2.

services he provided to Spire's Cup Series teams before the TRO continued unabated after the Court ordered him to stop.

The post-TRO evidence confirms as much. On March 21, 2026, while the TRO was effective, Gabehart discussed technical details and issues regarding Spire's No. 77 and No. 71 cars with Matt McCall, Spire's Cup Series competition director. Ex. R, MCCALL_0062, at MCCALL_0063–065. A week later, on March 28, 2026, Spire's top Cup Series driver Carson Hocevar relayed specific technical difficulties with his car to Gabehart by text message, and Gabehart responded: "[s]top." Ex. S, HOCEVAR_0051, at HOCEVAR_0052. And Gerringer confirmed that Gabehart attended multiple post-race Spire Cup Series competition meetings since the TRO and made substantive technical comments at each. Ex. O, Gerringer Dep. Tr. at 169:7–170:7; 173:5-174:5, 178:19–181:24, 184:4–186:24; Ex. N, Gerringer Dep. Ex. 4.

One meeting bears particular emphasis. Gerringer confirmed that Gabehart attended Spire's competition meeting on April 20, 2026 after the Cup Series race in Kansas. Gerringer's contemporaneous notes recorded Gabehart making two specific technical recommendations: to [redacted]" and to [redacted] Ex. N, Gerringer Dep. Ex. 4, at Spire_0001712. These recommendations relate to two distinct areas of a NASCAR Cup Series car. *See* Ex. O, Gerringer Dep. Tr. at 155:2-14; 157:12–158:13. [redacted]. Ex. T, MacGowan Dep. Tr., at 171:22-173:1, 179:6–9. [redacted]. Ex. U, Sparks Dep. Tr., at 249:1–5; 249:21–250:1; Ex. T, MacGowan Dep. Tr., at 189:19-190:17, 198:10–21.

[redacted]. Ex. T, MacGowan Dep. Tr., at 189:12-191:25. Both are referenced in the Focus Plan, Gabehart's roadmap for operationalizing JGR information at Spire. *See* Ex. E, Spire_0000851 ([redacted]). And they correspond to specific trade secrets JGR has identified in this litigation. *See* Ex. V, JGR 4th Supp. R&Os to Spire ROGs, at 25–27.

The deposition testimony confirms that Gabehart's comments about these procedures relate directly to Spire's Cup Series competition efforts. Doug Powers, Spire's shop foreman and the person responsible for the assembly of Spire's cars, confirmed that Spire had never [redacted] until "midsummer" of 2026—after Gabehart's arrival. Ex. W, Powers Dep. Tr., at 178:6–16. As for the [redacted], Powers confirmed that Spire had never used [redacted] until the week before the Charlotte race in late May 2026—roughly three weeks after the Kansas competition meeting at which Gabehart made those exact recommendations. *Id.* at 139:25–143:2, 165:22–166:16; *see also* Ex. X, Lambert Dep. Tr., at 159:2–161:22.

And Gabehart continued to provide such services to Spire's Cup Series teams even after the PI. At the Dover All-Star post-race meeting on May 18, 2026—nearly a month after entry of the PI—Gerringer's notes show that Gabehart made two more substantive comments: (1) that he was [redacted];" and (2) [redacted] Ex. N, Gerringer Dep. Ex. 4, Spire_0002053. Ryan Sparks, crew chief of Spire's No. 7 car, testified that Gabehart's ride-quality comment was directed at the drivers, because ride quality "is based off of feel" and "the driver is the only one that can understand that." Ex. U, Sparks Dep. Tr. at

255:20–256:24. Sparks also explained that Gabehart's bucket seat suggestion was a way to "streamline" the backup-car process so that "two drivers could share one seat instead of having to change it," because "[i]t's a huge pain when you have to get out a backup car. It takes many hours to prep the car." *Id.* at 257:3–20. These competition-related recommendations aimed at improving the performance and operational efficiency of Spire's Cup Series teams, services of the general type that he provided to JGR in his final year and thus were in violation of the Court's Orders.

Further, Dickerson admitted in his deposition that one of Gabehart's projects was evaluating Spire's equipment needs specifically "for the Cup Series deal," testifying that he asked Gabehart to assess "where are we weak as far as equipment that we need to get into our shop." Ex. J, Dickerson Dep. Tr., at 348:17–22. Dickerson also testified that he was "really leaning on [Gabehart] for the Cup stuff," tasking him with evaluating how Spire could improve its Cup Series program over the next two to three years. *Id.* at 349:1–4. JGR's competition director Walter Brown has attested that Gabehart's work for JGR included these same services, such as "***addressing longer-term competitive planning, capital investments***, resource allocation, and organizational strategy." Ex. F, 2d Brown Decl. ¶ 29 (emphasis added).

The evidence described above was obtained only through deposition testimony and Spire's sparse production of competition meeting materials. Despite testimony that Gabehart attended at least five—and possibly as many as twelve—competition meetings, Spire has produced just one competition-meeting video recording and three pages of meeting notes—and only after JGR demanded their production.[5] *See* Ex. X, Lambert Dep. Tr., at 252:16–253:4. Indeed, Spire has even

[5] Spire initially produced only Gerringer's Kansas meeting notes. Ex. N, Gerringer Dep. Ex. 4, at Spire_0001712. Only after JGR demanded production of all of Gerringer's competition meeting notes for the 2026 season did Spire produce the Atlanta and Dover meeting notes. *Id*., at Spire_0002051–53. Spire has yet to produce any other notes from Cup Series competition meetings.

refused to produce the video recordings of the April 20 and May 18 meetings described above in which Gabehart unquestionably provided competition services.

In sum, the record establishes that since the TRO, Gabehart has continued to provide competition services for Spire's Cup Series teams—attending competition meetings, making technical recommendations, and providing input on car setup and assembly processes.

**C. Spire has enabled Gabehart's provision of Cup Series competition services.**

Despite having full knowledge of the Orders, Spire imposed ineffective guardrails on Gabehart to ensure compliance with the Orders, thereby enabling his provision of Cup Series competition services. As an initial matter, Spire designed the role of Chief Motorsports Officer specifically for Gabehart, Ex. D, Spire R&Os to 1st JGR ROGs, at 5, and intended him to manage "all things racing" for Spire, including the Cup Series. Ex. J, Dickerson Dep. Tr., at 140:7–141:24. And it condones his performance of Cup Series competition services as proper based solely on Gabehart's "executive-level" position, knowing full well that the Orders prohibit the provision of services, not the holding of a particular title. Ex. H, Spire 30(b)(6) Dep. (Dickerson) Tr., at 52:13–55:21. Further, Spire made no attempt to determine the general types of services Gabehart provided JGR in his final year of employment until after the Court entered the PI, *id.* at 20:9–15, meaning that it made no attempt to ensure compliance with the TRO. Indeed, Spire continued to invite him to Cup Series competition meetings after the Court entered the TRO on March 5. Ex. Y, Spire_0000552. And it permitted him to continue attending those meetings until late May or early June, approximately three months after the TRO and a month after the PI. Ex. H, Spire 30(b)(6) Dep. (Dickerson) Tr., at 56:22–57:6. Finally, Spire's Cup Series crew chiefs, technical director, and shop foreman have all testified that—aside from a single post-PI email on May 5 describing Gabehart's title and stating that he was not responsible for day-to-day competition operations—no one has instructed them to refrain from discussing Cup Series competition matters with Gabehart

and there is nothing in place preventing them from doing so. Ex. W, Powers Dep. Tr., at 188:6–14; 222:2–13; Ex. O, Gerringer Dep. Tr., at 155:15–157:10; Ex. U, Sparks Dep. Tr. at 210:4–211:22; Ex. Q, Peterson Dep. Tr., at 227:21–228:2; Ex. X, Lambert Dep. Tr., at 38:9–25.

## III. Gabehart Retained JGR Confidential Information and Trade Secrets after the Orders.

Gabehart has also retained JGR confidential information and trade secrets after the entry of the Court's Orders. At the preliminary injunction hearing, counsel for Gabehart represented to the Court that Gabehart was no longer in possession of such information. Ex. A, PI Hr'g Tr., at 79:19–24. Indeed, Gabehart had sworn under penalty of perjury—at least twice—that "the only confidential information [he had] in [his] possession or control relating to [JGR] is either on [his] personal cell phone or in [his] personal Google Drive account," and that he had "not located and [was] not otherwise aware of being in possession of any additional confidential information relating to JGR." Dkt. 9-4, C. Walton Decl., at 30 (C. Gabehart Decl.). He further declared that he had not transferred JGR confidential information to any third party since November 1, 2025. Dkt. 12, C. Gabehart Decl., ¶ 26; Dkt. 37, 2d C. Gabehart Decl., ¶¶ 24–25. Nevertheless, the Court ordered him to cease and desist from retaining such information, PI at 34, and ordered the parties to engage in a second forensic review protocol, Dkt. 48, Order Granting Exped. Disc., ¶ 7, which Gabehart and JGR agreed to on April 22, 2026. *See* Dkt. 116-1, Forensic Analysis Protocol.

Under the protocol, Gabehart's counsel provided JGR with a list of file directories pulled from Gabehart's personal devices and cloud storage accounts as well as list files whose content hit on agreed search terms; JGR would then select—based solely on file names—the files that Gabehart would produce so that JGR could review and determine whether they contained JGR information. *Id.* § 5. Upon the completion of production, JGR then would provide Gabehart with a list of documents containing identified JGR information and the parties agreed to meet and confer

on such list, after which Gabehart would permanently delete the files containing JGR information. *Id.* This protocol has revealed that Gabehart knowingly possessed a multitude of documents containing JGR information that he failed to disclose in the initial pre-suit forensic review, retained those documents while working for Spire for much of the 2026 Cup Series season, and intentionally concealed and refused to produce those documents during the discovery period.

For instance, JGR discovered that Gabehart retained (1) a document containing his detailed notes of internal JGR meetings from December 19, 2022 through December 18, 2023 including detailed discussion of JGR's technical strategies and improvements to its racecars, Ex. Z, JGR_0003286, and (2) documents that included detailed notes from detailed discussions regarding JGR technical information and copies of two different race setups, Ex. AA, JGR_0003217; Ex. AB, JGR_0003296. Gabehart's possession of these documents flies in the face of his repeated assertions that he is no longer in possession of JGR information, including his sworn declarations that his personal cell phone and Google Drive accounts were the only devices or accounts that contained JGR confidential or trade secret information.

According to Gabehart's counsel, these documents were located on Gabehart's personal OneDrive account (an account that he actively used to store JGR material but did not disclose in connection with the first review protocol). *See* Ex. AC, Em. fr. W. Miller to JGR Counsel. Critically, on September 4, 2026—after discovery closed—counsel for Gabehart informed JGR for the very first time that it revoked Gabehart's access to only this account when it discovered these documents in ***June 2026***—more than halfway through the 2026 Cup Series season. *Id.* JGR was not otherwise alerted to the existence of these materials and was left to ***possibly*** discover them through the forensics process. It is undisputed that Gabehart, at a minimum, knowingly retained these documents in his possession for at least three months after the TRO and a month after the PI.

## LEGAL STANDARD

"[C]ourts have inherent power to enforce compliance with their lawful orders through civil contempt." *Shillitani v. United States*, 384 U.S. 364, 370 (1966). Accordingly, "[w]hen a litigant violates an order, the court generally may exercise its authority to hold the violator in civil contempt." *CFPB v. Klop*, 957 F.3d 454, 461 (4th Cir. 2020). "[A] single violation of an order is sufficient to support a finding of contempt." *Id.* at 459 (cleaned up).

A party who asks a court to find that an adversary is in contempt must prove four elements by clear and convincing evidence: "(1) the existence of a valid decree of which the alleged contemnor had actual or constructive knowledge; (2) that the decree was in the movant's favor; (3) that the alleged contemnor by its conduct violated the terms of the decree, and had knowledge (at least constructive knowledge) of such violations; and (4) that the movant suffered harm as a result." *dmarcian, Inc. v. dmarcian Europe BV*, 60 F.4th 119, 145 (4th Cir. 2023) (citation and quotation marks omitted). "Once the movant establishes these elements, the burden shifts to the defendant to show good faith [in making] all reasonable efforts to comply with the enforcement order." *Klop*, 957 F.3d at 461–62 (citation and quotation marks omitted). "A defendant who fails to meet this burden may be held in civil contempt." *Id.* at 462. And a lack of willfulness "does not relieve [a defendant] from civil contempt." *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949). Because civil contempt is remedial rather than punitive, it does not matter "with what intent the defendant did the prohibited act." *Id.*

## ARGUMENT

### I. The Evidence Supports Holding Gabehart and Spire in Contempt for Violating the Orders.

#### A. Gabehart and Spire have knowledge of all the Orders, and the Orders, which are in JGR's Favor

The first two elements of civil contempt are plainly satisfied. Both Gabehart and Spire had actual knowledge of the Orders: counsel for both appeared at the TRO and PI hearings, and both received notice via the Court's electronic filing system. Neither has challenged the validity of the Orders. And because JGR moved for both the TRO and the PI, and the Court entered each in JGR's name, the Orders are indisputably in JGR's favor. *See Colonial Williamsburg Found. v. Kittinger Co.*, 792 F. Supp. 1397, 1406 (E.D. Va. 1992), *aff'd*, 38 F.3d 133 (4th Cir. 1994); *JTH Tax, Inc. v. Lee*, 540 F. Supp. 2d 642, 648 (E.D. Va. 2007).

#### B. Gabehart and Spire have knowingly violated the Order through Gabehart's provision of Cup Series competition services for Spire.

##### (1) Gabehart has violated the Orders by performing Cup Series competition services for Spire.

The record establishes by clear and convincing evidence that Gabehart has repeatedly violated the Orders by providing services to Spire of the general type that he provided to JGR in the final year of his employment. Gabehart cannot claim that he was unable to discern what the Orders require of him. They prohibit him from providing "services of the general type" that he provided to JGR in the year prior to his termination, and no one is better positioned than Gabehart himself to know what those services were because he is the one that performed them. *See Life Techs. Corp. v. Govindaraj*, 931 F.3d 259, 268 (4th Cir. 2019) ("[A] party must be able to discern from the language of a court's order the actions necessary to comply with the court's directive."), *as amended* (Aug. 7, 2019) (citation omitted). Indeed, Gabehart admits that, as JGR competition director, he regularly attended and participated in weekly competition and post-race meetings and

provided input on car setups, aerodynamics, and other issues that he thought would add value to JGR's Cup Series competition efforts. *Supra* Background § II.A. And JGR's corroborating testimony that he performed these services stands undisputed. *Id.*

The record establishes that Gabehart has provided these types of Cup Series competition services to Spire contrary to the terms of the noncompete agreement and the Orders. As detailed above, he regularly attended and actively participated in Spire's Cup Series competition and post-race meetings; made specific technical recommendations that relate directly to Spire's Cup Series car performance and map onto his Spire-branded roadmap for implementing JGR information; sought direct feedback from Cup Series drivers and suggested strategies for Spire's backup-car process; and has testified that there has been "no change" in his job — confirming that his pre-TRO conduct, including use of JGR trade secrets to analyze Spire's race performances and disclosure of JGR setup parameters to Spire personnel, continued after the Orders. *Supra* Background §§ II.A–B. The evidence is clear and convincing that Gabehart has provided Spire with services of the general type he provided to JGR, in violation of the Orders.

JGR anticipates that Gabehart and Spire will (1) try to argue that Gabehart has not violated the Orders because of his title as an "executive" rather than a "competition director," and (2) attempt to minimize the impact of his demonstrated input on Cup Series competition matters. Dickerson's 30(b)(6) testimony reveals this position: he dismissed Gabehart's Kansas meeting recommendations as something "the janitor" could say, drew an artificial distinction between "activities" and "services" by testifying that "if he's standing somewhere and talking, that's a behavior," not a "service," and maintained that anything "an executive would do" is permissible. Ex. H, Spire 30(b)(6) Dep. (Dickerson) Tr., at 114:13–118:19; 38:12–39:25. But the Orders do not restrict Gabehart by title—they restrict him by kind of service provided. The Court expressly

declined to require Gabehart's resignation and permitted him to provide "[o]ther services not performed at JGR in the year prior to his termination." PI at 34. The operative phrase in the Court's prohibitions is "providing services," not "occupying a position" or "holding a title."

Courts routinely reject this kind of formalism. For example, the Court of Federal Claims held that a party "may not evade a permanent injunction by ***relabeling conduct*** or maneuvering around the intended actions in a way that would frustrate the injunction's remedial purpose." *Gemini Tech. Servs., LLC v. United States*, 180 Fed. Cl. 299, 303 (2026) (citing *McComb*, 336 U.S. at 192) (emphasis added). Defendants' position exalts form over substance without any basis in the language of the Orders. The Orders permitted Gabehart to remain at Spire and to render "[o]ther services not performed at JGR in the year prior to his termination"—no more. PI at 34. Defendants purport to honor that limitation while insisting that the very conduct it was designed to prevent is recharacterized as an "executive" prerogative, or as mere "behavior" rather than "service," because Gabehart's business card no longer reads "competition director." That is relabeling, not compliance. Further, the remedial purpose of the Orders was to keep Gabehart from contributing to Cup Series competition at a rival team; a construction under which he may sit in competition debriefs and recommend setup and performance adjustments so long as no one calls it a competition role would, as in *Gemini*, render the Orders meaningless. The issue is not whether Gabehart holds a competition title at Spire; it is whether he provided services of the general type he provided at JGR. The evidence is clear and convincing that he has.

Moreover, it matters not whether Gabehart's input was groundbreaking, commonplace, or ultimately implemented by Spire. The Orders prohibit services of the general type Gabehart provided to JGR. That Gabehart provided the same type of input to Spire's Cup Series competition personnel that he provided to JGR's is itself the violation, regardless of whether Spire acted upon

it. While Spire's witnesses now claim that Gabehart's comments at the Kansas competition meeting were "obvious" and unremarkable, the Court need not resolve that dispute at this stage: setting aside whether Gabehart's comments reveal trade secret misappropriation (which they do), they unquestionably demonstrate his performance of Cup Series competition services for Spire of the general type he performed for JGR, in violation of the Orders. In any event, the argument that Gabehart's recommendations were common knowledge does not square with Spire's own testimony that he was a "generational talent" worthy of being in the "Hall of Fame" as a crew chief, Ex. H, Spire 30(b)(6) Dep. (Dickerson) Tr., at 141:5–14, nor with the undisputed fact that Spire had never [redacted] until midsummer 2026 and had [redacted] until the week before the Charlotte race in late May 2026—roughly three weeks after the Kansas meeting at which Gabehart made those exact recommendations, Ex. W, Powers Dep. Tr., at 139:25–143:4, 178:6–16. Gabehart was not stating the obvious; he was introducing processes Spire had not previously employed.

The Court should also consider the credibility of Defendants' representations in assessing their denial of violations because the record plainly refutes—or at least renders substantively misleading—numerous sworn statements from Spire witnesses, Gabehart himself, and statements to the Court by counsel. These statements include:

- Dickerson's testimony that Gabehart is "not in any Cup-related meetings." Ex. J, Dickerson Dep. Tr., at 196:15–18; *compare with* Ex. H, Spire 30(b)(6) Dep. (Dickerson) Tr., at 59:7–10 (admitting Gabehart attended such meetings).

- McCall's sworn declaration that Gabehart's only "meaningful statement" at any Cup Series competition meeting was to introduce himself at a Cup Series competition debrief meeting after the Atlanta race. Dkt. 134-1, M. McCall Decl., ¶ 8 *compare with* Ex. AD, Spire_001487 at 20:17-22:00 (Gabehart's input on pit-stop analysis at the same meeting) *and* Ex. N¸ Gerringer Dep. Ex. 4 (reflecting substantive statements at multiple meetings).

- Heather Masterson's sworn declaration that Gabehart was never in the Spire "shop" prior to February 16 to provide services to Spire. Dkt. 20, H. Masterson Decl., ¶ 5,

*compare with* Ex. L, GABEHART01649 (texts evidencing Gabehart's presence in Spire war room and provision of substantive observations during Daytona 500 on February 15).

- Spire's counsel's representation that it had searched Gabehart's Spire-issued laptop and its system and did not find GABEHART00222. Ex. A, PI Hr'g Tr. at 54:24–55:2, 65:18–19; *compare with* Ex. D, Spire R&Os to 1st JGR ROGs, at 28 (admitting that Spire was aware that the post-race audit was on Gabehart's Spire-issued laptop ***at least a week prior to the preliminary injunction hearing***).

- Gabehart's multiple sworn statements that the only devices or accounts containing JGR information were his Google Drive and cell phone. Dkt. 9-4, C. Walton Decl., at 30 (C. Gabehart Decl.), Dkt. 12, C. Gabehart Decl., ¶¶24–25; *compare with* Ex. AB, JGR_0003296.

These misrepresentations go to the heart of whether Defendants have complied with the Orders and bear on what will be required to deter future violations.

Finally, Defendants' refusal to produce responsive documents that could reveal further violations should also be considered. Spire has refused to produce competition meeting video recordings and notes beyond the handful JGR demanded, despite testimony that Gabehart attended as many as twelve meetings. *See* Dkt. 118, JGR 1st Mot. to Compel, Dkt. 142, JGR Reply ISO First Mot. to Compel; Dkt. 170, JGR 2d Mot. to Compel. Gabehart has refused to produce work-related emails from his personal account, notwithstanding testimony from Spire witnesses that he has used his personal email account for Spire-related correspondence since Spire revoked access to his work email in March 2026. *See* Dkt. 170-1, JGR Br. ISO 2d Mot. to Compel at 4, 11.

In sum, the evidence is clear and convincing that Gabehart has repeatedly knowingly provided Spire with services of the same general type as those he provided to JGR, in direct violation of the Court's Orders and any argument to the contrary is unavailing.

#### (2) Spire aided and abetted Gabehart's violation of the Orders

Under Rule 65, a nonparty who has notice of an injunction may be held in contempt for violating it if the nonparty "acted in active concert or participation" with the enjoined party. FED.

R. CIV. P. 65(d)(2)(C). To establish that Spire acted in concert or participation, JGR must show that Spire had knowledge of the Orders and that it "aided and abetted" Gabehart in violating them. *Nat'l League of Junior Cotillions, Inc. v. Porter*, No. 3:06-CV-508-RJC, 2008 WL 11516421 at *4 (W.D.N.C. May 28, 2008) (citing *Microsystems Software, Inc. v. Scandinavia Online AB*, 226 F.3d 35, 43 (1st Cir. 2000)).

Spire satisfies both elements. It had actual knowledge of the Orders from the outset. And for months, it actively facilitated Gabehart's violations by giving him an executive title that concealed day-to-day competition involvement, allowing him to attend competition meetings and make specific technical recommendations, and facilitating his direct work with Spire's competition personnel—all while representing to JGR and this Court that his role was limited to business development. Spire did not merely turn a blind eye; it structured Gabehart's role to evade detection while extracting precisely the competition expertise the Orders were designed to protect.

The evidence is accordingly clear and convincing that Spire aided and abetted Gabehart's violations of the Orders. *See Porter*, 2008 WL 11516421 at *4–5 (holding non-party and non-enjoined party in contempt where evidence established they acted in concert with defendant and aided and abetted her violation of preliminary injunction enforcing noncompete agreement ); *Freedom Med., Inc. v. Sewpersaud*, No. 620CV771ORL37GJK, 2020 WL 6449312, at *5 (M.D. Fla. Nov. 3, 2020) (holding non-enjoined competitor in contempt where competitor knew enjoined defendant employee "wasn't permitted to work in [the restricted region]" but "chose to ignore the PI"); *Edwards Moving & Rigging, Inc. v. Jenkins*, No. 8:19-CV-1004-T-36SPF, 2020 WL 2570138, at *4–6 (M.D. Fla. May 21, 2020) (non-enjoined entity in contempt for violation of preliminary injunction where enjoined employee used non-enjoined entity email during the regular course of business to compete with plaintiff).


Case 3:26-cv-00133-SCR-DCK Document 219-1 Filed 09/15/26 Page 24 of 29

### C. Gabehart violated the Court's Orders by knowingly retaining JGR confidential information and trade secrets.

It is undisputed that, at a minimum, Gabehart had knowing access to documents containing JGR information following the Court's Orders. In fact, Gabehart's counsel only recently disclosed that it did not limit his access to certain materials until June 2026. These documents include categories of information that the Court has already found to be trade secrets, such as racecar setups for the 2024 Cup Series season. *See* Ex. AB, at JGR_0003296 (setup compares for JGR cars for the 2024 Cup Series race at Martinsville); PI at 17–18 (finding setup and simulation files found on Gabehart's Google Drive to be trade secrets under North Carolina and federal law). And Gabehart's own counsel has admitted that Gabehart had access to these documents well into the 2026 Cup Series season. Accordingly, the evidence is undisputed that Gabehart at least knowingly retained JGR trade secrets in violation of the Court's Orders.

Gabehart cannot hide behind the forensic review protocol, as JGR anticipates he may attempt to do. His obligation to cease retaining JGR trade secrets arises from the Court's Orders, and the protocol—which governs the ***deletion*** of identified materials—is not a license to continue possessing them in the meantime. The contents of Gabehart's devices and accounts were known to Gabehart—both before and after the Court's Orders. There is no legitimate explanation to justify why Gabehart has been found with JGR documents on an undisclosed OneDrive account (among other locations), why he failed to disclose that OneDrive account until the second forensic review protocol, or why he submitted false declarations to the Court.

And Gabehart's own counsel has admitted that Gabehart had access to these documents well into the 2026 Cup Series season. Accordingly, the evidence is undisputed that Gabehart retained JGR trade secrets in violation of the Court's Orders and without excuse.

### D. JGR Suffered Harm from Gabehart and Spire's Violations.

The final element is readily satisfied because the harm JGR has suffered is the precise harm that justified the entry of the Orders in the first place. *See Porter*, 2008 WL 11416421 at *3 ("[F]or the reasons set forth in its Injunctive Order, the Court finds that the plaintiffs will have suffered harm from the putative violations [of the noncompete agreement.]"). In entering the TRO, the Court found that JGR would be irreparably harmed in the absence of relief because, "[i]n a competitive racing industry, loss of a trade secret leads to the immediate and irreparable harm to JGR's ability to compete." TRO ¶ 30. Similarly, the Court found in the PI that JGR had "made a clear showing that it has suffered and will continue to suffer irreparable harm without an injunction to prevent further misappropriation . . . and to enforce Gabehart's contractual obligations." PI ¶ 110. The violations discussed here have made those harms concrete.

The evidence establishes that JGR has been harmed because Gabehart has used JGR's trade secrets to analyze Spire's Cup Series race performances, disclosed JGR's trade secret setup parameters to Spire personnel, and recommended that Spire adopt quality-control and production processes that correspond to JGR's trade secret processes. *Supra* Background §§ II.A-B. Further, he retained JGR's confidential and trade secret information, the possession of which the Court noted was itself sufficient to establish irreparable harm in the Orders. *Id.* § III. Given Gabehart's testimony that his role has not changed since he began at Spire and Spire's lack of controls on his ability to communicate with Cup Series competition personnel, there is no reason to believe that this conduct will not continue absent the coercive effect of civil contempt.

## II. Gabehart and Spire Did Not Take Reasonable Steps to Comply with the Orders.

JGR has presented clear and convincing evidence on each of the elements required for a civil contempt order, and neither Gabehart nor Spire can satisfy their burden to "show good faith [in making] all reasonable efforts to comply" with the Orders. *Klop*, 957 F.3d at 462. Gabehart had

clear notice of the terms of the Orders, was represented by counsel throughout, and had a complete understanding of the services he provided to JGR in the final year of his employment. Despite all of that, he continued to provide Cup Series competition services to Spire—conduct that reflects not inadvertent noncompliance, but a refusal to adhere to the Orders. *See SDSE Networks, Inc. v. Mathur*, No. 1:22-CV-1024-MSN-IDD, 2022 WL 18135768, at *3 (E.D. Va. Dec. 7, 2022). As for Spire, it was on notice that Gabehart could not provide it with services of the same general type as those he provided in his final year with JGR when the Court issued the TRO, but it has admitted that it took ***no steps whatsoever*** to determine the actual scope of those services until ***after the Court entered the PI*** and thus cannot argue that it took "***all*** reasonable steps" to comply with the Orders. *Klop*, 957 F.3d at 462 (emphasis added).

Moreover, it is no defense that Spire eventually removed Gabehart from Cup Series competition meetings because Spire admits that it allowed him to attend such meetings until well after the TRO. During that entire period, Gabehart was providing the very services the Orders prohibited. *Supra* Background § II. And even after he was nominally removed from meetings, Spire imposed ineffective guardrails to prevent its Cup Series crew chiefs, technical director, and shop foreman from discussing competition matters with Gabehart. *Id*. The absence of an ongoing formal meeting invitation does not cure months of contemptuous conduct, nor does it prevent future violations through the same informal channels Gabehart has used throughout.

**CONCLUSION**

For the foregoing reasons, JGR respectfully requests that the Court order Gabehart and Spire to appear and show cause why they should not be held in contempt for failure to comply with this Court's TRO and PI, find that their conduct is contemptuous, award JGR its costs and fees in bringing this Motion, and grant any other relief to which JGR is justly entitled.

This the 15th day of September, 2026.


**KING & SPALDING LLP**
/s/ *Danielle T. Williams*
Danielle T. Williams
dwilliams@kslaw.com
N.C. Bar No. 23283
300 South Tryon Street, Suite 1700
Charlotte, NC 28202
Thomas M. Melsheimer – *Pro Hac Vice*
tmelsheimer@kslaw.com
Chad B. Walker – *Pro Hac Vice*
cwalker@kslaw.com
Tracea Rice – *Pro Hac Vice*
trice@kslaw.com
Alexandra Moore - *Pro Hac Vice*
almoore@kslaw.com
2601 Olive Street, Suite 2300
Dallas, TX 75201

**PARKER POE ADAMS & BERNSTEIN**
Sarah F. Hutchins
N.C. Bar No. 38172
Tory Ian Summey
N.C. Bar No. 46437
Keith M. Weddington
N.C. Bar No. 14352
Charles G. Middlebrooks
N.C. Bar No. 55171
Madelyn R. Candela
N.C. Bar No. 63827
Bank of America Tower
620 South Tryon St., Suite 800
Charlotte, North Carolina 28202
sarahhutchins@parkerpoe.com
torysummey@parkerpoe.com
keithweddington@parkerpoe.com
charliemiddlebrooks@parkerpoe.com
madelyncandela@parkerpoe.com

*Attorneys for Joe Gibbs Racing, LLC*

**CERTIFICATE OF SERVICE**

The undersigned counsel hereby certifies that the foregoing was filed with the Court via its CM/ECF system and was served upon counsel of record via the same.

This the 15th day of September, 2026

**KING & SPALDING LLP**

/s/ *Danielle T. Williams*
Danielle T. Williams
dwilliams@kslaw.com
N.C. Bar No. 23283
300 South Tryon Street, Suite 1700
Charlotte, NC 28202
Thomas M. Melsheimer – *Pro Hac Vice*
tmelsheimer@kslaw.com
Chad B. Walker – *Pro Hac Vice*
cwalker@kslaw.com
Tracea Rice – *Pro Hac Vice*
trice@kslaw.com
Alexandra Moore - *Pro Hac Vice*
almoore@kslaw.com
2601 Olive Street, Suite 2300
Dallas, TX 75201

**PARKER POE ADAMS & BERNSTEIN**
Sarah F. Hutchins
N.C. Bar No. 38172
Tory Ian Summey
N.C. Bar No. 46437
Keith M. Weddington
N.C. Bar No. 14352
Charles G. Middlebrooks
N.C. Bar No. 55171
Madelyn R. Candela
N.C. Bar No. 63827
Bank of America Tower
620 South Tryon St., Suite 800
Charlotte, North Carolina 28202
sarahhutchins@parkerpoe.com
torysummey@parkerpoe.com
keithweddington@parkerpoe.com
charliemiddlebrooks@parkerpoe.com
madelyncandela@parkerpoe.com
*Attorneys for Joe Gibbs Racing, LLC*