# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CASE NO. 3:26-cv-133

JOE GIBBS RACING, LLC, Plaintiff,

vs.

CHRISTOPHER GABEHART and SPIRE MOTORSPORTS, LLC, Defendants.

Charlotte, North Carolina
March 26, 2026
9:19 a.m. - 2:30 p.m.

---

HEARING ON MOTION FOR PRELIMINARY INJUNCTION
BEFORE THE HONORABLE SUSAN C. RODRIGUEZ
UNITED STATES DISTRICT JUDGE

STENOGRAPHICALLY REPORTED BY:

REBECCA MAXCY, RMR, CRR
Federal Official Court Reporter
United States District Court
Charles R. Jonas Federal Building
401 W. Trade Street
Charlotte, North Carolina 28202
(704)350-7493

APPEARANCES:

FOR THE PLAINTIFF:

THOMAS M. MELSHEIMER
CHAD B. WALKER
Attorneys at Law
King & Spalding
2601 Olive Street
Suite 2300
Dallas, TX 75201

E. DANIELLE T. WILLIAMS
Attorney at Law
King & Spalding
300 S. Tryon Street
Suite 1700
Charlotte, NC 28202

SARAH F. HUTCHINS
TORY I. SUMMEY
KEITH M. WEDDINGTON
CHARLES G. MIDDLEBROOKS
Attorneys at Law
Parker Poe Adams & Bernstein, LLP
620 S. Tryon Street
Suite 800
Charlotte, NC 28202

FOR DEFENDANT CHRISTOPHER GABEHART:

CARY B. DAVIS
SPENCER WILES
Attorneys at Law
Robinson, Bradshaw & Hinson
600 S. Tryon Street
Suite 2300
Charlotte, NC 28202

FOR DEFENDANT SPIRE MOTORSPORTS, LLC:

JOSHUA D. DAVEY
LAWRENCE J. CAMERON
TROY C. HOMESLEY, III
JOHN S. GIBBS, III
Attorneys at Law
Troutman Pepper Locke, LLP
301 S. College Street
Suite 3400
Charlotte, NC 28202

into that website. This looks like it's actually Spire's logo and Spire's document. If this was created on January 28th, how did he get this logo if Spire didn't give it to him?

MR. CAMERON: Well, Judge, I don't know that we've had the opportunity -- this was just disclosed to us in the last day or so. So I don't know that we've --

THE COURT: And that's a fair answer, Mr. Cameron.

MR. CAMERON: Right.

THE COURT: If you don't know, I don't want to be making any speculations or representations about that today.

MR. CAMERON: Right.

THE COURT: But certainly it's a very perplexing question for the Court when I see a Spire logo on a document that's here before you-all supposedly hired him.

MR. CAMERON: Right. And I think what I'd say, Judge, is that, number one -- so let me zoom out a little bit. We have -- give me one moment. No one at Spire has seen this document before. I will say that. I can say that. What we have done more holistically, Judge -- and I think it's important that we say this early on in our proceedings, because this is something that you've asked about, and just the way that the proceedings have gone, we haven't really had the chance to directly address it.

But we have reviewed the laptop that Mr. Gabehart was given by Spire. We've preserved it. We've preserved Spire's

computer system network, and we've searched it for the information that they've identified as JGR information that was -- you know, the pictures and all that information that they identified through their original pre-litigation forensic protocol. We've imaged Mr. Dickerson's iPhone. I think that's important for you to hear that. His personal iPhone has been imaged, and it's been preserved. Mr. Anthony's iPhone and iPad have also been imaged and preserved.

And, you know, we have endeavored to try to conduct our own forensic analysis. I think it's near done, but we just didn't have time to get a declaration done before this preliminary injunction hearing. But what I can represent to the Court is we have not seen any JGR information in terms of the information that they identified through their original forensic protocol. And we certainly did not identify this document in any of Spire's systems that we've, you know, preserved and accessed thus far.

And then in terms of, you know, the insinuation from them and sort of the question from you about, you know, well, it has Spire's logo. I mean, we are living in sort of technological times. It is not inconceivable to me that somebody could create this on their own with publicly available sort of Spire branding and that kind of thing. With all the different artificial intelligence tools that there are out there nowadays, I don't think it necessarily follows,


Case 3:26-cv-00133-SCR-DCK Document 219-4 Filed 09/15/26 Page 5 of 16

respectfully, that he had to have gotten the template from someone at Spire. We don't know the answer to that in terms of how he got the template, but I don't think that's a fair inference to say that it must have come from Spire.

THE COURT: I mean, I think that's fair. It's just very curious as to the timing.

MR. CAMERON: Well, I mean --

THE COURT: And it's also fair that you don't have an answer. You just got this today.

MR. CAMERON: Right.

THE COURT: But that is a concerning thing for the Court at the moment.

MR. CAMERON: Well, I do understand that, Judge. But, I mean, also just -- and Mr. Davey is actually going to talk about this a little bit more holistically. But, you know, this information, this is not, you know -- we started this case talking about JGR's secret sauce. I mean, I don't see anything here that a NASCAR fan wouldn't be able to sort of, you know, think about in terms of what's important to a race team, right? I mean, this is not technical information here. This is generic categories of things that are important. And so, you know, I'm -- Mr. Davey is going to talk about that a little bit more holistically, but that's sort of my view of it at this point.

But if I could just kind of walk through some of the

sauce that JGR has been focused on.

Beyond that, though, as Mr. Cameron talked about, JGR has taken a number of steps to ensure -- excuse me. Spire has taken a number of steps to ensure that there's no possibility for transmission of any information that might be trade secrets.

And to begin with, to remind the Court -- and the Court knows this, but most of that information, the information that Mr. Gabehart had, was deleted before he got a Spire computer, which he had for nine days before we took that away and quarantined it. Since then we've searched, as Mr. Cameron said. We don't have JGR information. We've actually cut off Mr. Gabehart's access to any email or any other Spire systems --

THE COURT: What about the document 222 that we've been talking about --

MR. DAVEY: Yes, Your Honor.

THE COURT: -- have you-all looked for a version of that on your system?

MR. DAVEY: We looked --

THE COURT: I mean, sitting in your shoes today, I'm not sure if you did like a typical search that document would come up. And so that might be something you-all want to go back and look at as well.

MR. DAVEY: Certainly, Your Honor.

THE COURT: I don't know that that would necessarily come up immediately. It's a little bit more nuanced than that.

MR. DAVEY: Well, what I can say is that we had our own forensic examiner look for all of the files, the file names that were in Mr. Gabehart's OneDrive that JGR has claimed were trade secrets taken in this case and looked for that information across all of Spire's email and systems, and we don't have anything. I don't believe we have Gabehart 222. It certainly hasn't been used by Spire in any competitive way, even if it -- again, I don't believe we have it, Your Honor. Nothing we've done to date has indicated that we do. And so --

THE COURT: So, Mr. Davey, I hear you on that, but why in the world would Defendant Gabehart create an Excel spreadsheet with your client's numbers on them if it wasn't for Spire?

MR. DAVEY: Well, Your Honor --

THE COURT: This might be speculation on my part. I don't know what the answer is.

MR. DAVEY: I don't know is the truthful answer to that question, Your Honor. But I think what was going on is he was -- everyone was talking about the possibility through this time frame, in November, in middle November, when, as the documents show, Mr. Gabehart was negotiating with JGR for a separation agreement pursuant to that carve-out in the noncompete. And the expectation of JGR and Mr. Gabehart and

then Mr. Dickerson through his communications with Mr. Gabehart was that Mr. Gabehart would be leaving. So I don't know. I'd be speculating, but it's possible during that time frame Mr. Gabehart might have been thinking about, okay, what sorts of things might I be doing for Spire and let's look at how Spire did in these races.

And I think that's an important point, Your Honor, too in terms of the information that was allegedly filled in here. It's information about Spire's finish that would be information you can get on NASCAR.com. Any educated fan would be able to find that. It's publicly available. And Mr. Gabehart, again, we don't know, but he might have just been watching the race. He's interested in NASCAR. He's spent his whole career doing that. And he was maybe looking forward to the opportunity to go work for Spire, which is everyone's expectation at the time. So that's, you know, as best I can give you today, Your Honor. Again, we just got this.

But I do want to point out a couple of other things about the document which I think are maybe getting a little bit lost here. And I think you -- the Court rightly pointed out that the first page of the document 222, you know, it has things like race date, race location, aero package. Again, this is all publicly available. It's all on NASCAR.com, other places on the Internet. And then if you turn to the rest of the spreadsheet, it's got information like who finished first,

you know, what was their -- who finished 25th, what were their points. This is the kind of information --

THE COURT: So your point is well taken on that, that a lot of that -- I think it's the similarity between JGR's original spreadsheet, like that's the real issue. And to be clear, that's where your client's numbers are on it. The Spire logo that I was referring to is a separate document, but I think plaintiff is saying sort of those two go hand in hand. And so tell me -- but you haven't found this on your system. And, again, I know you're still searching.

MR. DAVEY: Right. We haven't found it, and we don't think there's any evidence that ties it all together. So I don't know where he got the Spire logo. I'm not sure, Your Honor. But you can get that through AI. You can get that on the Internet. We saw in plaintiff's presentation this morning to this Court the Spire logo, so it's not like it's unavailable. And I don't know what Mr. Gabehart was doing with it at the time.

The spreadsheet, whether that's similar or not to JGR information I think is an open question. So we saw in the presentation from plaintiff this morning copies of the photographs that Mr. Gabehart allegedly took. The first time we'd seen any of those, and we've not had the opportunity to compare what's in that little picture with what's in Gabehart 222, the spreadsheet we're referring to. So I don't know that

provision in a JGR employment contract. He negotiated that with Tim Carmichael. And he gave notice under that. I'll talk about that in a second.

But just to address Your Honor's question, he exercised a contractual right. So Your Honor points out if we have misappropriation from the pictures, that's an issue. That's an issue that JGR can certainly pursue through a trade secrets claim --

THE COURT: I think it's an issue for your contract. I mean, the contract talks about that too. I mean, that's what kind of changes it for without cause to for cause.

MR. DAVIS: It does. It does. Except for if you just step back and look at how it was handled, that the minute he got a letter he voluntarily submitted to a forensic review his phone, passwords to his Google drive and said, have at it. Now, if somebody is trying to hide something, they don't do something like that.

He has an obligation under his employment agreement to return confidential information. And so as part of the off-boarding, all of the confidential information, the crown jewels that we've heard about that Mr. Melsheimer mentioned today, all of those were given back. He doesn't have those anymore. So that was part of his off-boarding. He said, okay, I'll return the confidential information.

And then we get back to Mr. Carmichael's first

and forth. It says what the contract says and doesn't sort of go beyond that.

That's a point that I would like to hear more from you-all on in your response.

MR. DAVIS: Thank you, Your Honor. And then the last level of the waterfall is if the noncompete is enforceable, Chris is not in breach of it. And the case that we are admittedly leaning hard into here, it's not the only way we win, but, I mean, it is just such a great case because it is on all fours with this one. It's got similar noncompete language. It's in the NASCAR world. It actually involves Matt McCall, now the competition director for Spire. So small world. Judge Bledsoe opinion. And in that case Matt McCall was an engineer at Richard Childress Racing and took a job at Ganassi to be a crew chief. So both competition jobs. And Judge Bledsoe does a nice job analyzing it.

I would commend this case to Your Honor. And then look at the descriptions in Mr. Gabehart's declaration and Mr. Dickerson's declaration about what Mr. Gabehart is doing at Spire, essentially serving as an owner's advocate in an enterprise-wide C-suite level, essentially being the eyes and ears for Jeff Dickerson in the motorsports world.

In that case Judge Bledsoe, he assumed without deciding that the noncompete was -- that it applied and was enforceable, and he just went straight to the merits, do we have a breach of

contract here. And he analyzed the work that Mr. McCall was doing as an engineer and then what he would do as a crew chief at Ganassi, and he found there was no breach of contract. So without a breach of contract, we don't have a likelihood of success, and we don't enforce the --

THE COURT: So I hear you on that. I do think we have a little bit of a different factual scenario, though, here. So bear with me for a moment. A race engineer to a crew chief didn't violate his noncompete. That's what that case said. And so those are two different things. Here, I mean, when I asked you-all at the TRO hearing -- and I know facts develop, so I'm not going to hold you to this. I know you're looking at this. But both of you-all sort of acknowledged in so many words that some of the information -- some of the duties overlapped. And so, you know, that's why I did the TRO because it's already in the contract. Like we can't perform the same services if that is enforceable.

And so, you know, I guess what would be your argument against -- why should we not do that still at a PI stage?

MR. DAVIS: Okay. I've got a couple. I'll talk -- if you would permit me, I'll talk about on the likelihood of success point, but I also want to talk about the irreparable harm on this as well.

THE COURT: Okay.

MR. DAVIS: And so what I would say is -- and I don't

run from this at all. Overlapping is not a problem, I don't think. Subject matter overlapping is not what the noncompete says. The noncompete uses an active verb and an object, providing services. That means something.

THE COURT: Providing the same general services, right?

MR. DAVIS: Providing the same general services. But it is still an active verb. It is still what services are you providing for the benefit of your employer. It doesn't say -- it doesn't say what meetings can you not attend, and it doesn't say what places can't you go or what people can you not interact with, what information are you not allowed to see or use as part of your job. That is not what providing services is. It is what is in the proposed preliminary injunction order that plaintiff's counsel tendered to you, but that's not what the noncompete says. I think the Court needs to focus its analysis on what services are being provided by Mr. Gabehart.

THE COURT: And so what services is he providing?

MR. DAVIS: Well, I would commend Your Honor the --

THE COURT: I know you've addressed this some in your -- it's in your --

MR. DAVIS: I don't want to just read this. I'll just refer it to you. But I think -- we also described the services that he was providing at JGR. Mr. Brown has a declaration as well.

THE COURT: Sure.

MR. DAVIS: We would just say those are just distinctly different services that he is providing.

THE COURT: Okay. I understand your position, but I think, you know, the org chart and where he falls is fairly important. And I understand you-all have a different competition director and things like that, but we went through this scenario before. If there's anything that's changed, let me know, but we talked about, you know, offensive coordinator and whatnot --

MR. DAVIS: I would say --

THE COURT: -- versus the head coach. We talked a little bit about, well --

MR. DAVIS: That was not a good analogy. I'll fall on that. I think a more apt analogy is probably the head football coach at the University of North Carolina and the athletic director at the University of North Carolina. The athletic director, you know, might dabble a little bit and know what's going on in all the programs across the athletic programs at UNC, but he's not doing the work of the head football coach. I think that's more similar to what we have here today.

I want to -- that's a nice segue, though, to kind of what's the point, why are we -- and Mr. Davey alluded to this. But having the TRO has had -- I mean, we're talking about irreparable harm. Our argument is Chris is not violating the noncompete. He's doing something entirely different. And so

(Proceedings concluded at 2:30 p.m.)

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF NORTH CAROLINA

CERTIFICATE OF REPORTER

I, Rebecca S. Maxcy, Federal Official Realtime Court Reporter, in and for the United States District Court for the Western District of North Carolina, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 8th day of April, 2026.

/s/ Rebecca S. Maxcy______
REBECCA S. MAXCY, RMR, CRR
Official Court Reporter