# Exhibit G

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Case No. 3:26-cv-00133-SCR-DCK

JOE GIBBS RACING, LLC, )
)
Plaintiff, )
)
vs. )
)
CHRISTOPHER GABEHART and )
SPIRE MOTORSPORTS, LLC, )
)
Defendants. )
__________________________________/

* * CONFIDENTIAL * *
ATTORNEYS' EYES ONLY

VIDEOTAPED DEPOSITION OF CHRISTOPHER ALLEN GABEHART
(Taken by Plaintiff)
Charlotte, North Carolina
Tuesday, July 21st, 2026

Certified Stenographic Court Reporter
Amy A. Brauser, RPR, RMR, CRR

APPEARANCES

ON BEHALF OF THE PLAINTIFF JOE GIBBS RACING, LLC:

CHAD B. WALKER, Esquire
TAYLOR HINOJOSA, Esquire
DANIELLE T. WILLIAMS, Esquire (via Zoom)
King & Spalding LLP
2601 Olive Street, Suite 2300
Dallas, Texas 75201
(214) 764-4451
cwalker@kslaw.com
thinojosa@kslaw.com
dwilliams@kslaw.com

(and)

SARAH F. HUTCHINS, Esquire
MADELYN R. CANDELA, Esquire
Parker Poe Adams & Bernstein LLP
620 South Tyron Street, Suite 800
Charlotte, North Carolina 28202
(704) 335-6639
sarahhutchins@parkerpoe.com
madelyncandela@parkerpoe.com

ON BEHALF OF THE DEFENDANT CHRISTOPHER GABEHART:

CARY B. DAVIS, Esquire
SPENCER T. WILES, Esquire
ANNA CLAIRE TUCKER, Esquire (via Zoom)
Robinson Bradshaw
600 South Tyron Street, Suite 2300
Charlotte, North Carolina 28202
(704) 377-8376
cdavis@rbh.com
swiles@rbh.com
atucker@rbh.com

APPEARANCES (CON'T)

ON BEHALF OF THE DEFENDANT SPIRE MOTORSPORTS, LLC:

TROY C. HOMESLEY, Esquire
BENJAMIN WHORF, Esquire
Troutman Pepper Locke LLP
301 South College Street, 34th Floor
Charlotte, North Carolina 28202
(704) 998-6509
troy.homesley@troutman.com
benjamin.whorf@troutman.com

ALSO PRESENT:

Cliff Williams, Videographer
Eric Schaffer, Joe Gibbs Racing
Bill Anthony, Spire Motorsports

VIDEOTAPED DEPOSITION OF CHRISTOPHER ALLEN GABEHART, a witness called on behalf of Plaintiff, before Amy A. Brauser, Certified Stenographic Court Reporter and Notary Public, in and for the State of North Carolina, at the law offices of Robinson, Bradshaw & Hinson, P.A., 600 S. Tryon Street, Suite 2300, Charlotte, North Carolina, on Tuesday, the 21st day of July, 2026, commencing at 9:10 a.m.

* * * * * * * *

INDEX OF EXAMINATIONS


By Mr. Walker . . . . . . . . . . . . . . Page 10, 337
By Mr. Homesley . . . . . . . . . . . . . . Page 325


INDEX OF EXHIBITS



| NUMBER | DESCRIPTION | MARKED/IDENTIFIED |
|---|---|---|
| Exhibit 1 | Cell phone records, Bates VERIZON_0000001 | 109 |
| Exhibit 2 | VOLTE Call Detail Explanation Form | 110 |
| Exhibit 3 | Cell phone records, Bates VERIZON_0000002 | 113 |
| Exhibit 4 | Compilation of VERIZON_0000002, Sorted Chronologically | 116 |
| Exhibit 5 | Second Supplemental Declaration of Clark C. Walton, Bates JGR_0000492 to 570 | 124 |
| Exhibit 6 | Declaration of Jeffrey Dickerson | 141 |
| Exhibit 7 | Forensic report of JGR computer recycle bin | 142 |
| Exhibit 8 | Text message string, Bates Berrier_0000003 to 004 | 155 |
| Exhibit 9 | Email string, Bates JGR_0000328 to 330 | 161 |
| Exhibit 10 | Excel spreadsheet, VERIZON_0000006 | 172 |
| Exhibit 11 | Historical SMS (Text Message) Detail Report Explanation Form | 173 |
| Exhibit 12 | Responses to Plaintiff Joe Gibbs Racing, LLC's First Set of Interrogatories to Defendant Christopher Gabehart | 175 |

INDEX OF EXHIBITS (con't)


| | | |
|---|---|---|
| Exhibit 13 | Letter to Christopher Gabehart from Tory Summey | 193 |
| Exhibit 14 | Cell phone records, JGR_0001734 | 196 |
| Exhibit 15 | Pit Coach Performance Bonus Sheet, Bates JGR_0002828 | 224 |
| Exhibit 16 | 2025 CC post-race audit data, Bates JGR_0002671 | 227 |
| Exhibit 17 | 2025 CC post-race audit data, Bates JGR_0002651 | 236 |
| Exhibit 18 | JGR employee salary document, Bates JGR_0002659 | 241 |
| Exhibit 19 | Tire Tech Weight Summary, Bates JGR_0002698 | 242 |
| Exhibit 20 | Declaration of Christopher Gabehart | 249 |
| Exhibit 21 | Simulation setup compare, "End Race E-lap Cold," Bates JGR_0002855 | 251 |
| Exhibit 22 | Post-Race Data Analysis, Bates JGR_0002865 | 255 |
| Exhibit 23 | Post-Race Diffuser Skirts, Bates JGR_0003014 | 256 |
| Exhibit 25 | Excel spreadsheet, Bates GABEHART00028 | 265 |
| Exhibit 26 | Excel spreadsheet, Bates GABEHART00029 | 270 |
| Exhibit 27 | Text message string, Bates GABEHART01649 to 651 | 283 |
| Exhibit 28 | Excel spreadsheet, Bates Spire_0000849 | 292 |

INDEX OF EXHIBITS (con't)


| | | |
|---|---|---|
| Exhibit 29 | Excel spreadsheet compiled from Exhibit 28 | 292 |
| Exhibit 30 | Text message string, Bates HOCEVAR_0051 to 52 | 300 |
| Exhibit 31 | Text message string, Bates GABEHART01798 to 799 | 306 |
| Exhibit 32 | Excel spreadsheet, Bates JGR_0001504 | 309 |
| Exhibit 33 | Unidentified document, Bates JGR_0002084 | 313 |
| Exhibit 34 | Forensics protocol document | 316 |
| Exhibit 35 | Declaration of Toni Rogers | 321 |
| Exhibit 36 | Confidentiality and Non-Disclosure Agreement, Bates Spire_0000332 | 330 |
| Exhibit 24 | Email with attachment, Bates GABEHART00468 to 482 (Exhibit marked but not discussed) | 340 |

P R O C E E D I N G S

THE VIDEOGRAPHER: Good morning. We are going on the record at camera time 9:10 a.m. Please note that the microphones are sensitive and may pick up whispering and private conversations. Please mute our phones at this time.

Audio and video recording will continue to take place unless all parties agree to go off the record.

This is the video-recorded deposition of Christopher Gabehart taken by counsel for the Plaintiff in the matter of Joe Gibbs Racing, LLC, versus Chris Gabehart and Spirit -- and Spire Motorsports, LLC, filed in the United States District Court for the Western District of North Carolina, Charlotte Division. The case number is 3:26-CV-00122-SCR-DCK.

The location of this deposition is at the offices of Robinson Bradshaw & Hinson located in Charlotte, North Carolina.

My name is Cliff Williams representing Veritext Legal Solutions. I am the videographer. The court reporter is

Amy Brauser, also from the firm of Veritext Legal Solutions.

Counsel, please, introduce yourselves for the record, after which questioning -- and Amy will swear the witness in and questioning can proceed.

MR. WALKER: This is Chad Walker for King & Spalding on behalf of the Plaintiff Joe Gibbs Racing. With me is Sarah Hutchins from Parker Poe, also Eric Schaefer from Joe Gibbs Racing. Listening in is Danielle Williams from King & Spalding, Taylor Hinojosa, and Maddie --

MS. HUTCHINS: Candela.

MR. WALKER: -- Candela will also be in from time to time.

MR. DAVIS: Cary Davis with Robinson Bradshaw for Defendant Christopher Gabehart. Spencer Wiles, my law partner, is here with me in the room. And joining us on Zoom are William Miller and Anna Claire Tucker.

MR. HOMESLEY: Troy Homesley of Troutman Pepper Locke on behalf of Spire Motorsports. Along with me is Ben Whorf, Troutman Pepper Locke, on behalf of Spire

Motorsports and Bill Anthony of Spire Motorsports.

CHRISTOPHER ALLEN GABEHART,

after having been first duly sworn by the certified stenographer, was examined and testified as follows:

EXAMINATION

BY MR. WALKER:

Q. Good morning, Mr. Gabehart. My name is Chad Walker. We met just a moment ago for the first time.

Would you, please, state your name for the record?

A. Yeah, Chris Gabehart.

Q. And where do you reside?

A. Morrisville, North Carolina.

Q. And you just swore an oath to tell the truth?

A. Yeah.

Q. And you're going to do that today, right?

A. Yeah.

Q. Is there any reason, medical or otherwise, that you can't answer my questions today truthfully, accurately and completely?

A. No.

conversationally.
Q. Did you attend meetings?
A. Yes.
Q. What -- what meetings did you attend weekly as competition director for JGR?
A. There were several. So one would be the competition meeting with the group. So the group would be drivers, crew chiefs, department heads, engineers, many business people. Eric was in a lot of them. Coach Gibbs, Heather, owner -- ownership. There's a lot in that particular group. That was a weekly meeting.
There was a smaller meeting with crew chiefs and a few select department heads.
And then there was production -- a production -- a weekly production meeting that was more focused on making sure that the logistics of car assembly, I guess is the best way I can explain it, were being met.
Those were -- those are some that come to mind.
Q. Okay. Did you do anything as competition director to -- at JGR to review prior race results?
A. Yes.

Q. Not quantifying it, but qualitatively, all those things are important to the success of the team?
A. Efficiency matters, yes.
Q. Did you -- as competition director at JGR, did you take in information from crew chiefs?
A. Yes.
Q. Did you provide information to crew chiefs?
MR. DAVIS: Objection, form.
THE WITNESS: Yes.
BY MR. WALKER:
Q. Did you provide them input on car setups?
MR. DAVIS: Objection, form.
THE WITNESS: Yes.
BY MR. WALKER:
Q. Did you provide them input on race strategy?
A. All of this line of questioning is not me singularly. I mean, this comes from departments, and certainly, we have communication about these types of things. That's the fairest way to say it. But to say that I'm the one providing any of these things would be a misnomer.

Q. Well, I'm not suggesting you're the only one, but I'm just trying to figure out what you did in your role. And so I'm not -- when I'm saying that you communicated about something, I'm not saying you only did it or you weren't part of a team, but I'm asking you about the things that you did or didn't do. Do you understand that?
A. Yes.
Q. So did you provide input to crew chiefs as competition director at JGR about competition strategy?
A. Yes.
Q. Did you provide input to drivers about competition strategy as director -- competition director at JGR?
A. Yes.
Q. Did you provide input to engineers as competition director at JGR of any kind?
A. Yes.
Q. Including about setups?
A. Yes.
Q. What about concerning aerodynamics?
A. With engineers? Is that -- is that the question?
Q. Yes, sir.

Q. Yes.
A. I would assume that it would be their 11 Cup car, but it depends on the context, I guess.
Q. Okay. So in other words, you know what I'm referring to when I'm talking about the 11-car for JGR? That was one of the cars you were in charge of in 2025 as competition director?
A. Yes.
Q. Did the 11-car change setups for any particular tracks in 2025 versus 2024 when you were the crew chief of it?
MR. DAVIS: Objection, form.
THE WITNESS: That's hard for me to say, but I would assume so, yes.
BY MR. WALKER:
Q. Do you remember any particular changes?
A. No.
Q. And so as competition director, what was your role during practices at -- for JGR?
A. Mostly observationally of what the four teams were doing. You know, I was plugged into a lot of data streams and the database, and, obviously, you know, their communications between the crew chiefs, engineers and drivers, spotter. But it was -- it was mostly making sure I was aware

of what was going on so I was prepared to talk about it when needed.
Q. And in what situations might you be needed to talk about it?
A. I led the post-practice and qualifying meetings, so I obviously needed to know what track we were at and what we were doing.
Q. And what kinds of things would you say at the meetings, the post -- at the post-practice and post-qualifying meetings?
MR. DAVIS: Objection, form.
THE WITNESS: I just made sure that there was structure to the meeting and that everyone was -- knew when to speak and what the subject matter was and would ask questions from time to time if there was something that I picked up on throughout the practice that I thought might add value to the meeting.
BY MR. WALKER:
Q. Would you provide strategic input?
A. Perhaps, yes.
Q. Would you give people instructions on things that you wanted them to implement, whether it be crew chiefs or something else?

A. No. I mean, again, the crew chiefs make their final decisions at JGR. But certainly, we converse -- we conversed about things, sure.
Q. Okay. Would you converse about the strategy for the race?
A. Sometimes, yes.
Q. And what about at the actual races, what was your role at a race as competition director for JGR?
A. The race itself, so on like a Sunday?
Q. Yes, sir.
A. Very similar to practice and qualifying. Be -- be aware of all the goings on in the race from a detailed and data perspective to make sure that I understood how each of the teams were performing.
Q. And so that's talking about taking in input from various sources. So what were the various sources of input you were actually taking in during the race?
A. Mostly through our database and analytics tools, software tools, whatever it may be. Of course, generic timing, scoring, tools, TV. Whatever it might be. I mean, lots of data sources.

Q. And where would you physically be taking in that information?
A. It varied.
Q. What would the options be where you could have access to those input sources?
A. Most often where I would be would be on pit road. Most often I would be -- I mean, for nine of the races, I was on a pit box as a crew chief, so it was much more focused there. But, you know, I mean, a lot of the resources needed were via computer or tablet.
Q. Would you listen to radio chatter during the race?
A. Yes.
Q. Why -- why would you do that?
A. To make sure I would understand what's going on. No different than anyone who would be listening to radio chatter.
Q. And so all these input sources, you were taking them in as -- I mean, part of your job was to take in all that information and be a repository for it, correct?
MR. HOMESLEY: Objection.
THE WITNESS: Part of my job was to know what was going on, yes.

BY MR. WALKER:
Q. And you did that by taking in the information from all those sources?
A. That was one of the ways, yes.
Q. And if needed, you would provide input to people that needed input from you?
A. Yes.
Q. What channels would you listen to during races to listen to race chatter?
A. Publicly available channels, so the analog channels, and then private channels, so intercom and so forth.
Q. What private channel or channels?
A. And intercom and so forth. So each of the teams have their own intercom.
Q. So in the case of JGR, the four race teams each have their own intercom?
A. Correct.
Q. And you could listen to each four of those as you saw fit?
A. Correct.
Q. And what about messaging, would you do any messaging during the race, Slack or anything like that?
A. Sometimes, yes.

Q. And who would you be messaging with during the race sometimes?
A. Most often the crew chiefs.
Q. And during the races, were you providing input or just mostly listening?
MR. HOMESLEY: Vague, vague. I'm sorry. Objection, vague as to time. Just want to make sure we're clear on the record about what time period you're talking about here.
BY MR. WALKER:
Q. As competition director in 2025, at races, were you mostly listening or mostly providing input?
A. During races? Mostly listening.
Q. Including on the radio, you're more listening to the radio than providing input on the radio?
A. Yes.
Q. As competition director at JGR, did you consider yourself the central hub for competitive information?
MR. DAVIS: Objection, form.
THE WITNESS: No, I think that would -- I think that would be too broad a branch at

A. I mean, again, at JGR, the crew chiefs make a lot of their decisions. Was I unaware of tire strategy? That wouldn't be fair to say. Did I have anything to do with making decisions on the teams' tire strategies? No.
Q. You didn't -- you never provided any input into tire strategy?
A. I provided input, yes. Made decisions, no.
Q. Okay. Did you provide input into fuel mileage strategy?
A. Provided input, yes. Made decisions, no.
Q. Did you provide input into team logistics?
A. Define "team logistics."
Q. So, for example, transportation of cars and things of that nature.
A. I worked with the teams to get them what they needed and things like transportation logistics.
Q. Did you provide input into that?
A. Yes.
Q. What about the processes for purchasing parts, did you provide input into that?

oftentimes 38 times a week.

Q. Other than those -- seeing him at the track in the course of -- in the course of events type of thing, did you do anything -- did you have any other interactions with Mr. Dickerson?

A. I mean, every now and then. Casual, yes.

Q. What do you -- what do you mean by "casual" interactions outside of the -- outside of the track events?

A. For example, at dinner or something like that.

Q. Would you have dinner with just Mr. Dickerson or a small group of people?

A. It would depend on the situation.

Q. Okay. During that time frame, did you ever discuss, you know, possibly working with Mr. Dickerson in the future?

MR. DAVIS: Objection, form.

THE WITNESS: No.

BY MR. WALKER:

Q. Before October of 2025, how often would you say you were in contact with Mr. Dickerson, generally speaking?

A. I don't recall specifics, but generally

A. Term, base, salary. Those kinds of things.
Q. And what do you recall the term or base or salary was?
A. The same -- I recall the same as my Employment Agreement now, but I don't remember specifically.
Q. So do you remember a base of $3 million per year?
A. As I recall.
Q. What other aspects of it do you recall other than the base?
A. Any more detail than that, I don't know.
Q. Do you recall -- do you recall there being some bonuses tied to it in that initial message?
A. Perhaps, yes.
Q. What do you recall about that?
A. I would say it most nearly mirrors my agreement now, but that's not -- I don't recall the details.
Q. Did you recall that the bonuses were tied -- would be tied to Cup Series performance?
A. I don't recall.

A. Ooh. My wife would definitely say no.
Q. Okay. Had you been more involved in competition early on than later of your time at Spire?
A. I mean, you're focusing --
MR. DAVIS: Objection, form.
THE WITNESS: You're focusing on one part of Spire. So what you have to realize is I've been to many, many races, not all of which -- in fact, the minority of are Cup.
BY MR. WALKER:
Q. I'm focusing on Cup Series.
A. Yes. Okay.
Q. And you understand that your noncompete is about Cup Series, don't you?
A. Yes.
Q. So what I'm saying is, have you changed your role in competition over time at Spire with respect to what you do with respect to competition? Have you scaled it back?
MR. HOMESLEY: Objection.
MR. DAVIS: Objection, form.
THE WITNESS: No.
BY MR. WALKER:
Q. So there was never any directive from

anybody at Spire that you needed to change what you're doing at competition in any way for Cup Series?
A. There has been no change in my job. There has been caution so we're not purported to be breaking any kind of noncompete, because we're not.
Q. Okay. How have you been instructed to implement that caution?
MR. DAVIS: Objection.
BY MR. WALKER:
Q. And I'm not talking about from your counsel. I'm talking about from anybody -- anybody other than counsel.
A. There's -- there's been none. I mean, other than what I just said, there's been none. It's just being cautious.
Q. Being cautious to do what?
A. To subject myself to scrutiny, undo.
Q. And what are the kinds of things you think would subject you to scrutiny that you're trying to avoid?
A. Pictures of me in all different places as a -- at a race track, mischaracterizing what it is that I'm doing, freely and openly, and stating it as fact.

Q. Where is the Spire war room?
A. At their race shop.
Q. And who is the -- what is the ability of the Spire war room to communicate with competition personnel during a race?
A. I'm honestly not sure because I've never used it for that point, but I would presume they can communicate to people at the track.
Q. Okay. And would you -- do you know whether Mr. Dickerson is able to communicate with people at the track during a race?
A. Certainly. I would think so.
Q. Okay. And let's look at a couple portions of this.
The third text down says: (Reading)
We executed the first stage pretty well.
And then how do you respond? Would you mind reading that out loud?
A. Yeah, sure. I said: (Reading)
Yes, I'm sitting next to Dax. I have a couple of observations, but overall, good coms and execution.
Q. Who is Dax?
A. Dax is the Cup technical director.

Q. Okay. And Dax Gerringer?
A. Yes.
Q. When you say "a couple of observations," you mean a couple of observations about the Daytona 500 race that Spire was participating in at that time, correct?
A. Yes. And I would imagine myself and several million people were also watching with observation.
Q. But several million people were not in Spire's war room with the president -- with the owner of Spire and a direct communication link into the competition personnel at Spire who were conducting the race, correct?
MR. DAVIS: Objection.
MR. HOMESLEY: Objection.
THE WITNESS: I'm not sure what your question is there. It was pretty long. But are you saying were all several million people inside of that room?
BY MR. WALKER:
Q. Yes, sir.
A. No, I don't think so.
Q. Thank you.
So let's look down at the

[redacted]

MR. HOMESLEY: Objection as to "Spire's system."

MR. DAVIS: Objection.

THE WITNESS: [redacted]

BY MR. WALKER:

Q. [redacted]

A. [redacted]

Q. [redacted]

A. [redacted]

Q. [redacted]

A. [redacted]
Q. [redacted]
MR. DAVIS: Objection, form.
THE WITNESS: [redacted]
BY MR. WALKER:
Q. [redacted]
MR. DAVIS: Objection.
THE WITNESS: [redacted]
BY MR. WALKER:
Q. [redacted]
A. [redacted]
Q. [redacted]
A. [redacted]

STATE OF NORTH CAROLINA
COUNTY OF DAVIDSON

C E R T I F I C A T E

I, Amy A. Brauser, RPR RMR CRR, the officer before whom the foregoing deposition was taken, do hereby certify that the witness was duly sworn by me prior to the taking of the foregoing deposition; that the testimony of said witness was taken by me to the best of my ability and thereafter reduced to typewriting under my direction; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.

This is the 23rd day of July, 2026.

Amy A. Brauser, RPR RMR CRR
Notary Public # 20023030055