# Exhibit H

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Case No. 3:26-cv-00133-SCR-DCK

JOE GIBBS RACING, LLC, )
)
Plaintiff, )
)
vs. )
)
CHRISTOPHER GABEHART and )
SPIRE MOTORSPORTS, LLC, )
)
Defendants. )
___________________________________/

VIDEOTAPED RULE 30(B)(6) DEPOSITION OF SPIRE
MOTORSPORTS, LLC, by JEFFREY DICKERSON
(Taken by Plaintiff)
Charlotte, North Carolina
Wednesday, August 26th, 2026
1:43 p.m.

Certified Stenographic Court Reporter
Karen Kidwell, RMR, RPR, CRR

APPEARANCES

ON BEHALF OF THE PLAINTIFF JOE GIBBS RACING, LLC:

CHAD B. WALKER, ESQUIRE
DAVID TAYLOR HINOJOSA, ESQUIRE
King & Spalding LLP
2601 Olive Street, Suite 2300
Dallas, Texas 75201
(214) 764-4451
cwalker@kslaw.com

ON BEHALF OF THE DEFENDANT CHRISTOPHER GABEHART:

ANNA CLAIRE TUCKER, Esquire
Robinson, Bradshaw & Hinson, P.A.
600 South Tyron Street, Suite 2300
Charlotte, North Carolina 28202
(704) 377-8383
atucker@rbh.com

ON BEHALF OF THE DEFENDANT SPIRE MOTORSPORTS, LLC AND THE WITNESS:

JOSHUA D. DAVEY, Esquire
Troutman Pepper Locke LLP
301 South College Street, 34th Floor
Charlotte, North Carolina 28202
(704) 916-1503
joshua.davey@troutman.com

ALSO PRESENT:

William Anthony, Spire Motorsports
Jenna White, Paralegal, Troutman Pepper
Esmeralda James, Videographer

On August 26, 2026, commencing at 1:43 p.m., the Videotaped Rule 30(b)(6) Deposition of Spire Motorsports, LLC, by JEFFREY DICKERSON was taken pursuant to the Federal Rules of Civil Procedure, on behalf of the Defendants, before Karen Kidwell, Registered Merit Reporter, Certified Realtime Reporter, and Notary Public, in and for the State of North Carolina, at Troutman Pepper Locke LLP, 301 South College Street, Suite 3400, Charlotte, North Carolina, 28202.

* * *

I N D E X


| WITNESS/EXAMINATION | Page |
|---|---|
| JEFFREY DICKERSON | |
| By Mr. Walker | 7 |
| By Mr. Davey | 147 |


E X H I B I T S


| Number | Description | Page |
|---|---|---|
| Exhibit 1 | 11/15/2024 Employment Agreement between Joe Gibbs Racing, LLC and Chris Gabehart, Confidential, Bates JGR_0001857-1862 | 10 |
| Exhibit 2 | Venn Diagram Spire's View of Activities Permitted Under the Restrictive Covenant and hand-drawn diagram on back page | 41 |
| Exhibit 3 | 5/5/2026 E-mail, William Anthony to Spire All, Confidential, Bates Spire_0000757-758 | 67 |
| Exhibit 4 | 4/20/2026 Kansas meeting notes, Confidential - Outside Counsel Only, Bates Spire_0001712 | 71 |
| Exhibit 5 | Chart of quoted testimony, beginning Dickerson (7/29/26) | 79 |

E X H I B I T S (Cont'd)


| Number | Description | Page |
| --- | --- | --- |
| Exhibit 6 | Outside Counsel Only, Produced in Cleanroom, Bates JGR 3435 | 83 |
| Exhibit 7 | Colored chart, Confidential-Outside Counsel Only, Bates Spire_0000849 | 106 |
| Exhibit 8 | Exhibit C, Forensic Review Protocol document | 130 |


REPORTER'S NOTE: All quotations from exhibits are reflected in the manner in which they were read into the record and do not necessarily indicate an exact quote from the document.

CHARLOTTE, NORTH CAROLINA, WEDNESDAY, AUGUST 26, 2026

P R O C E E D I N G S

- - -

VIDEOGRAPHER: This is the beginning of Media Number 1 of the deposition of Jeff Dickerson, in the matter of Joe Gibbs Racing, LLC, vs. Gabehart, Christopher, et al.

Today's date is August 26th, 2026. The time is 1:43 p.m.

My name is Esmeralda James; I'm the videographer. The court reporter is Karen Kidwell, and we are here with Veritext.

Will counsel please introduce themselves and who they represent, after which the court reporter will swear in the witness.

MR. WALKER: Chad Walker, King & Spalding, for the plaintiff. With me is Taylor Hinojosa.

MR. DAVEY: Joshua Davey and Jenna White, of Troutman Pepper Locke, here on behalf of Spire Motorsports. We're joined by Bill Anthony, also of Spire Motorsports.

MS. TUCKER: Anna Claire Tucker, with Robinson Bradshaw, here on behalf of Christopher Gabehart.

///

JEFFREY DICKERSON
being first duly sworn, testified as follows:

EXAMINATION

BY MR. WALKER:
Q. Would you please state your full name for the ladies and gentlemen of the jury?
A. Jeffrey Dickerson.
Q. And you are the co-owner of Spire; is that correct?
A. I am.
Q. And you previously gave some deposition testimony in this case in your individual capacity. Is that true?
A. I did.
Q. And you understand that the same ground rules apply in this deposition concerning breaks, and talking over each other, and that kind of thing?
A. I'll do my best. Yeah.
Q. Okay. And today, by contrast, you are testifying on behalf of Spire regarding various topics concerning which you've been designated as the corporate representative. Do you understand that?
A. I do.
Q. And what have you done to prepare for that role, to testify as a corporate representative?

Come back to me and I'll help you. Okay?
A. I'm just making sure -- I'm just making sure I've got the right --
Q. Sometimes we refer to this second paragraph as 6.2, but it's really just the second paragraph, I think is what you're looking for.
A. Okay. Yeah, I'm just trying to make sure that I've got the right document. That's all.
Q. Yeah, that's fine. And look, if -- if I do something that's tricky or incorrect, then your counsel I'm sure will have a chance to correct it.
A. Yes, sir.
Q. Okay. So all that I'm asking you right now is: Do you see this language --
A. I do.
Q. -- in the first, it says "Employee shall not provide services of the general type of services" --
A. I do.
Q. -- "that employee provided to company." Do you see that?
A. I do.
Q. Okay.
MR. DAVEY: Just -- make sure you let him finish his question before you jump in.

BY MR. WALKER:
Q. And so does that refresh your recollection that the scope of Mr. Gabehart's noncompete with JGR makes reference to the services that he provided at JGR?
MR. DAVEY: Objection to the form.
THE WITNESS: Yeah, I'm -- I understand.
BY MR. WALKER:
Q. Okay. Now I'm going to ask you what knowledge Spire has about the services that Gabehart provided to JGR during his last year of employment there. Did -- did Spire understand, before it hired Mr. Gabehart, that he was at JGR the Cup Series director of competition?
A. Yes.
Q. And did Spire understand that Mr. Gabehart at JGR sometimes attended meetings with Cup Series competition personnel?
A. Am I familiar with that? I imagine that -- yeah, the competition director does all that, yeah.
Q. And did Spire know that before it hired him?
A. I'm just -- I just assumed that he was in competition meetings, yes.

Q. Okay. And was he -- was Mr. Gabehart in pit crew meetings at JGR? Is that something Spire knew?
A. Sure. I mean, he's the comp director, yeah.
Q. And race engineer meetings?
A. I mean, I don't know what your competition director does or doesn't. I know that our competition director is in engineering meetings, so you tell me.
Q. And you believe that you -- and Spire believed, before it hired Mr. Gabehart, that Mr. Gabehart attended engineer meetings with JGR from time to time?
A. I'm not sure I asked -- I'm just saying I understand what our guys do. And our -- our comp director goes to engineering meetings and pit crew meetings.
Q. And you assume Mr. Gabehart did the same?
A. At --
Q. At JGR?
A. Sure.
Q. Okay. Did Spire know or assume, before it hired Mr. Gabehart, that while at JGR he gathered information from engineers?

A. Sure. I -- I don't -- yes.
Q. Crew chief?
A. Hold on. I'm not sure that I know. I'm just saying like -- I know what -- generally what a comp director does. I'm not sure what a comp director does at Joe Gibbs Racing. I'm just saying -- when I'm saying "yes," I'm saying that's what -- I think what our comp director does, Matt McCall. That's what he does.
Q. And you assume that Mr. Gabehart did the same at --
A. I'm assuming, yes.
Q. -- at JGR?
And you assume that he talked with crew chiefs?
A. Yes.
Q. And car chiefs?
A. Yes.
Q. And drivers?
A. Yes.
Q. And NASCAR officials?
A. Sure.
Q. And OEM employees, which in the case of JGR, would be Toyota?
A. Yes.

Q. And that he received information from all of those different types of people?
MR. DAVEY: Objection to the form.
THE WITNESS: I -- you're asking me to -- if I knew he did that? Or --
BY MR. WALKER:
Q. If you knew or assumed.
A. I assumed that he was -- was talking to -- you know.
Q. Did Spire know or assume, before it hired Mr. Gabehart, that he received information about races, when at JGR?
A. Yes.
Q. Did -- did Spire know or assume that Mr. Gabehart provided input into competition strategy when at JGR?
A. While at JGR? Sure. Yes.
Q. Including high-level input?
A. What's -- what do you mean by "high-level"?
Q. Well, he could provide input of all kinds; some high-level, some very specific?
A. I know, but what's "high-level"? What do -- what do you consider high-level?
Q. What do you consider high-level?

A. Like from an ownership perspective? Like from an executive perspective?
Q. Explain what you mean by "high-level input."
A. Well, what -- the reason I'm asking you that is because I sit in comp meetings now, and my high-level input is essentially saying the most basic, obvious stuff.
Q. Okay.
A. So I'm -- that's what I'm saying, is just like -- when you mean "high-level," do you mean from a -- a high-level executive level?
Q. Okay.
A. I mean, he -- but he was an executive high-level. He was a comp director.
Q. Okay.
A. At your -- at your place.
Q. Okay. And what's an example of -- well, let's keep moving.
Did you know or assume that at JGR, Mr. Gabehart interfaced with JGR Cup Series drivers?
MR. DAVEY: Objection to the form.
THE WITNESS: Yes.
BY MR. WALKER:
Q. And did you know -- did Spire know that he

also performed crew chief duties for JGR's Number 55 car?

MR. DAVEY: Objection to form.

THE WITNESS: It was the 54, but yes.

BY MR. WALKER:

Q. 54. Thank you.

And that he determined strategy issues for the 54 car?

A. Absolutely. That is consistent with what a crew chief would do, yes.

Q. Including input into providing adjustments to the car?

A. That's what a -- even the bad ones make adjustments on cars.

Q. Okay.

A. During pit stops at the racetrack, that's what they do.

Q. Did -- did Spire know or assume that when Mr. Gabehart was at JGR, competition personnel approached Mr. Gabehart for input into strategy?

A. As the --

MR. DAVEY: Objection to the form.

THE WITNESS: As the crew chief of the 54?

BY MR. WALKER:

Q. In any capacity.

A. That they went to him for strategy?
Q. Yes, sir.
A. I mean, is that how -- is that what JGR does?
Q. Well, I'm asking what Spire knew or assumed. Did you know or assume that he did that?
A. I don't -- I just -- I know what we do. That's what I'm saying, is just like in our place, our comp director is not like giving minute -- or any executive is giving like strategy advice to anybody. Crew chiefs handle the -- the strategy on their own cars.
Q. Are crew chiefs asked for input from time to time on -- I'm sorry.
Is your competition director asked for input from time to time?
MR. DAVEY: Objection to the form.
BY MR. WALKER:
Q. On strategy?
A. I'm -- sure. You could -- in the middle of a race? I'm just --
Q. At any point during the week.
A. All right. Sure.
Q. And did you know, or did Spire know or assume that Mr. Gabehart was asked about strategy

from time to time?
A. Sure.
Q. What, if anything, did Spire do to investigate Mr. Gabehart's role at JGR before hiring him?
A. I was hiring him for a different position. Spire -- or should I say "I," or "Spire"? How do I -- either?
I was hiring him for a different position. I didn't care if he knew strategy or not strategy, or adjustments or not adjustments. That's not the role that he does at Spire.
Q. And so you didn't ask him anything about what roles he performed at -- at JGR before hiring him; is that correct?
MR. DAVEY: Objection to the form.
THE WITNESS: I know Chris. I generally know what he's capable of. And so I'm -- what I'm saying is understanding that that's his background, that's not what he's doing at Spire.
BY MR. WALKER:
Q. All right. And I'm not asking you about what he's doing at Spire. I'm just asking you about what -- what Spire knew about what he did at JGR at this point. Do you understand that question?

A. I do, but I'm just saying, is like the -- you're asking -- I wouldn't know what -- you know what I mean? Like it's -- we all have general ideas of what comp directors do, or -- you know what I mean? Or technical directors do, or what ownership does, or -- you know what I mean? Like -- we all have general understanding. That's what I'm saying "yes" to.

Q. And I'm just asking if you did anything else to ask him about what he did, either as competition director or as crew chief, during that past year before hiring him.

A. It didn't -- the only times that we were trying to figure out like the general types of services is after the PI ruling.

Q. What is Spire's position on any activities that Mr. Gabehart cannot do for Spire related to the Cup Series without violating the restrictive covenant?

MR. DAVEY: Objection to form.

THE WITNESS: Ask that one more time?

BY MR. WALKER:

Q. Sure. What is Spire's view about any activities that Mr. Gabehart cannot perform for the Cup Series for Spire, related to the Cup Series,

your proprietary information.
BY MR. WALKER:
Q. Now, does Spire understand that the -- that the scope of the restrictive covenant has got nothing to do with whether confidential information is involved?
MR. DAVEY: Objection to the form. Calls for a legal conclusion.
THE WITNESS: The restrictive covenant has no -- what?
BY MR. WALKER:
Q. The restrictive covenant, the scope of the restrictive covenant, as we talked about at the beginning, is governed by the services he provided at JGR, not whether confidential information is involved. Do you understand that?
A. Sure. But that's not what -- that's not what he's doing. If he's talking to Travis Peterson, he's not talking as the comp director, right? People bench-race all of the time. Again, these are like the best, most advanced, smartest people in the world. I'm just saying this is like -- this is not like -- an executive would do that at Spire.
Q. Right. And so that's all that I'm getting at, is --

A. Right.
Q. I've read your testimony carefully, and it seems to me that Spire's basic position is that an activity is within bounds of the restrictive covenant so long as it's the kind of thing that a Spire executive, such as yourself, would do.
MR. DAVEY: Objection to the form. Calls for a legal conclusion.
THE WITNESS: I -- I know what comp directors do. I know what executives do. Right? I know the -- whether -- and again, but I'm not -- I know I'm not asking you questions; it's like -- I don't know that we've asked, "Hey, Coach, how do you participate in meetings?" Right? Or "How do you participate in comp meetings?" I know they go to them as well. Right?
So I'm just saying, it's like -- at Spire, everybody contributes. Right? And everybody has information, and they have their own things that they've -- their own experiences coming up, and their own ideas, right? And we -- we encourage everybody to have those kinds of discussions.
///

But saying that, you had asked me what we were doing. He's not involved with anything on Cup.
Q. So even if he is doing the things that you said were improper adjustments, if he's doing that in his role as an executive for Spire, you believe that's -- that's appropriate?
A. There is no executive --
MR. DAVEY: Objection to the form.
THE WITNESS: -- in NASCAR that is doing adjustments on a race car.
MR. WALKER: Objection. Nonresponsive.
BY MR. WALKER:
Q. Sir, you're -- you're not answering my question. You're -- you're answering my question of what he does. I'm asking you about if he did something, if he did something, does the fact that he is called an executive make it okay under the restrictive covenant, in Spire's view?
A. Yeah, but --
MR. DAVEY: Objection to the form.
THE WITNESS: The way you're -- the way you're asking that --
BY MR. WALKER:
Q. Yes? Is that a yes?
A. The way you're asking that, if I'm an

executive and I grab the steering wheel and go drive around the racetrack, I'm the driver. Okay?

What I'm saying is that that would never happen. There's not an executive that is calling races. There's not an executive that is making adjustments at the racetrack. There's not an -- there's not an executive that are doing these things that you're talking about.

It's like -- but any -- any executive that has been in competition, including -- owners, like myself, can talk air pressure. That's not a proprietary thing. Okay? That's not something -- an owner can talk about it. It's not just a competition director. It's not just a chief motor sports officer. Everybody can talk about air pressure. That's not violating anything.

Q. Okay. So in your view, Mr. Gabehart could talk about tire pressure all he wants. That's not violating the restrictive covenant?

MR. DAVEY: Objection to the form.

THE WITNESS: He's not talking about it all he wants. Right?

BY MR. WALKER:

Q. But if he did, he could do that -- in Spire's view, he could do that all he wants, and it

wouldn't violate the restrictive covenant?
MR. DAVEY: Objection to the form.
THE WITNESS: He's not violating the restrictive covenants.
MR. WALKER: Objection. Nonresponsive.
BY MR. WALKER:
Q. You're -- you're -- do you understand that you're -- you're not answering my question about Spire's position; you're answering my question about what you believe he's doing?
I'm asking you about your -- Spire's position --
A. Spire's --
Q. If he did --
A. Spire's position is that everybody bench-races. Everybody can talk about air pressure. Anybody can talk about anything they -- anything they want, as long as we are not violating what -- a preliminary injunction ruling. Okay?
And what I've said to you is that we pulled him out of all those things. Anything that touches what's -- what -- any direction you're asking these things, he is not even close to any of them.
Q. So what did you pull him out of after the TRO that he was doing before?

A. Nothing. I pulled him out of going to -- the risk versus reward. I -- I have watched what -- I have watched your -- your tactics. Right? And I've watched how you guys started taking pictures of him going to the racetrack, even though that was -- the judge said he could go to the racetrack, but you guys thought it would be a good idea to take pictures of it. Okay?

So I pulled him out of anything. You know why? So that if I'm sitting in a deposition room and you're asking me questions like this, I can look you in the eye and say, "He's not doing any of that."

And I know he's not doing any of that, because we pulled him out of everything. Right? Not because the judge said it; because we said it. We're the ones that pulled him out of things. We're the ones that say, "You don't go to Cup races." We're the ones that say, "You don't go to these Cup meetings anymore."

He could. Executives go all the time. Bill goes; he's an executive. All right?

What I'm just saying is just like, again, you guys are looking at him like he's this, right? Just because I look at him like he's this, you guys are trying to -- going to try to hang us with it.

Right?

I'm saying I'm not taking that chance. A priority of us at Spire, corporate entity, is that we are winning this case. Right? And I'm not going to be sitting as a corporate representative answering these types of questions, telling you what you think I'm doing, when I can look at you and say, "He's not in any of those meetings."

And that's not how any Cup team is structured. There is no executive that's making adjustments on pit row. There's not any executives that is calling strategy. Right? That's not how race teams operate.

That's why -- it's like you're asking me these things where it's just like -- yeah. You know? You're -- you have these like hypotheticals, and it's like those things don't occur. They just don't occur.

MR. WALKER: I'm going to object as nonresponsive.

BY MR. WALKER:

Q. Have you pulled Mr. Gabehart out of competition meetings?

A. I instructed to have Chris Gabehart taken out of comp meetings, yes.

Q. When did you do that?
A. I don't know. Probably in late May or early June.
Q. Okay. So that was -- that was several months after the temporary restraining order?
A. It was -- it was probably two months.
Q. Okay. Why did you do that -- why did you make that instruction at that point?
A. Because I was tired of you guys splitting hairs on what he was doing because he went to a racetrack.
I mean, we're going to have a collage at our Christmas party of all your pictures of Chris Gabehart sitting in the stands at racetracks. Right? Or looking at the pylon at a racetrack.
And everything -- you guys are trying to make it look like everybody in the whole sport is a comp director, and that's a racetrack, and what's he doing, his job. That's not what he's doing.
So I can. Right? It's my company, right? I can be like -- "Listen, we don't even need to give them any ammunition. We don't need to explain anything. It's a lot easier to go to these things and just say, 'Hey, he's not in them. He's not at these races.'" Right?

Q. Have you instructed Mr. Gabehart to stop saying obvious things with competition personnel?
A. I don't -- I don't have to. He's not in comp meetings. He's not anywhere near -- he's not -- anything to do with Cup Series. Not -- not one thing.
Q. Spire knows that there -- that Mr. Gabehart has attended some competition meetings since he started working for Spire?
A. I know he's been in some, yes.
Q. Okay. And he has shared some input at some of those meetings, correct?
MR. DAVEY: Objection to the form.
THE WITNESS: I think Chris has said a few things, none of which that I would consider anything more than the most elementary, basic stuff.
BY MR. WALKER:
Q. Okay. But it relates to Cup Series competition issues, correct?
A. If it was a Cup Series comp meeting.
Q. And the words that were coming out of his mouth had something to do with Cup Series competition?
A. It had something to do with the

BY MR. WALKER:
Q. Have people been rolling eyes at Mr. Gabehart's conduct at Spire in his role?
MR. DAVEY: Objection to the form.
THE WITNESS: I would not say that they've rolled their eyes. I'm saying like it's just not -- this isn't -- this is like the most -- this is what I'm talking about, man. This is like the most obvious thing I've seen.
BY MR. WALKER:
Q. You sitting here, you don't even how he calculates well-executed race?
A. I don't care how he -- I don't care how he calculates it.
Q. And you don't know?
A. I don't know, and I would -- don't care. And don't -- wouldn't even ask. I don't need him to tell me what a well-executed race looks like. It's not why he's here.
Q. I want to ask you some more about what Spire has done to ensure Mr. Gabehart has not -- you can set that aside, if you want -- any trade secret or confidential information, verbally.
Has Spire restricted Mr. Gabehart from being physically present in any area of Spire's

facility where Cup Series competition work is performed?

A. He doesn't go to the Cup Series, sir.

Q. Has he been restricted from that?

A. I -- I don't know that he's been restricted, but I mean, yeah, he doesn't -- he knows not to go towards any -- anybody over there.

Q. How does he know that?

A. Because I've said to him, like I've said to you -- like when we pulled him out of stuff, I didn't say -- didn't tell him why we're pulling him out of stuff. I said, "I'm winning this case."

Q. What about before -- so you're talking about your May-or-so directive. What about before that?

A. Well -- yeah, but in May, we weren't giving him a directive to take stuff away from him. In May, we're just giving him -- we're just making sure that -- and underlined that this is his role; these are the services he provides. All right?

Talking about tire pressures, and things like that, that -- those are like activities. Okay? I'm not worried about activities. I'm worried about services. Okay? I'm just underlining what his services are. That was the May 5th e-mail.

Q. What's the distinction you're making between activities and services?
A. Because -- an employee provides services, right? The TRO is about services, or the PI is about services. It's not about behavior. It's about services.
Q. Are services not behavior?
A. No.
Q. What do you mean by that?
A. I don't know. Is -- if he's standing somewhere and talking, that's a behavior. If he's listening, that's a behavior. That's not the service. Service is he's a CMO. Service is that he's a -- not a competition director.
I know what the general services of what a comp director does. I'm --
Q. Could -- could providing input on competition strategy be a service?
A. No.
Q. Could providing input on setups be a service?
A. Sure. He's not doing that.
Q. Okay. Could providing advice on methods for checking airbox sealing be a service?
MR. DAVEY: Objection to the form.

A. Not yet.
Q. But you consider him to be in that same kind of class?
A. I do.
Q. Because of what he can do, among other things, to help the Spire Cup Series?
A. As -- he'll help Spire Motorsports. And as -- as I know you know, that's how he's described in your -- in your client's four -- four walls like he's a generational talent.
Chris -- Chris Gabehart, you know, if he wants to -- if he wanted to stay -- still be a crew chief -- I know that he wanted to stay being a crew chief -- he'd be in the Hall of Fame too.
Q. If Mr. Gabehart believed that 50 percent of Spire's improvement after his arrival over time was attributable to Mr. Gabehart's role, that's not something that you would have -- Spire would think would be unreasonable, do you?
MR. DAVEY: Objection to the form.
THE WITNESS: If Chris Gabehart thinks he's -- 50 percent of our improvement is because of him?
BY MR. WALKER:
Q. After his arrival, forecasting it before

STATE OF NORTH CAROLINA
COUNTY OF MECKLENBURG

I, Karen K. Kidwell, RMR, CRR, in and for the State of North Carolina, do hereby certify that there came before me on Wednesday, August 26, 2026, the person hereinbefore named, who was by me duly sworn to testify to the truth and nothing but the truth of his knowledge concerning the matters in controversy in this cause; that the witness was thereupon examined under oath, the examination was stenographically reported and reduced to typewriting under my direction, and the deposition is a true record of the testimony given by the witness.

I further certify that I am neither attorney or counsel for, nor related to or employed by, any attorney or counsel employed by the parties hereto or financially interested in the action. Signature of transcript was not requested.

This the 27th day of August, 2026.



Karen K. Kidwell, RMR, CRR
Notary Public #19971050142