**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**Case No. 3:26-CV-00133-SCR-DCK**

JOE GIBBS RACING, LLC,

Plaintiff,

v.

CHRISTOPHER GABEHART and SPIRE MOTORSPORTS II, LLC,

Defendants.

**PLAINTIFF JOE GIBBS RACING, LLC'S MEMORANDUM OF LAW IN SUPPORT OF RENEWED MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff Joe Gibbs Racing, LLC ("JGR" or the "Company"), pursuant to Rule 65 of the Federal Rules of Civil Procedure, respectfully submits this Memorandum of Law in Support of its Renewed Motion for Preliminary Injunction ("Renewed Motion for PI") to enjoin Spire Motorsports II, LLC's ("Spire") from misappropriating JGR's Trade Secrets and tortiously interfering with its contractual relations.[1]

## INTRODUCTION

JGR brings this Renewed Motion because the factual premise of this Court's denial of injunctive relief against Spire has collapsed. At the March 26, 2026 PI Hearing, Spire told this Court that its forensic examiner had searched Spire's systems for the JGR files identified in the Walton Declaration and that Spire did not "have anything." Ex. A, PI Hr'g Tr. at 66:3–8. Counsel likewise represented that "[n]o one at Spire has seen" Gabehart's Focus Plan, his roadmap for operationalizing JGR's Trade Secrets at Spire. *Id.* at 54:17–18. Relying on those representations

[1] As used herein, "Trade Secrets" has the same meaning as JGR's "Confidential Information and Trade Secrets," as used in JGR's Memorandum in Support of Temporary Injunction and Preliminary Injunction (Dkt. 10), the Courts Preliminary Injunction Order (Dkt. 78), and Gabehart's JGR Employment Agreement (Dkt 8-2).

and on Spire's assurances that it had revoked Gabehart's access to its computer systems, instructed him not to disclose JGR information, and signed a non-disclosure agreement with Gabehart, the Court found that JGR had not "clearly shown that Spire acquired, used, or disclosed any of the JGR trade secrets" and credited Spire's "proactive steps" to prevent disclosure. PI Order ¶¶ 66, 74. Fact discovery has since shown that each of those premises was false.

Spire has acquired JGR's Trade Secrets. As discussed in Section II.A, *infra*, the "CG Master"—the spreadsheet Gabehart built to replicate JGR's proprietary "CC Audit," which this Court has already found to contain trade secrets—was sitting on Gabehart's Spire-issued laptop. Indeed, Spire's own forensic examiner identified it there, along with Gabehart's Focus Plan, at least a week before the hearing at which Spire told the Court it did not have JGR's information and had never seen the Focus Plan. Spire revoked Gabehart's system access because it had located those files. Yet Spire disclosed none of them to the Court at the PI Hearing—and did not produce the CG Master spreadsheet until months later, in July 2026. The documents Spire disclaimed were on Spire's own computer system.

Spire does not merely possess JGR's Trade Secrets; it has used them. Sections II.B–II.D, *infra*, outline Spire's use. In his first weeks at Spire, Gabehart [redacted] He did so as Spire's Chief Motorsports Officer and for Spire's benefit. His use is Spire's use. He continued to [redacted] Gabehart also delivered JGR's Trade Secrets to Spire's competition personnel by mouth. Spire's Technical Director recorded Gabehart's contributions at a Cup Series Kansas race debrief, including comments concerning [redacted] JGR spent

years developing, and items that map to Gabehart's Focus Plan. Spire then adopted those processes. It had never [redacted] before the 2026 season—the season Gabehart arrived and raised those subjects in a Spire competition meeting. Gabehart's oral disclosures were not limited to JGR's processes. Spire's crew chief Travis Peterson testified that Gabehart disclosed JGR's [redacted], *see* Section II.C, *infra*, specific data points from the setup files this Court has found to be JGR's "secret sauce." *See* PI Order ¶ 62. Because Spire has refused to produce its own setups, JGR cannot yet test how far that information traveled.

The safeguards Spire represented it had implemented at the PI Hearing have not, in fact, mitigated Spire's acquisition or use of JGR's Trade Secrets. For example, Spire revoked Gabehart's Spire email access but never monitored or restricted the personal email account and personal computer he uses to do Spire's work—the same devices on which JGR's Trade Secrets still reside. Further, Spire never told a single member of its competition staff to limit what they discussed with Gabehart, and never attempted to determine what services Gabehart's JGR Employment Agreement actually barred until after this Court entered the PI Order. Spire closed one channel and left every other channel open. *See* Section II.E, *infra*.

Not only has Spire misappropriated JGR's Trade Secrets, but Spire has also induced Gabehart's breach of his JGR Employment Agreement. Spire pays Gabehart substantial bonuses contingent on Cup Series results—the racing series Gabehart predominantly worked in in his Competition Director role at JGR—and left his bonus structure untouched after this Court entered the TRO and the PI Order prohibiting him from "providing services of the general type of services that [he] provided to JGR in the year prior to his termination." PI Order at 35. It also continued inviting him to Cup Series competition meetings, knowing he gave competition advice there. A

company that pays a premium for results an employee is contractually prohibited from participating in—i.e., from providing Cup Series competition services he provided to JGR— and enjoined from pursuing has not merely failed to prevent a breach; it has bought one.

The PI Order enjoins Gabehart, for the pendency of this action, from retaining, transferring, using, or copying JGR's Trade Secrets, from using or disclosing them, and requires their return. PI Order at p. 34–35. JGR asks the Court to extend that same trade-secret relief to Spire, and separately to enjoin Spire from inducing Gabehart to breach the JGR Employment Agreement, Dkt. 8-2, that this Court has already held enforceable and enjoined him from violating. The injunctive relief JGR seeks is narrow. It would require Spire to do only what the law already requires and what Spire says it wants to do anyway—Spire's own owner has repeatedly disclaimed any interest in JGR's information—and it would not remove Gabehart from Spire's employ. On the other hand, absent injunctive relief against Spire—so long as the Orders reach Gabehart alone, Spire retains the JGR Trade Secrets it has acquired, continues to reward their use through performance bonuses, and leaves open Gabehart's access that makes further disclosure inevitable.

## FACTUAL BACKGROUND

### I. At the Temporary and Preliminary Injunction Stages, Before the Commencement of Discovery, Significant Circumstantial Evidence Demonstrated the Threat of Misappropriation by Spire.

In its March 5, 2026 temporary restraining order ("TRO") against Gabehart, this Court found that JGR demonstrated a likelihood of success on its trade secret misappropriation claim. TRO ¶ 29 (Dkt. 26). The Court found that Gabehart took JGR's post-race and performance analyses, compensation and payroll information, sponsor and revenue data, pit-crew analytics, and tire and race-performance analytics. *Id.* The Court enjoined Gabehart from retaining, transferring, using, or copying JGR's Trade Secrets, and using or disclosing them. TRO at 11–12.

At the PI Hearing, JGR presented additional evidence garnered from expedited discovery

of misappropriation by Gabehart, as well as circumstantial evidence of trade secret misappropriation by Spire, including: Gabehart accumulated over 200 files containing JGR's proprietary information in the months leading up to moving to Spire (*see* Walton Decl. (Dkt. 9-4) at ¶ 14); Gabehart took photos of his laptop screen depicting JGR's Trade Secrets on his personal cell phone (*see* Walton Sec. Suppl. Decl. (Dkt. 35-12) at ¶ 10); the JGR files Gabehart took were stored in a folder named "Spire," including a "Past Setups" subfolder with JGR's setup information (*see* Walton Decl. at ¶ 14); Gabehart and Spire's owners met on more than one occasion during the time Gabehart was improperly acquiring JGR's trade secrets (*see generally* Simpson Decl. (Dkt. 35-4; Berrier Decl. at ¶ 4 (Dkt. 22-2); Berrier Supp. Decl. (Dkt. 46-4) at ¶ 1); Gabehart accessed JGR documents in the "Spire" folder and attempted to access JGR's SharePoint containing its Trade Secrets after he stopped providing services to JGR and had a job offer from Spire. (*see, e.g.,* Walton 2nd Supp. Decl. at ¶¶ 15–19). JGR also provided evidence that Gabehart deleted all of his text messages with Dickerson—and only Dickerson—from the recruitment period, without offering any innocent explanation for singling out those messages. *See* Ex. B Gabehart's Resp. to Pl.'s Exp. RFPs at 2–3; Ex. AD, Gabehart's Resp. to Pl.'s 1st ROGs at 36–37.

On April 23, 2026, this Court issued a PI extending the TRO's prohibitions against Gabehart but denied injunctive relief as to Spire. PI Order at ¶ 66. The Court found that JGR had not "clearly shown that Spire acquired, used, or disclosed any of the JGR trade secrets resulting in actual or threatened misappropriation" or "identified a specific trade secret that Spire has misappropriated," *id.*, in part due to Spire's representations that it had not identified JGR information in its possession, revoked Gabehart's access to Spire's systems, instructed Gabehart not to disclose JGR information, and executed a non-disclosure agreement with Gabehart. *Id.* at ¶ 74.

## II. Fact Discovery Has Provided Abundant Evidence of Spire's Acquisition and Use of JGR's Trade Secrets.

Fact discovery has uncovered substantial direct and circumstantial evidence of misappropriation of JGR's Trade Secrets by Spire that was unavailable at the time of the original PI Hearing. The threatened misappropriation by Spire is no longer theoretical—it has occurred.

### *A. Spire Found JGR's Trade Secrets on Gabehart's Spire-Issued Computer in March 2026.*

Discovery has revealed that Spire's counsel's representation at the March 26, 2026 PI Hearing—that Spire had searched for but had not found JGR information on its systems—was false. One of the documents at the center of this issue has traveled under several names: (1) "CC Audit" or "Crew Chief Audit," JGR's proprietary post-race audit and analysis (Ex. AG JGR_0000490 (2025 CC Post-Race Audit.xlsx); (2) "audit spreadsheet" or "CG Master" (the "CG Master"), which Gabehart created to replicate the CC Audit for Spire; and (3) "2026 CG Master.xlsx," the same spreadsheet on Gabehart's Spire-issued laptop.

Spire found the document "2026 CG Master.xlsx" nearly two weeks before the PI Hearing and belatedly produced it as Spire_0000849. Ex. C. Indeed, Spire admits that, by March 13, 2026, its forensic examiner had identified files on Gabehart's laptop with names similar to those in the Walton Declaration, including "CG Master.xlsx," and that Spire revoked Gabehart's access to Spire's systems on March 18 precisely because it located those files. Ex. D, Spire Supp. ROG Resp. at 14, 21–22. The "2026 CG Master.xlsx," spreadsheet produced as Spire_0000849, is materially identical to GABEHART00222, *see* Ex. E, and substantially mirrors the CC Audit this Court found to be a trade secret. *Compare* Ex. C, Spire_0000849 (2026 CG Master as populated on Gabehart's Spire-issued laptop) with Ex. E, GABEHART00222 (CG Master produced from Gabehart's personal devices; file name "2026 CG Master.xlsx_v2"); PI Order at ¶¶ 60–62. Spire's belated disclosure and production cannot be reconciled with counsel's representation to this Court

at the PI Hearing that, after a forensic search, "we don't have anything." Ex. A, PI Hr'g Tr. at 66:3–8.

Spire likewise found the "Focus Plan" before the PI Hearing. At the PI Hearing, the Court considered the Spire-branded version of the Focus Plan, Ex. F, GABEHART00094, which lays out an overall plan for operationalizing JGR's trade secrets—expressly referencing setup procedures, the CC Audit, driver debriefs, and performance analytics. *Compare* Ex. F, GABEHART00094, *with* Walton Decl. at Ex. 4, ¶ 23; Walton Supp. Decl. at ¶¶ 10, 19; *see* PI Order ¶¶ 24, 61 n.10, 68. However, Spire's counsel disclaimed any connection to the document, telling the Court: "No one at Spire has seen this document before. I will say that. I can say that." Ex. A, PI Hr'g Tr. at 54:17–18. But, as with the CG Master, Spire has now admitted that its own forensic examiner identified documents named "CG Focus Plan.pptx" and "Focus Plan.pdf" on Gabehart's Spire laptop by at least a week before that hearing. *See* Ex. D, Spire Supp. ROG Resp. at 14, 21–22; Ex. G, Spire_0000851 (CG Focus Plan.pptx), Ex. C, Spire_0000849 (Focus Plan.pdf).

Moreover, the CC Audit listed on that Focus Plan had already been operationalized for Spire for Cup Series races and found on Spire's system. The Court will recall, Gabehart's "Focus Plan" for Spire lists "CC audit" (JGR's name for the document) as a line item among the deliverables he intended to implement at Spire. Ex. F, GABEHART00094 (Focus Plan.pptx); Ex. L, GABEHART00092; Ex. H, Spire_0000854–55 (Focus Plan.pdf). The evidence shows Gabehart followed through on that intention. Gabehart used Spire_0000849 in his first weeks at Spire for Spire's benefit—he populated the spreadsheet with Spire data to analyze Spire's Cup Series cars at the Daytona 500 race. [redacted] Gabehart's use of JGR's crew chief audit framework did not stop at Daytona. Additional versions of the same

spreadsheet were later produced by Gabehart, including GABEHART01500, which is populated with Spire data from the Daytona 500, Atlanta, and COTA Cup Series races. Ex. AB, GABEHART01500 ("2026 CG Master.xlsx_v7"). The document's metadata reflects that Gabehart last modified it on March 5, 2026[2]—after this Court entered the TRO. *See id.* In other words, Spire's Chief Motorsports Officer was using what this Court has already found to be a JGR trade secret—the CC Audit, including the proprietary [redacted] metric and algorithm, among others (PI Order at ¶¶ 60–62)—for Spire's benefit to analyze Spire's Cup Series performance.

### ***B. Gabehart Has Shared JGR's Trade Secrets at Spire's Cup Series Competition Meetings.***

Although Spire apparently took possession of Gabehart's Spire-issued laptop in late February and revoked his access to a variety of Spire systems in March 2026, the evidence and testimony of Spire witnesses show that Gabehart has been using and disclosing the trade secrets referenced in JGR's "Focus Plan" at Spire, even without a Spire-issued laptop. Just before Gabehart's deposition, Spire produced a video recording of a Spire Cup Series competition meeting, which shows Gabehart providing input into race strategy and making suggestions to the competition team on [redacted] *See* Ex. J, Spire_0001678 at 20:27–22:00;[3] *see* PI Order ¶¶ 61–62 (concluding that "a photo of a document detailing the manner in which JGR measures and seeks to eliminate subpar pit stops and its bonus structure for its pit crews for successful pit stops" was a trade secret). JGR promptly requested the remainder of Spire's competition meeting videos to determine whether Gabehart has shared JGR's Trade Secrets

[2] This Court granted JGR;s motion for a TRO by text-only order on March 2, 2026.
[3] Spire produced this unredacted version of the recording in the "clean room" which means JGR is not permitted to provide to the Court. JGR asked Spire to provide an unredacted version to the Court upon the filing of the present motion, which it has refused to do. JGR submitted a redacted version to the Court with its Motion to Show Cause (Dkt 218-30, Spire_0001487).

orally at other such meetings. To date, Spire has refused to produce those videos.[4] Even so, the four documents that Spire has produced concerning the competition meetings show that Gabehart has provided substantive technical advice reflecting the same categories of JGR trade secret information referenced in the Focus Plan.

Specifically, Spire produced Technical Director Dax Gerringer's notes from Cup Series competition meetings documenting Gabehart's substantive contributions to competition issues. *See* Dkt. 170-6, Spire_0001712, 0002051–53. According to those notes, Gabehart provided commentary in the competition meetings concerning [redacted]. Most notably, Gerringer's notes from a post-race competition debrief the day after the Cup Series race in Kansas (the "Kansas Notes") attribute to Gabehart comments about [redacted] Dkt. 170-6 at Spire_0001712. ***Gabehart's*** [redacted] ***comments correspond to JGR trade secrets and to Gabehart's own Focus Plan.*** *See* Ex. L, GABEHART00092 (Focus Plan identifying [redacted]

JGR's methods for [redacted] processes developed through years of engineering work. *See* Ex. M, MacGowan Dep. 211:17–24; 172:2–173:23. [redacted]

[4] This dispute is subject to JGR's pending Motion to Compel (Dkt. 170).

[redacted] JGR has likewise developed proprietary processes for [redacted]

Not only do Gabehart's Kansas meeting comments directly correlate to specific categories of JGR Trade Secrets—but also, before Gabehart's input at the Kansas meeting, [redacted] These newfound changes correspond directly to the proprietary processes Gabehart disclosed to Spire's competition personnel.

#### *C. Gabehart Has Shared Information Concerning JGR's Proprietary Setups and Setup Philosophies with Spire.*

In addition to JGR's quality control and optimization processes, Gabehart has also orally disclosed JGR's Trade Secrets concerning JGR's setup philosophies and setup data to Spire on at least one occasion. Setup philosophies embody a team's overarching approaches or guiding preferences with respect to how a team configures racecar setups. *See* Ex. Q, Dickerson 30(b)(6) Dep. 97:10–98:8. They are a glimpse into JGR's racing strategy and process for developing its proprietary setups and implementing them each week for a given Cup Series track. Although JGR

has been unable to test whether Spire has copied or implemented JGR's setups because Spire has not produced its setups,[5] Spire crew chief, Travis Peterson, testified that he had "probably" received JGR's information orally from Gabehart based on a conversation he had with Gabehart in which Gabehart compared Spire's COTA ("Course of the Americas"—NASCAR's Austin Cup Series race) [redacted]. Peterson further explained that at the same COTA race, [redacted] In response, Gabehart told Peterson that JGR [redacted] are one of the data points contained in JGR's setup files—files comprising the "secret sauce" developed by JGR and that this Court has already concluded constitute trade secrets. PI Order ¶ 62. In essence, Gabehart revealed both specific JGR setup data points and part of JGR's setup philosophy concerning [redacted] for that track which Spire cannot unlearn. Further, because COTA is a road course, Spire is now positioned to apply the COTA setup information at other Cup Series road courses.[6] *See generally* Ex. M, MacGowan Dep. 157:5–13.

### *D. Additional Circumstantial Evidence Suggests Spire Has Access to and is Implementing JGR's Trade Secrets.*

In addition to the direct evidence of misappropriation described above, discovery has supplemented the circumstantial evidence of Spire's threatened and actual misappropriation of JGR's Trade Secrets available at the PI Hearing. Spire's internal documents confirm that Spire recruited Gabehart in the fall of 2025 for the JGR knowledge he carried with him. On November

[5] Spire's setups and technical documents are the subject of a pending Motion to Compel (Dkt. 118).
[6] The setup data points and setup philosophy have value beyond a single race. NASCAR has hosted Cup Series races for seven consecutive years at COTA. 2027 will be the seventh consecutive year. NASCAR has held races at four to six road courses for the Cup Series over the last five years.

12, 2025, Spire co-owner Jeff Dickerson texted Anthony a copy of the message he had sent to then-Competition Director Matt McCall to justify the hire, explaining [redacted] Ex. S, ANTHONY_0013 (emphasis added). Dickerson confirmed at his deposition that the [redacted] was Gabehart's knowledge from JGR, testifying that Gabehart "was not internal because he was external. He was at JGR," and that "he has intel. He knows how to build race cars. He knows how to make them go fast." Ex. T, Dickerson Dep. 88:10–89:23.

Moreover, Spire's compensation structure confirms what it was buying: nearly every performance bonus was tied to Cup Series results, as summarized in Section II.E below. Ex. AF, Spire_0001005 at § 6(a)–(b). That structure is impossible to reconcile with Spire's account of a back-office executive and fits Dickerson's explanation that Gabehart [redacted] Ex. S, ANTHONY_0013; Ex. T, Dickerson Dep. 88:10–89:23. Spire also interviewed Charles "Winky" Donaldson, a JGR Body Assembly Group member, in fall 2025. Ex. V, Spire_0002446; *see also* Ex. W, Spire_0001703. Powers's suggested questions for Donaldson's interview—"What QC processes or checkpoints did you own for underbody components?" and "What tools did you rely on for measurement and validation?"—showed Spire was probing for proprietary systems and processes. Ex. W, Spire_0001703.

After hiring JGR competition personnel, Spire achieved by far its best Cup Series results to date in 2026: it won two races and qualified two drivers, Carson Hocevar and Daniel Suarez, for the championship; Hocevar rose from 23rd in 2025 to 9th, and Suarez from 29th to 16th. [redacted]

[redacted] suggesting implementation of JGR aerodynamic design. Ex. X, Spire_0001441–44. Taken together with Gabehart's admitted theft of JGR Trade Secrets and the evidence of Spire's use and implementation of JGR Trade Secrets uncovered in discovery, the most plausible explanation for Spire's drastic improvement is that Spire has implemented JGR's Trade Secrets and confidential information.

### *E. Spire Failed to Safeguard Against Continued Disclosure and Continued to Pay Gabehart for Cup Series Results and Permit Cup Series Access*

In the PI Order, the Court credited Spire's representations that it had revoked Gabehart's computer access, instructed him not to disclose JGR information, and signed an NDA with him. PI Order ¶ 74. Discovery shows those safeguards did not address the principal channels for continued disclosure. After revoking Gabehart's Spire email access, Spire did not monitor or restrict his use of personal email or a personal computer for Spire work, even though JGR Trade Secrets remained on those devices, and Spire employees sent him Spire information there. Ex. U, Anthony Dep. 261:16–264:2. Spire also continued paying Gabehart for Cup Series results and left his compensation unchanged. [redacted] Ex. AF, Spire_0001005 § 6(a)–(b). Spire concedes that it made no change to Gabehart's compensation or facility access. Ex. Z, Spire's Resp. to JGR's 2nd ROGS at 20–21. Spire also continued inviting him to Cup Series competition meetings where Gabehart disclosed JGR's Trade Secrets, as discussed above. *See e.g.,* Ex. AA, Spire_0000552.

At bottom, Spire's efforts to prevent Gabehart from disclosing JGR's Trade Secrets to Spire personnel were insufficient, and it did not attempt to prevent a breach of Gabehart's JGR Employment Agreement. It did not restrict Gabehart's access to competition spaces or personnel or effectively limit the Chief Motorsports Officer role, which Spire designed to manage "all things racing," including the Cup Series. Ex. Q, Dickerson 30(b)(6) Dep. 114:24–115:25; Ex. Y, Spire Resp. to JGR's 1st ROGs. at 6; Ex. T, Dickerson Dep. 140:1–141:24. Spire did not direct competition staff not to discuss Cup Series matters with him, did not define the services barred by his JGR obligations until after the PI Order, and did not require staff to report disclosures. *See generally* Ex. Q, Dickerson 30(b)(6) Dep. 20:9–15, 125:3–126:8; Ex. R, Peterson Dep. 227:21–230:1; Ex. P, Powers Dep. 221:19–222:14. Gabehart testified that there had been "no change" in his job. Ex. I, Gabehart Dep. 280:17–281:6.

## LEGAL STANDARD

Rule 65 authorizes a preliminary injunction when the plaintiff shows a likelihood of success on the merits, likely irreparable harm absent relief, a favorable balance of equities, and consistency with the public interest. FED. R. CIV. P. 65; *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The plaintiff bears the burden by a preponderance of the evidence. *Prysmian Cables & Sys. USA, LLC v. Szymanski*, 573 F. Supp. 3d 1021, 1035 (D.S.C. 2021). The purpose of a preliminary injunction "is not to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward." *Green v. ABC Companies*, 702 F. Supp. 3d 418, 423 (W.D.N.C. 2023) (quoting *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 580 (2017)). "'Where multiple causes of action are alleged, plaintiff need only show likelihood of success on one claim to justify injunctive relief.'" *Atlas Power Tech., Inc. v. Hinton*, 2025 WL 3473362, at *1

(E.D.N.C. 2025) (quoting *McNeil-PPC v. Granutec, Inc.*, 919 F. Supp. 198, 201 (E.D.N.C. 1995)).

## ARGUMENT

This Court has twice found that JGR has demonstrated a likelihood of success on its trade secret claims and irreparable harm stemming from Gabehart's admitted taking of JGR Trade Secrets. *See* PI Order ¶¶ 65, 108–110; TRO ¶¶ 29–30. Specifically, this Court found that Gabehart took confidential and proprietary JGR business and racing information that constitutes trade secrets, PI Order ¶¶ 61–62. and that "[i]n a competitive racing industry, loss of trade secrets leads to the immediate and irreparable harm to JGR's ability to compete." TRO ¶ 30. The Court should extend the current injunction against Gabehart with respect to JGR's Trade Secrets as to Spire, and should enjoin Spire from inducing Gabehart to breach his contract with JGR.

### I. JGR Has Demonstrated a Likelihood of Success on the Merits of its Trade Secret Misappropriation and UDTPA[7] Claims Against Spire.

At the preliminary-injunction stage, the Court considers less formal procedures and less complete evidence, and JGR need not prove its case in full. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). JGR must instead show a clear likelihood of success. *See Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013). To prevail on its Defend Trade Secrets Act, 18 U.S.C. §§ 1836 et seq. ("DTSA") claim,[8] JGR must show "(1) the existence of a trade secret, (2) the trade secret's misappropriation, and (3) that the trade secret implicates interstate or foreign commerce." *See*

[7] JGR is also likely to succeed on its UDTPA claim. Under the North Carolina Unfair and Deceptive Trade Practices Act, an injured party is entitled to relief upon proving "(1) an unfair or deceptive act or practice; (2) in or affecting commerce; which (3) proximately caused actual injury to the claimant or its business." N.C. Gen. Stat. § 75-1.1. Spire's misappropriation of JGR's Confidential Information and Trade Secrets was *per se* an unfair or deceptive trade practice, *see Grout Dr. Glob. Franchise Corp. v. Troutman, Inc.*, 2015 WL 2353698, at *5 (E.D.N.C. 2015), that has adversely affected JGR's position in the marketplace, reduced JGR's competitive advantage, and enabled Spire to unfairly compete against JGR in the NASCAR Cup Series.

[8] *Rels. Ins., Inc. v. Pilot Risk Mgmt. Consulting, LLC*, 2024 WL 3549145, at *16 (collecting cases noting no difference in the analysis for DTSA and NCTSPA claims).

*dmarcian, Inc. v. dmarcian Eur. BV*, 60 F.4th 119, 141 (4th Cir. 2023). JGR has demonstrated a likelihood of success on each element of its trade secret claims against Spire.[9]

***A. JGR Has Specifically Identified Relevant Trade Secrets.***

The statutory definition of "trade secret" encompasses "all forms and types of . . . technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, [or] procedures, . . . ." 18 U.S.C. § 1839(3).[10] Under both the DTSA and North Carolina TSPA statutes, "a trade secret is information that is subject to 'reasonable measures to keep such information secret' and which 'derives independent economic value' from its secrecy." *Sysco Mach. Corp.*, 143 F.4th at 228 (citing 18 U.S.C. § 1839(3); *accord* N.C. Gen. Stat. § 66-152(3)).

This Court has already determined that the information Gabehart took from JGR presented at the first PI Hearing, including setup files, post-race audits and analyses, and documents reflecting JGR's processes are trade secrets under federal and North Carolina law and "contain information which JGR developed based on its extensive research and collection of data points about different cars, drivers, tracks, tires, and race conditions (to name a few), that would be extremely valuable in the hands of a competitor." PI Order ¶¶ 60–62. The JGR Trade Secrets Gabehart has disclosed and transmitted to Spire, as described in more detail above, fall into the same categories. Moreover, JGR has employed reasonable measures to protect the confidentiality of those trade secrets, *see e.g.,* Ex. M, MacGowan Dep. 209:22–211:10, and derives substantial economic benefit from keeping these trade secrets confidential as their confidentiality allows JGR

---

[9] As to the third element, JGR's Trade Secrets are used and intended to be used in, interstate commerce. JGR uses its Trade Secrets in races across various states, and NASCAR racing is a national business.

[10] "The DTSA and North Carolina's TSPA define a trade secret in substantially the same terms." *Sysco Mach. Corp. v. DCS USA Corp.*, 143 F.4th 222, 228 (4th Cir. 2025).

to compete at the highest levels of racing that its competitors cannot replicate absent the significant expenditure of time, capital, and resources. *See* Hamlin Decl. at ¶ 15 (Dkt 35-9), Brown Decl. at ¶ 7 (Dkt. 9-2). JGR satisfies the first element of its trade secret claims.

### *B. Record Evidence Establishes Spire's Actual and Threatened Misappropriation of Specific JGR Trade Secrets.*

To meet its burden to show a likelihood of success on the misappropriation element, JGR is only required to demonstrate a *threat* of misappropriation. "Misappropriation" occurs under the DTSA "when a person either (1) acquires a trade secret while knowing, or having reason to know, that the trade secret was acquired by improper means, . . . or (2) uses or discloses the trade secret after acquiring it through improper means." *Brightview Grp., LP v. Teeters*, 441 F. Supp. 3d 115, 132 (D. Md. 2020) (citing 18 U.S.C. §§ 1839(5)(A), (5)(B)(i)) (internal citations omitted).[11] "Improper means" includes "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." 18 U.S.C.A. § 1839(6). The DTSA provides courts "authority to issue the injunctive relief upon a showing of either actual *or threatened* misappropriation of its 'trade secrets.'" *Glytec LLC v. Prisma Health*, 2025 WL 1750441, at *6 (D.S.C. 2025) (citing 18 U.S.C. § 1839(b)(3)(A)(i)) (emphasis added). Similarly, North Carolina law "permits preliminary injunctions where a prima facie case for 'actual or threatened misappropriation of a trade secret' is established." *Microban*, 2023 WL 2533085, at *5 (quoting N.C. Gen. Stat. § 66-154(a)). JGR has established more than a threat of misappropriation—record evidence supports a finding of *actual* acquisition and use of JGR's Trade Secrets by Spire as well as an ongoing threat of misappropriation.

[11] Similarly, a plaintiff states a prima facie case for misappropriation under the NCTSPA where the defendant "(1) [k]nows or should have known of the trade secret" and "(2) [h]as had a specific opportunity to acquire it for disclosure or use or has acquired, disclosed, or used it without the express or implied consent or authority of the owner." N.C. Gen. Stat. § 66-155.

It is undisputed that Gabehart improperly took JGR's Trade Secrets without JGR's consent and in violation of his Employment Agreement with JGR. PI Order ¶ 58. Spire acquired JGR's Trade Secrets through improper means—it "kn[ew] or ha[d] reason to know" that Gabehart acquired them through improper means before Gabehart began formally working at Spire. 18 U.S.C. § 1839(5)(A). Nevertheless, in February 2026, Spire issued Gabehart a company laptop and access to its network and computer systems—while on notice that Gabehart had secretly downloaded and photographed JGR's Trade Secrets without JGR's permission. *See* Ex. D, Spire Supp. ROG Resp. at 14. Gabehart loaded wrongfully taken JGR material onto that laptop, including the CG Master (produced by Spire as Spire_0000849) this Court has found to contain trade secret information. *See generally id.* at 14, 21–22; PI Order ¶¶ 60–62. Spire's failure to disclose the fact that its forensic examiner had already found user files on Gabehart's Spire-issued laptop with file names matching those flagged in the Walton Declaration at the PI Hearing confirms that Spire understood its acquisition of JGR's trade secrets was improper. *See id.*

Gabehart did not merely store that information at Spire; he used it there. As Spire's Chief Motorsports Officer, he populated the CC Audit with Spire data to analyze Spire's performance—operationalizing JGR's proprietary framework at Spire exactly as he had mapped out in his Focus Plan, the roadmap he created for putting JGR's information to work. *See* Section II.A, *supra*. Gabehart performed that analysis as a Spire executive and for Spire's benefit: his use is Spire's use. Further, record evidence demonstrates that Gabehart has orally disclosed specific JGR Trade Secrets to Spire's competition staff on multiple occasions to improve Spire's Cup Series performance, including in Spire competition meetings and conversations with Spire Crew Chief, Travis Peterson, at COTA. *See* Ex. R, Peterson Dep. 165:24–168:5. Indeed, Gabehart has delivered to Spire what its owner called [redacted] and has earned

[redacted] for delivering JGR's Trade Secrets to Spire. Ex. S, ANTHONY_0013; Ex. AF, Spire_0001006; see also Ex. P, Powers Dep. 268:14–17.

Gabehart's oral disclosure of JGR's Trade Secrets to Spire is particularly significant because it is virtually undetectable through conventional forensic means and therefore remains an ongoing channel of misappropriation. Forensic review cannot capture what Gabehart disclosed orally to Spire personnel in meetings or at the racetrack. Gabehart attended between five to twelve Cup Series competition meetings with Spire, where—with Spire's knowledge and approval—he could speak directly to the Spire personnel best positioned to receive and implement JGR's Trade Secrets; the Kansas Notes and Peterson's testimony show that he did just that. Ex. AE, Lambert Dep. 252:25–253:4; Ex. R, Peterson Dep. 165:24–168:5. The threat of continued transmission of JGR's Trade Secrets to Spire therefore persists.

Spire has not only improperly acquired JGR's Trade Secrets—but it has also used more than one of the JGR proprietary processes Gabehart disclosed. Although JGR has been unable to meaningfully assess whether Spire has implemented its setups due to Spire's unwillingness to produce the setups without court order, Spire's competition staff admitted that Spire has implemented certain proprietary and confidential processes for quality control and optimization, processes that mirror JGR trade secrets, and that map to both Gabehart's Focus Plan and advice he gave at the Kansas Cup Series competition meeting. Powers and Gerringer each testified that processes mirroring the JGR Trade Secrets Gabehart orally shared at the competition meetings have been used by Spire on at least one occasion. [redacted]

[redacted]

The foregoing evidence of Gabehart's actual disclosure of JGR's Trade Secrets to Spire and Spire's use of those Trade Secrets, combined with Spire's failure to disclose the JGR information it found on its system, hiring Gabehart despite knowledge of his misappropriation, and continuous failure to adequately safeguard against Gabehart's disclosure of JGR's information, demonstrate an ongoing threat of future misappropriation by Spire that warrants injunctive relief mirroring the relief granted against Gabehart. *ClearOne Advantage, LLC v. Kersen*, 710 F. Supp. 3d 425, 436 (D. Md. 2024) (citing *Brightview Grp., LP*, 441 F. Supp. 3d at138) ("[C]ourts frequently grant injunctions when there is a substantial risk that the defendants will continue to divulge or misappropriate trade secrets in the absence of court action."). The non-disclosure agreement between Spire and Gabehart does not change the analysis of threatened misappropriation here, where record evidence demonstrates that Gabehart shared JGR's Trade Secrets with Spire even after signing the agreement. *See FMC Corp. v. Cyprus Foote Min. Co.*, 899 F. Supp. 1477, 1484 (W.D.N.C. 1995) (noting that defendants' representations disavowing intent to disclose trade secrets alone were not dispositive).

Fourth Circuit courts have found a likelihood of success on the merits sufficient to issue injunctive relief against both the former employee and their new employer where, as here, there is some evidence of even the threat of misappropriation of plaintiff's trade secrets. *Prysmian Cables*, 573 F. Supp. 3d at 1032, 1044 (enjoining former employee and new employer where former employee emailed himself plaintiff's "business blueprint," and "initiated plans for an analogous [project] to compete with" plaintiff); *Bridgetree, Inc. v. Red F Mktg. LLC*, 2013 WL 443698, at

*7–8 (W.D.N.C. 2013) (permanently enjoining former employees and their new employer on the basis of trade secret misappropriation); *cf. Salomon & Ludwin, LLC v. Winters*, 150 F.4th 268, 278 (4th Cir. 2025) (reversing preliminary injunction based on trade secret misappropriation against new employer where it was party to a written agreement granting industry employees to take certain confidential information to new firm). Here, JGR has demonstrated both threatened and actual misappropriation by Spire through its improper acquisition and use of JGR's trade secrets. JGR has carried its burden to show a likelihood of success on its trade secret claims.

## II. JGR Has Demonstrated a Likelihood of Success on the Merits of its Tortious Interference Claim Against Spire.

Under North Carolina law, tortious interference requires: "(1) a valid contract between the plaintiff and a third person; (2) the defendant's knowledge of the contract; (3) that the defendant intentionally induced the third person not to perform the contract; (4) that the defendant acted without justification; and (5) that the plaintiff suffered actual damage." *dmarcian, Inc.*, 60 F.4th at 142. Spire's ongoing inducement of Gabehart's breach of the noncompetition and confidentiality provisions in his JGR Employment Agreement constitutes tortious interference. Elements one and two are satisfied: the Court found Gabehart's JGR Employment Agreement valid and enforceable, PI Order ¶ 78; Spire knew of it in late 2025 during Gabehart's recruitment and no later than the filing of this suit; the TRO and PI Order confirmed the obligations Spire was required to respect, and Spire also signed an NDA with Gabehart. The remaining elements are established below.

At the outset, the relevant inducement is not confined to Spire's initial decision to hire Gabehart away from JGR. The obligations at issue—the noncompetition covenant in Section 6 of the JGR Employment Agreement and Gabehart's confidentiality obligations—are continuing obligations that survive his departure, and they are breached anew each time Gabehart performs Cup Series competition services for Spire or conveys JGR's Trade Secrets to Spire personnel.

The tort reaches a defendant who intentionally induces the contracting party "not to perform the contract," *dmarcian*, *Inc*., 60 F.4th at 142, and that inducement may occur at any point during the life of the covenant, not only at the moment of departure. *See Truist Fin. Corp. v. Rocco*, 2024 WL 1804720, at *16 (N.C. Super. Ct. Apr. 25, 2024) (post-hire conduct satisfied inducement where the new employer paid a "bonus specifically determined by whether [the Executive Defendants] were successful in diverting employees from Plaintiffs," which "reflect[ed] . . . active and intentional conduct"); *Fin. Carrier Servs. LLC v. Kingpin Cap. Inc.*, 2025 WL 1719898, at *4 (N.C. Super. Ct. June 19, 2025) (sustaining interference claim premised on the new employer's inducement of the employee's breach of a confidentiality obligation that survived his departure). Courts applying North Carolina law have enjoined interference of a continuing character. *See dmarcian, Inc.*, 60 F.4th at 142–43, 146 (affirming preliminary injunction where the interfering conduct consisted of the defendant's post-departure solicitation of the plaintiff's customer). Thus, regardless of its role in inducing Gabehart's initial decision to leave, which is disputed, the evidence is clear that Spire has continuously induced Gabehart to breach obligations that remained in force after he left JGR, and it has continued that inducement week after week—including after the TRO and after the PI Order upheld the enforceability of the agreement and clarified its scope.

Inducement generally requires purposeful conduct by the defendant. *See, e.g., Gallaher v. Ciszek*, 2020 WL 6117740, at *6 (N.C. Super. Ct. Oct. 16, 2020). Spire intentionally and purposefully induced Gabehart's breach by leaving untouched the Cup Series performance bonuses tied to Spire's performance in the Cup Series—the racing series Gabehart predominantly worked in as Competition Director at JGR—continuing to invite him to Cup Series competition meetings, and failing to make sufficient efforts to prevent him from providing the same or similar services to Spire as he provided in his last year of employment at JGR. As detailed in Section II.E, *supra*;

they show that Spire supplied both the financial incentive and the forum for Gabehart's continued Cup Series services and use and transmission of JGR Trade Secrets. In addition to leaving the Cup Series bonus structure in place, continuing to invite Gabehart to Cup Series competition meetings, leaving him with unrestricted access to the competition personnel to whom it knew he was conveying JGR's Trade Secrets, Spire also declined to restrict Gabehart's use of the personal email account and computer on which those Trade Secrets still reside, never instructed its competition staff to limit what they discussed with him, and made no attempt to determine which services his JGR covenant barred until after the PI Order issued. *See* Sections II.A–II.E, *supra*. Spire's interference is ongoing inducement of Gabehart's breach of his JGR Employment Agreement. JGR has suffered actual injury, including lost competitive position and disclosure of protected information, and will continue to suffer that injury absent relief. *See* Section III, *infra*.

Moreover, Spire lacks reasonable justification for inducing Gabehart to violate his JGR Employment Agreement. Although business competition can in some circumstances be justified interference, that privilege is conditional or qualified, and it does not apply where the act is not a reasonable and bona fide attempt to protect the defendant's interests. *United Lab'ys, Inc. v. Kuykendall*, 370 S.E.2d 375, 387 (1988). The competition privilege is at its weakest where, as here, the interference continues after a court has construed the covenant and told the parties what it forbids. Such is the case presented here: Spire wrongfully induced services and disclosures of JGR Trade Secrets that are barred by this Court's TRO and PI Order; its conduct cannot be fairly characterized as a reasonable attempt to protect its own interests. *See Robinson, Bradshaw, & Hinson, P.A. v. Smith,* 129 N.C. App. 305, 318, 498 S.E.2d 841, 851 (1998); *see also* Restatement (Second) of Torts § 768 cmt. i (1979) (a competitor "would not be justified in engaging the employee to work for him in an activity that would mean violation of the contract not to compete").

Least of all can the privilege shelter Spire's inducement of Gabehart's misappropriation and transmission of JGR's Trade Secrets, which is competition by unlawful means. *See Fin. Carrier Servs. LLC*, 2025 WL 1719898, at *4 (sustaining interference claim where the new employer knew of the employee's confidentiality obligation, induced him to breach, and used confidential information to compete). Spire's conduct is tortious interference, not protected competition.

### III. Absent Injunctive Relief, JGR Will Suffer Ongoing Irreparable Harm from Both Spire's Misappropriation and Its Inducement of Gabehart's Ongoing Breach.

Spire's actual and threatened misappropriation of JGR's Trade Secrets constitutes irreparable harm. "The loss of even a single trade secret is irreparable harm, and the threatened disclosure of a trade secret supports the imposition of injunctive relief." *Vessel Med., Inc. v. Elliot*, 2015 WL 5437173, at *9 (D.S.C. 2015) (quoting *Nucor Corp. v. Bell*, 2008 WL 9894350 (D.S.C. 2008)). Spire's acquisition and use erode the competitive advantage JGR developed through decades and hundreds of millions of dollars of work; once disclosed, the information cannot be restored or readily quantified. Ex. AC, Alpern 30(b)(6) Dep. 44:2–10; *see also Prysmian Cables*, 573 F. Supp. 3d at 1044 (quoting *Nucor Corp.*) ("[T]he loss of a trade secret is difficult to measure in monetary damages because once the secret is lost, it is indeed lost forever.").

JGR also suffers a separate irreparable injury from Spire's inducement of Gabehart's breach. The Court has already found that JGR "has suffered and will continue to suffer irreparable harm without an injunction . . . to enforce Gabehart's contractual obligations." PI Order ¶ 110. Each week Gabehart provides Cup Series services in breach of the covenant, JGR loses the competitive position and bargained-for period that damages cannot restore. Spire's continuing bonuses, invitations, and unrestricted access make an injunction against Gabehart alone insufficient. *See* Section II.E, *supra*. Because the existing Orders have not prevented Spire from creating the incentive and opportunity for continued breach and disclosure, injunctive relief against

Spire is necessary to protect JGR until the merits can be fully litigated.

### IV. The Balance of Equities and Public Interest Are Best Served by the Issuance of the Injunctive Relief JGR Seeks.

The balance of equities weighs decidedly in JGR's favor. The Court has recognized the great harm from releasing JGR's Trade Secrets in this highly competitive industry. PI Order ¶ 111. Spire would suffer no harm from an order requiring it to comply with the law, refrain from using JGR's Trade Secrets, and not induce Gabehart to violate obligations the Court has already enforced. *See Biesse Am., Inc. v. Dominici*, 2019 WL 3916806, at *7 (N.C. Super. 2019); *see also Prysmian Cables*, 573 F. Supp. 3d at 1044–45. Nor would the requested relief prohibit Spire from employing Gabehart outside the services his covenant forecloses. Spire has repeatedly disclaimed any interest in JGR's information. Dickerson Decl. ¶ 46 (Dkt 45-2); Ex. T, Dickerson Dep. 73:18–19. Further, when the Court asked Spire's counsel at the PI Hearing why Spire would not agree to an order confirming it will not use JGR's information—relief Spire had previously offered—counsel responded that: "no one wants to be subject to a court order if they don't need to." Ex. A, PI Hr'g Tr. 69:24–70:8. An order holding Spire to that position imposes no cognizable harm.

The public interest likewise supports relief. Protecting trade secrets, preventing unfair business practices, ensuring fair competition, and enforcing valid restrictive covenants are important public interests. *ClearOne Advantage, LLC v. Kersen*, 710 F. Supp. 3d 425, 438 (D. Md. 2024); *see also Forestry Sys., Inc. v. Coyner*, 2011 WL 1457707, at *2 (M.D.N.C. 2011). The requested injunction advances those interests without imposing harm on Spire.

## CONCLUSION

For the reasons stated herein, JGR asks the Court to issue a preliminary injunction against Spire as set forth in JGR's Renewed Motion for PI, protecting JGR's Trade Secrets and barring Spire from inducing Gabehart to violate the obligations already enjoined by the Court.

This the 17th day of September, 2026

**KING & SPALDING LLP**


/s/ *Danielle T. Williams*
Danielle T. Williams
dwilliams@kslaw.com
N.C. Bar No. 23283
300 South Tryon Street, Suite 1700
Charlotte, NC 28202
Thomas M. Melsheimer – *Pro Hac Vice*
tmelsheimer@kslaw.com
Chad B. Walker – *Pro Hac Vice*
cwalker@kslaw.com
Tracea Rice – *Pro Hac Vice*
trice@kslaw.com
Alexandra Moore - *Pro Hac Vice*
almoore@kslaw.com
2601 Olive Street, Suite 2300
Dallas, TX 75201


**PARKER POE ADAMS & BERNSTEIN**


Sarah F. Hutchins
N.C. Bar No. 38172
Tory Ian Summey
N.C. Bar No. 46437
Keith M. Weddington
N.C. Bar No. 14352
Charles G. Middlebrooks
N.C. Bar No. 55171
Madelyn R. Candela
N.C. Bar No. 63827
Bank of America Tower
620 South Tryon St., Suite 800
Charlotte, North Carolina 28202
sarahhutchins@parkerpoe.com
torysummey@parkerpoe.com
keithweddington@parkerpoe.com
charliemiddlebrooks@parkerpoe.com
madelyncandela@parkerpoe.com


*Attorneys for Joe Gibbs Racing, LLC*

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that the foregoing **PLAINTIFF JOE GIBBS RACING, LLC'S MEMORANDUM OF LAW IN SUPPORT OF ITS RENEWED MOTION FOR PRELIMINARY INJUNCTION w**as electronically filed with the Clerk using the CM/ECF system which will automatically send notice and serve same upon counsel of record via the Court's electronic case filing system.

This the 17th day of September, 2026

**KING & SPALDING LLP**

/s/ *Danielle T. Williams*
Danielle T. Williams
dwilliams@kslaw.com
N.C. Bar No. 23283
300 South Tryon Street, Suite 1700
Charlotte, NC 28202
Thomas M. Melsheimer – *Pro Hac Vice*
tmelsheimer@kslaw.com
Chad B. Walker – *Pro Hac Vice*
cwalker@kslaw.com
Tracea Rice – *Pro Hac Vice*
trice@kslaw.com
Alexandra Moore - *Pro Hac Vice*
almoore@kslaw.com
2601 Olive Street, Suite 2300
Dallas, TX 75201

**PARKER POE ADAMS & BERNSTEIN**
Sarah F. Hutchins
N.C. Bar No. 38172
Tory Ian Summey
N.C. Bar No. 46437
Keith M. Weddington
N.C. Bar No. 14352
Charles G. Middlebrooks
N.C. Bar No. 55171
Madelyn R. Candela
N.C. Bar No. 63827
Bank of America Tower
620 South Tryon St., Suite 800

Charlotte, North Carolina 28202
sarahhutchins@parkerpoe.com
torysummey@parkerpoe.com
keithweddington@parkerpoe.com
charliemiddlebrooks@parkerpoe.com
madelyncandela@parkerpoe.com

*Attorneys for Joe Gibbs Racing, LLC*