IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Case No. 3:26-CV-00133-SCR-DCK

| | |
|---|---|
| **JOE GIBBS RACING, LLC,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**CHRISTOPHER GABEHART and SPIRE MOTORSPORTS II, LLC,**<br><br>**Defendants.** | **DEFENDANT CHRISTOPHER GABEHART'S BRIEF IN OPPOSITION TO JOE GIBBS RACING, LLC'S MOTION TO SHOW CAUSE**<br><br>**[REDACTED]** |

## INTRODUCTION

When JGR first brought this case, it told the Court a dramatic story. Mr. Gabehart, JGR said, had stolen the "crown jewels" of its racing operation and was deploying them at Spire Motorsports. JGR obtained a Temporary Restraining Order and then a Preliminary Injunction on the basis of that sensational claim. The Court, while granting partial relief, was careful to craft an Order that enforced the Employment Agreement *as written*—expressly permitting Mr. Gabehart to continue working at Spire and declining JGR's request to impose a detailed catalogue of prohibited activities. PI Order, ECF 78 at 26 n.15, 34-35. Now, seven months later and after discovery has utterly failed to substantiate the reckless claims it made at the start, JGR nonetheless returns to this Court seeking the extraordinary remedy of civil contempt—a remedy that requires proof by *clear and convincing evidence*. It cannot come close to meeting that exacting burden.

JGR conducted months of exhaustive discovery. It took nearly a dozen depositions of Spire personnel—from Mr. Gabehart to crew chiefs to the company president to the co-owner. It obtained voluminous document productions. It issued dozens and dozens of third-party subpoenas. It conducted forensic examinations. And now, armed with the fruits of that intensive investigation,

JGR's Motion for Order to Show Cause rests on a handful of general comments at meetings—comments that can only be described as humdrum shop talk—and the routine operation of a court-ordered forensic protocol. That is not clear and convincing evidence of contempt. It is a litigation tactic designed to achieve through the contempt power what this Court previously recognized is unavailable under North Carolina noncompete law.

The evidence that JGR withholds from the Court tells the real story. Nearly a dozen Spire witnesses—crew chiefs, the technical director, the competition director, the shop foreman, the company president, and the co-owner—all testified under oath that Mr. Gabehart has not been involved in Cup Series competition strategy, race-day decisions, or technical operations. Their testimony is unequivocal:

- **Matt McCall** (Competition Director): McCall testified that Mr. Gabehart "has not had any involvement in helping anything we do" and "is not contributing in the meetings." Ex. A, McCall Dep. 382:25-383:1, 364:10. McCall does not report to Mr. Gabehart, *id.* at 135:16-24, nor has he ever had a conversation with Mr. Gabehart related to setups. *Id.* at 73:8-10. His interactions with Mr. Gabehart are rare—he has "probably gone weeks without seeing him." *Id.* at 266:8-11.

- **Jeffrey Dickerson** (Co-Owner): When asked whether any aspects of Spire's Cup program have changed since Mr. Gabehart arrived, Dickerson testified, "they have not." Ex. B, Dickerson Dep. 209:4-8. In the same vein, Mr. Gabehart had "zero contribution" to anything at Daytona and also contributed "zero" to Spire's two 2026 Cup wins. *Id.* at 202:9-12, 230:3-11. Dickerson further testified that Mr. Gabehart "does not do anything on strategy," "[h]e's not doing anything with any of the Cup guys," and he has been removed from competition meetings. Ex. C, Dickerson 30(b)(6) Dep. 63:17-64:1, 119:11-12; Dickerson Dep. 159:10-160:18 ("He's not in comp meetings, he's not in engineering meetings, he's not in—I mean, there's plenty of meetings, right. He's not in any of them.").

- **Luke Lambert** (Crew Chief, No. 77): When asked whether Mr. Gabehart is the reason Spire is winning, Lambert responded: "100 percent untrue … I know he's had no impact." Ex. D, Lambert Dep. 214:24-216:3. "Mr. Gabehart has contributed nothing to our Cup performance." *Id.* at 58:2-3. Lambert does not seek his input, and Mr. Gabehart has no role with Lambert's team or the Cup competition group. *Id.* at 36:15-21, 75:23-76:6. Of approximately 260 Cup-related meetings this season, Mr. Gabehart attended roughly five to twelve. *Id.* at 252:15-253:17. Lambert "really do[esn't] see [ ] Gabehart much," has "not seen him in the shop in weeks," and has hardly ever interacted with him. *Id.* at 198:4-21.

- **Ryan Sparks** (Crew Chief, No. 7): Sparks testified that Mr. Gabehart "does not" have any role with respect to Spire's Cup Series competition and has not offered advice or support. Ex. E, Sparks Dep. 163:12-164:7. When asked whether Mr. Gabehart contributed to the No. 7 car's success, he answered: "1,000 percent no." *Id.* at 300:8-11. Mr. Gabehart's sparse meeting comments were "obvious and very general statements," *id.* at 249:8-12, and he has attended "maybe a handful, five or six" meetings this year. *Id.* at 294:9-12. When asked what Mr. Gabehart did to earn a bonus this year, Sparks said he had "no idea." *Id.* at 170:13-21 (also stating that Mr. Gabehart did not contribute at all to Spire's Top 5 finish at COTA this year).

- **Travis Peterson** (Crew Chief, No. 71): Peterson testified that Mr. Gabehart has not provided input or been involved in Cup competition decisions. Ex. F, Peterson Dep. 154:11-24. He could not "recall of anything of substance." *Id.* When asked whether anyone at Spire has acknowledged any contribution by Mr. Gabehart to Spire's Cup Series performance, Peterson replied: "no." *Id.* at 207:24-208:3.

- **Dax Gerringer** (Technical Director): Gerringer testified that he does "not work with [Mr. Gabehart] on a day-to-day basis," Ex. G, Gerringer Dep. 84:18-19, and that Mr. Gabehart "has not helped us at all in the Cup Series." *Id.* at 59:25-60:5. With respect to meeting commentary about vacuum testing, Gerringer referred to that as "[redacted]" among race teams, "[redacted]," and "[redacted]." *Id.* at 157:24-158:11.

- **William Anthony** (President): Spire's president testified that Mr. Gabehart has not contributed to the success of the No. 7, No. 71, or No. 77 car, Ex. H, Anthony Dep. 321:22-322:6, nor has Spire obtained sponsors because of Mr. Gabehart. Ex. I, Anthony 30(b)(6) Dep. 120:19-21. Mr. Gabehart's actual work includes assisting with Spire's Craftsman Truck Series team, attending sprint car races, providing guidance for Spire's late model team, and working on business operations and purchasing processes—none of which involve Cup Series competition. Anthony Dep. 46:10-48:2.

- **Doug Powers** (Shop Foreman): Powers testified that he has "no idea" what Mr. Gabehart does. Ex. J, Powers Dep. 256:9-11. Powers does "not work[ ] alongside Mr. Gabehart," *id.* at 39:23, and he has only spoken with Mr. Gabehart "five to ten times" about non-substantive matters. *Id.* at 107:9-109:23. Powers further testified that he has not heard Mr. Gabehart contribute in meetings, nor could he recall any instance of Mr. Gabehart discussing race strategy with anyone, providing suggestions on how to improve a race build, providing any suggestions on QC processes, or mentioning performance testing or seal checking the diffuser seams, the ductwork, or the airbox. *Id.* at 204:23-206:3.

Every one of these witnesses, under oath, confirmed that Mr. Gabehart is not providing services of the type he provided to JGR. He has not: served as a crew chief; acted as a competition director; shared JGR's aerodynamic information; shared setup documents; communicated with

GM Motorsports or Hendrick Motorsports about Cup Series; used any database for Cup purposes; been involved in any simulation, pre-event strategy, build sheets, QC materials, scans, fuel analysis, debrief forms, or project lists for Cup Series. Dickerson Dep. 369:1-373:2; Anthony Dep. 315:6-320:14; Gerringer Dep. 226:3-228:16; Peterson Dep. 148:16-25; Sparks Dep. 294:19-298:12; Lambert Dep. 257:3-258:23; Powers Dep. 280:24-282:20; *see also* Ex. K, Gabehart Dep. 325:8-329:5.

Two facts reinforce this conclusion. First, Mr. Gabehart's role as Chief Motorsports Officer entails fundamentally different job duties than those he performed as Competition Director at JGR—a point every deponent confirmed and the record makes clear. Second, the Preliminary Injunction Order has been effective. From the outset, Spire and Mr. Gabehart have taken affirmative steps to ensure full compliance with the Court's directives.

Against this mountain of sworn testimony, JGR offers a few stray general comments and attendance at handful of meetings—nothing more. That is the sum total of JGR's case for civil contempt. JGR must prove each element of its contempt claim by clear and convincing evidence—a heightened standard that demands more than inference, generalities, or characterization. The evidence catalogued above does not merely fall short of that standard. It affirmatively refutes JGR's claims. The Motion should be denied.

## **LEGAL STANDARD**

Courts have inherent power to enforce compliance with their lawful orders through civil contempt. *Shillitani v. United States*, 384 U.S. 364, 370 (1966). But that power must be exercised with care. Civil contempt is a *remedial* device—it exists "to enforce compliance with an order of the court or to compensate for losses or damages sustained by reason of noncompliance." *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949). It is not a vehicle for punishment, and it is not an invitation for a prevailing party to relitigate the underlying merits or to expand the scope of

the Court's prior orders. *See dmarcian, Inc. v. Millen*, 181 F.4th 452, 459 (4th Cir. 2026) ("The court's power of civil contempt must be focused on correcting a deficiency rather than on punishing the contemnor." (quoting *In re Gen. Motors Corp.*, 61 F.3d 256, 259 (4th Cir. 1995)).

To establish civil contempt, JGR must prove by clear and convincing evidence that: (1) a valid order existed and Mr. Gabehart had knowledge of the order; (2) the order favored JGR; (3) Mr. Gabehart knowingly violated the order; and (4) JGR suffered actual harm as a result. *dmarcian*, 181 F.4th at 459.

The clear and convincing standard is a heightened burden of proof. "To be clear and convincing, evidence must place in the ultimate factfinder an abiding conviction that the truth of the party's factual contentions are highly probable." *United v. Ali*, 874 F.3d 825, 832 n.2 (4th Cir. 2017). The standard reflects the serious consequences of a contempt finding and exists to protect parties from being held in contempt on the basis of ambiguity, characterization, or surmise. *See FinishMaster, Inc. v. Booth*, No. 1:15CV1042, 2016 WL 7638283, at *1 (M.D.N.C. Apr. 11, 2016) ("Given the severity of holding a party in contempt, evidence that falls short of showing that there is a high probability that" a party violated a court order "will not suffice.").

Only if the movant satisfies this initial burden does the burden shift to the alleged contemnor "to show good faith in making all reasonable efforts to comply with the enforcement order." *Consumer Fin. Prot. Bureau v. Klopp*, 957 F.3d 454,461-62 (4th Cir. 2020) (cleaned up). But the Court never reaches this inquiry unless the movant first carries its own clear-and-convincing burden of proof.

Critically, for civil contempt to be appropriate, the injunction must "set[] forth in specific detail an unequivocal command." *In re Gen. Motors Corp.*, 61 F.3d at 258. When an order is susceptible to more than one reasonable interpretation, the alleged contemnor receives the benefit

of the doubt. *See Klopp*, 957 F.3d at 464 ("A party cannot be held in contempt for violating an ambiguous order." (quoting *Acosta v. La Piedad corp.*, 894 F.3d 947, 951 (8th Cir. 2018))); *Life Techs. Corp. v. Govindaraj*, 931 F.3d 259, 267 (4th Cir. 2019) (contempt power "cannot be exercised when there is a fair ground of doubt as to the wrongfulness of the conduct in question").

**ARGUMENT**

These principles impose a rigorous framework. Mr. Gabehart does not dispute (for purposes of this motion) the first two elements—the existence and validity of the Preliminary Injunction Order, and that it was entered in JGR's favor. JGR's burden therefore turns on the two contested elements: whether Mr. Gabehart's conduct actually violated the Order's specific terms, and whether JGR suffered harm as a result. JGR must prove both clearly and convincingly—not merely that it disagrees with how Mr. Gabehart has structured his role at Spire, or that it wishes the Court had imposed broader restrictions. As set forth below, JGR fails to meet this burden at every turn.

## I. MR. GABEHART AND SPIRE HAVE COMPLIED WITH THE COURT'S ORDER

The Court's Preliminary Injunction prohibits Mr. Gabehart from providing "services of the general type" he performed as Competition Director at JGR—while expressly permitting him to remain employed at Spire and to perform other services not implicated by the noncompete provisions of his Employment Agreement. ECF 78 at 26 n.15, 34-35. The central, unrebutted fact of this case is that Mr. Gabehart has not provided for Spire's NASCAR Cup Series program any competition-related services of the general type that he provided in his last 12 months at JGR. He has not directed competition strategy. He has not served as a crew chief. He has not set up racecars. He has not analyzed telemetry or simulation data. He has not managed crew chiefs. He has not been involved in race-day operations. He has not communicated with equipment manufacturers about Cup competition. *See, e.g.*, Gabehart Dep. 325:8-329:5. Every Spire witness who was

deposed—crew chiefs, the technical director, the competition director, the company president, and the co-owner—confirmed this under oath.

JGR's Motion would have this Court believe otherwise, but the record reinforces the truth. From the earliest days of this litigation and the Preliminary Injunction Order being entered, Mr. Gabehart and Spire have taken affirmative, concrete steps to ensure that Mr. Gabehart does not provide Cup Series competition services—steps that go well beyond what the Court's Order required. Indeed, Spire's co-owner, Jeffrey Dickerson, candidly admitted under oath that he "tightened up the restrictions on Mr. Gabehart . . . beyond the injunction" because he did not want to be "flying too close to the sun." Dickerson Dep. 232:19-25. In his words: "I respect the Court's order. I don't need him doing anything that's going to get crossed up with the Court or anything that you guys are going to be able to throw at him." *Id.* at 233:19-22. The evidence of compliance is not equivocal; it is overwhelming.

**Electronic Access Revoked.** Spire revoked Mr. Gabehart's access to *all* electronic systems—email, Microsoft Teams, OneDrive, and SharePoint—on March 18, 2026, just days after the TRO was entered. Anthony 30(b)(6) Dep. 105:12-106:3, 118:1-119:19. Mr. Gabehart has had no access to any Spire electronic systems since that date. He does not have a Spire email address. He does not have access to crew chief reports, competition meeting notes, or the SharePoint folders where Cup competition documents are housed. *Id.*; Gabehart Dep. 331:21-332:14. Spire's Competition Director, Matt McCall, immediately took steps to remove Mr. Gabehart from internal Cup distributions, directing his assistant: "Hey, Cody, take Gabehart [ ] off emails, please, sir. I will let you know when we can add him back." McCall Dep. 341:20-23. Anthony confirmed that Mr. Gabehart does not have access to SharePoint, Microsoft Teams, or any Spire systems, and that

communications to him, to the extent they occur at all, go to a personal Gmail address unconnected to Spire's internal infrastructure. Anthony Dep. 261:9-23.

**Laptop Sequestered and Submitted for Forensic Review.** Spire confiscated Mr. Gabehart's Spire-issued laptop on February 27, 2026, and sent it to a forensic examiner. Clarke Decl., ECF 68-2 ¶ 7; Dickerson Dep. 163:10-11.

**Removed from All Cup Meetings—At Dickerson's Personal Direction.** Mr. Gabehart was removed from all Cup Series meetings by late May or early June 2026. Dickerson 30(b)(6) Dep. 56:22-57:3. But what makes this compliance measure particularly significant is that it was Dickerson's own initiative—not a requirement of the Court's Order. Dickerson testified: "I've directed him not to be in anything Cup-related … He's not in comp meetings, he's not in engineering meetings, he's not in—I mean, there's plenty of meetings, right. He's not in any of them." Dickerson Dep. 157:16-17, 160:15-18. When asked whether the Court's injunction required these restrictions, Dickerson was emphatic: "No. I—there is a court order. I know what we can and can't do with the court order. I'm saying *I'm* not letting him. Not the Court. *I'm* not letting him." *Id.* at 161:15-18 (emphasis added). Dickerson voluntarily went *beyond* the Court's Order to ensure there could be no question of compliance.

**Company-Wide Notification.** To ensure every employee understood Mr. Gabehart's role and the boundaries of his activities, Spire's President, William Anthony, sent a company-wide email on May 5, 2026, explaining Mr. Gabehart's responsibilities as Chief Motorsports Officer. *See* Ex. L, Anthony Dep. Ex. 33; Anthony Dep. at 291:12-291:18. Anthony testified he sent the email because he "[redacted]" and felt that "[redacted]." Anthony Dep. at 291:20-25. The email detailed Mr. Gabehart's non-Cup

responsibilities and was received by the competition staff. Crew chief Luke Lambert confirmed receiving the email and understood it as defining "what his role is" and "because of the case going on, how the interaction should look." Lambert Dep. 34:11-25.

**Active Compliance by Mr. Gabehart.** The Hocevar text exchange is particularly telling. On March 28, 2026—during the pendency of the TRO—Spire's top Cup Series driver, Carson Hocevar, texted Mr. Gabehart specific technical details about his car's handling. A person intent on flouting the Court's Orders would have seized the opportunity to provide competition input. Mr. Gabehart did exactly the opposite. His one-word response—"Stop"—and his explanation—"Because I'm not involved in competition on the Cup side"—demonstrate a real-time, instinctive commitment to compliance that no after-the-fact characterization by JGR can overcome. *See* Ex. M, Gabehart Dep. Ex. 30; Gabehart Dep. 301:5-302:22.

Mr. Gabehart's deposition testimony further confirms his compliance. When asked under oath about virtually every category of Cup Series competition activity, Mr. Gabehart's answers were uniform and unequivocal: he has never seen a Spire Cup Series setup; has never seen a Spire post-race analysis; has played no role in Spire's development of racecar setups for any Cup Series car; has not shared JGR's aerodynamic information, underbody design information, setup documents, or post-race analysis methodology with any Spire employee; has not used simulation tools, GM Motorsports reports, or the RBG database for any Cup Series purpose; has not prepared build sheets, build scenario materials, debrief forms, or pre-event strategy materials for the Cup Series; and has not conducted any fuel analysis, pit road data analysis, or scan work for the Cup Series. Gabehart Dep. 325:5-329:5. Mr. Gabehart does not even have access to Spire's electronic systems—no email, no OneDrive, no laptop, and no SharePoint, including no access to the SharePoint folders where Spire's Cup Series competition documents are housed. *Id.* at 331:21-

332:22. He signed a Confidentiality and Non-Disclosure Agreement on his first day of employment pledging not to disclose or use JGR confidential information for Spire's benefit, and he testified without qualification that he has complied with it. *Id.* at 330:8-331:20.

**Curtailed Race Attendance.** Mr. Gabehart has curtailed his attendance at Cup Series races—despite the Court's express permission to attend. Anthony testified that Mr. Gabehart "has curtailed attending Cup Series races, in light of the disruption and attempted humiliation from JGR by having photographers take pictures of him and filing them with the court." Anthony Dep. 285:13-19. This is a person who has voluntarily restricted his own activities *beyond* what the Court's Order requires—not someone flouting a judicial decree.

**Mr. Gabehart's Actual Work at Spire.** The activities Mr. Gabehart *has* been performing at Spire are precisely the kind of enterprise-wide executive work that the Court's Order expressly permits. Anthony—Spire's president and general counsel—confirmed under oath that Mr. Gabehart's work has been focused squarely on non-Cup Series responsibilities across Spire's business operations. Mr. Gabehart has been working on Spire's IndyCar program with Andretti/TWG, helping standardize communication in the Truck Series, attending Late Model races, and working with Spire's Sprint Car team. Anthony Dep. 46:10-48:2. Specifically, Anthony testified that Mr. Gabehart "has had communications and engagement with our NASCAR Craftsman Truck Series team," which "has been underperforming," and that "he's been asking members of that team questions to try and help them analyze how they could improve their performance overall." *Id.* at 46:15-20. Mr. Gabehart has also "provided some insight and guidance to [Spire's] chassis manufacturing business in terms of how to handle customer accounts and internal accounts regarding the building of [its] truck chassis, and the fab shop related to that chassis business." *Id.* at 46:21-47:1.

Anthony further testified that Mr. Gabehart has been "working with [Spire's] chassis manufacturing business and the related fabrication business, the CNC business," "helping [Spire] work through the potential acquisition of a body hanging business," and "working with the truck series team to help them determine how they can live up to their expectation." *Id.* at 247:2-12. He has also "traveled to go to ARCA tests and late model tests," attended "sprint car races" and "dirt late model races," and gone "to several Indy car races." *Id.* at 247:12-16. When asked about Mr. Gabehart's presence on the shop floor, Anthony confirmed that he has seen Mr. Gabehart "[p]rimarily on the truck series, which is the left side of the shop." *Id.* at 243:16-20. *See also* Dickerson Dep. 344:3-347:25. This is the broad portfolio of non-Cup responsibilities that Spire described when it created the Chief Motorsports Officer role—a role that has no analogue at JGR.

Anthony also described the broader executive work product Mr. Gabehart was hired to perform: "helping to improve the efficiencies of the overall business; planning of the business; dealing with the future of the company from a facilities, tooling, equipment, planning perspective; the allocation of resources; determining the viability of various other racing series, the effectiveness of our racing series and our development series; and how to keep those integrated together. Anthony Dep. 139:19-140:6. These are enterprise management functions—not Cup Series competition activities.

Anthony testified that he has never heard Mr. Gabehart convey competition or technical information to Spire's competition director, crew chiefs, car chiefs, drivers, engineers, or pit crew athletes. Anthony Dep. 312:3-17. Anthony likewise confirmed that Mr. Gabehart has made no contribution to the success of any of Spire's Cup Series cars—the No. 7, No. 71, or No. 77. *Id.* at 321:22-322:6. And Anthony confirmed that Mr. Gabehart has not shared any JGR confidential

information, aerodynamic information, underbody design information, setup documents, or post-race analysis with any Spire employee. *Id.* at 315:2-316:16.

**What the Preliminary Injunction Permits.** Critically, the Court's Preliminary Injunction *expressly permitted* Mr. Gabehart to remain at Spire. The Order states: "*[T]he Court is not requiring Gabehart to resign from his position at Spire or prohibiting him from working for Spire. Other services not performed at JGR in the year prior to his termination are permissible.*" ECF 78 at 35. The Order further provides that it "does not prohibit Gabehart from attending the NASCAR Cup Series . . . or prevent him from performing other services at those races not implicated by Section 6 of his Employment Agreement." *Id.* Mr. Gabehart has complied with both the letter and the spirit of that Order. If there were any doubt, the sheer volume and consistency of the deposition testimony catalogued above would resolve it. This is not a close question.

Indeed, the Court's Order goes further than merely permitting Mr. Gabehart to remain at Spire—it refused JGR's invitation to find that his role as Chief Motorsports Officer constitutes a breach of the noncompete. The Court received evidence that Mr. Gabehart's role at Spire was that of the "owner's advocate," "principally responsible for deploying strategic vision in all aspects of the business, including motorsports, executive-level management of personnel, and other business initiatives" *Id.* at 11. Not only did the Court decline to find that the Chief Motorsports Officer role violates Section 6 of the Employment Agreement, it also refused JGR's request to "adopt a long list of duties that Gabehart may not perform for Spire" and expressly stated that it would "enforce the Employment Agreement as it is written and will not re-write or expand its plain language." *Id.* at 26 n.15. The Court also declined JGR's request to require Mr. Gabehart to maintain "detailed contemporaneous records of all work activities and job duties performed for Spire." *Id.*

These deliberate choices by the Court—permitting Mr. Gabehart to remain at Spire and attend Cup Series races, declining to catalogue prohibited duties, and refusing to expand the Agreement's plain language—signaled that Mr. Gabehart's position at Spire and the general type of services he was performing did not violate the noncompete. JGR cannot now use the contempt power to obtain a finding the Court declined to make at the preliminary injunction stage. Indeed, the Court's order provides no notice to Defendants that the conduct JGR claims would violate the terms of the noncompete or be deemed "contemptuous." *See Taggart v. Lorenzen*, 587 U.S. 554, 561(2019) ("[P]rinciples of 'basic fairness require that those enjoined receive explicit notice' of 'what conduct is outlawed' before being held in civil contempt.'" (quoting *Schmidt v. Lessard*, 414 U.S. 473 (1974) (*per curiam*)).

For JGR to prevail on its contempt motion, it must prove by clear and convincing evidence that Mr. Gabehart violated the specific terms of the Order. *dmarcian*, 181 F.4th at 459. As set forth above, the record demonstrates the opposite: Mr. Gabehart has not provided "services of the general type" he performed at JGR, and every Spire witness—without exception—has confirmed as much under oath. Spire revoked electronic access, confiscated and submitted equipment for forensic review, removed Mr. Gabehart from all Cup meetings, and personally monitored his day-to-day activities—all while Mr. Gabehart himself turned away his own driver's unsolicited technical communications and voluntarily curtailed attendance at Cup races the Court's Order expressly permitted him to attend. JGR's clear-and-convincing burden is not satisfied by innuendo or characterization; it requires proof of actual violations. There are none.

Moreover, even if JGR could somehow carry its initial burden—which it cannot—Mr. Gabehart's evidence of good faith would independently defeat the Motion. Where the alleged contemnor demonstrates "good faith" and "all reasonable efforts to comply," contempt is not

appropriate. *Klopp*, 957 F.3d at 46162. All reasonable efforts includes "investigating likely sources of noncompliance, using available means to cure deficiencies, monitoring continued compliance, responding promptly when deficiencies are identified, and producing competent evidence documenting those efforts." *Gutierrez Aroca, et al. v. Mason, et al.*, No. 2:26-CV-00057, 2026 WL 2322952, at *4 (S.D.W. Va. Aug. 11, 2026).

The compliance record as detailed above satisfies each of these requirements—it is extensive, documented, and corroborated by every deposition witness. And JGR has not identified a single concrete harm: No JGR information has been shared with Spire, no witness attributes any aspect of Spire's Cup performance to Mr. Gabehart, and no trade secret has been disclosed or competition advantage gained. To the contrary, JGR's on-track performance confirms the absence of any competitive injury. All four of JGR's drivers have qualified for the Chase, and JGR currently holds three of the top six positions among Chase drivers. If Mr. Gabehart were truly providing prohibited competition services to a rival—deploying the "crown jewels" JGR claims he stole—one would expect some measurable competitive harm to JGR. There is none. Without proof of both a violation and resulting harm, JGR's contempt claim fails. *See dmarcian*, 181 F.4th at 459.

## II. JGR ATTEMPTS TO USE VAGUE, OVERBROAD LANGUAGE OF ITS OWN DRAFTING TO PREVENT MR. GABEHART FROM WORKING IN RACING

JGR's Motion reveals its true objective: to use the contempt power to achieve what the Court expressly refused to grant at the preliminary injunction stage—a *de facto* ban on Mr. Gabehart's participation in any aspect of motorsports that touches racing. JGR's strategy is to recharacterize ordinary executive presence as prohibited "services" and to stretch the Employment Agreement's language beyond any reasonable interpretation. This Court should refuse to permit JGR to accomplish through contempt what it could not accomplish through injunction.

That objective is not a matter of inference. It is a matter of record. The evening JGR filed this lawsuit, its President, David Alpern, texted a business associate: "[redacted]" Ex. N, J. Gibbs Dep. Ex. 10; Ex. O, J. Gibbs Dep. 167:6-169:13. At his 30(b)(6) deposition, Mr. Alpern confirmed that position under oath—testifying that *no role* at Spire would comply with the noncompete, "regardless of the job that he does for Spire, no matter what he's doing." Ex. P, Alpern 30(b)(6) Dep. 355:19-356:1. Coach Gibbs was no different. When asked whether there was any job in his mind that Mr. Gabehart could take at any other racing team and be in compliance, his answer was: "No, I don't" have one. J. Gibbs Dep. 219:3-7. Neither the owner nor the president of JGR can identify a single permissible role for Mr. Gabehart at any racing team.

Alpern went even further. He testified that Mr. Gabehart's mere *presence at a racetrack*—which the Court's Order expressly permits—is a noncompete violation: "Mr. Gabehart being at a racetrack is a violation of his noncompete because he's not there to sell sponsorship." Alpern 30(b)(6) Dep. 230:7-8 & 22-25. And he testified that even *discussing* employment with another NASCAR team—regardless of the role—would violate the agreement. *Id.* at 308:4-12. That is not a reasonable interpretation of a contractual restriction. It is a demand by JGR that this Court enforce a blanket prohibition on Mr. Gabehart's ability to earn a living—a prohibition this Court has already refused to impose.

### A. The Court Already Rejected JGR's Expansive Reading of Its Own Noncompete.

Covenants not to compete are disfavored under North Carolina law and must be strictly construed against the employer who drafted them. *E.g.*, *RLM Commc'ns, Inc. v. Tuschen*, 831 F.3d 190, 196 (4th Cir. 2016); ECF 78 at 24 ¶ 80; *Phelps Staffing, LLC v. S.C. Phelps, Inc.*, 217 N.C.

App. 403, 412, 720 S.E.2d 785, 792 (2011). Where the restriction's language is vague or overbroad, courts will not rewrite it—they will simply not enforce it. *See Beverage Sys. of the Carolinas, LLC v. Associated Beverage Repair, LLC*, 368 N.C. 693, 700, 784 S.E.2d 457, 462 (2016) ("Allowing litigants to assign to the court their drafting duties as parties to a contract would put the court in the role of a scrivener . . . [w]e see nothing but mischief in allowing such a procedure."); *VisionAIR, Inc. v. James*, 167 N.C. App. 504, 508, 606 S.E.2d 359, 362 (2004). The fundamental enforceability question—and the one that dooms JGR's contempt case—is whether the noncompete gave Mr. Gabehart clear, unambiguous notice of exactly what conduct was prohibited. It did not. The consequences of JGR's vague drafting fall on JGR—not on the employee left to divine its meaning. *See, e.g.*, *Klopp*, 957 F.3d at 464; *see also VisionAIR*, 167 N.C. App. at 508; *Higher Tech Realty NC, LLC v. Navigate Realty, LLC*, No. 26CV017628-910, 2026 WL 2656497, at *7-8 (N.C. Super. Sept. 4, 2026) (denying preliminary injunction where noncompete's enumerated definition of prohibited "services" was too vague to "put a former employee on notice as to precisely what acts are prohibited"); *Accelerando, Inc. v. Relentless Sols., Inc.*, No. 24CV028428-400, 2025 WL 1721497, at *6, 2025 NCBC 29 ¶ 48 (N.C. Super. June 19, 2025) (striking down an undefined "services" restriction because it did not "reasonably put [the defendant] on notice of what services he is prohibited from providing"). That principle applies with special force in a contempt proceeding, where there is such a high burden.

Armed with its fatally vague restriction, JGR came to this Court at the preliminary injunction stage and asked it to do what the Employment Agreement does not: define the prohibition. JGR submitted a sweeping, eight-page catalogue of prohibited activities—everything from attending competition meetings to communicating with personnel to being present in certain

areas of Spire's facility. ECF 35, Ex. A. The Court refused. In Footnote 15 of the Order, the Court stated:

> *The Court declines to do so. The Court will enforce the Employment Agreement as it is written and will not re-write or expand its plain language.*

ECF 78 at 26 n.15. The Court also specifically rejected JGR's request to require "detailed contemporaneous records" of Mr. Gabehart's activities. *Id.* These were not casual asides—they were deliberate refusals to expand a contractual restriction that JGR itself drafted and as a matter of law must be strictly construed against it.

Now, through a contempt motion, JGR asks this Court to do exactly what it already refused to do: read into the Employment Agreement and the PI Order a prohibition on Mr. Gabehart's mere *presence* at meetings, his mere *observation* of Spire's operations, and his *existence* within a motorsports organization. That is not what the Agreement says. It is not what the Order says. The contempt power exists to enforce orders *as written*, not to expand their scope or to supply the precision that the drafter's own contract language lacks. *See Commodity Futures Trading Comm'n v. Bryant*, No. 3:21-cv-00487-RJC-DCK, 2022 WL 2015291, at *5-6 (W.D.N.C. June 6, 2022); *Klopp*, 957 F.3d at 463. This Court should not permit JGR to obtain through contempt what it could not obtain through injunction.

### B. The Noncompete's "Services of the General Type" Language Is Too Vague to Put Mr. Gabehart on Notice, and JGR's Own Witnesses Prove It.

JGR's contempt case founders on the very language it drafted. The Employment Agreement (and the Preliminary Injunction) prohibits "services of the general type" Mr. Gabehart provided at JGR—a phrase so undefined, so devoid of operative content, that JGR's own 30(b)(6) witness, Dave Alpern, could define it only as "anything that aids to or helps a race team go fast." Alpern 30(b)(6) Dep. 301:1-6. That is not a contractual restriction—it is a blank check. Indeed, just this month, the North Carolina Business Court has refused to enforce noncompetes with far

more detailed "services" definitions than JGR's. *See Higher Tech Realty* , 2026 WL 2656497, at *7-8 (finding a fifteen-category enumerated definition of "services" too vague and overbroad to be enforceable). If a detailed enumeration cannot survive scrutiny, JGR's completely undefined restriction certainly cannot. Under Alpern's reading, a thirteen-year NASCAR veteran would be banished from gainful employment in his chosen field—a result the law does not tolerate. *See Phelps Staffing, LLC v. C.T. Phelps, Inc.*, 226 N.C. App. 506, 509-11, 740 S.E.2d 923, 927-28 (2013).

That vagueness is fatal—doubly so in a contempt proceeding, where JGR must prove a violation by clear and convincing evidence. The central question is not whether Mr. Gabehart made a passing comment at a meeting—it is whether the noncompete gave him clear notice that such a comment was prohibited. It plainly did not. At its core, JGR's case rests on a handful of alleged remarks: a comment about checking ductwork seals, a general observation about ride quality, a remark about a backup car's bucket seat, and a note about a back glass template. JGR asks this Court to find that these stray general comments constitute "services of the general type" that Mr. Gabehart provided as JGR's Competition Director—where he directed the entire competition strategy for a four-car Cup Series operation, managed race-day operations, analyzed data from four intercoms simultaneously, set up cars, managed crew chiefs, was a crew chief, and developed pre-race strategy.

The gulf between those two categories of activity is not merely wide—it is unbridgeable. Sitting in a meeting and making a passing comment is not the same as directing competition strategy, setting up cars, analyzing data, and managing race-day operations—and no reasonable reading of "services of the general type" can make it so. The Spire employees who were in these meetings confirm the comments were unremarkable. Spire's Technical Director, Dax Gerringer,

called the vacuum testing comment "[redacted]" and "[redacted]" Gerringer Dep. 157:24-158:11. Crew Chief Ryan Sparks described the statements as "obvious and very general statements" and testified that Spire had been trying to seal diffuser seams "since the inception of this car." Sparks Dep. 246:20-25, 249:8-12. Crew Chief Travis Peterson did not change anything based on the conversations about springs. Peterson Dep. 168:23-169:6. Crew Chief Luke Lambert testified that the vacuum testing process Spire developed was a result of organic infrastructure growth—hiring additional personnel, purchasing a router table, and finally having the bandwidth and car count to implement QC processes the team had long planned. Lambert Dep. 158:2-161:10. And Spire's Shop Foreman, Doug Powers—the person responsible for car assembly—confirmed that Spire's ductwork seal check was prompted not by Mr. Gabehart, *but by a newly hired employee from another Cup team who asked*, "[redacted]" Powers Dep. 178:14-179:6.

JGR also seizes on Mr. Gabehart's testimony that "[t]here has been no change in my job" to argue that his pre-TRO conduct continued after the TRO. Gabehart Dep. 281:4. But JGR strips that testimony of its context. Mr. Gabehart's full answer makes clear he exercised "caution so we're not purported to be breaking any kind of noncompete, because we're not." *Id.* at 281:5-6. He agreed that McCall's characterization of him as "merely observing" was "fair." *Id.* at 282:4-12. And he confirmed his role has been consistently observational: "I've done the same thing at races—when I go to races to start the year as I do now." *Id.* at 292:7-9. The Court evaluated this question at the Preliminary Injunction stage and resolved it against JGR. ECF 78 at 11 ¶ 42; *id.* at 35. If the Chief Motorsports Officer role constituted the wholesale noncompete violation JGR now asserts, the Court would not have let him keep his job. The "no change" JGR seizes on is itself

evidence of compliance: Mr. Gabehart's role has not changed because it was never the prohibited competition work JGR alleges.

Indeed, JGR's own framing of the evidence underscores the weakness of its position. JGR emphasizes that Spire began vacuum testing its diffusers around the Charlotte race in late May 2026—three weeks after the Kansas meeting where Gabehart mentioned vacuum testing. But JGR ignores the testimony explaining *why* Spire began that process: Spire had hired additional personnel, purchased a router table, and finally had the infrastructure to implement a QC process the team had been developing. Lambert Dep. 158:2-161:10. The timing was a function of Spire's organic growth, not a directive from Mr. Gabehart. Moreover, JGR's reliance on temporal proximity—"three weeks later"—is a textbook "after it, therefore because of it" fallacy, not clear and convincing evidence of causation.

As Mr. Dickerson correctly observed, the Court's Orders restrict *services*, not *presence*. Dickerson 30(b)(6) Dep. 116:1-14. Mr. Gabehart holds an executive title. His executive-level presence at a meeting—without directing competition operations—is not a violation of the Employment Agreement or this Court's Order. JGR's attempt to recharacterize Mr. Dickerson's distinction between "services" and "behavior" as formalism misses the mark. Dickerson's point was not that labels override substance—it was that an executive's *presence* at a meeting is not the same thing as *providing services*. *Id.* at 118:2-19. This Court expressly permitted Mr. Gabehart to remain at Spire and attend races, Dickerson Dep. at 158:11-17; mere attendance at a meeting—even one that touches on Cup operations—is not the same as the competition-directing, data-analyzing, strategy-setting "services" that Mr. Gabehart provided as JGR's Competition Director. *Id.* at 253:15-24. JGR's position would make presence itself a violation, which is precisely the expansive reading this Court rejected at the preliminary injunction stage.

In sum, "services of the general type" is JGR's language—language it chose, language it drafted, and language it now seeks to stretch beyond recognition. If JGR believed its restriction was insufficiently precise, the time to address that was at the drafting table—not through a contempt proceeding. Mr. Gabehart was entitled to know, with clarity and specificity, what conduct was prohibited. JGR's own language did not tell him, and neither does JGR's Motion. The gap between what Mr. Gabehart did at JGR and what he has done at Spire is vast, and no amount of creative characterization by JGR can bridge it—much less bridge it clearly and convincingly.

## III. MR. GABEHART IS FULLY COMPLYING WITH THE COURT'S FORENSIC ORDER

JGR's second supposed basis for contempt is that Mr. Gabehart retained JGR materials on a personal OneDrive account. But the discovery of these files is not evidence of a violation—it is evidence that the court-ordered forensic protocol is working exactly as designed. JGR agreed to that protocol, delayed its own obligations under it for months, and now seeks to weaponize the protocol's routine operation as a basis for contempt. This is not what the contempt power is for.

### A. JGR Is Attempting to Hold Mr. Gabehart in Contempt for the Routine Operation of the Court-Ordered Forensic Protocol.

To be sure, in addition to transferring, using or copying, this Court's Preliminary Injunction Order prohibits Mr. Gabehart from retaining JGR's confidential information and trade secrets. ECF 78 at 34. What JGR's motion disregards is that this Court also ordered a forensic review to make sure that part of its Order was carried out. ECF 48 at 4. The parties are executing that protocol now. It's proceeding exactly as designed and as expected. And there is no need for further intervention from the Court.

The forensic protocol (the "Protocol") drafted by JGR and agreed to by the parties was designed for a specific purpose: "to identify and extract" any lingering JGR materials that a thirteen-year employee might still have on personal devices or cloud accounts. *See* ECF 116-1,

Protocol § 5(a). The Protocol establishes a sequential process for the identification and removal of JGR materials from Mr. Gabehart's devices and accounts. First, Mr. Gabehart's forensic examiner produced extensive log and artifact reports and user-generated file directories and ran hundreds of JGR-requested search terms. JGR then identified files from those reports and directories that it believed may contain JGR's confidential information. Protocol §§ 5(b)-(i). Mr. Gabehart's counsel then reviewed the requested materials and either claimed an exception provided for by the Protocol or produced the content to JGR. Protocol §§ 5(i)-(g). Finally, JGR reviewed the content of the produced files and generated a list of identified JGR materials for remediation. Protocol § 5(j).

The process expressly *anticipates* that JGR materials could be found; the entire point of Section 5(j)'s remediation provisions is to address exactly that scenario. So, when Mr. Gabehart's counsel observed dated OneNote files from his time as crew chief of the 11 Car on a personal OneDrive account, counsel made sure Mr. Gabehart was immediately locked out of the account, produced the files to JGR, and waited for JGR to provide the list of identified JGR materials that the Protocol requires. Protocol § 5(i).

What JGR does not tell the Court is how long it took to fulfill its obligations. After receiving JGR's requested materials list, Mr. Gabehart's counsel promptly reviewed the content of the files and began producing them to JGR on July 2, completing the production of requested materials from all the accounts and devices Mr. Gabehart's forensic examiner had imaged by July 17.[1] *See* Ex. Q (Email exchange regarding production of requested materials). JGR was then

---

[1] After Mr. Gabehart's forensic examiner produced the requested materials from the images created for the Protocol, JGR introduced into the process materials from images produced during the voluntary, prelitigation protocol that are maintained by JGR's forensic examiner. JGR insisted that these files be rereviewed, even though files identified from these images had already been deleted from Mr. Gabehart's devices and accounts during the prior prelitigation protocol. Moreover, the images where those files were located are evidentiary copies maintained by JGR's forensic examiner and not subject to remediation.

required to provide a remediation list identifying the files it contended contained JGR information so that the remediation process could proceed. Protocol § 5(i). JGR dragged its feet—taking *months* and multiple requests before it finally produced the required remediation list on September 8. *See* Ex. R (Email exchange regarding forensic remediation timeline).[2] JGR cannot simultaneously slow walk its own performance under a court-ordered protocol and then ask the Court to hold Mr. Gabehart in contempt for the resulting delay in remediation.

**B. There Is No Evidence That Mr. Gabehart Knowingly Retained the Identified Materials—the Evidence Shows the Opposite.**

The files JGR cites were created during Mr. Gabehart's thirteen-year employment at JGR. They are files from Mr. Gabehart's time as a crew chief—before he became JGR's competition director—and were created years before this litigation and the entry of the Court's Orders. They were not the product of some post-Order misappropriation; they were the expected remnants of a long career at JGR. And they are precisely the type of old files that the Protocol was specifically designed to identify and extract.

JGR asks this Court to find—by clear and convincing evidence—that Mr. Gabehart "knowingly retained" these files in violation of the Court's Orders. Other than merely stating it over and over again, they do not point to any evidence to support the assertion that any retention

---

[2] The Protocol provides for the reimaging of any device or account where JGR materials were found that was returned to Mr. Gabehart after imaging but before the materials were identified. *See* Protocol § 5(i). The purpose of that process is "to determine whether the JGR Material was further accessed following the original imaging." *Id.* To fulfill that requirement, Mr. Gabehart's forensic examiner has reimaged any device or account on which JGR identified material, and Mr. Gabehart has surrendered access to those devices and accounts during the remediation process. He has also agreed to (i) run searches for the file names and associated hash values for all of the files JGR identified, (ii) search for hundreds of additional files that were identified in the prelitigation protocol, (ii) apply more than a hundred search terms targeted at the identified files, and (iii) consider whether additional forensic reports are necessary after the searches are run. *See* Ex. R.

was done knowingly. That's because the evidence that emerged from the Protocol shows these files were created while Mr. Gabehart worked for JGR, have not been modified or shared since he began working for Spire, and were not downloaded to any of his personal devices.

Contrary to JGR's suggestion, the fact that Mr. Gabehart's access to the OneDrive account was revoked once his lawyers identified the files is also not evidence that he knowingly retained them. When counsel discovered the files in June 2026 during the phase of the Protocol that called for review of the requested materials, they took immediate action to lock Mr. Gabehart out of the account and produced the files to JGR for review. That's not an admission; it's good-faith execution of the protocol. The "knowing retention" that JGR alleges is nothing more than the passive presence of old files on a cloud account—not knowing contempt, but exactly what the protocol was designed "to identify and extract." Protocol § 5(a).

### C. JGR's Motion Is Disingenuous Because Any Relief for Retention of Materials Is Already Provided for in the Protocol.

Civil contempt is a *remedial* device. It exists to enforce compliance with an order of the court or to compensate for losses or damages sustained by reason of noncompliance. *dmarcian, Inc.*, 181 F.4th at 459. Where the existing order already provides a mechanism to address the very issue a movant raises, contempt is neither necessary nor appropriate. *See id.* The question is not whether files were found—the Protocol *anticipated* they would be. The question is whether there is any harm that contempt is necessary to remedy, or any compliance that contempt is necessary to compel. There is neither.

The Protocol anticipates the discovery of JGR materials and outlines specific steps to remove or delete them. Protocol § 5(j). JGR drafted and agreed to the Protocol. And apart from JGR's delay by taking months to provide the required remediation list, the Protocol has operated exactly as intended. At all points throughout the forensic review process, Mr. Gabehart has

complied with the Protocol and cooperated fully with its terms, including giving up access to personal accounts and devices that contain years' worth of personal information, family photos, and other sensitive files pending final remediation.

There is no noncompliance for the Court to correct or additional steps beyond those already required for the Court to order. Nor is there any cost or harm that contempt is needed to remedy. The Protocol is working as designed. Any extra cost or further delay is a result of JGR wasting the Court's and the parties' time with this unnecessary and unsupported motion for contempt. Manipulating the contempt power to short-circuit a Protocol that JGR itself agreed to—and that JGR itself has delayed—is the kind of gamesmanship that this Court should reject.

## CONCLUSION

JGR has failed to carry its burden. It has not shown, by clear and convincing evidence, that Mr. Gabehart violated the specific terms of the Court's Order. It has not shown that it suffered any harm. And even if it could satisfy its initial burden—which it cannot—Mr. Gabehart's comprehensive, documented, and unrebutted evidence of good faith compliance would independently defeat the Motion. This is not the case JGR promised this Court. The Motion for Order to Show Cause should be denied, and Mr. Gabehart respectfully requests such other and further relief as the Court deems just and proper.

This the 29th day of September, 2026.

By: *_/s/ Cary B. Davis_*
Cary B. Davis
N.C. Bar No. 36172
cdavis@rbh.com
Spencer T. Wiles
N.C. Bar No. 53664
swiles@rbh.com
William M. Miller

N.C. Bar No. 36946
wmiller@rbh.com
Anna Claire Tucker
N.C. Bar No. 59457
atucker@rbh.com

ROBINSON, BRADSHAW & HINSON, P.A.
600 S. Tryon Street, Suite 2300
Charlotte, North Carolina 28202
(704) 377-2536

*Attorneys for Defendant Christopher Gabehart*

## CERTIFICATE OF SERVICE

I hereby certify that on the date indicated below, the foregoing document was filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

Dated: September 29, 2026

*\/s/ Cary B. Davis*
Cary B. Davis