**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| JOE GIBBS RACING, LLC,<br><br>Plaintiff,<br><br>v.<br><br>CHRISTOPHER GABEHART and SPIRE MOTORSPORTS II, LLC,<br><br>Defendants. | Case No. 3:26-cv-00133-SCR-DCK |

**DEFENDANT SPIRE MOTORSPORTS II, LLC'S OPPOSITION TO PLAINTIFF JOE GIBBS RACING, LLC'S MOTION FOR ORDER TO SHOW CAUSE WHY DEFENDANTS SHOULD NOT BE HELD IN CONTEMPT FOR VIOLATING THE TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**


INTRODUCTION ....... 1

BACKGROUND ....... 2

I. The Court Has Twice Declined to Issue an Injunction Against Spire ....... 2

A. The Court's Temporary Restraining Order Enforces JGR's Non-Compete Provision as Written—No Broader ....... 2

B. The Court's Preliminary Injunction Enforces JGR's Non-Compete Provision as Written—No Broader ....... 3

II. Spire Proactively Encouraged Gabehart's Compliance with the Court's Orders ....... 4

A. Gabehart's Role at Spire Is Distinct From His Role at JGR ....... 4

B. Discovery Has Exposed JGR's Non-Compete Theory to be Entirely Unsupported by the Evidence ....... 5

C. Even After the Court Denied JGR's Motions Seeking Injunctive Relief Against Spire, Spire Took Additional Steps to Ensure Gabehart's Compliance ....... 7

III. JGR's True Motive Is to Crush Gabehart and Put Him Out of a Job ....... 8

IV. JGR's Claimed Violations of the Non-Compete ....... 9

i. Pre-TRO Conduct ....... 10

ii. Post-TRO Conduct ....... 11

V. Spire's Counsel's Statements at a Preliminary Injunction Hearing Six Months Ago Were and Remain Accurate, but Are Irrelevant to this Motion In Any Event ....... 13

LEGAL STANDARD ....... 14

ARGUMENT ....... 15

I. Because Spire is in Compliance with the Court's Order, the Court Cannot Hold Spire in Contempt ....... 15

II. JGR's Expansive Interpretation of the Court's Orders, if Endorsed, Would Render Them Invalid ....... 16

III. JGR Has Failed to Prove a Violation of the Court's Orders by Clear and Convincing Evidence ....................18

IV. JGR Fails to Demonstrate that Spire Aided and Abetted Any Alleged Violations of the Court's Orders ....................23

V. Spire Has Taken Reasonable Steps to Comply with the Court's Orders ....................25

CONCLUSION ....................25

## TABLE OF AUTHORITIES

**Cases** **Pages**

*Accelerando, Inc. v. Relentless Sols., Inc.*, 2025 WL 1721497 (N.C. Super. Ct. June 19, 2025) ........ 17

*Ashcraft v. Conoco, Inc.*, 218 F.3d 288 (4th Cir. 2000) ........ 14

*Bone v. Univ. of N. Carolina Health Care Sys.*, 678 F. Supp. 3d 660 (M.D.N.C. 2023) ........ 15, 23

*Farr Assocs., Inc. v. Baskin*, 138 N.C. App. 276 (2000) ........ 17

*In re General Motors Corp.*, 61 F.3d 256 (4th Cir. 1995) ........ 18

*Higher Tech Realty NC, LLC v. Navigate Realty, LLC*, 2026 WL 1593399 (N.C. Super. June 02, 2026) ........ 20

*Int'l Longshoremen's Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64 (1967) ........ 17

*Nat'l League of Junior Cotillions, Inc. v. Porter*, 2008 WL 11516421 (W.D.N.C. May 28, 2008) ........ *passim*

*Project B.A.S.I.C. v. Kemp*, 947 F.2d 11 (1st Cir. 1991) ........ 17, 18

*RCR Enters., LLC v. McCall*, 2014 WL 7591977 (N.C. Super. Dec. 19, 2014) ........ 20

*Reaves v. Hayes*, 174 N.C. App. 341 (2005) ........ 19

*United States v. Holland*, 214 F.3d 523 (4th Cir. 2000) ........ 15

*Washburn v. Yadkin Valley Bank & Trust Co.*, 190 N.C. App. 315 (2008) ........ 17, 18, 19

Defendant Spire Motorsports II, LLC ("Spire"), by and through counsel, submits this Opposition to Plaintiff Joe Gibbs Racing, LLC's ("JGR") Motion for Order to Show Cause Why Defendants Should Not be Held in Contempt for Violating the Temporary Restraining Order and Preliminary Injunction, Dkt. 218-1 ("Mot.").

## INTRODUCTION

JGR has twice asked the Court to rule that Christopher Gabehart ("Gabehart") cannot work for Spire in essentially any capacity. The Court has twice rejected that position. The Court should do so again. JGR now asks the Court to inspect one-off comments allegedly made by Gabehart at two meetings (Gabehart attended just a handful of hundreds of Cup Series meetings at Spire). JGR wants to convert that chatter into a civil contempt order.

JGR originally sought extraordinary relief on the theory that Gabehart had taken and distributed JGR's race-car setups to Spire. It called those setups its "crown jewels." But extensive discovery—including more than 80 third-party subpoenas, hundreds of search terms, and searches across dozens of custodians—has not supported that theory. Spire never hired Gabehart as Competition Director or Crew Chief and never acquired JGR's trade secrets. Ex. A (Expert Report of K. Clarke) ¶ 4.a. Most importantly, ***there is no evidence Gabehart transmitted the files JGR claims he took to Spire***. If such evidence existed, the record would contain emails, texts, file-sharing, and other records showing Gabehart importing JGR's race team to Spire. It would also show Gabehart running meetings, directing personnel, sitting on pit boxes, calling races, and communicating with drivers and alliance partners. ***There is no such evidence, because that did not happen***. JGR's reliance on a few stray words speaks volumes about the merits.

JGR also seeks to turn the preliminary injunction into a device for micromanaging a competitor, second-guessing its business, and controlling an employee's whereabouts and speech.

Its tortured reading of the Orders would make them invalid, ambiguous, and overbroad—and the underlying non-compete unenforceable. It further seeks to extend that reading to Spire, which the Court ***expressly declined*** to enjoin, without clear and convincing evidence that Spire aided Gabehart. JGR even relies on pre-Order conduct, confirming that its real aim is to make work for Spire.

Put simply, there has been no violation of the Court's Orders. JGR's motion should be denied and Spire should be awarded attorneys' fees for having to respond to it.

## BACKGROUND

### I. The Court Has Twice Declined to Issue an Injunction Against Spire

The Court has twice previously declined to enjoin Spire, once in its March 2, 2026 TRO and again in its April 23, 2026 preliminary injunction Order. In both instances, the Court rejected JGR's interpretation of the non-compete and its request for line-by-line activity-based restrictions.

#### A. The Court's Temporary Restraining Order Enforces JGR's Non-Compete Provision as Written—No Broader

On February 24, 2026, JGR lopped Spire into this lawsuit and simultaneously sought a temporary restraining order and preliminary injunction requesting that "Gabehart cease and desist working or performing any services for Spire similar to those he provided to JGR" and that "Spire cease employing or accepting services from Gabehart in violation of Gabehart's noncompete obligations . . . ." Dkt. 9 at 3. After two hearings, the Court declined to issue a TRO beyond the plain terms of Gabehart's employment agreement. On March 2, 2026, the Court restricted Gabehart from "violating Section 6 of his Employment Agreement, which prohibits providing services of the general type of services that Defendant Gabehart provided to JGR in the year prior to his termination." Dkt. 26 at 12. The Court clarified that Gabehart was not required to resign from his position at Spire, nor was he prohibited from working for Spire, and "[o]ther services not

performed at JGR in the year prior to [Gabehart's] termination [were] permissible." *Id.* The Court declined to issue a TRO against Spire. *Id.*

### B. The Court's Preliminary Injunction Enforces JGR's Non-Compete Provision as Written—No Broader

Undeterred, JGR filed a supplemental brief the next day seeking even broader relief than what the Court had already declined to issue in the form of a preliminary injunction. Dkt. 35. JGR's proposed relief included restraining Gabehart "from violating Section 6 of his Employment Agreement, which prohibits providing services of the general type of services that Defendant Gabehart provided to JGR in the year prior to his termination." Dkt. 35-2 at 3. JGR's position then—and on which it has doubled down in discovery—is that there is ***no*** position Gabehart can hold with Spire. JGR made this clear (and made clear the ambiguity in its own contract) when it offered a proposed order that included a six-page list of prohibited services and activities that would "apply regardless of whether Gabehart's activities or services are provided: (i) directly or indirectly; (ii) formally or informally; (iii) on a full time, part-time, consulting, advisory, or occasional basis; (iv) in person, remotely, or through electronic or telephonic means; (v) through official meetings and communications or through unofficial or casual interactions; (vi) under any job title or organizational designation; (vii) as part of assigned job responsibilities or as voluntary assistance or collaboration." *See id.* at 3-9. JGR suggested prohibiting Gabehart from so much as "[a]ccessing . . . competition analytics," "[a]ttending . . . meetings," or "[p]articipating in strategic planning." *Id.* at 4-5.

The Court rejected JGR's expansive approach and declined to adopt JGR's extensive list of (still vague) prohibited activities, which appear nowhere in Gabehart's contract. Instead, on April 23, 2026, the Court upheld the plain terms of the contract as written and restrained Gabehart "from violating Section 6 of his Employment Agreement, which prohibits providing services of

the general type of services that Defendant Gabehart provided to JGR in the year prior to his termination." Dkt. 78 at 35. The Court again clarified that it was "not requiring Gabehart to resign from his position at Spire or prohibiting him from working for Spire" and "[o]ther services not performed at JGR in the year prior to his termination are permissible." *Id.* Further, the preliminary injunction "does not prohibit Gabehart from attending the NASCAR Cup Series and the NASCAR O'Reilly Auto Parts Series or prevent him from performing other services at those races not implicated by Section 6 of his Employment Agreement." *Id.* The Court again found no basis for injunctive relief against Spire. *Id.*

## II. Spire Proactively Encouraged Gabehart's Compliance with the Court's Orders

Although not subject to the Court's Orders, Spire has implemented reasonable measures designed to encourage Gabehart's compliance with them. Aside from the fact that Gabehart was hired to perform and has performed "services of the general type of services" that are different from those he performed for JGR, Spire has also taken steps to reduce even the possibility or appearance that he is in violation of the Court's Orders, as detailed below.

### A. Gabehart's Role at Spire Is Distinct From His Role at JGR

Spire hired Gabehart as Chief Motorsports Officer, an executive role unlike his JGR positions and one covering a broader portfolio: truck series, sprint cars, late models, dirt late models, IndyCars, and developmental drivers. Ex. B (Anthony Dep.) at 247:4-16; Ex. C (Dickerson Dep.) at 344:3-349:4. Gabehart is also involved in Spire's manufacturing, acquisition, and expansion work. *Id.* By contrast, JGR focuses on NASCAR Cup and Xfinity racing. At JGR, Gabehart called Cup races, sat on the pit box, led competition meetings, made real-time strategy calls, and had final responsibility for Cup performance. Ex. D, JGR Second Supp. Resp. to Spire's Interrog. No. 10, Jul. 16, 2026. At Spire, he does none of those things. Matthew McCall and Spire's three experienced crew chiefs run the Cup program; their responsibilities and reporting

lines have not changed since Gabehart was hired. Ex. E (Peterson Dep.) at 12:18-13:1; Ex. F (Sparks Dep.) at 19:10-12, 164:2-7; Ex. G (Lambert Dep.) at 196:8-10, 74:6-10, 214:15-20; Ex. H (McCall Dep.) at 135:16-24, 276:19-277:15.

### B. Discovery Has Exposed JGR's Non-Compete Theory to be Entirely Unsupported by the Evidence

At the preliminary injunction stage, JGR represented that "Spire structured his role as Chief Motorsports Officer to encompass precisely the same services he performed for JGR as Competition Director." Dkt. 35, 11. Extensive discovery has confirmed this is untrue. JGR emphasized that Gabehart was heavily involved in JGR's Cup operations, "over[seeing] race-related operations, technical coordination, and driver-crew communications on a *week-to-week basis*[]" and "*regularly* attend[ing] meetings with team members from every discipline." *Id.* at 12 (emphasis added). JGR further represented that "the Competition Director is one of the most prominent faces of the JGR track," meaning he "traveled to race venues, participated in NASCAR technical inspections, and interacted directly with NASCAR officials and team personnel on compliance and technical issues." *Id.* at 13. Gabehart's involvement was purportedly so extensive that JGR asked the Court to "clarify the scope of [the non-compete] provision," pointing to its six-page list of prohibited services. *Id.* at 13-14; *supra* Section I.B.

Gabehart's role at Spire is completely different. Unrebutted testimony from every Spire witness confirms that Gabehart has played no meaningful role in Spire's Cup Series operations this season. Gabehart does not oversee Spire's race-related Cup Series operations, technical coordination, or driver-crew communications—much less on a week-to-week basis as he did at JGR; that is Matthew McCall's job. Ex. H (McCall Dep.) at 271:15-21 (testifying that he is the person "ultimately responsible for the competition-related decisions" for Spire's Cup Series); Ex. G (Lambert Dep.) at 215:21-24 ("I know that Chris Gabehart has had no meaningful impact on the

reason why we are performing well, because I have been on the frigging journey the whole time."); Ex. E (Peterson Dep.) at 154:14-17 ("Decisions, no, no. Like I said, he's been aware of things and invited to things, but I don't recall him ever being part of a decision making process."). Gabehart does not regularly attend Cup Series related meetings as he did at JGR, and in any event Spire's executives routinely attend and observe Spire's Cup Series-related meetings.[1] Gabehart does not participate in NASCAR technical inspections, nor does he interact directly with NASCAR officials on compliance and technical issues.[2] In short, the services Gabehart performs for Spire are distinct from those he performed for JGR.

### C. Even After the Court Denied JGR's Motions Seeking Injunctive Relief Against Spire, Spire Took Additional Steps to Ensure Gabehart's Compliance

---

[1] Ex. H (McCall Dep.) at 137:22-25 ("Q. So during the entire time that he has been employed by Spire, you've not had any regular meetings with him? A. No, ma'am."); Ex. G (Lambert Dep.) at 197:4-6, 198:16 (testifying that he interacts with Gabehart "[a]lmost never" and has "not seen him in the shop in weeks"); Ex. F (Sparks Dep.) at 294:6-12 (estimating that out of roughly 280 meetings for the Number 7 car in the 2026 season, Gabehart had attended "maybe a handful, five or six"); Ex. G (Lambert Dep.) at 36:22-37:5 (testifying that Gabehart's role at meetings is "to watch the people work, see who is doing a good job, see how people are interacting," "much like Bill Anthony sits in those meetings"); Ex. T (Gerringer Dep.) at 70:18-22 (when discussing the competition meeting, "Bill's there because he's president; doesn't really have much input, he's just there to listen and be aware"). Gabehart rarely attends Cup Series races and has not attended any for several months. Ex. F (Sparks Dep.) at 124:3-6 (testifying he had seen Gabehart at "less than five" races); Ex. H (McCall Dep.) at 132:25 ("[Gabehart's] been to a couple races"); Ex. E (Peterson Dep.) at 134:15-19 ("I just remember it being the beginning of the year. The specific ones I don't 100 percent remember where it was like, yeah, he was there at a couple, but I don't remember which ones.").

[2] E.g., Ex. F (Sparks Dep.) at 105:12-19 ("Q. Has Chris Gabehart ever attended the NASCAR technical inspection for the Number 7 car? A. He has not. . . . Q. And have you ever seen Chris Gabehart attend the tech inspection for any other Spire car? A. I have not seen that."); Ex. E (Peterson Dep.) at 63:9-20 ("A. I don't think he's ever pushed through tech with us. . . . Q. Okay. Aside from whether he was pushing, has he been present? A. I don't recall seeing him with us. . . . I'm sure he was at the track while we were going through tech at some point, but never with us."); Ex. H (McCall Dep.) at 245:1-9 ("Q. Have you seen Mr. Gabehart interact with any of the NASCAR officials during the technical inspection for any of the Spire Motorsports cars since Mr. Gabehart has been employed by Spire Motorsports? . . . A. Ma'am, I do not. I do not recall any interaction with him with an official.").

Despite the fact that Gabehart was already in a different role from the one he held at JGR, and despite the Court declining to enjoin Spire, Spire nonetheless took numerous steps to ensure Gabehart's compliance with the Court's Orders.[3] On February 27, 2026, Spire removed Gabehart's Spire-issued laptop from his possession and quarantined it with Spire's forensic examiner, where it remains. Decl. of K. Clarke, Dkt. 68-2, ¶ 7. On March 18, 2026, Spire revoked Gabehart's access to the few Spire electronic systems he had access to. Dkt. 56 at 3-4. These measures remain in place. Ex. I (B. Bridges Supp. Decl.) ¶¶ 7-8. Gabehart ***never had access*** to Spire's Cup Series competition SharePoint. Ex. Z (Spire 30(b)(6) – Anthony Dep.) at 118:1-7; B. Bridges Supp. Decl. at ¶¶ 5, 7–8. On May 5, 2026, Spire's President sent an email to the entire company (1) explaining the Court's preliminary injunction Order and Gabehart's executive role; (2) reiterating Gabehart's role as an executive; and (3) explaining that Gabehart's presence in meetings and at the track was "in an executive capacity focused on Spire's overall strategic vision and long-term business objectives, not on making competitive calls." Ex. J (Spire_0000757). As it became clear that JGR intended to use this litigation to micromanage Gabehart's activities, Spire's co-owner instructed Gabehart to stop attending Cup Series races on Spire's behalf and pulled him from all Cup Series related meetings. Ex. AA (Spire 30(b)(6) Dep. – Dickerson) at 54:24-58:10. [redacted] Dickerson took these steps despite the absence of any Court Order requiring him to do so, and in the presence of a Court Order that expressly permitted Gabehart's attendance at Cup Series races. Dickerson's decision was motivated by concerns over JGR's

[3] Even before Gabehart began his employment, Spire required him to agree to two separate agreements: one that prohibited him from using or disclosing JGR's confidential information or trade secrets, and another that required him to confirm he was in compliance with any contractual obligations owed to former employers and would continue to comply with those obligations. Ex. W (Spire_0000332); Ex. X at 2 (Spire_0000125).

litigious nature, malicious approach to this litigation, and clear desire to publicly disparage Spire even for the most innocent of conduct, concerns that JGR's motion proves prescient. *Id.*

## III. JGR's True Motive Is to Crush Gabehart and Put Him Out of a Job

Despite extensive (unrebutted) testimony from every Spire witness demonstrating that Gabehart is not providing the same services to Spire that he provided to JGR, JGR maintains that Gabehart is somehow in violation of the Court's Orders. That position flows from a flawed interpretation of the Court's Orders and the palpable hatred JGR's leadership has for Gabehart. Ex. K (Alpern_0000001-2); Ex. L (Heather Gibbs_0000035) (January 27, 2026, writing, "Also what car does Gabehardt drive I might take my dogs on a drive some nights."); Ex. M (Heather Gibbs_0000224) (August 9, 2025, writing, "[redacted]"); Ex. N (Heather Gibbs_0000131) (August 23, 2025, writing, "[redacted]"). In discovery, JGR has doubled down on its position, previously rejected by the Court, that Gabehart's JGR employment agreement prevents him from holding ***any job*** with Spire. That's exactly what JGR's President and corporate representative, Dave Alpern, said in his deposition. Ex. O (JGR 30(b)(6) Dep., August 3, 2026) at 355:19-356:1 ("Q. You agree with me that there are some roles that Mr. Gabehart could perform for Spire that would not violate the noncompete; right? A. I don't agree with that. ***Q. You think regardless of the job that he does for Spire, no matter what he's doing, it would violate the noncompete? A. I do.***"). Alpern later went further in the 30(b)(6) deposition taken by Gabehart, testifying that Gabehart's "presence [at Spire] is the very services that he performed for Joe Gibbs Racing." Ex. P (JGR 30(b)(6) Dep., September 1, 2026) at 185:23-24; *see also id.* at 186:1-20 ("[E]ven if he's not leading meetings, even if he's not sitting on a box, he can direct [Spire] what not to do . . . him

being around the competition people, all of those are things he did at Joe Gibbs Racing. . . . ***So his presence in any of those activities is services of the kind he did at Joe Gibbs Racing***."). This is all consistent with how JGR started the case: "[redacted]" Ex. K, Alpern_000002.

JGR's contempt motion echoes that untenable position. It argues that Gabehart should not be able to work for Spire, speak with its employees, attend its meetings, or discuss racing. JGR criticizes his executive title as a mask for Cup Series competition work, treats his ***mere presence*** at a Cup Series meeting—or even in the Spire shop—as a violation, and faults Spire for not instructing employees to avoid Cup competition discussions with him. Mot. at 2, 13-14. In JGR's world, even ordinary workplace interactions violate the Orders.

## IV. JGR's Claimed Violations of the Non-Compete

JGR grossly misstates the factual record in its bid to identify violations of the Court's Orders. That aside, none of the conduct identified in JGR's motion violates the Court's Orders. And, of course, conduct that occurred before those Orders issued does not violate them.

### i. Pre-TRO Conduct

Tellingly, much of the conduct JGR cites as violating the TRO and preliminary injunction occurred prior to the entry of the TRO on March 2, 2026. Mot. at 7-9. As such, that conduct is not relevant to the Court's analysis. Nevertheless, Spire addresses that conduct here:

- February 14, 2026 Text Exchange with Matthew McCall (Mot. Ex. K): JGR asserts this text exchange would violate the Court's Orders if it post-dated the Court's Orders. Gabehart said two things: "up to speed ok today?" and "[a]ll is going ok?" The "detailed pit-stall assignment diagram," Mot. at 7, McCall sent to Gabehart is publicly available on the Internet. Jayski's, *Pit Stalls*, https://www.jayski.com/nascar-cup-series/2026-nascar-cup-series-daytona-500-at-daytona-international-speedway-pit-stalls/.

- February 15, 2026 Presence in Spire War Room (Mot. Ex. L): JGR claims Gabehart provided "input on race execution and strategy" and "real-time race observations and commentary" during the Daytona 500. Mot. at 7. None of that is true. Exhibit L itself

shows that all commentary about the Daytona 500 occurred ***after the race had ended*** and there is no evidence that Gabehart said anything to anyone in the war room during the race or on the team's radio. Ex. C (Dickerson Dep.) at 199:19-200:10 ("Chris Gabehart has never talked on a radio, intercom, war room. But he's only been in the war room for that one race."); Ex. E (Peterson Dep.) at 151:9-11 ("Q. Have you ever heard him talking over a radio channel during a race weekend? A. No.")

- CG Master (Mot. Ex. M): JGR claims Gabehart "operationaliz[ed] the CG Master document." In fact, he used it as a personal note-taking device, largely recording public data such as starting and finishing positions. There is no evidence he distributed it or used it at Spire's direction. Spire's forensic examiner found no distribution, and a complete video of the February 22 Atlanta competition meeting shows that no one presented or discussed it. It is also undisputed that Gabehart made no revisions to the version of this document that resided on his Spire-issued laptop after the TRO issued, because his Spire-issued laptop was no longer in his possession. Decl. of K. Clarke, Dkt. 68-2, ¶ 7. Furthermore, JGR presents no evidence that anyone at Spire was even aware this document existed or that Gabehart had it but for this litigation.

- February 23, 2026 Meetings (Mot. at 8): A complete video of a 1.5-hour long competition meeting from February 23, 2026 reflects that, aside from an introduction, Gabehart spoke for a grand total of 1.5 minutes. Mot. Ex. AD. Notes taken from two meetings that day reflect inconsequential comments from Gabehart, like "Chris asking about dogleg bottom" and "[n]o change on air pressure for temperature." Mot. Ex. N.

- March 1, 2026 Racetrack Talk with Travis Peterson: Gabehart's discussion with Peterson led to no changes and was, in Peterson's own words, a discussion that arose out of curiosity. Mot. Ex. Q at 169:4-22.

In the end, all of the conduct identified above occurred before the Court had issued any Orders, and is therefore irrelevant to the Court's analysis.

ii. Post-TRO Conduct

JGR's post-injunction violations fare no better. The relevant facts are addressed below:

- JGR's Contention that Gabehart's Pre-TRO Conduct Continued Post-TRO: JGR states categorically that "the same competition services [Gabehart] provided to Spire's Cup Series teams before the TRO continued unabated after the Court ordered him to stop." Mot. at 9-10. Not so. To the contrary, Gabehart testified that while there has been "no change in [his] job," "[t]here has been caution so we're not purported to be breaking any kind of noncompete." Ex. Q (Gabehart Dep.) at 281:4-6. And Spire's competition witnesses uniformly testified Gabehart has not been involved. Ex. H (McCall Dep.) at 277:14-15; Ex. E (Peterson Dep.) at 154:14-17; Ex. G (Lambert Dep.) at 20:1-18; *see also* Dkts. 105-1, 2, 3, 4, 5, 6; Dkt. 134-1.

- March 21, 2026 Text Message Exchange with Matt McCall: JGR claims that Gabehart's texts with Matt McCall about a race violate the Court's Orders because they "discuss[] technical details and issues regarding Spire's No. 77 and No. 71 cars." Mot. at 10. A brief review of the actual text message exchange belies JGR's characterization. Gabehart, an ***executive at Spire***, asked Matt McCall a few general questions about how Spire's cars were performing during practice and qualifying. Ex. R (MCCALL_0062) at MCCALL_0063-65. For example, Gabehart asked "how is the 71?" to which McCall responded, "[l]oose and cant keep RR loaded." *Id.* at MCCALL_0064. JGR has never claimed that asking questions violates the non-compete, nor could it, because asking questions is not providing a service of any kind, let alone a service that would violate any non-compete.

- March 28, 2026 Text Message Exchange with Carson Hocevar: JGR claims that a text message between Carson Hocevar (an independent contractor and driver for Spire) and Gabehart violates the Court's Orders. Mot at 10. Hocevar unilaterally shared his thoughts about how his car felt. Mot. Ex. S (HOCEVAR_0051). Gabehart responded by instructing Hocevar to "[s]top" talking to him about his feedback on how the car handled. JGR does not explain how this exchange could possibly violate the Court's Orders. Gabehart provided no services at all, let alone services that would violate any non-compete.

- Gabehart's April 20, 2026 Meeting Comments: JGR makes much of notes taken by an attendee at an April 20, 2026 meeting which include the following words under the heading "Gabehart": "[redacted]"; "[redacted]" Mot. Ex. N. No witness has been able to confirm what if anything Gabehart actually said at the meeting.[4] But even assuming Gabehart said something on these topics, JGR has not produced any evidence of Gabehart's involvement in these topics/processes at JGR, nor any evidence that Gabehart did so for Spire. Indeed, unrebutted testimony from Spire's witnesses establishes Gabehart's comments on these topics were not services performed for Spire, because every experienced professional in NASCAR understands that the [redacted]—indeed, these are elementary mechanical engineering concepts.[5] For the same reason,

[4] While JGR accuses Spire of "refus[ing] to produce the video recordings of the April 20 and May 18 meetings," Mot. at 12-13, there ***are no video recordings of those meetings to produce***.

[5] Ex. S (Powers Dep.) at 213:6-214:1 ("Maybe he was assuming that we didn't know how to check the very basic concepts of a race car. . . . We've been doing this for a very, very long time. . . . [redacted]"), 218:5 (testifying that Gabehart was "[redacted]" when referring "to vacuum testing."); Ex. G (Lambert Dep.) at 164:23-165:2 ("[redacted]"); Ex. F (Sparks Dep.) at 248:13-15 (when asked about the airbox, testifying "I wouldn't consider this a new idea. Like I said, this is a very generalized, obvious statement. That's what I would consider

these comments do not constitute trade secrets, as JGR weakly claims.[6] *See* Mot. at 10-11. In any event, JGR badly misconstrues testimony from Doug Powers, Mot. at 11, who actually confirmed that Spire independently evolved its [redacted] processes without any input from Gabehart. Ex. S (Powers Dep.) at 137:3-139:1.

- Gabehart's May 18, 2026 Meeting Comments: JGR focuses on another set of attendee notes from a May 18, 2026 meeting which record the following: "Very interested in your ride quality comments – that's very foreign to me with this car"; "Is there a common bucket we could put in backup car." Mot. at 11-12 & Ex. N. Again, no witness recalled what if anything Gabehart actually said. But assuming the notes accurately capture a Gabehart comment, they simply reflect general interest and observations from a disconnected executive and contributed nothing to Spire's Cup Series competition operations. Ex. T (Gerringer Dep.) at 186:15-25.

- Long-Term Planning: JGR asserts that Gabehart's alleged involvement in long-term planning for Spire violates the Court's Orders. Mot. at 12. But JGR's corporate witness testified that Gabehart's role was monolithic: he "knows how to make cars go fast," "doesn't talk to sponsors," "doesn't do P&L financials," and did not play a business role for JGR. Ex. P (JGR 30(b)(6) Dep., September 1, 2026) at 186:16-17. In any event, Dickerson's testimony confirms the executive nature of Gabehart's role, which has nothing to do with day-to-day Cup Series competition. Mot. at 12 (citing Dickerson testimony).

None of this conduct amounts to a violation of the Court's Orders. *Infra*, Section III.

## V. Spire's Counsel's Statements at a Preliminary Injunction Hearing Six Months Ago Were and Remain Accurate, but Are Irrelevant to this Motion In Any Event

JGR's accusation that Spire's counsel misrepresented facts to the Court is wrong and irrelevant. Mot. at 3-4. Desperate to twist the record, JGR mangles the transcript and ignores its

---

it."), 249:13-20 ("Q. [redacted] A. When there was just 20 of us and I was sleeping on the couch at night, we've been doing it. Q. All right. And so Mr. Gabehart is offering very obvious recommendations? A. Yes. Very obvious."); 251:9-16 ("Q. [redacted] Q. Okay. A. It's not a novel concept.").

[6] To be clear, JGR does not allege that Gabehart misappropriated a ***single document*** related to [redacted]. JGR also never claimed these supposed processes as trade secrets until ***after*** Spire produced these notes. JGR's theory is that Gabehart memorized these processes (processes for which there is no evidence of his involvement at JGR) and telegraphed these purportedly complex processes to Spire's employees in a few words at a meeting, even though no one in attendance could recall what if anything Gabehart said.

own misstatements. *E.g.*, TRO Hr'g Tr. 46:23-24 (JGR's counsel representing that JGR had received "no access to Spire nor offer to review Spire's computers," even though Spire had offered a forensic examination two weeks earlier); Dkt. 127 (JGR moving to strike its own false allegations); Ex. U (JGR RFA Responses) (JGR admitting "Focus Plan" is not a trade secret); Mar 16, 2026 Hr'g Tr. 39:49 ("[W]e have learned about communications in the garage area for NASCAR races that there are reports of people having access to JGR information."). JGR forgets that it ran to Court on an allegation that its "crown jewels" were on the loose, only for discovery to show the opposite. JGR's focus on two documents that have been part of this case since March tells the Court all it needs to know about the merits.

Spire told the Court what it searched for: the documents JGR claimed Gabehart misappropriated. PI Hr'g Tr. 55:1-8, 66:3-8; *see also* Dkt. 9-4, Ex. 4. Neither "CG Master" nor "Focus Plan" were among those documents, both of which were created by Gabehart after he left JGR. Spire pointed out that its nascent forensic review remained ongoing, which the Court acknowledged. PI Tr. at 68:19-69:3 (Spire's counsel noting JGR's ambush); *see also id.* at 67 (Spire's Counsel: "Again, we just got this."); PI Tr. at 68:10 ("And, again, I know you're still searching."); PI Tr. at 17:16-17 (JGR's counsel acknowledging "we're all sort of trying to process this in real time, including up until last night"). Indeed, JGR filed a number of documents in camera the night before and never provided them to Spire until right before (or during) the hearing. In this context, Spire informed the Court that it had not located GABEHART00222 (which itself was produced just days before the hearing) on its systems. PI Tr. at 68:11-12. That was true then and remains true today. Spire's forensic examination has definitively confirmed that GABEHART00222 never touched Spire's systems. Ex. A (Expert Report of K. Clarke) ¶¶ 4, 25.

JGR stretches to concoct misrepresentations by Spire's counsel. Ultimately, there is no dispute that Spire has produced CG Master in discovery and candidly described the process by which it was discovered. There is also no dispute that CG Master is a personal notetaking device Gabehart created to capture his own (mostly public) observations and was never used by Spire. Decl. of K. Clarke, Dkt. 68-2, ¶ 7; Ex. Q (Gabehart Dep.) at 293:1-295:20. JGR's focus on statements made at the preliminary injunction hearing are irrelevant to the weaknesses in JGR's pending motion.

## LEGAL STANDARD

A party seeking a civil contempt order has the burden of producing "clear and convincing evidence" of a violation of a court order. *Nat'l League of Junior Cotillions, Inc. v. Porter*, 2008 WL 11516421, at *3 (W.D.N.C. May 28, 2008) (citing *Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 301 (4th Cir. 2000)). The movant must demonstrate "(1) the existence of a valid decree of which the alleged contemnor had actual or constructive knowledge; (2) that the decree was in the movant's favor; (3) that the alleged contemnor by its conduct violated the terms of the decree, and had knowledge (at least constructive knowledge) of such violations; and (4) that the movant suffered harm as a result." *Ashcraft*, 218 F.3d at 301 (reversing district court's findings of contempt) (citation modified). When considering a contempt motion, courts focus on whether the non-movant's "conduct complied with some 'unequivocal command' set forth in specific detail in the injunctive order." *Porter*, 2008 WL 11516421, at *3. When there are ambiguities as to the requirements of an injunctive order, courts read the ambiguities "as redounding to the benefit of the person charged with contempt." *Id.* at *4.

Preliminary injunctions bind the enjoined parties and their agents. Fed. R. Civ. P. 65(d)(2)(A)-(B). Rule 65(d)(2)(C) is a "limited" exception for persons in "active concert or

participation." *See Bone v. Univ. of N. Carolina Health Care Sys.*, 678 F. Supp. 3d 660, 710 n. 37 (M.D.N.C. 2023); Fed. R. Civ. P. 65(d)(2)(C). The non-enjoined party must have aided and abetted conduct "for the benefit of, or to assist," the enjoined party in violating the order. *Porter*, 2008 WL 11516421, at *4-5.

## ARGUMENT

JGR's motion should be denied. At the threshold, its expansive interpretation would render the Orders ambiguous and overbroad, deprive Spire of notice, conflict with North Carolina's strict construction of non-competes, and violate the rule construing orders in favor of the alleged contemnor. JGR also has not shown a violation by clear and convincing evidence, Spire's aiding and abetting by that standard, or any actual damages. Spire acted in good faith and imposed reasonable measures to ensure Gabehart's compliance.

### I. Because Spire is in Compliance with the Court's Order, the Court Cannot Hold Spire in Contempt

The civil contempt power is coercive, not punitive, in nature. *United States v. Holland*, 214 F.3d 523, 526 (4th Cir. 2000) ("If the purpose of contempt is to coerce compliance, the penalty is civil; if the purpose of contempt is to punish for past disobedience, the penalty is criminal.")). JGR seeks to coerce compliance, but Spire never violated the Orders and is indisputably compliant now that Gabehart is on administrative leave. Nothing remains to coerce. Any contempt sanction would therefore be punitive and subject to the heightened standard for criminal contempt. The motion should be denied on this basis alone.

### II. JGR's Expansive Interpretation of the Court's Orders, if Endorsed, Would Render Them Invalid

To date, Spire has not challenged the validity of the Court's Orders, for two primary reasons: (1) as written, and when interpreted in light of North Carolina's strict construction of

non-competes, the Orders appear valid on their face; and (2) Spire was never subject to the Court's Orders. However, JGR's rewrite of the Court's Orders would render them invalid. That is because the Court's Orders do not put Spire (or anyone) on notice of the extraordinary breadth JGR now assigns to them. *See* Fed. R. Civ. P. 65(d)(1)(C) (requiring that every injunction order "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required").

JGR's corporate witness testified that JGR's non-compete bars Spire from employing Gabehart in ***any capacity***. Ex. O (JGR 30(b)(6) Dep., August 3, 2026) at 355:19-356:1. The Court adopted the language of JGR's non-compete in its Orders, but it expressly rejected JGR's expansive definition of the non-compete language, did not order Gabehart to resign, and expressly permitted Gabehart to perform certain functions such as race attendance. Dkt. 78 at 35. The Court's orders can only be read as a rejection of JGR's overly-expansive read of the non-compete. But JGR's motion doubles down: In JGR's world, Gabehart is barred from setting foot in Spire's shop, attending meetings where he works, speaking to other employees, or communicating via text with Spire's drivers and employees. *Supra*, Section II.A; *see also* Ex. D (JGR's Resp. to Spire's Interrog. No. 10) (asserting that "any communication or interactions with any" Spire employees at a racetrack, "[o]bserving . . . race data during race weekend events," "[b]eing present" in certain spaces, "[p]articipating in contract negotiations," and that mere attendance at meetings would violate the non-compete); *see also* Ex. O (JGR 30(b)(6) Dep., August 3, 2026) at 355:19-356:1.

JGR's formulation of the Court's Orders contradicts two well-settled rules of construction: (1) non-competes are strictly construed against the employer; and (2) any ambiguities in the Court's Orders are construed against the moving party. *First*, the ambiguous non-compete provision adopted by the Court's Orders is, itself, construed strictly and construed against the

drafting party. "Covenants not to compete between an employer and employee are 'not viewed favorably in modern law.'" *Farr Assocs., Inc. v. Baskin*, 138 N.C. App. 276, 279 (2000) (citation omitted). "Covenants not to compete restrain trade and are scrutinized strictly. To the extent the language of a written instrument is ambiguous, its provisions are to be strictly construed against the drafting party." *Washburn v. Yadkin Valley Bank & Trust Co.*, 190 N.C. App. 315, 323 (2008) (citations omitted). If a non-compete provision does not "reasonably put [Defendant] on notice of what services he is prohibited from providing," the provision is overbroad and will not be enforced. *Accelerando, Inc. v. Relentless Sols., Inc.*, 2025 WL 1721497, at *6 (N.C. Super. Ct. June 19, 2025). Additionally, "North Carolina courts have routinely refused to enforce noncompete provisions that prohibit former employe[e]s from 'indirectly' working for a competitor or similar business." *Power Home Solar, LLC v. Sigora Solar, LLC*, 2021 NCBC LEXIS 55, at *25 (N.C. Super. Ct. June 18, 2021) (cleaned up).

*Second*, the Orders themselves must also be "clear and unambiguous." *Project B.A.S.I.C. v. Kemp*, 947 F.2d 11, 16 (1st Cir. 1991). Because contempt is a potent weapon, courts must frame orders so those bound know what is required and forbidden. *Int'l Longshoremen's Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 76 (1967) (the contempt power can be "a deadly one" when founded on a decree too vague to be understood). Contempt therefore requires an order stating a specific, "unequivocal command," and lies only when the order is clear and unambiguous. *In re General Motors Corp.*, 61 F.3d 256, 259 (4th Cir. 1995); *Project B.A.S.I.C.*, 947 F.2d at 16. Ambiguities or omissions benefit the person charged with contempt. *Porter*, 2008 WL 11516421, at *3.

In tandem, this authority mandates a double-layered presumption that Gabehart has not violated either the non-compete or the Court's Orders. That becomes three layers when evaluating

whether Spire—a party not named in the Orders—has violated the Orders. For these reasons, to the extent the Court endorses JGR's broad view of the Court's Orders—which would render them ambiguous and deprive Gabehart and certainly Spire of any notice as to what constitutes a violation—Spire challenges their validity.

## III. JGR Has Failed to Prove a Violation of the Court's Orders by Clear and Convincing Evidence

JGR's hodge podge of stray remarks and text messages do not amount to a violation of the Court's Orders. To grant JGR's motion, the Court must find that JGR has proven a violation of the Court's Orders by "clear and convincing evidence." *Nat'l League of Junior Cotillions, Inc. v. Porter*, 2008 WL 11516421, at *3 (W.D.N.C. May 28, 2008) (citing *Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 301 (4th Cir. 2000)). JGR must show that Spire (or Gabehart) violated an unequivocal command that is clear and unambiguous. *Porter*, 2008 WL 11516421, at *3. Any ambiguities in the Court's Orders are construed in Spire's favor. *Id*. at *4 (citing *NBA Prop. Inc. v. Gold*, 895 F.2d 30, 32 (1st Cir. 1990)). And the underlying non-compete—which the Court's Orders adopt—is also construed against JGR. *Washburn*, 190 N.C. App. at 323 (citations omitted).

Applying the standards set forth above, JGR has utterly failed to prove any violation of the Court's Orders. The starting point is the Orders themselves. The Court declined JGR's invitation to restrict Gabehart's conduct on an activity-by-activity basis. *Supra*, Section I.B. And the Orders made clear that Gabehart could go to the places an executive for a motorsports team is expected to go—racetracks. The Court enjoined Gabehart from "providing services of the general type of services that [he] provided to JGR in the year prior to his termination." Dkt. 78 at 35. The Court did not prohibit Gabehart from engaging in specific activities. The Court did not prohibit Gabehart from speaking certain words. The Court did not prohibit Gabehart from going certain places or interacting with certain people.

Instead, the Court rightly focused on "services of the general type of services" he provided to JGR, tracking the language of the non-compete. This language is essential. The non-compete does not—as JGR wants the Court to accept—restrict Gabehart from performing "any service" he performed for JGR. Rather, the Court must give each word of the non-compete effect. *Reaves v. Hayes*, 174 N.C. App. 341 (2005) ("The various terms of the [contract] are to be harmoniously construed, and if possible, every word and every provision is to be given effect."); *see RCR Enters., LLC v. McCall*, 2014 WL 7591977, at *4 (N.C. Super. Dec. 19, 2014) (holding that "occasionally participating" in overlapping "activities" or interacting with other members of a race team—even through "regular and sustained engagement . . . on a daily basis"—did not violate a similarly-worded non-compete). And this in turn means the word "type"—which modifies "services," must be given effect. "Type" refers to a category, class or kind. Type, Merriam-Webster, https://www.merriam-webster.com/dictionary/type (last visited Sep. 28, 2026). Thus, "type of "services" is best understood is as describing a ***position***—the package of duties Gabehart performed as JGR's competition director or short-lived tenure as crew chief. And even if this were not the only possible reading of the non-compete, it is the reading the Court must accept given North Carolina's strict construction requirements if the provision is enforceable at all.[7] *Washburn*, 190 N.C. App. at 323.

When the Court's Orders are properly construed, JGR has presented no evidence that Gabehart violated them. Indeed, boiled down to its essence, JGR's entire motion is premised on a grand total of ***two text messages*** and ***two meeting notes***, after 3.5 months of fact discovery, 85 third party subpoenas, a 4-month long second forensic review of Gabehart's personal devices, and

[7] Spire reserves all arguments concerning the enforceability of the non-compete.

10 depositions taken by JGR, with 15 more taken by other parties.[8] *Supra*, Section IV.ii. JGR's other arguments, Mot. at 17-21, are ultimately irrelevant to whether there has been a violation of the Court's Orders but addressed for good measure.

*First*, JGR points to two text messages to convince the Court that Gabehart and Spire should be held in civil contempt. As an initial matter, neither text message exchange reflects Gabehart providing services ***of any kind,*** much less acting as competition director or crew chief. *Supra*, Section IV.ii. In one text message, Gabehart cut off the conversation and only said the word "Stop." *Id.* That is not a violation of anything, let alone an "unequivocal command" from the Court. The other text message reflects several questions posed by Gabehart to Spire's Competition Director. Again, asking questions is not providing a service. In any event, Gabehart was not acting as (or behaving like) a Competition Director or Crew Chief when he rejected a driver's outreach to him and asked questions about how Spire's cars were doing at qualifying. These are the same conversations that Heather Gibbs, Joe Gibbs, Dickerson, or Anthony could have with their own Competition Directors and Crew Chiefs—none of them are performing the services that Competition Directors and Crew Chiefs perform. *McCall*, 2014 WL 7591977, at *4.

*Second*, JGR relies on meeting notes from two meetings to argue a violation of the Court's Orders, but these do not prove a violation of the Court's Orders by clear and convincing evidence.

---

[8] JGR's reliance on pre-TRO conduct is irrelevant to the Court's analysis because pre-TRO conduct cannot violate a later-issued TRO. Likewise, JGR's reliance on vague testimony about whether there have been changes in Gabehart's job post-TRO is also irrelevant to the Court's analysis because that testimony does not establish any independent violation of the Court's Orders by clear and convincing evidence. Finally, JGR's emphasis on Gabehart's supposed role in "long-term planning" at Spire is a distraction. The Court's Orders cannot possibly be read to preclude Gabehart from engaging in activities that are so broad as to encapsulate something as vague as "long-term planning." *Higher Tech Realty NC, LLC v. Navigate Realty, LLC*, 2026 WL 1593399, at *5 (N.C. Super. June 02, 2026) (holding that even a non-compete that defined services to include "vague terms such as 'revenue generation,' 'Brand building,' and 'Company culture building'" was likely too vague to be enforceable).

At the threshold, JGR has not carried its burden to show what Gabehart actually said. But even if Gabehart said exactly what is recorded in the notes, JGR has failed to demonstrate that Gabehart actually performed similar services for JGR. JGR offers no evidence that Gabehart had involvement in, let alone provided services, equivalent to the purported "services" he provided by commenting about standard [redacted]. *Supra*, Section IV.ii. Even if JGR could make that threshold showing, JGR's bid for civil contempt would still fail because obvious observations at a meeting made by an executive at a race team are not "services." And even if comments at a meeting can be called "services," those services are not services of the same "general type" that Gabehart provided to JGR because he is not Spire's Competition Director or Crew Chief. An executive's commentary is entirely distinct from commentary provided by a Competition Director—the commentary is for a different purpose, with a different intent, and from a different perspective.

*Third*, JGR badly misrepresents the facts. Mot. at 18. JGR claims Gabehart "regularly attended and actively participated in Spire's Cup Series competition and post-race meetings." Mot. at 18. Not true. Spire's witnesses all testified that Gabehart attended at most a handful of meetings (out of hundreds), did not lead any, made no meaningful contributions, and usually scrolled on his phone or at times fell asleep. Ex. T (Gerringer Dep.) at 73:20-23; Ex. S (Powers Dep.) at 203:25-204:3; Ex. F (Sparks Dep.) at 47:21-25 (testifying that Gabehart is typically doing "[n]othing" at meetings or "[s]itting in the corner on his phone"); Ex. F (Sparks Dep.) at 47:21-25. And Gabehart's meandering observations at two post-TRO meetings hardly count as "active[] participat[ion]." Mot. at 18. As another example, JGR claims Gabehart "suggested strategies for Spire's backup-car process." Mot. at 18. Wrong again. The evidence shows that Gabehart asked a question about a common bucket seat after a crash at a non-points-paying race. One of Spire's

drivers is a foot taller than the others, so Spire's personnel already knew a common bucket seat would not work. Ex. T (Gerringer Dep.) at 186:15-25 ("[redacted]").

*Fourth*, acknowledging that it does not have the facts it needs to prove a violation of the Court's Orders, JGR resorts to old-fashioned mudslinging. Mot. at 20-21. But JGR's attempt to impugn Spire's counsel and its witnesses backfires. JGR claims, for example, that Dickerson lied when he testified that Gabehart was not attending Cup-related meetings at the time of his deposition. Mot. at 20. But neither Spire nor Dickerson have ever denied that Gabehart attended a handful of Cup Series meetings early in his tenure. Ex. V (Spire's Resp. to JGR Interrog. 17, Jun. 29, 2026). JGR then turns its ire on Matthew McCall, who recalled only one "meaningful statement" from Gabehart across the handful of Cup Series meetings he attended. Mot. at 20; *see also* Dkt. 134-1 at 1-3. McCall acknowledged that Gabehart "sporadically comment[s] on Spire's Cup Series performance" as any racing executive would, Dkt. 134-1 at 1-3, and the fact that Gabehart's alleged stray remarks are not meaningful statements says nothing about McCall's credibility (or a violation of the Court's Orders, *McCall*, 2014 WL 7591977, at *4 (holding that "occasionally participating" in overlapping "activities" did not violate a similarly-worded non-compete)). JGR even attacks Spire's head of Human Resources, claiming she too lied about when Gabehart began providing services to Spire. Mot. at 20. Again, there is no evidence that Gabehart provided services to Spire before February 16, and JGR's theory that Gabehart did so during the Daytona 500 is demonstrably false. *Supra*, Section IV.i. JGR's last arrow—a frontal assault on

the integrity of Spire's counsel, Mot. at 21—ultimately leaves JGR's own credibility in shambles. *Supra*, Section V.

*Fifth*, JGR's request for more documents comes after months of discovery, third-party subpoenas, forensic reviews, and tens of thousands of documents produced by parties and non-parties. Spire produced all meeting videos for meetings Gabehart attended and the only notes reflecting statements attributed to him (whether correctly or not). If JGR's alleged conspiracy existed, it would have generated an extensive record of implementing JGR information at Spire. It did not, because the alleged theft by Spire never happened.

## IV. JGR Fails to Demonstrate that Spire Aided and Abetted Any Alleged Violations of the Court's Orders

JGR's motion independently fails because, even assuming Gabehart violated some aspect of the Court's Orders, JGR fails to demonstrate that Spire aided and abetted any such violations. Indeed, JGR's supporting argument in this respect amounts to a single paragraph. Mot. at 22.

Because Spire is not named in any of the Court's Orders, JGR must invoke the "limited" exception to the general rule that non-named parties are not subject to injunctive orders. *See Bone v. Univ. of N. Carolina Health Care Sys.*, 678 F. Supp. 3d 660, 710 n. 37 (M.D.N.C. 2023); Fed. R. Civ. P. 65(d)(2)(C). Specifically, JGR contends that Spire "aided and abetted [Gabehart] in the enjoined conduct." *Porter*, 2008 WL 11516421, at *4. To make that showing, JGR must prove by clear and convincing evidence that Spire took actions "for the benefit of, or to assist, [Gabehart] in violating the order." *Id*. at *5 (citation modified).

*First*, JGR claims Spire "actively facilitated Gabehart's violations by giving him an executive title that concealed day-to-day competition involvement." Mot. at 22. JGR cites no facts to support that theory, because there are none. The evidence shows that Spire put Gabehart in a position that differed materially from the positions he held at JGR and actively took repeated

steps to avoid any violation of the Court's Orders. *Supra*, Section II.C. Gabehart had no "day-to-day" involvement in Spire's Cup Series activities. He attended only a handful of Spire's ***hundreds*** of Cup Series-related meetings. Ex. H (McCall Dep.) at 132:25, 137:22-25; Ex. G (Lambert Dep.) at 197:4-6, 198:16; Ex. F (Sparks Dep.) at 124:3-6, 294:6-12; Ex. E (Peterson Dep.) at 134:15-19.

*Second*, JGR complains that Spire "allow[ed] [Gabehart] to attend competition meetings and make specific technical recommendations." Mot. at 22. But nothing in the Court's Orders prohibits Gabehart from attending competition meetings, as any executive for any race team in NASCAR is free to do (and as Spire's and JGR's executives do). JGR's assertion that Gabehart "ma[d]e specific technical recommendations" misconstrues the evidence, which actually shows that Gabehart made a few offhanded remarks at a handful of meetings related to rudimentary, non-proprietary topics, none of which resulted in action by Spire. *Supra*, Section IV.ii.

*Third*, JGR claims without evidence that Spire "facilitate[ed] [Gabehart's] direct work with Spire's competition personnel." Mot. at 22. JGR does not bother to identify the facts supporting that assertion. And the only evidence JGR could rely upon—Spire's employment of Gabehart—is expressly permitted by the Court's Orders. Dkt. 78 at 35.

*Fourth*, JGR cites three cases that it believes warrant relief here. Mot. at 22. None of them do. In *Freedom Med., Inc. v. Sewpersaud*, a not-enjoined employer ***expressly instructed*** its enjoined employee to violate the court's order by asking him to contact his former customers (whom the court's order barred him from contacting) and to perform work within a restricted territory (the same territory the court's order barred him from working in "any capacity"). 2020 WL 6449312, at *5 (M.D. Fla. Nov. 3, 2020). In *Edwards Moving & Rigging, Inc. v. Jenkins*, the injunctive order listed specific off-limits activities applicable to the enjoined employee and ***expressly barred the employer from employing the employee***. 2020 WL 2570138, at *3 (M.D.

Fla. May 21, 2020). As a result, aiding and abetting was not at issue there. *Id.* at *4–6. Finally, in *Porter*, the enjoined party used her husband and a close friend to do precisely what the injunctive relief order at issue there prohibited. 2008 WL 11516421 at *1.

Because JGR has failed to show by clear and convincing evidence that Spire aided and abetted Gabehart in violating an unequivocal, unambiguous command, JGR's motion should be denied on this basis alone.[9]

## V. Spire Has Taken Reasonable Steps to Comply with the Court's Orders

As JGR acknowledges, even if it carries its burden of showing that its wild interpretation of the Court's Orders is right, that Gabehart violated them, that Spire aided and abetted those violations, and that JGR has been harmed, contempt remains unwarranted if Spire has made reasonable, good faith efforts to comply with the Court's Orders. Mot. at 16, 24-25. Spire has taken extraordinary steps to comply with the Court's Orders even though it is not subject to them. *Supra*, Section II.C. And, given that Spire has now placed Gabehart on administrative leave, any coercive purpose that could theoretically justify a contempt order has been accomplished. That alone ends the analysis.

## **CONCLUSION**

Spire respectfully requests that the Court deny JGR's motion and exercise its equitable powers to award Spire the attorneys' fees it has incurred to respond to JGR's motion.

This the 29th day of September, 2026.

By: */s/ Joshua D. Davey*
Joshua D. Davey (N.C. Bar No. 35246)

---

[9] JGR also admits that it has suffered no actual harm as a result of Gabehart's or Spire's conduct. Ex. Y JGR's Response to Spire Interrog. No. 17 ("[redacted]"); Ex. O (JGR 30(b)(6) Dep., August 3, 2026) at 40:11-22

Jason D. Evans (N.C. Bar No. 27808)
Lawrence J. Cameron (N.C. Bar No. 41922)
Troy C. Homesley, III (N.C. Bar No. 62148)
Anais M. Jaccard (N.C. Bar No. 58438)
Ben E. Whorf (N.C. Bar No. 64279)
**TROUTMAN PEPPER LOCKE LLP**
301 S. College St., 34th Floor
Charlotte, NC 28202
Telephone: (704) 916-1503
joshua.davey@troutman.com
lawrence.cameron@troutman.com
troy.homesley@troutman.com
anais.jaccard@troutman.com
ben.whorf@troutman.com

John S. "Evan" Gibbs III – Pro Hac Vice
**TROUTMAN PEPPER LOCKE LLP**
600 Peachtree St, NE #3000
Atlanta, GA 30308
Telephone: (404) 885-3093
evan.gibbs@troutman.com

## CERTIFICATE OF SERVICE

I hereby certify that on September 29, 2026, I filed the foregoing Defendant Spire Motorsports II, LLC's Opposition to Plaintiff Joe Gibbs Racing, LLC's Motion for Order to Show Cause Why Defendants Should Not be Held in Contempt for Violating the Temporary Restraining Order and Preliminary Injunction on the Court's ECF system through which all counsel of record will be served.

This is the 29th day of September, 2026.

*/s/ Joshua D. Davey*