IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| JOE GIBBS RACING, LLC,<br><br>Plaintiff,<br><br>v.<br><br>CHRISTOPHER GABEHART and SPIRE MOTORSPORTS II, LLC,<br><br>Defendants. | Case No. 3:26-CV-00133-SCR-DCK |

**PLAINTIFF JOE GIBBS RACING, LLC'S CONSOLIDATED REPLY IN SUPPORT OF ITS MOTION FOR ORDER TO SHOW CAUSE WHY DEFENDANTS SHOULD NOT BE HELD IN CONTEMPT**

**FILED UNDER SEAL**

**TABLE OF CONTENTS**

ARGUMENT ........ 1

I. Defendants violated the Court's Orders. ........ 1

A. Spire and Gabehart do not dispute the basic facts showing Gabehart's provision of Cup Series competition services to Spire. ........ 2

B. Defendants' downplaying of Gabehart's Cup Series contributions do not save them from liability. ........ 3

II. Defendants' attempt to wordsmith the restriction fails as a matter of law. ........ 6

III. This Court's prior rulings foreclose the vagueness defense. ........ 8

IV. The forensic protocol is not a safe harbor for retention of JGR information. The obligation arises from the Orders, not the protocol. ........ 10

V. JGR has suffered harm and Spire is liable. ........ 12

A. The "no harm" argument asks the Court to relitigate its own findings. ........ 12

B. Spire aided and abetted Gabehart's violations. ........ 13

CONCLUSION ........ 15

Because they cannot contest the underlying facts showing Gabehart provided Cup Series competition services to Spire in violation of this Court's Orders, Defendants respond as predicted: (1) downplaying the value of Gabehart's contributions as meaningless "shop talk," "one-off comments," "chatter," and "meandering observations," Dkt. 265 at 1, 10–12, and (2) excusing Defendants' conduct because Gabehart has a different title—he is an executive now, so whatever he does in that role is permitted.

Neither defense holds water. First, contempt here turns on whether the actual services Gabehart provided to Spire are of the same "general type" he provided to JGR—not on how Spire describes them in litigation. Defendants do not challenge the types of competitive services Gabehart provided to JGR, nor do they dispute the same competitive services Gabehart performed at Spire. Second, Defendants claim that since "executive" and "competition director plus crew chief" are different "packages" or "positions," Gabehart cannot violate the Orders with any particular conduct. But that contradicts the plain meaning of the contract and Orders.

The bottom line is the undisputed record provides many examples of Gabehart providing Cup services to Spire that are of the same general type he provided to JGR. It also shows Spire aided and abetted these violations by knowingly putting him in positions to provide these services. Finally, it is undisputed that Gabehart continued to have access to JGR confidential information during half the 2026 Cup Series season, and Defendants' procedural excuses do not show good faith in the face of multiple incorrect declarations and instances of hiding the violations for months.

## ARGUMENT

### I. Defendants violated the Court's Orders.

The parties agree on the standard for civil contempt and that the first two elements are met. The parties disagree only whether the Orders were violated and whether JGR suffered harm as a result. *See dmarcian, Inc. v. dmarcian Eur. BV*, 60 F.4th 119, 145 (4th Cir. 2023).

### A. Spire and Gabehart do not dispute the basic facts showing Gabehart's provision of Cup Series competition services to Spire.

Defendants do not dispute a single assertion concerning the scope of Gabehart's role at JGR, including that he participated in weekly competition meetings where he discussed car setups and performance data; communicated priorities and guidance to team personnel; attended technical meetings including pit crew, race engineering, and car performance meetings; and participated in post-race inspections and debriefs. Mot. at 7; *see* Dkt. 260 at 18; Dkt. 265 at 5–6. Thus, the first step in the contempt equation is undisputed.

Then, notwithstanding Court Orders prohibiting this very conduct, Defendants similarly do not dispute that once Gabehart joined Spire as an "executive" supposedly focused on anything but the NASCAR Cup Series, he performed the following Cup Series competition services: (1) on February 14, 2026 Gabehart communicated with Spire's Competition Director about car performance and received pit-stall diagrams for the Daytona 500, Dkt. 218-1 at 7; (2) on February 15, 2026 Gabehart was in Spire's war room beside its technical director and told Dickerson he had "observations" about the race, *Id.* at 7; (3) at the February 23, 2026 Atlanta debrief, video shows Gabehart discussing [redacted], *Id.* at 9; (4) on March 1, 2026 at COTA, Gabehart told Peterson that JGR's [redacted], *Id.* at 8–9; (5) Gabehart created the CG Master from JGR's CC Audit, filled it with Spire race data, and metadata shows it was modified on March 5, 2026, days after the TRO, *Id.* at 8–9; (6) on March 28, 2026 Spire's driver Carson Hocevar texted Gabehart seeking handling feedback for a race the following day, *Id.* at 10; (7) Spire had Gabehart attend five to twelve Cup competition meetings and did not remove him until late May or early June, *Id.* at 9, 12; (8) at the April 20, 2026 Kansas post-race meeting, Gerringer's notes show Gabehart recommending [redacted] Spire had never performed, *Id.* at 10–11; (9) at the May

18, 2026 Dover meeting, nearly a month after the PI, Gerringer's notes show [redacted], *Id.* at 11–12; and (10) Gabehart retained JGR material, including race setups, including on an undisclosed personal OneDrive until at least June 2026 and his counsel disclosed it only after discovery closed, *Id.* at 15, 23–24.[1] Thus, the undisputed record is sufficient to show Gabehart provided the same or similar Cup Series competition services to Spire that he did at JGR.

### B. Defendants' downplaying of Gabehart's Cup Series contributions does not save them from liability.

Defendants' primary strategy is to minimize and recharacterize Gabehart's Cup Series competition services. Dkt. 265 at 1, 10–12. But recharacterizing undisputed conduct as "chatter" or "executive observation" is irrelevant under the Orders. *See id*. JGR is not required to prove that Gabehart's comments were brilliant, novel, or outcome-determinative. Instead, JGR must only show that Gabehart provided prohibited services. *CFPB v. Klopp*, 957 F.3d 454, 461 (4th Cir. 2020); *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191–92 (1949) ("Because civil contempt is remedial rather than punitive, it does not matter 'with what intent the defendant did the prohibited act.'"). A single violation is enough, and the record contains many. *Klopp*, 957 F.3d at 461.

Even Gabehart's compensation undercuts Defendants' position that his contributions to the Cup Series have been meaningless. He is the highest paid Spire employee—by millions. He was hired to oversee all NASCAR Cup Series "competitive operations," and Dickerson has described Gabehart as being in charge of "all things racing." Dkt. 230-35, Spire_0001005, at 1; Dkt. 218-11,

[1] Of course, this is all that is known to JGR given Defendants' obstructionist behavior through discovery. It is uncertain, for instance, whether the CG Master was updated after March 5 and after collection. That document could very well have been modified subsequently, and Defendants have refused to provide the full forensic reporting from the OneDrive after the March imaging.

Dickerson Dep. Tr., at 140:13–23. Spire is paying Gabehart [redacted]es (already for 2026) tied exclusively to Cup results. Dkt. 230-25 § 6(a)–(b). [redacted]t of Gabehart's 2026 earnings is due to Spire's Cup performance alone. The Cup Series generates the vast majority of Spire's revenue. Ex. AE, Spire 30(b)(6) Dep. (Setzer) Tr., at 21:1–7. Gabehart's role and compensation structure are inconsistent with the hands-off role Defendants now claim Gabehart occupies.

Defendants' claims of good faith compliance with the Court's Orders also fall short. Contrary to Defendants' assertion, Spire's repeated decisions to curtail Gabehart's access to its systems and his involvement in the Cup Series were not the result of proactive compliance, they were damage control. Spire confiscated Gabehart's laptop only ***after*** it became a named defendant; it cut off his company email only after he continued to be included on Cup Series competitive communications;[2] it pulled him from Cup meetings only after he had repeatedly attended and offered commentary; and it placed him on administrative leave only after JGR filed this Motion. Spire's hollow claim that it acted because of JGR's "litigious nature" only confirms that Spire recognized that Gabehart's behavior could be seen as a violation of the Court's Orders. Dkt. 265 at 7–8. Indeed, Spire stripped Gabehart of his company email, his laptop, and his access to its systems because it evidently could not trust him with them, yet it kept paying its highest paid "executive" millions of dollars.

Additionally, whatever measures Spire purported to take before placing Gabehart on administrative leave were knowingly deficient. Spire cites Gabehart's confidentiality agreement as evidence of compliance. Dkt. 265 at 7 n.3. But that agreement was signed in February—and as Spire's own verified interrogatory responses admit, its forensic examiner found that Gabehart had

[2] Note, Gabehart admits he still receives Spire email at his personal Gmail account.

moved confidential JGR information to Spire systems ***after*** that date. Dkt. 218-7, Spire R&Os to 1st JGR ROGs, at 20, 28. Knowing the agreement was in breach, Spire kept Gabehart on the payroll, paid him millions of dollars, continued inviting him to Cup meetings, and never instructed anyone not to discuss Cup competition matters with him. Dkt. 218-26, Powers Dep. Tr., at 188:6–14, 222:2–13; Dkt. 218-18, Gerringer Dep. Tr., at 155:15–157:10; Dkt. 218-28, Spire_0000552. Spire admits that it did not even attempt to determine the scope of services that Gabehart provided in his final year with JGR until *after* the PI was entered. Dkt. 218-11, Spire 30(b)(6) Dep. (Dickerson) Tr., at 20:9–15. And Spire did not remove him from Cup meetings until "late May or early June," *after* the April 23 Preliminary Injunction and *after* the Kansas and Dover meetings where Gerringer's notes show him recommending processes Spire had never performed. *Id.* at 56:22–57:6; Dkt. 218-17, Gerringer Dep. Ex. 4, at Spire_0001712, Spire_0002053. Good faith under *Klopp* requires "all reasonable efforts," including "investigating likely sources of noncompliance, using available means to cure deficiencies, [and] monitoring continued compliance." *Id.* at 461–62. Spire investigated nothing, cured nothing, and monitored nothing until months of violations had already piled up.

Defendants also try to show they complied with the Court's Orders some of the time. *See* Dkt. 260 at 7–10; Dkt. 265 at 7–8, 12–14. But that misses the point. The question is whether Gabehart violated the Court's Orders at all. Even if Defendants complied on Monday and Tuesday, violations on Wednesday mean Defendants are in contempt.

Defendants place great weight on one text where Gabehart responded to Hocevar's text that he should "[s]top" texting him for help with his performance for the next day's race, as though it exonerates him. Dkt. 218-17, HOCEVAR_0051, at HOCEVAR_0052. The evidence should be viewed in light of Gabehart's history of deleting relevant evidence and trying to avoid a paper trail.

But even taking the text at face value, all it proves is that *weeks after the Court issued the TRO*, a Spire driver was still contacting Gabehart to get help improving his performance for his race the next day—not his crew chief, not Spire's competition director, but Gabehart. It is evidence of exactly the kind of provision of Cup Series competition services the Orders prohibit. And it shows that Spire did nothing to prevent it. Spire never told its drivers not to communicate with Gabehart about competition matters, it put Gabehart in a position to be reached, and Gabehart was willing to get on the phone with him. The same pattern appears in the March 21 McCall texts, the Kansas and Dover meeting comments, the Peterson setup discussion, and the CG Master. Dkt. 218-1 at 8–12; Dkt. 218-21, MCCALL_0062, at MCCALL_0063–65; Dkt. 218-17; Dkt. 218-19, GABEHART01500; Dkt. 218-20, Peterson Dep. Tr., at 165:21–169:25.

Finally, Spire's insistence that pre-TRO conduct is irrelevant misunderstands JGR's use of that evidence. JGR does not say the February and early March conduct was itself contempt. Instead, that conduct coupled with Gabehart's admission that there had been "no change in my job," is circumstantial evidence of post-TRO violations. Dkt. 218-10, Gabehart Dep. Tr., at 280:17–281:4; Dkt. 218-1 at 9–10. That context is especially important because the metadata on the CG Master file containing Spire race data shows it was modified on March 5—after the TRO. Dkt. 218-19. Defendants do not dispute that Gabehart used a version of CG Master to analyze Spire racecars *after the TRO*, nor that the Court has found portions of this document to be a trade secret. Further, they do not dispute that Spire's counsel found out this document was on Spire's system before the PI hearing and failed to disclose that fact to the Court.

## II. Defendants' attempt to wordsmith the restriction fails as a matter of law.

Because Defendants cannot and do not dispute the underlying facts, they resort to rewriting the restriction—which this Court has already found to be valid and enforceable. Defendants advance two variations of this strategy, and each fails.

*First*, Spire's textual argument that the word "type" essentially means "position" or "package of duties" cannot be squared with the plain language of Section 6 and the Orders. Dkt. 265 at 19. The language is clear: "services of the general *type* of services." Dkt. 26 at 12; Dkt. 78 at 34–35. "Type" is broad and not limited to a single activity. And "services" is plural, as in he provided more than one service to JGR, and is similarly not restricted to one "package," "position," or role. If the parties intended to restrict Gabehart only from holding a specific title, or performing a specific package or enumerated set of services, they could have done so. They did not. Instead, Section 6 is pegged to the type of services Gabehart was providing to JGR. Further, the modifier "general" forecloses an overly narrow reading of what qualifies as a service.

Indeed, the Court enforced the contract "as written," prohibiting Gabehart from providing "services of the general type of services" to Spire—regardless of the title he held. Dkt. 78 at 26 n.15. The Court also made clear that "[o]ther services not performed at JGR in the year prior to his termination are permissible." *Id.* at 34. If the restriction meant Gabehart simply could not replicate his total and precise "package" of JGR services at Spire, the Court would have said so—and Gabehart could perform any individual service so long as the package as a whole looked different. But that is not what the Orders say. They prohibit services *of the general type* he provided to JGR, meaning Gabehart can work for non-Cup Series teams at Spire or perform functions he did not perform at JGR—not provide the same general type of services under a different title.

*Second*, Spire's position that anything "an executive would do" is permissible is exactly the sort of formalism the law rejects. As stated in the Motion, a party "may not evade a permanent injunction by relabeling conduct or maneuvering around the intended actions in a way that would frustrate the injunction's remedial purpose." *Gemini Tech. Servs., LLC v. United States*, 180 Fed. Cl. 299, 303 (2026) (citing *McComb*, 336 U.S. at 192); Dkt. 218-1 at 19. Defendants do not attempt

to distinguish *Gemini*, and offer no contrary authority. Courts look to substance, not labels. *See McComb*, 336 U.S. at 191–92. Reading the Orders to permit Gabehart to comment on Cup performance, solicit driver feedback, and suggest process changes so long as he does so as an "executive" would nullify the contract term and injunction.

Contrary to Spire's arguments, *RCR Enters., LLC v. McCall*, 2014 WL 7591977, at *4 (N.C. Super. Dec. 19, 2014) actually refutes Spire's "position" interpretation. *RCR* concerned any agreement that prohibited employment "***in any capacity*** identical or similar to which he participated while employed by [Plaintiff]." *Id.* The case does not establish, as Defendants would argue, a general rule that restrictive covenants can "occasionally" be violated. The court was simply applying the plain words of that "capacity"- or "position"-based contract, as this Court has done here for a "service"-based contract. Further, it shows that parties are completely capable of drafting a position-focused provision when intended. *See also Kinesis Advert., Inc. v. Hill*, 187 N.C. App. 1, 14, 652 S.E.2d 284, 294 (2007) (rejecting the argument that a provision restricting conducting business "of the type similar to that of "the plaintiff was "impermissibly vague.").

**III. This Court's prior rulings foreclose the vagueness defense.**

The Preliminary Injunction enjoins Gabehart from "providing services of the general type" he provided to JGR while allowing other work. Dkt. 78 at 34–35. Defendants never sought clarification or modification of that order. Instead, they litigated under it for months and invoked it to explain later restrictions. A party may not choose self-help over compliance and then raise vagueness after the fact. The North Carolina cases Defendants cite—*Higher Tech Realty* and *Accelerando*—address enforceability of non-compete provisions, not contempt after an injunction has already been entered and left unchallenged. Dkt. 260 at 16–17.

Nevertheless, both Defendants had actual knowledge of the restrictions. No one had better notice than Gabehart himself—he was the person who performed the services the Court described.

Dkt. 218-9, 2d Brown Decl., ¶¶ 11–21; Dkt. 218-10 at 43:4–19, 50:13–16. Gabehart's pre-TRO conduct confirms this. Before the TRO was entered, Gabehart declared under oath that "I do not provide services similar to the general type of services that I provided to JGR during the 2025 season." Dkt. 12, Gabehart Decl. (Feb. 25, 2026). This is significant not only because it undermines Gabehart's credibility on this very issue, given his clear provision of Cup Series competition services days before and after this statement (*See* Dkt. 218-1 at II(A)), but also because it proves he understood what the restrictive language meant, belying his new claimed inscrutable vagueness.

Spire also demonstrated its knowledge of the services Gabehart was prohibited from providing. As a result of his conduct, Spire revoked his access to its electronic systems, confiscated his company computer, prohibited him from attending Cup Series competition meetings, and eventually, when all that failed to stop Gabehart from providing Cup Series competition services, placed him on administrative leave.

Contrary to Defendants' assertions, JGR is not asking the Court to expand the scope of the restriction or enforce a rejected list of activity-specific restrictions. JGR asks only that the Court enforce the Orders as written against the violations discovery has now established. And Spire's separate notice argument fails under Fed. R. Civ. P. 65(d)(2)(C), which binds persons in active concert or participation with the enjoined party by force of the rule itself. The Preliminary Injunction directly addressed whether JGR had clearly shown that Spire acquired, used, or disclosed JGR trade secrets—not whether Spire could later be held in contempt for acting in concert with Gabehart. Dkt. 78 at 19, 34–35. That rule squarely covers an entity that knows about the order, designs the role, invites the enjoined employee into the meetings at issue, and continues to extract the very services the order forbids. *See Nat'l League of Junior Cotillions, Inc. v. Porter*, No. 3:07-cv-00486, 2008 WL 11516421, at *4–5 (W.D.N.C. May 28, 2008); *Bone v. Univ. of N.C.*

*Health Care Sys.*, 678 F. Supp. 3d 660, 710 n.37 (M.D.N.C. 2023).

**IV. The forensic protocol is not a safe harbor for retention of JGR information. The obligation arises from the Orders, not the protocol.**

To deflect from his proven retention of more JGR confidential information and trade secrets, Gabehart attempts to recast the Court-ordered forensic protocol as a process "'to identify and extract' any lingering JGR materials that a thirteen-year employee might still have on personal devices or cloud accounts" and that the "process expressly anticipates that JGR materials could be found[.]" Dkt. 260 at 21-22. At the time, Gabehart repeatedly claimed that further forensic examination would exonerate him. *See e.g.*, Dkt. 42 p. 17 (arguing that there was no legitimate business interest supporting Gabehart's non-compete because the pre-litigation forensic examination "confirmed that Mr. Gabehart did not transmit, disclose, or use any JGR Confidential Information and that ***all such information has been permanently deleted from his devices*** . . . Under these circumstances, there is no confidential information—and thus no legitimate business interested—left to protect.") (emphasis added); p. 23 ("Mr. Gabehart no longer possesses JGR's Confidential Information[.]"); p. 26 ("the record establishes that no disclosure occurred, all JGR information has been permanently deleted, and binding confidentiality agreements are in place."); Dkt. 37, p. 7 (Gabehart declaration stating that "I therefore had no JGR materials to bring to or use at Spire when my access began."). Indeed, even before this case was filed, Gabehart stated under oath that the only accounts or devices of his containing JGR information were his phone and Google Drive and that he had not transferred JGR information to anyone else since November 1, 2025. Dkt. 9-4 at 30; Dkt. 12 ¶ 26; Dkt. 37 ¶¶ 24–25. This was not true.

The Court ordered Gabehart to "cease retaining, transferring, using, or copying JGR's confidential information and trade secrets." Dkt. 78 at 34. At the time, Gabehart claimed he had no more JGR information in his possession, so the forensic protocol was entered merely to "trust,

but verify" Gabehart's claims. The protocol did not permit Gabehart to silently retain JGR information in hopes that JGR would not locate it.

Gabehart also misstates how JGR actually learned that he still possessed this information. He wrongly claims that when his counsel found the information he "was immediately locked out of the accounts, produced the files to JGR, and waited for JGR to provide the list of identified JGR materials that the Protocol requires." Dkt. 260 at 22. In fact, Gabehart did not proactively produce any JGR confidential information but only produced materials that JGR had flagged as possibly containing its trade secrets. In other words, if JGR had not gotten lucky and located the items in the limited reporting it received, Gabehart would have continued to hide them.[3]

Additionally, the files were not merely stale "dated remnants," as Gabehart suggests. Dkt. 260 at 23–24. For example, Ex. R includes 2024 Martinsville setup comparisons—which this Court has already categorized as trade secrets. Dkt. 218-31, JGR_0003296; Dkt. 78 at 17–18. The files further contained Gabehart's running notes from competition meetings, which documented an extensive collection of JGR's highly confidential and proprietary information, including technical analyses and evaluations, race setups, competition strategies for future events, and detailed track-specific test plans. The notes also reflected JGR's proprietary performance observations, analytical judgments, and decision-making processes regarding vehicle setup, aerodynamic development, simulation methodologies, component performance, race execution,

[3] JGR further notes that the forensic process has required continuous back and forth between the parties. After negotiation of a detailed protocol that JGR and Gabehart could agree to and that afforded protection to any non-JGR material identified, the parties then had to address various issues with the reports provided. The detail provided in the reports has remained in dispute, and Gabehart has not provided subsequent forensic reporting after March. Further, and because of the numerous hits on the agreed-on search terms, the reporting contained hundreds of thousands of file names to review. When documents were identified, Gabehart produced them on a rolling basis and the volume often required extended time for Gabehart's counsel to complete its review. Thousands of pages were produced through the forensic process, which JGR's counsel subsequently reviewed and then discussed with Gabehart's counsel. Gabehart then made subsequent productions of metadata for the files produced. JGR has been diligent and thorough in addressing this important project, the scope of which is due, entirely, to Gabehart's taking and retention of material.

and overall competition planning. And counsel did not tell JGR about the OneDrive documents until September 4, 2026, even though counsel says Gabehart's access to that account was revoked in late June. Dkt. 218-32, Email from W. Miller to JGR Counsel; Dkt. 218-1 at 15–16.

Nor does the September 8 remediation-list date excuse the retention that had already occurred. Dkt. 260 at 22–23. The point is not that the protocol eventually required JGR to identify files for deletion; the point is that Gabehart retained undisclosed JGR materials through June 2026 and beyond while working for a direct competitor and only disclosed that circumstance after discovery closed. Dkt. 218-32. JGR could not demand remediation of an account it had never been told existed.

Even after Spire took Gabehart's Spire-issued laptop in February 2026, his counsel permitted him to retain access to the personal OneDrive account—the same account that had been synced to the Spire laptop—until late June 2026. Dkt. 218-32. Gabehart thus maintained access to JGR trade secret files for months after the TRO, through an account he had withheld from the January 2026 forensic process and that his counsel did not disclose to JGR until September 4, 2026. Ex. AF, Walton Decl., ¶ 18; Dkt. 218-1 at 15–16.

Contempt is necessary because the protocol cannot undo the harm. Deletion today would not erase the months during which Gabehart had access to JGR materials while employed by Spire, nor would it compensate JGR for the expense of uncovering the noncompliance. *See McComb*, 336 U.S. at 191. Civil contempt also serves a forward-looking role—to coerce compliance going forward. *Consolidation Coal Co. v. Local 1702, UMWA*, 683 F.2d 827, 830 (4th Cir. 1982).

## V. JGR has suffered harm and Spire is liable.

### A. The "no harm" argument asks the Court to relitigate its own findings.

Defendants' no-harm arguments essentially ask the Court to reconsider prior findings. Dkt. 260 at 14; Dkt. 265 at 25 n.9. The TRO found immediate and irreparable harm from loss of trade

secrets, TRO ¶ 30, and the Preliminary Injunction found that JGR "has suffered and will continue to suffer irreparable harm," Dkt. 78 ¶ 110. *Porter* teaches that those existing findings satisfy the harm element when the alleged violations are of the same kind the injunction was designed to stop. 2008 WL 11516421, at *3.

Spire's footnote nine notes that JGR has not identified the loss of any specific sponsors or partners. But lost sponsorships and other partners are only one form of competitive harm—and this Court has already found that JGR suffered irreparable competitive injury from disclosure of its trade secrets. Dkt. 78 ¶ 110; Dkt. 26 ¶ 30. Competitive harm from trade-secret misappropriation is notoriously difficult to quantify, which is precisely why courts treat such loss as irreparable. Spire's reliance on the Alpern 30(b)(6) deposition fares no better—that testimony addresses the difficulty of reducing harm to a dollar figure, not the absence of harm. *See* Ex. AG, JGR 30(b)(6) Dep. (Aug. 3, 2026) Tr., at 43:19–45:15.

Nor do race standings disprove injury. Dkt. 260 at 14. That all four JGR drivers made the Chase does not mean JGR's competitive position has not been harmed by disclosure of setup information, use of the CG Master, transfer of QC and process know-how, or continued retention of JGR materials at a rival organization. Dkt. 218-20 at 165:21–169:25; Dkt. 218-19; Dkt. 218-8, Spire_0000851; Dkt. 218-31. And regardless of whether Defendants have now ceased every prohibited act, the fees and costs JGR incurred in proving the violations are a recognized compensatory component of civil contempt. *McComb*, 336 U.S. at 191. Spire's request for attorneys' fees, by contrast, cites no statutory or contractual basis for fee-shifting and should be denied. Dkt. 264 at 25.

**B. Spire aided and abetted Gabehart's violations.**

Spire concedes it designed the Chief Motorsports Officer role specifically for Gabehart. Dkt. 218-1 at 13. Dickerson intended Gabehart to manage "all things racing" and said Spire was

"really leaning on [Gabehart] for the Cup stuff." *Id.* at 13–14. Spire continued inviting Gabehart to Cup competition meetings after the TRO. *Id.* at 14. Spire made no attempt to determine what services were off-limits until after the PI. *Id.* Spire permitted Gabehart to attend Cup meetings until late May or early June—after the Kansas and Dover meetings had already occurred. Dkt. 218-11 at 56:22–57:6. And no one instructed the crew chiefs, technical director, or shop foreman not to discuss Cup competition matters with Gabehart. Dkt. 218-1 at 14.

Those undisputed facts establish active concert under Rule 65(d)(2)(C). Spire's counsel appeared at both hearings. Spire created a role designed to capture Gabehart's racing expertise, continued inviting him to Cup meetings after the TRO, tolerated his participation in those meetings, and failed to install even basic guardrails on informal Cup-competition communications. Dkt. 218-11 at 20:9–15, 56:22–57:6; Dkt. 218-28; Dkt. 218-16. at 188:6–14, 222:2–13; Dkt. 218 at 155:15–157:10; Dkt. 218-24, Sparks Dep. Tr., at 210:4–211:22; Dkt. 218-20 at 227:21–228:2; Dkt. 218-27, Lambert Dep. Tr. at 38:9–25. Aiding and abetting does not require express instruction to violate; knowing facilitation is enough. *See Hawkins v. i-TV Digitalis Tavkozlesi zrt.*, 935 F.3d 211, 231 (4th Cir. 2019) ("aiding-and-abetting under Rule 65(d)(2)(C)" can occur where "[o]ne person [helps] another violate an injunction for selfish reasons," and *citing Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 950 (9th Cir. 2014), for the proposition that "the party giving assistance need not affirmatively desire to cause a violation of the injunction; it is enough that the party know a violation is highly likely ").

Spire's insistence that aiding and abetting requires an express instruction sets the bar too high. Rule 65(d)(2)(C) reaches persons with actual notice who act in active concert or participation, and *Porter* asks whether the nonparty aided and abetted conduct "for the benefit of, or to assist" the enjoined party. 2008 WL 11516421, at *4. Spire's conduct is knowing facilitation, not passive

employment, even absent a recorded instruction to violate.

Spire's late-breaking administrative-leave argument does not change that analysis. Dkt. 265 at 15, 25. Civil contempt is not punitive; it is compensatory and coercive. *McComb*, 336 U.S. at 191; *Consolidation Coal*, 683 F.2d at 830. The record shows that Spire's leave decision [redacted]. That decision does not erase months of noncompliance, does not compensate JGR for the cost of uncovering it, and does not provide the Court or JGR any durable assurance that the challenged conduct will not resume once the pressure of this Motion subsides.

**CONCLUSION**

For these reasons, JGR respectfully requests that the Court find Gabehart and Spire in civil contempt for violating the TRO and PI; order coercive relief including sworn compliance certifications and a prohibition on Gabehart's attendance at Cup competition meetings; award JGR its attorneys' fees and costs; and grant such other relief as the Court deems just.

This the 6th day of October, 2026.

Respectfully submitted,

***/s/ Danielle T. Williams***
**Danielle T. Williams**
N.C. Bar No. 23283

**KING & SPALDING LLP**
300 South Tryon Street, Suite 1700
Charlotte, NC 28202

*Thomas M. Melsheimer* – Pro Hac Vice
*Chad B. Walker* – Pro Hac Vice
*Tracea Rice* – Pro Hac Vice
*Alexandra Moore* – Pro Hac Vice

**KING & SPALDING LLP**

2601 Olive Street, Suite 2300
Dallas, TX 75201

*Sarah F. Hutchins*
N.C. Bar No. 38172
*Tory Ian Summey*
N.C. Bar No. 46437
*Keith M. Weddington*
N.C. Bar No. 14352
*Charles G. Middlebrooks*
N.C. Bar No. 55171
*Madelyn R. Candela*
N.C. Bar No. 63827

**PARKER POE ADAMS & BERNSTEIN LLP**
Bank of America Tower
620 South Tryon St., Suite 800
Charlotte, North Carolina 28202

*Counsel for Plaintiff Joe Gibbs Racing, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on this date, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

***/s/ Danielle T. Williams***
Danielle T. Williams