IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| JOE GIBBS RACING, LLC,<br><br>Plaintiff,<br><br>v.<br><br>CHRISTOPHER GABEHART and SPIRE MOTORSPORTS II, LLC,<br><br>Defendants. | Case No. 3:26-cv-00133-SCR-DCK |

**DEFENDANT SPIRE MOTORSPORTS II, LLC'S BRIEF IN SUPPORT OF ITS MOTION TO APPOINT A TECHNICAL ADVISOR**

Defendant Spire Motorsports II, LLC ("Spire") respectfully requests that the Court appoint a neutral technical advisor, pursuant to its inherent authority, to assist the Court in analyzing, evaluating, and understanding the scientific, engineering and other technical evidence to be presented to the Court in connection with the forthcoming summary judgment and *Daubert* motions of the parties, as well as trial of this case. By way of example, under the Court's October 7, 2026 order, the parties will produce racecar setups for the 2025 and 2026 NASCAR Cup Series: seven setups per race created by JGR for its four Toyota cars and the three cars JGR builds for 23XI, and three setups per race for Spire's Chevrolet cars. With 38 races in 2025 and 33 races to date in 2026, the production will encompass setups for 71 races—710 setups in total. Each setup contains hundreds of distinct parameters, and even minor adjustments to any one of them can affect the car's handling. Although there is no evidence that any JGR setup ever reached Spire, much less that Spire used one, JGR will undoubtedly argue, with support from one or more of its experts, that somewhere in this mountain of data lies evidence that Spire's 2026 Chevrolet setups were copied from JGR's 2025 Toyota setups.

Courts often appoint technical advisors in trade secret cases where—as here—the sheer volume and technical, arcane nature of the evidence could make it difficult for the Court to evaluate the parties' competing positions without neutral technical assistance. While it seems obvious to Spire and Gabehart that a technical advisor might be of assistance to the Court, JGR tellingly opposes this request.

## BACKGROUND

This case involves alleged trade secrets and other allegedly confidential and proprietary information in the NASCAR industry. Broadly speaking, Plaintiff Joe Gibbs Racing, LLC ("JGR") claims that defendants Gabehart and Spire have misappropriated its trade secrets and/or other confidential technical information and have used that information to compete in the 2026 NASCAR Cup Series. Spire denies any such misappropriation or use and denies that most or all of JGR's claimed trade secrets are actually protectable "trade secrets" within the meaning of the Defend Trade Secrets Act ("DTSA") or the North Carolina Trade Secrets Protection Act ("NCTSA"), including because the information these alleged trade secrets reflect is widely known and/or publicly available, because the information becomes obsolete in a short period of time, and because such information is readily ascertainable and has been ascertained by proper means by other race teams in NASCAR, including Spire. *See* 18 U.S.C. § 1839(3) (defining "trade secret" under the DTSA); *id.* § 1839(5) (defining "misappropriation").

The parties have collectively disclosed four retained experts[1] whose opening reports alone address a variety of technical matters across more than 490 pages, including (1) mechanical engineering and aerodynamic principles applicable to NASCAR Cup Series racing, including

---

[1] Spire and Gabehart retained Dr. Joshua Browne. *See* Exhibit A (Browne Rep.). Spire has also retained Dr. Devin Leahy. *See* Exhibit B (Leahy Rep.). JGR retained Tommy Wheeler and Brett Frood. *See* Exhibit C (Wheeler Rep.); Exhibit D (Frood Rep.).

racecar design, build, setup, and operation; (2) the alleged trade secrets of JGR, including whether those alleged trade secrets reflect "scientific, technical . . . or engineering information [which is] not generally known to, and not . . . readily ascertainable through proper means by" Spire, *see* 18 U.S.C. § 1839(3); (3) standards and practices of the NASCAR industry, including with respect to the rules, engineering concepts, and metrics used in Cup Series racing and evaluation of Cup Series team performance; (4) the processes by which NASCAR teams develop racecar builds, setups and race strategy, including reliance on information provided by technical alliance partners, Original Equipment Manufacturers ("OEMs"), and the use of race simulation software and tools; (5) the technical, scientific and engineering differences between racecars made by different OEMs (for JGR, Toyota, and for Spire, General Motors) that bear on the parties' arguments about the transferability of alleged trade secrets and/or confidential information among teams affiliated with different OEMs; and (6) whether Spire's on-track performance in the 2026 NASCAR Cup Series reflects use of JGR information. In addition to these retained experts, the parties will rely on a number of non-retained experts and/or fact witnesses—including NASCAR competition directors, crew chiefs, engineers, and drivers—whose testimony will embrace these same topics.[2] The full scope of at-issue technical information remains uncertain given JGR's failure to date to identify all allegedly misappropriated trade secrets with specificity, and in light of JGR's identification of trade secrets for which there is no evidence of misappropriation at all.

The volume and complexity of the technical record will only grow. On October 7, 2026, the Court ordered both JGR and Spire to produce their "final, as-raced, racecar setup sheets for the 2025 and 2026 NASCAR Cup Series," among other things. Dkt. 286 at 5–6. Racecar setups are

[2] *See* Pl.'s Rule 26(a)(2)(C) Expert Disclosure of Walter Brown and Rick McGowan (Sept. 25, 2026). Spire will also offer certain employee fact witnesses and/or non-retained experts to testify about similar technical topics.

highly technical—comprising hundreds of individual data points reflecting the precise configuration of each racecar for each race. The Court also ordered production of additional technical materials, including run logs, car chief and driver debrief forms, lap analysis documents, and engineering and race strategy meeting materials. *Id.* at 6–7. The parties' experts will undoubtedly analyze, and offer competing opinions about, this technical and highly specialized information.

Spire anticipates moving to exclude JGR's experts under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Fed. R. Evid. 702. JGR may move to exclude one or more of Spire's experts. Spire also anticipates moving for summary judgment on JGR's claims. These forthcoming motions—as well as any eventual trial of this case—will require the Court to assess the foregoing scientific, technical, and engineering evidence, including by making assessments of whether JGR's technical experts' opinions satisfy Rule 702's four requirements:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

## ARGUMENT

### A. Legal Standard

District courts have inherent authority to appoint technical advisors—which are distinct from Court-appointed experts under Fed. R. Evid. 706—in order to assist the Court in analyzing, evaluating, and understanding scientific or technical information. *See Reilly v. United States*, 863

F.2d 149, 154 (1st Cir. 1988). That inherent authority flows from the Court's gatekeeping function over both technical and scientific testimony. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141–42 (1999). Technical advisors are not "limited to and unique to patent cases." *TechSearch, L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1377 (Fed. Cir. 2002). Indeed, courts routinely appoint technical advisors in trade secret cases to assist them when processing large amounts of technical information and data. *See Johnson v. Ford Motor Co.*, No. 3:13-cv-06529, 2016 WL 4577419, at *1 (S.D. W. Va. Sept. 1, 2016) (technical advisor appointed to assist the court "with issues related to source code and source code discovery"); *HiRel Connectors, Inc. v. United States*, No. CV01-11069 DSFVBKX, 2006 WL 3618010, at *2 (C.D. Cal. Apr. 3, 2006) (technical advisor appointed to assist court in identification of trade secrets); *MSC Software Corp. v. Altair Eng'g, Inc.*, No. 07-12807, 2015 WL 13715590, at *12 (E.D. Mich. Sept. 22, 2015) (same).

The appointment of technical advisors is also common in other types of complex litigation involving scientific or technical evidence. *See, e.g.*, *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 602 F. Supp. 3d 767, 770 n.4 (D. Md. 2022) (technical advisor appointed to aid the court in a complex economic dispute); Case Mgmt. Ord. No. 27 at 1, *In re Blackbaud, Inc., Customer Data Breach Litig.*, No. 3:20-mn-02972 (D.S.C. Sept. 22, 2025), Dkt. No. 458 (technical advisor appointed to aid the court on the issue of ascertainability of a putative class, which turned on expert analysis of hundreds of databases); *Coleman v. Newsom*, No. 290CV0520KJMDBP, 2023 WL 6282900, at *1 (E.D. Cal. Sept. 26, 2023) (technical advisor appointed to assist the Court "in properly understanding certain issues related to labor economics").

Unlike a Rule 706 expert, a technical advisor's role is to explain the terminology, theory, and jargon underlying the evidence presented by the parties. *See TechSearch, L.L.C.*, 286 F.3d at 1380. And although a technical advisor may communicate with the Court *ex parte*, the technical

advisor may not make findings, supply evidence, be deposed, or be cross-examined. *See Reilly*, 863 F.2d at 158 (explaining that the role of a non-Rule 706 advisor "is to act as a sounding board for the judge—helping the jurist to educate himself in the jargon and theory disclosed by the testimony and to think through the critical technical problems"). Therefore, this Court may appoint a non-Rule 706 technical advisor if the Court determines that a technical advisor is helpful to aid its understanding of the underlying technical or scientific issues.[3] *See id.*

**B. Analysis**

Both fact and expert discovery demonstrate that the case JGR wants to make involves volumes of highly technical scientific and mechanical engineering jargon, theory, and principles of aerodynamics, race car design, race car simulation technology, mechanical engineering, and NASCAR industry rules, processes and norms, among others. This is precisely the kind of "jargon and theory" that technical advisors are often appointed to help courts understand. *See Reilly*, 863 F.2d at 158. By way of example, the parties dispute at least the following: (1) whether observations about whether a race went well—such as whether a car crashed—constitute JGR proprietary information or instead information well known in NASCAR and readily ascertainable to any minimally-informed observer; (2) whether race car setups and other technical information applicable to JGR's Toyota race cars are transferable to Spire's Chevrolet cars; (3) whether Spire's 2026 racecar setups reflect use of any 2025 JGR setup information or were instead the product of Spire's own development; (4) whether changes in JGR setups from 2025 to 2026 show the rapid obsolescence of so-called JGR "trade secrets"; (5) whether sealing a racecar airbox (*e.g.*, with tape) is a widely known principle of mechanical engineering which is applied frequently in racing, or a

[3] The district court's decision to appoint a non-Rule 706 technical advisor is reviewed for abuse of discretion. *See TechSearch, L.L.C.*, 286 F.3d at 1377–78.

JGR "trade secret"; (6) whether the use of [redacted] to test for airflow between race car body panels is a widely known, easily ascertainable technique or a JGR trade secret; (7) whether directional information concerning tire pressures or spring stiffness—two parameters of the hundreds in a setup—is of competitive value in isolation; and (8) whether Spire's on-track performance in the 2026 NASCAR Cup Series reflects use of stolen JGR information or instead a combination of Spire's investment in equipment and personnel, growth as a team, improvement and maturation of its drivers, fewer crashes and higher number of races completed, and sound on-the-fly race strategy and execution.

Each of these disputes presents "critical technical problems" that a technical advisor is well-suited to help the Court "think through." *See id.* The core purpose of a technical advisor here would be to assist the Court in understanding the engineering principles and technical jargon necessary to evaluate JGR's claims of misappropriation. JGR's allegations require consideration of highly technical scientific, engineering, and racing concepts, as well as mechanical engineering principles governing aerodynamics, computational fluid dynamics, race car simulation modeling, and the interplay between vehicle setup parameters and on-track performance. These are not intuitive subjects. A neutral technical advisor would help the Court meaningfully evaluate whether JGR's alleged trade secrets actually constitute protectable information and whether Spire's conduct amounts to misappropriation under the DTSA and NCTSA.

Spire does not doubt the Court's ability to grapple with these issues. But the sheer volume and nature of expert material—including hundreds of pages of expert reports and forthcoming testimony from four retained experts and two non-retained experts—combined with the complexity of the underlying engineering and scientific principles, presents a significant undertaking. That undertaking will become more complicated once the parties produce, and their

experts analyze, the materials required by the Court's October 7, 2026 Order. *See* Dkt. 286 at 5–6. A technical advisor would serve as a helpful "sounding board" for the Court, *Reilly*, 863 F.2d at 158, able to "explain the terminology, theory, and jargon underlying the evidence presented by the parties," *TechSearch*, 286 F.3d at 1380, distill competing technical narratives, separate legitimate engineering disputes from manufactured ones, and help the Court reach well-founded decisions during forthcoming motion practice—including at the summary judgment and *Daubert* stages—and at trial—including rulings on motions *in limine* and other evidentiary issues of a technical nature that will surely arise.

Spire therefore requests that the Court exercise its inherent authority and discretion to appoint a technical advisor to assist with the specialized technical jargon and theory that will guide admissibility and relevance decisions throughout the duration of this case. *See Reilly*, 863 F.2d at 154. Spire suggests that the Court require the parties to submit lists of up to three candidates each, from which the Court could select its chosen advisor, and that the advisor's compensation be paid in equal shares by the parties.

Dated: October 8, 2026


By: /s/ *Joshua D. Davey*
Joshua D. Davey (N.C. Bar No. 35246)
Jason D. Evans (N.C. Bar No. 27808)
Lawrence J. Cameron (N.C. Bar No. 41922)
Troy C. Homesley, III (N.C. Bar No. 62148)
Anais M. Jaccard (N.C. Bar No. 58438)
Ben E. Whorf (N.C. Bar No. 64279)
**TROUTMAN PEPPER LOCKE LLP**
301 S. College St., 34th Floor
Charlotte, NC 28202
Telephone: (704) 916-1503
joshua.davey@troutman.com
lawrence.cameron@troutman.com
troy.homesley@troutman.com
anais.jaccard@troutman.com
ben.whorf@troutman.com

John S. "Evan" Gibbs III – Pro Hac Vice
**TROUTMAN PEPPER LOCKE LLP**
600 Peachtree St, NE #3000
Atlanta, GA 30308
Telephone: (404) 885-3093
evan.gibbs@troutman.com