**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**Case No. 3:26-CV-00133-SCR-DCK**

JOE GIBBS RACING, LLC,

Plaintiff,

v.

CHRISTOPHER GABEHART and SPIRE MOTORSPORTS II, LLC,

Defendants.

**PLAINTIFF JOE GIBBS RACING, LLC'S REPLY IN SUPPORT OF RENEWED MOTION FOR PRELIMINARY INJUNCTION**

**FILED UNDER SEAL**

## I. Despite Spire's Attempt to Downplay the Substantial Evidence of Actual and Threatened Misappropriation, JGR has Established a Likelihood of Success on JGR's Trade Secret and UTDPA Claims Against Spire.[1]

Spire does not dispute that the proffered instances of Gabehart sharing JGR Trade Secrets[2] with Spire—whether by electronic transmission or orally—occurred. It instead characterizes the evidence as "isolated instances," disputes whether JGR's Trade Secrets qualify as trade secrets, and points to extraneous evidence. These tactics do not change that JGR has identified trade secrets and sufficiently shown that Spire has improperly acquired and/or used those trade secrets, or, at a minimum, shown a threat that Spire has access to and will acquire or use JGR's Trade Secrets.

### *A. JGR Has Provided Several Specific Examples of Spire's Threatened and Actual Misappropriation of JGR's Trade Secrets.*

Spire concedes most of the facts establishing threatened or actual misappropriation by Spire: that Gabehart downloaded the CG Master to his Spire-issued laptop; and used it to analyze Spire's Cup Series race performance; that he divulged information concerning JGR's setup philosophies and setup parameters to Spire crew chief Travis Peterson; that JGR's Focus Plan was discovered on Gabehart's Spire-issued laptop; that he orally disclosed [redacted] and that that the information he discussed at [redacted] maps onto specific categories of JGR's Focus Plan. Spire's attempts to downplay this unequivocal evidence of its acquisition and use of JGR's Trade Secrets are unavailing.

#### 1. Gabehart's Undisputed Use of the CG Master on this Spire Issued Laptop Constitutes Actual Misappropriation by Spire.

Spire concedes the CG Master—a version of the CC Audit this Court found to be a trade secret—was found on Gabehart's Spire-issued computer. *See* Spire Resp. at 1. The CG Master was

[1] Spire fails to address JGR's UTDPA claim in and thus does not dispute a likelihood of success on that claim.
[2] As used herein, "Trade Secrets" has the same meaning as JGR's "Trade Secrets," as used in JGR's Memorandum in Support of Renewed PI Motion (Dkt. 230-1).

downloaded to the Spire laptop through a Google Takeout (or zip file) of Gabehart's Google Drive account. *See* Walton Decl. at ¶ 10 (Dkt. 284-4). Spire does not dispute that Gabehart used it to analyze Spire Cup Series racecars for three races, including the [redacted] discussed extensively at the PI Hearing. *See* PI Motion at 7 (Dkt. 230-1).

To downplay this, Spire tries to distinguish between Gabehart's Spire-issued laptop and "Spire's systems"—a distinction without a difference that its own expert report undermines. Spire's forensic examiner states he did not identify JGR Trade Secrets on "any Spire systems *beyond the Gabehart Laptop*," on which he located the CG Master on February 18, 2026. *See* Clarke Report at ¶¶ 4.a, 4.e (Dkt. 275-10). This confirms Spire acquired JGR Trade Secrets and that at least the CG Master was downloaded from Gabehart's personal Google Drive to Gabehart's Spire-issued laptop.[3] Spire also argues that it did not acquire or use the CG Master even though Gabehart downloaded it to his Spire laptop and populated it with Spire data to analyze Spire's Cup Series performance. But a Spire executive performing services for Spire acts on Spire's behalf, and Spire offers no contrary authority. Its cases are readily distinguishable. In *MicroStrategy*, the employee downloaded the plaintiff's documents to his new employer's laptop, but there was "no evidence that they were disclosed to other employees at [the new employer] or that [he] used them in working at [the new employer]," and the employer fired him upon learning of the theft. *MicroStrategy Inc. v. Bus. Objects*, S.A., 331 F. Supp. 2d 396, 425 (E.D. Va. 2004). In *Six Dimensions, Inc. v. Perficient, Inc.*, there was no evidence the former employee uploaded the

[3] Spire's Response does not address its omission concerning the discovery of the CG Master prior to the PI Hearing in March 2026. Instead, they cite to their Show Cause Response, in which it attempts to reframe its apparent misrepresentation as accurate based on a technicality. Spire asserts that "Spire's forensic examination has definitively confirmed that GABEHART00222 never touched Spire's systems." Spire Resp. to Show Cause Motion at 13 (Dkt. 265) It fails to reconcile this assertion with the fact that the "2026 CG Master.xlsx," spreadsheet produced as Spire_0000849, is materially identical to GABEHART00222. *Compare* Dkt. 230-6 Spire_0000849 (2026 CG Master as populated on Gabehart's Spire-issued laptop) with Dkt. 230-8, GABEHART00222 (CG Master produced from Gabehart's personal devices; file name "2026 CG Master.xlsx_v2").

plaintiff's materials to the employer's systems, shared them, or of any specifics of the oral disclosure. 969 F.3d 219, 232 (5th Cir. 2020). Gabehart, by contrast, did not just download the CG Master—he used it to perform services for Spire. *See* Show Cause Motion at 7–9 (Dkt. 218-1).

Unlike the employer in *MicroStrategy*, Spire continues to employ Gabehart even after this document surfaced on his laptop, continuing to place him in positions to disclose and use JGR Trade Secrets for Spire's benefit in breach of his JGR Employment Agreement.[4] Moreover, Gabehart's personal OneDrive account was configured and actively synced to the Spire laptop, which occurred after the January 2026 forensic review and remediation process, allowing access to its contents which contain JGR Trade Secrets. *See* Walton Decl. at ¶ 14 (Dkt. 284-4). That conduct and evidence demonstrates Spire's improper acquisition and use of JGR's Trade Secrets. *See generally Am. Air Filter Co. v. Price*, 2017 WL 485517, at *8 (N.C. Super. 2017) (enjoining employee and new employer where employee accessed trade secrets post-offer despite contrary promises); *Sysco Hampton Roads, Inc. v. Cole*, 2026 WL 2412531, at *6, 8 (E.D. Va. 2026) (allegations that employer induced an employee to breach his secrecy duty or used the secrets to solicit customers stated a misappropriation claim).

**2. It is Undisputed Gabehart Orally Disclosed JGR Setups and Setup Philosophies to a Spire Crew Chief.**

Spire does not dispute that Gabehart discussed JGR [redacted] with Spire crew chief Peterson at a Cup Series qualifying event or that this information constitutes JGR

[4]*Six Dimensions*—which Spire cites for the notion that JGR waived a respondeat superior theory—is inapposite. There, the court declined to analyze respondeat superior because the plaintiff never alleged it and the jury was not instructed on it. *Six Dimensions, Inc.*, 969 F.3d at 232. here, JGR has alleged a claim against Spire for misappropriation of JGR's Trade Secrets, including facts sufficient to state a respondeat superior theory. Plaintiffs need not "use any precise or magical words in their pleading" *Stevenson v. City of Seat Pleasant, Md.*, 743 F.3d 411, 418 (4th Cir. 2014). Its Second Amended Complaint alleges "upon information and belief, Gabehart used and relied upon the trade secrets to perform work for or serve the interests of Spire . . . ," Second Am. Compl. ¶¶ 146, 160 (Dkt. 95). Read with JGR's allegations about Gabehart's employment and role at Spire, these allegations are enough to put Spire on notice of respondeat superior liability. *see also BDO USA, P.C. v. Ankura Consulting Grp., LLC*, 2024 WL 3874221, at *5 (E.D. Va. 2024) (employees acting "with the intent to further the employer's interest" suffices to establish general applicability of respondeat superior at the pleading stage).

setup data or philosophies. Spire argues only that the "discussion did not reveal any *specific* propriety information." Spire Resp. at 18 (emphasis added). That is not what Peterson said. He acknowledged [redacted] Peterson Dep. 166:20 (Dkt. 230-21).

Peterson further acknowledged that, in the same conversation, Gabehart disclosed that [redacted] *Id.* at 167:3–168:5. Far from revealing nothing specific, Gabehart conveyed a specific [redacted] precisely the proprietary setup data the Court has recognized as among JGR's "secret sauce." Peterson was also positioned to act on it: [redacted] and he is one of only two people who "make all the [setup] decisions" for the No. 71 car. Peterson Dep. 169:16–18 (Dkt. 218-20); Ex. A, Peterson Dep. 53:10–14. That Spire may not have ultimately changed its setup goes to use, not to whether Gabehart disclosed proprietary information. Spire's acquisition of this information alone shows actual misappropriation, much less a threat.

### 3. It is Undisputed Gabehart Shared Processes that Map to Asserted JGR Trade Secrets and Gabehart's Focus Plan.

Spire likewise does not deny that Gabehart made oral disclosures concerning JGR's [redacted] Spire_0001712, 0002051–53 (Dkt. 170-6). Spire's attempt to downplay those disclosures again mischaracterizes the Trade Secrets at issue. As JGR explained in its Response to Spire's Interrogatory No. 2, however, these Trade Secrets consist of [redacted]

[redacted] Gabehart retained notes of internal JGR meetings detailing JGR's [redacted] Show Cause Motion Ex. AB, JGR_0003286; *see also* Dkt. 218-31. Spire also does not dispute that these processes map to Gabehart's Focus Plan—his roadmap for implementing JGR information at Spire—which heightens the threat of disclosure.

Spire argues that it did not use JGR's [redacted] Spire Resp. 18–19. But it fails to address Powers' countervailing testimony that [redacted] *See, e.g.,* Powers Dep. 216:24–217:8 (Dkt. 230-19). [redacted] is strong circumstantial evidence of Spire's use of JGR's Trade Secrets. The Court need not resolve whether [redacted] were independently developed to find a threat of misappropriation. JGR need only show a threat that its Trade Secrets will be used or disclosed, and the undisputed fact that Gabehart discussed these specific JGR [redacted]—which map directly to the technical documents in his Focus Plan and work Gabehart performed at JGR—with Spire's competition personnel is itself compelling evidence of that threat.

**4. The Direct and Circumstantial Evidence of Spire's Misappropriation Supports a Finding of Likelihood of Success.**

Spire likewise does not dispute the circumstantial evidence JGR cites: that Spire conditioned Gabehart's bonuses on Cup Series performance, that Spire markedly improved its Cup Series performance in 2026 over 2025, and that [redacted]

[redacted] Renewed PI Motion 11–13. Spire cannot dispute JGR's direct and circumstantial evidence. Its focus on downplaying or recasting JGR's evidence does not dismiss the undisputed facts. On this record,[5] JGR has made a clear showing of both the "threatened misappropriation" required for an injunction, N.C. Gen. Stat. § 66-154(a); 18 U.S.C. § 1836(b)(3)(A)(i), and Spire's actual misappropriation of JGR's Trade Secrets. JGR's Motion Identifies and Describes the Relevant Trade Secrets.

### *B. JGR's Motion Identifies and Describes the Relevant Trade Secrets.*

Contrary to Spire's assertion that JGR "makes no attempt to specifically identify the trade secrets it accuses Spire of misappropriating," JGR identified: (1) the CG Master; (2) [redacted] (3) data from JGR's setups [redacted] and (4) JGR's setup philosophies, among others, for the purposes of this Renewed PI Motion. *See* JGR Renewed PI Motion at 6–11 (Dkt. 230-1). These Trade Secrets fall within the same categories this Court has already held are trade secrets. PI Order ¶¶ 60–62. JGR has also asserted a broader list of alleged trade secrets in the litigation generally, reflected in its response to Spire's Interrogatory 2. *See* JGR 4th Supp. ROG Resp. (Dkt. 218-25).

Spire's attacks on the qualification of specific Trade Secrets also fail. Its contention that the CC Audit and CG Master do not contain or qualify as trade secrets lacks merit. Gabehart's JGR Employment Agreement provides that material he created during his employment belong to JGR. *See* Employment Agreement § 7 (Dkt. 1-1). And the Court has already held the CC Audit is a trade secret. PI Order ¶¶ 60–62. Courts in this circuit recognize that "[e]ven if some portions of a

[5] "'When considering a motion for preliminary injunction, a district court may assess the relative strength and persuasiveness of the evidence presented by the parties and is not required to resolve factual disputes in favor of the non-moving party.'" *Microban Int'l, Ltd. v. Kennedy*, 2023 WL 2533085, at *3 (W.D.N.C. 2023) (quoting *Queen Virgin Remy, Co. v. Thomason*, 2015 WL 11422300, at *2 (N.D. Ga. 2015)). "In resolving contested allegations, the court must 'assess the facts, draw whatever reasonable inferences it might favor, and decide the likely ramifications.'" *Microban*, 2023 WL 2533085, at *3 (quoting *Weaver v. Henderson*, 984 F.2d 11, 14 (1st Cir. 1993)).

compilation of confidential information are publicly available, it can still be considered, in its entirety, as a trade secret." *Prysmian Cables & Sys. USA, LLC v. Szymanski*, 573 F. Supp. 3d 1021, 1037 (D.S.C. 2021) (citing *IHS Global Ltd. v. Trade Data Monitor, LLC*, 2021 WL 2134909, at *7 (D.S.C. 2021)). JGR also showed that its [redacted] were developed over many years and substantial investment, improve its racing performance, are kept confidential, and derive value from not being generally known: [redacted] *See* MacGowan Dep. 209:22–211:11 (Dkt. 230-16). JGR has thus sufficiently identified its trade secrets and shown both reasonable protective measures and substantial economic value.

### ***C. The Evidence JGR Has Provided Sufficiently Demonstrates a Likelihood of Success on its Trade Secret Claims to Justify Injunctive Relief.***

Several of these incidents would, even standing alone, support a finding of actual or threatened misappropriation at this stage. Critically, they are not isolated, disconnected episodes. Each category of Trade Secret—the CG Master, JGR's setups and setup philosophies, and JGR's [redacted]—maps directly onto Gabehart's "Focus Plan," the roadmap he created for implementing JGR's proprietary knowledge at Spire. *Prysmian Cables* is instructive. On evidence that a former employee emailed himself the plaintiff's "business blueprint" and "initiated plans for an analogous [project] to compete with" the plaintiff, the court enjoined both the employee and his new employer from possessing, disclosing, or using the plaintiff's trade secrets. *Prysmian Cables*, 573 F. Supp. 3d at 1033–35; *see also Biesse Am., Inc. v. Dominici*, 2019 WL 3916806, at *7 (N.C. Super. Aug. 19, 2019) (including a new employer in a trade-secret injunction where the former employee's bad acts occurred after he began his new employment and the new employer was on notice).

Here, the Focus Plan is the blueprint. Found on Gabehart's Spire-issued laptop and dated November 25, 2025—before he began at Spire—it lists [redacted] Spire_0000854–55 (Dkt. 230-11). JGR's corporate representative identified it as a roadmap of "very specific, very Joe Gibbs Racing-initiated trade secrets." Ex. B, Alpern 30(b)(6) Dep. (Sept. 1, 2026) 29:22–30:8. And like in *Prysmian Cables*, JGR does not rely on the blueprint alone. *Prysmian Cables*, 573 F. Supp. 3d at 1032–33. The record shows Gabehart executed multiple line items at Spire. The CC Audit framework surfaced on Spire's device as the CG Master (Spire_0000849) (Dkt. 230-6), which Gabehart populated with Spire data to analyze Spire's cars at the Daytona 500, Atlanta, and COTA—modifying one version after the Court entered the TRO. GABEHART01500 (Dkt. 230-31). And Spire's own Technical Director [redacted] Spire_0001712 (Dkt. 170-6); Powers Dep. 177:6–16, 217:3–8 (Dkt. 230-19). JGR has thus produced both the blueprint and proof that its most sensitive components were executed. A roadmap for operationalizing JGR's Trade Secrets, paired with concrete evidence of operationalization, readily satisfies the likelihood-of-success standard. The Court should enjoin Spire.

## II. JGR Has Shown a Likelihood of Success on JGR's Tortious Interference Claim.

### *A. This Court Should Reject Spire's Arguments Concerning Validity, Applicability, and Scope of the Restrictive Covenant.*

Spire's rehashed challenge to the validity and applicability of the 18-month noncompete in Section 6 of Gabehart's JGR Employment Agreement should be rejected outright. This Court has

already found the covenant "reasonable and enforceable," "necessary to protect [JGR's] legitimate business interests, including protecting its Confidential Information and trade secrets in a competitive racing industry," and that it "prohibits [Gabehart from] providing services of the general type of services that [he] provided to JGR in the year prior to his termination." PI Order ¶¶ 89, 93, p. 35. Spire effectively seeks reconsideration without ever moving for it, offering no new evidence that would justify reversing those conclusions.

First, the Court concluded the 18-month noncompete is operative. *See id.* ¶ 86 ("While there is evidence the parties initially discussed Paragraph 2 of Section 6, all bets were off once JGR uncovered [Gabehart] taking photographs on his personal cell phone of JGR's Confidential Information and taking other files without its permission. . . . JGR has demonstrated the termination was for cause and the separation agreement . . . had not yet been executed. Thus, the 18-month covenant not to compete is operative."). None of the evidence Spire cites in support of its contention that Section 6.2 applies—including evidence available at the PI Hearing—warrants a different conclusion. As Appendix 1 shows, nearly all[6] of it was before the Court at the TRO and PI stage—in the Employment Agreement, Gabehart's declarations, JGR's separation documents, and the parties' TRO and PI briefing—and the Court considered and rejected the same arguments.

Spire's repackaging also cannot satisfy Section 6.2's predicate. By its plain terms, the one-week reduction applies only on a "termination without cause," and then only if the employee gives written notice of inconsistent duties, affords JGR sixty days to cure, and gives sixty days' written notice of termination. Employment Agreement § 6. As JGR explained in its Reply in Support of

[6]Spire's one new submission does not alter the analysis. Spire cites deposition testimony that JGR purportedly declined to enforce the same restriction against other departing employees. Spire Resp. at 11 n.4 (citing Alpern Dep. 107:12–110:14). But whether the covenant protects a legitimate business interest was fully litigated: the Court found the restriction "necessary to protect its legitimate business interests, including protecting its Confidential Information and trade secrets in a competitive racing industry." PI Order ¶ 89. Isolated decisions about other employees—none of whom, unlike Gabehart, were terminated for cause after photographing and downloading JGR's Confidential Information—do not negate JGR's protectable interest here. *See* PI Order ¶¶ 86, 89, 93.

its PI Motion (Dkt. 46), Gabehart never invoked Section 6.2: his purported "notice" to Coach Gibbs invoked no provision of Section 6, described no inconsistent duties, and gave no cure period. *See* JGR Reply Supp. PI at 3–5. Nor was it made in good faith—by November 6, 2025, Gabehart had already discussed employment with Spire and, the next day, photographed his JGR laptop screen showing JGR confidential information. *Id.* Because the Court found the termination was for cause, "all bets were off" and "the 18-month covenant not to compete is operative." PI Order ¶ 86. No testimony restating the parties' 2025 discussions changes that.

Second, the assertion that the noncompete is "non-specific as to the type of services Gabehart is prohibited from performing," Spire Resp. at 9, is belied both by this Court's reading of the language as "restrict[ing] the employee from performing services provided to the employer in the year prior to such termination," PI Order ¶ 87, and by Gabehart's own declaration listing a dozen of his regular JGR duties. *See* Gabehart Sec. Decl. ¶ 6 (Dkt. 38). Spire's new argument that "'types of services' best described a 'position'" rather than "discrete activit[ies]"—so that Gabehart could not breach by virtue of his different Chief Motorsports Officer title—ignores the surrounding text ("services of the general type of services") and contradicts both its plain meaning and the Court's prior ruling. Spire Resp. at 11; *see also* Show Cause Reply at 7 (Dkt. 283).

Finally, the Court has already interpreted the covenant and found "the scope of the covenant does not completely bar an employee from working in the industry." PI Order ¶ 87. JGR has never contended the covenant bars Gabehart from working in any capacity at any racing team—only that it prevents him from performing services of the general type he performed in his last year at JGR for another NASCAR Xfinity or Cup Series team.[7]

[7]Alpern's 30(b)(6) testimony, in isolation, does not supplant the language of the covenant, JGR's pleaded positions, or the Court's interpretation of its plain language. *Nuzzo v. State Farm Fire & Cas. Co.*, 2026 WL 2098186, at *3 (E.D.N.C. 2026) ("Interpreting a written contract is a question of law for the court."); *see also Sports Med Props.,*

### *B. Even if Gabehart Represented He Was Subject to a 1-Week Noncompete, Spire Continued to Employ Gabehart After Learning of the 18-Month Noncompete.*

Spire's recitation of Gabehart's representations about a 1-week noncompete, and of various individuals' contemporaneous understandings during the separation negotiations, is inconsistent with the record evidence and misses the mark. As JGR's Renewed PI Memorandum explains, the relevant inducement is not only Spire's initial decision to hire Gabehart, but his noncompete and confidentiality obligations, which are breached each time he performs Cup Series services for Spire or conveys JGR's Trade Secrets to Spire personnel. Spire does not deny that inducing ongoing breaches support a tortious interference claim. Additionally, the record does not support Spire's assertion that it reasonably believed he was subject to a 1-week noncompete: Schaffer's sworn testimony is that he told Bill Anthony, Spire's general counsel who negotiated Gabehart's Spire employment agreement, of Gabehart's noncompete. Schaffer Decl. (Dkt. 35-5). Even Dickerson testified he was shocked it would be one week, and yet Spire did no investigation. Dickerson Dep. 59:3–21 (Dkt. 276-2). In any event, Spire knew of the 18-month noncompete no later than the filing of this suit, which attached the Employment Agreement, and any contrary impression was foreclosed by the Court's TRO (Dkt. 26). Gabehart's ongoing breaches at Spire thus occurred after Spire knew of the 18-month covenant.

### *C. Spire Induced Gabehart's Ongoing Breach of the Restrictive Covenant Without Legal Justification.*

Spire does not dispute that Gabehart's bonus is tied to Cup Series performance, that he was invited to Cup Series competition meetings where he provided input, or the other inducement evidence JGR cited. Nor does it dispute that inducing an ongoing breach is tortious interference. Instead, Spire points to other executives' compensation and meeting participation, and to its own

*LLC v. Talib*, 2019 WL 3403372, at *3 (W.D.N.C. 2019) (where a contract is attached to and incorporated in the complaint, the court is not bound by the parties' interpretation and may review the document itself).

witnesses' testimony that Gabehart does not meaningfully participate in competition meetings or Cup Series activities or communicate with Cup Series personnel. *See* Spire Resp. at 13.

Those assertions must be weighed against the contrary record evidence of Gabehart's breaches—his participation in competition meetings reflected in Gerringer's notes, and his direct race-day communications with Spire crew chief Travis Peterson about [redacted]. *See* Peterson Dep. 165:24-168:5 (Dkt. 230-21); Spire_0001712, 0002051–53 (Dkt. 170-6). That evidence, together with the evidence cited in JGR's Reply in Support of its Motion to Show Cause, shows that Gabehart has performed the same general services he performed as a crew chief and Competition Director at JGR and disclosed JGR Trade Secrets to Spire in breach of his obligations.

This Court has already determined that *RCR Enters., LLC v. McCall*, 2014 WL 7591977, at *4 (N.C. Super. Dec. 19, 2014), does not dictate otherwise. *See* PI Hearing Tr. at 92 (Dkt. 66). The Court in *RCR* found no likelihood of success where the noncompete barred employment "in a capacity similar or identical to that which he participated while employed," because the employee had only occasionally performed crew-chief duties at the plaintiff team before becoming a crew chief elsewhere. *RCR*, 2014 WL 7591977, at *4 (emphasis added). Gabehart's noncompete, by contrast, bars the same general services he performed at JGR. *See* Show Cause Reply (Dkt. 283).

Spire's recitation of the steps it took—revoking Gabehart's system access, defining the Chief Motorsports Officer role, and removing him from competition meetings—rings hollow against the unrebutted evidence that Spire never directed competition staff to refrain from discussing competition matters with him or to report violations, never monitored or restricted his use of personal email or a personal computer for Spire work, and made no change to his compensation or facility access after the PI Order. *See* JGR Renewed PI Motion at 13–14. Spire's hiring of Gabehart for a role necessarily overlapping with his JGR services, with financial

incentives to improve Spire's Cup Series team, was its first act of tortious interference; its conduct throughout his employment constitutes ongoing, intentional inducement of each of his breaches.

Spire's conduct is unjustifiable. It does not even attempt to rebut the case law JGR cites on lack of justification, relying instead on factual arguments that it did not induce Gabehart to provide services or disclose JGR Trade Secrets in violation of the Court's TRO and PI Order. For the reasons stated here and in JGR's Motion to Show Cause and Reply, those arguments fail. The record shows a clear likelihood that Spire wrongfully induced Gabehart's breaches and engaged in unfair competition by providing both the financial incentive and the forum for his continued Cup Series services and his use and transmission of JGR Trade Secrets.

### III. Spire Has Not Obviated the Clear and Present Risk of Irreparable Harm to JGR Absent Injunctive Relief.

Spire does not deny that the loss of even a single JGR Trade Secret constitutes irreparable harm. It argues instead that there is no risk of ongoing harm because it voluntarily took Gabehart's Spire laptop, the injunction against Gabehart already prohibits the conduct JGR seeks to prevent, and Spire [redacted]. *See* Spire Resp. at 22–24. Each argument fails.

The threat JGR faces is ongoing, not limited to Spire's past conduct. Spire's assertion that "the fully-developed evidentiary record contains no evidence that Spire actually acquired or used JGR's information" is wrong. Spire Resp. at 24. Spire admits the CG Master was on Gabehart's Spire laptop. *Id.* at 22. That Spire later revoked the laptop and its examiner took possession of one of many Trade Secrets Gabehart disclosed neither negates Spire's acquisition of that document nor dispels the threat that Spire still possesses or is using it or other JGR Trade Secrets.[8] Spire cannot dispute that Gabehart orally shared [redacted]

[8] As noted in Clark Walton's declaration, Spire has failed to provide any underlying forensic reporting that would allow JGR to assess broader access or dissemination. *See* Walton Decl. at ¶¶ 5, 6, 10 (Dkt. 284-4).

[redacted] with Spire's competition personnel—even after Spire removed his system access. The harm from Spire's continued actual or threatened use of JGR's Trade Secrets, including those shared by means undetectable through forensics, is alive and well.

JGR's 2026 Cup Series performance does not change this. JGR's competitive advantage over Spire is diminished by Gabehart's breach and disclosures; Spire's inducement and participation let it "benefit by having [his] knowledge of [JGR]'s trade secrets because it could produce similar [results] without expending resources or research and development," even if the results emerge over time. *TSG Finishing, LLC v. Bollinger*, 238 N.C. App. 586, 602 (2014). Spire need not have beaten JGR at every race for JGR to show harm. Spire has markedly improved from 2025 to 2026 since Gabehart joined, and its reliance on other personnel changes and driver investment cannot deflect the point: Gabehart, a "generational talent," was hired to improve Spire's performance, and the record contains numerous instances of him disclosing JGR Trade Secrets to Spire Cup Series personnel during the 2026 season. *See* Dickerson 30(b)(6) Dep. 141:7-14 (Dkt. 219-11); *see generally XPO Logistics, Inc. v. Northrop*, 2019 WL 3543877, at *8 (W.D.N.C. 2019).

[redacted] likewise does not obviate the ongoing risk, because the "'voluntary discontinuance of challenged activities' does not necessarily moot a request for injunctive relief unless 'there is no reasonable expectation that the wrong will be repeated.'" *Irwin Indus. Tool Co. v. Worthington Cylinders Wisconsin*, LLC, 747 F. Supp. 2d 568, 582 (W.D.N.C. 2010) (quoting *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 800 (4th Cir. 2001)). A defendant bears "a heavy burden to establish mootness in such cases because otherwise they would simply be free to return to their old ways after the threat of a lawsuit has passed." *Id.* Nothing prevents Spire from [redacted] Cup Series activities and share JGR Trade Secrets, or from continuing to use the secrets he already disclosed.

*See Gilead Scis., Inc. v. Meritain Health, Inc.*, 2025 WL 1745669, at *30 (D. Md. 2025), *aff'd*, 187 F.4th 139 (4th Cir. 2026); *Lance Mfg., LLC v. Voortman Cookies Ltd.,* 617 F. Supp. 2d 424, 431 (W.D.N.C. 2009) (voluntary cessation did not moot preliminary injunction request). Gabehart's [redacted] also does nothing about Spire's own disregard for JGR's Trade Secrets—most recently shown by Spire owner Jeff Dickerson publicly referencing JGR's alleged Trade Secrets and sealed content from the PI and Show Cause briefing in an interview on the Door Bumper Clear podcast.[9] Having already received Gabehart's disclosures, JGR faces an imminent, ongoing threat that Spire and its personnel will disclose and use its Trade Secrets even if [redacted]

## IV. Spire's Opposition Highlights that the Balance of Equities and Public Interest Support an Injunction.

Spire's Response underscores that the equities favor JGR. Even on Spire's own framing—that the Court should "cho[o]se 'the course of action that will minimize the costs of being mistaken'"—a preliminary injunction should issue. Spire Resp. at 25 (quoting *Scotts Co. v. United Indus. Corp.,* 315 F.3d 264, 284 (4th Cir. 2002)). By its own proclamations that "Spire doesn't want, doesn't need, and can't use" JGR's Trade Secrets, Spire cannot credibly claim harm from an injunction barring it from using those secrets or inducing breaches of Gabehart's noncompete, even if, *arguendo*, the injunction proved unwarranted. *See* Spire Resp. at 2, 5. A mistaken denial, by contrast, would permit continued misappropriation, causing JGR "great harm." *See* PI Order ¶ 111.

## CONCLUSION

For the reasons stated herein, JGR asks the Court to issue a preliminary injunction against Spire protecting JGR's Trade Secrets and barring Spire from inducing Gabehart to violate the obligations already enjoined by the Court.

---

[9] *See* https://www.dirtymomedia.com/doorbumperclear/episode/2f71242b/why-carson-hocevar-and-jeff-dickerson-are-dangerous-together.

This the 8th day of October 2026

**KING & SPALDING LLP**

/s/ *Danielle T. Williams*
Danielle T. Williams
dwilliams@kslaw.com
N.C. Bar No. 23283
300 South Tryon Street, Suite 1700
Charlotte, NC 28202
Thomas M. Melsheimer – *Pro Hac Vice*
tmelsheimer@kslaw.com
Chad B. Walker – *Pro Hac Vice*
cwalker@kslaw.com
Tracea Rice – *Pro Hac Vice*
trice@kslaw.com
Alexandra Moore - *Pro Hac Vice*
almoore@kslaw.com
2601 Olive Street, Suite 2300
Dallas, TX 75201

**PARKER POE ADAMS & BERNSTEIN**
Sarah F. Hutchins
N.C. Bar No. 38172
Tory Ian Summey
N.C. Bar No. 46437
Keith M. Weddington
N.C. Bar No. 14352
Charles G. Middlebrooks
N.C. Bar No. 55171
Madelyn R. Candela
N.C. Bar No. 63827
Bank of America Tower
620 South Tryon St., Suite 800
Charlotte, North Carolina 28202
sarahhutchins@parkerpoe.com
torysummey@parkerpoe.com
keithweddington@parkerpoe.com
charliemiddlebrooks@parkerpoe.com
madelyncandela@parkerpoe.com

*Attorneys for Joe Gibbs Racing, LLC*

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that the foregoing **PLAINTIFF JOE GIBBS RACING, LLC'S REPLY IN SUPPORT OF ITS RENEWED MOTION FOR PRELIMINARY INJUNCTION w**as electronically filed with the Clerk using the CM/ECF system which will automatically send notice and serve same upon counsel of record via the Court's electronic case filing system.

This the 8th day of October 2026

**KING & SPALDING LLP**

/s/ *Danielle T. Williams*
Danielle T. Williams
dwilliams@kslaw.com
N.C. Bar No. 23283
300 South Tryon Street, Suite 1700
Charlotte, NC 28202
Thomas M. Melsheimer – *Pro Hac Vice*
tmelsheimer@kslaw.com
Chad B. Walker – *Pro Hac Vice*
cwalker@kslaw.com
Tracea Rice – *Pro Hac Vice*
trice@kslaw.com
Alexandra Moore - *Pro Hac Vice*
almoore@kslaw.com
2601 Olive Street, Suite 2300
Dallas, TX 75201

**PARKER POE ADAMS & BERNSTEIN**
Sarah F. Hutchins
N.C. Bar No. 38172
Tory Ian Summey
N.C. Bar No. 46437
Keith M. Weddington
N.C. Bar No. 14352
Charles G. Middlebrooks
N.C. Bar No. 55171
Madelyn R. Candela
N.C. Bar No. 63827
Bank of America Tower
620 South Tryon St., Suite 800
Charlotte, North Carolina 28202
sarahhutchins@parkerpoe.com

torysummey@parkerpoe.com
keithweddington@parkerpoe.com
charliemiddlebrooks@parkerpoe.com
madelyncandela@parkerpoe.com

*Attorneys for Joe Gibbs Racing, LLC*