# EXHIBIT CC

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Case No. 3:26-CV-00133-SCR-DCK

JOE GIBBS RACING, LLC,, )
)
Plaintiff, )
)
vs. )
)
CHRISTOPHER GABEHART AND )
SPIRE MOTORSPORTS II, LLC, )
)
Defendants. )
)
______________________________ )

VIDEOTAPED DEPOSITION OF
HEATHER GIBBS
(Taken by Defendant)
Charlotte, North Carolina
Friday, August 28, 2026

Reported in Stenotype by
Kristy L. Clark, RPR, NV CCR #708,
CA CSR #13529, NC Notary #201807900150

Veritext Legal Solutions Job No. NC8354789

Q. In other words, the way Mr. Guttilla's employment agreement was set up, was that, at least within whatever parameters were defined in the noncompetition restriction, he cannot go to work for, for example, a competitor race team within 18 months of his leaving JGR; is that right?

MR. MELSHEIMER: Objection. Form.

THE WITNESS: He -- his -- his contract was specific to the 18 months' noncompete.

BY MR. EVANS:

Q. Okay. But you understand the effect of the noncompete provision is that would have limited where Mr. Guttilla could go to work during that 18-month period. Is that fair?

A. I would say that we had control over that contract.

Q. Okay. You had control over where Mr. Guttilla could go to work in that 18-month period following his leaving JGR. Is that fair?

A. We had -- yeah, we had control over that.

Q. Okay. And with respect to Mr. Guttilla, you agreed to either release or waive that provision in order to allow him to go take the job at LMC. Is that fair?

A. We negotiated that. We had a mutual

separation that we worked out with Michael Guttilla to be able to talk to Legacy and pursue that opportunity, or he would sit out.

Q. Okay. And part of the mutual separation agreement was that you waived or released the 18-month noncompetition restriction to permit Mr. Guttilla to go to work at LMC; is that correct?

A. We allowed him to go work at LMC.

Q. Okay. Now, the way we started that conversation, I think, although it's been a while, is I think I asked you about employees who you have some recollection of where JGR waived or released an employee or former employee from a noncompetition provision. You mentioned Mr. Guttilla is one example. We've talked about that one.

A. Yes.

Q. Tell me any other employees that fit into that bucket.

A. Specifically, during my active time, I don't recall any others.

Q. Do you recall any discussions around an employee named Stevie Reeves?

A. Yes.

Q. What do you recall -- what was Stevie Reeves' role?

JGR sent, Coach signed it, and it was the letter that officially terminated Mr. Gabehart?
A. Yes.
Q. Were you involved -- was there a -- was there a group decision made to send this February 9th letter?
A. I think, you know, we came to the conclusion that, unfortunately, you know, after discussions, finding out that he stole our items, that he was to be fired with cause.
Q. Was a motivation or the motivation of sending this letter three months after he stopped performing services terminating him for cause to trigger that 18-month noncompete?
A. I believe we were going through, it was lengthy trying to get the information back on the forensics. And so we were just -- it took quite a while to get back all that information. Still trying to find information.
Q. But my question is, is the reason to send a official letter terminating him for cause to trigger the 18-month noncompete?
MR. MELSHEIMER: Objection. Form.
THE WITNESS: Yes. The -- the reason for sending that for cause was that we came to the conclusion, after some forensic discovery, that he

stole our items and, therefore, was -- he's fired for cause.

BY MR. DAVIS:

Q. We looked at -- we looked at this letter that is -- excellent letter that my colleague Mr. Wiles wrote on February the 11th. The letter where the offer was made for JGR to do a forensic review of Spire's systems. Do you recall looking at that letter?

A. Yes.

Q. It's Exhibit 40 in your -- if you want to take a look.

Did you -- did -- were you aware of this letter at the time, or were you aware of this letter before JGR filed the lawsuit?

A. I was aware of this letter.

Q. Okay. Were you also aware of on the -- we didn't look at the second page, but on page 2, Mr. Gabehart had made an offer to pay up to $50,000 for JGR's reasonable legal fees at that point. Were you aware that he had made that offer as well?

A. Yes.

Q. And I'm not sure I -- I'm not sure I understood your answer to whether or not there was a -- there was a rejection of the offer to conduct a review of Spire's systems. Was there a rejection?