**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**CIVIL ACTION NO. 3:26-CV-00133-SCR-DCK**

| | |
|---|---|
| **JOE GIBBS RACING, LLC,**<br><br>**Plaintiff,**<br>**v.**<br><br>**CHRISTOPHER GABEHART and SPIRE MOTORSPORTS, LLC,**<br><br>**Defendants.** | **ORDER** |

**THIS MATTER** is before the Court on Joe Gibbs Racing, LLC's ("JGR") Renewed Motion for Preliminary Injunction (the "Motion"). (Doc. No. 231). JGR renews its request to enjoin Defendant Spire Motorsports, LLC ("Spire") from misappropriating JGR's trade secrets and tortiously interfering with its contractual relations. The Court has reviewed and carefully considered the evidence of record, applicable law, and the parties' arguments. For the reasons set forth below, the Motion is **DENIED**.

## I. PROCEDURAL HISTORY

The parties and the Court are well-versed in the history of this case. JGR filed suit against Gabehart on February 19, 2026, (Doc. No. 1), and filed an Amended Complaint against Defendants Christopher Gabehart ("Gabehart") and Spire on February 24, 2026, (Doc. No. 8), along with a Motion for Temporary Restraining Order and Motion for Preliminary Injunction. (Doc. No. 9). JGR filed a Second Amended Complaint on June 15, 2026. (Doc. No. 95). The claims in the Second Amended Complaint include: (1) Misappropriation of Trade Secrets – Federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836 et seq. (Gabehart and Spire); (2) Misappropriation of Trade Secrets – North Carolina Trade Secrets Protection Act ("TSPA"), N.C. Gen. Stat. §§ 66-

152, et seq. (Gabehart and Spire); (3) Unfair and Deceptive Trade Practices – North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. Gen. Stat. §§ 75-1.1, et seq. (Gabehart and Spire); (4) Breach of Contract (Gabehart); and (5) Tortious Interference with Contract (Spire). (Doc. No. 95).

The Court previously entered a temporary restraining order (the "TRO") and later a preliminary injunction (the "PI") as to Defendant Gabehart. (Doc. Nos. 26, 78). However, the Court denied without prejudice injunctive relief as to Spire, finding that JGR had not established likelihood of success on the merits as to its claims. (Id.).

On September 17, 2026, JGR filed the instant Motion, asking the Court once again to extend the preliminary injunction as to Spire. (Doc. No. 231).[1] On October 13, 2026, the Court held a hearing on the Motion and took the matter under advisement with a written order to follow. (See Minute Entry Entered 10/13/2026).

## II. FINDINGS OF FACT

The Court makes the following Findings of Fact for the purposes of this Order:[2]

### A. Gabehart's Employment with JGR and Later Employment With Spire

1. JGR is a chartered stock car race team competing in the NASCAR Cup Series and the NASCAR O'Reilly Auto Parts Series.

2. Gabehart began working for JGR as an engineer in 2012. Gabehart was later promoted to crew chief and then, in December 2024, to Competition Director.

[1] The Court notes that the procedural posture of this motion is somewhat unique given the proximity to summary judgment.

[2] To the extent any Findings of Fact constitute Conclusions of Law, they are so adopted. Further, the Court's findings and conclusions herein are for the purposes of this Motion only based on the current record and do not forecast any future rulings on the merits.

3. As the Competition Director, Gabehart's responsibilities included preparation and execution of JGR's car and race strategies, and overseeing development and improvement of analytics, processes, and procedures to improve race performance in the NASCAR Cup Series and the NASCAR O'Reilly Auto Parts Series.

4. In addition to his role as Competition Director, Gabehart also served as crew chief for the No. 54 car for a portion of the 2025 racing season.

5. In connection with Gabehart's promotion to Competition Director, the parties entered into an Employment Agreement effective December 1, 2024 (the "Employment Agreement"). (Doc. No. 95-2). The Employment Agreement includes a nondisclosure provision prohibiting disclosure of JGR's "Confidential Information" and a restrictive covenant not to compete. (Id. ¶¶ 5–6).

6. During a November 6, 2025 in-person meeting, Gibbs and Gabehart decided to part ways.

7. Gabehart turned in his JGR computer on November 10, 2025, and has not provided any services to JGR after that time.

8. Ultimately, the parties began negotiating a separation agreement, but negotiations fell apart, and the agreement was never executed.

9. By letter dated February 9, 2026, JGR formally terminated Gabehart's Employment Agreement. (Doc. No. 95-3).

10. Beginning December 8, 2025, JGR began conducting a forensic review of the computer JGR provided to Gabehart in conjunction with his employment. Gabehart ultimately retained counsel and voluntarily submitted to this forensic examination.

11. The forensic review revealed that Gabehart had connected his Google Drive to his JGR computer, and that Gabehart had been conducting online research about Spire during October and November of 2025.

12. Within the Google Drive, Gabehart had created and saved a folder titled "Spire" and a subfolder named "Past Setups." The Past Setups subfolder contained documents detailing JGR's past car setups and simulations for specific races at specific tracks. Gabehart accessed the "Spire" folder on his personal Google Drive several times after November 10, 2025.

13. On December 15, 2025, a forensic firm received access to a Microsoft OneDrive associated with Gabehart. This forensic review revealed that on November 7, 2025 (the day after the meeting wherein Gibbs and Gabehart decided to part ways), Gabehart used his personal cell phone to take approximately 16 pictures of items contained on his JGR computer, which included: comprehensive post-race audit and analyses of team and driver performance for the entire 2025 NASCAR season; complete team payroll details including job titles, contract length, annual compensation, incentive compensation, and compensation plans for prior years; an employee compensation calculator used to project and plan pay for key JGR positions; driver pay for the 2025 and 2026 NASCAR seasons; revenues from sponsors, partners, and other business arrangements for the 2024, 2025, and 2026 NASCAR seasons; JGR's pit crew analytics for the 2024 NASCAR season; and detailed analytics of racecar tires used to assess impact on race results.

14. Such information constituted Confidential Information as defined by the Employment Agreement, and taking pictures of this information was done without JGR's consent.

15. Gabehart later admitted to taking photographs of JGR's information with his cell phone. (Doc. No. 12 ¶ 13).

16. On or around February 17, 2026, and after his employment with JGR ended, Gabehart entered into an employment agreement to serve as the Chief Motorsports Officer for Spire. (Doc. Nos. 230-35, 231-35, & 231-7 at 5).

17. In addition to his base salary, Gabehart is eligible for bonuses based on Spire's performance in the NASCAR Cup Series, NASCAR O'Reilly Auto Part Series, and the Craftsman Truck Series. (Doc. Nos. 230 at 4–5, 231-35 at 4–5, & 275-4 at 136:3–9).

18. On September 23, 2026, Spire placed Gabehart on indefinite administrative leave. (Doc. No. 317-1 at 10).

### B. Gabehart's Digital Files

19. On February 17, 2026, Gabehart received a Spire-issued laptop and access to a Spire email account, Microsoft Teams, and a Microsoft OneDrive account linked to Gabehart's Spire email address. (Doc. Nos. 230-7 at 15 & 231-7 at 15). Gabehart also received access to two SharePoint sites that Spire used as document management systems. Id.

20. At some point after Gabehart was given the Spire-issued laptop, he moved files from his various personal cloud accounts associated with Gabehart's Gmail address to the Spire-issued laptop. (Doc. Nos. 230-12 at 297:12–19 & 231-12 at 297:12–19, 230-28 at 21–22, 231-28 at 21–22, & 275-10 at 3).

21. On February 27, 2026, Spire sent Gabehart's Spire-issued laptop to its forensic examiner for preservation. (Doc. No. 231-7 at 15, 24). In light of the litigation, on March 18, 2026, Spire revoked Gabehart's access to Spire's email, Microsoft Teams, Microsoft OneDrive, and SharePoint systems after Spire's forensic examiner reported that it had located certain user files relevant to this lawsuit on Gabehart's Spire-issued laptop. Id.

22. Those user files identified on Gabehart's Spire-issued laptop included files named "CG Focus Plan.pptx," "Focus Plan.pdf" and "2026 CG Master.xlsx." (Id.; see also Doc. No. 275-10 at 3). There was also a "Past Setups" folder that was empty when it was downloaded to Gabehart's

Spire-issued laptop, but a "Future Work" folder contained certain files, including the "2026 CG Master.xlsx." (Doc. No. 275-10 at 5–6).

23. The user file titled "2026 CG Master.xlsx" (the "CG Master Document") is a spreadsheet that lists several NASCAR Cup Series race locations with columns for race data. (Doc. Nos. 230-8 & 231-8). Spire's forensic examiner determined that the CG Master Document was downloaded to Gabehart's Spire-issued laptop from Gabehart's personal Google Drive account on February 18, 2026, and was opened or accessed on February 18, 19, and 23, 2026. (Doc. No. 275-10 at 3, 6).

24. Although there are several versions of the CG Master Document, the only version of the CG Master Document located on Gabehart's Spire-issued laptop was limited to certain race data populated for Daytona 2026, including start and finish positions, stage points, and laps completed, among other things. (Doc. Nos. 275-10 at 4–6, 230-6 & 231-6 [SPIRE0000849], 231-1 at 6–7).[3]

25. The version of the CG Master Document with data populated for Daytona, Atlanta, and COTA was produced by Gabehart. (Doc. Nos. 230-31 & 231-31 [GABEHART01500]).[4] JGR does not argue that this version was located on Gabehart's Spire-issued laptop or on Spire's systems but rather notes that it was "later produced by Gabehart" and was modified by Gabehart on March 5, 2026, which was after Spire had already sent Gabehart's Spire-issued laptop to its forensic examiner but before Spire revoked Gabehart's access to its email, Microsoft Teams, Microsoft OneDrive, and SharePoint systems. (Doc. Nos. 230-1 & 231-1 at 7–8).

26. The versions of the CG Master Document with data populated for Phoenix, Las Vegas, and Darlington were produced by Gabehart under the Forensic Analysis Protocol and then produced

---

[3] Other versions of the CG Master Document were produced by other parties but not located on Gabehart's Spire-issued laptop. These versions include information related to other race locations, including Atlanta (Doc. Nos. 230-31 & 231-31 [GABEHART01500]), COTA (Id.), Phoenix (Doc. Nos. 327-2 & 328-2 [JGR0036009], 327-3 & 328-3 [JGR0036011]), Las Vegas (Id.), and Darlington (Id.).

[4] Another version pointed to by JGR was a template, produced by Gabehart (Doc. No. 230-8, 231-8 [GABEHART00222]).

by JGR. (Doc. Nos. 328, 328-1, 327-2 & 328-2 [JGR0036009], 327-3 & 328-3 [JGR0036011]). JGR does not argue that these versions were located on Gabehart's Spire-issued laptop or on Spire's systems but rather contends that they were modified by Gabehart on March 23, 2026, which was after Spire had already sent Gabehart's Spire-issued laptop to its forensic examiner and after Spire revoked Gabehart's access to its email, Microsoft Teams, Microsoft OneDrive, and SharePoint systems. (Doc. No. 328).

27. JGR has not provided any evidence showing that the CG Master Document or Focus Plan files were distributed to, shared with, or accessed by anyone at Spire other than Gabehart.[5]

28. Spire's forensic investigator also concluded that JGR's alleged trade secrets have not been found otherwise on Spire's system outside of Gabehart's Spire-issued laptop. (Doc. No. 275-10 at 3).

### C. Communications with Spire Personnel

29. Spire has regular weekly meetings including competition meetings, engineering meetings, team car meetings, simulator sessions, pre- and post-qualifying meetings, pre-race crew chief meetings, and post-race driver debrief meetings. (Doc. Nos. 275-5 at 292:22–294:8, 275-6 at 250:8–253:17, 230-13 & 231-13).

30. Gabehart attended anywhere from five to twelve of those meetings in the first half of 2026. (Doc. Nos. 230-13, 231-13, 275-6 at 252:25–253:17, & 275-5 at 294:9–12). Spire eventually excluded Gabehart from any NASCAR Cup Series-related meetings at some point in May or June of 2026. (Doc. No. 275-3 at 56:22–58:13).

31. Gabehart appears to have spoken at some of these meetings, though the parties vigorously dispute the nature, extent, and substance of Gabehart's contributions. For example, Spire's

---

[5] JGR, however, argues that information was orally shared with Spire, as discussed herein. (See also Doc. Nos. 230-1 & 231-1 at 7-9).

Technical Director Dax Gerringer made notes during an April 20, 2026 meeting associated with a Kansas race that list three bullet points of information under Gabehart's name: "[redacted]"; "[redacted]." (Doc. Nos. 314-2 at 28 & 315-2 at 28).[6] JGR claims it has proprietary processes for [redacted]. (Doc. Nos. 230-16 at 192:7–193:14, 211:17–212:3, 231-16 at 192:7–193:14, 211:17–212:3, 230-17, & 231-17). The record is mixed as to when Spire first implemented processes related to [redacted], with testimony from various witnesses identifying dates from January 2025 to early in the 2026 racing season. (Doc. Nos. 230-19 at 165:11–166:22 & 231-19 at 165:11–166:22, 209:4–18, 275-11 & 276-6 at 215:9–19, 178:6–180:24, 137:11–141:19).

32. Additionally, though not associated with a specific meeting, Gabehart had verbal exchanges with Spire's Crew Chief, Travis Peterson, regarding JGR's and Spire's qualifying tire pressures and spring rates. (Doc. Nos. 230-21 at 165:24–168:22 & 231-21 at 165:24–168:22). A Spire setup comparison document shows numerical differences in the spring rates for Spire's No. 7 and No. 71 cars in the 2025 and 2026 COTA races. (Doc. Nos. 343-2 & 345-2). However, in his deposition, Peterson indicated that he did not change anything related to tire pressures or spring rates as a result of his conversation with Gabehart. (Doc. Nos. 275-13 at 168:23–170:20 & 276-7 at 168:23–170:20).

---

[6] The Court's redactions are narrowly limited to specific details of what JGR claims are its trade secrets related to [redacted], which are subject to the protective order in this case and an order to seal. (Doc. Nos. 124 & 182). The remainder of this Order is publicly filed. The public has a "qualified right of access to judicial documents and records filed in civil and criminal proceedings." Doe v. Pub. Citizen, 749 F.3d 246, 265 (4th Cir. 2014); see also Gray Media Grp., Inc. v. Loveridge, 155 F.4th 330, 339–41 (4th Cir. 2025). Even so, a party's interest in protecting its alleged trade secrets may justify partial sealing. See Doe, 749 F.3d at 269 ("A corporation may possess a strong interest in preserving the confidentiality of its proprietary and trade-secret information, which in turn may justify partial sealing of court records."). The Court may revisit whether continued sealing is warranted at a later stage.

## III. CONCLUSIONS OF LAW

The Court makes the following Conclusions of Law:[7]

### A. Preliminary Injunction Standard

33. In order to obtain a preliminary injunction, a party must establish that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008); see also Fed. R. Civ. P. 65; 2311 Racing LLC v. Nat'l Ass'n for Stock Car Auto Racing, LLC ("NASCAR"), 139 F.4th 404, 408 (4th Cir. 2025) ("To grant such an injunction, a court must conclude that the plaintiff made a clear showing that it 'is *likely* to succeed on the merits— along with the risk of irreparable harm, the balance of equities, and the public interest.'") (quoting Lackey v. Stinnie, 604 U.S. 192, 200 (2025) (emphasis in original)). The moving party bears the burden of proving all four elements by a preponderance of the evidence. Prysmian Cables & Sys. USA, LLC v. Szymanski, 573 F. Supp. 3d 1021, 1035 (D.S.C. 2021).

34. A preliminary injunction is an "extraordinary" remedy "'that may only be awarded upon a clear showing that the plaintiff is entitled to such relief' and may never be awarded 'as of right.'" SVB Sec. Holdings LLC v. Drendel, No. 3:22-CV-00457, 2022 WL 4369991, at *3 (W.D.N.C. Sept. 21, 2022) (quoting Paradies Shops, LLC v. Brookstone Charlotte, LLC, No. 3:19-CV-00631, 2019 WL 6337818, at *1 (W.D.N.C. Nov. 26, 2019)); see also Robinson v. Nat'l Collegiate Athletic Ass'n, No. 25-2003, 2026 WL 914055, at *6 (4th Cir. Apr. 3, 2026) (citing Munaf v. Geren, 553 U.S. 674, 689 (2008) and Winter, 555 U.S. at 22).

---

[7] To the extent any Conclusions of Law constitute Findings of Fact, they too are so adopted.

35. The purpose of preliminary injunctive relief "is not to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward." Trump v. Int'l Refugee Assistance Project, 582 U.S. 571, 580 (2017) (citation omitted). "Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." Id. (citing Winter, 555 U.S. at 20 and 11A WRIGHT & MILLER'S FEDERAL PRACTICE & PROCEDURE § 2948 (3d ed. 2013)). The court "need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of the particular case." Id. (citing WRIGHT, supra, § 2947, at 115); see also Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981) ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits.").

**B. Likelihood of Success on the Merits**

36. The party seeking the preliminary injunction must make a "clear showing" that the party is likely to succeed on the merits. Winter, 555 U.S. at 22; 2311 Racing LLC, 139 F.4th at 408; Prysmian Cables, 573 F. Supp. 3d at 1034; XPO Logistics, Inc. v. Northrop, No. 3:19-CV-00348-FDW-DSC, 2019 WL 3543877 at *4 (W.D.N.C. Aug. 2, 2019). This does not require a party to show a "certainty of success." Northrop, 2019 WL 3543877 at *4; see also Robinson, 2026 WL 914055 at 7. Courts should not improperly equate "likelihood of success" with "success." Glytec LLC v. Prisma Health, No. 6:25-CV-03211-DCC, 2025 WL 1750441, at *3 (D.S.C. June 25, 2025) (quoting Camenisch, 451 U.S. at 394).

37. For the reasons stated below, the Court denies JGR's renewed motion to extend injunctive relief as to Spire.[8]

**i. Actual or Threatened Misappropriation of Trade Secrets**

38. The Court concludes that JGR has not established a likelihood of success on the merits as to its misappropriation of trade secret claims against Spire.

39. Under both the DTSA and North Carolina's TSPA, a plaintiff must establish that (1) it owns a trade secret; and (2) the trade secret was misappropriated. Sysco Mach. Corp. v. DCS USA Corp., 143 F.4th 222, 228–29 (4th Cir. 2025); see also Samuel Sherbrooke Corp., Ltd. v. Mayer, 159 F.4th 252, 256 (4th Cir. 2025); Recon Grp. LLP v. Lowe's Home Centers, LLC, 743 F. Supp. 3d 737, 748 (W.D.N.C. 2024) (citing N.C. Gen. Stat. § 66-153).

40. The DTSA and North Carolina's TSPA define a trade secret in substantially the same terms. Sysco Mach. Corp., 143 F.4th at 228.

41. The DTSA defines "trade secret" as:

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if--
>
> (A) the owner thereof has taken reasonable measures to keep such information secret; and
>
> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3).

[8] For the sake of clarity, the Court's order enjoining Gabehart fully remains in place. (Doc. No. 78). Even though the Court is denying further injunctive relief as to Spire, this Order should not be misconstrued as permitting Spire to misappropriate JGR's trade secrets or tortiously interfere with Gabehart's JGR Employment Agreement. Spire remains bound to comply with the law regardless of whether an injunction issues.

42. North Carolina law similarly defines "trade secrets" as:

> business or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that:
>
> a. Derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and
>
> b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

N.C. Gen. Stat. § 66-152(3).

43. "According to both statutes, a trade secret is information that is subject to 'reasonable measures to keep such information secret' and which 'derives independent economic value' from its secrecy." Sysco Mach. Corp., 143 F.4th at 228 (citing 18 U.S.C. § 1839(3); N.C. Gen. Stat. § 66-152(3)). These requirements have been described as "the reasonable secrecy requirement" and "the independent economic value requirement," which are linked because the information's value "lies in the competitive advantage over others that [the plaintiff] enjoys by virtue of its exclusive access" to it. Id. (citing Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1012 (1984)).

44. Once a party has established the existence of a trade secret, the DTSA and North Carolina's TSPA authorize a court to issue injunctive relief upon a showing of actual or threatened misappropriation of those trade secrets. N.C. Gen. Stat. § 66-154(a) and 18 U.S.C. § 1836(b)(3)(A).[9]

---

[9] In relevant part, the DTSA provides:

> In a civil action brought under this subsection with respect to the misappropriation of a trade secret, a court may--
> (A) grant an injunction--
> (i) to prevent any actual or threatened misappropriation described in paragraph (1) on such terms as the court deems reasonable, provided the order *does not*--
> (I) prevent a person from entering into an employment relationship, and that conditions placed on such employment shall be based on evidence of threatened misappropriation and not merely on the information the person knows. . . .

45. Under both federal and North Carolina law, misappropriation generally involves (a) "acquisition" of that trade secret by "improper means"; or (b) "disclosure" or "use" without consent. 18 U.S.C. § 1839(5); N.C. Gen. Stat. § 66-152(1); see also Sysco Mach. Corp, 143 F.4th at 229. The DTSA further provides that the "improper means" of acquiring a trade secret "includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means" but does not include "reverse engineering, independent derivation, or any other lawful means of acquisition." 18 U.S.C. § 1839(6).

46. Under North Carolina law, misappropriation is established by introducing "substantial evidence" that the defendant: "(1) knows or should have known of the trade secret; and (2) has had a specific opportunity to acquire it for disclosure or use or has acquired, disclosed, or used it without the express or implied consent or authority of the owner." N.C. Gen. Stat. § 66-155.

47. For purposes of the Motion, JGR first references the Court's conclusions of law in the PI as categorical enumeration of JGR's relevant trade secrets, "including setup files, post-race audits and analyses, and documents reflecting JGR's processes" that "contain information which JGR developed based on its extensive research and collection of data points about different cars, drivers, tracks, and race conditions (to name a few), that would be extremely valuable in the hands of a competitor." (Doc. No. 231-1 at 16) (quoting Doc. No. 78 at ¶¶ 60–62). These were the trade secrets JGR identified at the time of the PI with the information presented in the spring of 2026 at the beginning of this litigation. However, as discussed at the hearing, those conclusions were limited to the Court's April 23, 2026 Order, as expressly noted in the Order, and JGR must still identify the trade secrets subject to actual or threatened misappropriation by Spire for the purposes of the instant Motion.

---

18 U.S.C. § 1836(b)(3)(A)(i)(I) (emphasis added).

48. JGR identifies "three categories of trade secrets" that it alleges Spire has misappropriated for the purposes of the Motion: (1) post-race analysis documents, specifically, the CG Master Document that JGR claims Gabehart built to replicate JGR's "CC Audit"; (2) setup philosophies and parameters regarding JGR's tire pressures and spring rates; (3) quality control and production processes, including processes for [redacted]. (Doc. No 314-2 at 42; see also Doc. Nos. 230-1 at 2–3, 231-1 at 2–3, 314-2 at 4).[10]

49. The parties contest whether the above constitute trade secrets and whether Spire—as opposed to Gabehart, individually—has misappropriated or threatened to misappropriate them through acquisition, use, or disclosure. (Compare Doc. Nos. 230-1 at 16–21, 231-1 at 16–21 and 302 at 1–8, 303 at 1–8, with 273 at 16–22, 274 at 16–22). Indeed, although JGR in its written hearing materials has referred to three "categories" of trade secrets, the Court generally notes that North Carolina law does not permit a plaintiff to rely solely on broad categories to identify its trade secrets that were allegedly misappropriated. VisionAIR, Inc. v. James, 606 S.E.2d 359, 364 (N.C. Ct. App. 2004); Analog Devices, Inc. v. Michaelski, 579 S.E.2d 449, 453 (N.C. Ct. App. 2003) (affirming denial of a preliminary injunction where a party asserting misappropriation failed to "identify a trade secret with sufficient particularity so as to enable a defendant to delineate that which he is accused of misappropriating and a court to determine whether a misappropriation has or is threatened to occur" and noting that "areas" identified by plaintiff were insufficient, such as "the ADC chips as a whole and the processes and techniques used to produce it"; "specific components and implementations used by Analog."). The Court need not resolve the parties' debate over this issue at this time because it concludes that JGR has not otherwise made a clear showing of likelihood of success on the merits as to its misappropriation of trade secrets claims.

---

[10] These also have been referred to as four issues, separating out [redacted] processes.

50. Even assuming without deciding that JGR has sufficiently identified and established the existence of its trade secrets, JGR has not shown actual or threatened improper acquisition, use, or disclosure by Spire.

51. JGR points to Gabehart's conversations with Spire's Crew Chief, Travis Peterson, regarding individual data points for tire pressures and spring rates and how those can impact a team's overall philosophy for configuring a racecar setup. JGR initially acknowledged that it has not yet been able to confirm "whether Spire has copied or implemented JGR's setups" (Doc. No. 231-1 at 10–11). JGR has since provided a comparison of Spire's spring rates for Spire's No. 7 and No. 71 cars in the 2025 and 2026 COTA races, (Doc. Nos. 343-2 & 345-2), but it has not shown how a Spire-to-Spire comparison of certain data points demonstrates actual or threatened acquisition, use, or disclosure by Spire of JGR's setup philosophies. Further, during his deposition, Peterson also denied changing anything related to tire pressures or spring rates following his conversation with Gabehart. (Doc. Nos. 275-13 at 168:23–169:8, 276-7 at 168:23–169:8).

52. JGR also relies on meeting notes that list three bullet points of information under Gabehart's name, including two that state the following: "[redacted]." (Doc. Nos. 314-2 at 28 & 315-2 at 28). Relatedly, JGR argues that the Focus Plan that Gabehart downloaded on his Spire computer with a Spire logo contained references like [redacted], among other things. Certain of Spire witnesses testified that [redacted] began in 2026 soon after Gabehart began working for Spire. (Doc. Nos. 230-19 at 165:11–166:25, 209:4–18 & 231-19 at 165:11–166:25, 209:4–18). JGR then invites the Court to infer that because of this, including the timeline, improvements in its Cup Series results to date in 2026, and aerodynamic coefficients more similar to Toyota teams

than Chevy teams, Spire is threatening or must have improperly acquired JGR's trade secrets. Spire disputes such claims, generally noting that all NASCAR teams are known to conduct [redacted], and there is evidence, although the record is mixed, that Spire first implemented certain [redacted] as early as January of 2025. (Doc. Nos. 275-11 at 213:12–216:25 & 276-6 at 213:12–216:25; see also Doc. Nos. 275-11 at 136–142:24, 178:6–180:24, & 276-6 at 136–142:24, 178:6–180:24). Considering all of this, the Court cannot conclude that JGR has met its burden and made a clear showing of threatened or actual misappropriation particularly where many of the facts are contested and the record is mixed. See RLM Commc'ns, Inc. v. Tuschen, 831 F.3d 190, 202–03 (4th Cir. 2016) (rejecting at the summary judgment stage plaintiff's argument that defendant's "leap in technical capacity" "permit[ted] an inference of misappropriation").

53. JGR also argues in its renewed motion that Spire's forensic examiner determined that the CG Master Document was downloaded to Gabehart's Spire-issued laptop from Gabehart's personal Google Drive account on February 18, 2026, when he first began his employment at Spire. (Doc. No. 275-10 at 3, 6). JGR acknowledges that, to date, copies of the CG Master Document have been found only on Gabehart's Spire-issued laptop or Gabehart's personal laptop. JGR contends that the very existence of the CG Master Document on Gabehart's Spire-issued laptop necessarily demonstrates Spire's improper acquisition of the CG Master Document.

54. Though applying Virginia law and decided at a different stage of litigation, the Court is persuaded by the reasoning in MicroStrategy, Inc. v. Bus. Objects, S.A., 331 F. Supp. 2d 396 (E.D. Va. 2004). In that case, the district court explained that liability for misappropriation of trade secrets does not automatically attach to a new employer solely because its employee took confidential documents from his former employer and placed them on the new employer's laptop.

331 F. Supp. 2d at 425; see also RLM Commc'ns, Inc., 831 F.3d at 203 (finding insufficient evidence of misappropriation where there was no evidence that employee who created CD provided information on CD to new employer); Six Dimensions, Inc. v. Perficient, Inc., 969 F.3d 219, 231–32 (5th Cir. 2020) (explaining that in the absence of precedent, a new employer does not misappropriate proprietary materials solely because an employee continued to possess improperly acquired materials after starting work with the new employer). So too here.

55. Gabehart accessed his personal cloud accounts using his Spire laptop at the beginning of his employment, which resulted in the download of the CG Master Document and Focus Plan documents. The CG Master Document or other files, such as the Focus Plan, were not further distributed, shared with, or accessed by anyone at Spire other than Gabehart.

56. JGR attempts to impute *Gabehart's* actions to *Spire*. (Doc. No. 231-1 at 4, 18). These and other arguments of JGR still rely in a roundabout way on the inevitable disclosure doctrine, even if not explicitly labeled as such.[11] See (Doc. Nos. 230-1 at 4; 231-1 at 4) ("leaves open Gabehart's access that makes further disclosure inevitable.") The Court has already declined an invitation to adopt the inevitable disclosure doctrine and does so again. See Doc. No. 78 at ¶¶ 69–73; see also Se. Anesthesiology Consultants, PLLC, 2018 WL 3304441, at *19.

57. Spire also took proactive steps, including sending Gabehart's computer to its forensic examiner for preservation. (Doc. No. 231-7 at 15, 24). Then, on March 18, 2026, Spire revoked Gabehart's access to Spire's email, Microsoft Teams, Microsoft OneDrive, and SharePoint systems. Id. And on September 23, 2026, Spire voluntarily placed Gabehart on indefinite

[11] The doctrine of inevitable disclosure posits that an employee who has trade secrets of his employer and leaves that employer for a competitor will inevitably use or disclose trade secrets of the first employer in the course of the new employment. See FMC Corp. v. Cyprus Foote Min. Co., 899 F. Supp. 1477, 1482 (W.D.N.C. 1995); Analog Devices, 579 S.E.2d at 455. The adoption of the doctrine has been rejected by North Carolina courts. See Se. Anesthesiology Consultants, PLLC v. Charlotte-Mecklenburg Hosp. Auth., No. 18-CVS-5899, 2018 WL 3304441, at *19 (N.C. Super. Ct. June 22, 2018) (noting that "after nearly twenty-two years[,]" another federal district court's prediction that North Carolina courts would adopt the inevitable disclosure doctrine "has still not come to fruition[.]").

administrative leave. (Doc. No. 317-1 at 10). See Analog Devices, 579 S.E.2d at 471 (affirming trial court denial of injunctive relief and noting, among other things, that defendant's new employer took proactive steps, such as instructing employee not to divulge confidential information belonging to former employer).

58. While the Court understands JGR's desire to protect its information, injunctive relief is an extraordinary remedy, and not relief that is appropriate when many facts and claims are sharply contested. Although the Court has carefully considered the information presented and the arguments, the Court concludes that JGR has not made a clear showing of the likelihood of success on the merits as to its misappropriation claims against Spire.[12] See Salomon & Ludwin, LLC v. Winters, 150 F.4th 268, 278 (4th Cir. 2025) (finding error in a district court's broad injunction against an employees' new firm employer).

**ii. Tortious Interference with Contract**

59. The Court also concludes that JGR has not made a clear showing of the likelihood of success on the merits as to its tortious interference with contract claim against Spire.

60. To establish a claim for tortious interference with contract under North Carolina law, a plaintiff must show: "(1) a valid contract between plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so [defendant] acts without justification; (5) resulting in actual damage to the plaintiff." United Laboratories, Inc. v. Kuykendall, 370 S.E.2d 375, 387 (N.C. 1988) (citing Childress v. Abeles, 84 S.E.2d 176, 181–82 (N.C. 1954)).

---

[12] JGR acknowledges for the purposes of the Motion that its UDTPA claim against Spire is predicated on JGR's misappropriation of trade secrets claim. (See Doc. No. 230-1 at 15 n.7). Because the Court concludes that JGR has not shown a likelihood of success on the merits as to its misappropriation claims against Spire, the Court likewise concludes that JGR has not shown a likelihood of success on the merits as to its UDTPA claim.

61. A complaint alleging tortious interference "must admit of no motive for interference other than malice." Filmar Racing, Inc. v. Stewart, 541 S.E.2d 733, 738 (N.C. Ct. App. 2001) (affirming dismissal of tortious interference with a contract claim); see also Privette v. Univ. of N. Carolina at Chapel Hill, 385 S.E.2d 185, 191 (N.C. Ct. App. 1989) (same); Prometheus Grp. Enters., LLC v. Gibson, No. 22-CVS-14236, 2023 WL 2589284, at *10 (N.C. Super. Ct. Mar. 21, 2023).

62. "Numerous authorities have recognized that competition in business constitutes justifiable interference in another's business relations and is not actionable so long as it is carried on in furtherance of one's own interests and by means that are lawful." Peoples Sec. Life Ins. Co. v. Hooks, 367 S.E.2d 647, 650 (N.C. 1954); see also RLM Commc'ns, Inc., 831 F.3d at 203.

63. If a defendant's interference is for "a legitimate business purpose, his actions are privileged." Hooks, 367 S.E.2d at 650. This privilege is conditional or qualified and will be lost if exercised for a wrong purpose. Id. "[A] wrong purpose exists where an act is done other than as a reasonable and *bona fide* attempt to protect the interest of the defendant." Id. (quoting Smith v. Ford Motor Co., 221 S.E.2d 282, 294 (N.C. 1976) (emphasis in original)). "If the defendant's only motive is a malicious wish to injure the plaintiff, his actions are not justified." Id.

64. "The malice required to overcome a justification of business competition is legal malice, and not actual malice." The Bldg. Ctr., Inc. v. Carter Lumber, Inc., No. 16-CVS-4186, 2016 WL 6142993, at *6 n.1 (N.C. Super. Oct. 21, 2016) (citing Childress, 84 S.E.2d at 182). "Legal malice" "denotes the intentional doing of the harmful act without legal justification." Childress, 84 S.E.2d at 182. "It is not necessary, however, to allege and prove actual malice in the sense of personal hatred, ill will, or spite in order to make out a case [for tortious interference with contract]." Id.

65. For the purposes of the Motion, JGR advances a similar theory as to its tortious interference claim that it did several months ago when initially asking for injunctive relief. Namely, that Spire's

"ongoing inducement of Gabehart's breach of the noncompetition and confidentiality provisions in his JGR Employment Agreement constitutes tortious interference." (Doc. No. 231-1 at 21). The Court remains unpersuaded.

66. On the record before it, the Court declines to award injunctive relief where JGR bears the burden to make a clear showing of likelihood of success on the merits, and the parties hotly contest the nature and extent of the claims and facts.

67. For example, JGR argues that "Spire intentionally and purposefully induced Gabehart's breach by leaving untouched the Cup Series performance bonuses tied to Spire's performance in the Cup Series" (Doc. Nos. 230-1 at 22 & 231-1 at 22), but Spire responds that "all Spire employees, including other executives, are bonused based on Cup Series performance[.]" (Doc. Nos. 273 at 13 & 274 at 13).

68. JGR argues that Spire intentionally and purposefully induced Gabehart's breach by "continuing to invite [Gabehart] to Cup Series competition meetings, and failing to make sufficient efforts to prevent him from providing the same or similar services to Spire" (Doc. Nos. 230-1 at 22 & 231-1 at 22), and Spire responds that "Gabehart attended only a handful of the hundreds of meetings in his capacity as an executive," "did not meaningfully participate in them," and "has not participated in any Cup Series meetings since around May" of 2026. (Doc. Nos. 273 at 13 & 274 at 13).

69. JGR argues that Spire left Gabehart with "unrestricted access to the competition personnel[.]" (Doc. Nos. 230-1 at 23 & 231-1 at 23). Spire counters that it has "taken affirmative actions to restrict Gabehart's access to competition materials and personnel[,]" including by assigning Gabehart to non-Cup Series duties, removing him from meetings, revoking his Spire-issued laptop, revoking his access to Spire's systems, and communicating to Spire personnel about

the Court's PI and the scope of Gabehart's role in a May 5, 2026 email. (Doc. Nos. 273 at 13–14 & 274 at 13–14).

70. JGR also argues that Spire failed to "restrict Gabehart's use of the personal email account and computer" that JGR alleges contain its trade secrets. (Doc. Nos. 230-1 at 23 & 231-1 at 23). Spire contends that it "cannot be enjoined from actions taken by Gabehart with respect to accounts and devices within his sole possession, custody, or control[,]" noting that "JGR has already obtained injunctive relief against Gabehart sufficient to safeguard against such transmission." (Doc. Nos. 273 at 23 & 274 at 23). These disputed issues highlight why injunctive relief is not proper at this time.

71. Moreover, JGR and Spire are competitors, and JGR has still not adequately explained why the conditional privilege no longer applies or shown that Spire was motivated by malice rather than competition. Hooks, 367 S.E.2d at 650; see also RLM Commc'ns, Inc., 831 F.3d at 203. Absent a showing of legal malice, JGR cannot satisfy its burden on the elements of its tortious interference claim.

72. As a result, the Court concludes that JGR has not made a clear showing of the likelihood of success on the merits as to its tortious interference with contract claim.

### C. Irreparable Harm, Balance of Equities, and Public Interest

73. Given that the Court has found JGR has not shown a clear likelihood of success on the merits as it relates to its claims against Spire, the Court is not required to further analyze the remaining Winter factors. See SVB Sec. Holdings, 2022 WL 4369991, at *6 ("Because Plaintiffs failed to demonstrate a likelihood of success on the merits, the Court need not consider the remaining factors.").

### D. Scope of Requested Preliminary Injunction

74. In addition to the Court's analysis in the preceding sections of this Order, the Court also concludes that several aspects of the injunctive relief JGR seeks are both overly broad and insufficiently precise. NovaQuest Cap. Mgmt., L.L.C. v. Bullard, 498 F. Supp. 3d 820, 839 (E.D.N.C. 2020) (finding that aspects of the injunctive relief requested were overly broad and insufficiently precise, including plaintiff's request to impose a requirement to terminate employment with defendant's new employer); see also Salomon, 150 F.4th at 271.

75. JGR asks the Court to enjoin Spire and its employees from "directing, inviting, or permitting [Gabehart's] attendance at or participation in any Spire NASCAR Cup Series activities or services, including NASCAR Cup Series competition team meetings and NASCAR Cup Series race-weekend competition activities;" to "[r]evoke Gabehart's access to Spire NASCAR Cup Series competition materials;" and to prohibit Spire and its employees from "transmitting Spire NASCAR Cup Series work product to or receiving it from Gabehart's personal email account or personal devices[.]" (Doc. No. 231).

76. As discussed with JGR's counsel during the hearing, the Court concludes that it would be problematic to fashion any form of injunctive relief prohibiting Spire from using [redacted] processes at all. JGR claims trade secrets as it relates to "[redacted]" (Doc. Nos. 230-1 at 9, 231-1 at 9).

77. The broad injunctive relief requested by JGR goes beyond maintenance of the status quo, "which is the traditional function of a preliminary injunction." Pierce v. N.C. State Bd. of Elections, 97 F.4th 194, 211 (4th Cir. 2024) (explaining the difference between a preliminary injunction, which "maintains the status quo until after trial and final judgment," and a mandatory

injunction, which alters the status quo and is disfavored absent the most extraordinary circumstances); see also 2311 Racing LLC, 139 F.4th at 408 (same).

78. Further, JGR would have the Court enjoin Spire from allowing Gabehart to access or interact with *Spire* materials, not JGR's information or materials. Such relief goes beyond protecting JGR's interests in injunctive relief and into the impermissible realm of improperly tailored relief.

## IV. CONCLUSION

79. Considering all the evidence, the parties' arguments, and the vigorously contested nature of the issues at the heart of the Motion, the Court concludes that JGR has not made a clear showing that the injunctive relief that remains in place against Gabehart should be extended to Spire.

80. For the reasons set forth above, the Court **DENIES** without prejudice JGR's Renewed Motion for Preliminary Injunction. (Doc. No. 231).[13]

**SO ORDERED.**

Signed: November 25, 2026

Susan C. Rodriguez
United States District Judge

[13] The Court's denial without prejudice should not be interpreted as an invitation to file yet another motion. Rather, given upcoming summary judgment proceedings and trial, injunctive relief remains an available remedy as requested in the Second Amended Complaint, which can be determined at a later stage of the proceeding.